IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ) | |
| THE HUMANE SOCIETY OF THE ) | |
| UNITED STATES, ) | |
| 2100 L Street, N.W. ) | |
| Washington, DC  20039 ) | |
| ) | |
| WILL ANDERSON ) | |
| 2122 8th Avenue North, #201 ) | |
| Seattle, WA 98109 ) | |
| ) | |
| and ) | |
| ) | Civil Action No. 1:05CV01392 |
| SHARON YOUNG ) | |
| 22 Washburn Street ) | |
| Sagamore Beach, MA 02562 ) | |
| Plaintiffs, ) | **AMENDED COMPLAINT** |
| ) | |
| v. ) | |
| ) | |
| DEPARTMENT OF COMMERCE, ) | |
| 14th & Constitution Avenue, N.W. ) | |
| Washington, DC  20230 ) | |
| ) | |
| Carlos M. Gutierrez, ) | |
| Secretary of the United ) | |
|   States Department of Commerce ) | |
| 14th & Constitution Avenue, N.W. ) | |
| Washington, DC  20230 ) | |
| ) | |
| Conrad C. Lautenbacher, Jr., ) | |
| Administrator, National Oceanic ) | |
|   and Atmospheric Administration ) | |
| 14th & Constitution Avenue, N.W. ) | |
| Washington, DC  20230 ) | |
| ) | |
| William T. Hogarth, ) | |
| Assistant Administrator, National ) | |
|   Marine Fisheries Service ) | |
| 1315 East-West Highway ) | |
| Silver Spring, MD  20910 ) | |

and

NATIONAL MARINE FISHERIES
SERVICE,
1315 East-West Highway
Silver Spring, MD  20910

Defendants.

1.    Plaintiffs, The Humane Society of the United States ("HSUS"), Mr. Will

Anderson, and Ms. Sharon Young, bring this action to challenge the issuance by the Secretary

of Commerce ("Secretary"), via the National Marine Fisheries Service ("NMFS"), of multiple

scientific research permits authorizing intrusive research activities involving, and the associated

killing of, endangered and threatened Steller sea lions.  The government has approved research

activities that will result in Steller sea lion mortality that exceeds the very threshold established

by Congress in determining whether a given impact to an endangered or threatened marine

mammal species could have irreversible effects (namely, the Potential Biological Removal

Level or "PBR Level").  In other words, the Secretary has approved activities that, by

definition, could have a significant, irreversible impact on the ability of this protected species

to survive.

2.    The government has also approved these questionable research activities

without the required environmental review.  By law, when a federal agency undertakes actions

that could result in a significant impact to the environment (here, the Steller sea lion species),

it must prepare an Environmental Impact Statement ("EIS") evaluating the impacts of its

proposed action.  In this case, the government has conceded that it, too, is concerned by the

2

research activities on the Steller sea lions and has expressed its plan to prepare an EIS that will evaluate the impacts to the species resulting from research and other activities that threaten the sea lions' existence. The government's expression of concern, however, is too little, too late. An EIS was mandated by law in connection with the proposed action *before NMFS took final action, not after the action when the impacts giving rise to the EIS will have already occurred.*

    3.  The government has no legal basis for taking a "kill first, study later" approach, particularly where, as here, the species suffering the impact is protected by law precisely because any further decline in its number could result in its extinction. In short, the Secretary has violated the law by issuing multiple research permits to a wide variety of entities that allow intrusive, duplicative, uncoordinated, and unnecessary research on Steller sea lions – marine mammals protected by the Marine Mammal Protection Act and the Endangered Species Act because of their rapidly declining populations. By (i) issuing scientific research permits allowing so many incidental mortalities that the research actually threatens the survival of this species, (ii) failing to conduct an adequate cumulative effects analysis of the effects of its proposed action, (iii) ignoring the cumulative effects of the authorized research activities in the Final Environmental Assessment ("EA"), (iv) failing to adequately evaluate alternative actions; (v) issuing a legally indefensible Biological Opinion ("BO"), (vi) failing to prepare an EIS before issuing the permits, (vii) refusing to suspend the effectiveness of the research permits prior to the completion and issuance of an EIS, and (viii) failing to comply with its own regulations implementing the Endangered Species Act, the Secretary has violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq., the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1374, et seq., the Endangered Species Act

3

("ESA"), 16 U.S.C § 1531, et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, et seq.

## Jurisdiction and Venue

4.    The Court has jurisdiction to hear this matter pursuant to 29 U.S.C. § 1331 relating to its original jurisdiction to hear civil actions arising under the Constitution, laws or treaties of the United States.

5.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and 16 U.S.C. § 1374(d)(6).

## Parties

6.    Plaintiff, The Humane Society of the United States ("HSUS"), is a non-profit organization headquartered in Washington, D.C.  The HSUS is the largest animal protection organization in the United States, with over nine million members and constituents, 178,647 of whom reside in the State of Washington and 14,813 of whom reside in the State of Alaska.  The HSUS is committed to the goals of protecting, conserving, and enhancing the nation's wildlife and wildlands, and fostering the humane treatment of all animals.  In furtherance of its goals and objectives, HSUS and its members have demonstrated a strong interest in the preservation, enhancement, and humane treatment of marine mammals.

7.    In recent years, HSUS has invested considerable organizational resources in the protection of Steller sea lions.  In addition to participating in numerous comment periods concerning the issuance of scientific research permits, HSUS has also regularly submitted comments on proposed revisions of the Steller sea lion stock assessments and has engaged in public education and advocacy on behalf of the species.

4

8.      HSUS's ability to protect Steller sea lions, and to participate in administrative processes, education, and outreach on Steller sea lion matters, has been and continues to be injured by Defendants' failure to comply with the MMPA, NEPA, ESA and APA because, by violating these statutes and their implementing regulations, the Defendants are threatening the very existence of the species.

9.      HSUS brings this action on its own organizational behalf and also on behalf of its members, who regularly have engaged in and will continue to engage in educational, recreational, and scientific activities in areas of Steller sea lion habitat and who enjoy observing Steller sea lions in this area of the country.  These members' interests in observing, studying, and appreciating Steller sea lions are injured by Defendants' failure to comply with the MMPA, NEPA, ESA and APA because, by violating these statutes and their implementing regulations, the Defendants are creating a threat to the sea lion population in the area and hastening the extinction of the species.

10.     Plaintiff, Will Anderson, resides in Seattle, Washington, in King County.  For years, Mr. Anderson has been heavily involved in marine mammal issues.  For example, from 2001-2003, Mr. Anderson was employed by the Earth Island Institute's Orca Recovery Campaign, which was dedicated to the protection and recovery of the orca population in Northwestern Washington.  Mr. Anderson continues to do related projects on a volunteer basis for Earth Island Institute.  Additionally, from 1994-2000, Mr. Anderson worked for the Progressive Animal Welfare Society ("PAWS") in Lynnwood, Washington, where he was responsible for alerting the public to the Makah Tribe's intention to resume its

5

gray whale hunt. Mr. Anderson also served as a member of the Ballard Locks Pinniped-Fishery Interaction Task Force.

11.     Mr. Anderson has been observing Steller sea lions in their natural habitat for nearly 40 years. During this time, he has observed Steller sea lions in a variety of coastal locations throughout Oregon, Washington, and Alaska. Since Mr. Anderson moved to Seattle, Washington in the mid-1990s, he has continued to observe Steller sea lions, including those off the coast of Northwest Washington. Mr. Anderson derives great enjoyment and satisfaction from viewing Steller sea lions in their natural habitat and has developed a unique and personal interest in ensuring the protection and recovery of this species. Mr. Anderson regularly seeks out opportunities to observe Steller sea lions in their natural habitat and intends to continue to do so in the very near future. In particular, Mr. Anderson plans to travel to the coast of Washington and Oregon sometime this summer or early fall in order to try and observe Steller sea lions, potentially including a visit to the Sea Lion Caves near Florence, Oregon.

