# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

THE HUMANE SOCIETY OF THE )
UNITED STATES, *et al.*, )
                       )
         Plaintiffs, )        Civil Action No. 05-1392
                       )
v. )        (Oral Argument Requested)
                       )
DEPARTMENT OF COMMERCE, *et al.*, )
                       )
         Defendants. )

## <u>MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Fed.R.Civ.P. 56, Plaintiffs, The Humane Society of the United States, Will Anderson and Sharon Young ("Plaintiffs"), respectfully move this Court for summary judgment on its claims that Defendants, the U.S. Department of Commerce, Carlos M. Gutierrez, Secretary, U.S. Department of Commerce, Conrad C. Lautenbacher, Jr., Administrator, National Oceanic and Atmospheric Administration ("NOAA"), William T. Hogarth, Assistant Administrator for Fisheries, NOAA, and the National Marine Fisheries Service ("NMFS") ("Defendants") violated the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"), the federal Endangered Species Act, 16 U.S.C. § 1531 *et seq.* ("ESA"), the Marine Mammal Protection Act, 16 U.S.C. § 1374 *et seq.* ("MMPA"), and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA") when they issued multiple research permits on federally endangered and threatened Steller sea lions without evaluating the effects of the activities being undertaken under the permits before issuing the permits. Defendants' actions in issuing the research permits without performing the proper NEPA analysis, its failure to evaluate the direct, indirect and cumulative impacts to Steller sea lions in its Biological Opinion, and its failure to

provide a non-arbitrary and capricious explanation for their actions in granting these permits violate NEPA, ESA, MMPA and the APA.

Plaintiffs seek declaratory and injunctive relief.  The research permits or permit amendments issued in 2005 should be stayed pending the completion of an EIS by Defendants and Defendants should be enjoined from issuing any further research permits or permit amendments, or Defendants should be ordered to vacate the permits as legally invalid.

In support of this Motion, Plaintiffs rely on the accompanying *Memorandum of Points and Authorities in Support of its Motion for Summary Judgment*, the declarations and exhibits in support thereof, the pleadings, the administrative record and any other evidence and any argument thereto.  Pursuant to Rule 7(f), Plaintiffs respectfully request oral argument before the Court on this matter.


DATED:        January 6, 2006                    Respectfully Submitted,

                                                 /s/ James R. Barrett
                                                 LATHAM & WATKINS LLP
                                                 James R. Barrett(DC Bar No. 441674)
                                                 David J. Hayes (DC Bar No. 252130)
                                                 Sara K. Orr (DC Bar No. 493765)
                                                 555 Eleventh Street, N.W.
                                                 Suite 1000
                                                 Washington, D.C. 20004-1304
                                                 (202) 637-2200

                                                 KIMBERLY MCCORMICK
                                                 8363 Sumanee Place N.E.
                                                 Bainbridge Island, WA  98110

                                                 Counsel for Plaintiffs The Humane Society
                                                 of the United States, Will Anderson and
                                                 Sharon Young

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

THE HUMANE SOCIETY OF THE )
UNITED STATES, et al. )
                        )     Civ. No. 05-1392 (ESH)
              Plaintiffs, )
                        )
vs. )
                        )
DEPARTMENT OF COMMERCE, et al., )
                        )
              Defendants. )
_____

## STATEMENT OF UNDISPUTED MATERIAL FACTS

        Pursuant to LCvR 7(h), Plaintiffs Will Anderson, Sharon Young and The Humane Society of the United States (collectively "the Plaintiffs") hereby submit this separate Statement of Undisputed Material Facts in support of Plaintiffs' Motion for Summary Judgment.  As to these facts, the Plaintiffs aver that there is no genuine issue.  Citations are to those portions of the Administrative Record filed herewith.

        1.      Steller sea lions are members of the sub-order pinnipedia, which means "winged foot."  Answer ¶ 54.

        2.      Steller sea lions are divided into two populations, or stocks, both protected under the federal Endangered Species Act and the Marine Mammal Protection Act.  62 Fed. Reg. 24,345, 24,354 (May 5, 1997); Answer ¶ 56.

        3.      The western stock of Steller sea lions is located in the Gulf of Alaska and the Bering Sea/Aleutian Islands and declined by 82% between 1960 and 1990.  55 Fed. Reg. 49,204 (Nov. 26, 1900); Answer ¶ 56.

        4.      The western stock was listed as endangered under the ESA in 1997. 62 Fed. Reg. 24,345 (May 5, 1997); Answer ¶ 56.

5.    The eastern stock of Steller sea lions is found throughout the northern Pacific basin and the coasts of Washington, Oregon and California.  Answer ¶ 56.

6.    The eastern stock was listed as threatened under the ESA in 1990.  55 Fed. Reg. 49,204 (Nov. 26, 1990); Answer  ¶ 56.

7.    Research has been conducted on Steller sea lions since at least the late 1980s, when a sharp population decline was identified.   62 Fed. Reg. 24,345, 24,346 (May 5, 1997); Answer ¶ 59.

8.    During the 1990s, research funding for federal agencies was less than $1 million annually.  Answer ¶ 59.

9.    In 2001 and 2002, Congress appropriated approximately $80 million for Steller sea lion research, creating the largest research effort on a single species in the history of the United States.  Answer ¶ 59.

10.    On April 4, 2005, NMFS published notice in the Federal Register of its receipt of permit applications for four new permits and major amendments to five existing permits for takes of Steller sea lions in the wild, and its issuance of a Draft Environmental Assessment ("Draft EA") under the National Environmental Policy Act (NEPA) evaluating its proposed issuance of the permits.  AR-395.

11.    NMFS concluded in the Final EA that issuance of the permits would not require an EIS.  AR-406; AR-404.

12.    NMFS admits that the annual mortality resulting from research activities may, in combination with other human-caused sources of mortality, exceed the Potential Biological Removal level ("PBR Level") for the species.  Answer ¶ 74.

13.    The PBR level is defined as the number above which the impact to the species is significant and potentially irreversible.  16 U.S.C. § 1362(20).

14.    Before approving the scientific research permits, NMFS is required, under the MMPA, to consult with the Marine Mammal Commission ("MMC"), an independent agency created to provide impartial oversight of marine mammal conservation policies and programs implemented by federal regulatory agencies.  Answer ¶ 64.

15.    The MMPA provides the MMC with a mandatory 45-day comment period.  50 C.F.R. § 216.33(d)(2).

16.    On May 19, 2005, NMFS received preliminary comments on the EA from the MMC.   Exhibit 1 to Declaration of James Barrett ("Barrett Declaration").

17.    The MMC preliminary comments protested the issuance of the permits and contended that an EIS was required.  Ex. 1 to Barrett Decl. at 5.

18.    The MMC requested that NMFS delay its final decision on permit issuance until the MMC submitted its final comments, which were due on or before June 6, 2005, 45 days from the date MMC received the permits from NMFS for review.  Ex. 1 to Barrett Decl. at 1.

19.    A number of organizations, including HSUS, also submitted comments raising concerns about the EA and recommending NMFS deny the permits or defer a decision pending completion of an EIS.  Answer ¶ 63; AR-401; AR 406 at 16.

20.    On May 24, 2005, prior to receiving final comments from the MMC, the NMFS issued its ESA Section 7 Biological Opinion, AR 407, its Final EA under NEPA, AR 406, and its Finding of No Significant Impact ("FONSI") under NEPA, AR 404.

21.    The Biological Opinion states "cumulative effects have not been considered in this biological opinion."  AR-407 at 67.

22.    NMFS issued the first research permit on or about May 27, 2005.  Answer ¶ 69.

23.    The MMC issued its formal comments to NMFS on June 10, 2005, reiterating that NMFS should perform an EIS before issuing the permits.  Ex. 2 to the Barret Decl.

24.    NMFS issued additional research permits on June 16, 2005.  AR-113; Answer ¶ 71.

25.    The permits at issue involve the killing of up to 292 Steller sea lions, hot branding over 2,900 Steller sea lions, and include other intrusive activities such as the collection of samples of muscle tissue, blood, and stomach contents; removing teeth; the use of biopsy darts, extracting milk from lactating mothers, surgically implanting tracking devices in free-ranging animals from shipboard, and injection of dyes and stable isotopes.  AR-406 at 103-119; AR-402 at 9.

26.    Sea lion pups are separated from their mothers in the flurry of research activities and may eventually die of starvation if not reunited.  Pups also can die during capture by aspirating milk.  Answer ¶ 93.

27.    In a letter to Plaintiffs dated June 27, 2005, NMFS conceded that it had concerns about the scope of research being performed on Steller sea lions, and had decided to prepare an EIS.  Ex. 3 to the Barrett Decl.

28.    On December 28, 2005, NMFS published a notice in the Federal Register announcing its intent to prepare an EIS evaluating impacts of research on Steller sea lions and northern fur seals.  Ex. 4 to the Barrett Decl.

29.    NMFS did not suspend the permits and research currently is underway in the Gulf of Alaska, and throughout the range of Steller sea lions in the United States, including California, Oregon, Washington and Alaska.  Answer ¶ 73.

