# EXHIBIT 2
# TO
# DECLARATION OF JAMES BARRETT

**MARINE MAMMAL COMMISSION**
**4340 EAST-WEST HIGHWAY, ROOM 905**
**BETHESDA, MD 20814-4447**

10 June 2005

Mr. Stephen L. Leathery
Chief, Permits Division
National Marine Fisheries Service
Office of Protected Resources
1315 East-West Highway
Silver Spring, MD 20910

Re:    Review of Permit Application Nos. 782-1768 (National Marine Mammal Laboratory), 782-
1702 (National Marine Mammal Laboratory), 358-1768 (Alaska Department of Fish and
Game), 715-1784 (North Pacific Universities, Marine Mammal Research Consortium), 1034-
1773 (Marcus Horning), Requests for Amendment of Permit Nos. 434-1669 (Oregon
Department of Fish and Wildlife), 1010-1641 (Aleutians East Borough), 800-1664 (Randall
Davis), 881-1668 Alaska SeaLife Center), and the Environmental Assessment on the Effects
of National Marine Fisheries Service Permitted Scientific Research Activities on Threatened
and Endangered Steller Sea Lions

Dear Mr. Leathery:

    The Marine Mammal Commission, in consultation with its Committee of Scientific Advisors
on Marine Mammals, has reviewed the above-referenced permit applications with regard to the
goals, policies, and requirements of the Marine Mammal Protection Act.

    The Commission staff sent you preliminary comments on the applications on 19 May 2005 in
response to your notifying us of a pressing need to issue the permits. The following is an expansion
of that previous letter and reflects the comments of the Commission and the Committee of
Scientific Advisors based on their review of the applications and the associated environmental
assessment.

### Summary of Concerns and Recommendations

    The applicants are seeking authorization to continue and/or initiate research on the ecology
and biology of threatened and endangered Steller sea lions to better understand the cause(s) of the
decline of the western population. The Commission supports such research in general. However, as
expressed in our previous letters (19 May 2005, 2 August 2002, and 27 July 2001) we are concerned
that the numerous projects being proposed, involving several different applicants, multiple
disturbances at rookeries, and a large number of proposed captures and other takings may adversely
affect local populations of Steller sea lions, particularly the endangered western population which
currently numbers approximately 39,434 individuals, of which 9,373 are pups. Based on our
understanding of the information provided, the combined requests of the applications under review
is for the an annual take of 525,131 sea lions (all populations) and the accidental mortality directly
resulting from the research of 85+ animals per year (all populations), including 17 animals from the
western population (see Table 1, enclosed). That is, the applicants are requesting authorization to

Mr. Stephen L. Leathery
10 June 2005
Page 2

accidentally kill up to 292 animals (all populations), including 85 animals from the western population over the duration of the research. These are direct, known mortalities. Additional mortalities resulting from stampede or animals that die after they are released (e.g., from capture myopathy or other causes related to the research procedures) are not likely to be accounted for under the proposed monitoring protocols and, as such, the actual number of animals that die or are otherwise compromised as a result of the proposed research may be considerably higher. The situation is further exacerbated by the prospect that some activities (e.g., branding pups) will be widely authorized before sufficient research has been done to determine that the proposed procedures are safe and effective. Even if the Service caps mortality from researchers at no more than 5 per year from the western population or 10 per year overall, the Commission is concerned that the potential impacts of the proposed research, particularly if the activities are concentrated at particular rookeries or within certain sub-areas within the range of the western population outweigh the potential benefits of the research. Further, based on the information presented in the applications and the Service's environmental assessment, the Commission cannot determine that the proposed research meets the standards of the Marine Mammal Protection Act, that all aspects of the proposed projects constitute *bona fide* research, animals will not be needlessly taken, all taking will be humane, etc. The table provided in Enclosure 1 reflects the Commission's understanding of the total number of animals being requested by the applicants and the resulting mortalities that could occur during those activities.

The Commission recommends that the Service reconsider the finding of no significant impact set forth in the environmental assessment and either –

(1)    provide additional explanation of its rationale for such a finding, including: a more thorough evaluation of each proposed activity and a determination of whether or not it should be permitted (i.e., that it constitutes *bona fide* scientific research that will likely contribute to recovery of Steller sea lions); a clear showing of the differences in takes of animals that would be allowed in the two alternatives being analyzed; and a realistic and thorough description and analysis of potential cumulative impacts.

(2)    reduce the scope of those research projects that have the highest potential to result in sea lion mortalities and other adverse impacts to a level that would more clearly have no significant population-level impacts, or

(3)    prepare an environmental impact statement on the proposed action.

With respect to the proposed permit requests, the Commission recommends that the Service defer final action pending (1) receipt and review, in consultation with the Commission, of supplemental information that addresses the issues raised by the Commission; (2) completion of the required Endangered Species Act consultations; and (3) additional justification for concluding that the proposed activities, if authorized, would not result in a significant impact to Steller sea lions.

Mr. Stephen L. Leathery
10 June 2005
Page 3

## General Comments on the Proposed Permit Applications

### Research Design

The permit applications under review often do not provide sufficient information on the proposed research design. It therefore is not possible to determine the likelihood that the applicants will achieve their research objectives. It also is unclear whether all of the proposed research is essential, and whether the potential benefits outweigh the combined risks. We note, for example, that –

- many of the applications lack specific information regarding when and where the proposed studies would occur. As a result, it is difficult to judge whether (1) the studies will be adequately distributed to avoid concentrating possible adverse effects on some segments of the population, (2) potentially important spatial variation in studied parameters are being assessed, and (3) research activities being conducted by multiple applicants will be adequately coordinated to provide the best scientific information with the least practicable adverse effects on the animals;

- although some of the researchers (e.g., Marcus Horning, Oregon Division of Fish and Wildlife) have submitted power analyses to justify the proposed sample sizes, in most cases, sample sizes and criteria for selecting subject animals are not described in sufficient detail to enable reviewers to determine whether the proposed research is sufficiently powerful enough to detect significant effects or that animals are representative of the sampled populations;

- in some cases, particularly in the amendment request from the Alaska SeaLife Center, the information provided is not sufficient to determine how the proposed additional activities will integrate into and/or affect the results of the permittee's currently authorized research;

