# EXHIBIT 7
# TO
# DECLARATION OF JAMES BARRETT

http://www.fundforanimals.org/library/documentViewer.asp?ID=35..



| ABOUT US | DONATE NOW | ONLINE STORE | FUND.ORG |

**SECTIONS**
Home
About the Fund
Action Center
Black Beauty Ranch
Donate
Online Store
Sanctuaries and Services
Urban Wildlife

**OUR OTHER WEBSITES**

AnimalFunding.org
BlackBeautyRanch.org
StopCannedHunts.org
MoreThanYouDo.org
MarylandBears.org
NeimanCarcass.org
Refuges.org

**SIGN UP FOR UPDATES**

your email    Join



# 20010328 Petition to List the Gray Whale under the ESA: Part III
3/28/2001, The Fund for Animals

**(LISTING CRITERIA cont'd.)**

**The Potential Biological Removal Level is Not Sustainable:**

The MMPA mandates the preparation of a Potential Biological Removal (PBR) level for all marine mammal species. The PBR is intended to be a conservative estimate of the number of animals from a particular species that can safely be removed without jeopardizing the population. For gray whales, as demonstrated below, the current PBR is not sustainable and would ultimately result in the extinction of the population.

The term "potential biological removal level" means the "maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." 16 U.S.C. §1362(20). Thus all whales that die in a year due to entanglements with fishing gear, ship strikes, slaughter, or for any other reported human-caused reason would all be encompassed by the PBR. The fact that "natural mortalities" such as fetal loss, starvation, strandings, whether documented or undocumented, are not considered part of the PBR raises serious concerns about the legitimacy or sustainability of this estimate.[17] Theoretically, if the number of dead whales exceeds the PBR, that level of mortality would not be considered sustainable.

A PBR is defined as the product of the minimum population estimate of the stock, one-half the maximum theoretical or estimated net productivity rate of the stock at a small population size, and a recovery factor between 0.1 and 1.0. It is expressed in mathematical terms as PBR = Nmin x 0.5Rmax x Fr. Thus, the PBR estimate is only as good as the population estimates used to calculate it.

The PBR for the gray whale fluctuates based on estimated population size. Thus, the gray whale PBR for the 1995/96 population estimate (22,571) is calculated as 432 based on a minimum population estimate of 21,597 and a maximum theoretical net productivity rate of .04 (Hill and DeMaster, 1999). Within two short years, the population estimate had increased by 4,064 whales to a level of 26,635 (U.S. Dept. of Comm. 2001). Despite the fact that such an increase is biologically impossible, the estimated PBR for the current gray whale population is 649 based on a minimum population estimate of 24,477. The annual removal of 649 gray whales from the current population, however, is not sustainable.[18]

Not only is this alleged safe level of mortality not sustainable, but the current gray whale PBR (649) is based on a maximum theoretical net productivity rate (5.3 percent) which is more than double the current estimated observed rate of increase. The 0.053 rate cited in Wade (1994) is also higher than the 4 percent net productivity rate recommended for gray whales by Hill and DeMaster (1999) in the 1999 Alaska Marine Mammal stock assessments.

The danger represented by the grossly overinflated PBR of 649 is evidenced by the results of the gray whale heuristic model. When the population is modeled under a scenario that removes 649 whales per

year, the population, as graphically indicated in Attachment 2, declines precipitously suggesting that the current PBR is more a prescription for extinction rather than a safe biological removal level for the gray whale.

**The Government has Misinterpreted the MMPA Moratorium on the Killing of Marine Mammals in Order to Accommodate Makah Whaling:**

In 1997, as previously explained, the government authorized the Makah to resume whaling. This was done in violation of the International Convention for the Regulation of Whaling (ICRW), the laws promulgated to implement the Convention, and in violation of the moratorium on taking contained in the MMPA. The MMPA provides only a limited number of exceptions to the moratorium which include a waiver procedure and a conditional exemption for native Alaskan subsistence taking. 16 U.S.C. §1371. Neither the exceptions to the moratorium or the waiver process apply or have been used by the NMFS to justify the Makah's proposed hunt.

