SUE ELLEN WOOLDRIDGE
Assistant Attorney General
JEAN E. WILLIAMS, Chief
SETH M. BARSKY, Assistant Chief
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
KRISTEN BYRNES FLOOM, Trial Attorney (DC Bar No. 469615)
P.O. Box 7369
Washington, D.C.  20044-7369
Telephone: (202) 305-0210
Facsimile: (202) 305-0275
Kristen.Floom@usdoj.gov

GREGORY PAGE, Trial Attorney (DC Bar No. 398121)
U.S. Department of Justice
Environment and Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C.  20044-0663
Telephone: (202) 305-0446
Facsimile: (202) 305-0506
Gregory.Page@usdoj.gov

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, et al. )<br>)<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>CARLOS M. GUTIERREZ, et al., )<br>)<br>Defendants. )<br>_____ | Civ. No. 05-1392 |

**FEDERAL DEFENDANTS' CONSOLIDATED STATEMENT
OF MATERIAL FACTS AND STATEMENT OF GENUINE ISSUES**

Pursuant to Local Civil Rules 7.1(h) and 56.1, federal defendants ("NMFS") respectfully submit their (1) Statement of Material Facts supporting their Motion for Summary Judgment and (2) Statement of Genuine Issues in opposition to plaintiffs' Motion for Summary Judgment.[1]/

## I. STATEMENT OF MATERIAL FACTS

1. Unless future scientific research ascertains the cause or causes of an alarming decline in the sea lions' western population,

> [e]xtinction rates for rookeries or clusters of rookeries could increase sharply in 40 or 50 years and Steller sea lions could become extinct throughout the entire Kenai-to-Kiska [Alaska] region in the next 100-120 years.

AR 407 at 45-46.[2]/

---

[1]/    Defendants dispute that the statements of fact called for by L. Civ. R. 7(h) are appropriate in this case, because plaintiffs' claims are governed by the Administrative Procedure Act ("APA"), and judicial review under the APA is limited to the agency's administrative record. Defenders of Wildlife v. Babbitt, 958 F. Supp. 670, 678 (D.D.C. 1997); 5 U.S.C. § 706. "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985).
   Under the APA, the Court may set aside a regulatory decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Marsh v. Oregon Natural Resources Council, 490 U.S. 360 (1989). Essentially, the Court's only function on APA review is to determine whether the agency has "'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" Carlton v. Babbitt, 26 F. Supp. 2d 102, 106 (D.D.C. 1998). Thus, this Court is not called upon to resolve issues of fact, and Defendants submit that the statements of fact required by L. Civ. R. 7(h) do not properly apply here.

[2]/    This citation denotes Document 407, internal pages 45-46, of NMFS' administrative record, previously submitted to the Court. Unless otherwise indicated, citations are from the excerpts of the administrative record previously submitted by plaintiffs in support of their motion for summary judgment.

2. Steller sea lions are distributed around the rim of the North Pacific Ocean from Southern California to Hokkaido, Japan. The species was first listed as threatened under the ESA in 1990 in response to a severe decline in the number of Steller sea lions observed in Alaska (reductions of 63% since 1985 and 82% since 1960). AR 406 at 7. In 1997, Steller sea lions were classified into two "distinct population segments" under the ESA. The segment of the population west of 144° W longitude (western stock) was listed as endangered, while the population east of 144° W longitude (eastern stock) was listed as threatened. Id.

3. The rate of decline in the western stock averages 5% per year. Id. at 38. By contrast, the eastern stock increased at an average rate of 5.9% per year between 1979 and 1997. Id. A prevailing theory regarding the cause of the western stock's decline is a decrease in juvenile (ages >1 year to 4 years) survival rates, most likely because juveniles are less adept at obtaining prey and avoiding predators. AR 407 at 32. Some scientists believe that the overall decline in the population is due to a 10-20% annual decrease in juvenile survival. AR 406 at 38. Other factors that may be influencing the depletion of the western stock are decline in reproductive success and changes in adult survival. Id. at 33.

