SUE ELLEN WOOLDRIDGE
Assistant Attorney General
JEAN E. WILLIAMS, Chief
SETH M. BARSKY, Assistant Chief
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
KRISTEN BYRNES FLOOM, Trial Attorney (DC Bar No. 469615)
P.O. Box 7369
Washington, D.C.  20044-7369
Telephone: (202) 305-0210
Facsimile: (202) 305-0275
Kristen.Floom@usdoj.gov

GREGORY PAGE, Trial Attorney (DC Bar No. 398121)
U.S. Department of Justice
Environment and Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C.  20044-0663
Telephone: (202) 305-0446
Facsimile: (202) 305-0506
Gregory.Page@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, et al. | ) ) ) | |
| Plaintiffs, | ) ) | Civ. No. 05-1392 |
| vs. | ) ) ) | |
| CARLOS M. GUTIERREZ, et al., | ) ) | |
| Defendants. | ) ) | |

_____

## FEDERAL DEFENDANTS' COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

PAGES

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    LITIGATION BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.     STATUS OF THE SPECIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       B.     RELATED FEDERAL RESEARCH . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       C.     SEA LION RESEARCH CHALLENGED BY PLAINTIFFS . . . . . . . . . . 6

III.   STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . 8

       A.     NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

       B.     ESA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       C.     MMPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

V.     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       A.     THIS COURT LACKS JURISDICTION TO REVIEW PLAINTIFFS'
              CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

              1.     Plaintiffs Lack Article III Standing To Bring Their Claims. . . . . . 17

              2.     Plaintiffs' MMPA Claim Fails To Challenge Final Agency
                     Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

       B.     NMFS PREDICATED ITS 2005 EA AND FONSI ON REASONED,
              SENSIBLE ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

              1.     NMFS Did Not Admit the 2005 EA and FONSI Were Unlawful.  20

              2.     NMFS Properly Analyzed PBR Numbers. . . . . . . . . . . . . . . . . . 22

i

3.    NMFS Properly Analyzed the Impacts that Plaintiffs
Allege are "Highly Controversial" and "Highly Uncertain." . . . . 27

4.    NMFS Properly Considered Cumulative Impacts. . . . . . . . . . . . 30

5.    NMFS' Range of Programmatic Alternatives Was Proper. . . . . . 30

C.    PLAINTIFFS' ESA CLAIM MUST FAIL ON THE MERITS OR,
ALTERNATIVELY, THE COURT SHOULD DECLINE TO EXERCISE
JURISDICTION OVER THE CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

1.    NMFS Analyzed The Effects Of The Action When Added To The
Environmental Baseline. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

2.    Plaintiffs Have Not Identified Any Cumulative Effects That NMFS
Failed To Consider. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

3.    NMFS Will Revisit The 2005 BiOp And Issue A New Biological
Opinion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

D.    THE CHALLENGED PERMITS WERE ISSUED IN COMPLIANCE
WITH THE MMPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

1.    NMFS Acted Reasonably In Issuing The Permits After Receiving the
MMC's Draft Comments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

2.    The Level Of Potential Take Under The Subject Permits Will Have
A Negligible Impact On The Species' Recovery. . . . . . . . . . . . . . 40

VI.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                            <u>PAGES</u>

<u>Air Canada v. DOT</u>, 148 F.3d 1142, 1156 (D.C. Cir. 1998 . . . . . . . . . . . . . . . . . . . . 36, 39

<u>A.L. Mechling Barge Lines v. United States</u>, 368 U.S. 324, 331 (1961) . . . . . . . . . . . 38

<u>Alaska Dep't of Envtl. Conservation v. EPA</u>, 540 U.S. 461, 497 (2004) . . . . . . . . . . . 35

<u>Am. Rivers v. NMFS</u>, 126 F.3d 1118, 1124 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 38

<u>American Bioscience v. Thompson</u>, 269 F.3d 1077, 1083 (D.C. Cir. 2001) . . . . . . . . . 16

<u>American Iron and Steel v. EPA</u>, 115 F.3d 979, 1004 (D.C. Cir. 1997) . . . . . . . . . . . . 27

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>Animal Defense Council v. Hodel</u>, 840 F.2d 1432, 1435-1438 (9th Cir. 1988)
  1432, 1435-1438 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

<u>Asarco, Inc. v. U.S.E.P.A.</u>, 616 F.2d 1153, 1160 (9th Cir. 1980) . . . . . . . . . . . . . . . . . 21

<u>ASPCA v. Ringling Bros. & Barnum & Bailey Circus</u>, 317 F.3d 334, 336 (D.C. Cir.
2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>Baltimore Gas & Electric Co. v. NRDC</u>, 462 U.S. 87, 105 (1983) . . 2, 3, 4, 11, 17, 27, 30

<u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>Chamber of Commerce v. U.S. Dep't of Energy</u>, 627 F.2d 289, 291(D.C. Cir. 1980) . . 37

<u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 415, 416 (1971) . . 16, 21

<u>Cmty. for Creative Non-Violence v. Hess</u>, 745 F.2d 697, 700 (D.C. Cir. 1984) . . . . . . 37

<u>Coal. on Sensible Transp. v. Dole</u>, 826 F.2d 60, 72 (D.C. Cir. 1987) . . . . . . . . . . . . . . 21

iii

Commodity Futures Trading Comm'n v. Nahas, 738 F.2d 487, 492 n.9 (D.C. Cir. 1984)17

Comtys. for a Great Nw., Ltd. v. Clinton, 112 F. Supp. 2d 29, 37, 38 (D.D.C. 2000)  . . 20

Cook Inlet Beluga Whale v. Daley, 156 F. Supp. 2d 16, 18 (D.D.C. 2001) . . . . . . . . . . 37

Dep't of Transportation v. Public Citizen, 541 U.S. 752, 763 (2004) . . . . . . . . . . . . 10, 31

Heartwood v. Forest Service, 380 F.3d 428, 432, 433 (8th Cir. 2004) . . . . . . . . . . . . . 28

First National Bank & Trust v. Department of the Treasury, 63 F.3d 894, 898 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Florida Power & Light Co. v. Lorion, 470 U.S. 729 (1985) . . . . . . . . . . . . . . . . . . . . . 20

Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089 (9th Cir. 2003) . . . . . . . . . . . . . 39

Friends of Endangered Species v. Jantzen, 760 F.2d 976, 987 (9th Cir. 1985) . . . . . . . . 26

Friends of the Payette v. Horseshoe Bend Hydroelectric Co., 988 F.2d 989, 993 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Georgiades v. Martin-Trigona, 729 F.2d 831, 833 n.4 (D.C. Cir. 1984) . . . . . . . . . . . . 17

Greenpeace Action v. Franklin, 14 F.3d 1324, 1331, 1332, 1333, 1335 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 26, 30

Indep. Petroleum Ass'n v. Babbitt, 235 F.3d 588, 594 (D.C. Cir. 2001) . . . . . . . . . . . . 18

Indiana Forest Alliance v. U.S. Forest Service, 325 F.3d 851, 859 et seq. (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28,29

Kleppe v. Sierra Club, 427 U.S. 390, 394 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994) . . . . . . . . . . . . . . . . . . 17

La. Envtl. Action Network v. Browner, 87 F.3d 1379, 1381 (D.C. Cir. 1996) . . . . . . . . 17

Lower Alloways Creek Tp. v. Public Service Elec., 687 F.2d 732, 740-741, 743, 747, 748 (3rd   Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Lujan v. Defenders of Wildlife, 504 U.S. 555, 586 n.3 (1992) . . . . . . . . . . . . . . . . . . . . 12

Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883 (1990) . . . . . . . . . . . . . . . . . 16, 18, 19

Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 372, 375, 376, 377 n. 23, 378
  (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11, 16, 17, 24, 30

Nat'l Audubon Society v. U.S. Forest Service, 46 F.3d 1437, 1447 n. 9 (9th Cir. 1992). 21

Nat'l Audubon Soc'y v. Hester, 801 F.2d 405, 407 (D.C. Cir. 1986) . . . . . . . . . . . . . . 16

Nat'l Trust for Historic Pres. v. Dole, 828 F.2d 776, 781 (D.C. Cir. 1987) . . . . . . . . . 16

Natural Res. Def. Council v. Evans, 364 F. Supp. 2d 1083, 1091 (N.D. Cal. 2003) . . . . 16

North Carolina v. FAA, 957 F.2d 1125, 1133-1134 (4th Cir. 1992) . . . . . . . . . . . . 28, 29

Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 66 (2004) . . . . . . . . . . . . . . . . . . 19

Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 230 (D.D.C. 2005) . . . . . . . . . . . . . . 33, 34

Preserve Endangered Areas of Cobb v. U.S. Army Corps of Engineers, 87 F3d 1242,
1248, 1249    (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 26

Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 . . . . . . . . . . . . . . . . 11

San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n, 789 F.2d 26, 37
(D.C.     Cir. 1986) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Sierra Club v. Marita, 46 F.3d 606, 619 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 11

Sierra Club v. Peterson, 228 F.3d 559, 565 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 18

Sierra Club v. U.S. Dep't of Transportation, 753 F.2d 120, 126, 127
  (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 24, 25, 26, 29, 30

Steamboaters v. FERC, 759 F.2d 1382, 1394 (9th Cir 1985) . . . . . . . . . . . . . . . . . . . . 26

Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93, 94 (1998) . . . . . . . . . . . . 17, 18

Tourus Records v. Drug Enforcement Admin., 259 F.3d. 731, 736 (D.C. Cir. 2001) . . . 11

