Civ. No. 05-1392 (ESH)
Defendants' Exhibit 3

# AR 390

**Civ. No. 05-1392 (ESH)**
**Defendants' Exhibit 3**

## SUPPLEMENTAL ENVIRONMENTAL ASSESSMENT

## ON THE EFFECTS OF NMFS PERMITTED SCIENTIFIC RESEARCH ACTIVITIES ON THREATENED AND ENDANGERED STELLER SEA LIONS

### June 2003

| | |
|---|---|
| **Lead Agency:** | USDC National Oceanic and Atmospheric Administration National Marine Fisheries Service |
| **Responsible Official** | Dr. William Hogarth, Assistant Administrator for Fisheries |
| **For Further Information Contact:** | Office of Protected Resources National Marine Fisheries Service 1315 East West Highway Silver Spring, MD 20910 (301) 713-2332 |

**Abstract**: The National Marine Fisheries Service (NOAA Fisheries) proposes to issue major amendments to two existing scientific research permits for takes of Steller sea lions (*Eumetopias jubatus*) in the wild, pursuant to the Marine Mammal Protection Act of 1972, as amended (MMPA; 16 U.S.C. 1361 et seq.), and the Endangered Species Act of 1973, as amended (ESA; 16 U.S.C. 1531 et seq.). Because the two existing permits were analyzed in a previous environmental assessment, that assessment is being supplemented in order to address the potential environmental impacts of the requested amendments. The objective of the proposed action is to collect information on the ecology and biology of threatened and endangered Steller sea lions that would improve understanding of management needs for recovering the species to the point that it can be removed from ESA listing. Scientific research permits are generally categorically excluded from the National Environmental Policy Act of 1969 (NEPA; 42 U.S.C. 4321 et seq.) requirements to prepare an environmental assessment (EA) or environmental impact statement (EIS) (NAO 216-6). However, when the activities that would be authorized in a scientific research permit would have uncertain environmental impacts or unique or unknown risks, would establish a precedent or decision in principle about future proposals, may result in cumulatively significant impacts, or may have any adverse effects upon endangered or threatened species and their habitats, the preparation of an EA or EIS is required. Because some of the research in the proposed action is new and innovative, likely to be adopted by others, involves unique or unknown risks to an endangered species, and because of the present intensity and magnitude of research on Steller sea lions throughout their range, NOAA Fisheries determined that further environmental review was warranted to determine whether significant environmental impacts could result from issuance of the proposed permit amendments. Therefore, this document evaluates the relevant effects of a variety of scientific research activities on Steller sea lions under several alternative permitting options.

AR 370

Civ. No. 05-1392 (ESH)
**Defendants' Exhibit 3**

**TABLE OF CONTENTS**

**CHAPTER 1 PURPOSE OF AND NEED FOR ACTION** ...................................................3

1.1    DESCRIPTION OF ACTION ...........................................................................................3
    1.1.1    *Background* ........................................................................................................4
    1.1.2    *Purpose and Need* ..............................................................................................5
    1.1.3    *Objectives* ...........................................................................................................5
1.2    OTHER EA/EIS THAT INFLUENCE SCOPE OF THIS SUPPLEMENTAL EA ......................5
1.3    DECISION AND OTHER AGENCIES INVOLVED IN THIS ANALYSIS ................................6
1.4    SCOPING SUMMARY ...................................................................................................6
1.5    FEDERAL PERMITS, LICENSES, AND ENTITLEMENTS NECESSARY TO IMPLEMENTATION OF THE ACTION ..........8

**CHAPTER 2 ALTERNATIVES INCLUDING THE PROPOSED ACTION** ....................10

2.1    ALTERNATIVE 1 – NO ACTION ALTERNATIVE ..........................................................11
2.2    ALTERNATIVE 2 – PROPOSED ACTION .....................................................................22
2.3    ALTERNATIVES CONSIDERED BUT ELIMINATED FROM DETAILED STUDY ................24

**CHAPTER 3 AFFECTED ENVIRONMENT** ....................................................................25

**CHAPTER 4 ENVIRONMENTAL CONSEQUENCES** ....................................................26

4.1    EFFECTS OF ALTERNATIVE 1 – NO ACTION .............................................................28
4.2    EFFECTS OF ALTERNATIVE 2 – PROPOSED ACTION ..................................................29
4.3    COMPARISON OF ALTERNATIVES ..............................................................................30
4.4    COMPLIANCE WITH ESA ..........................................................................................30
4.5    MITIGATION MEASURES ...........................................................................................31
4.6    UNAVOIDABLE ADVERSE EFFECTS ...........................................................................33
4.7    CUMULATIVE EFFECTS .............................................................................................34
4.8    CONSIDERATION OF SIGNIFICANT CRITERIA AND RECOMMENDATION ......................35

**BIBLIOGRAPHY** ...............................................................................................................37

**GLOSSARY OF TERMS AND ACRONYMS** ...............................................................38

**APPENDIX A: COMMENTS RECEIVED FROM MMC AND APHIS ON PERMIT APPLICATIONS** ......40

**APPENDIX B: DECISION MEMO REGARDING ISSUANCE OF PERMITS** .................46

**ATTACHMENT: 2002 ENVIRONMENTAL ASSESSMENT** .........................................61

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 3

SUPPLEMENTAL ENVIRONMENTAL ASSESSMENT
ON THE EFFECTS OF NMFS PERMITTED SCIENTIFIC RESEARCH ACTIVITIES
ON THREATENED AND ENDANGERED STELLER SEA LIONS

CHAPTER 1    PURPOSE OF AND NEED FOR ACTION

## 1.1    Description of Action

The National Marine Fisheries Service (NOAA Fisheries) proposes to issue major amendments[1] to two existing scientific research permits for takes[2] of Steller sea lions (*Eumetopias jubatus*) in the wild, pursuant to the Marine Mammal Protection Act of 1972, as amended (MMPA; 16 U.S.C. 1361 et seq.), and the Endangered Species Act of 1973, as amended (ESA; 16 U.S.C. 1531 et seq.). The subject permits to be amended are held by Dr. Glenn VanBlaricom (Permit No. 1016-16510-01) and the Alaska SeaLife Center (ASLC: Permit No. 881-1668-01). Both permits expire on December 31, 2004. The Holders of both permits have requested that the amendments be granted for the duration of the permits.

Permit No. 1016-1651-01 currently authorizes Dr. VanBlaricom to collect blubber biopsy samples from Steller sea lions on rookeries, haulouts and in the water in the Aleutian Islands, Gulf of Alaska, and Southeast Alaska using biopsy darts fired from rifles or cross-bows, and take Steller sea lions by harassment from aerial surveys in Southeast Alaska. The purposes of the research are to evaluate the prey selection in free-ranging Steller sea lions for both western and eastern populations through an assessment of the presence of fatty acid signatures from ephemeral, high-quality prey in Steller sea lion blubber, and to investigate the distribution and abundance of sea lions in relation to temporal and spatial distributions of prey. Because nutritional stress has been identified as a possible factor in the current decline of the Steller sea lion population, the Final Recovery Plan for Steller Sea Lions (Steller Sea Lion Recovery Team 1992) has identified the need to investigate feeding ecology and factors affecting energetic status of Steller sea lions, to describe foods consumed by Steller sea lions, and to assess the significance of various prey in the diet of Steller sea lions. Dr. VanBlaricom has requested authorization to collect muscle tissue incidental to remote biopsy darting for collection of

---

[1] A major amendment is defined as "any change to the permit specific conditions under §216.36(a) regarding: (i) The number and species of marine mammals that are authorized to be taken, imported, exported, or otherwise affected; (ii) The manner in which these marine mammals may be taken, imported, exported, or otherwise affected, if the proposed change may result in an increased level of take or risk of adverse impact; (iii) The location(s) in which the marine mammals may be taken, from which they may be imported, and to which they may be exported, as applicable, and; (iv) The duration of the permit, if the proposed extension would extend the duration of the permit more than 12 months beyond that established in the original permit." 50 CFR §216.39(a)(1)

[2] Under the MMPA, "take" is defined as to "harass, hunt, capture, collect or kill, or attempt to harass, hunt, capture, collect or kill any marine mammal." "Harass" is further defined as "any act of pursuit, torment, or annoyance which (i) has the potential to injure a marine mammal or marine mammal stock in the wild [Level A harassment]; or (ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing a disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering but which does not have the potential to injure a marine mammal or marine mammal stock in the wild [Level B harassment]." [16 U.S.C. 1362(18)(A)] The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."

3

Civ. No. 05-1392 (ESH)
**Defendants' Exhibit 3**

blubber to confirm the sampling of the animal's full blubber depth. Dr. VanBlaricom has also requested authorization to collect the biopsy samples from shoulder and back of animals in addition to the current target site – the animal's rump.

