# AR 384

**Civ. No. 05-1392 (ESH)**
**Defendants' Exhibit 4**



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
1315 East-West Highway
Silver Spring, Maryland 20910

THE DIRECTOR

JUN 2 1 2002

MEMORANDUM FOR:    James P. Burgess, III
                   Acting Director
                   Office of Policy and Strategic Planning

FROM:              William T. Hogarth, Ph.D.
                   Assistant Administrator
                     for Fisheries

SUBJECT:           Environmental Assessment on the Effects of NMFS
                   Permitted Scientific Research Activities on
                   Threatened and Endangered Steller Sea Lions

Based on the subject environmental assessment, I have determined
that no significant environmental impacts will result from this
action.  I request your concurrence in this determination by signing
below.  Please return this memorandum for our files.

1.  I concur.  _James P. Burgess III_  _06/27/02_
                                        Date

2.  I do not concur.  _____.
                                        Date

Attachments

♻ Printed on Recycled Paper

THE ASSISTANT ADMINISTRATOR
FOR FISHERIES



Civ. No. 05-1392 (ESH)
Defendants' Exhibit

ENVIRONMENTAL ASSESSMENT

## ON THE EFFECTS OF NMFS PERMITTED SCIENTIFIC RESEARCH ACTIVITIES ON THREATENED AND ENDANGERED STELLER SEA LIONS

### June 2002

| | |
|---|---|
| **Lead Agency:** | National Oceanic and Atmospheric Administration |
| | National Marine Fisheries Service |
| **Responsible Official** | Dr. William Hogarth |
| | Assistant Administrator for Fisheries |
| **For Further Information Contact:** | Office of Protected Resources |
| | National Marine Fisheries Service |
| | 1315 East West Highway |
| | Silver Spring, MD 20910 |
| | (301) 713-2332 |

**Abstract:** The National Marine Fisheries Service (NMFS), Office of Protected Resources, proposes to issue five new scientific research permits, and major amendments to two existing scientific research permits for takes of Steller sea lions (*Eumetopias jubatus*) in the wild, pursuant to the Marine Mammal Protection Act of 1972, as amended (MMPA; 16 U.S.C. 1361 et seq.), and the Endangered Species Act of 1973, as amended (ESA; 16 U.S.C. 1531 et seq.). The objective of the proposed action is to collect information on the ecology and biology of threatened and endangered Steller sea lions that would improve understanding of management needs for recovering the species to the point that it can be removed from ESA listing. The permitted research under the preferred action alternative would exceed the categorical exclusion (National Environmental Policy Act (NEPA); 42 U.S.C. 4321 et seq.) from the need to prepare an EA or EIS in that 1) it involves controversial techniques; 2) the proposed activities involve unknown or highly uncertain risks; 3) and the potential for an adverse effect on an endangered and threatened species because of the significant increase in research activity in recent years, which is largely related to recent funding opportunities, warranted a further environmental review to determine whether significant environmental impacts could result from issuance of the proposed scientific research permits and permit amendments. Therefore, this document evaluates the relevant effects of a variety of scientific research activities on Steller sea lions under several permitting alternatives. The analyses considered special mitigation measures addressing duration of research, developing a monitoring plan, limiting accidental mortality, and ensuring research coordination. With these mitigation measures in place, issuing the permits as requested would not have a significant effect on the human environment.

**Civ. No. 05-1392 (ESH)**
**Defendants' Exhibit 4**

## CHAPTER 3 AFFECTED ENVIRONMENT

This chapter presents baseline information necessary for consideration of the alternatives, and describes the resources that would be affected by the alternatives, as well as environmental components that would affect the alternatives if they were to be implemented. The effects of the alternatives are discussed in Chapter 4.

The action area being considered encompasses the entire range of Steller sea lions in California, Washington, Oregon, and Alaska, including the eastern (threatened) and western (endangered) populations. This area includes both state waters and the United States Exclusive Economic Zone off the coasts of California, Washington, Oregon, and Alaska. However, as most of the proposed action would focus on animals located on or near rookeries and haulouts, the action area could be further defined as all known rookeries, haulouts, and waters immediately surrounding these areas. Some of the proposed research would occur within the Alaska Maritime National Wildlife Refuge, which includes over 3,000 islands, islets, rocks, pinnacles, and headlands from northwest Alaska into the Bering Sea and along 4,800 miles of Alaska's coastline and the Aleutian chain. Most of the refuge (2.64 million acres) is designated as wilderness and has the most diverse wildlife species of all the refuges in Alaska, including between 15 to 30 million birds (80% of all Alaska seabirds, including species of puffins, kittiwakes, murres, petrels, auklets, murrelets, and gulls) representing about 55 species. In addition to Steller sea lions, marine mammals such as harbor seals, walrus, sea otters, polar bears, and whales are also common within the refuge. Other animals within the refuge include bald eagles, peregrine falcons, bears, caribou, musk oxen, river otters, and foxes. Further, the refuge contains many Aleut archeological sites as well as remnants of the only World War II battles fought on U.S. soil. Military clearance is required to visit some islands of the Aleutian Chain (Adak, Shemya, Amchitka, and Attu).

A detailed description of the distribution, population status and trends, and life history of Steller sea lions is contained within the Final Supplemental Environmental Impact Statement on Steller Sea Lion Protective Measures in the Federal Groundfish Fisheries Off Alaska (NMFS 2001) and in the Fisheries Management Plan Biological Opinion (NMFS 2000). The following is a brief summary of the relevant details.

The estimated minimum population of Steller sea lions is 69,434, which includes animals in California, Washington, Oregon, and British Columbia. This represents a total of 30,403 sea lions in the eastern population, of which 5,991 are pups, and 39,031 sea lions in the western population, of which 9,373 are pups (NMML 2000). The rate of decline in the western stock averages 5% per year but has not been uniform: in the eastern Gulf of Alaska the rate of decline is 10.52% per year while in the eastern Aleutian Islands, the rate is 1.75% per year (Loughlin and York, in press). Conversely, trend counts indicate the size of the eastern stock has increased at an average rate of 5.9% per year between 1979 and 1997 (Calkins et al. 1999).

Steller sea lion males are typically sexually mature at three to seven years, but are not usually large enough to compete for females until they are nine to 11 years old (Pitcher and Calkins 1981; Gisiner 1985). Females, which tend to be less than one-third the size of males at maturity, are sexually mature at three to six years. Male Steller sea lions rarely live beyond their mid-teens, while females may live up to 30 years old. Adult males and females congregate at rookeries in the spring of each year, where most adult females will give birth and be mated. Females give birth to a single pup between mid-May and mid-July, with the highest frequency of births occurring during mid-June (Calkins and Pitcher 1982; Merrick 1987; Chumbley et al.

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 4

1997). Newborn pups weigh about 20 to 30 kg and, although they are somewhat precocious compared to terrestrial mammals, are not yet able to swim or maneuver well on land. Behavioral observations and analyses using allometric relationships indicate that the majority of Steller sea lion pups are weaned at 11 months old (or when they have reached a mass equivalent to 1/3 of maternal mass), or just prior to their mother giving birth to a new pup (Pitcher and Calkins 1981; Lee et al. 1991). The transition to nutritional independence (i.e. weaning) is believed to be a gradual process during which pups begin to develop foraging skills and supplement milk from their mother with prey items captured in the water. Pups probably do not begin making true foraging dives, where prey is captured and consumed, until near weaning, but they may begin playing in the water near their rookery at a much younger age. However, pups are not adept swimmers until they are at least 2 months old (Sandegren 1970). There is little information on the behavior of Steller sea lions during the period between weaning and when they have become sexually mature and return to a rookery to reproduce. It has been hypothesized that the overall decline of the Steller sea lion population is consistent with a 10-20% annual decrease in juvenile survival.

### 3.1    Past, Present, and Reasonably Foreseeable Future Actions Affecting the Present Condition of the Population/Habitat

The baseline for this document includes the past and present impacts of state, Federal, private, and other human actions or activities in the action area, and anticipated impacts of proposed Federal actions. The details of the wide variety of human activities and natural phenomena that may affect the resources within the action area are documented in detail in Biological Opinions prepared on the effects of groundfish fisheries in the Bering Sea and Gulf of Alaska (NMFS 2000) and Environmental Impact Statements completed under NEPA (NMFS 2001). In brief, the human-related activities that are occurring, that have occurred in the past, or that are reasonably foreseeable in the future, include commercial fisheries, commercial and subsistence harvest, oil and gas exploration, and scientific research, and have been assessed in those previous documents which are incorporated by reference.

