# EXHIBIT 2

**MARINE MAMMAL COMMISSION**
4340 EAST-WEST HIGHWAY, ROOM 905
BETHESDA, MD 20814-4447

19 May 2005

Mr. Stephen L. Leathery
Chief, Permits Division
Office of Protected Resources
National Marine Fisheries Service
1315 East-West Highway
Silver Spring, MD 20910

Re:   Review of Permit Application Nos. 782-1768 (National Marine Mammal Laboratory), 782-
      1702 (National Marine Mammal Laboratory), 358-1768 (Alaska Department of Fish and
      Game), 715-1784 (North Pacific Universities, Marine Mammal Research Consortium), 1034-
      1773 (Marcus Horning), Requests for Amendment of Permit Nos. 434-1669 (Oregon
      Department of Fish and Wildlife), 1010-1641 (Aleutians East Borough), 800-1664 (Randall
      Davis), 881-1668 Alaska SeaLife Center), and the Environmental Assessment on the Effects
      of National Marine Fisheries Service Permitted Scientific Research Activities on Threatened
      and Endangered Steller Sea Lions

Dear Mr. Leathery:

        The Commission is sending these preliminary comments in response to your request that we
expedite our review of these applications because of a pressing need to issue the permits. To
respond as quickly as possible, the Commission staff prepared these comments to identify general
concerns with the applications and the related environmental assessment. However, we have yet to
complete the full review of these applications by the Commission and in consultation with the
Committee of Scientific Advisors as required under the Marine Mammal Protection Act.

        The Service published notice of these applications in the *Federal Register* on 4 April 2005,
apparently prior to the time the applications were considered to be complete by the Service. In any
event, the Commission did not receive copies of the applications until 22 April 2005. Under the
applicable regulations, the Commission is to have 45 days after receipt of the complete applications
in which to submit comments. Thus, technically the Commission has until 6 June to submit its
comments. Although we appreciate the importance of acting on these applications as quickly as
possible, and are doing all we can to accommodate your request for speedy review, we nevertheless
expect the Service to defer final action on the applications until the Commission has had an
opportunity to submit comments, consistent with the applicable regulations. We hope that the
Service appreciates the importance of full review by the Commission and its Committee of Scientific
Advisors. Further in this regard, we note that the Service's environmental assessment states that the
consultation process on the proposed permits under section 7(a)(2) of the Endangered Species Act
cannot conclude until the comment period on the permits has closed and the Permits Division has
decided whether to revise the proposed permits in response to public comment. It therefore seems
that the Service should not issue the permits prior to receipt of the Commission's formal comments
on that basis as well.

PRINTED ON RECYCLED PAPER

PHONE:  (301) 504-0087
FAX:    (301) 504-0099

Mr. Stephen L. Leathery
19 May 2005
Page 2

     The applicants are seeking authorization to continue and/or initiate research on the ecology and biology of threatened and endangered Steller sea lions to better understand the causes(s) of the decline of the western population. The Commission has commented on past requests from these and other applicants to conduct research into the decline of Steller sea lions – see enclosed letter of 2 August 2002 regarding permit application Nos. 800-1664 (Randall W. Davis, Ph.D.), 1016-1641 (Glenn R. VanBlaricom, Ph.D.), 434-1669 (Oregon Department of Fish and Wildlife), and 881-1668 (Alaska SeaLife Center), and associated environmental assessments on those applications and letter of 27 July 2001 concerning Permit Nos. 782-1532 (National Marine Mammal Laboratory) and 358-1564 (Alaska Department of Fish and Game).

     The Commission recognizes the need for and supports research on Steller sea lions to determine the nature of the western population's ongoing decline. However, as expressed in our previous letters, we are concerned that the multiple projects proposed, many of which are invasive and involve disturbing animals at rookeries, may result in cumulatively significant adverse effects on Steller sea lions, particularly those in the endangered western population. Based on the information submitted in the applications and the Service's environmental assessment, the Commission is unable to determine that the proposed research will not have significant population-level impacts.

<u>General Comments on the Proposed Research Activities</u>

<u>Research Design</u>

     The permit applications under review often do not provide sufficient information on their research design. It is therefore not possible to determine the likelihood that scientists will achieve their research objectives. It also is unclear whether all of the proposed research is essential and whether the potential benefits outweigh the cumulative or combined risks. We note, for example, that –

-     many of the applications lack sufficient information regarding when and where the proposed studies would occur. As a result, it cannot be judged whether (1) the studies will be adequately distributed to avoid concentrating possible adverse effects on some segments of the population, (2) potentially important spatial variation in studied parameters are being assessed, and (3) research activities are being adequately coordinated to provide the best scientific information with the least practicable adverse effects on the animals;

-     although some of the researchers (Marcus Horning, Oregon Division of Fish and Wildlife) have submitted power analyses to determine appropriate sample sizes, in most cases sample sizes and selection criteria for subject animals are not described adequately to enable reviewers to determine whether the proposed research is sufficiently powerful to detect significant effects or that animals are representative of the sampled populations;

Mr. Stephen L. Leathery
19 May 2005
Page 3

- in some cases, particularly in the amendment request from the Alaska SeaLife Center, the information provided is not sufficient to determine how the proposed additional activities will integrate into and/or affect the results of the permittee's currently authorized research;

- some of the proposed research (NMML, Alaska Department of Fish and Game, and Alaska SeaLife Center) involve the capture, handling, and branding of dependent pups 5 days of age and older and the use of Telazol in the process of capturing females with dependent pups. Because this drug involves a high risk of mortality, every precaution should be taken in its use and only veterinarians and biologists with significant experience in darting marine mammals should be authorized to conduct the activity. Applicants have not, but should, describe the measures that will be taken to (1) identify a female's dependent pup prior to her capture and (2) reunite the mother and pup after research activities have been completed. Information also should be provided concerning the effects of Telazol on nursing pups. As a related matter, additional justification should be provided for the Alaska SeaLife Center's proposed at-sea foraging study, which involves buoyancy/drag experiments on females with dependent pups. In light of the apparent risks involved, it would seem more prudent to determine the effects of the buoyancy/drag blocks on captive animals and on surrogate species prior to carrying out the study on an endangered population in the wild;