12.     Mr. Anderson's interests in observing and studying Steller sea lions are harmed by NMFS's decision to authorize research permits and amendments without properly taking into account the direct and cumulative effects of the permitted activities may have on an already endangered and threatened stock. Mr. Anderson believes that Defendants' actions may reduce the already depleted number of Steller sea lions that he is able to observe, and that he may observe injury to or the suffering of Steller sea lions, who will be disturbed, harassed, injured or killed as a consequence of the activities authorized under the NMFS-approved permits.

13.    The interests of Mr. Anderson in observing Steller sea lions free from harm, in protecting his own interest in viewing them in their natural habitat, in doing his part to halt the further decline of the species, and in preventing unnecessary pain and suffering of Steller sea lions, are harmed by NMFS's authorization of the scientific research permits and applicable amendments. Mr. Anderson is concerned that the permitted widespread, invasive research may cause an unacceptable level of mortality, pain, and suffering to these threatened and endangered species. By authorizing research permits and permit amendments – without adequately considering alternatives or the direct and cumulative impacts of the permitted activities – NMFS has deprived Mr. Anderson of his procedural right under NEPA to receive adequate information concerning the environmental impacts of the agencies' decision to authorize the research permits and related amendments.

14.    Plaintiff, Sharon Young, resides in Sagamore Beach, Massachusetts, in Barnstable County. For many years, Ms. Young has been actively involved in studying and observing marine mammals, conducting field research, and engaging in advocacy concerning conservation issues. For example, Ms. Young was employed as a naturalist on whale watch vessels in the 1980s and studied marine mammals in the U.S. and Canada in the 1980s and 1990s in association with research organizations such as the Mingan Islands Cetacean Study and Plymouth Marine Mammal Research Center. She has also been employed by marine mammal advocacy organizations such as the International Wildlife Coalition and The Humane Society of the United States since the 1990s.

15.    Ms. Young regularly attends and presents research at the Society for Marine Mammalogist's biennial conferences. In addition to her research on cetacean feeding

and foraging behavior and on the conservation status of marine mammals, she has published

papers on pinniped conservation issues including *Killing Pinnipeds to Save Fish–Science or

Sophistry?*, which was published as part of a workshop convened by the American Fisheries

Society. Ms. Young is also an appointed member of the Atlantic Scientific Review Group, a

Congressionally mandated body which reviews and comments on stock assessments and

research programs of the National Marine Fisheries Service relating to marine mammals. She

has also attended meetings of the Alaska Scientific Review Group and the Pacific Scientific

Review Group at which stock assessments for Steller sea lions are discussed.

      16.    Ms. Young also has an active avocational interest in observing wildlife

in its natural habitat. She has been an active birder for decades and makes a point of observing

local flora and fauna whenever she travels, with a particular interest in rare or unique species.

She has observed Steller sea lions in their natural habitat since 1985, when she attended the

biennial Conference of the Society of Marine Mammalogists. While attending the conference,

she toured the coastal areas around Vancouver, Canada for the express purpose of seeing

Steller sea lions, a species she had not seen before. She well remembers the thrill of scanning

rocky habitats looking for the particular pelage color, size, and facial shape that would

distinguish Steller sea lions from California sea lions. Subsequent to that time she has made a

point to look for them whenever she attends meetings on the west coast and has observed them

approximately once each year while attending meetings in California, Washington, British

Columbia, and Alaska. Because other species of sea lions are often more abundant, she is

always delighted when she spots the less-frequently sighted Steller sea lions. She thoroughly

enjoys observing their behaviors while hauled out and listening to their calls. Ms. Young

intends to continue to seek out Steller sea lions in their natural habitat in the future as she attends west coast meetings and vacations along the west coast. The 2005 Marine Mammal Commission annual meeting will be held in Alaska in October, and Ms. Young plans to attend and observe Alaska wildlife in this locale as well, including, she hopes, Steller sea lions.

17.    Ms. Young's interests in observing and conserving Steller sea lions are harmed by NMFS's decision to authorize research permits and amendments without properly taking into account the individual and cumulative effects of the permitted activities on an already endangered or threatened stock. Ms. Young believes, based on her knowledge and years of study of sea lions, that the defendant's actions are likely to reduce this depleted stock, which is already somewhat difficult to observe in the wild. Furthermore, knowing of the procedures to which individuals will be subjected, Ms. Young is distressed at the thought that animals that she will observe may have suffered injuries and pain, will have been disturbed and harassed, or may die as a result of activities allowed under the NMFS-approved permits.

18.    The interests of Ms. Young in observing Steller sea lions free from harm, in protecting her own interest in viewing them in their natural habitat, in doing her part to halt the further decline of the species, and in preventing unnecessary pain and suffering of Steller sea lions, are harmed by NMFS's authorization of the scientific research permits and applicable amendments. Ms. Young is concerned that the permitted, widespread invasive research may cause an unacceptable level of mortality, pain, and suffering to these threatened and endangered species. By authorizing research permits and permit amendments – without adequately considering alternatives or the direct and cumulative impacts of the permitted activities – NMFS has deprived Ms. Young of her procedural right under NEPA to receive

9

adequate information concerning the environmental impacts of the agencies' decision to authorize the research permits and related amendments.

19.    Defendant, the U.S. Department of Commerce, is a federal agency organized and existing pursuant to the Department of Commerce and Labor Act, codified at 15 U.S.C. § 1501 *et seq.*, and is responsible for, among other things, regulating marine resources and fisheries through the National Marine Fisheries Service ("NMFS").

20.    Defendant, Carlos M. Gutierrez, is the Secretary of the United States Department of Commerce. The National Oceanic and Atmospheric Administration ("NOAA") and NMFS are part of the Department of Commerce. The office of the Secretary of the Department of Commerce is located at 14th & Constitution Avenue, N.W., in the District of Columbia. By this Complaint, the Secretary is sued in his capacity as the Secretary of the Department of Commerce.

21.    Defendant, Conrad C. Lautenbacher, Jr., is the Administrator of NOAA, the parent agency of NMFS. The office of the Administrator of NOAA is located at 14th & Constitution Avenue, N.W., in the District of Columbia. By this Complaint, the Administrator is sued in his capacity as the Administrator of NOAA.

22.    Defendant, William T. Hogarth, is the Assistant Administrator for Fisheries at NMFS and signed the permits at issue in this case. The office of the Assistant Administrator for Fisheries is located at 1315 East-West Highway, Silver Spring, Maryland. By this Complaint, the Assistant Administrator is sued in his capacity as the Assistant Administrator for Fisheries at NMFS.

23.    Defendant, the National Marine Fisheries Service, is the federal agency charged with administration of the MMPA, including the issuance of scientific research permits for marine mammals.

24.    Collectively, those Defendants named in paragraphs 19-23 above shall be herein referred to as "Defendants" or "NMFS".

## RELEVANT STATUTES AND FACTS GIVING RISE TO PLAINTIFFS' CLAIMS FOR RELIEF

## I.  The Statutory and Regulatory Scheme

### A.    The Marine Mammal Protection Act and Implementing Regulations

25.    The MMPA represents Congress' most expansive explication of the nation's commitment to the "protection and conservation" of Steller sea lions and other marine mammals. 16 U.S.C. § 1361(5). Its primary purpose is to remedy "man's . . . malign, neglect, and virtual genocide" of marine mammals and to promote "solicitous and decent treatment" of marine mammals that "have been shot, blown up, clubbed to death, run down by boats, poisoned, and exposed to a multitude of other indignities, all in the interest of profit or recreation." H.R. Rep. No. 92-707 (1971).