Respectfully submitted,


Dated January 6, 2006                         /s/ James R. Barrett
                                              LATHAM & WATKINS
                                              JAMES R. BARRETT (DC Bar No. 441674)
                                              DAVID J. HAYES (DC Bar No. 252130)
                                              SARA K. ORR (DC Bar No. 493765)
                                              555 Eleventh Street, N.W.
                                              Washington, DC 20004
                                              Tel: (202) 637-2200

                                              KIMBERLY MCCORMICK
                                              8363 Sumanee Place N.E.
                                              Bainbridge Island, WA  98110


                                              Counsel for Plaintiffs The Humane Society of the
                                              United States, Will Anderson and Sharon Young

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, et al., | ) ) ) | |
| | ) | Civ. No. 05-1392 (ESH) |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| DEPARTMENT OF COMMERCE, et al., | ) ) | |
| Defendants. | ) | |

_____

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

LATHAM & WATKINS
JAMES R. BARRETT (DC Bar No. 441674)
DAVID J. HAYES (DC Bar No. 252130)
SARA K. ORR (DC Bar No. 493765)
555 Eleventh Street, N.W.
Washington, DC 20004
Tel: (202) 637-2200

KIMBERLY MCCORMICK
8363 Sumanee Place N.E.
Bainbridge Island, WA  98110

Counsel for Plaintiffs The Humane Society of the
United States, Will Anderson and Sharon Young

TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................1

II.  STATUTORY AND REGULATORY FRAMEWORK ...................................3

    A.  The National Environmental Policy Act ...............................................3

    B.  The Endangered Species Act ..................................................................5

    C.  The Marine Mammal Protection Act ......................................................6

III.  STATEMENT OF FACTS .................................................................................8

IV.  ARGUMENT ....................................................................................................12

    A.  Standard of Review ...............................................................................12

    B.  Defendants Violated NEPA ..................................................................13

        1.  NMFS Failed To Prepare an EIS Before Issuing The Permits ..................14
        2.  NMFS Was Required To Prepare an EIS ..................................................19
        3.  NMFS' EA Violated NEPA ......................................................................24

    C.  Defendants Violated The ESA ..............................................................28

        1.  NMFS Failed to Fully Consider the Effects of the Proposed Action ........29
        2.  NMFS Failed to Consider Cumulative Effects ..........................................33

    D.  Defendants Violated the MMPA ...........................................................37

        1.  Defendants Issued Permits Before Receiving MMC Comments, In
               Violation of the Plain Language Of Its Own Regulations ........................37
        2.  Defendants' Issuance of Permits In Excess of the PBR Level Is
               Arbitrary and Capricious...........................................................................37

V.  CONCLUSION..................................................................................................39

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Am. Lung Ass'n v. EPA*, 134 F.3d 388 (D.C. Cir. 1998) ...................................................13

*Am. Trucking Ass'n, Inc. v. EPA*, 283 F.3d 355 (D.C. Cir. 2002) ........................13, 21, 38

*Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004)...............................................................20

*Animal Welfare Inst. v. Kreps*, 561 F.2d 1002 (D.C. Cir. 1977) .......................................20

*Battle v. F.A.A.*, 393 F.3d 1330 (D.C. Cir. 2005) ..............................................................37

*Bennett v. Spear*, 520 U.S. 154, 117 S. Ct. 1166, 137 L. Ed. 2d 281 (1997)....................13

*Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678 (D.C. Cir. 1982) .............13, 26

*Citizens Exposing Truth About Casinos v. Norton*, Case No. A-03-CA-242, 2004
   U.S. Dist. LEXIS 27498 (D.D.C. Feb. 24, 2004) .......................................................24

*Coal. on Sensible Transport Inc. v. Dole*, 642 F. Supp. 573 (D.D.C. 1986), *aff'd*,
   826 F.2d 60 (D.C. Cir. 1987) .......................................................................................22

* *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121 (D.D.C. 2001) ....................30, 31

* *Defenders of Wildlife v. Norton*, No. 99-927, 2003 U.S. Dist. LEXIS 26558
   (D.D.C. Jan. 7, 2003) .......................................................................................30, 31, 32

*Earth Island Institute v. Evans,* No. C 03-0007, 2004 U.S. Dist. LEXIS 15729
   (N.D. Cal. Aug. 9, 2004)...............................................................................................20

*Foundation on Econ. Trends v. Heckler*, 756 F.2d 143 (D.C. Cir. 1985).........................14

* *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30
   (D.D.C. 2000) ........................................................................................22, 23, 24, 26

* *Fund for Animals v. Norton*, 281 F. Supp. 2d 209 (D.D.C. 2003).....................22, 23, 27

*Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1139 (W.D. Wash.
   2000) ........................................................................................................................34, 35

*Home Builders Ass'n of N. Cal. v. U. S. Fish & Wildlife Serv.*, 268 F. Supp. 2d
   1197 (E.D. Cal. 2003) ...................................................................................................13

*Huls America, Inc. v. Browner*, 83 F.3d 445 (D.C. Cir. 1996) .........................................13

\* *Humane Soc'y of the U.S. v. Clark,* C.A. 99-0424, 1999 U.S. Dist. LEXIS 3686 (D.D.C. Mar. 17, 1999)........................................................................17

*Idaho v. Interstate Commerce Comm'n*, 35 F.3d 585 (D.D.C. 1994)...............................26

*Jost v. Surface Trans. Board*, 194 F.3d 79 (D.C. Cir. 1999) .......................................13, 38

\* *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S. Ct. 2718, 49 L. Ed. 2d 576 (1976).......14, 17

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000).........................................................18, 27

*N. Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980) ..............................................5

*Nat'l Wilderness Inst. v. U.S. Army Corps of Eng'rs*, Civ. No. 01-0273, 2005 U.S. Dist. LEXIS 5159 (D.D.C. Mar.  23, 2005)...................................................12

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. 05-23-RE, 2005 U.S. Dist. LEXIS 16345 (D. Or. May 26, 2005) ..................................................36

*Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170 (D.D.C. 2004) ...............................34

\* *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203 (D.D.C. 2005)....................................30, 32

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028 (9th Cir. 2001)..............................................................................................34

\* *Robertson v. Methow Valley Citizens*, 490 U.S. 332, 109 S. Ct. 1835, 104 L. Ed. 2d 351 (1989)..............................................................................................18

\* *S. Utah Wilderness v. Norton*, 237 F. Supp. 2d 48 (D.D.C. 2002) ..........................25, 26

*Save the Yaak Comm. v. Block*, 840 F.2d 714 (9th Cir. 1988)..........................................18

\* *Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983) .......................................14, 17

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 98 S. Ct. 2279, 57 L. Ed. 2d 117 (1978) ............6

## FEDERAL STATUTES

5 U.S.C. § 706..............................................................................................................2, 13

42 U.S.C. § 4332.....................................................................................................2, 3, 4, 25

16 U.S.C. § 1361...................................................................................................................7

16 U.S.C. § 1362 ...................................................................................7, 8, 20, 37

16 U.S.C. § 1371 ...................................................................................................7

16 U.S.C. § 1374 .........................................................................................2, 7, 8, 38

16 U.S.C. § 1386 ...................................................................................................7

16 U.S.C. § 1531 ...............................................................................................2, 5

16 U.S.C. § 1532 ...................................................................................................6

16 U.S.C. § 1536 .........................................................................................5, 6, 28

40 C.F.R. § 1500.1 .............................................................................................3, 5

40 C.F.R. § 1500.3 ...............................................................................................3

40 C.F.R. § 1502.14 .............................................................................................25

40 C.F.R. § 1502.5 ...................................................................................5, 17, 18

40 C.F.R. § 1505.2 ...............................................................................................4

40 C.F.R. § 1506.1 ...............................................................................................4

40 C.F.R. § 1508.7 ...............................................................................................4

40 C.F.R. § 1508.8 ...............................................................................................4

40 C.F.R. § 1508.9 ...........................................................................................3, 25

40 C.F.R. § 1508.13 .............................................................................................5

40 C.F.R. § 1502.16 .............................................................................................4

40 C.F.R. § 1508.27 .....................................................................................3, 4, 22

50 C.F.R. § 17.3 ...................................................................................................6

50 C.F.R. § 216.3 ...............................................................................................8

50 C.F.R. §§ 216.31-216.45 ...........................................................................8, 38

50 C.F.R. § 216.33(d)(2) ...........................................................................8, 11, 37

50 C.F.R. § 402.02 ...........................................................................................29, 33, 36

50 C.F.R. § 402.14 ...................................................................................6, 28, 29, 33

55 Fed. Reg. 49,204 (Nov. 26, 1990).....................................................................9

62 Fed. Reg. 24,345 (May 5, 1997) ...........................................................8, 9, 10

70 Fed. Reg. 76,780 (Dec. 28, 2005) ..................................................................12

H.R. Rep. No. 92-707  (1971).................................................................................6

H.R. Rep. No. 93-412 (1973)..................................................................................5

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, et al., | ) ) ) |
| Plaintiffs, | ) Civ. No. 05-1392 (ESH) ) |
| | ) |
| vs. | ) ) |
| DEPARTMENT OF COMMERCE, et al., | ) ) |
| Defendants. | ) |

_____

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

This case is neither novel nor complicated, and the relevant facts are not in dispute. Defendants have authorized various entities to engage in research activities on declining and federally threatened and endangered Steller sea lions. Defendants concede that such activities will result in the "taking" of thousands of Steller sea lions, and that this taking will occur at levels exceeding the very threshold established by the Defendants to protect the species from extinction. *See* Answer ¶ 74. Defendants also freely admit that issuance of the research permits at the heart of this case warrants the preparation of an environmental impact statement ("EIS") to understand their direct and cumulative impact on the species.[1]

_____

[1] The permits at issue involve the killing of up to 292 Steller sea lions, hot branding over 2,900 Steller sea lions, and include other intrusive activities such as the collection of samples of muscle tissue, blood, and stomach contents; removing teeth; the use of biopsy darts, extracting milk from lactating mothers, surgically implanting tracking devices in free-ranging animals from shipboard, and injection of dyes and stable isotopes. AR-406 at 103-119; AR-402 at 9.

However, in an unprecedented reversal of the normal process under the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), Defendants have taken the actions requiring an EIS *first*, and propose to complete an EIS concerning the environmental effects of those actions after-the-fact.  As discussed herein, this "kill first, study later" approach clearly violates the procedural requirements of NEPA.  Moreover, by failing to prepare a Biological Opinion that evaluates the direct, indirect and cumulative impacts to Steller sea lions resulting from the proposed research, failing to abide by their own regulations, and failing to provide a non-arbitrary and capricious explanation for their actions in granting these permits, the Defendants also have violated the federal Endangered Species Act of 1973, as amended, 16 U.S.C. §§ 1531 *et seq.* ("ESA"), the Marine Mammal Protection Act, 16 U.S.C. §§ 1374 *et seq.* ("MMPA"), and the Administrative Procedure Act, 5 U.S.C. §§ 706 *et seq.* ("APA").

Before turning to those arguments, however, it is important to make clear what this case is *not* about.  This case does not present a policy disagreement, a conflict between scientific research and humane interests, or an attempt to second-guess federal agency decisionmaking.  To the contrary, Plaintiffs fully understand the need for a sound research program into the startling decline of Steller sea lions, and recognize that such research may result in incidental takings, if such takings are necessary to help ensure the species' long-term survival.  Instead, this case is purely about Defendants' failure to abide by the minimum procedural requirements established by Congress to help assure protection and restoration of a declining, endangered and threatened species.[2]

---

[2] Indeed, Plaintiffs have no objection to continuing some non-intrusive research activities that could be considered "takings" under the ESA while the EIS is completed, as long as intrusive research and activities with the highest potential to result in mortality – such as the proposed "pup roundups" which have resulted in the deaths of pups from drowning or from

## II.     STATUTORY AND REGULATORY FRAMEWORK

### A.     The National Environmental Policy Act

NEPA mandates procedures designed to "insure that environmental information is available to public officials and citizens *before decisions are made* and *before actions are taken*." 40 C.F.R. § 1500.1(a)-(b) (emphasis added).  The Council on Environmental Quality ("CEQ"), an agency in the Executive Office of the President created under NEPA, has promulgated "regulations applicable to and binding on all Federal Agencies for implementing the procedural provisions of [NEPA]." 40 C.F.R. § 1500.3.