- some of the proposed research (e.g., NMML, Alaska Division of Fish and Game, and Alaska SeaLife Center) involves the capture, handling, and branding of dependent pups as young as five days of age, and the use of Telazol in the process of capturing females with dependent pups. Under laboratory conditions, Telazol is an acceptable and effective anesthetic. However, on beaches or rocks off Alaska, we question its appropriateness because once animals are darted, it takes up to 15 minutes for the drug to take effect. If the animals are in or near the water, there is a significant risk that they may drown. Accordingly, every precaution should be taken in its use and only veterinarians and biologists with significant experience in darting marine mammals should be authorized to conduct the activity. Applicants have not, but should, describe the measures that will be taken to (1) identify a female's dependent pup prior to her capture and (2) reunite the mother and pup after research activities have been completed. Information also should be provided concerning the effects of Telazol on nursing pups;

06/15/2005 14:26 FAX 301 504 0099    MARINE MAMMAL COMM.    ☒005

Mr. Stephen L. Leathery
10 June 2005
Page 4

- in some cases, the research methods proposed by the different applicants are not consistent. Of particular concern is the difference in the proposed use of anesthesia for hot branding animals. Seven of the nine applicants are requesting authorization to hot brand animals. Many are proposing to use gas anesthesia for this activity, consistent with the hot-branding protocol developed by the National Marine Mammal Laboratory and the Alaska Department of Fish and Game). One of NMML's applications (No. 782-1702) states that no anesthesia will be used for hot branding animals, while another NMML application (No. 782-1768) clearly states that young pups will be anesthestized for branding, but is less clear regarding the use of gas anesthesia in branding older pups, juveniles, and adults. The application from the Alaska SeaLife Center states that "animals will typically be anesthetized with isoflurane for hot branding and tooth extraction," but does not explain when anesthesia would not be used. Methods used for branding animals should be consistent unless there is a compelling reason for any such differences. Moreover, it should be accomplished in a manner that meets the Marine Mammal Protection Act's requirement that taking authorized by permit involve the least possible degree of pain and suffering practicable to the mammal. The Service should request clarification from the applicants as to why anesthesia would not be used in branding or other painful procedures. If the concern is the potential risk involved with its use, the Service should review existing research records to evaluate the risk before further branding is approved;

- a few of the applicants have not responded to requests for additional information made by the NMFS Permits Office seeking clarification of certain proposed research activities. Until that information is submitted, those applications should be considered incomplete;

- none of the applications provide explicit monitoring protocols. This is of particular concern with respect to the proposed hot branding activities, which pose risks associated with capture, handling, the infliction of burn wounds that may become infected, and disruption of rookeries. Branding is only useful as a mark-recapture technique if adequate monitoring occurs. However, the applications do not provide sufficient information for reviewers to determine whether resighting efforts will be adequate to yield meaningful results. The Service's environmental assessment states that more than 15,000 Steller sea lions have been branded since 1975 (p. 127 of the environmental assessment), but that there has been insufficient resighting effort to validate the merits of hot-branding when weighed against the potential adverse impacts to individual sea lions. The assessment also notes that Merrick et al. (1996) state that studies of branded Steller sea lions on Marmot Island in Alaska suggest that branding may lead to increased mortalities. An increased risk of injuries or mortalities associated with branding would not only impede recovery, but also would bias scientific conclusions based on these studies. The applicants cumulatively are proposing to hot brand over 3,000 animals over the next five years. If monitoring

Mr. Stephen L. Leathery
10 June 2005
Page 5

efforts are not adequate to provide meaningful results, then the studies proposed will
not achieve their stated objectives. We also note that the Oregon Division of Fish
and Wildlife is proposing to conduct hot branding studies to "examine the effects of
branding during the first few weeks and months post-handling including the
documentation of any sustained injury, unusual mortality or immediate movements
in response to marking." If information on the effects of hot branding on young
Steller sea lions is so incomplete that such research is needed, it seems premature to
authorize the branding of over 3,000 animals being proposed by 7 of the 9
researchers, until more information on the impacts associated with branding become
available.

- from the information provided in the applications (and the environmental
assessment), it is unclear whether, or to what extent, the researchers are aware of the
full scope of Steller sea lion research projects being conducted or proposed; and
whether and, if so, how, the various research projects are being/will be coordinated.
Absent adequate coordination of these multiple research projects, either by the
applicants or the Service, it is not possible to ensure that some research will not be
duplicative and that no unnecessary taking of animals will occur. Furthermore, the
utility of some research activities, particularly efforts such as branding and resighting
of animals, cannot be maximized without a very high level of coordination among all
involved investigators. As a related matter, the Service's environmental assessment
states that the Service has convened a new recovery team to develop a revised
recovery plan for Steller sea lions. We commend the Service's decision to update the
outdated recovery plan and urge that the recovery team be effectively incorporated
into research planning;

- although some of the applicants have provided documentation indicating that their
proposed research has been reviewed and approved by an Institutional Animal Care
and Use Committee (IACUC), others have not. A written decision from each
applicant's IACUC (or in the case of federal agencies, their equivalent) must be
provided stating that the proposed studies have been reviewed and approved in
accordance with §§ 2.31 or 2.37 of the Animal and Plant Health Inspection Service's
regulations implementing the Animal Welfare Act.

<u>Reports of Previous Years' Research</u>

No reports of previous years' research have been submitted with the applications.
Thus, it is not possible to determine what research has been conducted, the number of
animals that have been taken, the effects of the activities on the animals, the results of post-
capture/tagging/branding monitoring activities, or the number of mortalities that have
occurred under each permit to date, and, if mortalities have occurred, the measures proposed
to avoid or reduce the occurrence of such mortalities in the future.

Mr. Stephen L. Leathery
10 June 2005
Page 6

The Commission's full comments on the specific permit applications and the Service's environmental assessment are provided as enclosures to, and incorporated by reference in this letter.

Also, we reiterate that the Commission did not receive the subject applications until 22 April 2005, and that under applicable regulations, the Commission is to have 45 days after receipt of the complete applications in which to submit comments. The Service has nevertheless issued the permits prior to receipt of these comments. This is particularly disturbing in light of the scope of the proposed research activities and the potential for adverse effects on the western population of Steller sea lions. The Commission asks that the Service provide an explanation as to why it issued the permits prior to receiving the Commission's formal comments.