The native Alaskan exemption is inapplicable to the proposed Makah hunt because this provision only covers taking by "any Indian, Aleut, or Eskimo who resides in Alaska and who dwells on the coast of the Northern Pacific Ocean or the Arctic Ocean." Id. at §1371(b).[19]

Recognizing the obvious conflict between NMFS's whaling proposal and the MMPA, NMFS maintains that the MMPA is simply inapplicable to both the Makah hunt and the Secretary's decision to seek a gray whale quota from the IWC. The apparent authority for NMFS's position is the 1855 Treaty of Neah Bay and a provision of Public Law 103-238 which included, among other things, the 1994 MMPA Amendments.

The relevant provision of Public Law 103-238 provides:

"Sec. 14. Indian Treaty Rights: Alaska Native Subsistence. Nothing in this Act, including any amendments to the Marine Mammal Protection Act of 1972 made by this Act - (1) alters or is intended to alter any treaty between the United States and one or more Indian tribes; or (2) affects or otherwise modifies the provisions of section 101(b) of the Marine Mammal Protection Act . . ." Pub. L. No. 103-238. 103rd Cong. 2nd Sess., 108 Stat. 532, 559 (1994).

NMFS apparently reads this provision as a general amendment to the MMPA, providing that nothing in the 1972 Act abrogates Native American treaty rights. However, it is clear from even a cursory reading of this provision that the "Act" referenced is Public Law 103-238 and not the MMPA in its entirety. The fallacy of NMFS's position is that the agency has interpreted section 14 substituting the phrase "the MMPA of 1972" for "this Act." Moreover, each of the amendatory provisions of Public Law 103-238 provides that a particular section of the MMPA "is amended" by the language provided in Public Law 103-238. No such language appears in section 14.

Moreover, NMFS's efforts to facilitate Makah whaling are inconsistent with section 1378 of the MMPA which provides "The Secretary ... shall ... initiate the amendment of any existing international treaty for the protection and conservation of any species of marine mammal to which the United States is a party in order to make such treaty consistent with the purposes and policies of the chapter." 16 U.S.C. §1378(a)(4). Congress has specifically identified the Whaling Convention as an example of a deficient international agreement that the Secretary must renegotiate under MMPA section 1378.[20] Instead of fulfilling this mandate, NMFS is actually moving in the opposite direction by pursuing the Makah quota. Indeed, the efforts by NMFS to facilitate Makah whaling is inconsistent with the Secretary's obligations under section 1378 of the MMPA by seeking a quota under an international convention that Congress has explicitly identified as inconsistent with the purposes and policies of the MMPA.

The failure of the MMPA to provide any meaningful protection to gray

whales and absolutely no protection to gray whale habitat has facilitated the decline in the population. The inadequacy of the MMPA is also caused by the government's blatant misinterpretation of the Act to favor the whaling interests of the Makah.

**International Convention on the Regulation of Whaling:**

The ICRW, adopted in 1946, established the International Whaling Commission as the preeminent authority for the worldwide regulation and management of whaling and whales.[21] The IWC prohibited the commercial slaughter of gray whales in 1946 but has consistently authorized the killing of gray whales by aboriginal groups. In the early 1980s the IWC created policies regarding aboriginal subsistence whaling. These policies were intended to standardize decisions made by the IWC as to which groups qualify to conduct aboriginal subsistence whaling. In 1997, despite no recognition of the Makah's subsistence needs by the IWC, the U.S. delegation failed to comply with these policies and U.S. law when it announced that the IWC approved a joint gray whale quota for the Russians and the Makah.[22]

The ICRW is an inadequate regulatory mechanism for the protection of gray whales because:

1) The U.S. government purposefully misinterpreted the IWC aboriginal subsistence
whaling policies in order to facilitate the Makah's resumption of whaling;[23]
2) No IWC member country has attempted to address this blatant violation of IWC policies
by the U.S. delegation since 1997;
3) The U.S. delegation's actions in recognizing the aboriginal subsistence whaling needs of the Makah, in defiance of accepted IWC policies, establishes a dangerous precedent that may cause an increase of aboriginal subsistence whaling of gray whales.

**The U.S. Government Purposefully Misinterpreted the IWC Aboriginal Subsistence Whaling Policies in Order to Facilitate the Makah's Resumption of Whaling:**

"Aboriginal subsistence whaling" means "whaling, for purposes of local aboriginal consumption carried out by or on behalf of aboriginal, indigenous or native peoples who share strong community, familial, social and cultural ties related to a continuing traditional dependence on whaling and on the use of whales." Rep. Int. Whal. Comm., Special Issue 4, 83 (1982). The phrase, "local aboriginal consumption," is further defined under the IWC regulations to mean "the traditional uses of whale products by local aboriginal, indigenous or native communities in meeting their nutritional, subsistence and cultural requirements." Rep. Int. Whal. Comm., Special Issue 4, 83 (1982). The relevant U.S. laws refer to the same definition of aboriginal subsistence whaling.