4. Although the recent declines in the sea lions' western population have coincided with the "reduced juvenile survival" of young sea lions in this population, the reason for or "ultimate cause of [this] decline remains unknown." AR 202 at 9 (NMFS excerpt submitted today). Many scientists believe that, when the least likely of this

decline's possible causes are excluded, "[w]hat remains as a cause of the recent decline appears to be a decline in the prey base available to young sea lions." Id.  Recent research has (1) "shown a strong positive correlation between a reduction in the diversity of the diet and [the western sea lion's] population decline" and (2) concluded that "nutritional stress is the most likely cause" of this decline.  Exh. 2 (AR 259) at 338, 339 (map distinguishing between eastern and western sea lion populations); AR 407 at 42.

    5.  To establish "ultimate" or primary causes of western sea lion's decline, NMFS' 1992 Final Recovery Plan for Steller Sea Lions prioritized different research needs for potential causes, including research methodologies that would

> monitor status and trends of sea lion abundance and distribution, monitor health, condition, and vital parameters, assess and minimize causes of mortality, and investigate feeding ecology and factors affecting energetic status.

AR 390 at 5, 10 (NMFS excerpt).

    6.  Beginning in 2000 and 2001, Congress responded to this recovery plan, existing research, and the western sea lion's continued population declines by disbursing substantial public monies for more comprehensive research. In the Fiscal Year 2001 Consolidated Appropriations Act, for example, Congress appropriated $43.2 million for sea lion research needs designated by it, including "juvenile and pup survival rates," "population counts," and "nutritional stress."  Compare AR  406 at 7-8 with Pu. L. 106-554, 114 Stat. 2763, 2763A-175 to 179.

    7.  Congress disbursed this money both directly to NMFS and also to several non-federal scientists and research institutes, including the Alaska Department of Fish

and Game ("State of Alaska"), the University of Alaska's Sea Life Center ("Alaska Sea Life Center"), and the North Pacific University's Marine Mammal Research Consortium ("Research Consortium"). In 2002, Congress appropriated an additional $40.15 million to these federal and non-federal research entities for the same designated sea lion research needs. Id.; see also AR 406 at 53.

      8. In its 2002 EA and FONSI, NMFS analyzed the environmental effects of issuing permits under both the ESA and MMPA allowing these scientists and research institutions to conduct the particular sea lion research that Congress authorized and designated. Upon completing and considering this environmental analysis, NMFS allowed these and other institutions to conduct this research, including (1) aerial surveys of sea lion numbers; (2) surveys of these numbers by boat or "vessel;" (3) surveys on the ground by authorized individuals; (4) scat (sea lion feces) collection and analysis; (5) carcass analysis of any sea lions found dead; (6) tissue analysis from sea lions harvested by aboriginal peoples; (6) behavioral and other observations of rookeries by remote means; (7) tracking and monitoring sea lions swimming at sea; and (8) the temporary capture or recapture and subsequent release of sea lions for blood collection, population tracking (by tagging or hot branding), and physiological purposes. AR 406 at 22-23, 79-83.

      9. NMFS analyzed the effects of extending or expanding this research in its 2005 EA and FONSI. It also studied two research methodologies not previously analyzed: (1) inserting tiny transmitters to monitor stomach temperature and (2) data loggers in juvenile sea lions. After completing this analysis, NMFS determined that this additional research

also met the research needs designated by Congress.  Id. at 8, 27-30.

10.  Plaintiffs challenge the 2005 EA, FONSI, and corresponding permits, not the 2002 EA and FONSI.  NMFS determined that it could not and would not authorize "intentional lethal mortality of Steller sea lions" in either its 2002 research permits or the 2005 research permits that plaintiffs challenge.  AR 406 at 53.

11.  The authorized research involves "takes," because scientific research "(1) attempting to harass a marine animal is considered a take and (2) any act that has the potential to disturb a marine mammal is considered harassment."  AR 384 at 57 (emphasis supplied) (NMFS excerpt); see also  AR406 at 65 (NMFS notes MMPA's definition of "harass" includes, among other things, acts of "annoyance [having] the potential to disturb a marine mammal").