Town of Cave Creek v. FAA, 325 F.3d 320, 331, 332 (D.C. Cir. 2003) . . . . . . . . . . . . 28

Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558 (1978)  . . . . . 10, 31

White v. Fraternal Order of Police, 909 F.2d 512 (D.C. Cir. 1990)  . . . . . . . . . . . . . . . 15

STATUTES

5 U.S.C. § 70 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
5 U.S.C. § 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

16 U.S.C. § 1362  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 22, 24
16 U.S.C. § 1362(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
16 U.S.C. § 1362(12)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
16 U.S.C. § 1362(18)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
16 U.S.C. § 1371(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
16 U.S.C. § 1374(c)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
16 U.S.C. § 1374(c)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
16 U.S.C. § 1386(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41
16 U.S.C. § 1531  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
16 U.S.C. § 1531(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
16 U.S.C. § 1532 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
16 U.S.C. § 1532(5)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
16 U.S.C. § 1532(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
16 U.S.C. § 1532(20) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
16 U.S.C. § 1533 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
16 U.S.C. § 1536(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
16 U.S.C. § 1536(b)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
16 U.S.C. § 1371  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
16 U.S.C. § 1371-1389  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 4321  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

43 U.S.C. § 4332(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

40 C.F.R. § 1500.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
40 C.F.R. § 1501.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
40 C.F.R. § 1501.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
40 C.F.R. § 1508.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

40 C.F.R. § 1508.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
40 C.F.R. § 1508.9(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
40 C.F.R. § 1508.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
40 C.F.R. § 1508.27(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

50 C.F.R. § 216.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
50 C.F.R. § 216.33(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
50 C.F.R. § 402.0 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 36
50 C.F.R. § 402.12(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
50 C.F.R. § 402.12(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
50 C.F.R. § 402.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
50 C.F.R. § 402.13(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
50 C.F.R. § 402.14(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
50 C.F.R. § 402.14(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14
50 C.F.R. § 402.14(g)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
50 C.F.R. § 402.14(h)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
50 C.F.R. § 402.14(l)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
50 C.F.R. § 402.15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## OTHER STATUTES

Pub. L. 106-554 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

114 Stat. 2763 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 8

# I.    INTRODUCTION

Defendants hereby oppose plaintiffs' motion for summary judgment, and move for summary judgment on plaintiffs' claims for relief.  The crux of plaintiffs' claims is that, by following Congress's direction to increase the scope and comprehensiveness of the Steller sea lion ("sea lion") research that Congress has specifically authorized since 2000, federal defendants (collectively "NMFS") violated the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq.  ("NEPA"), the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., and the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1371-1389.  Relying on the expert opinion of its scientists, NMFS has determined that unless future scientific research ascertains the cause or causes of an alarming decline in the sea lions' western population,

> [e]xtinction rates for rookeries or clusters of rookeries could increase sharply in 40 or 50 years and Steller sea lions could become extinct throughout the entire Kenai-to-Kiska [Alaska] region in the next 100-120 years.

AR 407 at 45-46.[1]/ Notably, plaintiffs do not contest this premise for the research they challenge.

Plaintiffs claim that a 2005 environmental assessment ("EA") and a corresponding finding of no significant impact ("FONSI")  are arbitrary and capricious, and therefore contrary to NEPA, because NMFS did not properly analyze three environmental issues:

---

[1]/    This citation denotes Document 407, internal pages 45-46, of NMFS' administrative record, previously submitted to the Court.  Unless otherwise indicated, citations are from the excerpts of the administrative record previously submitted by plaintiffs in support of their motion for summary judgment.

the environmental effect of increasing the number of sea lions that skilled scientists

monitor or touch during research from the levels established in 2002; alleged "highly

controversial," "highly uncertain," and "cumulative" impacts of research methodologies

for studying the sea lions' population, diet, physiology, and movement; and an

appropriate range of programmatic alternatives to this research.

However, NMFS thoroughly and sensibly analyzed <u>all</u> these environmental factors

in its EA and FONSI. Because plaintiffs never controvert this analysis, they cannot meet

NEPA's elementary burden of establishing that NMFS acted arbitrarily and capriciously

by not (1) considering "the relevant factors" in its EA and FONSI and (2) articulating "a

rational connection between the facts found and the choice made" in those documents.

<u>Baltimore Gas & Electric Co. v. NRDC</u>, 462 U.S. 87, 105 (1983).

Nor can plaintiffs meet their burden with respect to their ESA and MMPA claims.

Plaintiffs allege that the consideration of effects of the action and cumulative effects in

NMFS' biological opinion ("BiOp") were arbitrary and capricious, but fail to cite any

effects that NMFS failed to consider, or any harm resulting from the alleged errors.

Moreover, as will be discussed <u>infra</u>, NMFS has decided voluntarily to reconsider and

clarify the effects analysis in the 2005 BiOp and issue a new BiOp by March 1, 2006.

Under these circumstances, the Court should dismiss plaintiffs' ESA claim. Similarly,

NMFS is entitled to summary judgment on plaintiffs' MMPA claim because the record

shows that NMFS acted reasonably in relying on preliminary comments of the Marine

Mammal Commission ("MMC") in light of the pressing need to issue the permits, and

reasonably determined that the total amount of take authorized under the permits would not significantly reduce the ability of the species to recover.

## II.     LITIGATION BACKGROUND

### A.     STATUS OF THE SPECIES

The research at issue in this case is designed to provide data that will aid scientists in solving a decades-old question: what is causing the drastic decline in the population of Steller sea lions?  Steller sea lions are distributed around the rim of the North Pacific Ocean from Southern California to Hokkaido, Japan.  The species was first listed as threatened under the ESA in 1990 in response to a severe decline in the number of Steller sea lions observed in Alaska (reductions of 63% since 1985 and 82% since 1960).  AR 406 at 7.  In 1997, Steller sea lions were classified into two "distinct population segments" under the ESA.[2]/  The segment of the population west of 144° W longitude (western stock) was listed as endangered, while the population east of 144° W longitude (eastern stock) was listed as threatened.  Id.

The rate of decline in the western stock averages 5% per year.  Id. at 38.  By contrast, the eastern stock increased at an average rate of 5.9% per year between 1979 and 1997.  Id.  A prevailing theory regarding the cause of the western stock's decline is a decrease in juvenile (ages >1 year to 4 years) survival rates, most likely because juveniles

---

[2]/     The term "species" is defined under the ESA as any subspecies and any "distinct population segment" of the species "which interbreeds when mature."  16 U.S.C. § 1532(16).  "Distinct population segment" is not a defined term under the Act.

are less adept at obtaining prey and avoiding predators.  AR 407 at 32.  Some scientists

believe that the overall decline in the population is due to a 10-20% annual decrease in

juvenile survival.  AR 406 at 38.  Other factors that may be influencing the depletion of

the western stock are decline in reproductive success and changes in adult survival.  Id. at

33.

> **B.    RELATED FEDERAL RESEARCH**

As shown above, although the "ultimate cause" of the recent declines in the sea

lions' western population "remains unknown," many scientists believe that, when the

least likely of this decline's possible causes are excluded, "[w]hat remains as a cause of

the recent decline appears to be a decline in the prey base available to young sea lions."

AR 202 at 9 (NMFS excerpt attached hereto as Exhibit 1).  Recent research has (1)

"shown a strong positive correlation between a reduction in the diversity of the diet and

[the western sea lion's] population decline" and (2) concluded that "nutritional stress is

the most likely cause" of this decline.  AR 259 at 338, 339 (map distinguishing between

eastern and western sea lion populations (NMFS excerpt attached hereto as Exhibit 2);

AR 407 at 42.

To establish "ultimate" or primary causes of the western sea lion's decline, NMFS'

1992 Final Recovery Plan for Steller Sea Lions prioritized different research needs for

potential causes, including research methodologies that would

>> monitor status and trends of sea lion abundance and distribution, monitor
>> health, condition, and vital parameters, assess and minimize causes of
>> mortality, and investigate feeding ecology and factors affecting energetic

status.

AR 390 at 5, 10 (NMFS excerpt attached hereto as Exhibit 3).  Beginning in 2000 and

2001, Congress responded to this recovery plan, existing research, and the western sea

lion's continued population declines by disbursing substantial public monies for more

comprehensive research.

In the Fiscal Year 2001 Consolidated Appropriations Act, for example, Congress

appropriated $43.2 million for sea lion research needs designated by it, including

"juvenile and pup survival rates," "population counts," and "nutritional stress."  Compare

AR  406 at 7-8 with Pub. L. 106-554, 114 Stat. 2763, 2763A-175 to 179.  Congress

disbursed this money both directly to NMFS and also to several non-federal scientists and

research institutes, including the Alaska Department of Fish and Game, the University of

Alaska's Sea Life Center , and the North Pacific University's Marine Mammal Research

Consortium.  In 2002, Congress appropriated another $40.15 million to these entities to

address the same designated sea lion research needs.  Id.; see also AR 406 at 53.

In its 2002 EA and FONSI, NMFS analyzed the environmental effects of issuing

both ESA and MMPA permits allowing these scientists and research institutions to

conduct the particular sea lion research that Congress authorized and designated.  After

considering this environmental analysis, NMFS allowed these and other institutions to

conduct this research, including (1) aerial surveys of sea lion numbers; (2) surveys of

these numbers by boat or "vessel;" (3) surveys on the ground by authorized individuals;

(4) scat (sea lion feces) collection and analysis; (5) carcass analysis of any sea lions found

5

dead; (6) tissue analysis from sea lions harvested by aboriginal peoples; (6) behavioral

and other observations of rookeries by remote means; (7) tracking and monitoring sea

lions swimming at sea; and (8) the temporary capture or recapture and subsequent release

of sea lions for blood collection, population tracking (by tagging or hot branding), and

physiological analysis.  AR 406 at 22-23, 79-83.