Permit No. 881-1668-01 currently authorizes the ASLC to remotely monitor, capture, hot-brand, flipper tag, collect blood and tissue samples from, and attach external scientific instruments to pups and juvenile Steller sea lions throughout their range in Alaska. The ASLC requests authorization to implant scientific instruments in, hold in captivity for up to three months, and conduct controlled feeding and endocrinology experiments on juvenile Steller sea lions captured throughout their range in Alaska. The ASLC also requests authorization to capture, tag, hot-brand and collect blood and tissue samples from pups less than six weeks old. The overall purpose of the research proposed by the ASLC is to collect information on the health status (*e.g.*, morphometrics, body composition, immunology, epidemiology, endocrinology, viral serology), physiology (*e.g.*, vitamin requirements, stress responses to capture, handling, and captivity), life history (*e.g.*, ontogenetic and annual cycles, population dynamics), foraging behavior and habitat use of Steller sea lions. The results of these studies would be used to address various objectives in the Final Recovery Plan and assist in the recovery of Steller sea lions.

Because the two existing permits were analyzed in a previous Environmental Assessment (EA), that assessment is being supplemented in order to address the potential environmental impacts of the requested amendments. The previous EA (NMFS 2002) is attached.

### 1.1.1   Background

Steller sea lions were listed as threatened under the ESA in 1990[3] under an emergency rule, because the numbers of Steller sea lions observed on rookeries in Alaska had declined by 63% since 1985 and by 82% since 1960. A final rule was published on November 26, 1990 and the final listing became effective on December 4, 1990. In 1997, Steller sea lions were classified as two distinct population segments under the ESA. The segment of the population of Steller sea lions west of 144°W longitude was listed as endangered, while the threatened listing was maintained for the remainder of the population in the United States.[4] The reclassifications were primarily due to information that indicated two genetically differentiated population segments, a continued decline in abundance trends, and population viability analysis models that predicted a 65-100% probability of extinction for the population from Kenai Peninsula to Kiska Island within 100 years if the trends continued. The cause of the continued decline is unknown, but the prevalent theory is that it is related to nutritional stress resulting from a change in the abundance and/or distribution of prey species caused by some combination of commercial fisheries activities and environmental changes (Alaska Sea Grant 1993; Loughlin 1998).

There has been no change in the population status and trends for either the eastern or western population of Steller sea lions since the preparation of the Environmental Assessment on the Effects of NMFS Permitted Scientific Research on Threatened and Endangered Steller Sea Lions in 2002 (NMFS 2002). Please refer to this attached 2000 EA for additional background information.

---

[3] 55 FR 12645, April 5, 1990
[4] 62 FR 24345, May 5, 1997

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 3

### 1.1.2  Purpose and Need

The primary purpose of the proposed permit amendments is to authorize takes of threatened and endangered Steller sea lions for scientific research related to better understanding the cause(s) of the population decline in order to develop conservation and protective measures to ensure sea lion recovery.

The need for the proposed action arises from several sources. First, NOAA Fisheries has a responsibility to implement both the MMPA and ESA to protect, conserve, and recover threatened and endangered marine mammals under its jurisdiction, which includes Steller sea lions. The MMPA and ESA prohibit takes of threatened and endangered marine mammals during the moratoriums with only a few very specific exceptions, including native subsistence harvest, incidental to commercial fishing operations, and for scientific research/scientific purposes. Joint MMPA/ESA scientific research permits are the major exception to the moratoriums. Permit issuance criteria require that research activities are consistent with the purposes and polices of these acts and will not have an adverse impact on the species or stock. A second reason for the proposed action is the need for additional information on the biology and ecology of Steller sea lions, particularly as it relates to the potential for adverse effects of commercial groundfish fisheries on sea lions and adverse modification of their habitat. NOAA Fisheries has a responsibility to ensure that fishing activities do not jeopardize the continued existence of Steller sea lions or adversely modify their critical habitat.

### 1.1.3  Objectives

The objective of the proposed action is to authorize takes of threatened and endangered Steller sea lions for scientific purposes to allow the collection of information on their ecology and biology that would improve understanding of management needs for recovering the species to the point that it can be removed from ESA listing.

### 1.2    Other EA/EIS that influence scope of this supplemental EA

An EA was prepared in 2002 by NOAA Fisheries on the effects of scientific research on threatened and endangered Steller sea lions (NMFS 2002). The EA was prepared in response to applications for five new permits and amendments to two existing permits that would have resulted in an unprecedented magnitude and intensity of research on these endangered marine mammals. The applications were largely related to substantial funding opportunities, made available through Congressional appropriations, that directed research into the cause of the population decline and to develop conservation and protective measure to ensure recovery of the species, as well as contribute immediate, short-term information relevant to adaptive fishery management strategies in the Bering Sea/Aleutian Islands and the Gulf of Alaska groundfish fisheries. The 2002 EA analyzed the effects on Steller sea lions and the environment of a variety of research activities including some of the immobilizing drugs and tissue sampling protocols proposed in the permit amendments by the ASLC. The 2002 EA also analyzed the effects of collecting muscle biopsies, although not by remote darting as proposed by Dr. VanBlaricom. In June 2002, a Finding of No Significant Impact was signed by the Assistant Administrator for Fisheries which concluded that the issuance of the permits and permit amendments, with the mitigation measures described, would not significantly impact the human environment.

## 1.3    Decision and other agencies involved in this analysis

NOAA Fisheries must decide whether allowing the proposed amendments to the subject permits would be consistent with the purposes and policies of the MMPA, ESA and their implementing regulations, including making certain the permitted activities will not operate to the disadvantage of the endangered species.

In reviewing the requested amendment to ASLC's Permit No. 881-1668-01, NOAA Fisheries has consulted with the Marine Mammal Commission (MMC), pursuant to 50 CFR § 216.33 (d)(2) and with the Animal Plant and Health Inspection Service (APHIS). Both the MMC and APHIS supplied substantive comments, to which the ASLC provided responses. The MMC and APHIS comments are in Appendix A.

## 1.4    Scoping Summary

Upon receipt of a valid and complete application for a scientific research permit, NOAA Fisheries publishes a notice of receipt in the *Federal Register* that summarizes the application, including: the purpose of the request; the species and number of marine mammals; the type and manner of special exception activity proposed; the location in which the marine mammals will be taken; and the requested period of the permit (50 CFR §216.33 (d)(1)). This notice also lists where the application will be available for review and invites all interested parties to submit written comments concerning the application within 30 days of the date of the notice. Concurrent with publication of this notice, NOAA Fisheries forwards a copy of the complete application to the MMC for comment (50 CFR §216.33 (d)(2)). The application is also forwarded to NOAA Fisheries Regional Offices and Science Centers in the area where the proposed research would occur, and independent scientific experts, as appropriate (50 CFR §216.33 (d)(3)). The provisions of 50 CFR §216.33(d) and (e) governing notice of receipt, review, and decision apply to all proposed major amendments.

Issuance of scientific research permits is among a category of actions that are exempted (categorically excluded) from further environmental review and requirements to prepare environmental review documents, except under extraordinary circumstances. However, under NOAA Fisheries NEPA regulations, when the activities that would be authorized in a scientific research permit would have uncertain environmental impacts or unique or unknown risks, would establish a precedent or decision in principle about future proposals, may result in cumulatively significant impacts, or may have any adverse effects upon endangered or threatened species and their habitats, the preparation of an EA or EIS is required (NAO 216-6).

On June 27, 2002, NOAA Fisheries published a notice of receipt of applications for scientific research permits and permit amendments from several applicants, including the ASLC and Dr. VanBlaricom, for takes of Steller sea lions (67 FR 43283). The notice contained a statement that NOAA Fisheries had prepared an EA on the issuance of the proposed permits, resulting in a finding of no significant impact. That EA did not discuss collection of muscle tissue incidental to remote blubber biopsy sampling because the request for that activity was received after the analyses were completed. That EA also did not discuss the transport of wild Steller sea lions to the ASLC for temporary captivity and associated experiments included in the original application because NOAA Fisheries determined there was not enough information in the application on the proposed activities to perform an analysis of effects. Substantial comments were received from the public, the MMC and the APHIS regarding these applications. These comments are summarized in the Decision Memo recommending issuance of the permit

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 3

(Appendix B). Permit Nos. 881-1668-00 and 1016-1651-00 were issued to the ASLC and Dr. VanBlaricom, respectively, on November 11, 2002 (67 FR 69724; November 19, 2002). Authorization for the capture, temporary maintenance and associated experiments proposed by the ASLC was deferred pending additional environmental analyses. A minor amendment[5] to Dr. VanBlaricom's permit was issued on March 11, 2003 to clarify some of the terms and conditions and allow more discretion in the field on the part of researchers. A similar minor amendment was issued to the ASLC on May 16 2003.