#### 3.1.1   Historical Commercial Harvest and Intentional Takes

An experimental commercial harvest contracted by the Bureau of Commercial Fisheries resulted in the killing of 630 adult male Steller sea lions in Alaskan waters. Between 1963 and 1972, over 45,000 Steller sea lion pups of both sexes were killed in the Aleutian Islands and Gulf of Alaska. The harvest of adult males likely had no significant effect on the population trends, but the removal of the large number of pups contributed to local population trends in the Aleutian Islands and Gulf of Alaska from the 1960s through the early 1980s. There are presently no commercial harvests of Steller sea lions in Alaska.

Although government-sanctioned efforts to control populations of Steller sea lions considered as nuisances or competitors by the fishing industry and fishery management agencies ceased with passage of the MMPA in 1972, there are still anecdotal reports of fishermen shooting sea lions and a small number of prosecutions still occur. Records from NMFS Enforcement indicate that there were two cases of illegal shooting of Steller sea lions in 1998, both of which were successfully prosecuted (NMFS, Alaska Enforcement Division). In addition, there are a small number of Steller sea lions that strand with evidence of gunshot wounds (average of two animals per year from 1996-99; Angliss et al., in press). However, it is not possible to determine whether these animals were illegally shot or if they were struck and lost during the legal subsistence harvest. Because the full extent of such killings is not known, intentional shooting of

39

sea lions by fishermen should be considered a potential factor in the decline of sea lions at some locations.

### 3.1.2. Commercial Fishing

Commercial fisheries can directly affect Steller sea lions by capturing, injuring, or killing them incidental to fishing operations. Estimates of rates of entanglement through the early 1980s suggest that mortalities from entanglement were a contributing factor in the decline of Steller sea lions in the Bering Sea, Aleutian Islands, and Gulf of Alaska. The relative impact of mortalities to marine mammals occurring incidental to commerical fisheries is estimated under the MMPA by comparing minimum annual mortality rate to a Potential Biological Removal (PBR) level. Recent estimates of the numbers of sea lions killed incidental to commercial fisheries is low (28.3/year for the western stock and 16/year for the eastern stock). The estimate of incidental takes in the eastern stock is considered negligible being significantly less than 10% of the PBR for that stock (PBR = 1,395 animals) and is not considered to have a significant effect on Steller sea lion population dynamics. The relative impact of Steller sea lion incidental mortality in commercial fisheries in the western population is approximately equal to 10% of PBR for that population and may increase as the western population declines, even if the rate of incidental takes remains constant.

Commercial fisheries may also affect Steller sea lions indirectly by altering the quality of their habitat. The removal of large numbers of fish (both target and non-target or bycatch species) from a marine ecosystem can change the composition of the fish community, which can alter the abundance and distribution of prey available for Steller sea lions. In addition, removal of large amounts of biomass by commercial fisheries can compete with other consumers that depend on the target species for food, which can, in turn, increase competition between Steller sea lions and other piscivorous predators. Changes in the abundance and distribution of prey can have cascading effects on predators including increased susceptibility to predation and reduced productivity. These effects have been the focus of recent Biological Opinions written by NMFS on the effects of the groundfish fisheries in Alaska on Steller sea lions (NMFS 2000).

### 3.1.3 Subsistence Harvests

Steller sea lions are an important food source for many Alaska Native village residents. Between 1992 and 1995, the mean annual subsistence takes of Steller sea lions averaged 448 animals per year. The mean annual subsistence takes of Steller sea lions have declined to approximately one-third between 1996-1998, and have been estimated at 171 animals per year (Wolfe and Hutchinson-Scarbrough 1999). Wolfe and Hutchinson-Scarbrough (1999) indicate that subsistence harvest levels have declined sharply between 1992 and 1998, due largely to a decline in the number of hunters harvesting sea lions. The authors hypothesize that this decline in the subsistence harvest may be due to a number of local factors, including seasonal hunting conditions and local food needs, and may reflect a personal choice to avoid hunting Steller sea lions out of concerns about the population size. The majority of sea lions are taken in the Aleutian and Pribilof Islands.

The subsistence takes are below PBR for the western stock, are considered insignificant, and are managed thru agreements between NMFS and an Alaskan Native Organization under the MMPA. The estimated subsistence takes account for only a small portion of the total sea lions lost to the population each year. Further, the significance of subsistence harvesting, as with other sources of mortality, may increase as the population decreases, unless

40

there is a corresponding decrease in the rate of harvesting.

### 3.1.4    Scientific Research

Steller sea lions were intentionally killed for scientific research from the end of World War II up to as recently as the 1980s. The data collected from these animals, including stomach contents, blood samples, and morphometrics, was used to examine age, size, reproductive condition, food habits, and incidence of disease and parasites. Recent research efforts have employed non-lethal means for collecting such data, although there is the risk of accidental mortality resulting from certain research techniques, as described in Chapter 4. For more than a decade, researchers have been conducting aerial surveys, counts of pups on rookeries, and capturing individual sea lions for flipper-tagging, hot-branding, collection of blood and tissue samples, morphometric data, and attachment of scientific instruments. The effects of research on the Steller sea lion population are uncertain, but some research techniques and activities are known to adversely affect individual animals, as described in Chapter 4. It is not known whether research activities themselves have had a significant adverse impact on the Steller sea lion population, or if the disturbance and accidental mortality associated with research activities have been a factor in the decline.

Until recently, the principal investigators in Steller sea lion research activities were limited to a few scientists, primarily from federal and state entities, with collaboration from a small number of non-profit organizations, including several universities. Recent funding opportunities have significantly expanded the number of individuals and entities that would be engaged in Steller sea lion research, as well as the number and types of projects proposed.

The FY2001 congressional appropriations language identified a total of $43.2 million in the NOAA budget for the implementation of Steller sea lion protective measures. This represented a substantial increase of over $36.8 million for research and management of Steller sea lions from previous years. Recipients of the funding included NMFS, Office of Atmospheric Research (OAR), National Ocean Service (NOS), North Pacific Fisheries Management Council (NPFMC), State of Alaska (Alaska Department of Fish and Game: ADF&G), University of Alaska, Alaska Sea Life Center (ASLC), and the North Pacific Universities Marine Mammal Research Consortium (NPUMMRC). While portions of this appropriation were allocated directly to agencies or organizations for specific purposes, including research regarding litigation concerning the Alaska Steller sea lion and Bering Sea/Gulf of Alaska groundfish fisheries, $20,000,000 was appropriated to the Secretary of Commerce to develop a coordinated, comprehensive research and recovery program for the Steller sea lion. Of this, $15 million was set aside for non-federal research, to be distributed competitively through a grants process referred to as the Steller Sea Lion Research Initiative (66 FR 15842). Some of the grant recipients have yet to submit applications for the necessary marine mammal research permits. However, review of the proposals indicates that some of the proposed research funded under the SSLRI, is new, innovative, controversial, or experimental, likely to be adopted by other researchers, involves unique, unknown, or uncertain risks to an endangered or threatened species, and could have significant cumulative effects. An additional $40.15 million was appropriated in 2002 for research on Steller sea lions and was distributed non-competitively to the NMFS (for ESA, Steller sea lion recovery, climate change (OAR), and predator-prey studies (NOS)), North Pacific Fisheries Management Council, Alaska SeaLife Center, University of Alaska (Gulf Apex Predator Project), North Pacific Universities Marine Mammal Research Consortium, Alaska Department of Fish and Game, and the Alaska Fisheries Development Foundation.

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 4

Research has been and is also being conducted on endangered Steller sea lions in Russian and Japanese waters. This research includes population assessments and investigations of vital rates (which includes measuring and branding pups, and monitoring abundance and breeding success), remote monitoring of behavior (including attendance patterns) and resighting of marked (branded) animals, and collecting blood and scat samples. Much of the recent and ongoing research in Russia has involved collaborative effects between scientists from NMML and the Alaska SeaLife Center, using protocols and techniques comparable to those employed for studies of Steller sea lions in U.S. waters.

**Civ. No. 05-1392 (ESH)**
**Defendants' Exhibit 4**

## CHAPTER 4 ENVIRONMENTAL CONSEQUENCES

This chapter represents the scientific and analytic basis for comparison of the direct, indirect, and cumulative effects of the alternatives. Regulations for implementing the provisions of the NEPA require consideration of both the context and intensity of a proposed action (40 CFR Parts 1500-1508). Thus, the significance must be analyzed in several contexts, such as society as a whole, the affected resources and regions, and the affected interests. Intensity refers to the severity of the impact and has the following 10 specific aspects that must be considered: (1) beneficial and adverse effects; (2) effects on public health and safety; (3) unique characteristics of the geographic area (e.g., proximity to historic or cultural resources, park lands, and ecologically critical areas); (4) degree to which possible effects are likely to be highly controversial; (5) degree to which possible effects are highly uncertain or involve unique or unknown risks; (6) precedent-setting actions; (7) whether the action is related to other actions with individually insignificant but cumulatively significant impacts; (8) loss or destruction of significant scientific, cultural, or historical resources (including adverse effects on sites listed in the National Register of Historic Places); (9) degree to which action may adversely affect an endangered or threatened species or designated critical habitats; and (10) violation of Federal, state, or local laws imposed for protection of the environment.