- in some cases, the research methodologies proposed by the different applicants are not consistent. Of particular concern is the difference in the proposed use of anesthesia for hot-branding animals. Seven of the nine applicants are requesting authorization to hot-brand animals. Many are proposing to use gas anesthesia for this activity, consistent with the hot-branding protocol developed by the National Marine Mammal Laboratory and the Alaska Department of Fish and Game (provided as an appendix to this and some of the other applications). One of NMML's applications (No. 782-1702) states that no anesthesia will be used for hot-branding animals, while another NMML application (No. 782-1768) clearly states that pups will be anesthetized for branding, but is less clear regarding the use of gas anesthesia in branding older pups, juveniles, and adults. The application from the Alaska SeaLife Center states that "animals will typically be anesthetized with isoflurane for hot branding and tooth extraction," but does not explain what is meant by "typically." Methods used for branding animals should be consistent unless there is a compelling reason for any such differences. Moreover, it should be accomplished in a manner that meets the Marine Mammal Protection Act's requirement that taking authorized by permit be humane – i.e., that it involve the least possible degree of pain and suffering practicable to the mammal. Although anesthesia involves potential risk, branding with anesthesia has been occurring for several years. The risk therefore should be evident in existing research records and should be evaluated before further branding is approved;

- a few of the applicants have not responded to requests for clarification posed by the NMFS Permits Office concerning proposed research activities and their applications should therefore be considered as incomplete.

Mr. Stephen L. Leathery
19 May 2005
Page 4

- none of the applications provides explicit monitoring protocols. This is of particular concern with respect to the proposed hot-branding activities, which pose risks associated with capture, handling, the infliction of burn wounds that may become infected, and disruption of rookeries. Among other things, branding is used to facilitate the investigation of survival and reproductive rates. The value of such studies depends largely on the nature and extent of resighting efforts. However, the applications do not provide sufficient information for reviewers to ascertain that resighting efforts will be adequate to yield meaningful results. In this regard, the Service's environmental assessment states that more than 15,000 sea lions have been branded since 1975 (p. 127 of the environmental assessment), but that there has been insufficient resighting effort to validate the merits of hot-branding when weighed against the potential adverse impacts to individual sea lions. The assessment also notes that Merrick et al. (1996) state that studies of branded Steller sea lions on Marmot Island in Alaska suggest that branding may lead to increased mortalities. The increased risk of injuries or mortalities associated with branding would not only impede recovery but also bias scientific conclusions based on these studies. The applicants are proposing to hot-brand more than 3,000 animals over five years. If monitoring efforts are not adequate to provide meaningful results, then the studies proposed will not achieve their stated objectives. Nevertheless, the animals involved will be exposed to considerable risks, regardless of whether the research furthers the recovery and conservation of the species. We also note that the Oregon Department of Fish and Wildlife is proposing to conduct hot-branding studies to "examine the effects of branding during the first few weeks and months post-handling including the documentation of any sustained injury, unusual mortality or immediate movements in response to marking." If information on the effects of hot-branding on young Steller sea lions is indeed lacking, it seems premature to authorize the large-scale branding activity that is being proposed by 7 of the 9 researchers until more information on the impacts associated with branding becomes available.

- from the information provided in the applications (and the environmental assessment), it is unclear whether, or to what extent, the researchers are aware of the full scope of Steller sea lion research projects being conducted or proposed; and whether and, if so, how, the various research projects are being or will be coordinated. Absent adequate coordination of these multiple research projects, either by the applicants or the Service, it is not possible to ensure that some research will not be duplicative and that unnecessary taking of animals will not occur. As a related matter, the Service's environmental assessment states that the Service has convened a new recovery team to develop a revised recovery plan for Steller sea lions. We commend the Service's decision to update the outdated recovery plan and urge that the recovery team be effectively incorporated into research planning.

- although some of the applicants have provided documentation indicating that their proposed research has been reviewed and approved by an Institutional Animal Care and Use Committee, others have not. A written decision from each applicant's committee (or in the case of federal agencies, their equivalent) must be provided, stating that the proposed studies have been reviewed and approved in accordance with sections 2.31 and 2.37 of the Animal and Plant Health Inspection Service's regulations implementing the Animal Welfare Act.

Mr. Stephen L. Leathery
19 May 2005
Page 5

Reports of Previous Years' Research

No reports of previous years' research have been submitted with the applications. Thus, it is not possible to determine what research has been conducted, the number of animals that have been taken, the effects of the activities on the animals, the results of post-capture/tagging/branding monitoring activities, or the number of mortalities that have occurred under each permit to date, and, if mortalities have occurred, the measures that have been taken to avoid mortalities in the future.

General Comments on the Environmental Assessment

Our comments on the Service's environmental assessment of the permit applications are essentially the same as provided in our review of the Service's 2002 assessment of previous research activities on Steller sea lions (see our letter of 2 August 2002, incorporated here by reference). The Commission remains concerned that the cumulative effects of the proposed research, in combination with other factors that are affecting the western population of Steller sea lions, could have significant adverse impacts on the population. Such information is particularly important for assessing the effects on and benefits to a species listed as endangered under the Endangered Species Act.