26.    The MMPA's primary objective is to prevent marine mammals such as Steller sea lions from extinction caused by man's activities. 16 U.S.C. § 1361(2). Consistent with this objective, the MMPA states that marine mammal populations "should not be permitted to diminish below their optimum sustainable population." 16 U.S.C. § 1361.

27.    "Optimum sustainable population" means the number of animals which will result in the maximum productivity of the population or the species, keeping in mind the

11

carrying capacity of the habitat and the health of the ecosystem of which they form a constituent element. 16 U.S.C. § 1362(9).

28.    To keep track of declining populations of marine mammals, particularly those like Steller sea lions that are negatively affected by commercial fisheries, the MMPA requires the Secretary of Commerce to develop stock assessments for marine mammals. Stock assessments provide minimum population estimates, evaluate the number of human-caused mortalities, and estimate levels of population decline that will affect the recovery of the species. 16 U.S.C. § 1386. Most importantly, the stock assessment includes the Potential Biological Removal Level ("PBR Level") for the species. The PBR Level is the maximum number of animals that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population. 16 U.S.C. § 1362(20).

29.    Because Steller sea lions are protected by the Endangered Species Act, the Secretary also must develop a plan that assists in the recovery of the Steller sea lion population, including a plan to reduce "takes" of sea lions below the PBR Level. 16 U.S.C. § 1387(f). A "take" means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(13).

30.    The centerpiece of the MMPA's protection efforts is a strict moratorium on the taking and importation of all marine mammals and marine mammal products. 16 U.S.C. § 1371(a).    Recognizing that takings for research purposes may be warranted under very controlled circumstances, Congress established in Section 104 of the MMPA a framework under which all such takings must be evaluated before they are authorized. 16 U.S.C. § 1374.

Any taking must be approved by the Secretary of Commerce and be consistent with the statute's goal of protecting marine mammals.  16 U.S.C. § 1374(a).

31.    To eliminate the opportunity for abuse by private parties who seek to take marine mammals for research purposes, the MMPA provides that a permit may be issued "for scientific research purposes to an applicant which submits with its permit application information indicating that the taking is required to further a *bona fide* scientific purpose."  16 U.S.C. § 1374(c)(3)(A).

32.    In order to protect endangered or threatened marine mammals, the MMPA further mandates that "the Secretary shall not issue a permit for research which involves the lethal taking of a marine mammal from a species or stock that is depleted, unless the Secretary determines that the results of such research will directly benefit that species or stock, or that such research fulfills a critically important research need."  16 U.S.C. § 1374(c)(3)(B).

33.    In addition to the MMPA itself, the permit process is guided by Defendants' regulations implementing the MMPA.  These regulations require, among other provisions, that (1) the research furthers a *bona fide* scientific purpose under 50 C.F.R. § 216.41; (2) the research is humane and does not present any unnecessary risks to the health and welfare of marine mammals under 50 C.F.R. § 216.34; and (3) the research permits as a whole will not have an adverse impact to the species under 50 C.F.R. § 216.34.

34.    As a further safeguard on the permitting process, NMFS is required to submit permit applications to the Marine Mammal Commission ("MMC") for review and comment prior to approval.  In enacting the MMPA, Congress recognized that those federal

agencies charged with primary regulatory responsibility for marine mammal programs often had potentially conflicting missions and had, in some instances, failed to prevent the overharvesting and endangerment of stocks. Thus, the MMC was created to provide independent oversight of the marine mammal conservation policies and programs being carried out by the federal regulatory agencies. After receiving a copy from NMFS of permit applications for scientific research on marine mammals, the MMC has forty-five days in which to raise any objections to the issuance of scientific research permits. 50 C.F.R. § 216.33(d)(2).

35.    The MMPA further requires that treatment of animals subjected to research be humane. Under the MMPA, "humane" is defined as "that method of taking which involves the least possible degree of pain and suffering practicable to the mammal involved." 16 U.S.C. § 1362. To ensure humane treatment, MMPA regulations require that when a live animal is held captive or transported, "the applicant's qualifications, facilities, and resources are adequate for the proper care and maintenance of the marine mammal." 50 C.F.R. § 216.34(a)(6).

**B.    The Endangered Species Act and Defendants' Implementing Regulations**

36.    Recognizing that certain species of plants and animals "have been so depleted in numbers that they are in danger of or threatened with extinction," 16 U.S.C. § 1531(a)(2), Congress enacted the ESA with the express purpose of providing both "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

14

37.    The ESA protects plant and animal species which are listed as "endangered" or "threatened." A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" if the species is likely to become endangered within the foreseeable future. 16 U.S.C. § 1532(20). Once listed as endangered or threatened, an animal receives a number of critical and mandatory protections under the Act. The Stellar sea lion was listed as "threatened" under the ESA in 1990. 55 Fed. Reg. 12645 (April 5, 1990). In 1997, NMFS reclassified the western population as "endangered." 62 Fed. Reg. 24345 (May 5, 1997). The eastern population remains classified as "threatened."

38.    Under Section 7 of the ESA, when a federal agency undertakes or permits actions that may affect a listed species, such as the issuance of scientific research permits, the agency must consult with the Secretary to insure that its activities are "not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). Section 7 requires the Secretary to issue a Biological Opinion ("BiOp") which sets forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. 16 U.S.C. § 1536(b)(3)(A).

39.    When preparing a BiOp, the agency must (1) review all relevant information, (2) evaluate the current status of the listed species, (3) and evaluate the effects of the action and cumulative effects on the listed species. 50 C.F.R. § 402.14(g)(3).

40.    The regulations governing the consultation process define "cumulative effects" as "those effects of future State or private activities, not involving Federal activities,

that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02.

41. Defendants also must consider the cumulative impacts on the species or stocks and habitat as a result of the proposed activity in determining whether to issue a scientific research permit. 50 C.F.R. § 222.307(c)(1)(ii).

42. The ESA provides that the Secretary of Commerce may permit "any act otherwise prohibited by [ESA] for scientific purposes or to enhance the propagation or survival of the affected species…" 16 U.S.C. 1539(a)(1)(A).

43. Defendants' regulations governing the issuance of scientific research permits implement both MMPA and ESA requirements. See paragraphs 25-35 above (MMPA); see 50 C.F.R. Part 222 (ESA). Defendants are required to satisfy *all* applicable sections of the ESA and MMPA regulations. 50 C.F.R. § 222.301.

44. Defendants' regulations implementing the ESA require Defendants to specifically consider the following when issuing scientific research permits: (1) whether the permit, if granted and exercised, will not operate to the disadvantage of the endangered species; (2) whether the permit would be consistent with the purposes and policy of the ESA; (3) the status of the Steller sea lion population and the effect of the proposed action on the population, both direct and indirect; (4) whether alternative non-endangered species or population stocks can and should be used; (5) how the applicant's needs, program, and facilities compare and relate to proposed and ongoing projects and programs; and (6) opinions or views of scientists or other persons or organizations knowledgeable about the species which is the subject of the application or of other matters germane to the application. 50 C.F.R. § 222.308(c).

**C.    The National Environmental Policy Act and Implementing Regulations**

45.    The National Environmental Policy Act ("NEPA") is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1. NEPA requires all agencies of the federal government to prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). NEPA's broad procedural scope is intended to ensure that federal agencies engage in accurate and high quality scientific analysis before any decisions affecting the environment are made. 40 C.F.R. § 1500.1.