Under NEPA, federal agencies proposing "major Federal actions significantly affecting the quality of the human environment" must prepare an EIS.  42 U.S.C. § 4332(2)(C).  The agency first prepares an EA that provides "sufficient evidence and analysis" to determine whether the impact is significant such that an EIS is required.  40 C.F.R. § 1508.9(a)(1).  The EA includes a discussion of the proposal, its alternatives, and "environmental impacts of the proposed action and alternatives . . . ." 40 C.F.R. § 1508.9(b).  If the agency determines its proposed action will have a significant affect on the environment, it must prepare an EIS.  42 U.S.C. § 4332(2)(C)(i)-(v).

When determining the significance of the agency action, both the "context" and the "intensity" of the proposed action are to be considered.  *See* 40 C.F.R. § 1508.27.  The context of the action includes factors such as "society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a).  Intensity is defined as the severity

---

attacks by other sea lions when separated from their mothers – are suspended.  However, because Defendants apparently intend to proceed with both intrusive and non-intrusive research before the EIS is completed, Plaintiffs have no choice but to proceed to judgment in this action.

of the impact, 40 C.F.R. § 1508.27(b), and should include the following factors pertinent to this case:  (1) impacts that may be both beneficial and adverse; (2) the degree to which the effects on the quality of the human environment are likely to be highly controversial; (3) the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; (4) the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; (5) whether the action is related to other actions with individually insignificant but cumulatively significant impacts; (6) the degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the ESA; and (7) whether the action threatens a violation of federal, state, or local law or requirements imposed for the protection of the environment.  *Id.*

Whether an EIS is required or not, the agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources,"  42 U.S.C. § 4332(2)(E), and must include an analysis of direct, indirect and cumulative effects of its proposed action and alternatives.  42 U.S.C. § 4332(2)(E); 40 C.F.R. §§ 1508.7, 1508.8, 1508.27, 1502.16.

Moreover, an agency cannot take any action that would "have an adverse environmental impact or limit the choice of reasonable alternatives" for the proposed federal activity, until it issues a record of decision after completing its EIS.  40 C.F.R. §§ 1505.2, 1506.1.  CEQ regulations further require that "the [environmental impact] statement shall be prepared early enough so that it can serve practically as an important contribution to the decision-making

process and will not be used to rationalize or justify decisions already made."  40 C.F.R. § 1502.5.

If an agency determines its proposed action has no "significant effect on the human environment," it prepares a Finding of No Significant Impact ("FONSI").  40 C.F.R. § 1508.13. These decisions are subject to judicial review, as CEQ regulations mandate that the "President, the federal agencies, and the courts share responsibility for enforcing the Act . . . ."  40 C.F.R. § 1500.1(a).

### B.  The Endangered Species Act

The ESA was enacted in an effort to protect the "various species of fish, wildlife, and plants in the United States [which] have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation."  16 U.S.C. § 1531(a)(1).  The paramount importance of the legislation is perhaps best articulated in the House Report on the ESA: "[f]rom the most narrow possible point of view, it is in the best interests of mankind to minimize the losses of genetic variations.  The reason is simple: they are potential resources.  They are keys to puzzles which we cannot solve, and may provide answers to questions which we have not yet learned to ask."  H.R. Rep. No. 93-412, at 144 (1973).

The ESA "mandates affirmative preservation of endangered life."  *N. Slope Borough v. Andrus*, 642 F.2d 589, 607 (D.C. Cir. 1980).  Under Section 7 of the ESA, 16 U.S.C. § 1536, federal agencies are directed to "insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species . . . ."  16 U.S.C. § 1536(a)(2).  Underlying Section 7 is the "explicit congressional decision . . . to give endangered species a priority over the 'primary missions' of

federal agencies." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185, 98 S. Ct. 2279, 2297, 57 L. Ed. 2d 117, 140-41 (1978).

Under Section 7, an agency must first determine whether its proposed action "may affect listed species or critical habitat," and then, if the answer is affirmative, proceed with formal consultation with the federal resource agency with jurisdiction over the listed species at issue. 50 C.F.R. § 402.14(a). Formal consultation culminates with issuance of a Biological Opinion ("BiOp") by the resource agency, which addresses "how the agency action affects the species or its critical habitat" and concludes with a jeopardy or no jeopardy finding. 16 U.S.C. § 1536(b)(3)(A). The BiOp also includes authorization for any take of the species, and reasonable and prudent measures and terms and conditions to ensure that the take is minimized and mitigated. 50 C.F.R. § 402.14(h)(3)(i). "Take" is defined under the ESA and its regulations as any action that may harm or harass a listed species. 16 U.S.C. § 1532(19); 50 C.F.R § 17.3.

Until Section 7 consultation is concluded, the agency "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" that would not violate Section 7. 16 U.S.C. § 1536(d). This provision is designed to ensure that federal agencies do not act until the environmental review required under Section 7 is complete.

## C.    The Marine Mammal Protection Act

The primary purpose of the MMPA is to remedy "man's . . . malign, neglect, and virtual genocide" of marine mammals, to promote "solicitous and decent treatment" of marine mammals that "have been shot, blown up, clubbed to death, run down by boats, poisoned, and exposed to a multitude of other indignities, all in the interest of profit or recreations," H.R. Rep. No. 92-707

(1971), and to prevent marine mammals, such as Steller sea lions, from extinction caused by man's activities, including scientific research.  16 U.S.C. § 1361(2).

To achieve this purpose, the MMPA prohibits unauthorized taking and importation of all marine mammals and marine mammal products.  16 U.S.C. § 1371(a).  It also states that marine mammal populations "should not be permitted to diminish below their optimum sustainable population."  16 U.S.C. § 1361.  "Optimum sustainable population" ("OSP") is defined as the number of animals that will result in the maximum productivity of the population or species, keeping in mind the carrying capacity of the habitat and the health of the ecosystem of which they form a constituent element.  16 U.S.C. § 1362(9).

To keep track of declining populations of marine mammals, particularly those like Steller sea lions that are negatively affected by commercial fisheries, the MMPA requires the Secretary of Commerce to develop stock assessments which provide minimum marine mammal population estimates, evaluate the number of human-caused mortalities and estimate levels of population decline that will affect recovery of the species.  16 U.S.C. § 1386.  Most importantly, the stock assessment establishes the Potential Biological Removal level ("PBR level") for the species, which is the maximum number of animals that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population.  16 U.S.C. § 1362(20).

Recognizing that takings of marine mammals for research purposes may be warranted under very controlled circumstances, Congress established a framework under which all such takings must be evaluated before they are authorized.  16 U.S.C. § 1374.  A permit applicant must submit information indicating that the taking is required "to further a bona fide scientific purpose," 16 U.S.C. § 1374(c)(3)(A), and a research permit may not be issued for the lethal

taking of marine mammal from a species or stock that is depleted "unless the Secretary determines that the results of such research directly benefit that species or stock, or that such research fulfills a critically important research need."  16 U.S.C. § 1374(c)(3)(B); *see also* 50 C.F.R. §§  216.31-216.45 (regulations governing issuance of MMPA scientific research permits). **By definition, this finding cannot be made unless the effect of the activities authorized under the permit on the PBR level is known and understood.**

NMFS is required to submit all MMPA research permit applications to the Marine Mammal Commission ("MMC") for review and comment prior to NMFS approval.  50 C.F.R. § 216.33(d)(2).  The MMC has 45 days in which to raise any objections to the issuance of the permits.  *Id*.  The MMPA further requires that all treatment of animals subject to research be humane, which is defined as "that method of taking which involves the least possible degree of pain and suffering practicable to the mammal involved."  16 U.S.C. § 1362; 50 C.F.R. § 216.3.

## III.    STATEMENT OF FACTS

Steller sea lions are members of the sub-order pinnipedia, which means "winged foot." Answer ¶ 54.  The name "sea lion" came from early explorers, who believed the heavy ruff of fur around the male's neck resembled the mane of a lion.  *Id*.  Females can live as long as 30 years, and males can weigh over half a ton.  *Id*. at ¶ 55.  Their large eyes help them see in the dim light that filters through the rich, cold ocean water in which they live.  *Id*. at ¶ 54.  Pups are born in late spring and summer, weigh approximately 35-50 pounds at birth and usually remain with their mother for up to a year.  *Id*. at ¶ 55.  Females typically give birth to only a single pup each year.  *Id*.

Steller sea lions are divided into two populations, or stocks, both protected under the ESA and the MMPA.  62 Fed. Reg. 24,345, 24,354 (May 5, 1997).  The western stock, located in the

Gulf of Alaska and the Bering Sea/Aleutian Islands, declined by 82% between 1960 and 1990. 55 Fed. Reg. 49,204 (Nov. 26, 1990). In 1997, the western stock was listed as endangered under the ESA. 62 Fed. Reg. 24,345 (May 5, 1997). The eastern stock, found throughout the northern Pacific basin and the coasts of Washington, Oregon and California, was listed as threatened under the ESA in 1990. 55 Fed. Reg. 49,204 (Nov. 26, 1990).

Research has been conducted on Steller sea lions since the late 1980s, when a sharp population decline was identified. 62 Fed. Reg. 24,345, 24,346 (May 5, 1997). During the 1990s, research funding for federal agencies was less than $1 million annually. Answer ¶ 59. During the late 1990s, however, research efforts intensified as public attention grew increasingly focused on the ongoing decline and possible impacts to sea lions from commercial fisheries in Alaska waters. *Id.* In 2001 and 2002, Congress appropriated approximately $80 million for Steller sea lion research, creating the largest research effort on a single species in the history of the United States. *Id.*

Responding to this flood of funding, multiple research entities applied for permits between 2001 and 2005 for permits or permit amendments to "take" Steller sea lions during scientific activities. Answer ¶ 60. Following the $80 million appropriation, in 2005 NMFS' announced receipt of applications from four research entities for new permits and four original permit holders for major modifications to existing permits to allow increased activities. AR-395. These permit requests were granted following issuance of an Environmental Assessment ("EA") under NEPA and a Biological Opinion ("BiOp") under Section 7 of the ESA. AR-406; AR-407. At that time, Plaintiffs contended that an EIS was required to study the significant effects of the research permits, and Defendants refused. AR-401; AR-402; *see also* Letter from David Cottingham, Executive Director, Marine Mammal Commission to Steve Leathery, Chief, Permits

Division, National Marine Fisheries Service (May 19, 2005), a copy of which is attached as Exhibit 1 to the Declaration of James Barrett ("Barrett Declaration").