Please contact me if you have any questions concerning the Commission's comments and recommendations.

Sincerely,

David

David Cottingham
Executive Director

Enclosures:
1. Table 1: Total Requested Takes
2. Specific comments on the Individual Permit Application
3. Comments on Environmental Assessment

Enclosure 1-1

Table 1
Total Requested Takes of Steller Sea Lions by All Research Applications Under
Consideration

| Activity | No. of Animals Requested | |
|---|---|---|
| | Annual | Total |
| Taking by Harassment | | |
| Vessel Surveys | 1,600 | 4,800 |
| Aerial Surveys | 367,500 | 1,214,500 |
| Ground Counts | 75,000 | 251,000 |
| Incidental taking during scat collection, capture/sampling, etc. | 73,000 | 234,000 |
| Incidental taking during research on other species | 4,500 | 13,500 |
| | | |
| Taking by Capture/ Recapture/Restraint* | 3,531 | 15,261 |
| Incidental Mortality | 85+ (Incl. 17 from western population) | 302 (Incl. 85 from western population) |

*Subsets of the number of animals captured will have the following procedures performed: blood collection; muscle/blubber biopsy; tissue sampling; fecal loops/culture swabs, skin and mucousal swabs; milk sampling; tooth extraction; flipper tagging; marking (bleach, paint, etc.); hot-branding; tagging (e.g., VHF, SLTDR, UTPR, video system/data logger, sonic tag, drag/bouyancy blocks); surgical implanting of data loggers; insertion of stomach temperature transmitters; bioelectrical impedance analysis; stable isotope studies; Evans blue dye studies; oxytetracycline injection; enema or stomach intubation; portable metabolic chamber measurements; ultrasonic imaging; and removal from the wild for temporary captivity at Alaska SeaLife Center.

Enclosure 2-1

Enclosure 2
Specific Comments on the Individual Permit Applications

Following are specific comments on each of the subject permit applications, followed by comments on the associated environmental assessment.

782-1768 (National Marine Mammal Laboratory)

The applicant is requesting authorization over a five-year period to conduct aerial and ground surveys, scat collection, capture/sample/branding/tagging/physiological testing, recapture activities, and observational/monitoring activities on Steller sea lions of the western and eastern populations. Animals of both sexes over 5 days of age would be captured for sampling, branding, and tagging. Up to 10 Steller sea lions (not to exceed 5 annually in the western population) could be accidentally killed during the activities. Up to 15,000 northern fur seals and up to 5,000 harbor seals would be incidentally harassed during the activities focused on Steller sea lions. The research would be conducted throughout Alaska during all months of the year. No formal research proposal has been prepared. The purpose of the proposed research is to collect information on the life history, foraging behavior, habitat use, physiology, population status and trend, survival and reproductive rates, and condition of Steller sea lions in the North Pacific Ocean. The proposed research is a continuation of that carried out under the applicant's current Permit No. 782-1532.

Based on our review of the application, the Commission notes that –

- it appears that the applicant is planning to use anesthesia in branding pups between the ages of five days and two months. It is less clear whether anesthesia will be used in branding older pups, juveniles, and adults. The protocol for hot-branding developed by the National Marine Mammal Laboratory and the Alaska Department of Fish and Game (provided as an appendix to this and some of the other applications), states that "NMML and ADFG use gas anesthesia (isoflurane) to render the animal unconscious during the branding process." The applicant should clarify whether older pups, juveniles, and adults will be anesthetized for this procedure and, if not, provide justification as to why anesthesia will not be used;

- darting adult female sea lions using Telazol, as proposed, involves a high risk of mortality both from the drug and from drowning if animals enter the water before the drug takes full effect. We recommend that every precaution be taken when using this drug and that only veterinarians and biologists with significant experience in darting marine mammals be authorized to conduct activities involving its use;

- the application states that reasonable steps will be taken to identify pups of lactating females before attempting to immobilize those adult female sea lions, and that, if a female is killed or seriously injured as a result of the activities, the orphaned pups shall, when they can be identified, be humanely provided for. The applicant should provide more specific information as to what steps will be taken to identify dependent pups and to care for them in the event of a mortality of a lactating sea lion;

Enclosure 2-2

- the application does not, but should, discuss the potential effects of Telazol on the nursing pups of females injected with the drug. If it appears that adverse effects are possible, appropriate steps be taken to mitigate those effects, or that research be conducted to resolve uncertainties concerning possible effects;

- the application states that an experienced marine mammal veterinarian will be present to carry out or supervise all activities involving the use of inhaled anesthesia. However, a curriculum vitae for the veterinarian(s) who would be involved in the research has not been, but should be, provided if it is not already on file;

- the application states that scientific instruments will be attached to sea lions two months of age and older, but does not describe the sizes and weights of the instruments and the number/combination of instruments that may be applied to individual animals. Although large animals may be unaffected by such instruments, this is not necessarily the case for smaller animals, and information on tag dimensions, weight, and total tags per animal should be provided, as well as an assessment of the possible effects of tagging on the animals. As a related matter, the application also states that "[t]he number of animals outfitted with instruments each year will be determined by budget limitations rather than more rigorous calculations of optimum or minimum sample sizes." Although budget is a necessary consideration in research planning, determining sample sizes solely on that basis raises questions as to whether sample sizes will be adequate to meet the research objectives. Thus, before proceeding with research in a given year, the Service should establish proposed sample sizes based on funding limitations and conduct statistical analyses sufficient to demonstrate that the sample sizes will enable it to accomplish the research goals;

- holding time for animals captured in water or on land and taken to the research ship is estimated at between 3 - 13 hours, during much of which time animals are held in the capture box. The applicant should provide further justification of its request to hold animals for such lengthy periods of time before initiating research procedures and an assessment of why alternative capture or research protocols that require shorter holding times are impractical;

- the application does not include documentation that the proposed research has been reviewed and approved by an equivalent Institutional Animal Care and Use Committee (IACUC) in accordance with § 2.37 of the Animal and Plant Health Inspection Service's regulations implementing the Animal Welfare Act. This information should be provided prior to permit issuance;

- insufficient information is provided concerning short- and long-term monitoring of animals, particularly mother/pup pairs, after release. This information is needed to allow reviewers to evaluate whether monitoring will be sufficient to assess the effects of branding/handling on the subject animals and should be provided prior to permit issuance;

Enclosure 2-3

- reports of previous years' research are not, but should be, provided with the application.