Therefore, in addition to satisfying U.S. legal standards, the Makah's alleged subsistence needs have to be recognized by the IWC before a whaling quota can be granted.[24] At the 1997 IWC meeting the U.S. and Russian delegations submitted a joint request for a gray whale quota to be shared by Russian aboriginal groups and the Makah. The record of the 1997 IWC meeting clearly demonstrates that the IWC did not make this determination. Indeed, France, the Netherlands, China, Oman, Australia, United Kingdom, New Zealand, Mexico, Argentina, Brazil, and other IWC member countries expressed opposition to Makah whaling because of the failure of the Makah to meet the IWC's aboriginal subsistence need standards.[25] See, Attachment 3 at 10-15.

As the foregoing evidence conclusively demonstrates, the IWC has never recognized the aboriginal subsistence needs of the Makah tribe and, therefore, the quota did not authorize the U.S. to permit the Makah to whale. Though the ICRW remained intact during this episode, the U.S. delegations misinterpretation of the Convention's standards and

policies revealed the inadequacy in this international agreement to protect gray whales.

**No IWC member country has attempted to address this blatant violation of IWC policies by the U.S. delegation since 1997:**

Despite the U.S. delegation's misinterpretation or misapplication of the IWC policies on aboriginal subsistence whaling at the IWC meeting in 1997, the Makah issue has not been revisited by the IWC. Allowing this violation of IWC policies to continue without any challenge is particularly disturbing given the number of countries who expressed serious reservations about the Makah proposal and the Makah's inability to meet the IWC aboriginal subsistence need standards. It is expected that this reluctance may be associated with U.S. government influence on IWC member countries to avoid a renewed debate on the Makah proposal.[26] As a result, the ICRW, the IWC, and the domestic legislation implementing the ICRW have failed to provide adequate protection to the gray whale.

**The U.S. delegation's actions in recognizing the aboriginal subsistence whaling needs of the Makah, in defiance of accepted IWC policies, establishes a dangerous precedent that may cause an increase of aboriginal subsistence whaling of gray whales:**

This misinterpretation of IWC policies on aboriginal subsistence needs reduces the credibility of the U.S. on the international whaling stage. In addition, in creating a precedent for nation states to make their own recognition of aboriginal subsistence whaling, U.S. actions have usurped the powers of the IWC. The U.S. has also established a precedent which will increase the potential for subsistence and commercial indigenous whaling throughout the world.[27] This may increase the number of gray whales killed by aboriginal groups, particularly in Canada a non-member of the IWC, to the detriment of the gray whale population. In addition, this type of unilateral action severely undermines the authority and responsibility of the IWC to protect the world's whales.

**National Environmental Policy Act:**

NEPA requires federal agencies to evaluate the environmental impacts of their actions before implementing the actions. As previously explained, the original environmental assessment was ultimately determined to be invalid by the Court in Metcalf v. Daley. As a result, the government prepared a revised draft environmental assessment on the Makah gray whale hunt. This new document was also deficient as it, among other things, failed to disclose and evaluate critical information (e.g., decline in benthic amphipods, trawling impact to amphipods and their habitat), neglected to consider a reasonable range of alternatives, and failed to evaluate the cumulative impacts of the action. See, Attachment 3. To date the government has not issued either a Finding of No Significant Impact (FONSI) or a decision to prepare an environmental impact statement. If the government issues a FONSI, then NEPA would qualify as an inadequate regulatory mechanism because of the deficiencies in the environmental assessment and the government's continued inability to subject the Makah whale hunt to adequate NEPA review.

**Washington State Endangered Species Act:**

The gray whale has been protected under the Washington State Endangered Species Act since 1981. Initially it was listed as "endangered" but, in 1997, the gray whale was upgraded to "state sensitive" largely based on the concern that the summer resident whales that inhabit inland waterways are especially vulnerable to harvest by Washington tribes. The hunting of species classified as "sensitive" is specifically prohibited by Washington State law. WAC §232-12-011.