12.  Thus, NMFS reiterated that, under this "broad definition of 'take,'" its research permits would not authorize killing for research purposes, but only strictly limited "accidental mortality . . . resulting from the actions or presence of researchers while conducting permit-authorized activities."  AR 246 (NMFS excerpt).

13.  In the context of both widespread sea lion population monitoring and physiology studies, and under this broad definition of "take," NMFS' 2002 research permits authorized the taking during aerial surveys, scientific monitoring, and other study of up to 331,174 sea lions from both the western and eastern populations.  AR 406 at 79-83.  In 2005, NMFS increased the maximum number of animals that could be studied during this research to 527,690 western and eastern sea lions, an increase of

approximately 59 percent.  Compare id. with AR 406 at 103-107.

14.  NMFS did not change the maximum amount of accidental or incidental mortality, both of which are regulated and limited under the 2005 research permits. NMFS' 2002 permits authorized the accidental deaths of no more than 20 western sea lions.  AR 406 at 82; Exh. 4 (AR 384) at 113 (NMFS excerpt).

15.  Similarly, in 2005, NMFS decided that its Permits Division and Alaska Region would ensure that sea lion mortality would "not exceed 20 animals per year in the western stock."  AR 407 at 65.  Further, NMFS determined that it would suspend all research under all 2002 and 2005 permits, pending additional scientific review, "if the total number of research-related mortalities of endangered [western] sea lions reaches 10 animals under any combination of permits."  AR 406 at 50, 106 (emphasis supplied).

16.  Adding NMFS' maximum number of 10 western sea lions accidently killed before all 2002 and 2005 research is suspended to both NMFS' estimated PBR numbers for aboriginal or subsistence harvests (171) and incidental kills during commercial fishing (26) yields a PBR number of 207.  AR 384 at 40; AR 407 at 39.

17.  Defendants applied PBR analysis for marine mammals listed as endangered under the Endangered Species Act ("ESA") using a default value for the recovery factor (an element in the calculation of PBR) of 0.1.  Exh. 3 (AR 390), Appendix B at 14.  If PBR is calculated in this manner, NMFS has determined that, with a rate of human-caused mortality equal to PBR, the recovery time of endangered marine mammals would be increased by no more than 10%.  Id.

## II. STATEMENT OF GENUINE ISSUES

Pursuant to Local Rule 7.1(h), NMFS hereby submits the following response to Plaintiffs' Statement of Undisputed Material Facts (January 6, 2006) (Doc. # 11). For ease of reference, NMFS adopts the format used by plaintiffs, specifying which facts are disputed in each Paragraph:

1. Statement not disputed.

2. Statement not disputed.

3. Statement not disputed.

4. Statement not disputed.

5. Statement not disputed.

6. Statement not disputed.

7. Statement not disputed.

8. Statement not disputed.

9. Statement not disputed.

10. Statement not disputed.

11. Statement not disputed.

12. Statement partially disputed. Defendants do not admit that the potential biological removal ("PBR") level for the Steller sea lion's endangered western population would be exceeded. NMFS' 2002 permits ensure that accidental deaths will be limited to 20 animals per year in the western stock. See supra Statement of Material Facts ¶¶ 14, 15. Further, all research under the 2002 and 2005 permits will be suspended "if the total number of research-related mortalities of endangered [western] sea lions reaches 10

animals <u>under any combination of permits</u>." See supra Statement of Material Facts ¶¶ 15.

13.  Statement disputed. Plaintiffs characterize a section of the Marine Mammal Protection Act ("MMPA"), which speaks for itself. Defendants aver that the MMPA defines PBR as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." 16 U.S.C. § 1362(20). The "optimum sustainable population" is "the number of animals which will result in the maximum productivity of the population or the species," taking into account the carrying capacity of the habitat and the health of the ecosystem. Id. at § 1362(9). For marine mammals listed as endangered under the ESA, NMFS calculates PBR conservatively, such that if human-caused mortality is equal to PBR, the recovery time of endangered marine mammals would be increased by no more than 10%. See supra Statement of Material Facts ¶¶ 17.