NMFS analyzed the effects of extending or expanding this research in its 2005 EA

and FONSI.  It also studied two research methodologies not previously analyzed: (1)

inserting tiny transmitters to monitor stomach temperature and (2) data loggers in juvenile

sea lions.  After completing this analysis, NMFS determined that this additional research

also met the research needs designated by Congress.  Id. at 7-8, 27-30, 53.

## C.    SEA LION RESEARCH CHALLENGED BY PLAINTIFFS

Plaintiffs challenge the 2005 EA, FONSI, and corresponding permits, not the 2002

EA and FONSI.  Therefore, plaintiffs ask this Court to enjoin NMFS from continuing to

allow increases or changes from the scientific research first authorized by federal permit

in 2002.  Amended Complaint, p. 41 (plaintiffs request Court to vacate "all research

permits or permit amendments issued in 2005").

NMFS determined that it would not authorize "intentional lethal mortality of

Steller sea lions" in either its 2002 research permits or the 2005 research permits that

plaintiffs challenge.  AR 406 at 53-54.  Instead, NMFS authorized research behavior or

protocols necessary to accurately study the population and physiology of virtually any

elusive, intelligent wild animal.  NMFS noted that, under the ESA and MMPA, this basic

research was defined as "a take" because scientific research "(1) attempting to harass a

marine animal is considered a take and (2) any act that <u>has the potential</u> to disturb a

marine mammal is considered harassment."  AR 384 at 57 (emphasis supplied) (NMFS

excerpt attached hereto as Exhibit 4); AR 406 at 65 (NMFS notes MMPA's definition of

"harass" includes acts of "annoyance [having] the potential to disturb a marine

mammal").  Thus, NMFS reiterated that, under this "broad definition of 'take,'" its

research permits would not authorize killing for research purposes, but only strictly

limited "accidental mortality...resulting from the actions or presence of researchers while

conducting permit-authorized activities."  AR 246 (NMFS excerpt attached hereto as

Exhibit 2).

        In the context of both widespread sea lion population monitoring and physiology

studies, and under this broad definition of "take," NMFS' 2002 research permits

authorized the taking during aerial surveys, scientific monitoring, and physiological study

of up to 331,174 western and eastern sea lions.  AR 406 at 79-83.  In 2005, NMFS

increased the maximum number of animals that could be studied during this research to

527,690 western and eastern sea lions, an increase of approximately 59 percent.  <u>Compare</u>

<u>id</u>. with AR 406 at 103-107.

        NMFS did not change the amount of accidental or "incidental mortality" both

regulated and limited under the 2005 research permits.  NMFS' 2002 permits authorized

the accidental deaths of no more than 20 western sea lions.  AR 406 at 82; Exh. 4 (AR

384) at 113.  Similarly, in 2005, NMFS decided that its Permits Division and Alaska

7

Region would ensure that sea lion mortality would "not exceed 20 animals per year in the western stock." AR 407 at 65. Further, NMFS determined that it would suspend <u>all</u> research under all 2002 and 2005 permits, pending additional scientific review, "if the total number of research-related mortalities of endangered [western] sea lions reaches <u>10</u> <u>animals under any combination of permits</u>." AR 406 at 50, 106 (emphasis supplied).

## III.  STATUTORY AND REGULATORY BACKGROUND

### A.    NEPA

NEPA generally requires a federal agency to prepare an environmental impact statement ("EIS") when a proposed governmental action significantly affects "the quality of the human environment." However, where the proposed action would not significantly affect the environment, NEPA does not require an EIS. <u>See</u> 43 U.S.C. 4332(2); 40 C.F.R. § 1508.9; <u>see also</u> <u>Marsh v. Oregon Natural Resources Council</u>, 490 U.S. 360, 372, 375-376, 377 n. 23, 378 (1989); <u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 394 (1976)(EIS required if proposed action "<u>would be</u> environmentally 'significant'")(emphasis supplied).

The Council on Environmental Quality ("CEQ") has issued regulations governing agency compliance with NEPA. 40 C.F.R. § 1500.1. The CEQ regulations provide that agencies may prepare an environmental assessment ("EA") to determine whether their proposed actions would precipitate a significant impact on the environment necessitating an EIS. 40 C.F.R. § 1501.4.

CEQ regulations define an EA as "a concise public document ... that serves to

[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9(a).  Under this standard, an agency need not prepare an EIS if, on the basis of "sufficient evidence" and related analysis, it concludes in an EA and corresponding finding of no significant impact ("FONSI") that its proposed action would not significantly affect the environment.  Id.; 40 C.F.R. § 1508.13.

These NEPA provisions impose procedural, not substantive, constraints on the government.  Thus, NEPA does not dictate a federal agency's particular programmatic objectives or a particular level of environmental protection or economic development per se.  Instead, NEPA governs the manner in which an agency reaches its decisions.  Its dominant purpose is to ensure that federal agencies consider the environmental consequences of their proposed actions in advance of a final decision to proceed. Robertson v. Methow Valley Citizens Council, 490  U.S.  332,  349-350  (1989).

The Supreme Court has emphasized NEPA's procedural purpose.

[NEPA's] mandate to the agencies is essentially procedural....It is to insure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decisionmaking unit of the agency.  Administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute, ... not simply because the court is unhappy with the result reached.

Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558 (1978).

Judicial review of NEPA decisions is the same as judicial review of other informal agency decisions under the Administrative Procedure Act ("APA"): this Court must

9

decide whether NMFS' determination in the 2005 EA and FONSI that the scientific

research would not have significant environmental consequences was arbitrary and

capricious.  <u>Dep't of Transportation v. Public Citizen</u>, 541 U.S. 752, 763 (2004); <u>Marsh v.</u>

<u>Oregon Natural Resources Council</u>, 490 U.S. 360, 375-376, 377 n. 23, 378; <u>Greenpeace</u>

<u>Action v. Franklin</u>, 14 F.3d 1324, 1331-1333, 1335 (9th Cir. 1992)(upholding EA and

FONSI analyzing threatened sea lions); <u>Sierra Club v. U.S. Dep't of Transportation</u>, 753

F.2d 120, 126-127 (D.C. Cir. 1985)(EA and FONSI may be overturned only if they are

"arbitrary, capricious, or an abuse of discretion").

The Supreme Court has defined the type of reasoning that reviewing courts must

uphold under NEPA.  The Court has concluded that NEPA documents must be upheld if

an agency conducts a "reasoned evaluation" of environmental factors in them.  <u>Marsh</u>,

490 U.S. at 377, 385.  The Supreme Court defines a "reasoned evaluation" under NEPA

as having two components: an agency must (1) consider "the relevant factors" and (2)

articulate "a rational connection between the facts found and the choice made."

<u>Baltimore Gas & Electric Co. v. NRDC</u>, 462 U.S. 87, 105; <u>see</u> <u>also</u> <u>Tourus Records v.</u>

<u>Drug Enforcement Admin.</u>, 259 F.3d 731, 736 (D.C. Cir. 2001).

Under this standard, once an agency adequately identifies and evaluates the

relevant environmental factors, it "is not constrained by NEPA from deciding that other

values outweigh the environmental costs."  <u>Robertson v. Methow Valley Citizens</u>

<u>Council</u>, 490 U.S. 332, 350.  Under the same standard, plaintiffs cannot prevail unless

they meet their burden of showing that NMFS acted arbitrarily.  To meet this burden,

plaintiff must supply persuasive and palpable evidence, not speculation or conjecture, to clearly controvert the analysis underlying an agency's NEPA document.  Kleppe v. Sierra Club, 427 U.S. at 412-414; Sierra Club v. Marita, 46 F.3d 606, 619 (7th Cir. 1995)(plaintiffs cannot meet NEPA burden where they do not show agency "offered an explanation for its decision that runs counter to the evidence...or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise"); Lower Alloways Creek Tp. v. Public Service Elec., 687 F.2d 732, 740-741, 743, 747-748 (3rd Cir. 1982); Sierra Club v. U.S. Dep't of Transportation, 753 F.2d 120, 128-129.

Where agencies analyze conflicting or uncertain scientific data in their NEPA documents within their areas of special expertise, reviewing courts are highly deferential. Marsh, 490 U.S. at 378; Baltimore Gas, 462 U.S. at 93, 103, 105;  Greenpeace Action v. Franklin, 14 F.3d 1324, 1331-1333, 1335; Sierra Club, 753 F.2d at 128-129.

## B.    ESA

The ESA contains both substantive and procedural requirements designed to conserve endangered and threatened species, and the ecosystems on which they depend. 16 U.S.C. § 1531(b).  The starting point for species preservation is Section 4 of the ESA, 16 U.S.C. § 1533, which empowers the Secretary of Commerce to designate species as "threatened" or "endangered," and to designate "critical habitat" for listed species.  See 16 U.S.C. § 1532(6) (defining "endangered species"); 16 U.S.C. § 1532(20) (defining "threatened species"); 16 U.S.C. § 1532(5)(A)(ii) (defining "critical habitat").

Once a species is listed, Section 7(a)(2) of the ESA requires each federal agency

11

("action agency") to ensure, in consultation with the consulting agency, that any action authorized, funded or carried out by the agency "is not likely to jeopardize the continued existence" of an endangered or threatened species, or "result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2).[3]/ If the agency action will have no effect on a listed species or critical habitat, the consultation requirements are not triggered and the action agency need not take any further steps to consult.  50 C.F.R. 402.12(d)(1).