Dr. VanBlaricom's request to collect muscle tissue incidental to remote biopsy darting for blubber samples has not been published in the *Federal Register* because NOAA Fisheries determined that the proposed change in the permit constitutes a minor amendment. Pursuant to 50 CFR §216.39, a notice of receipt of the application does not need to be published in the Federal Register to make the application available for public comment because the proposed change would not: (1) extend the duration of the permit; (2) represent a change in the permit specific conditions regarding the number and species of marine mammals that are authorized to be taken; (3) represent a change in the locations in which the marine mammals may be taken, from which they may be imported or to which they may be exported; nor (3) represent a change in the manner in which the marine mammals may be taken, imported, exported, or otherwise affected in a way that would result in an increased level of take or risk of adverse impact.

There are five issues within the scope of this document. First, some of the proposed techniques that would be authorized have never been employed with Steller sea lions or marine mammals, so the environmental impacts could be considered uncertain and may present unique risks to the animals captured as well as to the environment once they are released. In the case of Dr. VanBlaricom's proposed remote biopsy sampling of muscle tissue: while muscle tissue has been collected from Steller sea lions under previous permits with no reports of serious injury or mortality, all previous samples were collected from chemically or physically restrained animals under controlled circumstances. The risks associated with remote sampling are discussed in section 4.1 of the attached EA. In the case of the ASLC, the capture of free-ranging juvenile marine mammals, transport of said mammals to a holding facility, and their subsequent maintenance for up to three months during which they would be subject to various experimental protocols including fasting, surgery, and weekly anesthesia prior to release back into the environment is unprecedented. While some marine mammals have been released following rehabilitation, and numerous captive-bred species have been re-introduced to the wild, the concept of bringing healthy free-ranging endangered marine mammals into captivity for research and then releasing them back into the wild is quite innovative.

Secondly, if the ASLC is successful in meeting its objectives, it is likely they will wish to continue beyond the duration of their current permit, which expires in 2004, because they originally requested a five-year permit. It is also possible that other researchers will wish to adopt this innovative technique with Steller sea lions and possibly other marine mammals. Dr. VanBlaricom's remote sampling of blubber to determine diet is similarly innovative and likely to be adopted by other Steller sea lion and pinniped researchers if proven successful.

---

[5] Pursuant to 50 CFR §216. 39, a "minor amendment means anything that does not constitute a major amendment." Requests for minor amendments are not published in the *Federal Register* for public comment and consultation with the MMC is discretionary. Minor amendments become effective upon a final decision by the Office Director and a notice of issuance is not published in the *Federal Register* unless the amendment extends the duration of the permit more than 12 months beyond the expiration date established in the original permit.

Thus, the third issue within the scope of this document is that issuance of the permit amendments would establish a precedent or decision in principle about future proposals because other researchers could point to the success of these two projects as reason for issuing subsequent permits. Historically, when a new technique or piece of equipment is validated in the field, other researchers either adopt it as is, or make further modifications in its subsequent applications.

The fourth issue within the scope of this document is that issuance of the new permit and permit amendments would have an adverse effect upon endangered or threatened species. Some of the proposed techniques, such as remote blubber/muscle biopsy sampling and use of injectible immobilizing agents, pose a risk of injury to individual sea lions. Given this potential for adverse effects, in addition to the large geographic extent of the existing research (throughout the species' range in North America, focused primarily in Alaska), the percentage of the total population that would be disturbed and/or handled, the large number of separate research projects and permits, and the focus on intrusive research[6] on young animals (newborn pups to juveniles), there is a potential for cumulative adverse effects on the populations as a whole from the research program overall.

Finally, because there are currently 10 permits authorizing takes of Steller sea lions throughout their range in North America by a variety of activities, issuance of the permit amendments could result in cumulative impacts. Therefore, the purpose of this document is to examine the relevant effects of a variety of scientific research activities on Steller sea lions and the environment.

### 1.5    Federal permits, licenses, and entitlements necessary to implementation of the action

The Marine Mammal Protection Act of 1972, as amended (MMPA; 16 U.S.C. 1361 *et seq*.), generally prohibits any person from taking marine mammals in U.S. waters and prohibits U.S. citizens from taking marine mammals on the high seas. Section 104 of the MMPA allows for issuance of permits to take marine mammals for the purposes of scientific research or to enhance the survival or recovery of a species or stock. These permits must specify the number and species of animals that can be taken, and designate the manner period, and locations in which the takes may occur.

Further, Section 9 of the Endangered Species Act of 1973, as amended (ESA; 16 U.S.C. 1531 *et seq*.) and Federal regulations pursuant to section 4(d) of the ESA prohibit the take of endangered and threatened species, respectively, without special exemption. Permits to take ESA-listed species for scientific purposes (or for the purpose of enhancing the propagation or survival of the species) may be granted pursuant to Section 10 of the ESA and in accordance with the issuance criteria specified at 50 CFR §222.308(c). The intent of the issuance criteria (which represent the restrictions placed upon the Secretary's discretion to issue permits) is to ensure that any such activities represent the most practicable and realistic opportunity to

---

[6] NMFS regulations implementing the MMPA define intrusive research as "a procedure conducted for bona fide scientific research involving: A break in or cutting of the skin or equivalent, insertion of an instrument or material into an orifice, introduction of a substance or object into the animal's immediate environment that is likely either to be ingested or to contact and directly affect animal tissues (i.e., chemical substances), or a stimulus directed at an animal that may involve a risk to health or welfare or that may have an impact on normal function or behavior (i.e., audio broadcasts directed at animals that may affect behavior)." 50 C.F.R. § 216.3

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 3

encourage the development of the species. Further, these permits, when exercised, shall not operate to the disadvantage of the listed species.

Some of the previously approved and proposed research could occur within the boundaries of state or national wildlife refuges or parks. For example, the Alaska Maritime National Wildlife Refuge encompasses coastline, islands, reefs, etc. extending from southeast Alaska on the border of British Columbia to Cape Lisburne on the Chukchi Sea. Some islands within the refuge have restricted access in order to protect wildlife (including seabirds, Steller sea lions, and other mammals), and special use permits must be obtained from the U.S. Fish and Wildlife Service (USFWS). The previously approved permits contained a condition requiring permit holders to contact the USFWS to obtain the necessary permits for activities within the Refuge. Military clearance is required for access to Adak, Shemya, Amchitka, and Attu Islands in the Aleutian Chain.

A brief overview of the process for obtaining a Scientific Research Permit, including NOAA Fisheries regulations implementing the MMPA and ESA, can be found in Section 1.5.1 of the attached 2002 EA on the effects of research on Steller sea lions.

CHAPTER 2    ALTERNATIVES INCLUDING THE PROPOSED ACTION

This chapter describes the range of potential actions (alternatives) determined reasonable with respect to achieving the stated objective, as well as alternatives eliminated from detailed study. This chapter also summarizes the expected outputs of, and any related mitigation for, each alternative.

As discussed in Section 1.2 (and in more detail in Chapter 1 of the attached EA), substantial resources recently were dedicated to investigating the cause of the continued population decline and identifying conservation measures that can be taken to recover the species to a level where it can be removed from listing under the ESA. As a result, in November 2002 NOAA Fisheries issued five new scientific research permits and major amendments to two existing permits for takes of Steller sea lions throughout their range in North America. An additional three permit amendments were issued in January 2003 for additional studies involving takes of Steller sea lions in Alaska incidental to studies of killer whale predation on sea lions and other marine mammals.

A primary factor in determining whether to authorize intrusive research on marine mammals listed under the ESA is whether the information expected to be gained will contribute to fulfilling a research need or objective identified in the species recovery plan or will contribute significantly to identifying, evaluating, or resolving conservation problems for the species. The general research needs and objectives identified in the Final Recovery Plan for Steller Sea Lions (Steller Sea Lion Recovery Team 1992) included research to identify habitat requirements and areas of special biological significance, identify management stocks, monitor status and trends of sea lion abundance and distribution, monitor health, condition, and vital parameters, assess and minimize causes of mortality, and investigate feeding ecology and factors affecting energetic status. The Recovery Plan acknowledges that certain types of research activities, including capturing animals for attaching telemetry instruments or obtaining blood samples, are intrusive and cause disturbance. The Recovery Plan, therefore, recommends that such intrusive studies be conducted in conjunction with other activities, and that factors such as possible injury and mortality associated with disturbance and handling be considered when planning and conducting studies. By conducting multiple procedures on individual animals, the ASLC and other permit holders are balancing efforts to minimize the total number of sea lions affects against the potential cumulative affects on individual animals. Further, by combining activities such as scat collection with pup counts and branding operations, permit holders are attempting to minimze overall disturbance. The Recovery Plan encourages use of mitigation measures to minimize the impacts of research and recommends development of alternative, less intrusive, techniques for collecting data.