A detailed socioeconomic analysis on the effects of proposed fishery management measures related to the potential adverse effects of commercial fishing on Steller sea lions is available in the SEIS on Steller sea lion protection measures in the federal groundfish fisheries off Alaska (NMFS 2001). In so far as the results of the proposed research on Steller sea lions being considered in this EA may affect those protection measures or other, future, management measures for the groundfish fisheries, those analyses are relevant to this assessment. There may be economic effects of the alternatives considered in this EA that are not directly related to the fishing industry. Most notably, there may be effects on researchers involved in the research, as well as industries that support the research, such as charter airplanes and vessels, and suppliers of equipment needed to accomplish the research. The effects of all alternatives, except the "No-action" alternative, would likely be equally positive with respect to these entities.

The potential for loss or destruction of cultural or historic resources is likely equal among the alternatives, and probably negligible given the nature of the research and permit requirements. Given that declining numbers of Steller sea lions would probably increase the cost of subsistence harvests, and that fewer sea lions would be likely to be harvested, the effects of the proposed alternatives on the non-market use value (subsistence) of Steller sea lions would depend on whether there was likely to be a significant reduction, either locally or overall, in the numbers of Steller sea lions. The SEIS on Steller sea lion protection measures in the federal groundfish fisheries off Alaska (NMFS 2001) stated that improvements in welfare of subsistence users (i.e., positive econominc, cultural, and social benefits) would be directly correlated with improvement in the abundance of Steller sea lions. Whereas the objective of the alternatives is to collect information on the ecology and biology of threatened and endangered Steller sea lions that would improve understanding of management needs for recovering the species to the point that it can be removed from ESA listing, such welfare improvements would be equally likely under all alternatives in the long term.

An issue extremely relevant to the analysis of alternatives and discussion of the proposed action is an examination of the information gained to conserve Steller sea lions relative to the potential for negative impacts on wildlife within the action area, especially Steller sea lions, and

43

their habitat. It is important to put into context the proposed research under review in these permit applications and the reason why the investigators developed their respective research plans. In FY01, Congress provided $43.15 M to address scientific and management needs regarding the continued decline of Steller sea lions in Alaska and the impact of that decline on Alaskan commercial fisheries. Congress specifically appropriated $20M to the DOC to develop and implement a coordinated, comprehensive research and recovery program for the Steller sea lion, which was designated to study:

1. Available prey species.
2. Predator/prey relationships.
3. Predation by other marine mammals
4. Interactions between fisheries and Steller sea lions, including localized depletion theory.
5. Regime shift, climate change, and other impacts associated with changing environmental conditions in the North Pacific and Bering Sea.
6. Disease.
7. Juvenile and pup survival rates.
8. Population counts.
9. Nutritional stress.
10. Foreign commercial harvest of sea lions outside the EEZ.
11. The residual impacts of former government authorized eradication bounty programs, and
12. The residual impacts of intentional lethal takes.

In addition to the funds provided to the DOC (including NMFS, OAR, NOS and the NPFMC), congress also appropriated funds for Steller sea lion studies to the Alaska Department of Fish and Game (ADFG), the Alaska Sea Life Center (ASLC), the University of Alaska (UA), and the North Pacific Marine Mammal Research Consortium (NPMMRC).

In response to the congressional directive to DOC and the NMFS, the NMFS provided funds through a competitive Request for Proposals (RFP) during FY01 termed the Steller Sea Lion Research Initiative (SSLRI). The NMFS attempted to synthesize the hypothesis-driven research program outlined by congress (above) into six major hypotheses. The proposers to the SSLRI were advised to develop research programs addressing one or all of these six hypotheses:

1. Fisheries competition hypothesis
2. Environmental change hypothesis
3. Predation hypothesis
4. Anthropogenic effects hypothesis
5. Disease hypothesis, and
6. Pollution hypothesis.

The research programs developed by the proposers to the NMFS SSLRI, and those entities specifically appropriated funds by congress, include those studies under review in the permit applications summarized in this Environmental Assessment. It is worth noting that none of the proposed permittees developed their planned permit activities outside the structure of the congressional guidance.

The proposed scientific research is not likely to affect designated Steller sea lion critical habitat or essential fish habitat because none of the proposed techniques have a measurable potential to alter any substrate or the marine environment in general. However, in gaining access

44

to research sites by land, there is the potential for damage to the terrestrial substrate in which some species of ground-nesting birds dwell. The animals most likely to be affected by the alternatives are those on or near the Steller sea lion rookeries and haulouts where the research activities would occur. Within their range, Steller sea lions co-occur with numerous other marine species including other pinnipeds (e.g., harbor seals, California sea lions, Northern fur seals, walrus), whales (e.g., blue, fin, humpback, and killer whales), fish and invertebrates (e.g., salmon, pollock, mackerel, flatfish, crabs, lobster, and squid), sea turtles, sharks, Northern sea otters, and seabirds (e.g., puffins, murres, gulls, kittiwakes, petrels, etc.). Because the majority of research activities occur on, or near Steller sea lion rookeries and haulouts, the potential for adverse impacts of the research on cetaceans and other aquatic species is negligible and would be limited to occasional level B harassment from aerial surveys or vessel approach. Steller sea lions and the other pinniped species mentioned do not typically occupy the same beaches at the same time. Therefore, the potential impacts of research activities on Steller sea lions on other pinnipeds would be limited to a small amount of incidental level B harassment from aerial surveys and occasional displacement due to disturbance from vessel approach to Steller sea lion rookeries and haulouts or researchers approaching on land. This would also apply to most of the terrestrial species that occur within the same geographic area as Steller sea lions. Of the other animals that occur within the geographic range of Steller sea lions, those most likely to potentially be adversely affected by research activities on Steller sea lion rookeries and haulouts are cliff-dwelling and ground-nesting seabirds. For example, there are a number of ground-nesting seabird species whose burrows are vulnerable to crushing by foot-traffic, including rhinoceros auklets on Forrester Island where there has been intense Steller sea lion research effort. Cliff-dwelling sea birds are vulnerable to disturbance, particularly from aerial surveys, as well as the presence of researchers conducting research activities on Steller sea lion rookeries and haulouts. Disturbance of cliff-dwelling birds can result in abandonment of nests and loss of eggs as adults flee a nest. The U.S. Fish and Wildlife Service (USFWS) is responsible for issuing special use permits for activities within the Alaska Maritime National Wildlife Refuge, and all holders of NMFS scientific research permits would be required to coordinate the timing and location of their research with the USFWS to ensure that the Steller sea lion research would not adversely impact birds or other animals within the Refuge.

### 4.1    Potential Effects of Research Activities on Steller Sea Lions

The proposed action is an examination of the information gained to conserve Steller sea lions relative to the potential for negative impacts on wildlife within the action area, especially Steller sea lions. The following is a description of the potential short-term, or immediate, effects on individual Steller sea lions from the various types of research activities authorized and proposed as part of the Proposed Action. Tables 1-8 summarize the numbers of Steller sea lions that would be affected by each of these types of takes for each Alternative. The effects discussed below are, in many cases, the worst case scenario. It should be understood that while some effects, as some amount of serious injury and mortality, are unavoidable during the types of procedures described, the application by experienced personnel of the mitigation measures that are considered "good practice" (see Chapter 2), in conjunction with appropriate monitoring, would make such serious injury and mortality unlikely for many procedures. Nevertheless, it is important to mention such worst cases in order to allow adequate consideration of the potential for significant effects of the proposed action.

Effects of Aerial surveys: Disturbance from aircraft and vessel traffic has been observed to have highly variable effects on Steller sea lions that are hauled out (Calkins and Pitcher 1982). Reactions ranged from none to complete and immediate departure from the haulout, i.e. a stampede. The applicants for both Permits No. 358-1564-01 and 782-1528 report

45

that, during aerial surveys, usually less than 1% of hauled out animals go into the water, and that the sound change associated with banking the aircraft increases the likelihood of disturbing the animals. When Steller sea lions are frightened off rookeries in this way, pups may be trampled, or even abandoned. Juvenile and adult animals can also be injured during stampedes. (See also "Ground Counts" below for additional detail on potential adverse effects of stampedes.). In the absence of adequate post-activity monitoring, such serious injuries or deaths would not be recorded.