We therefore reiterate our recommendation that the Service reconsider the finding of no significant impact set forth in the environmental assessment and either (1) provide additional explanation of its rationale for such a finding, (2) reduce the scope of those research projects that have the highest potential to result in sea lion mortality and other adverse impacts to a level that would more clearly have no significant population-level impacts, or (3) prepare an environmental impact statement on the proposed action.

With respect to the proposed permit requests, the Commission recommends that the Service defer final action pending (1) receipt and review, in consultation with the Commission, of supplemental information that addresses the issues discussed above; (2) completion of Endangered Species Act consultation; and (3) additional justification for concluding that the proposed activities, if authorized, would not result in a significant impact on Steller sea lions.

Please contact me if you have any questions concerning these comments and recommendations.

Sincerely,

David Cottingham
Executive Director

Enclosures

Chron
Reading (DC) (JKD)
File:
    permit

06/29/2005 15:18 FAX 301 504 0089    MARINE MAMMAL COMM.    ☑007

05/29/2005 15:18 FAX 301 504 0099   MARINE MAMMAL COMM.   @006

**MARINE MAMMAL COMMISSION**
4340 EAST-WEST HIGHWAY, ROOM 905
BETHESDA, MD 20814-4447

2 August 2002

Mr. Eugene T. Nitta
Acting Chief, Permits Division
Office of Protected Resources
National Marine Fisheries Service, NOAA
1315 East-West Highway
Silver Spring, MD 20910

> Re:   Review of Permit Application Nos. 800-1664 (Randall W. Davis,
> Ph.D.), 1016-1641 (Glenn R. VanBlaricom, Ph.D.), 434-1669
> (Oregon Department of Fish and Wildlife), and 881-1668 (Alaska
> SeaLife Center), and the Environmental Assessment on the Effects
> of National Marine Fisheries Service Permitted Scientific Research
> Activities on Threatened and Endangered Steller Sea Lions

Dear Mr. Nitta:

The Marine Mammal Commission, in consultation with its Committee of Scientific
Advisors on Marine Mammals, has reviewed the above-referenced permit applications with
regard to the goals, policies, and requirements of the Marine Mammal Protection Act. The
Commission also has reviewed the environmental assessment prepared by the Service, which
evaluates the impacts of the issuance of these and other requested permits and authorizations on
the human environment, i.e., permit application no. 1010-1641 (Aleutians East Borough) and
requests for amendments to permit nos. 358-1564-00 (Alaska Department of Fish and Game) and
782-1532 (National Marine Mammal Laboratory, NMFS). The Commission has previously
commented on those requests (see letters of 5 September 2001 and 27 July 2001, enclosed).

The applicants are seeking authorization to conduct research for the purpose of obtaining
information on the ecology and biology of threatened and endangered Steller sea lions to better
understand the cause(s) of the decline of those populations. Such information is needed to enable
the Service to develop effective management strategies to promote the species' recovery and to
make informed decisions related to fishery management and other human activities within the
species' range. The Commission notes that recent increases in funding available for research
related to Steller sea lions provide an important opportunity to investigate the species' decline
and the factors that may be contributing to the decline. However, we are concerned that, given
the number of projects authorized and proposed, many of which are invasive in nature, they may
cumulatively operate to the disadvantage of the western Steller sea lion population. Based on the
information provided in the applications and in the environmental assessment, the Commission is
unable to adequately determine if this will be the case, and additional steps may be necessary to
ensure that there will not be a significant impact. Among other things, the Commission is unable
to determine (1) the likelihood that the objectives of some of the proposed research projects will

PHONE:   (301) 504-0087
FAX:       (301) 504-0099

2

be achieved; (2) whether, and to what extent, attempts will be made to monitor the short- and long-term adverse effects of the research efforts; and (3) the extent to which the various research activities will be coordinated. In addition, as noted in our comments later in this letter on the Service's environmental assessment, the Commission remains concerned that the cumulative effects of the proposed research, in combination with other factors that are affecting the western population of Steller sea lions, could have significant adverse impacts on the population. We note that such information is particularly important for assessing the effects on and benefits to a species listed as endangered under the Endangered Species Act.

We first provide specific comments on each of the subject permit applications and then offer general comments pertaining to the applications and the associated environmental assessment.

Permit Application No. 800-1664 (Randall W. Davis, Ph.D.)

The applicant is requesting authorization over a five-year period to capture, anesthetize, measure, weigh, blood and tissue sample, tag, hot brand, and release up to 45 Steller sea lions (15 adult females and 30 juveniles of either sex) annually and to harass incidental to the capture and tagging activities up to 2,000 Steller sea lions (1,000 adults of either sex and 1,000 juveniles and pups of either sex). Individual animals could be captured up to three times over the five-year research period. Each year, up to 13 animals could be accidentally killed during the research activities. Research would be conducted in the Gulf of Alaska and the Aleutian Islands.

In reviewing the application, the Commission notes that animals may be anesthetized for up to three hours for tagging, branding, and sampling. Although the time estimated appears to be longer than necessary to carry out these procedures, it is perhaps based on a need for flexibility in the event that anesthetized animals have adverse reaction(s) to the anesthesia or associated tagging, branding, and sampling activities, or that it incorporates holding time for recovery from the anesthesia. Nonetheless, the Marine Mammal Commission recommends that clarification of the basis for the three-hour time frame be provided by the applicant, including the length of time that animals will be held after concluding the research procedures to ensure that they have recovered sufficiently from the effects of the anesthesia. We also note that, although the application states that a veterinarian will be present to monitor anesthetized animals, a curriculum vitae for the veterinarian(s) who would be involved has not been, but should be, provided.

Darting adult female sea lions with Telazol, as proposed, involves a high risk of mortality, either from their reaction to the drug or from drowning if they enter the water before the drug takes full effect. Although darting with Telazol apparently is the only method currently available for capturing adult female Steller sea lions, the Marine Mammal Commission recommends that every precaution be taken to avoid sea lion mortality and that only veterinarians and biologists with significant experience in darting marine mammals be authorized to conduct the activity.