46.    The Council on Environmental Quality ("CEQ") – an agency within the Executive Office of the President – has promulgated regulations implementing NEPA that are "binding on all Federal agencies." 40 C.F.R. § 1500.3. These regulations are binding on NOAA and NMFS.

47.    NOAA also has issued its own NEPA procedures with which NOAA and NMFS must comply. *See Environmental Review Procedures for Implementing the National Environmental Policy Act*, NOAA Administrative Order 216-6, May 20, 1999.

48.    Under NEPA, an agency is required to first prepare an Environmental Assessment ("EA") to determine whether the agency should prepare an Environmental Impact Statement ("EIS") or a "finding of no significant impact" ("FONSI"). 40 C.F.R. § 1508.13.

49.    As part of its analysis, an agency must "study, develop, and describe appropriate alternatives to recommended courses of action," 42 U.S.C. § 4332(2)(E), and discuss alternatives it has considered. *See* 40 C.F.R. § 1508.9. Alternatives are considered the "heart of the NEPA process" in that the public and decision makers are informed of the

17

options and likely consequences of a proposed action to meet a particular purpose and need. 40 C.F.R. § 1502.14.

      50.    If an agency determines on the basis of its EA that an EIS is not required because its action will not have a significant impact on the environment, the agency will then issue a FONSI.  40 C.F.R. § 1501.4.  However, federal agencies *must* prepare an EIS for every major federal action that could significantly affect the environment.

      51.    To determine whether an agency action is "significant" under NEPA, requiring preparation of an EIS, an agency must consider both the context and intensity of the proposed action. 40 C.F.R. § 1508.27.

      52.    In evaluating the impacts of a proposed action, the agency must consider "the degree to which the action is related to other actions with . . . cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7).  Such cumulative impacts include "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) undertakes such other actions." 40 C.F.R. § 1508.7.  The regulations further describe cumulative impacts to include "individually minor but collectively significant actions taking place over a period of time." *Id.*

      53.    When preparing an EIS, NEPA mandates that "agencies shall not commit resources prejudicing selection of alternatives before making a final decision." 40 C.F.R. § 1506.2.

## II.    Facts

### A.    Introduction

54.    Steller sea lions (*Eumetopias jubatus*) are members of the sub-order pinnipedia, which means "winged foot." The name "sea lion" originated because early explorers believed that the heavy ruff of fur around the male's neck resembled the mane of a lion. Their large eyes help them see in the dim light that filters through the rich, cold ocean water in which they live. They are able to hold their breath and dive to depths of over 1,000 feet.

55.    Female Steller sea lions can live as long as 30 years. The males, which are larger and can weigh over half a ton, generally do not live as long. Males vigorously compete for territory along the rocky coast and maintain a harem that consists of all the females in their territory. Pups are born in the late spring and early summer, weighing approximately 35-50 pounds at birth. The female fasts for the first nine days of her pup's life, nursing and protecting her pup. After that time, she begins a cycle alternating one to three days at sea feeding, followed by one to two days of nursing her pup on land. Pups remain with their mother for up to a year, and females are able to give birth to a single pup each year.

56.    Steller sea lions are divided into two populations, or stocks, and both stocks are protected under the ESA and the MMPA. The western stock, located in the Gulf of Alaska and the Bering Sea/Aleutian Islands, declined by 82% between 1960 and 1990. In 1997, the western stock was listed as endangered under the ESA. The eastern stock, found throughout the northern Pacific basin and the coasts of Washington, Oregon, and California, was listed as threatened under the ESA in 1990.

57.    The cause of the rapid decline of the western stock of Steller sea lions is unknown at this time.  Over the past 30 years, studies have observed that the body mass of the sea lions has shrunk significantly, potentially due to the inability of the sea lions to obtain enough nutrients.  The lack of adequate nutrition leads to reproductive failure among female sea lions, higher mortality of pups and juveniles, and behavioral modifications.  The prevailing theory explaining the rapid decline of the species is that commercial fisheries are competing with Steller sea lions for the types of fish the sea lions historically have eaten.

58.    Because scientists do not know why the endangered Steller sea lion population is plummeting, research has been and is being performed to study the cause(s) of decline and formulate a plan to restore the population to a sustainable level.  However, because Steller sea lions are protected under the MMPA and ESA, permits for scientific research cannot be issued unless and until the permitting agency can demonstrate that the effects of the research will not harm the animals in any way or cause or contribute to the very decline it is intended to prevent.

**B.    Steller Sea Lion Research**

59.    Research has been conducted on Steller sea lions since a sharp population decline was identified in the late 1980s.  Research funding for federal agencies during the 1990s was less than $1 million annually, with half of this money dedicated to the monitoring of populations, i.e., non-intrusive research.  During the late 1990s, research efforts were intensified as public attention grew increasingly more focused on the ongoing decline and possible impacts by commercial fisheries in Alaskan waters.  In 2001 and 2002, Congress appropriated approximately $80 million for Steller sea lion research.  This Congressional

20

appropriation created the largest research effort on a single species in the history of the United States.

60.    In response to this flood of funding, multiple research entities applied in both 2001 and, more recently, April 2005 for permits or permit amendments to take Steller sea lions during scientific activities.  After the $80 million appropriations in 2001, five new research entities applied for permits and the two original permit holders requested major modifications to their permits.  In 2005, a total of nine entities representing government agencies, universities, and private research institutions have applied for permits or major amendments to existing permits.

61.    NMFS is the federal agency charged with the issuance of scientific research permits for research on marine mammals.  On April 4, 2005, NMFS published notice of its receipt of permit applications and its issuance of a Draft EA evaluating NMFS's proposed issuance of the permits.  70 Fed. Reg. 17,072 (Apr. 4, 2005).  Four of the 2005 applications were for new five-year permits, while five applications were for "major amendments" to existing permits, extending many of the authorized takes through 2009.[1]  The proposed scientific research spans the entire population of Steller sea lions.

---

[1]    New permit applications were received from the North Pacific Universities Marine Mammal Research Consortium, University of British Columbia, Vancouver, British Columbia (File No. 715-1784); Dr. Markus Horning, Texas A&M University, Galveston, TX (File No 1034-1773); the National Marine Mammal Laboratory, Alaska Fisheries Science Center, Seattle, WA (File No 782-1768); and Alaska Department of Fish and Game, Anchorage, AK (File No. 358-1769).  Applications for major amendments to existing permits were received from the Alaska SeaLife Center, Seward, AK (Permit No. 881-1668); Aleutians East Borough, Juneau, AK (Permit No. 1010-1641); Oregon Department of Fish and Wildlife, Corvallis, OR (Permit No. 434-1669); and Dr. Randall Davis, Texas A&M University, Galveston, TX (Permit No. 800-1664).  Additionally, the National Marine Mammal Laboratory had submitted an earlier request for a permit amendment (Permit No. 782-1708).  The Draft Environmental Assessment discusses this amendment request in addition to those listed in the Federal Register Notice.

62.    NMFS prepared a Draft EA for the scientific research permits at issue in this matter and concluded that an EIS was not necessary.  Yet NMFS failed to evaluate the cumulative effects of the issuance of a multitude of permits that authorized a significant increase in the amount of take, over a longer period of time, and ignored the fact that its proposed action would result in Steller sea lion mortality exceeding the very threshold that NMFS has established in determining whether a given impact to an endangered or threatened species could have irreversible effects – the PBR Level.  *See* U.S. National Oceanic and Atmospheric Administration & National Marine Fisheries Service, *Draft Environmental Assessment of the Effects of Permit Issuance for Research and Recovery Activities on Steller Sea Lions* (issued on or around April 4, 2005) (hereinafter "Draft EA").