In 2005, a total of eight entities representing government agencies, universities and private research institutions applied for permits or major permit amendments.  AR-406.  On April 4, 2005, NMFS published notice of its receipt of these permit applications and its issuance of a Draft EA under NEPA evaluating NMFS' proposed issuance of the permits.  AR-395.  Four of the 2005 applications were for new five-year permits, *id*. at 73-74, and five applications were for major amendments to existing permits, extending many of the authorized takes through 2009.  AR-406 at 54-56.

The Final EA concluded that issuance of the permits would not have a significant environmental impact and therefore would not require preparation of an EIS.  AR-406 at 58.  Yet NMFS failed to evaluate the cumulative effects of issuance of a multitude of permits that authorized a significant increase in the amount of take, over a longer period of time, and ignored the fact that its proposed action would result in Steller sea lion mortality exceeding the very threshold that NMFS has established under the MMPA to determine whether a given impact to marine mammals, including Steller sea lions,  could have irreversible species effects – the PBR level.  AR-406 at 79-93.[3]

---

[3] According to the EA, the permits in the proposed action authorized:  (1) harassment takes of over 200,000 Steller sea lions during aerial and vessel surveys; (2) disturbance/harassment of over 145,000 other Steller sea lions during permitted on-the-ground research activities; (3) annual incidental mortality of  up to 60 Steller sea lions, up to 18 of which are from the endangered Western stock;  (4) capture and restraint of 3,115 Steller sea lions, of which 2,000 will be less than two months old; (5) hot branding 2,945 Steller sea lions, some without benefit of anesthesia.  AR-407 at 103-119.  Captured animals will be subject to a variety of invasive procedures, including blood collection, muscle biopsy, tissue sampling, tooth

On May 19, 2005, NMFS received preliminary comments on the EA from the MMC,  an independent agency created to provide impartial oversight of marine mammal conservation policies and programs implemented by federal regulatory agencies.  *See* Ex. 1 to the Barrett Decl.  NMFS is required to consult with the MMC before issuing permits under the MMPA, which provides MMC with a mandatory 45-day comment period.  50 C.F.R. §  216.33(d)(2). The MMC received copies of the permit applications from NMFS on April 22, 2005.  *See* Ex. 1 to the Barrett Decl. at 1. The MMC preliminary comments protested the issuance of the permits and contended that an EIS was required.  *Id*. at 5.  The MMC further requested that NMFS delay its final decision on permit issuance until the MMC submitted its final comments, which were due on or before June 6, 2005, 45 days from the date MMC received the permits from NMFS for review.  *Id*. at 1.

Without waiting to receive the MMC's final comments, NMFS purported to complete its review under NEPA and the ESA on May 24, 2005, AR-406, AR-404, AR-407, and issued the first permit on or about May 27, 2005.  Answer ¶ 69.  The MMC issued its formal comments on June 10, 2005, reiterating that NMFS should perform an EIS before issuing the permits.  *See* Letter from David Cottingham, Executive Director, Marine Mammal Commission, to Steve Leathery, Chief, Permits Division, National Marine Fisheries Service (June 10, 2005), a copy of which is attached as Ex. 2 to the Barrett Decl.  Disregarding the MMC recommendations, NMFS issued additional permits on or about June 16, 2005.  AR-113.

---

extraction and collection of nails, whiskers and hair.  *Id*.  Blubber biopsies will be taken from 470 Steller sea lions, 1070 will have enemas or stomach intubation, and 1,599 will be subjected to insertion devices to collect fecal samples, skin and mucous.  In addition, one of the permittees, the Alaska Sea Life Center, will be allowed to capture and retain 16 juvenile sea lions for up to three months to subject them to forced fasting and repeated sampling  of various bodily fluids and tissues, as well as branding and attachment of remote monitoring devices prior to release. *Id*.

Following permit issuance, NMFS conceded that it, too, had concerns about the scope of research being performed on Steller sea lions, and decided to prepare an after-the-fact EIS.  *See* Letter from William T. Hogarth to David J. Hayes, June 27, 2005 ("Hogarth Letter"), a copy of which is attached as Ex. 3 to the Barrett Decl.  NMFS formalized this concern on December 28, 2005, when it published a notice in the Federal Register announcing its intent to prepare an EIS evaluating impacts of research on Steller sea lions and northern fur seals.  70 Fed. Reg. 76,780 (Dec. 28, 2005), a copy of which is attached as Ex. 4 to the Barrett Decl.  The notice outlined numerous unresolved issues, which Plaintiffs have excerpted verbatim herein at page 15, fn. 4.

The sum and substance of these issues is that NMFS has not analyzed the impact that the already approved research activities will have on the declining Steller sea lion stocks.  The notice also reflects NMFS' frank admission that its action in approving Steller sea lion research permits is not only subject to NEPA requirements, but that it is a significant action that triggers an obligation to prepare an EIS.  Despite this admission, NMFS did not suspend the permits and research currently is underway in the Gulf of Alaska, and throughout the range of Steller sea lions in the United States, including California, Oregon, Washington and Alaska.  Answer ¶ 73.

## IV.    ARGUMENT

### A.    Standard of Review

When, as here, a court reviews a final decision of an administrative agency, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Nat'l Wilderness Inst. v. U.S. Army Corps of Eng'rs,* Civ. No. 01-0273, 2005 U.S. Dist. LEXIS 5159, at *24 (D.D.C. Mar.

23, 2005) (*citing Home Builders Ass'n of N. Cal. v. U. S. Fish & Wildlife Serv.*, 268 F. Supp. 2d

1197, 1207 (E.D. Cal. 2003)).

In this case, Plaintiffs' claims are reviewable under the standards set forth in the APA.

*See Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 686 (D.C. Cir. 1982) (challenge to

agency action under ESA subject to APA "arbitrary and capricious" standard of review); *Bennett*

*v. Spear*, 520 U.S. 154, 174-79, 117 S. Ct. 1166, 1167-69, 137 L. Ed. 2d 281, 302 (1997) (claims

alleging violation of ESA Section 7 reviewable under APA).  The APA requires courts to "hold

unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," along with any agency action taken "without observance

of procedure required by law."  5 U.S.C. § 706(2).  At a minimum, the agency must have

reviewed the relevant data and articulated a satisfactory explanation for its action.  *Huls Am., Inc.*

*v. Browner*, 83 F.3d 445, 452 (D.C. Cir. 1996); *Am. Trucking Ass'n, Inc. v. EPA*, 283 F.3d 355,

362 (D.C. Cir. 2002) (agency's determinations must be "reasonable and supported by the

record").  Thus, an agency must "take whatever steps it needs to provide an explanation that will

enable the court to evaluate the agency's rationale at the time of decision."  *Jost v. Surface*

*Trans. Bd.*, 194 F.3d 79, 85 (D.C. Cir. 1999) (agency must adequately explain its result) (*quoting*

*Dickson v. Sec'y  of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995)); *Am. Lung Ass'n v. EPA*, 134

F.3d 388, 392 (D.C. Cir. 1998) ("judicial review can occur only when agencies explain their

decisions with precision").

> **B.      Defendants Violated NEPA**

The Administrative Record shows that NMFS failed to satisfy NEPA's environmental

review requirements before it issued its EA, FONSI and the multiple research permits for Steller

sea lions that are being used today to poke, prod, invasively sample and ultimately kill members

of an endangered and threatened species. When reviewing agency decisions under NEPA, the role of the court is "to insure that the agency has taken a 'hard look' at the environmental consequences." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21, 96 S. Ct. 2718, 2730 n.21, 49 L. Ed. 2d 576, 590 (1976), *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 151 (D.C. Cir. 1985) (stating the role of the judiciary is to ensure the agency's "legal duty" to take a "hard look" is fulfilled). This Circuit has noted that "the critical judicial task is 'to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" *Id.* at 151 (*citing Balt. Gas & Elec. v. Natural Res. Def. Council*, 462 U.S. 87, 98, 103 S. Ct. 2246, 2252, 76 L. Ed. 2d 437, 447 (1983)).

For purposes of this legal action, the test for NEPA compliance is simple: Would NMFS' proposed action reasonably be expected to have a ***significant*** adverse impact on the protected, and declining, Steller sea lion population? If the answer to that question is "yes," NMFS had an unavoidable duty to prepare an EIS before it issued the permits pursuant to all applicable NEPA requirements. *See Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983) ("[NEPA] requires federal agencies to evaluate the environmental consequences of their actions *prior* to commitment to any actions which might affect the quality of the human environment. If *any* 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared *before* the action is taken."). This case is unusual in that, rather than disputing the significance of the actions at issue, the agency itself has conceded that its actions are significant by declaring its intent to prepare an EIS. *See* Ex. 4 to the Barrett Decl.