## 782-1702 (National Marine Mammal Laboratory)

The applicant is requesting authorization over a five-year period to conduct aerial, ground, and boat surveys of pinnipeds; and to capture/sample/brand/tag/physiological test, and recapture harbor seals, California sea lions, Steller sea lions, and northern elephant seals. Scats would be collected from harbor seal, California sea lion, and Steller sea lion haul out areas for food habits analysis. Authorization is requested for the annual incidental mortality of up to 5 harbor seals, 5 California sea lions, 1 Steller sea lion, and 2 elephant seals.

Capture of harbor seals (all ages and both sexes) would include physical or chemical restraint (valium), tagging and branding for long term identification of individuals for information on reproductive success, survival, and longevity; blood sampling for disease screening; blubber biopsy for contaminant analysis; tissue sampling for genetics and for fatty acid analysis; some seals would be instrumented with VHF radio transmitters and/or time-depth recorders or satellite tags or sonic tags to document movements, activity and foraging patterns. Activities would occur in Washington and Oregon.

Capture of California sea lions (adult and subadult males) would include tagging and branding for long-term identification of individual animals to determine predation rates on endangered salmonids; blood sampling for disease screening; blubber biopsy for contaminant analysis; and instrumentation with VHF radio transmitters, TDRs, or satellite tags to document movements and migration rates. Activities would occur in Shilshole Bay, Washington, Everett, Washington, and Astoria, Oregon.

Capture of up to 12 Steller sea lions (both sexes and any age class except pups) annually from the eastern population would include tagging and hot branding for long-term identification of individuals to determine predation rates on endangered salmonids; blood sampling for disease screening; tissue sampling for genetic analysis, and instrumentation with VHF radio transmitters, TDRs, or satellite tags to document movements and migration rates. Activities would take place incidental to California sea lion captures in Shilshole Bay, Washington, Everett, Washington, and Astoria, Oregon.

Capture of northern elephant seals (all ages and both sexes) would include tagging to document survival, movements, and site fidelity.

<u>Based on our review of the application, the Commission notes that –</u>

- the applicant is not planning to use anesthesia for branding or other invasive

                                      )                                    ¡

                                                                    Enclosure 2-4

        activities. Justification should be provided as to why anesthesia will not be used;

   •    in two instances, the applicant declined to answer questions from the Permits
        Division, stating that they did not understand the questions or why there were being
        asked. The application should be considered incomplete until the information
        requested by the Permits Division has been is provided;

   •    in response to a question from the Permits Division regarding how the sample size
        for Steller sea lions was chosen, the applicant stated that "[t]welve seemed a
        reasonable number, not too big, not too small, around six for the Astoria trap and
        around six for the Shilshole trap." In response to another question about how the
        sample size for tagging Stellers to identify "nuisance" animals was determined, the
        applicant stated that "[i]t was arbitrarily chosen. It could have been 2 or 4."
        Arbitrary determination of sample sizes raises questions as to whether the sample
        sizes will be adequate to achieve the research objectives. Additional justification for
        the proposed sample sizes is needed to allow reviewers to evaluate whether they are
        sufficient to achieve the stated research objectives and whether the proposed
        activities constitute "bona fide research;"

   •    the applicant does not, but should, state whether a veterinarian will be present in the
        field to oversee branding and other invasive activities. Clarification of this point
        should be provided. If a veterinarian will not be present in the field, an explanation
        of why one is not needed should be provided. If a veterinarian will be present, his or
        her c.v. should be submitted if it is not already on file;

   •    detailed information concerning the short- and long-term monitoring of animals has
        not, but should be provided to allow reviewers to evaluate whether monitoring will
        be sufficient to assess the effects of branding/handling on the subject animals;

   •    the proposed taking of Steller sea lions by this applicant does not appear to be
        reflected in the Service's master table. The Service should update the table to
        include all proposed/authorized activities;

   •    reports of the applicant's previous years' research are not, but should be, provided.

**358-1768 (Alaska Department of Fish and Game)**

        The applicant is requesting authorization over a five-year period to conduct aerial and
ground surveys, scat collection, capture/sampling/branding/physiological testing, and recapture
activities, and observational/monitoring activities, on Steller sea lions of the western and eastern
stocks. Animals of both sexes over 5 days of age would be captured for sampling, branding, and
tagging (newborns, as well as other age groups, would be injected with oxytetracycline).
Authorization is requested for the accidental mortality of up to 10 Steller sea lions annually (not to
exceed 5 annually in the western population). An unspecified number of northern fur seals and
harbor seals would be incidentally harassed during the activities on Steller sea lions. The research
would be conducted Alaska-wide during all months of the year, concentrated in the summer

06/15/2005 14:28 FAX 301 504 0099        MARINE MAMMAL COMM.        ☒013

Enclosure 2-5

months. A formal research proposal accompanies the application. The proposed research is a continuation of that carried out under the applicant's current Permit No. 358-1564-07, which expires on June 30, 2005.

Based on our review of the application, the Commission notes that —

- the text of the application (p. 13) states that researchers are proposing to attach instruments to 120 pups between 5 days and 2 months of age, however, Table 1 of the application states that 130 pups would be instrumented. This discrepancy should be resolved. Also, the application does not, but should, describe the sizes, weights, and number of tags that would be placed on individual animals, particularly on young pups;

- pages 7 and 23 of the application contain differing information concerning the number of mortalities that have occurred under the permit. The text on page 23 refers the reviewer to Table 6 for information on the number of mortalities that occurred during the previous four years of research. However, Table 6 is not included in the application. A Table 6 is included in application No 782-1768 from NMML (these two applications are almost identical). Further, the information provided in that table does not appear to be consistent with the information given in the text of the ADFG application. Clarification of the mortality information should be provided, including the total number of animals per age group that died during the activities, and how the mortalities occurred, and what steps, if any, are proposed to reduce the number of mortalities during future research;