The Constitution and Bylaws of the Makah require the tribe to comply with state law. Specifically, it states that, "the Makah Indian Tribe, in

order to establish a more perfect tribal organization ... secure to ourselves and our posterity the power to exercise certain rights of home rule, not inconsistent with the Federal, State, and local laws..." Therefore, the prohibitions imposed by the Washington State Endangered Species Act on the killing of species listed as "sensitive" apply to the Makah. The failure of the Makah and the U.S. government to comply with state law and the failure of the State of Washington to enforce its law renders the protections intended to be afforded to the gray whale by the state endangered species act meaningless and, therefore, inadequate.

As a result of the inadequate regulatory mechanisms and the government's failure to properly implement mandatory provisions of the ESA and to comply with the standards and policies of the IWC, the gray whale and its habitat have been harmed. Specifically, these deficiencies have resulted in: 1) no meaningful protection for gray whale habitat; 2) no protection for the gray whale from killing that is in violation of international, U.S., and state laws or policies; 3) no legitimate means to determine the size or trend in the gray whale population; 4) no reliable or consistent mechanism to monitor the status of gray whale habitat, particularly its feeding habitat; 5) no comprehensive mechanism to assess the extent and severity of gray whale mortality; 6) the use of a PBR which is unsustainable and will drive the population to extinction; and, 7) no agreement or other mechanism to guarantee the protection of gray whales and their habitat throughout gray whale range.

**CRITERIA A: THE PRESENT OR THREATENED DESTRUCTION, MODIFICATION, OR CURTAILMENT OF ITS HABITAT OR RANGE; CRITERIA E:OTHER NATURAL OR MANMADE FACTORS AFFECTING ITS CONTINUED EXISTENCE**

For the purpose of this discussion, Criteria A and E will be combined. This is largely due to the fact that the majority of natural or manmade factors affecting the continued existence of the gray whale impact both gray whales and their habitat. The destruction, degradation, and/or loss in the quality and quantity of gray whale habitat directly and adversely impact the viability, health, and survival of individual gray whales and the gray whale population.

As the Marine Mammal Commission has repeatedly stated in its annual report to Congress (See, e.g., MMC 1999):

Gray whales typically migrate, calve, and rear their young within a few miles of shore, and feed over the continental shelf. As a result, they are exposed to the effects of various human activities that tend to be concentrated near shore. Some whales are killed or injured as a result of entanglement in coastal gillnets or collisions with ships. Their behavior, habitat use patterns, and health also may be affected by noise, contaminants, or other human activities and development, including offshore oil and gas development, coastal development, whale watching, military exercises, and industrial facilities.[28]

Threats to the gray whale include the number and composition of gray whales killed by aboriginal groups and various mortality factors. While such impacts are of serious concern to the gray whales, other activities pose a considerable and immediate threat to gray whale habitat. The warming of sea temperatures caused by natural and human-influenced global warming, the destruction of benthic habitat by bottom trawlers, and the contamination of the gray whale's primary food supply - benthic amphipods - have impacted and will substantially impact gray whales. This section will evaluate those activities that are having the greatest adverse impact on gray whales and their habitat.

As previously indicated, a heuristic model has been developed for the gray whale.[29] The value of a heuristic model is that it is a learning tool that is intended to be highly adaptive in order to easily accommodate new data or information about the model parameters. The model is designed to be both age and sex structured with time-varying,

density-dependent and stochastic demographic processes that were parameterized using the best available information on gray whale demography, catch and stranding history and the productivity of the benthic amphipod food stock subject to environmental fluctuations (Chaloupka 2000). The results of the model, which is subject to ongoing development and validation, demonstrate that the gray whale population is seriously threatened by recent trends in the population and by current management actions. For example, as previously stated, the current PBR for the gray whale population is unsustainable (See, Attachment 2). Similarly, the number of undocumented gray whale mortalities and/or reduction in gray whale production, can drastically impact the survival and viability of the gray whale population. The impact of these factors on population viability will become more severe as benthic amphipod communities decline in quantity and quality.

---

[17] It may be the case that the NMFS does consider documented "natural mortalities" such as strandings in determining the number of gray whales removed from the population. Whether this is done, however, is not clear from the definition of PBR provided in the MMPA. Even if this is the case, it does not alter the fact that the PBR formula does not provide sufficient consideration of undocumented mortalities which, in gray whales, may represent the vast majority of the mortalities (See, Heyning and Dahlheim 1994).