14.  Statement not disputed.

15.  Statement partially disputed. Defendants aver that the MMPA imposes a requirement that the Marine Mammal Commission ("MMC") review any permits issued for purposes of scientific research. 16 U.S.C. § 1371(a)(1). NMFS' implementing regulations provide for a 45-day time period for MMC review, after which it will be assumed that the MMC has no comments. 50 C.F.R. §216.33(d)(2).

16.  Statement not disputed.

17.  Statement disputed. Defendants aver that the May 19, 2005 MMC comments recommended that NMFS defer final action pending receipt of supplemental information, completion of ESA consultation, and additional justification for concluding

that the permitted activities would not result in a significant impact on Steller sea lions. Declaration of James Barrett ("Barrett Decl.") Exh. 1 at 5. The MMC further recommended that NMFS reconsider its finding of no significant impact and either: (1) provide additional explanation of its rationale; (2) reduce the scope of certain research projects; or (3) prepare an environmental impact statement ("EIS"). Id.

18. Statement not disputed.

19. Statement partially disputed. Defendants aver that a number of organizations submitted comments on the proposed action, and that Defenders of Wildlife and The Humane Society of the United States ("HSUS") recommended that NMFS deny the permits or defer a decision pending completion of an EIS. AR 406 at 16.

20. Statement not disputed.

21. Statement not disputed. However, Defendants aver that the 2005 Biological Opinion further states that "NMFS has no information on future State, tribal, local, or private actions in the action area that would not be subject to section 7 consultation." AR 407 at 67 (emphasis added).

22. Statement not disputed.

23. Statement partially disputed. The MMC's June 10, 2005 letter recommended that NMFS reconsider its finding of no significant impact and either: (1) provide additional explanation of its rationale; (2) reduce the scope of certain research projects; or (3) prepare an environmental impact statement ("EIS"). Barrett Decl. Exh. 2 at 2.

24. Statement not disputed.

25. Statement partially disputed. NMFS denies that 292 actual mortalities will result from the permitted activities. Annual reports from permit holders reflect that, in 2003-2004, the number of reported mortalities did not exceed 10 per year. AR 406 at 42. Moreover, with respect to the endangered western population, NMFS will ensure that sea lion mortality will not exceed 20 animals per year. AR 407 at 65. Finally, NMFS denies that tracking devices will be surgically implanted in animals from shipboard. This activity is a component of Permit No. 1034-1773, which has not been issued.

26. Statement not disputed.

27. Statement partially disputed. Plaintiffs characterize a June 27, 2005, letter from Dr. William T. Hogarth to counsel for plaintiffs, which states "we share your concerns over the scope of the research of Steller sea lions." Barrett Decl. Exh. 3. The letter further states that NMFS "has decided to prepare an environmental impact statement (EIS) on the effects of scientific research on this species," and anticipates "completing the process and issuing a final EIS by September 2007." Id.

28. Statement not disputed.

29. Statement not disputed.

Respectfully submitted this 27th day of January, 2006

        SUE ELLEN WOOLRIDGE
        Assistant Attorney General
        JEAN E. WILLIAMS, Chief
        SETH M. BARSKY, Assistant Chief
        U.S. Department of Justice
        Environment and Natural Resources Division
        Wildlife and Marine Resources Section

        /s/ Kristen Byrnes Floom
        KRISTEN BYRNES FLOOM, Trial Attorney (DC Bar No. 469615)
        P.O. Box 7369
        Washington, D.C. 20044-7369
        Telephone: (202) 305-0210
        Facsimile: (202) 305-0275
        Kristen.Floom@usdoj.gov

        GREGORY PAGE, Trial Attorney
        (DC Bar No. 398121)
        U.S. Department of Justice
        Environment and Natural Resources Division
        General Litigation Section
        P.O. Box 663
        Washington, D.C. 20044-0663
        Telephone: (202) 305-0446
        Facsimile: (202) 305-0506
        Gregory.Page@usdoj.gov

<u>Of Counsel:</u>
Mary O'Brien
NOAA Office of General Counsel
for Fisheries
1315 East-West Highway
SSMC3 - Room 15111
Silver Spring, MD 20910

        *Attorneys for Defendants*