If the action agency determines that its action "may affect" listed species, it must pursue either informal or formal consultation with NMFS.  50 C.F.R. §§ 402.13, 402.14. Informal consultation is an optional process comprised of all discussions and correspondence between NMFS and an action agency in order to determine whether formal consultation is necessary.  50 C.F.R. § 402.13(a).  If an action agency determines, with the written concurrence of NMFS, that the action "is not likely to adversely affect" the listed species or critical habitat, the consultation process is terminated, and formal consultation is not necessary.  50 C.F.R. § 402.13(a).

If either the action agency or NMFS determines that the proposed action is "likely to adversely affect" listed species or designated critical habitat, the agencies must engage

---

[3]/     The Secretary of Commerce jointly administers the ESA with the Secretary of the Interior, with authority over marine species delegated to NMFS and authority over all other species delegated to the U.S. Fish and Wildlife Service ("FWS").  See 16 U.S.C. § 1532; Lujan v. Defenders of Wildlife, 504 U.S. 555, 586 n.3 (1992).  NMFS has authority over the species at issue in this litigation, and NMFS is both the action agency and the consulting agency in this case.

in formal consultation. 50 C.F.R. §§ 402.13(a), 402.14(a)–(b). Formal consultation

typically begins with a written request by the action agency, 50 C.F.R. § 402.14(c), and

may include the preparation of a biological assessment ("BA") by the action agency that

evaluates "the potential effects of the action on listed and proposed species and

designated and proposed critical habitat" and "whether any such species or habitat are

likely to be adversely affected by the action . . . ." 50 C.F.R. § 402.12(a). Formal

consultation concludes with the issuance of a biological opinion ("BiOp") by the

consulting agency. 50 C.F.R. § 402.14(l)(1). The BiOp assesses the likelihood of

jeopardy to the species and whether the proposed action will result in destruction or

adverse modification of critical habitat. See 50 C.F.R. §§ 402.14(g), (h). In preparing its

BiOp, NMFS must evaluate the current status of the listed species and critical habitat and

the effects of the action and cumulative effects on the listed species and any designated

critical habitat in the action area. Id. If NMFS determines that the action is likely to

jeopardize the continued existence of the species or result in an adverse modification of

critical habitat, it must determine whether any "reasonable and prudent alternatives" exist

for the action that will not violate section 7(a)(2). 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §

402.14(h)(3). "Following the issuance of a biological opinion, the Federal agency shall

determine whether and in what manner to proceed with the action in light of its section 7

obligations and [NMFS'] biological opinion." 50 C.F.R. § 402.15(a).

### C.    MMPA

Congress enacted the MMPA in 1972 to address concerns over the decline of

13

marine mammal populations.  The MMPA, among other things, establishes a general

"moratorium" prohibiting the taking or importation of marine mammals or marine

mammal products.  Id. § 1371(a); see also id. § 1362(8) (defining "moratorium"); id. §

1371(a)(1) - (a)(6) (describing exceptions); id. § 1373 (authorizing regulations on take

and importation).  The term "take" means "to harass, hunt, capture, or kill, or attempt to

harass, hunt, capture, or kill any marine mammal."  16 U.S.C. § 1362 (13); 50 C.F.R. §

216.3.[4]/  Like the ESA, administration of the MMPA is divided between NMFS and

FWS.  NMFS has jurisdiction over sea lions, whales, porpoises, and seals and FWS has

jurisdiction over all other marine mammals (sea otters, walruses, polar bears, and

dugongs).  16 U.S.C. § 1362(12)(A).

    The MMPA provides a mechanism for limited waiver of the moratorium's

prohibition on take.  16 U.S.C. §§ 1371, 1374.  The Secretary of Commerce or Interior

may issue permits authorizing the take of marine mammals for, inter alia, scientific

research purposes, provided that the taking "is required to further a bona fide scientific

purpose."  16 U.S.C. § 1374(c)(3)(A).  If the research will involve lethal taking from a

---

[4]/    Congress has defined the term "harassment" under the MMPA as follows:
The term "harassment" means any act of pursuit, torment, or annoyance which
(i) has the potential to injure a marine mammal or marine mammal stock in the wild; or
(ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering.
16 U.S.C. § 1362(18)(A).

stock that is depleted, the Secretary must determine that the results of the research "will directly benefit that species or stock, or that such research fulfills a critically important research need." 16 U.S.C. § 1374(c)(3)(B).[5]/

## IV.    STANDARD OF REVIEW

Granting summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); White v. Fraternal Order of Police, 909 F.2d 512 (D.C. Cir. 1990). Because there are generally no facts in dispute in administrative record cases, and the court need not – and, indeed, may not – "find" underlying facts, there are no material facts essential to the court's resolution of this action, and a motion for summary judgment is appropriate. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883 (1990); San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n, 789 F.2d 26, 37 (D.C. Cir. 1986) (en banc). See also American Bioscience v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) ("[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law") (footnote omitted).

Challenges to final agency actions under NEPA, the ESA, and the MMPA are subject to the review provisions of the APA. See Nat'l Audubon Soc'y v. Hester, 801

---

[5]/     Species listed as endangered or threatened under the ESA, such as the Steller sea lion, are considered "depleted" for purposes of the MMPA. 16 U.S.C. § 1362(1)(C).

F.2d 405, 407 (D.C. Cir. 1986) (NEPA and ESA); <u>Natural Res. Def. Council v. Evans</u>,

364 F. Supp. 2d 1083, 1091 (N.D. Cal. 2003) (MMPA).  Under the APA, the Court may

set aside a regulatory decision only if it is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); <u>Marsh v. Oregon Natural</u>

<u>Res. Council</u>, 490 U.S. 360 (1989); <u>Nat'l Trust for Historic Pres. v. Dole</u>, 828 F.2d 776,

781 (D.C. Cir. 1987).  This standard of review is narrow, and the Court is only

empowered to determine whether "the decision was based on a consideration of the

relevant factors and whether there has been a clear error of judgment."  <u>Citizens to</u>

<u>Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 415-16 (1971).  <u>See also</u> <u>Baltimore</u>

<u>Gas</u>, 462 U.S. at 103; <u>Marsh</u>, 490 U.S. at 377.

## V.    ARGUMENT

### A.    THIS COURT LACKS JURISDICTION TO REVIEW PLAINTIFFS' CLAIMS.

The Supreme Court has held that a court should not review the merits of a claim

until it determines that it has jurisdiction to do so.  <u>Steel Co. v. Citizens for a Better Env't</u>,

523 U.S. 83, 93-94 (1998).  A federal court "presumptively lacks jurisdiction in a

proceeding until a party demonstrates that jurisdiction exists."  <u>Commodity Futures</u>

<u>Trading Comm'n v. Nahas</u>, 738 F.2d 487, 492 n.9 (D.C. Cir. 1984); <u>Kokkonen v.</u>

<u>Guardian Life Ins. Co.</u>, 511 U.S. 375, 377 (1994).  A party invoking federal jurisdiction,

once challenged, has the burden of proving its existence.  <u>Georgiades v. Martin-Trigona</u>,

729 F.2d 831, 833 n.4 (D.C. Cir. 1984); <u>see</u> <u>also</u> <u>La. Envtl. Action Network v. Browner</u>,

16

87 F.3d 1379, 1381 (D.C. Cir. 1996) ("An Article III court cannot entertain the claims of a litigant unless that party has demonstrated constitutional and prudential standing.").

In this case, plaintiffs lack standing because they have not established an actual or imminent "injury in fact" fairly traceable to Defendants' actions. Further, their MMPA claim is not reviewable under the APA because they fail to challenge a final agency action.

## 1.    Plaintiffs Lack Article III Standing To Bring Their Claims.

To establish standing under Article III of the Constitution, a plaintiff must demonstrate that: (1) he has personally "suffered an 'injury in fact,' – an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) 'actual or imminent, not conjectural or hypothetical'"; (2) the injury complained of is fairly traceable to the challenged action of the defendant; and (3) it is likely that the injury will be redressed by a favorable decision. Defenders of Wildlife, 504 U.S. at 560-61 (internal citations omitted). The burden of proof on this issue falls squarely on the plaintiff. Steel Co., 523 U.S. at 103-104. In the context of a motion for summary judgment, a plaintiff may not rest on mere allegations of injury, but must provide affidavits or other evidence showing, through specific facts, that he himself is among the injured, as opposed to simply possessing an interest in the subject matter at issue. Defenders of Wildlife, 504 U.S. at 560-62 (standing is a threshold jurisdictional requirement that must be affirmatively demonstrated "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the

successive stages of the litigation.").

Plaintiffs have not demonstrated injury in fact fairly traceable to Defendants' actions. The conclusory allegations in plaintiffs' complaint are insufficient to establish standing, and plaintiffs have failed to provide affidavits or other evidence demonstrating that they have suffered actual injury. Plaintiffs speculate that Defendants' actions "<u>may</u>" reduce the number of Steller sea lions, or that they "<u>may</u> observe injury" to sea lions, and fail to demonstrate actual, imminent harm to their alleged interests in observing and studying the species. <u>See</u> Am. Cmplt. at ¶¶ 12, 18. Even if plaintiffs are correct that individual sea lions will suffer harm, that is not the focus of the standing inquiry: plaintiffs must establish that they are <u>themselves</u> subject to present or imminent injury. <u>See</u> <u>ASPCA v. Ringling Bros. & Barnum & Bailey Circus</u>, 317 F.3d 334, 336 (D.C. Cir. 2003). Here, plaintiffs rely on broad allegations that Defendants are "creating a threat to the sea lion population" and "hastening the extinction of the species," and wholly fail to back these allegations with specific instances of actual injury. <u>Id.</u> at ¶ 9. Because plaintiffs have failed to establish that they have standing to bring any of their claims, the Court lacks jurisdiction over this matter.