In addition to measures identified by researchers in their applications and otherwise considered "good practice", all NOAA Fisheries marine mammal research permits contain conditions intended to minimize the potential adverse effects of the research activities on the animals. These conditions are specific to the type of research authorized and the species involved. The conditions are based on information in the literature, and from the researchers themselves, about the effects of particular research techniques and the responses of animals to the activities. The attached 2002 EA describes the general conditions common to all permits for research on pinnipeds that are intended to minimize the potential negative effects of research. In addition to specific conditions regarding capture, handling and sampling protocols, the permits also contain conditions requiring researchers to coordinate with other permit holders to ensure

that the activities do not result in unnecessarily duplicative impacts or unnecessary harassment of animals. To implement the special mitigation measures of the FONSI for the attached 2002 EA, all permits for research on Steller sea lions contain additional requirements to minimize total research-related mortalities and develop research coordination and monitoring plan to ensure that research will not have a significant adverse impact. To further ensure that research under the 10 permits will not have a significant adverse impact, all permits for direct takes of Steller sea lions are limited in duration to two years to allow time for collection of additional information on the effects of research under the research coordination and monitoring plan.

In the last decade, a great deal of research has been conducted on a variety of aspects of Steller sea lion biology and ecology. During 1997-1999, the Steller Sea Lion Recovery Team conducted four peer-reviewed workshops to review research implemented under the Recovery Plan. The Recovery Team identified four subject areas to be dealt with in the workshops: land-based observational studies of behavior; telemetry studies; physiological studies; and feeding ecology studies. The discussion of the peer-reviewed workshop on telemetry studies concluded that the ability to determine feeding areas and cycles of Steller sea lions using telemetry was limited by the size of the tags, the ability to capture animals, problems with tag attachment, and limited ability to identity when and where animals are successfully feeding (NMFS 1997). A variety of new and developmental technologies were discussed, including use of implantable tags, such as those in the proposed amendment to ASLC's Permit No. 881-1668. The review panel for the telemetry workshop recommended that the effectiveness of implant methods be demonstrated using a properly designed experiment with an adequate sample size, and that a feasibility test could be performed using carcasses of California sea lions, elephant seals, and Steller sea lion pups. A scientific research permit (Permit No. 1034-1685) was issued to Dr. Markus Horning in April 2003 to conduct validation studies for the implantable tag using rehabilitated California sea lions. However, authorization to surgically implant the tags is pending approval of the tag size by the attending veterinarian at the Marine Mammal Center. NOAA Fisheries regulations implementing the ESA require consideration of whether the activity proposed for a permit to take endangered species for scientific purposes can be performed on an alternative non-endangered species or population (50 CFR §222.308). Consistent with these regulations, and the purposes and policies of the ESA, NOAA Fisheries has determined that studies to validate the effectiveness of this new tag should not be conducted on Steller sea lions. Therefore, NOAA Fisheries is not proposing to authorize the ASLC to implant these tags into Steller sea lions at this time, and authorization to implant these tags in Steller sea lions will be contingent upon the results of this validation study in California sea lions.

## 2.1    Alternative 1 – No Action Alternative

Under this alternative, which is the "status quo" alternative, the permits held by the ASLC and Dr. VanBlaricom would not be amended. However, research would continue under these permits as is currently authorized and all takes of Steller sea lions presently authorized under the other 11 existing permits would also continue until the permits expire. See Table 1 for permit holders and expiration dates. These 13 permits combined currently authorize takes of Steller sea lions throughout their range in the U.S. (including California, Oregon, and Alaska) by a variety of research activities involving both level A and level B harassment, as defined under the MMPA. The permits held by Mystic Aquarium (Permit No. 42-1642-02), John Wise (Permit No. 1008-1637-00) and ASLC (Permit No. 881-1443-06) for research and enhancement activities on Steller sea lions are not considered in the cumulative impacts of scientific research

11

on Steller sea lions because they do not involve additional direct takes of sea lions in the wild, but rather rely on captive animals and blood and tissue samples collected in the field by other permit holders during their permitted activities. Table 2 illustrates the numbers of sea lions authorized to be taken by various activities under these permits. A description of the methods for each activity can be found in Section 2.1.1 of the attached 2002 EA. Details of the various protocols can also be found in the applications submitted by the permit holders.[7]

No permits authorize intentional lethal takes of Steller sea lions. However, in acknowledgement of the fact that there is an inherent risk of serious injury and mortality associated with certain research activities on wild animals, all permits allow for a limited number of research-related unintentional, or incidental, mortalities. A total of 50 incidental mortalities per year (all age and sex categories) are authorized, with not more than 20 from the western population. Consistent with the broad definitions of "take" under the MMPA, ESA, and the implementing regulations of these acts, this permit condition has been interpreted by the Office of Protected Resources to include any mortality resulting from the actions or presence of the researchers while conducting permit-authorized activities. This has included, but is not limited to: deaths of pinniped pups by starvation following abandonment resulting from disturbance to a rookery or the research-related death of a lactating female; deaths of marine mammals due to adverse reactions to anesthetics or other chemical agents; deaths of marine mammals caused or precipitated by infections resulting from intrusive research procedures; deaths of animals due to capture myopathy resulting from the stress of capture and handling; and deaths of animals due to serious injuries sustained in attempts to escape or evade capture or in response to stampedes or aggressive social interactions caused by research activities.

The number of incidental mortalities allowed is based on the permit holders' estimate of the potential for such mortalities. As a mitigation measure for the Finding of No Significant Impact for the 2002 EA, not more than 20 incidental mortalities per year can be from the western, or endangered, population under any combination of permits. To further ensure that research-related mortalities do not rise to a level that could be significant, research under all permits authorizing takes of Steller sea lions must cease, pending review by NOAA Fisheries, if the total number of mortalities from the western population reaches 10, under any combination of permits. To date, no mortalities have been reported for research conducted under the permits and permits amendments issued following the 2002 EA.

---

[7] The applications are available upon request from the NMFS Office of Protected Resources, Division of Permits, Conservation and Education, 1315 East-West Highway, Silver Spring, MD 20910.

**Table 1: Current Permits for Research on Steller Sea Lions**

| Permit Number | Permit Holder | Expiration Date |
|---|---|---|
| 662-1345-04 | Dena Matkin | May 31, 2003 |
| 473-1433-04 | Janice Straley | November 30, 2003 |
| 545-1488-01 | North Gulf Oceanic Society (NGOS) | March 31, 2004 |
| 881-1443-06 | Alaska SeaLife Center (ASLC) | March 31, 2004 |
| 881-1668-01 | Alaska SeaLife Center | December 31, 2004 |
| 434-1669-01 | Oregon Dept. Fish & Wildlife (ODFW) | December 31, 2004 |
| 800-1664-01 | Randall Davis | December 31, 2004 |
| 1016-1651-01 | Glenn VanBlaricom | December 31, 2004 |
| 1010-1641-00 | Aleutians East Borough (AEB) | December 31, 2004 |
| 782-1532-02 | National Marine Mammal Laboratory (NMML) | December 31, 2004 |
| 358-1564-05 | Alaska Dept. Fish & Game (ADF&G) | June 30, 2005 |
| 42-1642-02 | Mystic Aquarium | October 15, 2006 |
| 1008-1637-00 | John Wise | October 31, 2006 |
| 715-1475-00* | Andrew Trites | March 31, 2004 |

* This permit is effectively inactive at present because takes were only authorized through 2002 pending receipt of specific protocols for additional research.

**Civ. No. 05-1392 (ESH)**
**Defendants' Exhibit 3**

**APPENDIX B: DECISION MEMO REGARDING ISSUANCE OF PERMITS**

NOV 1 2 2002

| | |
|---|---|
| MEMORANDUM FOR: | F/PR - Donald R. Knowles |
| FROM: | F/PR1 - Eugene T. Nitta |
| SUBJECT: | Report on the Applications for Scientific Research Permits and Amendments to Scientific Research Permits to take Steller Sea Lions [Permit Numbers 358-1564 and 782-1532; File Numbers 1016-1651, 1010-1641, 800-1664, 881-1668, and 434-1669]: Recommendation for Issuance |

### Abstract: Permit No. 358-1564

**The Alaska Department of Fish & Game (ADF&G), Juneau, Alaska 99802-5526 (PI: Dr. Thomas Gelatt)** requests a major amendment to scientific research Permit No. 358-1564. Permit No. 358-1564 authorizes the permit holder to take Steller sea lions of all ages and both sexes over a 5-year period in Alaska and British Columbia by aerial/boat surveys, capturing, handling, tagging, blood/biopsy sampling, branding, and accidental mortality. The permit holder requests authorization to administer Evans blue dye, collect additional blood and tissue samples from, and attach additional/different scientific instruments to Steller sea lions already authorized to be captured and handled, increase the frequency of aerial surveys and recaptures for purposes of scientific research, and increase the number of accidental mortalities.