The incidence of stampedes in response to aerial surveys flown as described in the application are not known. Researchers report that only a small percentage (less than 1%) of animals are observed to be affected by the approaching survey planes, but the magnitude or type of the response is not reported. In addition, the cumulative effects of aerial surveys on Steller sea lions in Alaska, both within a season and over years of research, have not been documented.

Effects of ground counts: The possible effects of a stampede are similar to those described for aerial surveys, i.e. serious injuries and mortality are possible. However, experienced personnel move slowly through a haulout or rookery to minimize the likelihood or to avoid entirely, such events. Parturition in Steller sea lions occurs from mid-May until mid-July, with the highest frequency of births occurring mid-June. Thus, the majority of pups on a rookery at the time these ground counts occur would be a few days to six weeks old, depending on the timing. If sufficient pre-disturbance monitoring is not conducted, it is not possible to identify mother-pup pairs. If researchers have not identified which mothers are in attendance and which are at sea, there is no way to determine whether a pup has been abandoned as the result of the disturbance unless they remain to monitor the rookery for several days. Foraging trips of lactating females may last several days or more (Brandon 2000). Even if mother-pup pairs have been identified, if researchers do not monitor a rookery after the disturbance until all the adult females that entered the water return to their pups, it will not be possible to determine if pups have been abandoned as a result of the disturbance. Fostering is very rare in Steller sea lions, thus the majority of abandoned pups will starve to death. Further, if pups (or adults) were injured during a stampede, they may not die from their injuries immediately. Death may not occur for several days, or weeks, in the case of infections or hemorrhages resulting from injuries, or injuries that affect an animal's ability to forage.

Steller sea lions in Alaska demonstrate site fidelity with respect to rookeries. The arrivals of males and pre-parturant females are closely timed and fairly predictable from one year to the next. Large males of reproductive age are usually the first to arrive, establishing territories by aggressive competition with other males. Presumably, the holders of the best territories gain access to more females, and are therefore more successful at mating. When adult animals are displaced from the rookery during breeding season at least some males will likely have to re-establish their territories by fighting with other males. Thus, each disturbance that displaces the males from their territories increases the likelihood of aggressive interactions among males and the possibility of injury. Adult male Steller sea lions have large canines and powerful jaws and are capable of inflicting serious puncture and laceration wounds on opponents. These wounds may become infected. In addition, other sea lions on the rookery, including pups, may be injured during these aggressive competitions among males. Along with the possibility of physical trauma, the heightened aggressive interactions and resulting psychological effects can result in secondary disease manifestations (Sweeney 1990).

The magnitude of the disturbance effects on the animals may be affected by the number of personnel who come ashore, the amount of time the rookery or haulout is occupied by researchers (which usually means the amount of time the animals remain in the water or the pups

46

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 4

are separated from their mothers), the frequency of these disturbances (both intra- and inter-annually), and the timing of the disturbance (with respect to breeding, pupping, etc.).

Effects of incidental disturbance during scat collection, capture, and observational activities: This typically disturbs animals in the same way, and has the same potential affects, as described for ground counts above. The majority of scat collection coincides with other shore-based activities, so disturbance is often incidental to these activities rather than the direct result of the scat collection itself, with the exception of some samples collected in winter when no capture activities are planned.

General Effects of Capture and Restraint: Restraint procedures constitute one of the most stressful incidents in the life of an animal, and intense or prolonged stimulation can induce detrimental responses (Fowler 1978). Each restraint incident has some effect on the behavior, life, or activities of an animal. A variety of somatic, psychological, and behavioral stressors can be associated with capture and restraint of wild animals. These include strange sounds, sights, and odors, the effects of chemicals or drugs, apprehension (which may intensify to become anxiety, fright, or terror), and territorial or hierarchical upsets associated with displacement of animals by researchers who come onto rookeries and haulouts. Animals that are stressed can incur contusions, concussions, lacerations, nerve injuries, hematomas, and fractures in their attempts to avoid capture or escape restraint (Fowler 1978). The stress response can change an animal's reaction to many drugs, including those commonly used for chemical restraint, which can have lethal consequences. The annual reports from the current and previous permits held by NMML and ADF&G indicate that some animals showing distress and/or adverse reactions to drugs or handling that were not immediately released, subsequently died. Continuous stimulation of the adrenal cortex, as from stress associated with chronic disturbance or repeated capture, can cause muscle weakness, weight loss, increased susceptibility to bacterial infections, and poor wound healing, and can lead to behavioral changes including increased aggressive and antisocial tendencies (Fowler 1986). Capture myopathy is a possible consequence of the stress associated with chase, capture, and handling in numerous mammal species (Fowler 1978). Capture myopathy is characterized by degeneration and necrosis of striated and cardiac muscles and usually develops within 7 to 14 days after capture and handling. It has been observed both in animals that exert themselves maximally and those that remain relatively quiet, and occurs with either physical or chemical restraint. Fear, anxiety, overexertion, repeated handling, and constant muscle tensions such as may occur in protracted alarm reaction are among the factors that predispose an animal to this disease. A variety of factors may function in concert or individually. The muscle necrosis is likely due to acidemia resulting from a build up of lactic acid following profound muscle exertion: once necrosis has occurred, the prognosis for recovery is not favorable. The number of times an animal is captured, the method(s) of restraint, as well as the age and general condition of the animal are all factors that will affect an animal's response to capture.

Effects of Chemical Immobilization (Anesthesia/Sedation): A fairly high mortality rate caused by anesthesia has been reported in otariids (Gage 1993). Delivery of anesthesia in pinnipeds can be complicated by their particular anatomical and physiological specializations to the marine environment and by the logistics of working with wild animals. Determining the proper dose is dependent on a fairly accurate assessment of the animal's weight and condition, as miscalculation of an animal's weight can lead to an overdose, which can have lethal consequences (Fowler 1986). The typical induction time for most chemical restraint agents is 10 to 20 minutes following intramuscular injection. Thus, darting can be dangerous because it can spook an animal into the water before the immobilization has taken affect, which can result in drowning. In February 1993, under Permit No. 771 (64), an adult female darted with Telazol

47

died.[2] Although the animal was "one of the farthest from the water" among the animals on the beach, she moved toward the water within 30 seconds of being darted. Within 5 minutes she had rolled over into the surf and appeared unable to swim. By the time the researchers reached the animal she was not breathing and was given Dopram (a respiratory stimulant). She resumed breathing and began moving her head side to side and moving her foreflippers slightly. When these movements on the part of the animal began to interfere with the researcher's efforts to collect samples and attach a transmitter, the animal's head was covered in an attempt to calm her. By the time attachment of the transmitter was nearly completed it was noted that the female had been still for about a minute. Upon removing the rain jacket it was discovered that her pupils were dilated and she had no blink reflex. Attempts at resuscitation were unsuccessful and it was believed that the animal's immersion in sea water after darting may have triggered the dive response (breath holding, decreased heart rate, and reduced peripheral blood flow) and/or she may have aspirated sea water. It was also suggested that covering the animal's head may have contributed to her death by making her condition difficult to monitor and/or by pushing her back into the dive reflex.

The safest injection site for projectile syringes (darts) are in the deep muscle areas of the hind limbs (Scott and Ayars 1980). However, the blubber layer on pinnipeds can make delivery of an injectable drug into the muscle, where needed for proper absorption and distribution, difficult. In addition, inadvertent injection of drugs into the blubber frequently results in aseptic necrosis, sometimes leading to large abscesses (Geraci and Sweeney 1986). Injections into the chest cavity or stomach region can result in puncture of the lungs or stomach, which may kill the animal. In February 1993, under Permit No. 771(64), issued to NMML, a pup that was accidentally darted with Telazol when it unexpectedly moved in front of the target adult animal died, apparently as a result of inadvertent intravenous injection of a drug intended for intramuscular administration in a larger animal. According to the report, the dart struck on the left flank, about 5 inches forward of the hip and about 2 inches off the spine, which apparently, as indicated by necropsy, entered the kidney, effectively causing an intravenous injection. Necropsy also revealed slight trauma to the kidney. The pup had also regurgitated approximately a liter or more of milk following the darting and may have aspirated some, which could have contributed to the death.

Hyperthermia (over-heating) can occur in animals under anesthesia because the blubber layer can make heat dissipation a problem, even at ambient temperatures that are comfortable for the researchers: otariids over 25 kg tend to become hyperthermic during anesthesia (Gage 1990). Hypothermia can also occur in sedated animals, during anesthesia or post-recovery, as many drugs can affect thermoregulation. In hypothermia, the reduction in body temperature reduces tissue metabolism, while hyperthermia increases it. Both of these can have implications for the animal's reaction to any drugs administered, as well as any pathological conditions that may exist.