3

The investigators describe the attachment of a number of instruments to animals, but do not provide complete information on the size and weight of the instruments. Although large animals may be unaffected by such instruments, this is not necessarily the case for smaller animals, and information on dimensions and weight should be provided as well as an assessment of possible effects.

It is unclear whether the research activities and associated taking proposed in the applicant's Alaska SeaLife Center's 2001 Steller Sea Lion Research Plan have been included in the take table on page 4 of the application. For example, although the table states that 75 adult females (15 annually) and 150 juveniles (30 annually) will be captured and tagged over the five-year period, page 2 of the Alaska SeaLife Center 2001 Research Plan states that up to 20 Steller sea lions of both sexes and all age classes older than pups would be tagged with location-only satellite linked transmitters in the first year of the study. Further, the table makes no reference to the use of location-only satellite-linked transmitters as is indicated in the text of the application. Clarification of these points should be provided by the applicant.

Justification should also be provided for the requested authorization of up to 13 mortalities per year out of 45 animals to be captured. This would be a mortality rate of almost 30 percent of animals handled, which, if it actually occurred, would be unacceptably high.

Permit Application No. 1016-1651 (Glenn R. VanBlaricom, Ph.D.)

The applicant is requesting authorization to take biopsy samples from up to 200 adult and juvenile Steller sea lions annually (100 each from both the western and eastern populations) at no fewer than two sites for each population over a three-year period, and to harass incidental to biopsy sampling up to 1,000 Steller sea lions (500 from the western stock and 500 from the eastern stock), up to 1,000 northern fur seals, and up to 1,000 harbor seals over the duration of the research. Biopsy samples would be exported to Canada for analysis.

The investigators state that "the primary objective of [their] work is to obtain an assessment of the presence of fatty acid signatures from ephemeral, high-quality prey in free-ranging Steller sea lion blubber for both the western and eastern populations, and evaluate the relative contribution of such prey to blubber stores and diet." They expect to test the null hypothesis that "there is no difference in the use of ephemeral high-quality prey between the western and eastern populations of Steller sea lions by measuring the quantitative contribution of fatty acid signatures from prey species in sea lion blubber stores." However, it is not clear that the research design is sufficient to test this hypothesis and to characterize any differences in the use of forage fish by sea lions in the two populations. The approach appears to rest on the assumption that the samples taken from two (or possibly more but as yet undetermined) locations west of Cape Suckling will be representative of the western population and those taken from two or more other (also undetermined) locations east of Cape Suckling will be representative of the eastern population. However, it seems questionable that samples taken from sea lions at two sites per population will be representative of the larger populations for several reasons: these

4

populations span huge regions; forage fish and other prey are not evenly distributed throughout these regions; and foraging patterns of sea lions may vary considerably by season, available prey species, and region. Importantly, the assumption that the samples are representative also is questionable because the sites where the samples are to be taken will be determined based on the availability of spawning forage fish. Thus, the nature of the data collected will be unavoidably influenced by the selection of sample sites. The simple recognition that forage fish availability varies by site suggests that a more complicated sampling regime will likely be necessary to compare in a meaningful way the foraging patterns and the significance of forage fish to the two populations of sea lions.

The description of the methods for this study indicates that animals may be taken by biopsy-darting when they are in the water. For the most part, only the head and necks of immersed sea lions are visible at the surface, and attempts to take biopsies by shooting darts at these targets pose an unacceptable risk of striking an animal in the head and causing serious injury. In addition, we note that biopsy darting would be conducted using a crossbow. Crossbows have been used with apparent success and safety to biopsy-sample certain otariid species, and we understand that there apparently have been no problems with controlling the depth of the dart penetration using this system. However, inasmuch as this technique has not been used previously to collect biopsy samples from Steller sea lions, the technique and equipment should first be tested on carcasses. In addition, the individual(s) who will be darting the animals should be thoroughly trained and experienced in using the technique prior to employing this method in the field, and animals in the water should not be darted.

A second study described in this application involves aerial surveys to test for correlations between the use of haul-out sites by sea lions and the occurrence of spawning aggregations of forage fish. Again, it is not clear that the design described will be sufficient to accomplish its purpose. The design appears to involve only a single flight during each spring period when spawning may occur. A single flight seems a questionable basis for characterizing the potentially complex spatial and temporal variation of spawning events of forage fish in the region to be surveyed and for correlating the distribution of those events to the distribution of sea lion haulouts, which also may be shifting in response to prey availability or other seasonal events such as the onset of the reproductive period. It is also not clear why this study is not being coordinated with other aerial surveys proposed for southeastern Alaska.

In light of the above questions and concerns, the potential utility of these studies is not clear and seems, at best, questionable. Without additional information on these studies, it does not seem possible to confirm that they will achieve the stated research objectives or will contribute to the conservation and recovery effort for Steller sea lions.

5

### Permit Application No. 434-1669 (Oregon Department of Fish and Wildlife)

The applicant is requesting authority to harass annually up to 3,800 Steller sea lions during pup counts on selected rookeries in Oregon and northern California during June and July and, of these 3,800 animals, to capture, anesthetize, weigh, measure, sample (blood, tissue, swabs), and hot-brand up to 200 pups of both sexes under 1½ months of age. Authorization is also requested to capture on or adjacent to rookeries and haulouts during all months of the year and to anesthetize, weigh, measure, sample (blood, tissue, swabs, enemas), flipper-tag, radio/satellite-tag (10 animals only), and hot-brand up to 30 juvenile sea lions (including pups of the year greater than 4 months of age). Up to 10,000 Steller sea lions would be incidentally harassed each year during the proposed research activities. The applicant also is requesting authorization for the accidental death of up to 10 animals annually or a total of 30 animals over the five-year research period. Authorization is also requested to harass up to 1,000 northern fur seals and up to 1,000 harbor seals incidental to the proposed research activities on Steller sea lions.