63.    A number of commenters, including HSUS, strongly protested the issuance of these permits, stating concerns about unnecessary, duplicative, inhumane and uncoordinated research, and stressing the scientific and legal importance of performing an EIS for this magnitude of research activities.

64.    Before approving the scientific research permits, NMFS is required to consult with the MMC, an independent agency created to provide impartial oversight of marine mammal conservation policies and programs implemented by federal regulatory agencies.  The MMC received copies of the permit applications on April 22, 2005.  *See Letter from David Cottingham, Executive Director, Marine Mammal Commission to Steven Leathery, Chief, Permits Division, National Marine Fisheries Service* (May 19, 2005) (hereinafter "MMC Preliminary Comments").  The MMC submitted its preliminary comments on May 19, 2005, 17 days short of the required 45-day comment period, stating that its comments were submitted

22

in response to NMFS's request for an expedited review due to a pressing need to issue the

permits. See *MMC Preliminary Comments.* The preliminary comments protested the issuance

of the permits and contended that an EIS was required. *Id.* The MMC further requested that

NMFS delay its final decision until the MMC submitted its formal comments within its allotted

45-day comment period. *Id.*

       65.    Without waiting for the MMC's official comments, NMFS rushed to

issue the permits. It completed its internal ESA Section 7 consultation and issued its ESA

Section 7 BiOp and EA on or about May 24, 2005.

       66.    The BiOp did not evaluate the cumulative effects of other agency actions

nor Defendants' own actions of issuing permits that authorized mortalities in excess of the PBR

Level for the western endangered stock of Steller sea lions. *See* Memo from Laurie Allen,

Director, Office of Protected Resources, *Biological Opinion on Proposed Marine Mammal*

*Permits Which Would Authorize Various Research Activities on Steller Sea Lions* (issued on or

about May 24, 2005) (hereinafter "BiOp").

       67.    The EA also did not evaluate the impact of an exceedance of the PBR

Level in its analysis of the cumulative effects, nor did it evaluate reasonable alternatives to

issuance of the permits as submitted. *See* U.S. National Oceanic and Atmospheric

Administration & National Marine Fisheries Service, *Environmental Assessment of the Effects*

*of Permit Issuance for Research and Recovery Activities on Steller Sea Lions* (April 2005)

(hereinafter "EA").

       68.    Disregarding the MMC recommendations, NMFS issued a Finding of No

Significant Impact ("FONSI") on or about May 24, 2005.

23

69.    NMFS approved the first research permit on or about May 27, 2005.

70.    The MMC submitted its formal comments on June 10, 2005, again reiterating that NMFS should perform an EIS. *See Letter from David Cottingham, Executive Director, Marine Mammal Commission to Steven Leathery, Chief, Permits Division, National Marine Fisheries Service* (June 10, 2005) (hereinafter "MMC Comments").

71.    NMFS issued additional permits on or about June 16, 2005. 70 Fed. Reg. 35,065 (June 16, 2005).[2]

72.    After issuing the permits, NMFS conceded that it has concerns over the scope of research performed on Steller sea lions and decided to prepare an EIS on the effects of the research. Letter from William T. Hogarth to David J. Hayes, June 27, 2005. Despite this concession, NMFS did not suspend the permits and the research has moved forward.

73.    Research currently is underway in the Gulf of Alaska, including many of the intrusive and inhumane activities described in this Complaint.

**C.    Authorized Research Activities Will Contribute to the Decline of Steller Sea Lions**

74.    The levels of research activity allowed by the recently authorized permits will contribute to the very decline of the species to be studied. The permitted research activities are extraordinarily inhumane and intrusive. If the activities are not stopped, the research activities will kill sea lions in numbers that will exceed the PBR for this species, i.e.,

---

[2]    Permit applications for the National Marine Mammal Laboratory, Alaska Fisheries Science Center; Alaska Dept. of Fish and Game; North Pacific University Marine Mammal Research Consortium, University of British Columbia; Oregon Department of Fish and Wildlife; Aleutians East Borough; and Alaska Sea Life Center, Seward, Alaska have been granted by NMFS. To the best of our knowledge, the applications for Dr. Marcus Horning, Texas A&M University, (File No. 1034-1773) and Dr. Davis, Texas A&M University (Permit No. 800-1664) are still outstanding.

the number above which the impact to the species is *per se* significant and potentially irreversible.

**1.    NMFS Failed To Analyze the Cumulative Effects of its Actions, Including the Total Incidental Mortalities Authorized By the Permits, Which Will Exceed the PBR Level.**

75.    In preparing the BiOp and the EA, which address the issuance of the research permits, NMFS disregarded cumulative effects and ignored the fact that the total incidental lethal takes authorized by the current permits exceeds the PBR Level for the endangered western stock. This ironic and catastrophic consequence of the increased magnitude of research activities must be analyzed by NMFS, yet nowhere in its BiOp or EA does NMFS address the cumulative impact of allowing this level of lethal take.

**a.    *The PBR Level Will Be Exceeded By the Incidental Lethal Takes Allowed By the Research Permits.***

76.    The PBR Level, as defined by the MMPA, is the maximum number of animals that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population – the main objective of the MMPA. Killing animals above this level will thus accelerate the decline of a sustainable population and vitiate the purpose of the MMPA.

77.    For the endangered western stock, the lethal takes allowed by the research frustrate the very purpose of the research in the first place – i.e., to conserve the species by maintaining the optimum sustainable population. According to NMFS's most recent final stock assessment for the endangered western stock of Steller sea lions, a minimum of 176 deaths are caused each year by subsistence hunting by Alaska Natives. Commercial fisheries

25

cause a minimum of 31.5 deaths each year.  Over 85 Steller sea lion deaths may occur as a result of the authorized scientific research *per year*, including 17 sea lions per year from the endangered western stock.  The incidental mortalities permitted by the research, when added to the minimum numbers of other authorized lethal takes, actually *exceeds* the PBR Level of 209 for the western stock. *Alaska Marine Mammal Stock Assessments*, 2003, NOAA Tech. Memo. NMFS AFSC-144 (August 2004).

78.    Moreover, lethal takes that will occur as a result of the research activities are likely to be under-reported, if reported at all, as NMFS and the MMC both recognize. NMFS has admitted that "the number of observed and reported mortalities may or may not represent the number of actual mortalities" due to mortalities resulting from stampedes or capture-related myopathy caused by the research activities.  *EA* at 42. The MMC warns that the number of direct, known deaths, including the killing of up to 292 animals over the duration of the research (in both the western and eastern stock), is dangerously high; in conjunction with the deaths that will not be counted due to inadequate monitoring protocols, the actual number of animals killed will be considerably higher.  *MMC Comments* at 2.

79.    Although NMFS requires, as a condition of the permits, that permits be modified and, if necessary, research suspended when 10 endangered sea lions are documented to have been killed, this permit condition still does not prevent an exceedance of the PBR Level.

80.    Regardless of whether the PBR Level is exceeded by one animal or hundreds of animals, the exceedance of the PBR Level, by definition, causes a direct impact on the survival of the endangered species.  NMFS is allowing research permittees to kill so many

Stellar sea lions that they will cause, in conjunction with other forms of authorized killings, the decline of the very animals the research seeks to help conserve.

81.    Moreover, the PBR Level establishes a bright line threshold of significance under NEPA – and thus triggers the need to prepare an EIS – because the PBR Level is used to calculate the optimum sustainable population in fulfillment of the MMPA's purpose. Exceeding this level goes to the very heart of the MMPA, as the PBR Level's primary purpose is to act as a safeguard for marine mammals nearing extinction.