### 1.    NMFS Failed To Prepare an EIS Before Issuing The Permits

NMFS has candidly admitted that its action is subject to NEPA's EIS requirements. As discussed above, NMFS wrote a letter to the Plaintiffs expressing its concern regarding the effect

that the research permits could have on the Steller sea lions, and expressing its intent to prepare

an EIS to evaluate same. *See* Ex. 3 to the Barrett Decl. NMFS then took the formal step of

announcing in the Federal Register its intent to prepare an EIS to evaluate the impact of the

research permits (and associated activities) on Steller sea lions. *See* Ex. 4 to the Barrett Decl. In

so doing, NMFS outlined myriad unresolved issues that would be the subject of an EIS.[4]

---

[4] The Federal Register notice announcing NMFS' intent to prepare an EIS described the following issues to be included in that review:

> *(1) Types of research methods and protocols permitted. For example, are there critical research needs for these species other than those identified in the Recovery or Conservation Plans? If so, what are they and how are they likely to benefit the species? Of the research, information, and monitoring needs identified in the Recovery and Conservation Plans, what are the most appropriate methods to conduct the study or obtain the information? What criteria for developing and incorporating new research techniques should be used?*

> *(2) Level of research effort. For example, how much of a specific research activity (e.g., aerial survey, tagging, biopsy sampling, etc.) is enough for management and conservation needs? Can there be too much?*

> *If so, how should NMFS set limits? Are the current methods to assess and document numbers of different ``takes'' that occur as a result of permitted research appropriate? Should there be different standards or more restrictions placed on research conducted on certain age, sex, or life-history stages or on the geographic or temporal distribution of research effort? If so, what should those limitations be?*

> *(3) Coordination of research. For example, assuming permits are issued to multiple individuals, what are the most appropriate mechanisms for ensuring research is coordinated to maximize information and reduce adverse impacts? Alternatively, should NMFS consider limiting the number of permits to increase coordination and cooperation? If so, how should this be accomplished? Should researchers operating under different permits (but studying the same or related questions such as aerial survey for population census or biopsy for population genetics) be required to use the same or similar methods to ensure the information collected is comparable and useful for NMFS conservation of the species? If so, what methods are most appropriate (e.g., for aerial surveys; capture and restraint; tissue sampling; marking; etc.)? If not, how should NMFS compare or use the data from various permit holders in its management decisions?*

Remarkably, despite NMFS' solemn recognition that the research activities must be analyzed in an EIS, NMFS blithely sanctioned the continuance of activities under the approved research permits.

NMFS' approach here is a classic head-scratcher. On one hand, it is a bold, if brazen, disregard of NEPA procedure – under which an EIS is required to be prepared *before* the agency takes final action. On the other hand, it is a glittering pronouncement that, yes, NMFS' action to approve research permits is *a major agency action that could have significant adverse impacts on Steller sea lion populations.*

When NMFS issued research permits allowing takes of Steller sea lions before preparing the EIS that NMFS itself admitted was necessary, it violated NEPA's timing requirements. *See*

---

*(4) Effects of research. NMFS will be assessing possible effects of the various research methods using all appropriate available information. Anyone having relevant information they believe NMFS should consider in its analysis should provide a complete citation or reference for retrieving the information. In addition, NMFS is seeking recommendations for study designs that could detect or predict the effects of research on Steller sea lions and northern fur seals.*

*(5) Qualification of researchers. For example, to ensure the study is conducted successfully and with the minimum of adverse impacts, how much prior experience should a permit applicant, principal investigator, or anyone else operating under a permit have with the specific methods for which they seek a permit?*

*(6) Criteria for allowing modifications or amendments to existing grants and permits; for denying permit amendments; and for suspending or revoking permits. In addition to the existing statutory and regulatory criteria for permit issuance and denial, should there be restrictions on the number or type of permit modifications or amendments issued over the life of a permit? With respect to environmental impacts, under what conditions should a permit be modified, revoked or suspended by NMFS?*

Ex. 4 to the Barrett Decl. at 76,781-76,782.

40 C.F.R. § 1502.5 ("The [EIS] shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made."). This Circuit has stated that "[i]f any 'significant' environmental impacts might result from the proposed action then an EIS must be prepared before the action is taken." *Sierra Club,* 717 F.2d at 1415. The *Sierra Club* court held that the agency could not issue certain oil and gas leases prior to preparing an EIS because, despite the fact that it retained the power to mitigate environmental harm that may be caused by future "site-specific" proposals, it remained "unable to preclude activities which might have unacceptable environmental consequences." *Id.* Likewise, NMFS' pledge to suspend research permits once 10 endangered Steller sea lions have been documented as killed fails to "preclude activities which might have unacceptable environmental consequences." *See id.*; Am. Compl. ¶ 79; Answer ¶ 79. By the time this suspension occurs, the mortality rate will have already exceeded the allowable PBR level and thus, significant impact already will have occurred.

In a similar case, where an agency moved forward with its proposed action and later declared it would prepare an EIS to consider long-term effects, this Court found that "the governing law is clear that the EIS must be prepared at the time the agency commences with its program." *Humane Soc'y of the U.S. v. Clark*, C.A. 99-0424, 1999 U.S. Dist. LEXIS 3686, at *16-17 (D.D.C. Mar. 17, 1999) (finding that in light of the Supreme Court's ruling in *Kleppe v. Sierra Club*, 427 U.S. at 405-06, that "the courts must require agencies to prepare an EIS at the time the proposal for a major federal action occurs," the plaintiffs in this case were correct that "an EIS [was] required prior to the agency's promulgation of the program."). To comply with NEPA, NMFS was required to prepare an EIS before issuing any research permits.

The U.S. Supreme Court has stated that the NEPA requirement to prepare an EIS "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens*, 490 U.S. 332, 349, 109 S. Ct. 1835, 1845, 104 L. Ed. 2d 351, 369 (1989). The NEPA process must be initiated "early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made." *See Save the Yaak Comm. v. Block*, 840 F.2d 714, 718 (9th Cir. 1988) (*citing* 40 C.F.R. § 1502.5). Because the impacts of NMFS' proposed action are significant, and so that the agency's NEPA process can serve as a decision-making tool rather than a justification of actions taken and resources committed, it is essential that the agency not be permitted to move forward with its proposal prior to completing its statutory obligations under NEPA. As such, the permits must be revoked or stayed pending NMFS' completion of an EIS.

As the Ninth Circuit noted in a similar case, "[T]he comprehensive 'hard look' mandated by Congress and required by [NEPA] must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *See Metcalf v. Daley*, 214 F.3d 1135, 1142, 1146 (9th Cir. 2000) (describing NMFS' decision to first authorize the killing of whales and then prepare a NEPA document after-the-fact as "a classic Wonderland case of first-the-verdict, then-the-trial").

In short, NMFS, by its own admission, has now conceded that the effects of its actions in issuing the research permits were significant, requiring an EIS. *See* Ex. 4 to the Barrett Decl. There is simply no credible dispute that NMFS violated NEPA in issuing the permits without first preparing an EIS, and this Court therefore should suspend or invalidate the permits until the requisite environmental review is completed. That review will include, according to NMFS, an

analysis of (1) the types of research methods and protocols permitted, (2) the level of the research effort, (3) coordination of that research, (4) effects of the research, (5) researchers' qualifications, and (6) criteria for allowing modifications or amendments to existing permits, denying permit amendments and suspending or revoking permits. *Id.* at 76,781-76,782.  These are the very issues that NMFS failed to analyze in the EA, *see* AR-406, and the very issues that are crucial for determining whether the research permits should be issued at all in light of their effects on Steller sea lions.  Because this legal violation is clear and indisputable, the Court need go no further to resolve Plaintiffs' NEPA claim in this case.

## 2.    NMFS Was Required To Prepare an EIS

### a.    The Effects of the Proposed  Action Were Significant

Even if Defendants had not effectively conceded the need for an EIS in this case, there are several independent bases for concluding that the impacts on Steller sea lions of NMFS' action in approving the research permit applications are in fact "significant" under NEPA.

#### (1)    Activities Authorized Under The Permits Will Exceed The PBR level

NMFS frankly admits that its actions will result in Steller sea lion mortality levels that exceed the PBR level for this species, Answer ¶ 74, which is that level beyond which the species' decline may be irreversible.  The PBR level for the western stock of this species is 208 deaths annually.  AR-401 at 4.  Estimated mortality from native harvest (171 deaths) and fisheries (29.5 deaths) totals 197 deaths, which leaves only 11 mortalities remaining before the PBR level is exceeded.  *Id.*  Yet the permits issued by NMFS authorize potential annual mortality of approximately 50 Steller sea lions from the western stock, clearly an exceedance of the PBR level that constitutes a significant adverse impact.  AR-407 at 69; *see also Earth Island*

*Inst. v. Evans*, No. C 03-0007, 2004 U.S. Dist. LEXIS 15729 (N.D. Cal. Aug. 9, 2004) (if

dolphin mortality figures exceed PBR level, this fact alone would require a finding of significant

adverse impact); *Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004).

The PBR level functions as a baseline for limiting unnatural casualties in marine

mammals.  16 U.S.C. § 1362(20).[5]  Under the MMPA, the PBR level is defined as "the

maximum number of animals, not including natural mortalities, that may be removed from a

marine mammal stock while allowing that stock to reach or maintain its optimum sustainable

population."  *Id.*  The PBR level is the "maximum allowable level of anthropogenic mortality . . .

for each stock of marine mammals."  *See* Ex. 5 to the Barrett Decl. at 4.  Perhaps the simplest

way to interpret a PBR level is to view it as "represent[ing] the most deaths a species can sustain

from unnatural causes before its recovery is threatened."  *See* Mark Johnson, *Experts unravel*

*mystery of blue whale's death*, SouthCoast Today, Dec. 6, 1998, a copy of which is attached as

Ex. 6 to the Barrett Decl.

NMFS is charged with calculating PBR levels for species protected by the MMPA.  PBR

levels are "intended to be a conservative estimate of the number of animals from a particular

species that can safely be removed without jeopardizing the population."  *See* The Fund for

Animals, *Petition to List the Gray Whale Under the ESA: Part III* (Mar. 28, 2001), a copy of

which is attached as Ex. 7 to the Barrett Decl.  So long as the total number of anthropogenic

---

[5] The MMPA's overall goal is to maintain marine mammal populations at their respective optimum sustainable populations ("OSPs").  *See Animal Welfare Inst. v. Kreps*, 561 F.2d 1002, 1014 (D.C. Cir. 1977).  NMFS has defined OSP to be a population size exceeding the maximum net productivity level ("MNPL"), where MNPL is "the population size yielding the greatest net increment from additions to the population due to reproduction and growth, minus losses due to natural mortality."  *See* Andrew J. Read, Report to ASCOBANS, *Potential Mitigation Measures for Reducing the By-catches of Small Cetaceans in ASCOBANS Waters* (Dec. 27, 2000), a copy of which is attached as Ex. 5 to the Barrett Decl. at 4.

removals remains below the PBR level, marine mammal species should equilibrate above the

MNPL level, meeting the overarching goal of the MMPA.  *Id.*

     In other words, the PBR level established by NMFS provides an undeniable litmus test

for determining the significance of agency action on an affected species (in this case, the Steller

sea lions).  It would be remarkable in the extreme for the government to now take the position

that the very levels it has established to assure recovery of the endangered Steller sea lion species

are not a "significance" barometer for purposes of NEPA review.  In short, Defendants'

authorization of the research permits presently at issue not only reflects a *per se* violation of the

MMPA's fundamental purpose, it creates a significant impact that must be analyzed in an EIS

under NEPA.[6]

### (2)    NMFS' Action is Controversial, Involves Unknown and Uncertain Effects and Results in Significant Cumulative Impacts

     The proposed action is significant not only because NMFS says it is, but also because

"the effects are likely to be highly controversial," "the possible effects are highly uncertain or

involve unique or unknown risks," and the action results in "cumulatively significant impacts."