- it appears that the applicant is requesting the option to use anesthesia in branding older pups, juveniles, and adults, but does not explain the basis upon which decisions to use anesthesia would be made or why anesthesia would not be used in all cases. An explanation should be provided;

- the application does not, but should, discuss the potential effects of Telazol and other proposed drugs on the nursing pups of females on which the drug(s) are used;

- identical to the NMML application, this application states that reasonable steps will be taken to identify pups of lactating females before attempting to immobilize them, and that, if a female is killed or seriously injured as a result of the activities, the orphaned pups will, when they can be identified, be humanely provided for. The applicant should clarify what steps would be taken to identify dependent pups before capturing their mothers and to reunite pup and mother after the research activities are concluded;

- page 10 of the application states that gas anesthesia will be administered and monitored only by personnel thoroughly trained in its application. It is unclear whether a veterinarian will be present in the field to supervise administration of anesthesia and invasive procedures. Clarification of this point should be provided. If a veterinarian will not be present, justification should be provided as to why not;

Enclosure 2-6

- additional information should be provided concerning short- and long-term monitoring of animals to allow reviewers to evaluate whether monitoring will be sufficient to assess the effects of branding/handling on the subject animals;

- the application does not include documentation that the proposed research has been reviewed and approved by an Institutional Animal Care and Use Committee (IACUC);

- reports of previous years' research are not, but should be, provided.

### 715-1784 (North Pacific Universities, Marine Mammal Research Consortium)

The applicant is requesting authorization over a five-year period to harass Steller sea lions (animals of both sexes and all ages) of the eastern population in the course of conducting aerial surveys, behavioral observations from blinds, scat collection, at-sea tracking of tagged sea lions using a small vessel, and retrieval of automatically released instrument packages at sea. Authorization is requested for the accidental mortality of up to 10 Steller sea lions annually. The research would be conducted throughout the year in waters of Southeast Alaska. The proposed research is a continuation of research authorized in the applicant's current Permit No. 715-1457.

Based on our review of the application, the Commission notes that –

- the application states that one purpose of the proposed research is to study the possible relationship between diet, physiological stress, and population trends and the distribution of Steller sea lions in Southeast Alaska, for comparative analysis with that of the western population. It is unclear, however, whether a companion study using the same methods are being conducted or proposed for the western population. If so, the details of that study should be provided. If not, it is unclear how the proposed comparison will be made;

- reports of previous years' research are not, but should be, provided with the application.

### 1034-1733 (Marcus Horning)

The applicant is requesting authorization over a five-year period to capture, sample, tag, and brand up to 120 Steller sea lions (animals of both sexes between the ages of 9 months and 4 years) of the western stock. Up to 80 of these 120 animals also would be intraperitoneally implanted with dual satellite-linked Life History Transmitters (LHX tags) using ship-based surgical facilities. Implanted animals would be monitored after their release using externally attached ARGOS satellite transmitters. The applicant is requesting authorization for the accidental mortality of up to 7 Steller sea lions annually (not to exceed 15 total over the five-year duration of the permit). As currently planned, the research would commence in the summer of 2005 between Prince William Sound and

Enclosure 2-7

Kodiak Island, and subsequent capture and other procedures would occur in either the same region or further west along the Aleutian Islands. The purpose of the proposed research is to monitor the health, condition, and vital parameters of Steller sea lions, assess the causes of mortality, and investigate sea lion feeding and ecology. The application provides a power analysis that is used to determine sample sizes. No formal research proposal accompanies the application, since the University considers such proposals to contain confidential information beyond the research related to the requested permit.

- the application states that a critical component of the project is the post-release monitoring of individuals and that implanted animals would be tagged with external SLTDRs, to provide dive behavior and location data. The applicant anticipates that animals will be monitored for at least two years post-release. The applicant notes that information from implanted animals may only be used in testing hypotheses if the animals can be confirmed via external tracking devices to have survived the first two weeks following release after implantation. The application does not, but should, explain how researchers will be determine whether an implanted animal has died or whether its SLTDR has simply been lost or stopped functioning. Additional details about how and how long post-release monitoring will be carried out should be provided;

- the application states that "the battery life of the LHXD is expected to be a minimum of 8 years, during which time we expect a return of 60-70 percent of animals tagged" (that is, that 60-70 percent of the animals will die within 8 years of being implanted). Inasmuch as the life expectancy for male and female Steller sea lions is up to 18 and 30 years, respectively, clarification of this expected percentage of return should be provided;

- reports of previous years' research are not, but should be, provided.

**434-1669 (Oregon Department of Fish and Wildlife)**

Permit No. 434-1669 authorizes the Oregon Department of Fish and Game to conduct ground counts and capture/sample/tag/hot brand Steller sea lions in California, Washington, and Oregon. Authorization is also provided for the incidental harassment of Steller sea lions during these activities and remote monitoring of the animals. Up to 10 accidental mortalities annually are currently authorized.

The permittee is requesting that the permit be amended to extend its duration and to allow the application of VHF radio tags and/or small temporary visual patches on a sample of up to 80 pups less than 1.5 months of age currently authorized to be handled and branded each year. The objective of the amendment request is to carry out a pilot study to examine the effects of branding during the first few weeks and months post-handling, including the documentation of any sustained injury, unusual mortality, or immediate movements in response to marking activities. A power analysis to determine sample sizes was provided by the applicant which documents the sample sizes needed to obtain statistically relevant information.