[18] In its 2000 gray whale stock assessment, NMFS now believes the Rmax is .047 or 4.7 percent resulting in a newly revised PBR level of 575. This new PBR level remains unsustainable based on the results of the heuristic model (See, Attachment 2). Remarkably, NMFS actually claims, based on Wade (in press), that the actual Rmax is .072 or 7.2 percent. Not only did NMFS fail to provide a citation for Wade (in press), but given the lack of population demographic information, the use of highly questionable demographic information, and other flaws raise concerns about the legitimacy of this new Rmax estimate which is, at best, excessive and entirely inconsistent with the observed rate of production.

[19] Similarly, the revised regulation implementing the Whaling Convention Act, 36 C.F.R. §230 et seq., is illegal under the MMPA because the regulations extend the authority for the aboriginal killing of whales to indians living outside of Alaska.

[20] See, H.R. Rep. No. 92-707, 92nd Cong., 1st Sess. (1971), providing that "an obvious case in point [of a convention the Secretary must renegotiate pursuant to section 1378] is the International Whaling treaty which was entered into not for the benefit of the whales, but for the benefit of the companies exploiting them. This inadequate measure should clearly be strengthened.[21] During its early history, the IWC was a greater advocate for whaling than for the protection and responsible management of whales. While many IWC member countries no longer advocate commercial whaling, the

IWC remains restrained in its ability to protect whales since it has no enforcement authority. The U.S. was instrumental in preventing the IWC from having such authority by claiming that its domestic legislation was sufficient to provide the enforcement of IWC directives (Hankins 1990).

[22] The quota authorized the Makah to kill/strike up to 41 gray whales from 1997 to 2002.

[23] As previously indicated, it is the cumulative impact of all threats to the Eastern North Pacific gray whale population that justifies its listing under the ESA. Therefore, though some may claim that Makah quota consists of a small proportion of the estimated total number of gray whales, given the status of benthic amphipods and the adverse impact of the decline on gray whale survival and productivity requires that all intentional forms of human caused gray whale mortality be prevented or eliminated.

[24] The U.S. has consistently recognized the IWC as the preeminent authority for the regulation of whaling. See, Attachment 3 at 15-16.

[25] Eventually the schedule amendment relevant to the joint quota was revised to include a statement indicating that the Makah's subsistence needs have to be recognized before the tribe can engage in whaling. Despite this clear requirement, after the quota was approved, the U.S. proclaimed that the IWC had approved Makah whaling. This drew an immediate response from the Australian delegation who made it clear that the approved quota did not constitute an acceptance or recognition by the IWC of the validity of the Makah claims.

[26] If the U.S. elects to authorize Makah whaling at the conclusion of the current NEPA process, the ruling in Metcalf v. Daley requires the U.S. to gain IWC recognition of the alleged subsistence needs of the Makah.

[27] O'Leary (1984) identifies eight aboriginal group who engaged in whaling from the Aleutian Islands to Washington State. The MMC identified the Quilute, Hoh, Quinault, and S'Klallam as tribes that all actively hunted whales on the Pacific Coast (October 8, 1997 letter from J. Twiss, MMC, to H. Diaz-Soltero, NMFS). Since the Makah resumed whaling, at least one group, the Nuu-chah-nulth from Canada has expressed its interest in hunting gray whales. Indeed, the Nuu-chah-nulth have indicated its interest in killing up to 1000 gray whales per year.

[28] See also, Swartz (1986), "Because of their coastal habits gray whales may be regularly observed from shore, and their lengthy annual migration is one of the

world's most outstanding wildlife spectacles. Yet it is this affinity with coastal waters that poses a very real threat to the species. They cannot easily avoid exposure to marine pollution, vessel traffic, industrial noise, and activities associated with the development of outer continental shelf resources over virtually their entire range." [29] The petitioners and Dr. Chaloupka are prepared to meet with U.S. government representatives to explain and review the features of the heuristic model, document how the model is constructed, and to demonstrate the decline in the gray whale population based on current threats to the gray whale and its habitat.

**Cover Letter, Executive Summary**
**Part I: Introduction and Background**
**Part II: Listing Criteria**
**Part III: Listing Criteria, Habitat, Other Factors (this file)**
**Part IV: Mortality Factors**
**Part V: Mortality Factors, Oil and Gas Exploration**
**Part VI: Noise Impacts, Contaminants, Other Impacts (this file)**
**Part VII: Conclusion**
**Literature Cited**