## 2.    Plaintiffs' MMPA Claim Fails To Challenge Final Agency Action.

Plaintiffs' MMPA claim is further barred by their failure to challenge a "final agency action," a fundamental requirement for judicial review under the APA. The APA provides a waiver of sovereign immunity and cause of action for judicial review of final

18

agency action, 5 U.S.C. § 702; however, only <u>final</u> agency action may be reviewed.  5

U.S.C. § 704; <u>see</u> <u>also</u> <u>Nat'l Wildlife Fed'n</u>, 497 U.S. at 882.  Plaintiffs may only

challenge "a <u>specific</u> 'final agency action' [that] has an actual or immediately threatened

effect."  <u>Id.</u> at 894 (emphasis added) (citation omitted); <u>see</u> <u>also</u> <u>Indep. Petroleum Ass'n</u>

<u>v. Babbitt</u>, 235 F.3d 588, 594 (D.C. Cir. 2001); <u>Sierra Club v. Peterson</u>, 228 F.3d 559,

565 (5th Cir. 2000).  Thus, federal courts lack jurisdiction to adjudicate "programmatic"

challenges that seek wholesale review of an agency's policies or practices.  <u>See</u> <u>Nat'l</u>

<u>Wildlife Fed'n</u>, 497 U.S. at 890-91.  The principal purpose of this limitation is "to protect

agencies from undue judicial interference with their lawful discretion, and to avoid

judicial entanglement in abstract policy disagreements which courts lack both expertise

and information to resolve."  <u>Norton v. S. Utah Wilderness Alliance</u>, 542 U.S. 55, 66

(2004).

     In the instant case, plaintiffs mount an impermissible attack on the entire

permitting program for Steller sea lion research, asking this Court to grant injunctive

relief that would affect not only outstanding permits, but also future permits.  Plaintiffs

ask the Court to "vacat[e] all research permits or permit amendments issued in 2005 for

activities involving Steller sea lions."  Rather than identifying specific weaknesses in

individual permits, plaintiffs discuss the permits globally.  <u>See</u>, <u>e.g.</u>, Am. Cmplt. at ¶ 3

(alleging that NMFS violated the law by "issuing multiple research permits to a wide

variety of entities"); <u>Id.</u> at ¶¶ 89-95 (discussing activities that allegedly violate MMPA

without distinguishing between permits); <u>Id.</u> at ¶ 96 (alleging that NMFS has not

determined that "this suite of research activities" will directly benefit Steller sea lions).

Moreover, plaintiffs not only challenge existing permits, but also ask the Court to enjoin

the Secretary of Commerce from "issuing any more research permits or amendments or

modifications to the existing permits until an EIS is complete."  Am. Cmplt. at 41

(emphasis added).  Plaintiffs clearly seek "wholesale correction" of alleged flaws, which

is prohibited under Nat'l Wildlife Fed'n, 497 U.S. at 892-93.  This Court lacks

jurisdiction to review plaintiffs' general challenge to NMFS' permitting program,

couched as an MMPA claim.  See Comtys. for a Great Nw., Ltd. v. Clinton, 112 F. Supp.

2d 29, 37-38 (D.D.C. 2000) (APA does not confer jurisdiction to review "generalized

grievance").

**B.    NMFS PREDICATED ITS 2005 EA AND FONSI ON REASONED, SENSIBLE ANALYSIS.**

**1.    NMFS Did Not Admit the 2005 EA and FONSI Were Unlawful.**

Plaintiffs contend the 2005 EA and FONSI are arbitrary and capricious because

NMFS supposedly conceded that the 2005 EA and FONSI were unlawful.  Proffering a

letter that NMFS wrote to them, plaintiffs posit that NMFS "candidly admitted" that the

2005 EA and FONSI are erroneous.  See Memorandum of Points and Authorities in

Support of Plaintiffs' Motion for Summary Judgment ("Pl. Mem.") at 12-16.

Plaintiffs are wrong.  Although NMFS stated it would prepare an EIS in the future

for its entire program of both administering future sea lion research grants and issuing

corresponding permits because it shared "your concerns about the scope" of that research,

20

the letter to which plaintiffs refer postdates the 2005 EA and FONSI.  Id.; Pl. Exh. 3

(letter dated 27 June 2005).  Thus, this letter is inadmissible because it is outside the

authenticated administrative record.

    By limiting judicial review to the administrative record, NEPA and the APA

prohibit plaintiffs from merely disagreeing with that record by attempting to change the

quantum of evidence in it.  Florida Power & Light Co. v. Lorion, 470 U.S. 729 (1985),

quoting Camp v. Pitts, 411 U.S. 138, 142 (1973); Citizens to Preserve Overton Park, Inc.

v. Volpe, 401 U.S. 402, 416, 420 (1971); Coal. on Sensible Transp. v. Dole, 826 F.2d 60,

72 (D.C. Cir. 1987).[6]/

    Even if arguendo this extra-record letter were admissible[7]/, NMFS did not state or

hint in it (1) that the 2005 sea lion research permits preceding that letter would precipitate

"significant" environmental impacts under NEPA or (2) that the 2005 EA and FONSI

were arbitrary, capricious, or otherwise wrong.  Instead, NMFS properly notified

plaintiffs of its policy decision to prepare an EIS not merely to analyze either research

permits that NMFS had issued previously or congressional research grants that NMFS

---

[6]/     See also Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps.
of Engineers, 87 F.3d 1242, 1246-1247, 1247 n. 1 (11th Cir. 1996); First National Bank &
Trust v. Department of the Treasury, 63 F.3d 894, 898 (9th Cir. 1995); National Audubon
Society v. U.S. Forest Service, 46 F.3d 1437, 1447 n. 9 (9th Cir. 1992);  Animal Defense
Council v. Hodel, 840 F.2d 1432, 1435-1438 (9th Cir. 1988); Asarco, Inc. v. U.S.E.P.A.,
616 F.2d 1153, 1160 (9th Cir. 1980).

[7]/     Plaintiffs also attempt to proffer additional extra-record documents.  See Pl. Mem.,
Declaration of James Barrett.  For the same reasons discussed above, these documents are
also inadmissible under NEPA and the APA.

had administered previously, but to analyze its <u>entire program</u> of "administering grants and issuing permits associated with [sea lion] research" now and in the future.  Pl. Exh. 4.

Therefore, far from showing NMFS "candidly admitted" the 2005 EA and FONSI are unlawful, plaintiffs celebrate a letter and notice that actually establish NMFS' diligent compliance with NEPA's CEQ regulations.  40 C.F.R. §§ 1501.3(a) (where agency "has decided to prepare an environmental impact statement" in the future, a future EA "is not necessary"); 1502.4(b)("[e]nvironmental impact statements <u>may</u> be prepared [for] broad actions so that they are <u>relevant to policy</u> and are timed to coincide with meaningful points in agency <u>planning and decisionmaking</u>")(emphasis supplied).

## 2.     NMFS Properly Analyzed PBR Numbers.

Plaintiffs also theorize that the 2005 EA and FONSI were arbitrary and capricious because NMFS did  not properly analyze the sea lion's "potential biological removal" ("PBR") level.  Pl. Mem. at 10, 19-20.  PBR analysis is a regulatory methodology defined and authorized in the Marine Mammal Protection Act ("MMPA").  The MMPA defines PBR as the "maximum number of animals, not including natural mortalities, that may be <u>removed</u> from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population."  16 U.S.C. § 1362 (20).  <u>Id.</u> (emphasis supplied).[8]

Under this plain language, the MMPA provides that PBR analysis may be used to

--------

[8]     The "optimum sustainable population" is "the number of animals which will result in the maximum productivity of the population or the species," taking into account the carrying capacity of the habitat and the health of the ecosystem.  <u>Id.</u> at § 1362 (9).

22

analyze situations in which, as a result of federal or private harvesting or other removal plans, a given species will be necessarily and permanently "removed" from a given "marine mammal stock." Id. (emphasis supplied)  Here, as shown supra at 8-9, the 2005 research permits challenged by plaintiffs do not authorize anyone or any entity to necessarily and permanently remove a single sea lion.  Exh. 2 (AR 246); AR 406 at 53. Instead, these permits strictly limit hypothetical sea lion "mortality" or permanent removal that may or may not occur and that, even if it did occur, would occur solely by accident.  AR 406 at 50, 106; AR 407 at 65.  Thus, even if plaintiffs' PBR numbers were accurate, which they are not, their PBR methodology is inapplicable because it assumes the removal of sea lions is certain, unlike the case here.

Further, after reviewing all available studies of or data about the extent to which intrusive scientific study of sea lions may or may not affect sea lion numbers, NMFS concluded  that even a limit of "up to 20" accidental western sea lion deaths (more than double the amount that NMFS would allow before suspending every activity authorized by its 2005 permits) "would have a negligible impact on the western stock of Steller sea lions."  Compare Exh. 3 (AR 390), Appendix B at 14 and AR 407 at 65, 69 with AR 406 at 50, 106.