### Chronology

| | |
|---|---|
| May 21, 2001 | Date of application - Part 1 |
| June 15, 2001 | Application - Part 1 received complete |
| July 5, 2001 | Application - Part 1 distributed |
| July 5, 2001 | Application - Part 1 published in the Federal Register |
| July 30, 2001 | Marine Mammal Commission comments received on application - Part 1 |
| August 6, 2001 | Close of public comment period |
| December 18, 2001 | Date of application - Part 2 |
| December 28, 2001 | Application - Part 2 received complete |
| February 21, 2002 | Date of application - Part 3 |
| March 5, 2002 | Application - Part 3 received complete |
| June 21, 2002 | FONSI for Environmental Assessment on the Effects of NMFS Permitted Scientific Research Activities on Threatened and Endangered Steller Sea Lions signed by Assistant Administrator for Fisheries |
| June 27, 2002 | Application - Parts 2 & 3 published in the Federal Register |
| June 28, 2002 | Application - Parts 2 & 3 distributed |
| July 3, 2002 | Section 7 consultation requested |
| July 29, 2002 | Close of public comment period |



AR 390

**Civ. No. 05-1392 (ESH)**
**Defendants' Exhibit 3**

2

August 2, 2002          Additional Marine Mammal Commission comments received
November 7, 2002      Biological Opinion issued

### Abstract: Permit No. 782-1532

**The National Marine Mammal Laboratory (NMML), National Marine Fisheries Service, NOAA, Seattle, WA 98115-0070 (PI: Dr. Thomas Loughlin)** requests a major amendment to scientific research Permit No. 782-1532. Permit No. 782-1532 authorizes the permit holder to take Steller sea lions of all ages and both sexes over a 5-year period in Alaska, California, Washington, and Oregon by aerial/boat surveys, capturing, handling, tagging, blood/biopsy sampling, branding, and accidental mortality. The permit holder requests authorization to increase the frequency of takes by aerial surveys, include Southeast Alaska in monthly surveys, increase the number of animals to be incidentally harassed during scat collection, and increase the number of accidental mortalities. Additional procedures for animals already authorized for capture, including using gas anesthesia, branding of any animal captured, injecting Evans blue dye and deuterated water, collecting additional blood and tissue samples, and using bioelectric impedance analysis are also requested.

### Chronology

May 4, 2001            Date of application - Part 1
May 23, 2001          Application - Part 1 received complete
June 7, 2001           Application - Part 1 distributed
June 8, 2001           Application - Part 1 published in the <u>Federal Register</u>
July 9, 2001            Close of public comment period
July 30, 2001          Marine Mammal Commission comments received on application - Part 1
December 14, 2001   Date of application - Part 2
December 21, 2001   Application - Part 2 received complete
June 21, 2002          FONSI for Environmental Assessment on the Effects of NMFS Permitted
                             Scientific Research Activities on Threatened and Endangered Steller Sea
                             Lions signed by Assistant Administrator for Fisheries
June 27, 2002          Application - Part 2 published in the <u>Federal Register</u>
June 28, 2002          Application - Part 2 distributed
July 3, 2002            Section 7 consultation requested
July 29, 2002          Close of public comment period
August 2, 2002        Additional Marine Mammal Commission comments received
November 7, 2002    Biological Opinion issued

### Abstract: File No. 1010-1641

**The Aleutians East Borough, Juneau, Alaska 99801 (PI: Kate Wynne)** requests a scientific research permit to take Steller sea lions by harassment during aerial surveys, vessel-based behavioral observations, and scat collection. The purpose of the research is to provide additional information on seasonal prey consumption by Steller sea lions through scat collection at rookeries and haulouts along the Alaska Peninsula and Eastern Aleutian Islands and to improve

3

the accuracy and precision of population indices through expanded aerial and vessel surveys in the western Gulf of Alaska.

## Chronology

| | |
|---|---|
| July 9, 2001 | Date of application |
| August 15, 2001 | Application received complete |
| August 20, 2001 | Application distributed |
| August 22, 2001 | Application published in the Federal Register |
| September 21, 2001 | Close of public comment period |
| October 17, 2001 | Marine Mammal Commission comments received on application |
| June 21, 2002 | FONSI for Environmental Assessment on the Effects of NMFS Permitted Scientific Research Activities on Threatened and Endangered Steller Sea Lions signed by Assistant Administrator for Fisheries |
| July 3, 2002 | Section 7 consultation requested |
| August 2, 2002 | Additional Marine Mammal Commission comments received |
| November 7, 2002 | Biological Opinion issued |

## Abstract: File No. 1016-1651

**Dr. Glenn VanBlaricom, Washington Cooperative Fish and Wildlife Research Unit, School of Aquatic and Fishery Sciences, University of Washington, Seattle, WA 98195** requests a scientific research permit to take threatened and endangered Steller sea lions in the Aleutian Islands, Gulf of Alaska, and southeast Alaska by remote biopsy darting, incidental harassment, and accidental mortality, to collect blubber samples for analysis to assess prey selection. Some samples will be exported to Canada for analysis. Northern fur seals (*Callorhinus ursinus*) and harbor seals (*Phoca vitulina richardsi*) may be incidentally harassed during biopsy sampling.

## Chronology

| | |
|---|---|
| September 5, 2001 | Date of application |
| November 30, 2001 | Application received complete |
| June 21, 2002 | FONSI for Environmental Assessment on the Effects of NMFS Permitted Scientific Research Activities on Threatened and Endangered Steller Sea Lions signed by Assistant Administrator for Fisheries |
| June 27, 2002 | Application distributed |
| June 27, 2002 | Application published in the Federal Register |
| July 3, 2002 | Section 7 consultation requested |
| July 29, 2002 | Close of public comment period |
| August 2, 2002 | Marine Mammal Commission comments received on application |
| September 18, 2002 | Applicant responses to comments received |
| November 7, 2002 | Biological Opinion issued |

4

### Abstract: File No. 800-1664

**Dr. Randall Davis, Department of Marine Biology, Texas A&M University, Galveston, TX 77551** requests a scientific research permit to take threatened and endangered Steller sea lions in Alaska by capture, anesthesia, hot-branding, tissue sampling (including blood, skin, and blubber), attachment of scientific instruments (video system/data logger and satellite transmitters), and accidental mortality to compare hunting behavior and three-dimensional movements of free-ranging adult females (including pregnant animals) and juveniles of both sexes at various rookeries, as it relates to prey preferences and predator-prey relationships.

### Chronology

| | |
|---|---|
| January 16, 2002 | Date of application |
| February 8, 2002 | Application received complete |
| June 21, 2002 | FONSI for Environmental Assessment on the Effects of NMFS Permitted Scientific Research Activities on Threatened and Endangered Steller Sea Lions signed by Assistant Administrator for Fisheries |
| June 27, 2002 | Application distributed |
| June 27, 2002 | Application published in the <u>Federal Register</u> |
| July 3, 2002 | Section 7 consultation requested |
| July 29, 2002 | Close of public comment period |
| August 2, 2002 | Marine Mammal Commission comments received on application |
| September 16, 2002 | Applicant responses to comments received |
| November 7, 2002 | Biological Opinion issued |

### Abstract: File No. 881-1668

**The Alaska SeaLife Center (ASLC), Seward, Alaska 99664 (PI: Don Calkins)** requests a scientific research permit to take threatened and endangered Steller sea lions in Alaska by capture, hot-branding, flipper tagging, collection of blood and tissue samples from, attachment of external scientific instruments to, implanting scientific instruments in, holding in captivity for up to 3 months, conducting controlled feeding and endocrinology experiments on, accidental mortality, and harassment incidental to these activities and remote monitoring. The overall purpose of the research is to collect information on the health status, physiology, life history, foraging behavior and habitat use of Steller sea lions. Implanting of scientific instruments, holding in captivity, and conducting controlled feeding and endocrinology experiments are not being considered for authorization at this time due to their complex and controversial nature. Consideration of authorization of these activities is contingent upon further environmental analyses and receipt of information on tag validation studies to be conducted under a separate permit.

### Chronology

| | |
|---|---|
| March 11, 2002 | Date of application |
| April 24, 2002 | Application received complete |

5

| | |
|---|---|
| June 21, 2002 | FONSI for Environmental Assessment on the Effects of NMFS Permitted Scientific Research Activities on Threatened and Endangered Steller Sea Lions signed by Assistant Administrator for Fisheries |
| June 27, 2002 | Application distributed |
| June 27, 2002 | Application published in the Federal Register |
| July 3, 2002 | Section 7 consultation requested |
| July 29, 2002 | Close of public comment period |
| August 2, 2002 | Marine Mammal Commission comments received on application |
| September 9, 2002 | Applicant responses to comments received |
| November 7, 2002 | Biological Opinion issued |

### Abstract: File No. 434-1669

**The Oregon Department of Fish and Wildlife (ODFW), Corvallis, Oregon 97330 (PI: Robin Brown)** requests a scientific research permit to take threatened Steller sea lions in California, Washington, and Oregon by capture, hot-branding, flipper tagging, collection of blood and tissue samples from, attachment of external scientific instruments to, harassment incidental to these activities and remote monitoring, and accidental mortality. The purpose of the research is to continue monitoring the status of the Alaskan Steller sea lion population and to identify causes of the population decline so as to provide for the population's recovery.