About 10% of animals induced with Telazol (tiletamine-zolazepam) or gas were observed to become apneic (stop breathing) within five minutes of induction (Gage 1990). Tiletamine is a cyclohexamine, which is a dissociative anesthetic that induces catatonia. It also has an analgesic effect through its action on the spinal cord, but it does not block visceral pain. Both hyperthermia and hypothermia are possible consequences of immobilization with tiletamine, depending on ambient temperatures. Respiratory depression is also possible, as is hypersalivation, which can lead to choking or aspiration of fluid. There is an excitatory phase seen with tiletamine characterized by occasional muscle spasms resembling seizures, due to spinal reflex firings, which can be minimized by using tiletamine in combination with diazepam. Zolazepam is a benzodiazepine, or antianxiety drug, that has a sedative effect and is a skeletal muscle relaxant. Zolazepam slightly depresses cardiovascular function. Both tiletamine and

48

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 4

zolazepam are excreted in the kidneys and are contraindicated in animals with severe renal or hepatic disease. The safety of these drugs is adversely affected in animals that are ill, stressed, or which have suffered from physical exertion (e.g. have been chased) prior to administration of the drug. There is no antidote (reversal agent) for tiletamine. Diazepam, which is a benzodiazepine similar to zolazepam, is metabolized slowly, with clinical effects typically disappearing within 60 to 90 minutes (Fowler 1986). There is a reversal agent for zolazepam, flumazenil. However, because zolazepam is used in combination with tiletamine to reduce the effects of the excitatory phase, reversing the effects of zolazepam in the absence of a reversal agent for tiletamine could result in convulsions and other side effects.

Inhalation anesthetics such as isoflurane gas are used to induce anesthesia in animals that can be manually restrained, and are commonly used to augment analgesia or increase the depth of anesthesia in animals previously immobilized by injectable agents. Prolonging immobilization by administering repeated doses of injectable agents is associated with a high risk of mortality, and an additional dose of Telazol should never be given (Gage 1990).[4] Isoflurane, a halogenated ether with potent anesthetic action (Stedman's Medical Dictionary 2000), is an inhaled general anesthetic that induces reversible depression of the central nervous system, resulting in unconsciousness, analgesia, voluntary muscular relaxation, and suppression of reflex activity (Fowler 1986). Isoflurane is especially useful for short procedures in which rapid recovery and few aftereffects are desirable. The effects of inhalation anesthetics increase predictably with increased dose, unlike injectable agents, which tend to be unpredictable and idiosyncratic among animals (Fowler 1986). In general, captive animals have been observed to fully recover from anesthesia with isoflurane after 8 hours (Gage 1990). Isoflurane gas appears to have the best recovery characteristics, and be safe and reliable, in otariids (Haulena and Heath 2001).

Effects of blood collection (venipuncture): The risks of blood collection are largely incidental to capture and restraint, as are described above. However, multiple attempts to obtain a blood sample are not only stressful and cause some degree of pain, they can result in damage to the vein, clotting, and abscess. Removing a volume of blood too large relative to the animal's mass and ability to replace what was taken can result in fatigue, anemia, weakened immunity, and problems with clotting.

Effects of skin and blubber biopsy: The effects of the capture and restraint necessary for obtaining these samples are described above. In addition, as with any wound, there is always the potential for infection after any of these procedures, particularly given the unsanitary environment of the rookeries. An otherwise healthy animal should be able to heal and recover from a properly performed procedure, but animals with compromised immune systems may develop major complications. This procedure may cause more than momentary pain. There is a risk of injury from the pneumatically-propelled $CO_2$-rifle, and cross-bow fired biopsy darts if they strike an unintended area. In a study on the effectiveness of a crossbow-launched biopsy system for collecting tissue samples from South American fur seals (*Arctocephalus australis*), the authors concluded that animals were likely to be badly injured if a dart were to hit them in the head (Gemmell and Majluf 1997). The size of the sample dart for this study was smaller than that proposed by Dr. VanBlaricom, largely because the intent was to obtain samples for genetic and toxicological analyses rather than fatty acid profile analysis. Gemmell and Majluf (1997) also found that success was highly dependent on the location and angle of the biopsy dart at

---

[4] Note that several of the animals that died under previous permits issued to ADF&G were given repeat injections of medetomidine and/or ketamine, the injectable agents used to immobilize them. See annual reports for Permits No. 771 and 965.

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 4

impact and stated that the high animal densities and rugged terrain encountered on the study site hindered use of the remote biopsy dart system. Gemmell and Majluf (1997) reported that the typical response of male fur seals to the remote biopsy dart was to recoil from the impact and search briefly for the "assailant." Both sampling success and accuracy using remote biopsy darts decrease markedly with distance from the target.

The holders of Permit No. 782-1532 report that the response of animals struck by the dart fired from a $CO_2$-charged rifle is minimal, and less than that of animals struck by a Telazol dart. They also report that their techniques for using a blubber punch or pneumatically-propelled dart have been used without adverse effect on a variety of pinniped species.

Effects of muscle biopsy: The small diameter of the wound, combined with the depth of the biopsy, would create a wound that would tend to close on the surface prior to deep tissue healing. This increases the chances of abscess formation, particularly if the biopsy needle or dart was not properly sterilized. Biopsy wounds, as with any wounds including those acquired during intra-species aggressive interactions, can become contaminated despite use of sterile equipment. Therefore, leaving the wound open to drain should an abscess form, rather than suturing closed, is preferable. As with skin and blubber biopsies, unhealthy animals or those with compromised immune systems may develop major complications from such an infection. Depending on the depth of penetration and force of impact, biopsy darts can also damage internal organs if they strike the abdominal area. Animals can be severely injured if darts strike them in the head (Gemmell and Majluf 1997). The potential adverse effects of this procedure include more than momentary pain, risk of infection, and the stress and risks associated with capture and restraint, as described above.

Effects of ultrasound: This procedure, by itself, poses no risk of injury to an animal. However, there is the possibility for adverse affects from the need for capture and restraint, as described above.

Effects of fecal loops and culture swabs: The potential adverse affects relate primarily to the risks of capture and restraint, as described above. In addition, there is the slight potential to introduce or spread infection if the loops and swabs are not used properly. There is the potential for perforation, and subsequent infection, when fecal loops are inserted into the rectum. There is the possibility for damage to the cornea of the eye if ocular swabbing is done incorrectly. When performed by a qualified, experienced person using commonly accepted standards of good practice, these risks are likely negligible.

Effects of tooth extraction: The potential adverse affects relate to the risks of capture, anesthesia, and the possibility of infection following extraction. The procedure may result in more than momentary pain, which could interfere with foraging, at least temporarily.

Effects of clipping vibrissae, hair, and nails: Clipping whiskers, hair and nails is not likely to result in any pain. The effects on the animal of clipping a whisker, toenail or patch of hair are probably largely incidental to the effects of capture and restraint described above.

Effects of pulling vibrissae: The area of the snout where the vibrissae follicles are located is highly vascularized and ennervated to enable a sea lion to use its vibrissae in search of food even at very cold temperatures (Gee 1998). Owing to the highly sensitive nature of this sensory organ, the pulling of a whisker may cause more than momentary pain. The effects on the animal of pulling a whisker are probably largely incidental to the effects of capture and restraint described above.

50

**Civ. No. 05-1392 (ESH)**
**Defendants' Exhibit 4**

General effects of marking (e.g., flipper tags and branding): Measures of natality and rearing success, sex and age ratios, mortality, and survival are important indicators of population health. Studies of these vital rates are often facilitated by the ability to recognize individual animals in a population. For example, although natality can be estimated by counting newborns, observing deaths is more difficult and is therefore usually estimated using mark-recapture techniques that use mathematical formulas to correlate capture probability with survival rates. Mark-recapture studies require that individual animals are easily recognized. In a large number of marine and terrestrial species, natural marks have been and are used to identify individual animals. For example, individual humpback whales can be recognized by the patterns of pigment on their tail flukes, right whales are known by their callosities, lions have been identified by vibrissae patterns (Pennycuick and Rudnai 1970), and individual differences in appearance have been used to identify dolphins (*Tursiops truncatus*) and several primate species. In general, the use of natural marks and individual appearance requires familiarity with the subject animals, which typically means many hours of personal observation. When the use of natural marks to identify individual animals is not suitable or practical for achieving study objectives, there are a variety of methods for marking animals available. Marking devices can be divided into temporary, semi-permanent, and permanent.