The Commission notes that the applicant requests authorization to capture and brand pups under 1½ months of age, noting, on page 10 of the application, that "[p]ups that are very young or in poor physical condition will not be branded." Clarification should be requested as to the minimum age and size of pups that will be hot-branded. The applicant also requests authority for the "optional" use of gas anesthesia to reduce stress on pups during branding, but does not explain the basis upon which decisions to use anesthesia will be made or why anesthesia will not be used all cases.

The application implies that a veterinarian will be present to monitor anesthetized animals and to supervise other research personnel directly, but it is not clear that this will be the case. The Commission requests clarification of this point. Further, a curriculum vitae for the veterinarian(s) who would be involved in the research has not been, but should be, provided. Also, the applicant has not, but should, describe the sizes and weights of the instrument packages that will be placed on the animals. Finally, the applicant has not, but should, explain why such a high number of research-related mortalities (10) are needed on an annual basis.

### Permit Application No. 881-1668 (Alaska SeaLife Center)

The applicant is requesting authority to capture up to 610 Steller sea lions annually for various research procedures, of which up to 16 juveniles would be maintained in captivity at the applicant's facility for up to three months. Authorization is also requested to take by harassment up to 5,850 Steller sea lions incidental to the proposed research activities. Research would be conducted throughout the Alaska range of the Steller sea lion and at the applicant's facility. The applicant is requesting authorization for the accidental death of up to five sea lions annually in the field and up to three mortalities annually for animals maintained in captivity at the Alaska SeaLife Center. The proposed research consists of five projects, the objectives of which are to

6

obtain data on juvenile survival, population dynamics, immunology, epidemiology, endocrinology, viral serology, physiology, ontogenetic and annual body condition cycles, foraging behavior, and habitat use.

The Commission notes that the applicant does not, but should, provide an estimate of the length of time that animals may be anesthetized. The applicant should also be asked to describe any potential consequences of repeatedly anesthetizing animals (i.e., on a weekly basis). Although the application implies that a veterinarian will be present to monitor anesthetized animals and to supervise personnel directly, it is not clear that this will be the case. The Marine Mammal Commission recommends that clarification of this point be provided.

In addition, the Commission notes the following:

- At the bottom of page 12 of the application, six activities are listed that would be facilitated by the use of a blind/platform. It is not clear if the applicants are providing these as examples of activities that could conceivably be attempted using a blind or whether they are requesting permission to conduct these activities

- (page 12) Task 3. Although the anticipated period of captivity is described as being "short-term," it is nevertheless accompanied by some level of risk to the animals brought into captivity and to the wild population when those animals are released. The permit application indicates that rigorous criteria have been developed to screen animals to be released. As a precaution, it would be useful to compare the criteria developed by the Alaska SeaLife Center with similar criteria being developed by the Service for releasing captive marine mammals to the wild to ensure that the Center's list of criteria is comprehensive

- (page 30) Task 1. The application states that 60 pups will be captured and sampled with an associated disturbance of 150 animals per capture for a total of 2,100 animals disturbed. As the disturbance of 150 new animals for each of 60 captures would result in a total disturbance of 9,000 animals, it is not clear how the applicant determined that the total number of disturbed animals would be only 2,100, unless they are assuming that multiple captures would result in the incidental disturbance of the same animals at the same time. Clarification of this statement would be useful

- (page 31) Task 5. Permission is requested to capture more animals than will be sampled. It is not clear why some animals that are captured would not be sampled

- (page 33) Task 3.3. Table 1 includes an entry pertaining to adrenocorticotropic hormone challenge. This activity is not further explained and no rationale for such a study is provided. Thus, it is not clear why it is included here, how it might contribute to recovery efforts for Steller sea lions, or why permission for this activity is being requested. Such information should be provided before authorization of this activity is considered

7

- (page 36) End of first paragraph. The application states that "An emergency kit... *should* be readily available." (Emphasis added). An emergency kit should be *required* if this activity is permitted

- (page 41). Task 2. The application does not include branding in the list of requested take activities, and it is not clear if these animals would be branded

- (page 42). Task 3.a. The application states that it is possible to determine if an animal is weaned by looking at the size, eruption, and wear patterns of the teeth. This information implies an understanding of weaning patterns that seems inconsistent with the uncertainty about Steller sea lions and their life history patterns. If information exists that demonstrates that tooth size and wear patterns can be used to determine if an animal is weaned, the applicant should be asked to provide or reference such information. If such information is not available, then the applicant should recognize this and be prepared to handle some animals that may not yet be weaned

- (page 45). Task 3.3.a. This section again refers to injections of adrenocorticotropic hormone to "challenge" juveniles. The purpose and utility of such tests are not clear, and the applicant should provide a rationale and research protocol for them; and

- (page 48). Task 5.b. The list of sampling activities does not include branding. It would be useful if the applicant would clarify whether these animals would be branded prior to release.

Other questions identified by the Commission include:

- what is the minimum age at which pups may be captured?
- what are the weights of the transmitter devices that will be implanted in juvenile animals and the animals themselves? how does one determine the maximum size (dimensions, size) of instruments than can be implanted safely into the animals?
- what precisely will be done in terms of "re-evaluating the process" (as noted on page 44 of the application) if more than three captive animals are deemed to be non-releasable within the period of one year? and
- under what circumstances would animals deemed non-releasable be euthanized?