82.    Neither the EA nor the BiOp address the exceedance of the PBR Level as a result of the cumulative effects of the permitted incidental killing. The law governing the issuance of scientific research permits provides two safeguards that require agencies to evaluate the cumulative effects of their actions: (1) in the BiOp issued as part of the ESA Section 7 consultation process, and (2) in the NEPA document. A federal agency must evaluate the cumulative effects of not only its *own* actions, but also those of other federal, State, tribal, local and private actors. NMFS wholly failed to analyze the cumulative effects of issuing the research permits in both of these documents.

b.    *The BiOp Fails to Analyze Cumulative Effects.*

83.    While NMFS is required to analyze cumulative effects in its BiOp, the BiOp simply states that "*cumulative effects have not been considered in this biological opinion.*" *BiOp* at 66-67.

84.    Based on the *prima facie* language of the BiOp, there is absolutely no evidence that NMFS endeavored to look into any State, tribal, local or private actions that were reasonably certain to take place, as required under the ESA. *BiOp* at 66-67. Most

importantly, NMFS failed to look at the cumulative effects of its own actions.  There is no discussion in the BiOp of the cumulative effects of authorizing this magnitude and intensity of research, and no discussion of the actions' effects on the PBR Level for the species.

> **c.**   ***The EA Fails to Address the Exceedance of the PBR Level.***

85.   While the EA purports to discuss the cumulative impacts of subsistence takes, commercial fisheries takes and scientific research, its conclusion that "there are no individually significant but cumulatively significant impacts of the proposed action" is inherently flawed and misleading. *EA* at 59.

86.   The EA ignores the combined total number of approved deaths, thus skirting the entire issue of whether the multitude of lethal takes will exceed the PBR Level. No comparison is made between the total number of approved new takes and current levels of approved takes, nor is an estimate provided for the number of potential takes or activities that would be considered significant.  The EA itself states that intensified contact with Steller sea lion populations and habitat could have adverse effects on the endangered species and that the magnitude of those effects is unknown, but provides no explanation for the agency's decision to forgo additional investigation and analysis of the cumulative effect of increased research.

87.   Even though research on Steller sea lions has been performed since the 1970s, NMFS has never analyzed the cumulative effects of all of these surveys and research activities, either within a research season or across years of research.  NMFS acknowledges that "there have been no studies dedicated to documenting and assessing the effects of research

on Steller sea lions or other marine mammals at a population level, nor on the synergistic or

cumulative effects of various research activities." *EA* at 41.

### 2.    The Research is Intrusive and Inhumane, in Violation of the MMPA and its Implementing Regulations.

88.    Not only has NMFS failed to evaluate the cumulative effects of the

research activities, it also has allowed inhumane and intrusive research to be executed upon

this rapidly declining marine mammal species.

89.    Activities allowed under the approved research permits include hot-

branding of adults, juveniles, and sea lion pups less than one week old; collection of blood;

biopsies of muscle, blubber, and tissue; extractions of teeth; the marking with bleach or paint;

surgical implantation of data loggers; insertion of stomach temperature transmitters;

performance of enema or stomach intubations; and placement of adults and pups in captivity.

90.    Of great concern is the capture and hot-branding of Steller sea lions,

including sea lion pups as young as six days old.  Hot branding involves a cold-rolled steel

branding iron heated to "red-hot" (about 500 degrees Fahrenheit).  *EA* at 100. This iron

produces burns that penetrate the entire outer layer of skin and burn into the inner skin.  *Id.*

The burns are characterized by the formation of blisters, swelling and fluids seeping from the

burned area and, as noted by NMFS, are accompanied by severe pain.  *Id.*  Hot-branding often

occurs while the mammal is restrained in a "squeeze cage," which functions as the name

implies – the cage is cranked smaller and smaller to squeeze the animal in order to restrain it

while samples are being collected.  The sea lions are then hot-branded while trapped in the

squeeze cage, a very painful procedure that is often performed without the benefit of anesthetic.

91.    NMFS admits in the EA that researchers have not adequately studied the effects of hot-branding and have not determined whether hot-branding leads to an increase in sea lion deaths, *EA* at 16, yet NMFS has capriciously allowed hot-branding to take place on animals whose species is in rapid decline. As the MMC warns, hot-branding sea lion pups has not been determined to be safe and effective. *MMC Comments* at 2. Furthermore, the MMC notes that "none of the applicants provide explicit monitoring protocols. This is of particular concern with respect to the proposed hot branding activities, which pose risks associated with capture, handling, [and] the infliction of burn wounds that may become infected." *MMC Comments* at 3. It is thus confounding that NMFS has nonetheless authorized hot-branding as a research activity in contravention of the MMPA's requirement that research directly benefit Steller sea lions or fulfill a critically important research need.

92.    Not only are endangered sea lion pups branded with hot irons, but sea lions' coats are caustically burned with bleach for marking purposes even when other less painful methods of marking exist. Hundreds of animals will also be subjected to muscle biopsies, insertion of fecal sampling tools, and sampling of stomach contents with stomach tubes on a repeated basis each year.

93.    Sea lion pups may be separated from their mothers in the flurry of research activities and may eventually die of starvation if not reunited. Pups can even die during capture by aspirating milk.

94.    Many of these intrusive and inhumane procedures are conducted without regard for alternative methods of research which do not contribute to the harm of the animal and avoid the potential to contribute to the incidental mortality of the animals being studied. Researchers have uniformly ignored those methods and NMFS has made no effort to protect these special marine mammals from the battery of intrusive procedures.

95.    Displaying even further disregard for humane treatment, NMFS has issued permits to applicants that are not required to have their studies approved by an institutional animal care and use committee ("IACUC"), which provides oversight to ensure the implementation of the most humane, effective methods of data collection.   Nor have the permittees demonstrated that they will take adequate steps for the proper care of the animals as required by MMPA regulations.  50 C.F.R. § 216.34(a)(6).

### 3.    Uncoordinated and Duplicative Research Does Not Benefit Steller Sea Lions and Does Not Fulfill a Critically Important Need.

96.    The MMC warns that "based on the information presented in the applications and [NMFS's] environmental assessment, the Commission cannot determine that the proposed research meets the standards of the Marine Mammal Protection Act, that all aspects of the projects constitute *bona fide* research." *MMC Comments* at 1.   Neither has NMFS determined that this suite of research activities will directly benefit Steller sea lions, or that such research fulfills a critically important research need, two standards the MMPA requires when authorizing scientific research permits for the study of endangered or threatened species.

97.    The repetitiveness and lack of coordination of the research serves only to further harass Steller sea lions with little scientific benefit.  In some cases, the same sea lion may be captured up to five times in a single year, subjected over and over again to intrusive procedures and general distress, which can lead to reproductive failure or even death. Multiple researchers will be simultaneously pulling teeth, taking skin and muscle biopsies, and performing other intrusive procedures on hundreds of sea lions – without coordination and without ensuring that the research is not duplicative.

98.    Further, NMFS cannot establish the parameters of all of the research for purposes of coordination because the permittees are constantly requesting permit modifications and amendments.  For example, NMFS recognized in its EA that one entity, the Alaska SeaLife Center, submitted six separate requests within eighteen (18) months of the issuance of its permit to add new procedures, modify protocols or objectives, and increase the number of animals taken by existing activities.  *EA* at 57.  Since issuance of the permits in late May and early June 2005, at least three entities have already requested permit amendments.  Thus, this moving target of research activities and modifications to the amount of takes makes it nearly impossible to coordinate research because the types of activities and takes allowed are constantly evolving.