40 C.F.R. § 1508.27(b).  *See Fund for Animals v. Norton,* 281 F. Supp. 2d 209, 231, 235 (D.D.C.

---

[6] Indeed, by allowing exceedance of the PBR level, Defendants have undercut the very purpose of the research: conserving the population of Steller sea lions by maintaining the OSP. The stock assessment for the endangered western stock of Steller sea lions notes that a minimum of 176 deaths are caused each year by subsistence hunting by Alaskan Natives. *See Alaska Marine Mammal Stock Assessments*, 2003, NOAA Tech. Memo. NMFS AFSC-144 (August 2004), a copy of which is attached as Ex. 8 to the Barrett Decl.  Exceeding the PBR level, by its very definition, directly reduces the ability of the species to recover, which means Defendants are allowing research permittees to kill so many Steller sea lions that their activities are contributing to the decline of the very animals the research is designed to protect.  Such action cannot be "reasonable" and is clearly not "supported by the record."  *Am. Trucking Ass'n,* 283 F.3d at 362.

2003) ("the existence of one or more significance factors can justify setting aside a FONSI and remanding either for further consideration of those factors or preparation of an EIS").

**(a)    The Permits Allow Research Activities That Are Highly Controversial**

That the effects of the proposed action are "likely to be highly controversial" is established by both the MMC comments in the record urging NMFS to prepare an EIS and the NMFS' own admission that an EIS is required. *See Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 43 (D.D.C. 2000) (finding "highly controversial effects" when three federal agencies and one state agency urged preparation of an EIS while several members of the public and the Army Corps' own leadership expressed concern over the proposed action); *see also Coal. on Sensible Transp. Inc. v. Dole*, 642 F. Supp. 573, 587 (D.D.C. 1986) (finding it significant that "no agency charged with environmental responsibility opposed . . . [the] project.") (internal quotations omitted), *aff'd*, 826 F.2d 60 (D.C. Cir. 1987) (*citing W. Houston Air Comm. v. Fed. Aviation Admin.*, 784 F.2d 702, 705 (5th Cir. 1986)). The MMC's final comments to the proposed action urged NMFS to reconsider its FONSI and either "(1) provide additional explanation of its rationale for such a finding . . . ; (2) reduce the scope of . . . research projects [with] the highest potential to result in sea lion mortalities . . .; or (3) prepare an environmental impact statement on the proposed action," Ex. 2 to the Barrett Decl. at 2, thereby illustrating the controversial nature, and thus the significance, of the proposed permit action.

Moreover, NMFS itself admitted having concerns about the research and has now conceded that an EIS was required. *See* Ex. 4 to the Barrett Decl.; *see also* Ex. 3 to the Barrett Decl. In *Friends of the Earth*, the fact that the Army Corps' own leadership expressed concern about the effects of the proposed action was a factor leading the court to find the existence of

22

"highly controversial effects." *Friends of the Earth*, 109 F. Supp. 2d at 43. Likewise here, NMFS can hardly claim it has made a convincing case that the impact is insignificant when the agency itself conceded the need for an EIS and admitted concern about the impacts of that action.

**(b)    The Effects Of The Permitted Activities Are Highly Uncertain**

The issuance of Steller sea lion research permits is also significant because it poses "highly uncertain effects or unknown risks." NMFS admits this. Indeed, the Final EA acknowledges that "[t]here have been no studies dedicated to documenting and assessing the effects of research on Steller sea lion stock or population. The cumulative effects of various research activities on Steller sea lions, including the possibility of cumulative effects that may not become evident for some time, are uncertain." AR-406 at 120.

Both the issuance of multiple new permits and major amendments to existing permits for intrusive research on Steller sea lions – the negative effects of which are "uncertain" – are precisely the types of actions that require an EIS because of their "highly uncertain effects." *See Fund for Animals v. Norton*, 281 F. Supp. 2d at 234 (finding that the agency "failed to identify the precise locations at which mute swans will be killed, the number of birds that will be killed at particular individual sites, or the environmental impacts of those killings on local communities" and, as such, the effects of the proposed action were highly uncertain).

**(c)    The Permits Have Significant Cumulative Impacts**

NMFS states in its EA that the cumulative impacts of its action on the Steller sea lion populations are unknown and uncertain. AR-406 at 120. At the threshold, the fact that its action

23

exceeds the PBR for this species would suggest, if not conclusively establish, that the impact will have an adverse cumulative impact which is significant. *See* discussion *supra at* 19-21. Moreover, although NMFS provides a "brief summary of the past, present, and future human-related activities affecting the marine mammals, particularly Steller sea lions, within the action area," these dismissive and conclusory remarks can hardly suffice as a discussion and analysis of possible "cumulatively significant impacts." AR-406 at 51; *see generally*, AR-406 at 51-57.

Something more than several pages of conclusory remarks and summaries of future actions is required to properly analyze whether a cumulatively significant impact exists such that preparation of an EIS is statutorily required. *See Friends of the Earth*, 109 F. Supp. 2d at 42 (finding insufficient the agency's conclusory remarks that the impact of three permits for riverboat casinos would be "minimal" because, despite 9-10 pages of discussion in each of three EAs, there was no analysis of cumulative impacts); *see also Citizens Exposing Truth About Casinos v. Norton,* Case No. A-03-CA-242, 2004 U.S. Dist. LEXIS 27498, at *27-28 (D.D.C. Feb. 24, 2004) (finding insufficient analysis in the EA when the agency makes such conclusory and dismissive statements as "when evaluated together with future projected increases in ambient noise in the vicinity, there will be some increase in noise, but it will probably not be measurable").

### 3.    NMFS' EA Violated NEPA

Even if no EIS were required in this case, the EA prepared by NMFS is itself fundamentally insufficient to satisfy the requirements of NEPA.

### a.    The EA Failed to Adequately Consider Alternatives

NMFS violated NEPA because it did not "study, develop, and describe appropriate alternatives to recommended courses of action," as required under NEPA, 42 U.S.C. § 4332(2)(E), when it dismissed all alternatives but the proposed action and a no action alternative in its EA.  AR-406 at 30-33.  NMFS briefly mentioned three other alternatives in the EA, but did not provide any independent analysis of their feasibility.  *Id.*  In fact, NMFS inappropriately dismissed two of the alternatives by referencing self-serving, unsupported assertions made by the permittees.  AR-406 at 32-33.  ("[Non-intrusive population monitoring only] was not considered further because permit holders and applicants have indicated it is important for them to conduct the intrusive activities to obtain information on the physiology, foraging behavior, health and reproductive status of individual sea lions.").  This is precisely the type of hurried and unreasoned decision-making that courts have warned against.  *See S. Utah Wilderness v. Norton*, 237 F. Supp. 2d 48, 52-54 (D.D.C. 2002) (holding that while agency should consider the project applicant's needs when discussing alternatives, the agency was required to independently analyze the feasibility of certain alternatives instead of dismissing them merely because the applicants declared the alternatives wouldn't meet their objectives).

In order to fulfill its statutory obligations under NEPA, NMFS is required to adequately consider feasible alternatives, the "heart" of the NEPA process.  40 C.F.R. §§ 1502.14, 1508.9. Judicial intervention is required here for the same reason as in *Southern Utah Wilderness* – the Administrative Record shows an agency "in a hurry to approve the . . . project" and alternatives rejected because of permit applicant statements about the feasibility of alternatives rather than reasoned discussion and analysis by the agency.  *See S. Utah Wilderness*, 237 F. Supp. 2d at 53-

54  (noting judicial intervention would not be required had the record shown that the agency

carefully considered alternatives and then provided reasons for their rejection).

**b.     The EA Failed To Take A Hard Look at Impacts**

For all the reasons already discussed in reference to the need for an EIS in this case,

NMFS failed to take the required "hard look" at the impacts associated with the scientific

research permits when it issued a FONSI after a rushed NEPA process that produced an EA

replete with conclusory statements rather than discussion and analysis of the impact of the

proposed action and its alternatives.  An EA containing the agency's conclusory statements

without any accompanying analysis or evaluation does not satisfy the "hard look" requirement.

*See Friends of the Earth, Inc.*, 109 F. Supp. 2d at 38-39 (finding conclusory statements in the EA

such as "impact 'is not expected to be significant'" without further analysis inadequate to support

a finding that the agency took a "hard look").  Here, like the Army Corps of Engineers in *Friends*

*of the Earth*, NMFS dismissed the significance of the proposed action through its failure to give

any consideration whatsoever to the exceedance of the PBR level.  Indeed, the agency's EA

ignores the fact that its action will result in Steller sea lions deaths at levels that exceed the PBR

for this species.  The agency also failed to consider the cumulatively significant impacts of its

action – it merely states that such impacts are unknown.  And it failed to consider reasonable

alternatives to issuance of the permits, instead offering self-serving statements to exclude

alternatives from consideration.  There is no justification for NMFS' abject failure to take a hard

look at the impacts of its action.  *See Idaho v. Interstate Commerce Comm'n*, 35 F.3d 585, 596

(D.D.C. 1994) (*citing Cabinet Mountains Wilderness v. Peterson*, 685 F.2d at 882) (remanding

the Commission's decision not to prepare an EIS because "without the requisite hard look, we

26

cannot determine whether the Commission made a convincing case that the impact was insignificant . . . .") (internal quotations omitted).

In addition, NMFS' request that the MMC, an independent federal agency created to provide oversight of marine mammal conservation policies, expedite its comments on the Draft EA based on a purported "pressing need to issue the permits," *see* Ex. 1 to the Barrett Decl. at 1, weighs against any argument that it took the required "hard look" before taking action that significantly impacts the environment. *See Fund for Animals v. Norton*, 281 F. Supp. 2d at 226 n.11, 226-29 (finding the agency failed to take the requisite hard look because, among other things, it gave those commenting insufficient time to respond to the Draft EA, as several individuals and organizations asked for more time to provide complete comments).