Enclosure 2-8

Based on our review of the application, the Commission notes that –

- the permittee states that a controlled study of the impacts of hot branding on initial survival and behavior of pups has not been conducted. The amendment request notes that NOAA's 2002 Environmental Assessment on Steller sea lion studies states that the absence of evidence of branding-induced mortality cannot be interpreted as evidence of no effect because there has not been sufficient post-activity monitoring of branded pups (vs. non-branded controls). The EA called for research to monitor the effects of branding and on the disturbance to rookeries that branding causes. If the effects of branding and associated disturbance on the survival of pups is so uncertain, and additional information on such effects is needed to enable the Service to assess the impacts of these ongoing activities, it is unclear how the Service could determine that branding 3,000 Steller sea lion pups is an appropriate research practice. An explanation in this regard should be provided;

- in a memorandum dated 29 March 2004, the Service asked the permittee questions about several aspects of the applicant's 2003 annual report (including the post-branding behavior of mother/pup pairs). It appears that the applicant intended to answer the questions, but such information is not included in the materials provided by the Service to the Commission for review. In the absence of this information, the application should be considered incomplete. The Service should again request that the information be provided;

- the application does not, but should, provide the dimensions of the VHF tag to be applied to animals;

- it is unclear whether a veterinarian will be present in the field to oversee branding and other invasive activities. Clarification of this point should be provided. If a veterinarian will not be present in the field, an explanation should be provided. If a veterinarian will be present, his or her c.v. should be submitted if it is not already on file;

- the application does not include documentation that the proposed research has been reviewed and approved by an Institutional Animal Care and Use Committee (IACUC) in accordance with § 2.31 the Animal and Plant Health Inspection Service's regulations implementing the Animal Welfare Act;

- reports of previous years' research are not, but should be, provided with the application.

## 1010-1641 (Aleutians East Borough)

Permit No. 1010-1641 authorizes the Aleutians East Borough to conduct aerial surveys and vessel-based behavioral observations of Steller sea lions in the western Gulf of Alaska, and scat collection at rookeries and haul outs along the Alaska Peninsula and Eastern Aleutian Islands. The permit authorizes one accidental mortality annually.

Enclosure 2-9

The permittee is requesting that the permit be amended to extend its duration through 2007 and to authorize an increase in the number of sea lions that may be harassed during aerial surveys from 7,000 to 105,000 annually. The purpose of the proposed activities is to provide additional information on seasonal prey consumption by Steller sea lions through the analysis of scats collected at rookeries and haul outs along the Alaska Peninsula and Eastern Aleutian Islands, and to improve the accuracy and precision of population indices through expanded aerial and vessel surveys in the western Gulf of Alaska

An annual report of the previous years' research should be provided to help reviewers assess the findings and effects of the past research activities.

## 800-1664 (Randall Davis)

Permit No. 800-1664 authorizes Dr. Randall Davis to capture, restrain manually or chemically, blood sample, biopsy sample, sample (fecal loops/culture swabs/tooth/vibrissae/hair/nails), flipper tag, hot-brand, attach external scientific instruments to, and conduct bioelectric impedance analyses, deuterated water, and NaBr studies, and ultrasonic imaging on Steller sea lions in the Gulf of Alaska and the Aleutian Islands. Up to 10 accidental mortalities annually are authorized.

Dr. Davis is requesting that the permit be amended to extend its duration to January 2007 and to expand the research to include two related projects: a study of diving and hunting behavior that involves attaching a small video system/data logger to animals for several weeks and attaching satellite transmitters to animals for up to one year. In some cases, the same animals may temporarily carry both instruments for the purpose of cross-comparison of diving and location data. Up to 15 female Steller sea lions per year (including pregnant or lactating animals with dependent pups 0-1 month of age) would be captured, anesthetized for approximately three hours using gas anesthesia and valium, weighed, measured, sampled, tagged (flipper, video system/data logger and transmitters), hot branded, and have various other procedures conducted (e.g., doubly-labeled water studies). Animals would be recaptured up to three times to attach and remove instruments, inject deuterated and oxygen-18 labeled water and take blood sample. Up to 1,000 adults and up to 1,000 juveniles and pups of both sexes would be incidentally harassed per year during the proposed activities. Authorization is requested for an additional three accidental mortalities of adult female animals per year. Northern fur seals and Pacific harbor seals may be incidentally harassed during the proposed activities on Steller sea lions.

Based on our review of the application, the Commission notes that –

- under these new projects the applicant is requesting authorization for annual accidental mortality of up to 10 of 30 female juveniles and young of the year and of 3 of 15 adult females that may be pregnant or lactating and have a dependent pup 0-1 months of age. This is a total of up to 32 mortalities (assuming the death of females' dependent pups) over the remaining two-year duration of the permit. The Commission believes that this is an excessive mortality rate. Further, these mortalities would be in addition to those already authorized under the permit for other projects;

Enclosure 2-10

- page 18 of the application notes that the video system/data recorder will increase hydrodynamic drag on animals to some degree but, based on experience with Weddell seals, the instrument package does not appear to diminish foraging and prey capture effectiveness. However, inasmuch as the activity involves female animals with dependent pups, these animals should be carefully monitored to ensure that is in fact the case;

- there is no discussion in the application of whether and how the researchers would attempt to identify females without dependent pups and what steps would be taken to identify the dependent pups associated with other females prior to conducting capture activities, to ensure that mothers and pups are reunited or that orphaned pups are identified and cared for (i.e., captured for rehabilitation or euthanized). The applicant should provide more specific information as to what steps will be taken to identify dependent pups and to care for them in the event of a mortality of a lactating sea lion;

- the application discusses the effects of various drugs that have been used to chemically immobilize otariids. It is unclear, however, whether the applicant is requesting the option of using any/all of these drugs to capture animals. Also, the application does not, but should, discuss the potential effects of the various drugs he plans to use on nursing pups;

- the application refers reviewers to research proposals for Projects 1 and 2 for a justification of the age classes to be studied. However, no research proposals accompany the application. The proposals should be submitted and assessed before a permit is issued;

- the application states that "Any animal captured will be marked by hot branding for future identification. Although not a necessary part of our research, we will hot brand our animals at the request of the permit office." The Permits Office should clarify whether it is requesting that researchers brand animals. If so, what arrangements have been made to provide the follow-up necessary to collect sufficient data from branded animals to provide meaningful results? Further, the Service should explain the apparent conflict in its position that additional research is needed to assess the effects of hot branding on pinnipeds, especially pups, and a request that additional branding be carried out;

- the application does not, but should, include documentation that the proposed research has been reviewed and approved by an Institutional Animal Care and Use Committee (IACUC).