Although NMFS acknowledged that more data was needed, it also determined that every known study of intrusive scientific analysis of sea lions has established that this research does not appreciably or measurably affect their numbers.  For example, NMFS noted that, within a group of 7,500 sea lions disturbed during similar research in 1995,

23

"no mortalities were reported." Similarly, NMFS determined that, within a larger group

of 31,150 and 48,000 sea lions that it studied in 1997 and 1998 respectively, "no

mortalities were detected or reported," even though these animals were approached,

disturbed, captured, tagged, or branded. AR 407 at 43. Finally, NMFS determined that

of the 331,174 western and eastern sea lions that were monitored by air, counted on foot,

or otherwise touched by scientists under the 2002 permits, supra at 8, (1) no mortalities

were reported in 2002 and (2) no more than 10 mortalities were reported in 2003 and

2004. Exh. 3 (AR 390) at 12; AR 406 at 42.

Plaintiffs do not controvert NMFS' specialized analysis of this data with a scintilla

of evidence, analysis, or studies of their own. Therefore, this Court must defer to NMFS'

expertise because it analyzed the effects of scientific research within the specialized

jurisdiction that Congress has conferred on it. Marsh, 490 U.S. at 377-378 ; Sierra Club,

753 F.2d at 126-129.

Even if arguendo plaintiffs could supplant NMFS' specialized analysis with their

preferred PBR numbers, which they cannot, plaintiffs' PBR analysis is internally and

mathematically flawed. Because plaintiffs erroneously assert that NMFS rested its PBR

analysis on a presumed maximum "annual mortality of approximately 50 [western] sea

lions," plaintiffs predicate their PBR theories on a stark misreading of the record. Pl.

Mem. at 19. As shown above, NMFS actually determined that (1) accidental mortality

during research would "not exceed 20 animals per year in the western stock" and (2) all

research under the 2002 and 2005 permits would be suspended "if the total number of

research-related mortalities of endangered [western] sea lions <u>reaches 10 animals under</u> <u>any combination of permits</u>."  AR 406 at 50, 106; AR 407 at 65 (emphasis supplied).

Plaintiffs' PBR computations collapse under the weight of the correct PBR numbers.  They begin their figures, for example, by urging a PBR limit of 208.  Pl. Mem. at 19.  Adding NMFS' maximum number of 10 sea lions accidently killed before all 2002 and 2005 research would be suspended to both NMFS' estimated PBR numbers for aboriginal or subsistence harvests (171) and incidental kills during commercial fishing (26) yields a PBR number of 207.  This number is one **less** than plaintiffs' preferred PBR maximum of 208.  <u>Compare</u> Pl. Mem. at 19 with Exh. 4 (AR 384) at 40; AR 407 at 39.

Even if plaintiffs had established that NMFS exceeded an applicable PBR level, they still cannot show that NMFS' limit of 10 accidental sea lion deaths before suspending permit activity would significantly affect the western sea lion population. The MMPA provides that PBR must be a cautious, conservative methodology erring on the side of biological sustainability, not maximum harvesting.  Thus, it authorizes agencies to predicate their PBR analysis on a species' "minimum population estimate," not its observed maximum populations, increased by only "one-half the maximum theoretical or estimated net productivity rate of the stock at small populations."  <u>Id</u>.

However, NMFS predicated its own analysis on an even "more conservative" PBR approach: instead of assuming the sea lion population would increase at 50 percent of its projected rate, as allowed by the MMPA, NMFS assumed the sea lion population's "net productivity rate" would increase at only 10 percent of the projected rate.  This

calculation will "reserve 90% of annual net production for recovery of endangered species and allow only 10% of annual net production to be authorized for taking incidental to human activities."  Exh. 3 (AR 390), Appendix B at 14.

Finally, in addition to its decision to suspend all 2002 and 2005 permit activity in the event accidental mortality ever exceeds 10 western sea lions, NMFS adopted detailed ameliorative measures designed to minimize this sea lion mortality, however problematic. These measures include the (1) required attendance of a "veterinarian" or trained "biologists" during intrusive physiological study and (2) aerial flight restrictions ensuring that sea lions would only hear plane noise for "1-2 minutes."  AR 406 at 45-50.

Plaintiffs do not mention these mitigation measures, let alone allege they have been inadequately analyzed.  Because plaintiffs have not established that these protective measures are arbitrary and capricious, they cannot challenge the 2005 EA and FONSI's analysis of the discrete environmental impacts ameliorated by these measures.  Mitigation measures need not eliminate all adverse impacts or the possibility thereof.  Preserve Endangered Areas of Cobb v. U.S. Army Corps of Engineers, 87 F3d 1242, 1248-1249 (11th Cir. 1996); Friends of the Payette v. Horseshoe Bend Hydroelectric Co., 988 F.2d 989, 993 (9th Cir. 1993); Greenpeace Action,  14 F.3d at 1331-1333, 1335; Friends of Endangered Species v. Jantzen, 760 F.2d 976, 987 (9th Cir. 1985); Steamboaters v. FERC, 759 F.2d 1382, 1394 (9th Cir 1985); Sierra Club, 753 F.2d at 126-129.

In sum, one searches plaintiffs' papers in vain for a plausible reason why this Court should not defer to NMFS' specialized finding that, unless more comprehensive

26

scientific research establishes the cause or causes of the western sea lion's serious

decline, and unless such research precipitates the proper corrective action, authoritative

"population viability models predict...a 65-100% probability of extinction for the [sea

lion] population from Kenai Peninsula to Kiska Island within 100 years."  Exh. 3 (AR

390) at 4.  Therefore, plaintiffs cannot show, as they must, that NMFS acted arbitrarily

and capriciously by not (1) considering "the relevant factors" in its EA and FONSI and

(2) articulating "a rational connection between the facts found and the choice made" in

those documents.  Baltimore Gas, 462 U.S. 87, 105 (1983); American Iron and Steel v.

EPA, 115 F.3d 979, 1004 (D.C. Cir. 1997)(courts defer to agency's chosen scientific

model unless "there is simply no rational relationship between the model chosen and the

situation to which it is applied").

### 3.    NMFS Properly Analyzed the Impacts that Plaintiffs Allege are "Highly Controversial" and "Highly Uncertain."

Plaintiffs posit that the 2005 permits would have "highly controversial" and

"highly uncertain" environmental effects that NMFS did not properly consider or analyze.

Pl. Mem. at 21-23.  The extent to which a factual, scientific, or other dispute implicates

"highly controversial" and "highly uncertain" environmental effects constitutes two

factors, among many, that are relevant to whether a given agency action would or would

not "[s]ignificantly" affect the natural environment and, therefore, require an EIS.  40

C.F.R. § 1508.27(b).  Plaintiffs predicate their claim that the NMFS did not properly

analyze alleged "highly controversial" environmental effects on a Marine Mammal

27

Commission ("MMC") letter, dated 10 June 2005.  Under settled NEPA and APA tenets, supra at 11-12, this letter is inadmissible because the MMC wrote it after the administrative record closed.

Even if arguendo plaintiffs' extra-record letter were admissible, the letter does not refer to a single highly controversial environmental impact.  To establish that NMFS improperly analyzed such an impact, plaintiffs must meet a two-part analytical and evidentiary burden.  First, they must show the disputed environmental effects implicated a "substantial dispute concerning the size, nature, or effect" of the proposed action rather than the mere "existence of opposition to a use."  Second, in the event they establish such a "substantial dispute," plaintiffs must also show that the agency was "off-base" because it did not take a "'hard look' at the relevant issues" implicated by it and that, therefore, the agency's decision to "proceed [in the face of disagreement ] is arbitrary or capricious."  Heartwood v. Forest Service, 380 F.3d 428, 432-433 (8th Cir. 2004); Town of Cave Creek v. FAA, 325 F.3d 320, 331-332 (D.C. Cir. 2003); Indiana Forest Alliance v. U.S. Forest Service, 325 F.3d 851, 859, 857-861 (7th Cir. 2003);  Northwest Environmental Defense Center v. Bonneville Power, 117 F.3d 1520, 1536 (9th Cir. 1997): North Carolina v. FAA, 957 F.2d 1125, 1133-1134 (4th Cir. 1992)(equating even widespread opposition by itself with "controversial" action improper under NEPA because it would allow agency action to be "governed by a 'heckler's veto'").

Plaintiffs do not meet either part of this two-part burden.  First, they fail to establish that their extra-record MMC letter implicates a "substantial dispute" different

28

from mere "opposition" or mere public criticism.  Id.; see also Forest Alliance , 325 F.3d at 857-858.  Instead, they simply stress an unremarkable fact usually true for all NEPA documents: different members of the public often criticize or oppose different aspects of a proposed agency action at different times.  Notably, plaintiffs do not show that NMFS' disagreement with the MMC was so pervasive within the relevant scientific or other communities that it impaired or could impair rational environmental analysis.  Therefore, the effects to which plaintiffs refer cannot be highly controversial because traditional case law deems mere opposition or mere criticism during the NEPA process diametrically different from the "substantial dispute" required for "highly controversial impacts."  Id.

Second, even if arguendo plaintiffs had established that the mere MMC criticism to which they refer implicated a "substantial dispute" about specific environmental impacts, plaintiffs must also show that the 2005 EA and FONSI were "arbitrary or capricious" because NMFS failed to take a "hard look" at these impacts.  Id.  Otherwise, where an agency properly analyzes all applicable environmental factors, "NEPA does not demand technical or "scientific unanimity in order to support a FONSI."  Forest Alliance, 325 F.3d at 857-859, 861; see also Sierra Club, 753 F.2d at 128-129. Thus, the criticism or opposition to which plaintiffs refer cannot be "highly controversial" because, as shown above, NMFS properly analyzed every environmental effect identified by plaintiffs.  Id. at

Finally, plaintiffs complain that NMFS improperly analyzed "highly uncertain" environmental impacts.  However, as shown above, supra at 28, agencies may adopt mitigation measures to ameliorate environmental effects, including uncertain impacts.