### Chronology

| | |
|---|---|
| March 11, 2002 | Date of application |
| April 24, 2002 | Application received complete |
| June 21, 2002 | FONSI for Environmental Assessment on the Effects of NMFS Permitted Scientific Research Activities on Threatened and Endangered Steller Sea Lions signed by Assistant Administrator for Fisheries |
| June 27, 2002 | Application distributed |
| June 27, 2002 | Application published in the Federal Register |
| July 3, 2002 | Section 7 consultation requested |
| July 29, 2002 | Close of public comment period |
| August 2, 2002 | Marine Mammal Commission comments received on application |
| November 7, 2002 | Biological Opinion issued |

### Comments on All Applications

**The Marine Mammal Commission (MMC)** recommended that NMFS defer final action on the permit applications pending (1) receipt and review, in consultation with the Commission, of supplemental information that addresses the issues discussed in their comments (attached); and (2) clarification, in response to the Commission's comments, of the basis for the Service's finding that the proposed activities, if authorized, would not result in a significant impact to Steller sea lions. Upon resolution of these questions and concerns, the Commission recommends that the Service grant approval of the requested activities, subject to the following conditions:

6

- the researchers take steps to minimize disturbance of the subject animals by exercising caution when approaching animals, particularly mother-pup pairs, and halt an approach if there is evidence that the activity may be interfering with pair bonding, nursing, feeding, or other vital functions;

- all branding activities be accompanied by effective programs to monitor their short- and long-term effects;

- whenever possible, new invasive research procedures be tested on non-listed otariid species and on captive Steller sea lions before they are used on sea lions in the wild to ensure that the proposed techniques can be employed safely;

- surgical implants of instruments be performed by experienced marine mammal veterinarians, and the animals be fully recovered from the anesthesia and exhibiting no ill effects of the surgery prior to release;

- an experienced marine mammal veterinarian be present in the field to carry out or to provide direct on-site supervision of all activities involving anesthesia of animals;

- surgical implantation of instruments be immediately suspended, until reauthorized by the Service, in the event that two animals die or are injured during or following the surgery and the mortality or injury can reasonably be attributed to that activity;

- the Service, in consultation with the applicants, review the basis for the numbers of accidental mortalities requested and provide reasonable justification for the number that can occur annually before research activities must be suspended. It may be useful, as part of such review, to examine the data concerning the number of accidental mortalities authorized and the number of animals actually killed during permitted Steller sea lion research over the past five years. On a related matter, in the event that a lactating female is killed or seriously injured as a result of the activities, the female's orphaned pup should be humanely provided for (i.e., salvaged and cared for, or if salvage is not possible, euthanized);

- inasmuch as the use of a crossbow for biopsy sampling has not been previously used on Steller sea lions, the Service be satisfied that the individual(s) carrying out the biopsy sampling are sufficiently experienced and the technique and equipment have been adequately tested prior to authorizing the activity on animals in the field;

- the proposed studies have been reviewed by the permittee's Institutional Animal Care and Use Committees in accordance with § 2.31 of the Animal and Plant Health Inspection Service's regulations governing the humane handling, care, treatment, and transportation of marine mammals;

- the Service ensure that activities to be conducted under these permits and those of other permit holders who might be carrying out research on the same species in the same areas

7

arc coordinated and, as possible, data are shared to avoid unnecessary duplication of research and disturbance of animals; and

- as appropriate, the applicants obtain the necessary permits under the Convention on International Trade in Endangered Species of Wild Fauna and Flora prior to importing or exporting tissue samples into or from the United States.

**Response to MMC comments:** Due to the time-sensitive nature of the permit requests, NOAA Fisheries did not forward additional comments to the MMC for consideration. However, the responses of applicants for File Nos. 1016-1651, 800-1664, and 881-1668 to the comments from the MMC are attached. The applicants have responded to the satisfaction of the NOAA Fisheries. In addition, the permits contain conditions that address the above concerns of the MMC, including measures intended to minimize the potential for adverse impacts and unnecessary duplication overall. The applicant for File No. 434-1669 did not respond, however, the permit has been conditioned to address the concerns expressed regarding activities in that application. There were no comments specific to Permit Nos. 358-1564 and 782-1532 that required responses from the Permit Holders.

**The U.S.D.A. Animal and Plant Health Inspection Service (APHIS)** provided comments on application File No. 881-1668 (ASLC). The APHIS states it cannot recommend approval of the requested permit until the following concerns about the application are addressed:

- The facilities proposed do not meet the space requirements found in Section 3.104 of 9 CFR.

- APHIS cannot approve facilities that are not yet built. The proposed size of pools would be too small to meet space requirements without a variance and there is no medical or study-related reason for such a variance.

- The protocols presented should not be approved by the respective IACUCs under the AWA unless the principal investigators have done the appropriate literature searches for alternatives to painful and distressful procedures, protocols are in place for pre- and postoperative care, and it is clarified that only qualified veterinarians will be performing surgical and sampling procedures other than blood draws.

- The alternative searches must include looking for alternatives to the intraperitoneal implant of the tracking device, using anesthesia for blood sampling and hot branding. APHIS cannot support hot branding of marine mammals unless it is shown that there is no alternative. Cold branding and other methods must be considered.

- It is not apparent what animals would be subject to multiple protocols. All animals should be identified as to which protocols they would be subjected to.

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 3

8

- APHIS remains concerned about any protocol that calls for fasting of an animal. Such experiments are noncompliant with the AWA requirements for animals to be provided full ration of food and water daily, unless there is an approved protocol with definite endpoints.

- APHIS remains concerned about the use of anesthesia when doing hormonal studies because the risk to the animal is usually greater than the potentially flawed data obtained.

- APHIS remains concerned about blood collection techniques in light of the past necropsy report of peri-puncture hemorrhage that contributed to the death of a marine mammal.

- The proposed transportation arrangements for the animals is not currently compliant with the AWA.

**Applicant response:** The activities of primary concern to APHIS relate to temporary captivity and associated studies. These activities are not being considered for authorization at this time, as noted above. The applicant for File No. 881-1668 has provided responses to the comments from the APHIS (see attached). The NMFS is satisfied with the applicant's responses. In addition, the permit contains conditions to address many of these concerns, including proper IACUC reviews and space requirements.

**Public Comments:** Substantial comments were received from the Humane Society of the United States (HSUS), the Trustees for Alaska (representing Greenpeace, Oceana, Sierra Club, and The Ocean Conservancy), and a qualified veterinarian, regarding the applications for permits and permit amendments. Their complete comments are attached; the following is a summary of the main issues and concerns raised.

**HSUS Comments:** The HSUS agrees that it is critical to develop a better understanding of the causative factors in the declines of Steller sea lions; however, it is not clear that there has been adequate coordination of the various research proposals, nor is it clear that the proposals meet all of the conditions stipulated in the MMPA. Of the three alternatives provided in the EA, HSUS favors Alternative 3, reallocating intrusive research so that only the eastern portion of the stock would be affected unless a project was directly related to conservation and management needs for that stock. The HSUS does not agree that the finding of negligible impacts, particularly for the western stock, is well founded. The HSUS general and specific comments are summarized as follows:

(1) Compliance with issuance criteria: While individual permit applications may comply with some or all of the permit issuance criteria specified at 50 CFR 216.34, it is not clear that these proposals, in sum, can comply with all of them, particularly regarding ensuring humaneness and avoiding significant adverse impacts on marine mammal species or stocks. The HSUS recommended that at least all or part of two of the seven permit applications be denied based on these issuance criteria.

(2) Monitoring and Coordination: There is apparent duplication in sampling, and it is not clear how NMFS can ensure compliance with permit issuance criteria given that it will only develop a monitoring plan after the permits have been issued and research is underway. The time for developing a plan to monitor potential effects is before the research is undertaken.

9

It is not clear whether or how a 5-year permit will be halted to allow evaluation of longer-term effects. It is clear that a plan to monitor lethal and sub-lethal effects is not in place at this time. The number of animals that will be harassed/disturbed by the various projects is enormous; harassing this large a number of endangered or threatened species should not be taken lightly. The proposed monitoring plan described in the EA does not appear to consider the stress of the cumulative effects of being captured multiple times, and of being harassed during survey activities and scat collection on rookeries.

(3) Research related mortality: There appears to be an unacceptably high level of stress and mortality allowed for a stock that is already declining in many parts of its range. It is not clear whether NMFS' proposal to force consultation among researchers to assure that not more than 20 animals are incidentally killed will be time-sensitive or whether consultation will take place before the number is exceeded given that a monitoring plan does not appear to be in place. NMFS' argument that these 20 mortalities per year from the western stock represent less than 10% of the PBR and are therefore negligible, does not appear to account for the other potential sources of mortality for that stock (i.e., native harvest and fisheries related mortality). The MMPA did not intend for each user to have access to the entire PBR (nor one assumes the entire number defining the uppermost bound of negligible impact) such that the cumulative impact is well over PBR. The most conservative estimate for mortality from harvest and fisheries interactions is 199 animals per year from the western stock, which is only 9 less than the entire PBR. If scientific permit-related mortalities for this stock can reach 10 (the number that merely triggers consultation among permit holders), then the entire PBR will have been exceeded. The HSUS feels that insufficient attention was given to consideration of post-capture myopathy in the EA.