Temporary marks: Paints and dyes have been used successfully to temporarily mark Steller sea lions and other pinnipeds. The duration of the mark depends on, among other things, the type of paint or dye used, and the season applied, because all pinnipeds molt (shed their coats) annually. Thus, paints and dyes can be used to identify individuals for weeks to months. Paint marks can be applied remotely using a paint gun that fires pellets filled with pigment that burst on impact and leave a spot on the animal's fur. This method does not allow use of alphanumeric characters and is therefore not practical when other than the crudest of marks are needed. If animals can be captured and restrained, paints and dyes can be used to make unique alphanumeric marks on their fur. This method likely involves more stress to the animal than remote marking, and may cause incidental disturbance of conspecifics. However, the marks can be made large enough to be easily read from a distance, making it unnecessary to recapture the animal for identification, or cause additional disturbance to conspecifics. A variation on painting or dying the animal's fur is to capture animals and glue (using epoxy) a colored tag to their fur. This tag would fall off when the animal molts, and could have unique alphanumeric information written on it that could be read if researchers could get close enough or recapture the animal. Attaching a scientific instrument that emits a unique signal to the fur is also a method of temporary marking that has been used in a variety of species, including Steller sea lions.

Semi-permanent marks: There are numerous plastic, aluminum, and plated-steel tags available in a variety of colors, sizes, and identifying symbols that can be affixed to animals to allow identification of individuals. All of these techniques require capture and restraint of the animal. Plastic cattle ear tags have been used for many years to mark numerous pinniped species, including Steller sea lions. The tags are attached through the flippers. While these tags may remain attached for the life of the animal, they can and do pull out. In addition, they can become faded or otherwise difficult to read over time. These plastic tags cannot necessarily be read from as a great a distance as large paint or dye marks, thus recapture of animals may be required for positive identification of individuals. However, when the study objectives require identification of individuals for longer than a few months or a season, or when animals will need to be recaptured for other reasons, plastic tags are the alternative of choice for many researchers. Another method of identifying individual animals is to attach scientific instruments, such as VHF and satellite transmitters, that broadcast signals on unique frequencies and allow tracking of animals or remote monitoring of their movement and activities. In pinnipeds, these tags are

51

**Civ. No. 05-1392 (ESH)**
**Defendants' Exhibit 4**

glued to the fur, or affixed to plastic tags that are attached through the flippers. These are considered temporary (if glued to fur) or semi-permanent (if affixed to flipper tags) because they will fall off when the animal molts or be lost when the flipper tag pulls out. In addition, the life of the tag is limited by the battery capacity, which, in turn, is limited by the size of the tag.

Permanent marks: When study objectives require recognition of individual animals for more than a season or a few years, temporary or semi-permanent marks must be re-applied, or a permanent mark can be used. As discussed above, applying both temporary and semi-permanent marks usually requires capture and restraint of the animal. Given that each capture event is stressful, and has the potential to injure the animal, when the objective is only to have animals that can be individually recognized from a distance, it is more advantageous to apply a permanent mark from the start. Using permanent marks is also favored over re-applying temporary marks when the interval between capture events is longer than the duration of the temporary mark. Hot brands have been used for many years to permanently mark domestic livestock and some species of wildlife, including Steller sea lions and other pinnipeds. Cryo-branding, or freeze branding has also been used successfully to permanently mark numerous species, including white-tail dear, horses, and harbor seals. Tattoos have also been used to permanently identify domestic animals (e.g., cattle, dogs, horses) and wildlife (e.g., rabbits, polar bears, deer). To be clear and legible, tattoos must be applied to a body site free of hair (either a hairless site on the animal, or a site shaved prior to tattoo application), and work best on light-colored skin. The most common sites for tattoos on animals are the ear, inner lip, and inner thigh. The technique for tattooing animals involves applying tattoo pliers that puncture the skin, followed by rubbing dye into the puncture wound. Thus, as with branding, tattooing involves some degree of pain and risk of infection. The advantage of a brand over a tattoo is that the brand can be made large enough to be visible from a distance, whereas reading tattoos usually requires capture of the animal to read the mark.

Freeze branding is considered by some to be more acceptable for marking wildlife than hot branding because, if done correctly, there is a negligible risk of infection (Day et al., 1980). In the 1993 EA on the effects of branding, hot-branding was said to be preferred over freeze branding because freeze branding required longer restraint times that could result in increased stress on the animals. There was also concern about the safety of using anesthesia to restrain the sea lions. NMML and ADF&G have been using isoflurane gas to anesthetize Steller sea lions for many years, with few complications. Since the animals being hot-branded under existing permits are anesthetized, a longer restraint time would not necessarily result in more stress. However, the use of anesthesia is not entirely without risks, and the risk of adverse effects increases with the duration of use. Thus, if pups needed to be under anesthesia for significantly longer for freeze-branding than for hot-branding, the risk of adverse effects from anesthesia might outweigh the potential benefit of decreased risk of infection from freeze branding. In addition, if it takes significantly more time to freeze-brand Steller sea lions than to hot brand the same number of animals, the rookeries would be disturbed for longer, or fewer animals would be marked. The applicants state it currently takes about one minute per animal [exclusive of preparation time and anesthesia] to apply a four-character hot-brand, as described in Section 2.2.1. The 1993 EA also found that freeze branding was less preferable than hot branding because of concerns about the visibility of freeze-brands on the light pelage of Steller sea lions and evidence that freeze brands may disappear over time and with molting. However, in a study on spatial structure of harbor seals in Sweden, 163 harbor seals were freeze-branded as pups (less than one year old) and juveniles/young adults (1-4 years old) and tracked for up to 14 years, including during periods of molting (Härkönen and Harding 2001).

The practicality of hot-branding as a means of permanently marking pinnipeds in the wild has been demonstrated in several studies. However, there has been insufficient resight

52

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 4

effort of the more than 15,000 sea lions branded by ADF&G and NMML since 1975 to validate the merits of hot-branding versus the potential for adverse impacts to individual sea lions. The applicants state there is no evidence suggesting increased mortality of pups after branding. The absence of such evidence cannot be interpreted as evidence of no effect because there has not been sufficient post-activity monitoring to determine whether hot-branding, or other research activities on rookeries, has contributed to increased mortality of pups. Further, Merrick et al. (1996) state that studies of branded Steller sea lions on Marmot Island in Alaska suggest branding may lead to increased

In 1993, 399 Steller sea lion pups were branded on Forrester Island in Southeast Alaska.[5] Four to five days after branding six dead, branded pups were collected during pup counts. Necropsy revealed blunt trauma as the probable cause of death for two of the pups, and starvation was the likely cause of death for the other four. Although the pathologist stated that these deaths could not be linked to branding, it is not apparent how this possibility could be ruled out. In a subsequent report from the permit holder, it was stated that it was unclear whether branding operations contributed to abandonment of pups, and their subsequent starvation.[6] An additional 36 dead pups were recovered on this rookery 4-5 days after branding. Five of these pups were from a growth study in which pups were marked to be recaptured regularly for weighing and other measurements: at least four of these pups appeared to have starved, possibly as the result of abandonment. Of the remaining 26 dead pups, 1 was still born, 3 were neonatal deaths of unknown cause, 15-16 were emaciated and probably starved to death, 4 died of trauma, 1 from pneumonia, and 1 drowned. The possibility that the deaths of the emaciated animals, or those that died from trauma, pneumonia or drowning were related to the branding and research activities cannot be ruled out.

In a recent branding of Steller sea lion pups on rookeries in Oregon (under Permit No. 782-1532), approximately 1/3 of the pups present were captured and branded. Several days later 7 pup carcasses were observed on the rookery: 6 of the dead pups were branded.[7] It is not known what percentage of these mortalities could be attributed to the research activities vs. natural causes. Necropsy indicated that one of the dead branded pups probably died as the result of trauma associated with a bite wound on the head.[8] An additional dead pup was recovered during the branding operations whose death was believed to be due to suffocation as a result of being trapped in a crevice beneath another pup: this is being counted against the total number of accidental mortalities allowed under their permit.

Effects of flipper tagging: As described above, these types of tags are best considered semi-permanent markers as they can and do pull out because sea lions use their foreflippers in both aquatic and terrestrial locomotion. In addition to the effects of capture and restraint as described above, it is likely that affixing these tags to the flippers of sea lions causes more than momentary pain. When the tag is affixed there is the potential for infection at the wound site, particularly because the environment on the rookery is not aseptic and because the activity of the animal may prolong or prevent healing by producing repetitive stress on the wound. There is also the potential for infection when a tag pulls out of the flipper, for whatever reason. In moving about on a rookery or haulout, or swimming, there is the potential for a tag to be torn out of the flipper by abrasion on the substrate or by hydrodynamic pressure (Fowler

---

[5] A letter reporting on activities conducted under Permit No. 809, issued to NMML, submitted by D. Calkins to H. Braham, NMML on December 14, 1994.