### General Comments on the Permit Applications

#### Research power and sampling designs

The utility of the proposed research depends largely on the power of the projects to describe important factors and processes (e.g., weaning of sea lion pups) and detect significant effects (e g., competition with fisheries) if they occur. The power of the research depends on,

8

among other things, the sampling protocol used, which should ensure that important effects are detected if they occur and faulty conclusions of no-effect are avoided. This being the case, it is essential that the samples collected during the course of research should be representative of the sea lion populations from which they were taken and should be pertinent to identification of the causes of the decline or steps that can be taken to facilitate the species' recovery. The permit applications under review often do not provide sufficient information on their research sampling design and thus it is not always possible to determine if they will meet their stated objectives. In the following paragraphs, we provide some examples of how the lack of information confounds the evaluation of the merit of the proposed studies.

The locations where and times when studies would be conducted often have a significant bearing on the potential utility and merit of the proposed studies. Nevertheless, several proposals either fail to describe where the studies would occur or provide incomplete information. As a result, it is not clear that these studies will be adequately dispersed to assess potentially important spatial variation in the factors being assessed. For example, if studies are concentrated in the Gulf of Alaska or along the Alaskan Peninsula, it is not clear that their results will be pertinent to or representative of sea lions in the western Aleutian Islands. Similarly, the temporal distribution of sampling is also important, and this generally was not described in sufficient detail for the reader to determine if the research results would reliably answer the research question. If, for example, changes in juvenile growth, condition, and survival are most likely to occur during winter months (as has long been suspected) and research sampling occurs primarily in the summer months, then the research design may not be adequate for detecting important potential effects. The lack of information on the area and time during which research activities would occur also makes it impossible to determine if the research is being suitably coordinated to provide the best scientific information with the least practicable adverse effects on the animals resulting from handling and disturbance.

Another important element of sampling is selection of the animals to be included in the research. Some previous studies of Steller sea lions have been limited to very small sample sizes of animals selected on the basis of criteria that may have reduced the difficulty of the study or avoided related risks (i.e., animals at the edge of the rookery, animals appearing to be in excellent or good condition, or animals of sufficient age or size), but selection by such criteria may introduce bias that raises questions as to whether those animals are truly representative of all the animals at a particular site or all the animals in the population. For example, comparison of the condition of animals at different sites may not be meaningful if animals are chosen for sampling on the basis of their apparent good health. Because the reliability and utility of the results often depend on the assumption that the animals sampled are representative of the larger population of concern, the issue of sample selection is important to research success. In some cases, the applications do not describe how the animals would be selected and it is therefore not possible to determine if the sampling scheme is adequate to allow reliable interpretation of results.

Further, the value of studies to investigate survival and reproductive rates using marked animals depends largely on the nature and extent of resighting efforts. More than 15,000 sea

)                                              )

9

lions have been branded since 1975 (p. 53 of the environmental assessment), but few estimates of survival or reproduction have been forthcoming from these animals due to limited resighting effort, and those estimates that have been produced are of limited use. Branding poses risks associated with capture, handling, the infliction of burn wounds that may become infected, and the disruption to rookeries. The permit applications (and the environmental assessment) do not discuss these concerns in sufficient detail and have not provided the requisite level of assurance that resighting efforts will be adequate to yield meaningful results. If such efforts are not adequate, then the studies proposed will not achieve their stated objectives, the animals involved will be exposed to unnecessary risks, and the research will not contribute to the recovery and conservation of the Steller sea lion.

### Incidental effects of research

Research activities may pose significant risks to a study population if they cause reductions in survival or reproduction. Such effects can result directly (e.g., animals that die in the course of sampling or experimentation) or indirectly (e.g., animals that are disturbed by research activities and abandon important habitat or dependent pups). Although such effects are not intentional, they may be of sufficient magnitude that, either by themselves or in combination with other human-related effects, they result in significant adverse effects on the study population. The costs and benefits of such research can only be weighed if such effects are adequately identified, monitored, and assessed.

As noted above, the lack of information on the location and time of research activities precludes an evaluation of how proposed activities and their incidental effects may overlap or be concentrated. As noted below, the lack of a monitoring plan will preclude an analysis of the effects of the proposed research, both while it is in progress and after it has been completed.

The lack of information on incidental mortality also could confound research results and, if not accounted for, could undermine the ability of the projects to produce information that can be expected to contribute to the recovery and conservation of the Steller sea lion. Also, if animals are branded for the purpose of assessing survival, and some of the animals die from branding or its complications, then the resulting estimates of survival will be biased unless the effect of branding is somehow quantified and accounted for in the final analysis of survival.

### General Comments on the Environmental Assessment

The studies proposed in the permit applications are part of the largest research effort ever undertaken to investigate the factors contributing to the decline of a single marine mammal population. In 2002 funding for research related to Steller sea lions exceeded $40 million, an amount roughly equivalent to research funding for all other marine mammal species in waters under U.S. jurisdiction. Because of the considerable increase in funding for Steller sea lion research and the limited time for developing effective research programs, and because even the most well-intentioned research may have undesirable effects, it is important to evaluate the

10

research activities thoroughly to ensure that they do not, either by themselves or in combination with other activities, have significant adverse impacts on the subject populations or their recovery.

The environmental assessment for the subject permit applications and other ongoing and proposed research activities determined that they would have no significant adverse impact on the Steller sea lion. The environmental assessment based that conclusion on the presumed beneficial effects of proposed mitigation measures, the development of a monitoring plan, efforts to limit accidental mortality, and research coordination. The first of these factors, proposed mitigation measures, is based largely on "best practices" that should help prevent the potentially detrimental effects of the research from occurring.

The second factor, the development of a monitoring plan will not contribute to the reduction of significant effects that may result from the proposed research until a plan is completed and implemented. Although such a plan is needed, it is not expected to be in place for some time, and therefore will be of no use in describing incidental effects during the first years of this research. This apparent oversight is particularly significant because large numbers of animals will be captured or otherwise subjected to research activities that may have significant effects.