99.    NMFS's attempt to require coordination as a permit condition is also unacceptable.  NMFS required permit holders to coordinate with other researchers and submit a coordination plan to NMFS by November 1, 2005 – five months *after* the permits are issued, thus providing no assurance of coordination during the height of the summer research season in 2005.  Furthermore, the coordination permit condition is limited to researchers

32

working at the same locations at the same times, thus arbitrarily avoiding the fact that research activities will be affecting nearly the entire population of Steller sea lions.

### 4.    The NEPA Analysis in the EA is Flawed.

100.    NEPA requires federal agencies to evaluate different alternatives to the proposed agency action.  Through identification and comparison of the impacts of "reasonable alternatives," the public and decision-makers are informed of the options and likely consequences of each proposed action to meet a particular purpose and need.

101.    NMFS's EA identifies five different courses of action for evaluation. The first alternative is for NMFS to undertake no action, i.e., issue no new permits or amendments.  The second alternative is the action NMFS ultimately undertook: issue the proposed permits and amendments with limited exceptions.

102.    NMFS also mentioned three other alternatives, but eliminated them from detailed study, even though all three alternatives were "identified as likely to result in reduced impacts from research compared to both the No Action and the Proposed Action." *EA* at 30. The first eliminated alternative was the establishment of a temporary moratorium on all research affecting Steller sea lions. *Id.* at 31.  This moratorium would prevent takes of Steller sea lions for research purposes by suspending any existing permits that authorize takes and denying future applications for such takes for a given time.

103.    The second eliminated alternative was to allow only non-intrusive population monitoring for all Steller sea lion research. *EA* at 31-32.  This alternative would suspend intrusive research and new permits or permit amendments would not authorize

33

intrusive research. *Id.* Non-intrusive activities, such as those from aerial and vessel monitoring, would still be allowed. *Id.*

104.    The final eliminated alternative was to redirect "experimental" intrusive research to surrogate species. *EA* at 32-33.   Under this alternative, the only research of an intrusive nature that would be permitted for the western population would be that directly related to conservation and management needs. *Id.* All other intrusive research would be restricted to the eastern (threatened) population or a non-ESA listed surrogate species, such as California sea lions. *Id.*

105.    Instead of conducting a detailed study on the eliminated alternatives, all of which would eliminate intrusive research on this protected species, NMFS selected alternative two, as described above, in making its permit decisions.  NMFS did not evaluate the common sense alternative of withholding research permits and amendments until NMFS sufficiently coordinated the activities of the permittees.  Its failure to consider this alternative results in NMFS's failure to consider the full spectrum of alternatives necessary to produce a reasoned choice.

106.    Further, NMFS inappropriately dismissed two of the alternatives by referencing self-serving, unsupported assertions made by the permittees.  Specifically, NMFS rejected the alternative of allowing only non-intrusive population monitoring because "permit holders and applicants have indicated it is important for them to conduct the intrusive activities to obtain information." *EA* at 31-32.   NMFS also rejected the alternative redirecting intrusive research to surrogate species, because "various permit holders and applicants" believe it would

34

make research impractical or because they must pursue invasive studies on the exact population experiencing a decline. *EA* at 32-33.

107.    Relying on conclusory and unsupported statements of permit applicants to make a decision that affects protected marine mammals frustrates the very purpose of the MMPA and the NEPA. Despite public comments that questioned NMFS's reliance on these comments, NMFS failed to adequately "study, develop, and describe" reasonable alternatives in its EA.

**5.    NMFS Was Required to Prepare an EIS Before Issuing the Permits.**

108.    NMFS now concedes that it has strong concerns about the research activities and will prepare an EIS. However, NMFS's offer is too late; it has already issued seven of the nine permits and the duplicative and inhumane activities are currently ongoing. To continue to allow numerous researchers, who are not coordinating their research species-wide, to perform a variety of intrusive research activities only contributes to the decline of the very species the research is supposed to help. Most importantly, it has not been shown that this research will directly benefit Steller sea lions, nor does it fulfill a critically important research need--the cornerstone of the MMPA's scientific permit program for endangered and threatened species.

109.    NMFS's last minute decision to prepare an EIS after the issuance of the permits and its failure to suspend the authorized permits pending the preparation of the EIS violates NEPA's prohibition of the commitment of resources prejudicing selection of alternatives before a final decision based on the EIS has been made. While the EIS process has yet to begin, the permits are still effective and the inhumane and intrusive research as detailed

above is ongoing.  Regardless of what NMFS concludes in its EIS, its failure to suspend the permits demonstrates that it has already made up its mind and is allowing these continuing violations.  Defendants' refusal to suspend the effectiveness of the research permits prior to the completion and issuance of the EIS demonstrates a prejudicial predecisional selection of the final alternative in violation of NEPA and its implementing regulations.  Moreover, Defendants' refusal to suspend the effectiveness of the research permits prior to the completion and issuance of the EIS promotes the continuing violations of NEPA and the MMPA.

## PLAINTIFFS' CLAIMS FOR RELIEF

### Claim One—Violations of the Administrative Procedure Act, the Marine Mammal Protection Act, and Implementing Regulations (MMPA)

110.    Plaintiffs reallege and incorporate by reference herein paragraphs 1-109 above.

111.    Defendants have violated Section 104 of the Marine Mammal Protection Act.  16 U.S.C. § 1389.  Defendants additionally have violated the Act by failing to comply with their regulations governing the issuance of permits under Section 104 of the Marine Mammal Protection Act.

112.    Defendants acted arbitrarily and capriciously by not complying with MMPA Section 104 and its implementing regulations, including its approval of permits wherein the permittees did not demonstrate that the research furthers a *bona fide* scientific purpose, nor prove that the research directly benefits Steller sea lions or fulfills a critically important need.

36

113.    By permitting the hot-branding of Steller sea lions while crushed between the bars of a squeeze cage, and without the benefit of anesthesia, among other inhumane and intrusive activities, Defendants additionally have disregarded their own regulations under the MMPA requiring that scientific research be humane and present no unnecessary risks to the health and welfare of marine mammals. 16 U.S.C. § 1362; 50 C.F.R. § 216.34.

114.    By authorizing lethal takings that will exceed the PBR Level, Defendants contravened NMFS's regulations that mandate that "the proposed activity, by itself or in combination with other activities will not have a long-term direct or indirect adverse impact on the species or stock." 50 C.F.R. § 216.34.

115.    Several of the research permits violate the MMPA regulations' requirement that when a live animal is held captive or transported, "the applicant's qualifications, facilities, and resources are adequate for the proper care and maintenance of the marine mammal." 50 C.F.R. § 216.34(a)(6).

116.    Defendants thus have violated Section 104 of the MMPA as well as its implementing regulations by issuing permits in a manner that is arbitrary, capricious, an abuse of discretion, and contrary to law within the meaning of the MMPA and the APA by determining that (1) the research directly benefits Steller sea lions or fulfills a critically important need under MMPA Section 104(c)(3); (2) the research furthers a *bona fide* scientific purpose under 16 U.S.C. 1374(c)(3)(A); (3) the research is humane and does not present any unnecessary risks to the health and welfare of marine mammals under 50 C.F.R. § 216.34; (4) the research permits as a whole will not have an adverse impact to the species under 50 C.F.R.

§ 216.34; and (5) the applicants will take adequate steps for the proper care of the animals

under 50 C.F.R. § 216.34(a)(6). 16 U.S.C. § 1389 and 5 U.S.C. § 706(2)(A), (C) and (D).