In response to NMFS' request, the MMC submitted preliminary comments 17 days short of the required 45-day comment period, concluding that it was unable to find that the research would not significantly impact the Steller sea lion population and requesting NMFS delay any decision until the MMC was able to have a full review period. *See* Ex. 1 to the Barrett Decl. NMFS, however, quickly issued the permits without waiting for final MMC comments. AR-406 (EA issued May 24, 2005); AR-404 (FONSI issued May 24, 2005); AR-407 (BiOp issued May 24, 2005); Answer ¶ 69. This action illustrates NMFS' inexplicable decision to subordinate reasoned environmental analysis to its desire to issue the research permits.[7]

---

[7] It is particularly troubling that NMFS stated in its recent Federal Register notice that it is considering eliminating from detailed study in its future EIS three alternatives – imposing a research moratorium, suspending intrusive research activities, and retaining the status quo, thereby eliminating the ability of researchers to change the conditions of their permits – "because they would not allow conduct of research." Ex. 4 to the Barrett Decl. at 76,782. It appears that NMFS already is circumscribing the scope of its environmental review of the

C.    **Defendants Violated The ESA**

As discussed above, under section 7 of the ESA, NMFS was required to ensure its issuance of the scientific research permits was not likely to jeopardize the continued existence of Steller sea lions.  16 U.S.C. § 1536(a)(2).   Because the permits are likely to affect sea lions, NMFS was required, as the action agency issuing the permits, to consult with itself, as the resource agency with jurisdiction over Steller sea lions, under Section 7.  50 C.F.R. § 402.14(a). Specifically, NMFS was directed in its formal consultation process to "evaluate the *effects of the action and cumulative effects on the listed species* or critical habitat," and to "[f]ormulate its biological opinion as to *whether the action, taken together with cumulative effects*, is likely to jeopardize the continued existence of the listed species."  50 C.F.R. § 402.14(g)(3)-(4) (emphasis added).  In so doing, NMFS was required to "use the best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).

Furthermore, NMFS was prohibited from taking any action that would constitute an irreversible or irretrievable commitment of resources that would have the effect of foreclosing the formulation or implementation of reasonable and prudent alternatives to issuance of the permits.  16 U.S.C. § 1536(d).  NMFS violated the ESA by (1) failing to fulfill its Section 7 requirements to both analyze the effects of the proposed action and to evaluate the cumulative effects, and (2) taking actions that foreclosed formulation or implementation of reasonable and prudent alternatives prior to issuance of the permits.

---

impacts of these permits and exhibiting a predisposition to issue the permits notwithstanding the outcome of its purported EIS.  This is all the more reason why this Court should revoke the permits pending the outcome of that environmental review.  *See Metcalf*, 214 F.3d at 1142 (finding that agency approval to kill whales before completing NEPA process must be set aside while NEPA document was prepared in order to ensure that the new NEPA process was accomplished "objectively and in good faith").

### 1.    NMFS Failed to Fully Consider the Effects of the Proposed Action

In conducting a formal Section 7 consultation, NMFS is required to engage in a "detailed discussion of the effects of the [proposed] action on the listed species."  50 C.F.R. § 402.14(h)(2).  "Effects of the action" are defined as "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, *that will be added to the environmental baseline*."  50 C.F.R. § 402.02 (emphasis added). The environmental baseline includes "the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early Section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process."  50 C.F.R. § 402.02.

Despite this clear statutory mandate, NMFS failed to issue a BiOp that adequately analyzes the effects of the proposed action when added to the environmental baseline.[8]  This

---

[8] The "Effects of the Action" section of the BiOp presents data in both narrative and tabular form.  However, the data are inconsistent between the sections.  For example, while the narrative portion of the BiOp states that teeth will be extracted from "about 720 Steller sea lions," the tabular portion of the BiOp reflects a teeth extraction figure of more than twice that amount (extraction from 1543 Steller sea lions).  *See* AR-407 at 11-12, 53.  A review of the 2002 BiOp reveals that much of the data in the narrative portion of the 2005 BiOp have been copied verbatim from the 2002 BiOp, including the figure of teeth extraction from 720 Steller sea lions, leaving the data in the 2005 BiOp incongruent between the tables and the narrative.  Presuming that the table reflects current data, and the narrative reflects the stale 2002 data, the actual *discussion* of the effects of the proposed action relies on data that are three years old, corresponds to a different set of permits and is, in many instances, reflective of a much lower number of takes than is quantified in the 2005 BiOp table.  Due to this inconsistency, it is impossible to determine whether NMFS based its "no jeopardy" finding on data from the outdated 2002 BiOp or on actual data submitted in the 2005 permit applications.  *See* AR-389 (2002 BiOp contains the same data as are present in the narrative portion of the 2005 BiOp).  Additionally, the "Status of the Species and Environmental Baseline" section is deficient.  In this case, the data are not inconsistent, but instead are sparse and inadequate.  The statistics regarding past research permits granted illustrates this point; the data discussed span permits granted only

29

Court has repeatedly emphasized that the consulting agency has not fulfilled its requirement to consider such effects when the agency considers the effects of the proposed action and the environmental baseline in isolation.  *Oceana, Inc. v. Evans,* 384 F. Supp. 2d 203, 230 (D.D.C. 2005); *Defenders of Wildlife v. Norton*, No. 99-927, 2003 U.S. Dist. LEXIS 26558, at *19 (D.D.C. Jan. 7, 2003) ("*Defenders II*"); *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 127-28 (D.D.C. 2001) ("*Defenders I*").   In other words, "[s]imply reciting the activities and impacts that constitute the baseline and then separately addressing only the impacts of the particular agency in isolation is not sufficient." *Defenders I*, 130 F. Supp. 2d at 127-28.  At best, the NMFS BiOp merely presents a bifurcated recitation of the effects of the action on the one hand, and the environmental baseline on the other.

While it is true that the NMFS BiOp contains sections titled  "Effects of the Proposed Action," AR-407 at 46-61, and "Status of the Species and Environmental Baseline," AR-407 at 29-46,  the BiOp is fatally flawed because there is no meaningful discussion of the effects of the proposed permits when added to the environmental baseline.  In *Defenders I*, this Court carefully examined an INS/Border Patrol BiOp, and noted that despite its separate discussions of both the environmental baseline, including all relevant federal activities impacting the Sonoran pronghorn, and the anticipated effects of the proposed activities, the BiOp was "deficient [because] it does not analyze the effects of the activity in light of the environmental baseline." *Defenders I,* 130 F. Supp. 2d at 127.

---

up to 1998, and for the years included simply provide an aggregate number of Steller sea lions that were approached, tagged, captured, branded or killed by researchers.  AR-407 at 43.  This lack of updated data in the environmental baseline description is inexcusable, particularly given NMFS' receipt of annual reports containing 2004 data on takes from many permittees.  *See e.g.*, AR-145, AR-177.

The NMFS BiOp suffers from precisely the same problem – it fails to undertake any "analysis of the total impact on the species." *Id.* at 128. The "Integration and Synthesis of Effects" section of the BiOp provides only limited aggregate information regarding the permits at issue. Specifically, the BiOp estimates that the issuance of the permits is "expected to result in the accidental death of approximately 50 threatened or endangered Steller sea lions over the next 5 years," though the BiOp also states that this may be an underestimation. AR-407 at 69. However, even this "Synthesis" portion of the BiOp fails to present data regarding the effects of those estimated 50 deaths when combined with the already outstanding permits, as well as other past and present Federal, State and private actions. Accordingly, this "synthesis" does not fulfill the requirement that the NMFS BiOp must include an analysis of the effects of the action in conjunction with the environmental baseline.

The similarities between the NMFS BiOp and the NPS BiOp found to be deficient in *Defenders II,* also illustrate NMFS' shortcomings in its discussion of the effects of the action. In *Defenders II*, this Court found the NPS BiOp, despite being revised and somewhat improved, was insufficient because it still failed to "specifically and comprehensively connect the agency action at issue with the environmental baseline." *Defenders II*, 2003 U.S. Dist. LEXIS 26558, at *19. In holding that the BiOp was deficient, this Court focused on the "cryptic and cursory" two-paragraph "Conclusion" section in the NPS BiOp, which read "after reviewing the current status of the Sonoran pronghorn, the environmental baseline for the action area, the effects of the NPS GNP for Organ Pipe Cactus NM, and the cumulative effects, it is the Service's opinion that the GMP, as proposed is not likely to jeopardize the continued existence of the Sonoran pronghorn." *Id.* at 18-19 (*quoting NPS BiOp* at 54).

What is striking here is that the "Conclusion" section of the faulty NPS BiOp is actually *identical* to the text of the "Conclusion" section of the NMFS BiOp, save for differing factual references. *See* AR-407 at 69. Just as this Court viewed the brief "Conclusion" section of the NPS BiOp as endemic of that BiOp's "failure to specifically and comprehensively connect the agency action at issue with the environmental baseline," *Defenders II*, 2003 U.S. Dist. LEXIS 26558, at *19, so too does the "Conclusion" portion of the NMFS BiOp highlight the insufficiency of NMFS' proffered effects analysis.

Defendants may point to this Court's opinion in *Oceana* as support for the proposition that NMFS was not required to "numerically add the takes from different sources together" in conducting a proper analysis of the effects of the action. *Oceana,* 384 F. Supp. 2d at 230. However, in holding that a failure to numerically add the effects to the baseline may not be fatal to a BiOp, this Court did nothing to alter the requirement that the environmental baseline and the effects of the proposed action must be viewed cumulatively. To the contrary, this Court specifically pointed to several elements in the BiOp in *Oceana* which rendered it sufficient, including: thoroughly discussing the anthropogenic effects on the loggerhead turtles; detailing, quantitatively (in table form) and narratively, the anticipated takes from other federally approved fisheries; listing the number of lethal and non-lethal takes for previously authorized federal projects; and discussing efforts of the agency and others to reduce the effects and improve the baseline. *Id.* at 230-31.

In contrast, while the NMFS BiOp here gives lip service to both the anthropogenic effects on Steller sea lions and mitigation measures, it fails to discuss the scant data presented regarding such components of the environmental baseline such as fisheries, subsistence hunting, and previously authorized research permits *in combination* with the effects of the proposed permits.

It is this lack of cumulative analysis, and not simply NMFS' failure to "numerically add the takes from different sources together," which distinguishes the NMFS BiOp from the BiOp in *Oceana*, and renders it inadequate.