## 881-1668 (Alaska SeaLife Center)

Permit No. 881-1668 authorizes the Alaska SeaLife Center to capture, hot-band, flipper tag, collect blood and tissue samples, attach external scientific instruments, accidentally kill, and harass

Enclosure 2-11

Steller sea lions in Alaska incidental to research activities and remote monitoring activities. The permit was amended on 31 July 2003 to include capture and transport of up to 16 juvenile Steller sea lions per year to the Center for short-term captivity, health assessments (including anesthesia, blood sampling, blubber biopsy, diagnostic x-ray, endoscopy, bioelectric impedance analysis, deuterated water sampling, and urinalysis), controlled fasting, and adrenocorticotrophic hormone challenge experiments.

The Alaska SeaLife Center is requesting that the permit be amended to: extend its duration through December 2007; allow it to carry out various additional research procedures involving animals currently authorized to be taken under the permit (e.g., additional instrumentation, increased sampling, additional bioelectrical impedance analysis studies, deuterium oxide dilution studies; add a period of 48-hour dry holding of captive juvenile animals to allow for solid and liquid phase marking during food intake studies; and an increase in the dimension of external data loggers). Authorization also is requested for two new projects involving subsets of animals currently authorized to be taken under the permit: (1) validation of the doubly-labeled water technique in Steller sea lions, using four juvenile Steller sea lions held temporarily in captivity at the Alaska SeaLife Center; and (2) remote instrument monitoring of at-sea foraging ecology, involving the capture, sampling, hot branding, and instrumentation, and recapture/sampling of 20 adult females and the capture, sampling, and injection with deuterium, and recapture/sampling of their dependent pups. Pups would be recaptured and hot-branded when they reach 4 weeks of age. These additional activities/projects are proposed/clarified/updated in amendment requests dated 3 December 2003, 7 December 2003, 1 May 2004, undated request received at the Service on 11 May 2004, 7 October 2004, 19 November 2004, and 26 January 2005.

<u>Based upon our review of the application, the Commission notes that</u> –

*   the Center's 19 November 2004 letter states that adult females will be captured on the rookery by darting them with Telazol or securing them in a noose when they are on land or in water close to shore. Due to the high risk of using Telazol on animals in the water, the applicant should explain why such use is appropriate. It also notes that pups will be captured at the same time as their mothers by using hoop nets. It is unclear how the females' dependent pups will be identified prior to the females' capture, particularly if the females are captured in the water and their pups are not with them at the time of capture. The applicant should provide more specific information as to what steps will be taken to identify dependent pups and to care for them in the event of a mortality of a lactating sea lion;

*   additional justification should be provided for the proposed at-sea foraging study which involves buoyancy/drag experiments on females with dependent pups. In light of the apparent risks involved, it would seem more prudent to first determine the effects of the buoyancy/drag blocks on captive animals and on surrogate species prior to carrying out the study on an endangered population in the wild; .

*   the Center's amendment request, dated 7 December 2003, states that "buoyancy/drag blocks will be left on [females] for no more than 4 weeks." However a subsequent letter from the Center (received by the Service on 11 May

2004) states that "[b]ecause the manipulations [buoyancy/drag experiments] will last no more than 2 weeks, any effect will be temporary and unlikely to compromise the health of Steller sea lions (sea lions of this age can typically go without any food for more than 2 weeks)." Clarification of whether the experiments will last 2 or 4 weeks should be provided. Also, the Center should clarify whether they are referring to adult females, pups, or both when it refers to "sea lions of this age." If they are referring to females only, additional information should be provided as to how long pups are able to go without food and, if less than 2 weeks, explain how the research can be conducted humanely;

- pages 2 and 3 of the 7 December amendment request state that animals will "typically be anesthetized with isoflurane" for hot branding and tooth extraction. It is unclear what is meant by "typically." The applicant should specify whether the use of anesthesia will be optional for any such activities. If the applicant is requesting the option of not using anesthesia in some cases, justification should be provided as to why it considers anesthesia unnecessary;

- the Center's 3 December 2003 amendment request asks for authority to increase the size of external data loggers to allow for "temporary simulation of reduced prey availability." Further details concerning why this change is being requested or how the change in the instrumentation will be used to study the effects of reduced prey availability are needed before this aspect of the proposed research can be evaluated. The Commission therefore recommends that the Service consider the amendment request incomplete until additional information and justification for the proposed activity is submitted;

- page 5 of the Center's 3 December 2003 amendment request notes that pups will be opportunistically recaptured for blood sampling and morphometric measurements as frequently as once per week (up to 4 times) during the breeding season. A discussion of the potential for adverse impacts on pups or disruption of the mother/pup bond as a result of such frequent activities is not, but should be, provided. The Service should refrain from authorizing this activity until additional information has been provided and the Service has evaluated the potential for adverse impacts to the subject animals and the potential for biasing the research results by subjecting the pups to the repeated stress of capture and handling;

- the Center has provided no information to show that the proposed studies have been reviewed by an Institutional Animal Care and Use Committee in accordance with § 2.31 of the Animal Plant Health Inspection Service's regulations governing the humane handling, care, treatment, and transportation of marine mammals;

- the Center's 19 November 2004 amendment request proposes to use a modified purse seine net to capture adult female Steller sea lions. The application does not, but should, discuss whether this method has been used previously to capture Steller sea lions. If not, its use on females with dependent pups seems inappropriate until further testing on animals without dependent pups has been completed and the use

Enclosure 2-13

of this capture technique has been shown to be safe and effective;

- the 19 November 2004 amendment request describes a large variety of instruments that would be attached to adult females for the at-sea foraging project. However, it is not clear how many combinations of tags would be used or the number of animals that would receive the various combinations. Clarification of this point should be provided to enable reviewers to determine the potential effects of the various combinations of tags on the animals. Also, in describing the instruments and attachment methods that would be used for recording jaw opening and closing, page 16 of the November 2004 request refers the reader to figures that are not included with the application. Those figures should be provided;

- in studies of captive juveniles, the Center's 7 October 2004 amendment request provides the experimental timeline for the project involving the validation of the doubly-labeled water technique in captive juvenile Steller sea lions. The timeline indicates that the animals could be anesthetized up to 3 times in 4 days (possibly twice in one day). The applicant should describe any potential consequences of repeatedly anesthetizing animals.