See also Greenpeace Action, 14 F.3d at 1331-1333, 1335.  Because plaintiffs have not

shown that NMFS' analysis of scientific uncertainty is arbitrary and capricious,

controlling Supreme Court and other case law require this Court to defer to NMFS'

specialized expertise. Marsh, 490 U.S. at 378; Baltimore Gas, 462 U.S. at 93, 103, 105;

Greenpeace Action, 14 F.3d at 1331-1333, 1335; Sierra Club, 753 F.2d at 128-129.

### 4.     NMFS Properly Considered Cumulative Impacts.

To meet their burden of showing that NMFS' analysis of cumulative impacts was

arbitrary and capricious, plaintiffs must show that NMFS did not consider an

environmental impact or impacts that would be "cumulatively significant," either alone or

by themselves.  40 C.F.R. §§ 1508.7, 1508.25(a)(2) (emphasis added).  Thus, plaintiffs'

cumulative impact claims necessarily fail because they have not shown a cumulative

impact that (1) NMFS did not consider and (2) would or even could be environmentally

"significant."  Id.; compare Pl. Mem. at 23-24 with AR 406 at 51-59.  Unable to meet this

burden, plaintiffs  theorize instead that an unidentified part of NMFS' cumulative impacts

analysis must be wrong because NMFS' PBR numbers are wrong.  However, as shown

above, supra at 24-27, it is plaintiffs' PBR analysis that is internally flawed, not NMFS'.

### 5.     NMFS' Range of Programmatic Alternatives Was Proper.

Plaintiffs claim that NMFS erred in analyzing alternatives fails on two grounds.

First, plaintiffs did not raise this claim in the administrative proceedings underlying the

2005 EA and FONSI.  Thus, both NEPA and the APA prohibit plaintiffs from raising

their alternatives claim for the first time now.

> [A]dministrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'

Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 553-554; see also Dep't

of Transportation v. Public Citizen, 541 U.S. 752, 764-765.

Second, even if arguendo plaintiffs had raised their alternatives claim, NMFS

analyzed alternatives in detail.  AR 406 at 20-33 and 40-50.   Plaintiffs neither show that

these alternatives are arbitrary and capricious nor describe another alternative consistent

with both the programmatic goals and research directed by Congress.  Thus, their claim

fails because a range of alternatives

> cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man.  Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved.

Vermont Yankee, 435 U.S. 519, 551.

## C.    PLAINTIFFS' ESA CLAIM MUST FAIL ON THE MERITS OR, ALTERNATIVELY, THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION OVER THE CLAIM.

For purposes of issuing research permits for Steller sea lions, NMFS' Permits,

Conservation, and Education Division is the "action agency," and the Endangered Species

Division is the "consulting agency."  In this case, the Endangered Species Division issued

a BiOp, dated May 24, 2005, on the issuance of the permits and amendments that

plaintiffs challenge in this case ("2005 BiOp"), concluding that issuance of the permits and permit amendments was not likely to jeopardize the continued existence of the endangered western population or threatened eastern population of Steller sea lions, or result in adverse modification of designated critical habitat.  AR 407 at 1, 69.

**1.     NMFS Analyzed The Effects Of The Action When Added To <u>The Environmental Baseline.</u>**

NMFS adequately considered the effects of the proposed research when added to the environmental baseline.[9]/  The 2005 BiOp sets forth in detail the status of the species (<u>id.</u> at 29-33, 43-44), separately considering the status of the endangered western population and the threatened eastern population, and concluding that, while the eastern population is stable or slightly increasing, the western population could become extinct in the next 100-120 years.  <u>Id.</u> at 46.  NMFS also considered the past and present impacts of other ongoing activities in the action area, including: commercial and subsistence harvest (<u>id.</u> at 34); oil and gas or mineral development (<u>id.</u> at 35-36); incidental and intentional take in fisheries (<u>id.</u> at 39-40); and research (<u>id.</u> at 42-43).

NMFS analyzed the effects of the proposed action, as well as mitigating measures to minimize such effects.  <u>See id.</u> at 3-18 (detailing anticipated takes from each proposed activity); <u>id.</u> at 46-61 (explaining in detail effects of each type of activity); <u>id.</u> at 61-66

---

[9]/     "The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process."  50 C.F.R. § 402.02.

(mitigating measures). NMFS then considered how the proposed action, when added to the baseline, would affect the species. Id. at 67-69 ("Integration and Synthesis of Effects"). NMFS took into account the additional mortality expected to result from the proposed permits – approximately ten Steller sea lions per year – and expressly found that the "total number of accidental mortalities per year that would be authorized under all permits" would not be likely to contribute significantly to the decline of the species. Id. at 68 (emphasis added). Although conceding that there is "limited information available on the short- and long-term effects of [the permitted] activities on Steller sea lions," NMFS concluded that the additional research was not likely to result in "population-level adverse effects." AR 407 at 69. The 2005 BiOp "'takes the baseline seriously and makes a concerted effort to evaluate the impact of [the agency's] proposed action against that backdrop.'" Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 230 (D.D.C. 2005) (quoting Defenders of Wildlife v. Norton, Civ. No. 99-927, 2003 U.S. Dist. LEXIS 26558, at *4 (D.D.C. Jan. 7, 2003)).

As plaintiffs note, Pl. Memo. at 29, n.8, NMFS modeled the narrative portion of the 2005 BiOp after the corresponding discussion in the 2002 BiOp. Plaintiffs criticize NMFS' analysis of the environmental baseline, alleging that the agency should have used updated data. See id. However, plaintiffs fail to point to specific data affecting the baseline that NMFS failed to consider, and do not offer any evidence to show that there has been a significant change in the status of the species since 2002. Because the types of research activities to be undertaken under the new permits and the amendments were not

33

significantly different from those activities that had been ongoing for a number of years

under the existing permits, see AR 406 at 44, NMFS relied on the analysis in the 2002

BiOp. Whether to rely on old data in assessing threats to a species is a complicated

inquiry, requiring specialized knowledge and reconciliation of conflicting data, which is

the province of the agency. See Oceana, 384 F. Supp. 2d at 223-24. It is not "the Court's

role to substitute its evaluation of the data for that of the agency." Id. at 224 (citation

omitted).

Plaintiffs correctly note that the narrative portion of the 2005 BiOp, because it was

based on the 2002 BiOp, reflects a different number of takes than those quantified in

Tables 1 and 2 of the 2005 BiOp. Pl. Memo. at 29, n.8. Thus, plaintiffs allege that it is

impossible to determine whether NMFS based its no jeopardy finding on the outdated

take data reflected in the narrative portion. Id. Plaintiffs' assertions are incorrect. NMFS

based its determinations on the updated data, reflected in the tables that appear

prominently at the beginning of the 2005 BiOp. Although the analysis in the narrative

portion of the BiOp is at times lacking in clarity, the basis for the agency's determination

is reasonably discernible: the agency relied on the information in the tables, which

provide a comprehensive list of the activities and corresponding number of takes. AR

407 at 2 ("Tables 1 and 2 summarize the types of activities that would be authorized by

the permits."). Thus, the Court should not disturb NMFS' no jeopardy determination on

this basis. See Alaska Dep't of Envtl. Conservation v. EPA, 540 U.S. 461, 497 (2004)

("Even when an agency explains its decision with 'less than ideal clarity,' a reviewing

34

court will not upset the decision on that account 'if the agency's path may reasonably be discerned.'") (quoting Bowman Transp., Inc. v. Arkansas Best Freight Sys., 410 U.S. 281, 286 (1974), aff'd, 425 U.S. 901 (1976)).

However, NMFS recognizes that the internal inconsistency in the BiOp may frustrate judicial review and, as discussed below, NMFS proposes to revise the 2005 BiOp, in part to clarify its analysis of the effects of the action.

### 2. Plaintiffs Have Not Identified Any Cumulative Effects That NMFS Failed To Consider.

Plaintiffs take out of context and overstate the significance of the statement in the 2005 BiOp that "cumulative effects have not been considered in this opinion."  When considered in its entirety, the "Cumulative Effects" section of the BiOp explains why such effects were not considered:

> NMFS has no information on future State, tribal, local, or private actions in the action area that would not be subject to section 7 consultation.

AR 407 at 67 (emphasis added).  Under the regulatory definition of "cumulative effects," the agency need only consider effects of future activities "that are reasonably certain to occur within the action area."  50 C.F.R. § 402.02 (emphasis added).  If NMFS is aware of no specific, non-federal activities that would be considered cumulative impacts under the regulatory definition, it is not required to analyze cumulative effects in the BiOp.  In issuing its BiOp, NMFS is required to use the "best scientific and commercial data available," not to speculate about possible future effects.  See 50 C.F.R. § 402.14(g)(8) (emphasis added).

35

Plaintiffs point to no specific State, tribal, local, or private actions that NMFS should have considered.  Thus, plaintiffs have failed to meet their burden to prove that NMFS overlooked cumulative effects which, if considered, would have affected the agency's "no jeopardy" determination.  Even if plaintiffs are correct that NMFS failed to undertake a sufficient investigation of cumulative effects, in the absence of any relevant activities in the action area, any error would be harmless.  The APA requires that upon review of final actions, such as NMFS' decision at issue here, the Court is to take "due account" of "the rule of prejudicial error."  5 U.S.C. § 706.  "As incorporated into the APA, the harmless error rule requires the party asserting error to demonstrate prejudice from the error."  Air Canada v. DOT, 148 F.3d 1142, 1156 (D.C. Cir. 1998) (citing 5 U.S.C. § 706).  Plaintiffs' claim must fail because they have failed to demonstrate any harm resulting from NMFS' alleged failure to consider cumulative effects.