(4) Specific comments on application to amend Permit No. 358-1564 (ADF&G): The activities under this permit are Alaska-wide and therefore likely to overlap with other proposed permitees, allowing multiple sampling of animals unless there is strict coordination. The HSUS suggests that the ADF&G spend more effort trying to re-sight branded animals and analyze the information from re-sighting, rather then continuing to brand animals. If continued or additional branding is authorized, the applicant must be required to monitor post-branding effects and provide evidence of little or no effects of their various activities on rookeries.

(5) Specific comments on application to amend Permit No. 782-1532 (NMML): The HSUS reiterates their concern, expressed in the specific comments on Permit No. 358-1564, about the effects of hot branding, specifically on pups. The HSUS points out that the recovery time for animals immobilized using gas anesthesia (fully recovered within 8 hours) is longer than the period of time that animals will be observed under this permit. Without post-release monitoring, the fate of these animals, if released prior to 8 hours, will apparently be unknown. The HSUS reiterates that the applicant should institute a post-capture monitoring program and assessment of condition.

(6) Specific comments on application File No. 1016-1651 (Dr. VanBlaricom): The HSUS states that it should be mandatory that the proposed collection of biopsy samples under this permit be done in conjunction with NMML and ADF&G to avoid duplicative sampling of animals.

(7) Specific comments on application File No. 800-1664 (Dr. Davis): It is not entirely clear why Dr. Davis, who is receiving funding from two other permit applicants (NMFS and ASLC) cannot conduct his activities under the auspices of their permits rather than seeking

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 3

10

separate take authorizations to avoid duplicative sampling or harassment wherever possible. The research related mortality rate of 20% for this proposed permit seems unacceptably high, particularly for juveniles. While underwater videotaping may be interesting, HSUS does not believe it is critical to understanding the foraging issues facing Steller sea lions. While there may be some justification for some of the ancillary tagging proposed in this application, it is not clear why this is not duplicative information. In light of the extremely high mortality rates, HSUS does not see that the justification for this permit outweighs the potential risk to animals, as would be required under the MMPA and ESA.

(8) Specific comments on application File No. 434-1669 (ODFW): While it is not clear why it is necessary to change the lead agency for the research already authorized under Permit No. 782-1532, the HSUS does not oppose the change and feels that the ODFW has demonstrated that they are the sole research group studying the Steller sea lion population in California, Washington and Oregon. The HSUS believes that NMFS should request post-capture monitoring of survival and re-sighting to fill apparent gaps in understanding this sort of information.

(9) Specific comments on application File No. 881-1668 (ASLC): Although they support the remote videotaping and the proposed demonstration of the efficacy of a floating trap that could be used as an alternative to chemical immobilization, the HSUS has grave concerns regarding this application and does not support the portions relating to capturing and holding animals for testing. Cumulative impacts of the projects proposed by the ASLC are not addressed in the EA. The HSUS reiterates their concerns regarding the use of anesthesia and post monitoring. There is no discussion about capture myopathy or death associated with anesthesia for the proposed surgically implanted transmitters. The HSUS questions the value of some of the information gained from live captured animals that are caged in either 12' or 20' diameter pens and subjected to constant testing, with regard to making reasonable conclusions about wild animals. The HSUS questions whether the stress responses of animals maintained under different conditions (e.g., space constraints and number of conspecifics in the cage) over the course of the permit will be the same and is concerned that data may therefore be compromised. The HSUS also believes that it is disingenuous for the applicant to claim that "all efforts will be taken to minimize exposure to humans," when the animals are being subjected to continual sampling and at least 8 of the animals will be subjected to highly stressful fasting or hormone "challenges." The HSUS finds that the proposed rate of research related mortality for this application (18% over three months) is unacceptably high for animals in a captive facility and that the level is far from humane or negligible. The HSUS therefore recommends that the portions of the permit related to capturing and holding animals for testing be denied.

**The Trustees for Alaska (Greenpeace, Oceana, Sierra Club, and the Ocean Conservancy) Comments:** The Trustees for Alaska support legitimate research into the causes of the decline of endangered Steller sea lions. However, they state that, in order to insure the survival and recovery of this species, it is vital that we act in a precautionary manner while gathering data that will contribute to our understanding of its life history and the role that various factors have played, or are playing, in the decline. Because of the scope of the research initiative and the anticipated impacts on great numbers of animals in threatened and endangered populations, it is essential that all direct, indirect and cumulative impacts of the research program are carefully evaluated and all projects are shown to be essential for the conservation of

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 3

11

the species. The general and specific comments and concerns expressed by the Trustees for Alaska are summarized as follows:

(1) NMFS has not demonstrated that the impacts of the proposed action will be insignificant or satisfy all permitting criteria. The Trustees are concerned that substantial direct, indirect, and cumulative effects of the proposed action in Alternative 2 of the EA may result in further jeopardy to the species. NMFS is frequently arguing from the absence of evidence (due to an inability to measure it or a failure to try) to an assumption of no harmful effects.

(2) NMFS has not shown that all projects and procedures in the proposed action are necessary and essential to the conservation of Steller sea lions. There are specific research proposals (e.g., the capture and long-term retention of wild animals as proposed by ASLC for surgical implantation of devices) that should not be permitted as described. The Trustees have major concerns about the efficacy of the experimental protocols, sampling regimes, and statistical power to detect effects, as well as the ability of NMFS to coordinate and synthesize the data generated by such a large research program involving many different agencies.

(3) The EA does not address the absolute need for an accompanying monitoring program to assess the effects of research on the threatened and endangered populations, as recommended by the Marine Mammal Commission in a letter dated July 27, 2001 addressing the proposed amendments to the NMML and ADF&G permits. An adequate monitoring program should enable NMFS to suspend permits if subsequent information indicates that the research impacts are unacceptable or are exceeding the number of mortalities and injuries authorized under the permit.

(4) The Trustees concur with the MMC's assessment of the projects, as outlined in the above mentioned July 27, 2001 letter, and conclude that the EA analysis is not adequate to distinguish between projects that merit permitting and those that are unnecessary, duplicative, inhumane, or in violation of other established permitting criteria.

(5) The Trustees have concerns about the scope of the EA: it appears that the analysis of various research activities is being piecemealed whereas the direct, indirect, and cumulative effects of all research activities should be analyzed in a single NEPA document.

(6) The cumulative effects analysis in the EA is internally confused and appears to be inadequate. The cumulative effects analysis needs to consider the effects of research stress being added to nutritional stress.

(7) The ASLC proposed project that entails capture and retention of wild juvenile sea lions for up to 3 months, during which time "life-history transmitters" would be surgically implanted, is a highly experimental and unvalidated technique. Using animals from an endangered population as guinea pigs to test the viability of the surgical implantation technique is not an appropriate form of research and should not be permitted at this time.

(8) The rationale for techniques such as tooth extraction and attachment of flipper tags, which may result directly or indirectly in increased mortality due to infection, illness, reduced foraging success or increased predation, is not evaluated in detail. No studies have been conducted that would allow NMFS to conclude that the effects of these practices are insignificant or benign.

(9) The Trustees have serious doubts about the usefulness of additional branding in the absence of a long-term monitoring/resighting component. The potential for harm from hot-branding large numbers of pups and young juveniles may be outweighed by the benefits to be gained from the ability to identify animals across multiple years, but only if there is a long-term

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 3

12

commitment to monitor the status of branded animals.

(10) Given the endangered and declining status of the western stock of Steller sea lions and concerns about the potential for increased killer whale predation on sea lions, NMFS should more carefully evaluate the extent to which research procedures may increase the incidence of infection, diseases and/or predation on test animals that are subjected to repeated stress and disturbance, immobilizing drugs, anesthesia, tooth extractions, biopsies, branding, attachment of instruments, or even long-term captivity and surgical implantation of experimental monitoring devices. That analysis and consideration is largely absent from the EA and adverse effects are largely dismissed based on a lack of evidence or lack of study.

(11) The Trustees underscore the concerns expressed previously by the Steller Sea Lion Recovery Team's peer-review workshops, which noted a lack of integrated research, poor condition of existing research projects, as well as serious limitations in experimental protocols, sample sizes, and statistical power to detect effects. The EA should have addressed these concerns and evaluated the degree to which proposed action will or will not remedy the limitations and shortcomings identified by peer reviewers of the existing research program.