[6] Annual report on research conducted under MMPA Permit No. 809. Submitted December 30, 1994.

[7] David Pitkin, Oregon Coast National Wildlife Refuge Complex, USFWS, Newport, OR., personal communication

[8] Memo from D.P. DeMaster to Ann Terbush, dated July 25, 2001 regarding Steller sea lion pup mortality during and after handling activity at Rogue Reef, Oregon.

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 4

1986). There is no information on long-term tag retention or average retention rates in the annual reports from NMFS permits holders who use these tags on Steller sea lions. There is also no quantitative information on the rate of infection caused by flipper tagging. Both applicants report that tag-related mortality does not add significantly to natural mortality. Also, Merrick et al. (1996) report that flipper tags can become difficult to read as the colors and markings on them fade over time and that they are not readily visible from any distance, partially because the gregarious nature of sea lions causes them to group together and obscure the flippers.

Effects of Attachment of scientific instruments: In addition to the effects of capture and restraint described above, the attachment of an instrument can have both short- and long-term adverse effects. Possible chronic, short-term effects can include a reduction in foraging activity or an increase in grooming at the expense of other behaviors (Kenward 1987). These types of effects are likely present after most tagging events and may be as much a delayed result of the capture and handling as of the tag's presence. Short-term effects can lead to acute problems for animals of various species: the presence of a tag has exacerbated capture shock and led to death in hares; the disturbance of tagging has resulted in desertion by incubating birds; abandonment or rejection of young in birds and ungulates was seen following tagging; and tagging may be enough to stop a dispersing animal from securing a territory, or push an animal over the brink of starvation when food is short (Kenward 1987). The hydrodynamic drag created by the instrument can exert an additional energetic demand on an animal which could, over time, result in reduced foraging success, increased metabolic load, and resultant stress to the animal. Reactions of pinnipeds fitted with Crittercams ranged from apparent curiosity about the instrument, to attempts to dislodge it, and aggressive reactions (Marshall 1998).

The attachment of instruments to the hair with epoxy should not cause any pain if done properly, but may result in discomfort if the placement of the instrument causes pulling of the hair or skin as the animal moves. In addition, if the ratio of resin and catalyst is not correctly measured, the resultant exothermic (heat-producing) reaction can burn the animal's skin. Both the resin and hardener (catalyst) can cause skin irritation (itching, rashes, hives) and prolonged or repeated skin contact may cause sensitivity (itching, swelling, rashes). The low vapor pressure of the resin by itself makes inhalation unlikely in normal use. There is the possibility that an instrument could be knocked or torn off, pulling out the hair and/or some of the underlying skin, which would then be open to infection.

The use of the proposed experimental collar could be problematic in a number of ways depending on the design used. Even the best-fitting collars may snag, and if this were to occur while an animal is underwater and unable to free itself, the animal would drown. Collars can chafe, and the constant irritation could lead to infection. If collars are too tight, either when initially attached or due to seasonal or age related changes in the neck circumference, an animal's ability to swallow large food items (such as whole fish) without choking would be hindered. A too tight collar could also interfere with breathing, or could, over time, cut into the animal as it grows. There may also be unanticipated behavioral effects of the collar.

*General Effects of Administering Drugs and Other Substances*: As with the other activities, the potential adverse affects of administering drugs in general are related to the effects of capture and restraint, as described above. In addition, because the blubber in some areas is not well vascularized, inadvertent injection of drugs into the blubber frequently results in aseptic necrosis, sometime leading to large abscesses (Fowler 1986). Thus, subcutaneous administration of drugs is usually problematic in marine mammals. There is the possibility of accidentally injecting drugs subdurally (beneath the dura matter, a fibrous membrane covering the central nervous system) when attempting to inject into the extradural vein (Stoskopf 1990).

54

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 4

Effects of deuterium oxide injection: Deuterium oxide ($^2H_2O$) is a stable, relatively non-toxic and naturally occurring isotope: up to 20-25% of body water can be replaced by deuterium oxide in mice before toxic effects are observed (Oftedal and Iverson 1987). The effects of injecting deuterium are probably largely incidental to the capture and restraint as described above. However, because a post-equilibration sample must be collected, the use of deuterium increases the amount of time an individual animal must be held and the amount of time researchers are occupying a rookery. As with any procedure that breaks the skin, there is also the potential to introduce infection during injection.

Effects of lidocaine: A surface anesthetic effect, e.g. loss of feeling or sensation, can be achieved by subcutaneous injection. Lidocaine hurts for several seconds to a minute following injection into the skin. Lidocaine can produce serious side-effects if injected intravascularly, and if accidentally swallowed, can cause convulsions.[9] The use of lidocaine with epinephrine is contraindicated as it may cause tachycardia (rapid heart rate). As a surface anesthetic, lidocaine is relatively safe, as evidenced by its available in a variety of over-the-counter topical preparations for relieving pain and itching in humans.

Effects of valium: The effects are dose-related, and cumulative. It is metabolized by the liver and excreted by the kidneys. Possible side effects include bradycardia (slowed heart rate), respiratory depression, tremor, confusion, photo-phobia, blurred vision, nausea, vomiting, depressed gag reflex, lethargy, and ataxia (inability to coordinate muscle activity during voluntary movement). It should be used with caution in animals experiencing shock.[10] Injectable valium is irritating to the vein and tissue, and may cause pain during administration. It has a rapid onset when given intravenously.

Effects of injecting Evans blue dye: Evans blue is a diazo dye used for determination of blood volume on the basis of dilution of a standard solution of the dye in plasma following intravenous injection. The dye binds to albumin in the blood stream and remains bound long enough to circulate and distribute in the entire plasma volume of the blood stream. Evans blue was carcinogenic in one study in rats when administered intraperitoneally, the only species and route tested. It produced sarcomas of the reticuloendothelial system in the liver.[11] This dye is considered a teratogen at high doses, which can cause abnormal prenatal development.[12] However, although there are no references to the safety of this dye in Steller sea lions, this dye is currently used safely for numerous human medicine applications.[13]

Effects of Betadine: Following contact with skin, a burning sensation and itching can occur. Severe complications are rare following application on intact skin.

Effects of bioelectric impedence analysis: Because the animals would be anesthetized, there will be no pain associated with the insertion of the needles. The insertion of needles does pose a risk of infection: bacteria or other infectious agents that may be present on the animal's skin or hair can be introduced under the skin. When performed by a qualified, experienced person using commonly accepted standards of good practice, these risks are likely negligible. The effects of this procedure are probably largely incidental to those associated with capture and restraint, as described above. However, the 2000 annual report for Permit No. 881-

---

[9] Lidocaine: adverse reactions. http://www.infomed.org/100drugs/lidotoc.html
[10] http://www.kcmetro.cc.mo.us/pennvalley/emt/diazep.htm
[11] Animal carcinogenicity data. http://193.51.164.11/htdocs/Monographs/Vol08/EvansBlue.html
[12] Aldrich Chemical Catalog, Aldrich, Milwaukee, WI.
[13] Numerous references available.

**Civ. No. 05-1392 (ESH)**
**Defendants' Exhibit 4**

1443 (Alaska Sea Life Center) reported development of a subcutaneous abscess on a captive adult female Steller sea lion, apparently resulting from tissue necrosis induced by the focal electrical current at the site of a bioimpedence electrode implant. The abscess was opened for drainage and began to heal slowly over the next 5-6 months. However, a scab and area of granulation tissue then formed at the site and was treated with topical antibiotics for several months, resulting in a small area of scar tissue, which will likely remain hairless.

Effects of enemas: Any time a foreign object is inserted into the rectum there is the possibility of perforation, which can lead to peritonitis that may result in death. When performed by a qualified, experienced person using commonly accepted standards of good practice, these risks are likely negligible. As animals must be restrained for this procedure, and are usually chemically restrained, the risks associated with capture and restraint are also associated with this procedure.

Effects of stomach intubation: In addition to the effects of capture and restraint, as described above, there is the risk of introduction of liquid into the trachea, initiating aspiration pneumonia or death. There is also a risk of cross-contamination if equipment is not properly disinfected between animals. When performed by a qualified, experienced person using commonly accepted standards of good practice, these risks are likely negligible.