The third factor, efforts to limit accidental mortality by using the best practices approach, should help to reduce the potential for adverse effects. However, the number of accidental mortalities requested in the permit applications does not appear to be consistent with the finding of no significant adverse impact. Combined, the permit applications request permission for a total accidental mortality of 51 sea lions per year, at least 41 of which may be from the western population. This number is considerably larger than allowed in past years (10). In the absence of effective monitoring, it is possible, if not likely, that the number of observed deaths will constitute only a minimum estimate of the actual number of animals that die as a result of the research effort. Although the environmental assessment determined that this minimum number would not constitute a significant adverse impact, it did so partly on the basis of comparisons with the species' potential biological removal level, which is one standard used to characterize a species' or stock's tolerance for human-related mortality. A stock's potential biological removal level is defined in section 2 of the Marine Mammal Protection Act as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." In the 2001 stock assessment report for the western population of Steller sea lions, its potential biological removal level is calculated to be 208 animals, the direct take in fisheries is estimated at about 28 animals, and mortality from subsistence taking is estimated at 353 animals. If an additional 41 animals from the western population are taken during the course of research, then known human-related take would be about twice the potential biological removal level. It is not clear how such a level can be considered insignificant.

11

The fourth factor is research coordination. It is not possible to determine from the permit applications how such coordination will be accomplished. In particular, we are concerned that the lack of information on the spatial and temporal distribution of the different research efforts precludes an analysis of overlap of research by different agencies and organizations, which would seem to be essential for adequate coordination.

In addition, the environmental assessment includes a cumulative effects analysis that fails to consider the effects of the proposed research together with the effects of all of the other factors that are, or may be, affecting sea lions. For example, the indirect effects of fisheries were not considered in the analysis in a meaningful way, despite the fact that indirect fisheries effects have been at the center of a significant controversy involving the Alaska groundfish fisheries and have formed the basis of several section 7 jeopardy findings under the Endangered Species Act. Therefore, the cumulative effects analysis is incomplete and, in the absence of such an analysis, the conclusion of no significant adverse impact seems unfounded.

In light of the considerable increase in research activities (including a number that would employ invasive techniques that pose risks to the sea lions involved), the potential for disturbance of animals at rookeries and haulouts, the lack of a monitoring plan to assess incidental impacts, the lack of an adequate cumulative effects analysis, and the ongoing decline of the western population of Steller sea lions, significant adverse effects resulting from the proposed and ongoing research activities cannot be ruled out. In such cases, the National Environmental Policy Act directs federal agencies to prepare an environmental impact statement that considers alternatives to the proposed actions that would achieve the stated goals in a way that has fewer adverse environmental impacts. The overall research approach being taken for investigation of the decline of Steller sea lions is largely a reductionist approach that requires identification and description of the mechanisms linking potential causes to the sea lion decline. The large increase in funding for this research reflects a concern about the effects of fisheries on Steller sea lions, and such effects may be difficult to describe if the research conducted lacks the investigative power to describe the mechanisms of interaction in detail. For that reason, alternative research approaches should be considered. One alternative empirical approach that should be reflected in the Service's NEPA analysis would be to prohibit fishing in areas large enough to ensure that fishing has no effect on prey availability and then observe sea lion population trends to determine whether they do, in fact, respond. The advantage of this more direct approach would be that it could address the hypothesis more directly, and perhaps more quickly, and pose less risk to sea lions and their recovery. Because of the problems identified above, the Marine Mammal Commission recommends that the Service reconsider the finding of no significant impact set forth in the environmental assessment and either (1) do a better job of explaining its rationale for such a finding, (2) scale back those research projects that have the highest potential to result in sea lion mortalities and other adverse impacts such that a finding of no significant impact is more defensible, or (3) prepare an environmental impact statement on the proposed action.

12

## Conditions

In view of the above comments, the Marine Mammal Commission recommends that the Service defer final action on the permit applications pending (1) receipt and review, in consultation with the Commission, of supplemental information that addresses the issues discussed above; and (2) clarification, in response to the Commission's comments, of the basis for the Service's finding that the proposed activities, if authorized, would not result in a significant impact to Steller sea lions. Upon resolution of these questions and concerns, the Marine Mammal Commission recommends that the Service grant approval of the requested activities, subject to the following conditions:

--    the researchers take steps to minimize disturbance of the subject animals by exercising caution when approaching animals, particularly mother-pup pairs, and halt an approach if there is evidence that the activity may be interfering with pair bonding, nursing, reproduction, feeding, or other vital functions;

--    all branding activities be accompanied by effective programs to monitor their short- and long-term effects;

--    whenever possible, new invasive research procedures be tested on non-listed otariid species and on captive Steller sea lions before they are used on sea lions in the wild to ensure that the proposed techniques can be employed safely;

--    surgical implants of instruments be performed by experienced marine mammal veterinarians, and the animals be fully recovered from the anesthesia and exhibiting no ill effects of the surgery prior to release;

--    an experienced marine mammal veterinarian be present in the field to carry out or to provide direct on-site supervision of all activities involving anesthesia of animals;

--    surgical implantation of instruments be immediately suspended, until reauthorized by the Service, in the event that two animals die or are injured during or following the surgery and the mortality or injury can reasonably be attributed to that activity;

--    the Service, in consultation with the applicants, review the basis for the numbers of accidental mortalities requested and provide reasonable justification for the number that can occur annually before research activities must be suspended. It may be useful, as part of such review, to examine the data concerning the number of accidental mortalities authorized and the number of animals actually killed during permitted Steller sea lion research over the past five years. On a related matter, in the event that a lactating female is killed or seriously injured as a result