**Claim Two—Violations of the Administrative Procedure Act, the National**

**Environmental Policy Act, and Implementing Regulations (EIS)**

117.    Plaintiffs reallege and incorporate by reference herein paragraphs 1-116

above.

118.    Defendants failed to perform an EIS before issuing the permits as

required by NEPA because issuance of the seven scientific research permits was a major

federal action that significantly affects the environment by, among other things, allowing lethal

takes that will exceed the PBR Level for the endangered western stock of Steller sea lions.

119.    Defendants' refusal to suspend the effectiveness of the research permits

prior to the completion and issuance of the EIS demonstrates a prejudicial predecisional

selection of the final alternative in violation of NEPA and its implementing regulations.

Moreover, Defendants' refusal to suspend the effectiveness of the research permits prior to the

completion and issuance of the EIS promotes the continuing violations of NEPA and the MMPA.

120.    Defendants' failure to prepare an EIS, their commitment of resources

prejudicing the selection of alternatives before making a final decision in its EIS, and their

promotion of continuing violations is arbitrary, capricious, an abuse of discretion, and contrary

to law within the meaning of NEPA and the APA.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §

1506.2; 5 U.S.C. § 706(2)(A), (C) and (D).

**Claim Three—Violations of the Administrative Procedure Act, the National**

**Environmental Policy Act, and Implementing Regulations (NEPA Alternatives)**

121.    Plaintiffs reallege and incorporate by reference herein paragraphs 1-120 above.

122.    Defendants' consideration of alternatives in its EA does not satisfy NEPA because (1) Defendants do not address the non-speculative alternative of withholding all new permits and amendments until it can ensure the various research activities will not be unnecessarily duplicative; and (2) Defendants unreasonably dismisses two of the secondary alternatives by relying on permittees' conclusory statements instead of its own analysis.

123.    Defendants have violated NEPA by (a) failing to address the full spectrum of alternatives to its proposed action of granting and amending permits for the study of western endangered Steller sea lions and the threatened eastern stock; and (b) failing to adequately "study, develop, and describe" the alternatives it did identify in its EA in contravention of NEPA, 42 U.S.C. § 4332(2)(E), and its implementing regulations, 40 C.F.R. § 1508.9.

**Claim Four—Violations of the Administrative Procedure Act, the National**

**Environmental Policy Act, and Implementing Regulations (Cumulative Impacts)**

124.    Plaintiffs reallege and incorporate by reference herein paragraphs 1-123 above.

125.    The cumulative impact analysis in the EA is inadequate as a matter of law under NEPA because the EA does not provide aggregate quantitative information, such as the combined total number of takes approved, a comparison of the total number of approved

39

new takes with current levels or other mainstream endangered species benchmarks such as the PBR Level, or an estimate for the number of potential takes or activities that would be considered significant, instead relying on conclusory statements with little or no analysis as required by law.

126. Defendants failed to evaluate cumulative impacts in the EA. Such failure is arbitrary, capricious, an abuse of discretion, and contrary to law under NEPA and the APA. 40 C.F.R. § 1501.4(e)(2) and 5 U.S.C. § 706(2)(A), (C) and (D).

**Claim Five—Violations of the Administrative Procedure Act (Biological Opinion)**

127. Plaintiffs reallege and incorporate by reference herein paragraphs 1-126 above.

128. Defendants' Biological Opinion fails to evaluate the cumulative effects of other agency actions or its own actions.

129. In making their decision to issue the scientific research permits, Defendants issued a Biological Opinion which was arbitrary, capricious, an abuse of discretion, and contrary to law under the APA and Defendants' regulations. 5 U.S.C. § 706(2)(A), (C) and (D) and 50 C.F.R. § 402.14(g)(3).

**Claim Six—Violations of the Endangered Species Act and Administrative Procedure Act (ESA Regulations)**

130. Plaintiffs reallege and incorporate by reference herein paragraphs 1-129 above.

131. Defendants' decision to issue the scientific research permits was made without compliance with Defendants' regulations implementing the ESA, including their duty to specifically consider: (1) whether the scientific research permits, if granted and exercised,

40

will not operate to the disadvantage of the endangered species; (2) whether the permits would be consistent with the purposes and policy of the ESA; (3) the status of the population of Steller sea lions and the effect of the proposed action on the population, both direct and indirect; (4) whether alternative non-endangered species or population stocks can and should be used; (5) how the applicant's needs, program, and facilities compare and relate to proposed and ongoing projects and programs; and (6) opinions or views of scientists or other persons or organizations knowledgeable about the species which is the subject of the application or of other matters germane to the application. 50 C.F.R. § 222.308(c).

132.   Defendants' decision to issue the scientific research permits without complying with its regulations implementing the ESA is arbitrary, capricious, an abuse of discretion, and contrary to law under the ESA and the APA. 16 U.S.C. 1539(a)(1)(A) and 5 U.S.C. § 706(2)(A), (C) and (D).

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment:

1.   Declaring that Defendants have violated MMPA, NEPA, ESA and APA;

2.   Vacating all research permits or permit amendments issued in 2005 for activities involving Steller sea lions;

3.   Ordering the Secretary of Commerce to perform an EIS;

4.   Enjoining the Secretary of Commerce from issuing any more research permits or amendments or modifications to the existing permits until an EIS is complete;

5.   Ordering the Secretary of Commerce to conduct a workshop to accomplish the following: identification of the key recovery plan goals that require additional research; establishment of an appropriate sampling design for survey, behavioral and

physiological research; development of a strategic plan and study design to ensure a cohesive approach to research; and development of quantitative models of energetics, life history, and population dynamics of Steller sea lions;

7.    Retaining jurisdiction of this matter until Defendants have fulfilled all of their legal obligations, including completion of an EIS which fully evaluates cumulative effects and analysis of an adequate range of alternatives to the proposed action;

8.    Awarding Plaintiffs their reasonable attorneys' fess and costs for this action, as may be authorized under applicable law; and

9.    Granting such other and further relief as the Court may deem just and proper.

DATED: September 14, 2005            Respectfully submitted,

                        By:    _____

                        LATHAM & WATKINS
                        David J. Hayes (DC Bar #252130)
                        James R. Barrett (DC Bar #441674)
                        Kimberly McCormick
                        Sara K. Orr
                        555 Eleventh Street, N.W.
                        Washington, DC 20004
                        (202) 637-2200

                        Attorneys for Plaintiffs The Humane
                        Society of the United States, Will Anderson
                        and Sharon Young

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Amended
Complaint was served on the following:

Alberto Gonzales
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Civil Process Clerk
United States Attorney's Office
for the District of Columbia
555 4th Street, NW
Washington, DC 20530

Kristen Floom
Department of Justice
Environment and Natural Resources Div.
Wildlife Section
601 Pennsylvania Avenue, N.W.
South Building
Suite 5000
Washington, DC 20044-7369
(202) 305-0340

Counsel for Defendants
Department of Commerce, Carlos M. Gutierrez,
Conrad C. Lautenbacher, Jr., William T. Hogarth
and National Marine Fisheries Service;

and, Defendants,

Carlos M. Gutierrez,
Secretary of the United
States Department of Commerce
14th & Constitution Avenue, N.W.
Washington, DC 20230

Conrad C. Lautenbacher, Jr.,
Administrator, National Oceanic
and Atmospheric Administration
14th & Constitution Avenue, N.W.
Washington, DC 20230

William T. Hogarth,
Assistant Administrator, National
Marine Fisheries Service
1315 East-West Highway
Silver Spring, MD 20910

via First Class Mail this 14th day of September, 2005.


Jason LaMantia