In summary, not only are the individual environmental baseline and effects of the proposed action sections of the NMFS BiOp severely flawed, but there has been no effort to consider the two sections in connection to one another. For these reasons, the NMFS BiOp falls woefully short of the standards articulated by this Court in *Defenders I, Defenders II* and *Oceana,* and thus violates the ESA.

### 2.    NMFS Failed to Consider Cumulative Effects

Just as NMFS failed to comply with the statutory mandate to consider the effects of the proposed permits in conjunction with the environmental baseline, so too did the agency fail when it neglected to adequately consider the cumulative effects. As discussed above, when conducting a formal consultation, the agency must evaluate not only the effects of the action, but also the "cumulative effects on the listed species." 50 C.F.R. § 402.14(g)(3). Cumulative effects are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02.

In the instant case, NMFS blatantly failed to make even the most minimal effort to engage in a cumulative effects analysis. Shockingly, the cornerstone sentence of the two-paragraph "Cumulative Effects" section of the BiOp reads **"cumulative effects have not been considered in this biological opinion."** AR-407 at 67 (emphasis added). NMFS purports to explain away this blatant ESA violation by stating that "NMFS has no information on future

State, tribal, local or private actions in the action area that would not be subject to section 7 consultation." AR-407 at 67. This completely circular reasoning, which relies on NMFS' failure to take any action to analyze cumulative effects, simply cannot stand.

Not only is there an affirmative regulatory duty on NMFS to conduct such an analysis, but courts have also articulated standards to guide the discussion of cumulative effects in BiOps, including (1) the requirement that agencies "may not disregard reasonably foreseeable projects 'with a relatively small area of impact but that carr[y] a high risk of degradation when multiplied by many projections and continued over a long time period,'" *National Wildlife Federation v. Norton*, 332 F. Supp. 2d 170, 179 (D.D.C. 2004) (*quoting Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1036 (9th Cir. 2001)), and (2) the guidance that a mere list of State and private actions does not equal an evaluation of cumulative effects. *See Greenpeace v. Nat'l Marine Fisheries Serv.,* 80 F. Supp. 2d 1139, 1149 (W.D. Wash. 2000) (holding a cumulative effects section which simply listed state-regulated fisheries and fisheries granted to Native Americans to be insufficient).

In the instant case, because the NMFS BiOp fails to even list relevant State and private actions or to explain why such actions were excluded, there is no way to know which projects NMFS may have examined and on which grounds such State and private projects were excluded from the cumulative effects analysis. To make matters worse, it appears that NMFS actually made no effort to consider any of the potentially relevant State or private activities, as NMFS states that it simply "has no information." AR-407 at 67.

An absence of information does not excuse NMFS' inadequate cumulative effects analysis. In *Greenpeace,* the court found inadequate a BiOp which stated that its "Cumulative Effects" section was limited by a "lack of available information." *Greenpeace,* 80 F. Supp. 2d at

1149.  The *Greenpeace* court emphasized that while "an agency need not rely on conclusive scientific proof in a biological opinion, its conclusions must be based on 'the best scientific and commercial data available.'"  *Id.* at 1150 (*citing* 16 U.S.C. § 1536(a)(2)).  Furthermore, the agency "cannot ignore available biological information or fail to develop projections . . . ."  *Id.* (*quoting Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)).  This, unfortunately, is exactly what NMFS did.

NMFS and FWS have both acknowledged in their jointly drafted handbook, the Final ESA Section 7 Consultation Handbook, the challenges of gathering information on cumulative effects.  *See U.S. Fish and Wildlife Service and National Marine Fisheries Service Final ESA Section 7 Consultation Handbook* (1998) ("Consultation Handbook"), a copy of which is attached as Ex. 9 to the Barrett Decl. at 4-30, 4-31.  The Consultation Handbook states that gathering data on cumulative effects requires "more effort," but offers guidance on how to obtain such information, such as gleaning cumulative effects data from the EA and engaging in "observations and inquiries during field reconnaissance in the action area; discussions with State game and fish agencies and other Federal, State, tribal and local agencies, and conservation organizations; and newspapers and other sources of local information."  Ex. 9 to the Barrett Decl. at  4-31.  Because NMFS is statutorily mandated to consider "the best scientific and commercial data available," and because in this instance the agency overtly admitted to not complying with that command, the cumulative effects section of the BiOp is inadequate.

NMFS' limited explanation for its failure to discharge its duty to engage in an analysis of cumulative effects is based on NMFS' alleged lack of information regarding actions "that would not be subject to section 7 consultation."  AR-407 at 67.  However, simply because Section 7

consultation "may" occur at some point in the future, does not exempt relevant State and private actions from consideration in the BiOp.

In *National Wildlife Federation v. National Marine Fisheries Service*, No. 05-23-RE, 2005 U.S. Dist. LEXIS 16345 (D. Or. May 26, 2005), a federal court in Oregon addressed this issue and concluded that despite the fact that future Section 7 consultation may be required, under the ESA regulations and Consultation Handbook, it was rational to "consider the effects of such future [state-managed] harvests as cumulative effects" until the permit process is completed**.** *Id.* at *67. The court emphasized that the key issue was not whether the state-managed harvests are analyzed in the environmental baseline or the cumulative effects, but "that the effects be accounted for one way or another in order to provide an accurate picture of the current status of the listed species which, after all, is the purpose of the exercise." *Id.* at *67-68. In this case, the "purpose of the exercise" has truly been defeated. Because NMFS omits any such discussion of cumulative effects, "an accurate picture" of the status of the Steller sea lion never emerges, leaving the BiOp, as a whole, lacking.

In summary, NMFS shirked its statutory and regulatory duty to formulate a Biological Opinion that analyzes both the effects of the proposed action when added to the environmental baseline and the cumulative effects. *See* 50 C.F.R. §§ 402.02, 402.14(g)(3)-(4). This breach comes at a time that NMFS itself describes as "crucial for the Steller sea lion," with the worst-case scenario resulting in the extinction of Steller sea lions from an entire region within the next 100-120 years. AR-407 at 44. In failing to conduct the requisite effects and cumulative effects analysis, NMFS risks the precarious survival of the Steller sea lion and violates the ESA.

    **D.**    **Defendants Violated the MMPA**

        **1.**    **Defendants Issued Permits Before Receiving MMC Comments, In Violation of the Plain Language Of Its Own Regulations**

NMFS is required to submit all MMPA research permit applications to the Marine Mammal Commission ("MMC") for review and comment prior to NMFS approval. 50 C.F.R. § 216.33(d)(2). The MMC has 45 days in which to raise any objections to the issuance of the permits. *Id.* Although the MMC comments on the permits at issue were not due until June 6, 2005, Ex. 1 to the Barrett Decl. at 1, NMFS nevertheless purported to complete its review under NEPA and the ESA on or about May 24, 2005, and issued the first permit on or about May 27, 2005. AR-406; AR-404; AR-407; Answer ¶ 69. This was so notwithstanding the MMC's protest, in preliminary comments submitted to NMFS, to the issuance of the permits in the absence of an EIS, and notwithstanding MMC's request that NMFS delay its final permit decisions until MMC timely submitted its final comments. Ex. 1 to the Barrett Decl. at 5.

NMFS acted arbitrarily and capriciously in refusing to comply with its own regulations requiring that no permits be issued until MMC comments are received by NMFS pursuant to the MMPA. *See Battle v. F.A.A.,* 393 F.3d 1330, 1336 (D.C. Cir. 2005) ("agencies may not violate their own rules and regulations to the prejudice of others").

        **2.**    **Defendants' Issuance of Permits In Excess of the PBR Level Is Arbitrary and Capricious**

As discussed *supra* at 19-21, NMFS authorized activities under the permits that will exceed the PBR level for Steller sea lions. The PBR level functions as a baseline for limiting unnatural casualties in marine mammals. 16 U.S.C. § 1362(20). Under the MMPA, the PBR level is defined as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." *Id.* Nowhere does NMFS analyze the effects of authorizing

research activities that step over this "line in the sand" and thereby threaten the ability of this endangered species to recover.

Indeed, by allowing exceedance of the PBR level, Defendants have undercut the very purpose of the research: conserving the population of Steller sea lions by maintaining the OSP. The stock assessment for the endangered western stock of Steller sea lions notes that a minimum of 176 deaths are caused each year by subsistence hunting by Alaskan Natives. *See* Ex. 8 to the Barrett Decl. Exceeding the PBR level, by its very definition, directly reduces the ability of the species to recover, which means Defendants are allowing research permittees to kill so many Steller sea lions that their activities are contributing to the decline of the very animals the research is designed to protect. Such action cannot be "reasonable" and is clearly not "supported by the record." *Am. Trucking Ass'n*, 283 F.3d at 362.

Furthermore, the MMPA requires NMFS to make a finding that any research permit that allows the lethal taking of a member of a species that is depleted must provide either a direct benefit to that species, or must fulfill a "critically important research need." 16 U.S.C. § 1374(c)(4)(B); 50 C.F.R. §§ 216.31-216.45 (regulations governing issuance of MMPA scientific research permits). Because NMFS did not analyze the effects on the PBR level of activities authorized under the permits, or explain why the use of lethal means was required instead of non-lethal, less intrusive research procedures, NMFS acted arbitrarily and capriciously in issuing the permits in violation of these MMPA requirements. *See Jost*, 194 F.3d 79, 85 ("[t]he requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result.")

## V.    CONCLUSION

As set forth herein, Defendants have acted arbitrarily and capriciously, in violation of the APA, by failing to evaluate under NEPA, the MMPA and the ESA the effects of activities being undertaken under multiple scientific research permits on Steller sea lions before issuing the permits.  Their permit decisions therefore should be overturned and the permits should be revoked as legally invalid or, at a minimum, stayed pending Defendants' full compliance with the law.

Respectfully submitted,

Dated January 6, 2006

/s/ James R. Barrett
LATHAM & WATKINS
JAMES R. BARRETT (DC Bar No. 441674)
DAVID J. HAYES (DC Bar No. 252130)
SARA K. ORR (DC Bar No. 493765)
555 Eleventh Street, N.W.
Washington, DC 20004
Tel: (202) 637-2200

KIMBERLY MCCORMICK
8363 Sumanee Place N.E.
Bainbridge Island, WA  98110

Counsel for Plaintiffs The Humane Society of the
United States, Will Anderson and Sharon Young