Enclosure 3-1

## Enclosure 3
## Comments on the Environmental Assessment

Our comments on the Service's environmental assessment of the proposed research activities are largely the same as provided in our review of the Service's 2002 assessment of previous research on Steller sea lions (see our letter of 2 August 2002, incorporated here by reference). The Commission remains concerned that the cumulative effects of the proposed research, in combination with other factors that are affecting the western population of Steller sea lions, could have significant impacts on the population. Such information is particularly important for assessing the effects on and benefits to a species listed as endangered under the Endangered Species Act.

The draft assessment does not provide a quantitative evaluation of the difference in what would be allowed in the two alternatives being considered. Although the assessment includes tables that show the takes that would be authorized under each alternative, it does not provide a table showing the difference in the types of takes that would be allowed under the two alternatives. In many places the assessment states that more animals would be taken under the proposed action, but does not state how many more animals would be taken or how invasive those takes would be. The differences may not always be trivial. For example, it appears that the allowed incidental mortality is 48 animals per year under the no-action alternative and 85+ animals under the proposed action alternative, a difference of more than 77 percent. While we recognize that the Service has proposed a cap on the number of accidental mortalities that can occur annually, it seems contradictory to permit a cumulative total of 85+ mortalities/year under all the permits, but then stop research if 10 mortalities occur within a given year. A table reflecting the Commission's understanding of the total number of animals being requested by the applicants and the resulting mortalities that could occur during those activities is provided at the end of this enclosure.

Also, the analysis in the draft environmental assessment appears to be incomplete. In this regard, the Service, on page 17 of the Service's draft environmental assessment lists six questions, referred to as "environmental impact issues," that the Service considers within the scope of the assessment. However, most of these issues are not addressed or even discussed in the document. We recognize that the first three questions, which deal with NMFS's abilities to coordinate and monitor the effects of research activities under the various permits and to synthesize research data, are complex. However, if the questions are going to be asked, an attempt should be made to answer them. At a minimum, the Service should analyze each permit application and assess whether or not each proposed activity should be allowed based on the statement on page 9 of the environmental assessment that "the objective of issuing the proposed permits is to allow conduct of bona fide scientific research that will likely contribute to recovery of Steller sea lions." Proposed activities that do not meet this criterion should not be permitted. Also, the environmental assessment should provide a thorough quantitative analysis of the cumulative impacts of the proposed activities that considers the specific geographic and temporal distribution of requested takes.

The environmental assessment considers but summarily dismisses seemingly viable alternatives to the proposed action (pages 28-31). We are particularly concerned that option 2.3.3 (redirecting "experimental" intrusive research to surrogate species) was dismissed based on the investigators' opinions about logistical convenience and the importance of their own investigations.

Enclosure 3-2

A more objective analysis is needed.

We also provide the following specific comments on the draft assessment –

1.  Pages 6-7, Background: This section briefly describes funding made available and study objectives through 2001. It should be updated to describe funding and study objectives at least through 2004;

2.  Page 24, last par.: Appendix B does not describe the conditions that the Service is considering attaching to these permits but, rather, the general MMPA requirements for permit conditions;

3.  Pages 25-28: The EA should clearly state the number of additional takes that would be allowed by the proposed action versus the no-action alternative;

4.  Page 31, last par. of 2.3.3: Dismissing this alternative (i.e., redirecting "experimental" intrusive research to surrogate species) based on the investigators' opinions about logistical convenience and the importance of their own investigations does not constitute an objective analysis. At a minimum, there should be an evaluation of how potential inconvenience to investigators weighs against the mandate to reduce impacts to protected species/populations;

5.  Page 31, sec 2.4, par. 2: Again, the document should quantify the difference in the number of takes under the two alternatives. We suggest that the document provide a table showing the differences in take numbers and types;

6.  Page 33, sec 3.2.3, par. 1: It appears that a description of aquatic critical habitat west of 144° W. longitude was omitted from this description;

7.  Pages 36-37, sec. 3.3.5: This section should include a description of other marine mammals in the action area, their population status, and whether or not they may be affected by the proposed action;

8.  Pages 41-42, sec. 4.2: This section should evaluate the possible cumulative effects of permitted activities at easily-accessible research sites, especially rookeries, that might be preferentially studied;

9.  Pages 42-43, sec. 4.3: Again, this section should provide a quantitative description of the differences between the number and temporal/spatial distribution of takes under the two alternatives;

10. Page 45, footnote 7: The proposal to count the fetus of a pregnant female that dies as an additional mortality may result in stopping research activities in some years when the

Enclosure 3-3

mortality ceiling might not otherwise have been reached. As such, this proposal needs to be carefully considered;

11.  Page 46, last par.: The discussion of cold sterilization is confusing and should be revised to note that cold sterilization of tubes is required;

12.  Page 49, last par.: The period of time over which the 10 mortalities could occur should be clearly explained. Also, it seems contradictory to permit a cumulative take of 85+ mortalities/year under the individual permits, yet stop research if 10 mortalities occur within a given year.

Enclosure 3-4

Total Requested Takes of Steller Sea Lions by
All Research Applications Under Consideration

| Activity | No. of Animals Requested | |
|---|---|---|
| | Annual | Total |
| Taking by Harassment | | |
| Vessel Surveys | 1,600 | 4,800 |
| Aerial Surveys | 367,500 | 1,214,500 |
| Ground Counts | 75,000 | 251,000 |
| Incidental taking during scat collection, capture/sampling, etc. | 73,000 | 234,000 |
| Incidental taking during research on other species | 4,500 | 13,500 |
| | | |
| Taking by Capture/ Recapture/Restraint* | 3,531 | 15,261 |
| Incidental Mortality | ·85+ (Incl. 17 from western population) | 302 (Incl. 85 from western population) |

*Subsets of the number of animals captured will have the following procedures performed: blood collection; muscle/blubber biopsy; tissue sampling; fecal loops/culture swabs; skin and mucousal swabs; milk sampling; tooth extraction; flipper tagging; marking (bleach, paint, etc.); hot-branding; tagging (e.g., VHF, SLTDR, UTPR, video system/data logger, sonic tag, drag/bouyancy blocks); surgical implanting of data loggers; insertion of stomach temperature transmitters; bioelectrical impedance analysis; stable isotope studies; Evans blue dye studies; oxytetracycline injection; enema or stomach intubation; portable metabolic chamber measurements; ultrasonic imaging; and removal from the wild for temporary captivity at Alaska SeaLife Center.