Because plaintiffs have failed to carry their burden of proving that NMFS' consideration of the effects of the action when added to the environmental baseline and cumulative effects was arbitrary and capricious, NMFS is entitled to summary judgment on the ESA claim.  See Cook Inlet Beluga Whale v. Daley, 156 F. Supp. 2d 16, 18 (D.D.C. 2001).[10]/  However, as explained infra, NMFS has decided to voluntarily revisit

---

[10]/      Plaintiffs also allege that NMFS violated the ESA by "taking actions that foreclosed formulation or implementation of reasonable and prudent alternatives prior to issuance of the permits," Pl. Memo. at 28, but fail to elaborate on the referenced "actions."  Thus plaintiffs have similarly failed to meet their burden of proof with respect to this issue.

the 2005 BiOp and issue a revised biological opinion.  Thus, the Court need not reach the merits of plaintiffs' ESA claim.

### 3.    NMFS Will Revisit The 2005 BiOp And Issue A New Biological Opinion.

In light of the internal inconsistencies and lack of clarity in the agency's analysis noted <u>supra</u>, NMFS intends to revisit the 2005 BiOp.  NMFS will remedy the inconsistencies and clarify its analysis of the effects of the action.  <u>See</u> Decl. of James H. Lecky at ¶ 2 (attached hereto as Exh. 5).  NMFS will also reconsider the cumulative effects of the action.  <u>Id.</u> at ¶ 3.  NMFS will issue the revised BiOp by March 1, 2006, <u>id.</u> at ¶ 4, before the commencement of the majority of permitted research activities planned for 2006.  <u>Id.</u> at ¶ 5 ("the majority of research under the permits, in terms of field effort and number of takes, will not occur until after March 1, 2006, with the bulk of the permitted research occurring after May 1, 2006 ").

In light of NMFS' decision to revisit the 2005 BiOp, the Court should exercise its discretion to decline to address plaintiffs' ESA claim.  The exercise of that discretion, referred to as prudential mootness, is well-established in this Circuit, and grounded on "considerations of prudence and comity" in dealing with governmental defendants such as NMFS.  <u>Chamber of Commerce v. U.S. Dep't of Energy</u>, 627 F.2d 289, 291 (D.C. Cir. 1980).  Even where a controversy is not actually moot the court may, based on prudential considerations, "stay its hand" and "withhold relief it has the power to grant.  <u>Id.</u>  <u>See</u> <u>also</u> <u>Cmty. for Creative Non-Violence v. Hess</u>, 745 F.2d 697, 700 (D.C. Cir. 1984) ("[C]ourts

have developed principles, which are closely related to the Article III mootness doctrine, guiding their discretion to forego decision on the merits in some circumstances actually leaving them with power to act.")(footnotes omitted).  The court may withhold relief "where it appears that a challenged 'continuing practice' is, at the moment adjudication is sought, undergoing significant modifications so that its ultimate form cannot be confidently predicted."  Id. at 701 (citing A.L. Mechling Barge Lines v. United States, 368 U.S. 324, 331 (1961)).

It is appropriate in this case for the Court to withhold relief with respect to plaintiffs' ESA claim.  Plaintiffs' ESA claim relates solely to the 2005 BiOp, which will be superseded by the new opinion to be issued on March 1, 2006.  When the new opinion is issued, plaintiffs ESA claim will be jurisdictionally (as distinguished from prudentially) moot.  See Am. Rivers v. NMFS, 126 F.3d 1118, 1124 (9th Cir. 1997); Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089 (9th Cir. 2003).  Under these circumstances, the Court should forego deciding plaintiffs' ESA claim on the merits.

### D.    THE CHALLENGED PERMITS WERE ISSUED IN COMPLIANCE WITH THE MMPA.

Even if the Court determines that it has jurisdiction to review plaintiffs' MMPA claim, see supra Section V.A.2., the Court should dismiss the claim because plaintiffs' challenges to the permits are baseless.

### 1.    NMFS Acted Reasonably In Issuing The Permits After Receiving the MMC's Draft Comments.

The MMPA imposes a requirement that the Marine Mammal Commission

38

("MMC") review any permits issued for purposes of scientific research.  16 U.S.C. §

1371(a)(1).  NMFS' implementing regulations provide for a 45-day time period for MMC

review, after which it will be assumed that the MMC has no comments.  50 C.F.R.

§216.33(d)(2).  In this case NMFS provided an opportunity for the MMC to comment on

the permits.  NMFS specifically requested that the MMC expedite its review of the permit

applications due to a pressing need to issue the permits.  See Declaration of James Barrett

("Barrett Decl."), Exh. 1 at 1.  On May 19, 2005, prior to issuance of the permits, the

MMC provided comments to NMFS.  Id.  Thus, although the MMC characterized its

comments as "preliminary," it did have an opportunity to comment on the permits, as

required by the regulations.

     Moreover, the overall recommendations of the MMC in its June 10, 2005, final

comment letter were substantially the same as the general comments in its May 19, 2005,

letter, which NMFS reviewed prior to issuing the permits.  Compare Barrett Decl. Exhibit

2 at 1-6 with Barrett Decl. Exhibit 1 at 1-5.[11]/  Although the June 10 letter contained more

detailed analysis of the individual permits, the overall recommendations with respect to

the proposed permit requests and the EA were the same.  See Barrett Decl. Exh. 1 at 5;

Exh. 2 at 2.  Thus, even if plaintiffs are correct that NMFS was required to await the final

comments of the MMC, any error was harmless because the final comments were not

substantially different from the draft comments.  See Air Canada, 148 F.3d at 1156

---

[11]/     This is not part of the administrative for NMFS' determination, because, as
plaintiffs note, it post-dates the decision.  See supra at 23, n.7.

(plaintiff must demonstrate prejudice resulting from alleged error).

**2.    The Level Of Potential Take Under The Subject Permits Will Have A Negligible Impact On The Species' Recovery.**

NMFS is required to estimate the PBR level (discussed <u>supra</u> at Section V.B.2.) for all marine mammals in the context of preparing stock assessments. 16 U.S.C. § 1386(a)(6). Plaintiffs argue that PBR is a "line in the sand," such that authorizing activities under the permits "that <u>will</u> exceed the PBR level for Steller sea lions" is per se arbitrary and capricious. Pl. Memo. at 37-38 (emphasis added). As explained above, plaintiffs may not assume that mortality from the permitted activities will necessarily exceed the PBR level, because the challenged permits authorize <u>accidental</u> – not intentional – mortality, and that level of mortality may never be realized. <u>See</u> <u>supra</u> at 24-25. Moreover, even under the conservative PBR calculation that NMFS uses for Steller sea lions, NMFS has concluded that even if as many as twenty accidental mortalities were to result from research, there would be a "negligible impact on the western stock of Steller sea lions regardless of other human-caused mortality affecting the stock." <u>Id.</u>[12]/ Thus, NMFS reasonably determined that the permitted level of mortality would not

_____

[12]/    NMFS calculates PBR for marine mammals listed as endangered under the ESA using a default value for the recovery factor (an element in the calculation of PBR) of 0.1. Exh. 3 (AR 390), Appendix B at 14. This default reserves 90% of annual net production for recovery of the species, and allows only 10% of annual net production to be authorized for taking incidental to human activities. <u>Id.</u> NMFS concluded that calculating PBR in this manner, and limiting human-caused mortality to PBR, would increase the recovery time of endangered marine mammals by no more than 10%, and this conclusion has been supported by extensive simulation modeling. <u>Id.</u>

significantly impair the ability of the endangered western stock to recover.

Contrary to plaintiffs' allegations, NMFS determined that the permitted research fulfills a "critically important research need."  <u>See</u> Pl. Memo. at 38.  NMFS fully explained the purpose and need for the research in the 2005 EA.  <u>See</u>, <u>e.g.</u>, AR 406 at 8 (research is necessary to allow NMFS to manage Steller sea lions in a manner that will replenish population); <u>id.</u> at 21 (there is a need for better information on effects of human activities on Steller sea lions to inform management decisions on modifications to human activities to promote recovery of species); <u>id.</u> at 32 (intrusive research activities are necessary to obtain information on physiology, foraging behavior, health and reproductive status).  NMFS reasonably determined that the proposed research would address the areas of study specifically identified by Congress.  <u>See</u> AR 406 at 8.

## CONCLUSION

For the foregoing reasons, the Court lacks jurisdiction to consider plaintiffs' claims in this case.  In the alternative, if the Court determines that it is appropriate to consider the merits of plaintiffs' claims, NMFS' decision to issue the Steller sea lion research permits and amendments should be upheld based on the administrative record before the Court.

Respectfully submitted this 27th day of January, 2006

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
JEAN E. WILLIAMS, Chief
SETH M. BARSKY, Assistant Chief
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section

/s/ Kristen Byrnes Floom
KRISTEN BYRNES FLOOM, Trial Attorney (DC Bar
No. 469615)
P.O. Box 7369
Washington, D.C.  20044-7369
Telephone: (202) 305-0210
Facsimile: (202) 305-0275
Kristen.Floom@usdoj.gov

GREGORY PAGE, Trial Attorney
(DC Bar No. 398121)
U.S. Department of Justice
Environment and Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C.  20044-0663
Telephone: (202) 305-0446
Facsimile: (202) 305-0506
Gregory.Page@usdoj.gov

Of Counsel:
Mary O'Brien
NOAA Office of General Counsel
for Fisheries
1315 East-West Highway
SSMC3 - Room 15111
Silver Spring, MD  20910

*Attorneys for Defendants*

42