(12) As a matter of NEPA process, the Trustees are concerned that NMFS issued the Final EA and signed the FONSI on this project without any involvement by the public. Accordingly, they urge NMFS to withdraw the FONSI and to issue a revised EA or EIS that takes into account the comments received on this document.

(13) Based on their analysis of the proposed action, the Trustees are concerned that there is a real risk that some of this research will simply cause unnecessary disturbance and increase mortality on the endangered stock without contributing significantly to the conservation of Steller sea lions. The Trustees recommend that NMFS withhold new or amended permits pending further evaluation of the research program in a substantially expanded EA or an EIS and consultation with the Steller Sea Lion Recovery Team.

**Kimberlee Beckman, D.V.M., Ph.D.** submitted substantial comments on application File No. 1016-1651 (Dr. VanBlaricom). Dr. Beckman is a wildlife veterinarian with extensive experience in performing blubber biopsies on four species of pinnipeds and has the necessary expertise to render an expert opinion on the techniques proposed in the application. Although Dr. Beckman supports the scientific research goals of the study, she expressed serious concerns about the impact of the actual darting technique on the health and well-being of juvenile and adult female Steller sea lions.

(1) The reference cited for the safety of the technique only used the dart on territorial adult male pinnipeds; it was not tested for safety in females or juveniles of any species. Given the thickness of the skin and underlying blubber layer in females and juveniles, particularly thin animals, and the ballistic force compression of the blubber layer due to the forward directed force of the flying dart, the dart will penetrate deeply into the muscle layer of these animals. Although muscle can be safely biopsied under controlled circumstances, it is quite risky to the animal without exact control over where the dart is placed.

(2) If the dart hits an area of the body overlaying the abdominal cavity or the thorax, serious and perhaps fatal injuries could occur which are not addressed in the application. The length of the dart, even without the additional ballistic compression, means that penetration of the peritoneal cavity or the pleural cavity is a risk. Penetration of either cavity will not kill the animal instantly (unless it hits the lung and lacerates a pulmonary vessel); if the viscera are

13

lacerated, the animal may die days later. If the dart penetrates or injures an artery within a muscle belly or a large superficial vessel such as the jugular vein, a fatal exsanguination [loss of blood] could occur within several hours. The application does not address this possibility.

(3) Accidental lethal takes are requested but there is no description of how animals will be monitored or assessed after darting or for how long. In the event of death, there is no indication that a necropsy will be performed to determine what occurred and how it might be prevented in the future, nor is there mention of tissue sampling/archiving.

(4) The risk of how a misplaced firing might impact the pup of a lactating female is not addressed, nor is the possibility of inadvertently hitting and injuring a young pup addressed. If the dart penetrates the mammary gland, the milk pouring from the wound and leaking into the underlying tissues could create a serious inflammatory reaction that would not only affect the health of the female but also the survival of the pup if the female develops mastitis [inflammation of the mammary gland].

**Response to public comments:**

- Note that the ASLC is not proposing to begin the controversial tag implant studies at this time, pending completion of a tag validation study to be conducted on California sea lions under another permit. In addition, NOAA Fisheries has deferred authorization of the tag implantation, as well as the proposed temporary captivity and associated studies pending further environmental analyses.

- NMFS Response to comments on Finding of No Significant Impact and compliance with issuance criteria: NMFS has assessed the effects of the increased scope of the research activities on Steller sea lions and, based on this assessment, and as indicated in Sections 2 and 4 of the Environmental Assessment, believes the activities to be conducted under the Proposed Action neither result in a significant increase in the level of take over the status quo such that an EIS is required, nor does the proposed action increase the level of takes such that the categorical exclusion made in previous determinations under NEPA should be altered (Sections 2.2, 4.1-4.6). The measures contained in this action may be controversial because some sectors of the public oppose some of the methodologies used in the proposed action. However, the most controversial of the methodologies [hot branding] is a minor component of the proposed action (See Chapter 4 of EA). Due to the recent jeopardy determination on the effects of the Bering Sea/Gulf of Alaska groundfish fisheries and the FY2001 congressional appropriations for the implementation of Steller sea lion protective measures, there is a heightened expectancy that the results from permitting research under the Proposed Action will provide information necessary such that the conservation and management of Steller sea lions might eventually result in a reduced impact on the commercial fisheries. In this regard the "Steller Sea Lion" issue, including the release of these permits, might be considered controversial. However, the need for the research outlined in the proposed action are recognized by all public sectors as being essential. In that regard, while the issue may be controversial, the issuance of these permits is not.

Further, a Biological Opinion analyzing the impacts of proposed action - the issuance of scientific research permits as identified in the EA - on Steller sea lions was issued by NMFS. NMFS has determined that the status quo alternative would not pose

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 3

14

harm to a listed species, nor would it result in jeopardy or adverse modification of critical habitat for Steller sea lions.

- NMFS response to comments on mortality: Although the definition of PBR is included in the MMPA, NMFS implemented the definition of PBR for endangered species in a more conservative manner. NMFS used a default value for a recovery factor of 0.1 for endangered species of marine mammals in calculating a PBR. This default value in the PBR calculation would reserve 90% of annual net production for recovery of endangered species and allow only 10% of annual net production to be authorized for taking incidental to human activities. NMFS concluded that keeping human-caused mortality at or below PBR calculated with a recovery factor of 0.1 would increase the recovery time of endangered marine mammals by no more than 10%, and this conclusion was supported by extensive simulation modeling at a later date (Wade, P.R. 1998. Calculating limits to the allowable human-caused mortality of cetaceans and pinnipeds. Marine Mammal Science 14:1-37). Research-related mortality at a level of 20 sea lions per year or less would not have an appreciable impact on the trend of the western stock and would not appreciably affect its prospects for recovery. Therefore, allowing a research accidental mortality limit of up to 20 sea lions per year would have a negligible impact on the western stock of Steller sea lions regardless of other human-caused mortality affecting the stock.

- NMFS response to comments on research coordination and need for monitoring: The permits contain a condition requiring development of a plan for coordinating research among permit holders and for monitoring the effects of such research within six months of permit issuance. This plan would be submitted to PR for review and final approval, and the plan would be implemented by amending the permits to include any additional conditions, as appropriate. In addition, the term of all new permits is limited to the duration of the two existing permits. In other words, no takes of Steller sea lions for scientific research have been authorized beyond June 30, 2005.

- Applicant responses to public comments: The responses of applicants for File Nos. 1016-1651, 800-1664, and 881-1668 to the comments from the public are attached. The applicants have responded to the satisfaction of the NMFS. In addition, the permits contain conditions regarding research coordination and monitoring, as well as measures intended to minimize the potential for adverse impacts and unnecessary duplication. The applicant for File No. 434-1669 did not respond, however, the permit has been conditioned to address the concerns expressed regarding activities in that application. There were no comments specific to Permit Nos. 358-1564 and 782-1532 that required responses from the Permit Holders.

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 3

15

### Other Applicable Regulations

**Oceans Act of 1992:** Research will not occur in or near a National Marine Sanctuary.

**CITES:** Steller sea lions are not listed on Appendix I or II of the Convention on International Trade in Endangered Species, so this is not applicable.

**ESA Section 7 Consultation:** The consultation concluded, based on the available information, that the issuance of these Permits and Permit Amendments to take threatened and endangered Steller sea lions for scientific research, is not likely to adversely affect the continued existence of the endangered Steller sea lions, or result in the destruction or adverse modification of designated critical habitat.

**National Environmental Policy Act:** Scientific research and enhancement permits are, in general, categorically excluded from the requirement to prepare an Environmental Assessment (EA) or Environmental Impact Statement (EIS) (NOAA Administrative Order 216-6, May 20, 1999) since, as a class, they do not have a significant effect on the human environment. When a proposed action that would otherwise be categorically excluded involves a geographic area with unique characteristics, is the subject of public controversy based on potential environmental consequences, has uncertain environmental impacts or unknown risks, establishes a precedent or decision in principle about future proposals, may result in cumulatively significant impacts, or may have an adverse effect upon endangered or threatened species or their habitats, preparation of an EA or EIS is required.

Therefore, because of the unprecedented magnitude and intensity of proposed research, which is largely related to recent funding opportunities, and the controversy surrounding Steller sea lions and commercial fisheries, NMFS determined that further environmental review was warranted and prepared an EA. Based on the information in the EA, the Assistant Administrator for Fisheries signed a Finding of No Significant Impact on June 21, 2002.

### RECOMMENDATION

The research is consistent with the purposes and policies of the MMPA, ESA and FSA. It is believed that the research will further a *bona fide* scientific purpose and does not involve unnecessary duplication. No adverse impacts to the populations or to the ecosystem as a result of the authorized activities are anticipated. Issuance of these permits, as required by the ESA, was based on a finding that the permits (1) were applied for in good faith, (2) will not operate to the disadvantage of the endangered species which is the subject of the permits, and (3) is consistent with the purposes and policies set forth in section 2 of the ESA. For these reasons, I recommend that you sign the Permits.

cc: Stuckey