## 4.2    Potential Effects of Alternative 1 -    Status Quo on Steller Sea Lions

### 4.2.1 Information Gained by this Alternative

Under Alternative 1-status quo: no amendments or new permits, NMFS and ADFG have existing research programs developed prior to the congressional appropriation and SSLRI which address specific research needs and hypotheses outlined in the Steller Sea Lion Recovery Plan. NMFS and ADFG studies under this alternative focus on monitoring sea lion status and trends through aerial and ground surveys; food habits through scat analysis, stable isotopes, and fatty acid; foraging ecology through deployment of satellite dive recorders on juvenile sea lions captured using hoop nets on land or underwater; stock identification using mitochondrial and nuclear DNA; health and condition by comparative morphological measures and a variety of blood parameters obtained from pups and captured juveniles; and determination of survival and age-specific reproductive rates by marking pups at their natal rookeries.

### 4.2.2    Potential Takes Under this Alternative

Under this Alternative, up to 20% of the pups born annually would be captured and handled for various sampling activities, including hot-branding, flipper-tagging, and blood and tissue sampling. The annual maximum number of sea lions that would be harassed during aerial surveys represents approximately three times the minimum population estimate. This could translate into each animal being harassed three times per year by this activity or some animals being harassed more or less, depending on the timing and locations of the surveys. Similarly, the total number of sea lions harassed during ground counts and scat collection, or incidental to capture activities, represents nearly twice the minimum estimated population. The total number of sea lions that could be potentially taken under this alternative through harassment is nearly five times the minimum estimated population. However, the number of sea lions authorized to be taken by harassment overestimates (based on previous research) the total number of animals that are actually harassed, or otherwise affected, in a given year. This relates

56

to the definitions of take and harassment under the MMPA where (1) attempting to harass a marine mammal is considered a take and (2) any act that has the potential to disturb a marine mammal is considered harassment. Thus, because aerial surveys may cover the entire range of Steller sea lions in North America, the number of takes authorized represents the number of animals estimated in the population times the number of surveys. However, not all sea lions surveyed may respond adversely to the survey. As with aerial surveys, the total number of sea lions authorized to be taken by harassment incidental to activities on land represents an estimate of the maximum number of sea lions that could be present in the research area multiplied by the number of times researchers visit a given site. However, the actual number of sea lions taken may be less because some may not be present on or near a rookery or haulout during a disturbance, or may be far enough away from the research activity to not be disturbed. The takes authorized in a permit are, therefore, conservative in allowing for the maximum potential number of animals that could be harassed, regardless of the intensity of the animals' reaction. However, the effects of harassment associated with a given activity are evaluated relative to the total number of animals that could be affected and, more importantly, by the intensity of the observed reaction of the animal and the potential effects (short- and long-term) on its survival and reproductive success.

The best available information indicates that there is a minimal likelihood for adverse physical and behavioral effects on individual Steller sea lions from the research activities currently authorized and conducted. For that reason, NMFS, Office of Protected Resources, made a determination these activities should be categorically excluded from further reviews under NEPA. However, upon receipt of subsequent research permit requests, it was determined that there have been no studies on the cumulative effects on individual stocks, or the population, especially with respect to the potential for adverse effects on the annual rates of recruitment or survival. There is a large amount of disturbance associated with some of the research activities. This disturbance could be considered significant if it affects the survival or fecundity of the population. The extent to which behavioral changes in response to disturbance can affect demographic parameters such as survival and reproductive success is not known for Steller sea lions. The potential consequences of such flight are discussed above under descriptions of effects of aerial survey and ground counts.

Under this alternative, which is the "no action" alternative, no amendments to existing permits or new permits for scientific research on Steller sea lions would be issued. However, all takes of Steller sea lions presently authorized under permits held by NMML (Permit No. 782-1532) and ADF&G (Permit No. 358-1564-01) would continue until the permits expire in December 2004 and June 2005, respectively. These two permits currently authorize takes of Steller sea lions throughout their range in the U.S. (including California, Oregon, and Alaska) by a variety of research activities involving both level A and level B harassment, as defined under the MMPA. Table 1 summarizes the numbers of sea lions authorized to be taken under these two permits. A description of the authorized takes that could occur under each activity authorized under this alternative is provided in Chapter 4.1-Effects of Alternative 1.

57

**Civ. No. 05-1392 (ESH)**
**Defendants' Exhibit 4**

the light house was no longer inhabited by humans. The consequences of such disturbance to the overall population are difficult to measure. Disturbance may have contributed to or exacerbated the decline, although Federal, State, and private researchers familiar with the data do not believe disturbance has been a major factor in the decline of Steller sea lions. Disturbance of sea lions during research, transiting vessels, and researchers is recognized as a potential factor affecting Steller sea lions but is not believed to produce effects at the population level. Past external influences of disturbance are identified for foreign fisheries and state-managed fisheries such as state-managed salmon and herring fisheries. The limits on fishing activity within critical habitat are expected to offer some level of protection from these disturbances. Disturbance from researchers visiting sites across the US range of the species at infrequent intervals under Alternative 1, and vessel traffic and acoustic disturbance from trawling is an ongoing condition of these areas, and Steller sea lions appear to be tolerant of at least some anthropogenic effects. Overall, the current level of disturbance is rated as insignificant.

### 4.6.2.2 Alternative 2 – Proposed Action: Issue New and Amend Existing Permits to Allow All Additional Takes as Requested by Applicants

Under this Alternative, in addition to the takes described under Alternative 1, permits to NMML and ADFG would be amended to include additional types of take per animal and increases the numbers of animals taken. In addition, the number of takes authorized for certain activities would be further increased by issuance of the proposed permits to AEB, Dr. van Blaricom, Dr. Davis, the ASLC, and ODFW.

**Accidental mortality during research**: The upper limit for accidental mortality under the status quo is 10 Steller sea lions per year, and the proposed action would increase this limit to 51 sea lions per year. If all accidental mortality was restricted to the eastern stock of Steller sea lions, proposed authorization for accidental mortality would have a negligible impact on the stock. On the other hand, if all of this authorized take was applied to the western stock, such a level of mortality would exceed negligible impact. Consequently, NMFS has established an upper limit to the average annual mortality that can be applied to the western stock at a level that would cause insignificant impact. If accidental mortality in the western stock reached 10 sea lions (about 5% of the stock's PBR) then researchers would be required to consult with one another to identify research practices that would prevent accidental mortality in the western stock to exceed 20 sea lions (10% of te stock's PBR). With this mitigation measure in place, accidental mortality would not have a significant adverse impact on the Steller sea lion population.

**Incidental Take/Entanglement:** The cumulative effect of incidental take/entanglement is similar to Alternatives 1 and 3 and considered insignificant.

**Direct take through subsistence harvest:** The cumulative effect of shooting and subsistence harvest is similar to Alternatives 1 and 3 and considered insignificant.

**Synergistic effects of intrusive research:** See Section 4.6.2.1

**Disturbance:** The cumulative effect of disturbance is similar to Alternatives 1 and 3 and considered insignificant.

113

### 4.6.2.3 Alternative 3 – Re-allocation of Intrusive Research

Under this alternative, takes from non-intrusive research (e.g., aerial surveys) and essential population monitoring (e.g., pup counts) would be allowed as with the Status Quo and Proposed Action Alternatives. The only research of an intrusive nature that would be permitted in the western stock would be that directly related to conservation and management needs. All other intrusive research would be restricted to the eastern stock or a surrogate species.

**Accidental mortality during research**: The upper limit for accidental mortality under the status quo is 10 Steller sea lions per year, and the proposed action would increase this limit to 51 sea lions per year. If all accidental mortality was restricted to the eastern stock of Steller sea lions, proposed authorization for accidental mortality would have a negligible impact on the stock. On the other hand, if all of this authorized take was applied to the western stock, such a level of mortality would exceed negligible impact. Consequently, NMFS has established an upper limit to the average annual mortality that can be applied to the western stock at a level that would cause insignificant impact. If accidental mortality in the western stock reached 10 sea lions (about 5% of the stock's PBR) then researchers would be required to consult with one another to identify research practices that would prevent accidental mortality in the western stock to exceed 20 sea lions (10% of te stock's PBR). With this mitigation measure in place, accidental mortality would not have a significant adverse impact on the Steller sea lion population.

**Incidental Take/Entanglement:** The cumulative effect of incidental take/entanglement is similar to Alternatives 1 and 2 and considered insignificant.

**Direct take through subsistence harvest:** The cumulative effect of shooting and subsistence harvest is similar to Alternatives 1 and 2 and considered insignificant.

**Synergistic effects of intrusive research:** See Section 4.6.2.1

**Disturbance:** The cumulative effect of disturbance is similar to Alternatives 1 and 2 and considered insignificant.

Civ. No. 05-1392 (ESH)
Defendants' Exhibit 4