06/29/2005 15:24 FAX 301 504 0099      MARINE MAMMAL COMM.                         ⌀020

13

of the activities, the female's orphaned pup should be humanely provided for (i.e., salvaged and cared for, or if salvage is not possible, euthanized);

— inasmuch as the use of a crossbow for biopsy sampling has not been previously used on Steller sea lions, the Service be satisfied that the individual(s) carrying out the biopsy sampling are sufficiently experienced and the technique and equipment have been adequately tested prior to authorizing the activity on animals in the field;

•• the proposed studies have been reviewed by the permittee's Institutional Animal Care and Use Committees in accordance with § 2.31 of the Animal and Plant Health Inspection Service's regulations governing the humane handling, care, treatment, and transportation of marine mammals;

•• the Service ensure that activities to be conducted under these permits and those of other permit holders who might be carrying out research on the same species in the same areas are coordinated and, as possible, data are shared to avoid unnecessary duplication of research and disturbance of animals; and

•• as appropriate, the applicants obtain the necessary permits under the Convention on International Trade in Endangered Species of Wild Fauna and Flora prior to importing or exporting tissue samples into or from the United States.

    Please contact me if you have any questions concerning these recommendations and comments.

Sincerely,

Robert H. Mattlin
Executive Director

Enclosures

MARINE MAMMAL COMMISSION
4340 EAST-WEST HIGHWAY, ROOM 905
BETHESDA, MD 20814

27 July 2001

Ms. Ann D. Terbush
Chief, Permits Division
Office of Protected Resources
National Marine Fisheries Service, NOAA
1315 East-West Highway
Silver Spring, MD  20910

Re:    Requests for Amendment of Permit Nos. 782-1532
       (National Marine Mammal Laboratory, National
       Marine Fisheries Service) and 358-1564 (Alaska
       Department of Fish and Game)

Dear Ms. Terbush:

        The Marine Mammal Commission, in consultation with its Committee of Scientific
Advisors on Marine Mammals, has reviewed the above-referenced requests for permit
amendments with regard to the goals, policies, and requirements of the Marine Mammal
Protection Act.

        Permit No. 782-1532 authorizes the permittee to (1) capture, anesthesize, sample, tag,
brand, release, and conduct aerial and vessel surveys of Steller sea lions of both sexes and all
ages over a five-year period (through 31 December 2004) in Alaska waters; and (2) harass
northern fur seals and harbor seals incidental to research on Steller sea lions. Importation of
blood and tissue samples collected from Steller sea lions outside United States territorial waters
is also authorized.

        The permittee is requesting that Permit No. 782-1532 be amended to authorize the
harassment of additional numbers of Steller sea lions during scat collection; and conduct of
additional procedures (i.e., gas anesthesia, branding, administration of Evans blue dye and
deuterated water, muscle biopsies, noninvasive bioelectric impedance analysis, increasing blood
sample volume, tooth extractions, vibrissae sampling, and instrumentation with newly available
Underwater Timed Picture Recorders) on animals currently authorized to be taken under the
permit.

        Permit No. 358-1564 authorizes the permittee to capture, anesthesize, sample, tag, brand,
release, and conduct aerial and land-based surveys of Steller sea lions of both sexes and all ages
over a five-year period (through 30 June 2005) in Alaska waters. Importation of blood and tissue
samples collected from Steller sea lions outside United States territorial waters is also authorized.

PRINTED ON RECYCLED PAPER

2

The permittee is requesting that Permit No. 35801564 be amended to authorize the administration of Evans blue dye to, the collection of additional blood and tissue samples from, the attachment of instruments to, and the conduct of additional recaptures of Steller sea lions already authorized to be captured and handled, and the conduct of additional aerial surveys of the population.

The Commission has no objection to the permittee's research authorized under the subject permits, nor the Service amending the permits to provide for the conduct of new or additional activities of a benign nature involving minimal risk of cumulative impacts on individual animals or populations. The Commission realizes an essential need for research on the Steller sea lion to determine the nature of its ongoing decline.

However, as discussed below, we are concerned that the proposed multi-year activities could have adverse effects on both individual Steller seal lions and sea lion populations. Due to increased funding, many projects are being planned and a number of those require invasive procedures on animals as well as associated disturbance of rookeries. The potential adverse effects of research on Steller sea lions have long been a matter of concern, as discussed in the recovery plan for this species. It is conceivable that the extensive research described in the existing permits, together with the additional research requested in the proposed amendments, and other research, may become a significant factor affecting the status of the species.

It is not clear that all of the planned research is essential, and that the potential merits outweigh the cumulative or combined risks. Some of the activities described have the potential to adversely affect individual animals, and all of the activities combined may also have the potential to affect populations of animals. Rookery and haulout populations are low and may be particularly vulnerable to disturbance. To ensure that such adverse effects do not occur and become a significant factor in the decline, the Service should develop a monitoring program to assess the effects of research that may affect individuals or populations.

In addition, research should be carried out under the guidance provided by the recovery plan and the recovery team. The plan is currently outdated and, to our knowledge, the recovery team has not been helping to coordinate the overall research effort. The Commission believes that the recovery plan should be updated and the recovery team should be more effectively incorporated into research planning. Among other things, the updated plan should describe for all participating management and research agencies and the public (1) the overall research direction, (2) the parties responsible for coordinating and conducting the resulting research, (3) the mechanisms for monitoring the adverse effects of such research, (4) a realistic research budget and schedule, and (5) an analysis of the benefits and risks associated with each major research activity. An updated Recovery Plan is necessary to ensure that the research effort

3

underway is carried out effectively without adding unnecessary adverse effects to what is already a very difficult and complex problem.

Please contact me if you have any questions concerning this recommendation.

Sincerely,

Robert H. Mattlin, Ph.D.
Executive Director