## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, et al., | ) ) ) | |
| | ) | Civ. No. 05-1392 (ESH) |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| DEPARTMENT OF COMMERCE, et al., | ) ) | |
| Defendants. | ) | |
| _____ | | |

## PLAINTIFFS' COMBINED MEMORANDUM IN REPLY TO FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

LATHAM & WATKINS
JAMES R. BARRETT (DC Bar No. 441674)
DAVID J. HAYES (DC Bar No. 252130)
SARA K. ORR (DC Bar No. 493765)
555 Eleventh Street, N.W.
Washington, DC 20004
Tel: (202) 637-2200

KIMBERLY MCCORMICK
8363 Sumanee Place N.E.
Bainbridge Island, WA 98110

Counsel for Plaintiffs The Humane Society of the
United States, Will Anderson and Sharon Young

February 17, 2006

**Table of Contents**

I.      INTRODUCTION ..............................................................................................1

II.     JURISDICTION AND STANDING .............................................................4

    A.    The Individual Plaintiffs ............................................................ 4
    B.    The Humane Society Of The United States.................................. 6
    C.    Plaintiffs Challenge Final Agency Action .................................. 7

III.    Defendants Violated NEPA, The ESA And The MMPA By Failing To
    Analyze The Significance Of A Potential Exceedance Of The PBR Level
    If All Mortality Authorized Under The Permits Actually Occurs ..........................9

    A.    Defendants Failed To Analyze The Impact Of The Research
        Permits On The PBR Level........................................................ 11
    B.    There Is No Effective Mechanism By Which Defendants Can
        Track The Cumulative Amount Of Mortality And Thereby Enforce
        The "Suspension" Authority NMFS Tried To Impose Under The
        Permits ................................................................................... 13

IV.     Defendants Cannot Remedy Their ESA Violations By "After The Fact"
    Examination, In A New BiOp, Of Environmental Impacts Resulting From
    Issuance Of The Research Permits .......................................................................17

    A.    Defendants Have Admitted That The 2005 BiOp Is Deficient................. 17
    B.    Defendants Admit That They Did Not Conduct A Cumulative
        Effects Analysis In The 2005 BiOp .......................................... 18
    C.    Defendants' BiOp Is Also Legally Deficient Because NMFS Did
        Not Adequately Consider Effects Of The Proposed Research,
        When Added To The Environmental Baseline ........................... 22
    D.    There Is No Legal Basis Under ESA Section 7 For "Reexamining"
        A BiOp While Allowing The Activities Requiring Section 7
        Consultation To Continue ........................................................ 24
    E.    Plaintiffs' ESA Claims Are Not Moot ...................................... 26

V.      Defendants Cannot Remedy Their NEPA Violations "After the Fact" By
    Conducting An EIS While Continuing To Allow Research Activities To
    Occur Under The Permits .....................................................................................29

    A.    Defendants Have Admitted They Must Prepare An EIS To Fully
        Examine The Impacts Of The Steller Sea Lion Research Permits ........... 29
    B.    There Is No Legal Basis Under NEPA For Allowing Federal
        Action To Continue While "After The Fact" EIS Analysis Is
        Conducted ............................................................................... 31
    C.    Defendants Violated NEPA By Failing To Prepare An EIS.................... 33

VI.     CONCLUSION...............................................................................................43

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv.*, 273 F.3d 1229 (9th Cir. 2001) ............................................................................................43

*Balt. Gas & Elec. v. Natural Res. Def. Council*, 462 U.S. 87 (1983) ................................34

*Beethoven.com, LLC v. Librarian of Cong.*, 394 F.3d 939 (D.C. Cir. 2005) ....................28

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ............................................................................................................30

*Buschmann v. Schweiker*, 676 F.2d 352 (9th Cir. 1982)......................................................20

*Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678 (D.C. Cir. 1982)................................................16, 34

*Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142 (9th Cir. 1997) ............................................................................................................41

*Citizens Exposing Truth About Casinos v. Norton*, Case No. A-03-CA-242, 2004 U.S. Dist. LEXIS 27498 (D.D.C. Feb. 24, 2004) ......................................42

*Coal. on Sensible Transp., Inc. v. Dole*, 642 F. Supp. 573 (D.D.C. 1986), *aff'd*, 826 F.2d 60 (D.C. Cir. 1987) ..............................................................38

*Communities for a Great Nw., Ltd. v. Clinton*, 112 F. Supp. 2d 29 (D.D.C. 2000) ............................................................................................................4, 5

*Confederated Tribes and Bands of the Yakima Indian Nation v. FERC*, 746 F.2d 466, 471-72 (9th Cir. 1984) ............................................................32

*Conner v. Burford*, 848 F.2d 1441 (9th Cir.  1988) ............................................................19

* *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121 (D.D.C. 2001) ...............12, 19, 23

*Defenders of Wildlife v. Norton*, No. Civ. A. 99-927, 2003 U.S. Dist. LEXIS 26558, at 19 (D.D.C. Jan 7, 2003)..................................................23

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 124 S. Ct. 2204, 159 L. Ed. 2d 60 (2004) ......................................................................................36

*El Rio Santa Cruz Neighborhood Health Ctr, Inc. v. U.S. Dep't of Heath & Human Servs.*, 396 F.3d 1265 (D.C. Cir. 2005) ......................................20

*Envtl. Def. Fund v. Andrus*, 596 F.2d 848, 853 (9th Cir. 1979) ......................................32

*Found. on Econ. Trends v. Heckler*, 756 F.2d 143 (D.C. Cir. 1985)................................34

*Found. on Econ. Trends v. Weinberger*, 610 F. Supp. 829 (D.D.C. 1985).......................34

*Found. on Economic Trends v. Lyng*, 943 F.2d 79 (D.C. Cir. 1991)..................................8

*Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*, 528 U.S. 167, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000) ...........................................6, 7

\* *Friends of the Earth v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30 (D.D.C. 2000) ........................................................................33, 37, 38, 42

*Fund for Animals v. Norton*, 281 F. Supp. 2d 209 (D.D.C. 2003).............................37, 40

*Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059 (9th Cir. 2004)...................................................................................20

*Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C. Cir. 2002)......................................12, 42

\* *Greenpeace v. NMFS*, 80 F. Supp. 2d 1139 (W.D. Wash. 2000) ......................19, 23, 27

*Hammond v. Norton*, 370 F. Supp. 2d 226 (D.D.C. 2005) .................................................41

*Haw. Longline Ass'n v. NMFS*, 281 F. Supp. 2d 1 (D.D.C. 2003) ....................................28

*Headwaters, Inc. v. Bureau of Land Mgmt., Medford District*, 893 F.2d 1012 (9th Cir. 1989)...........................................................................................27

*Humane Soc'y of the U.S. v. Clark,* C.A. 99-0424, 1999 U.S. Dist. LEXIS 3686 (D.D.C. Mar. 17, 1999)..........................................................................32

*Hunt v. Wash. State Adver. Comm'n*, 432 U.S. 333 (1977)................................................6

*Jones v. Gordon*, 792 F.2d 821 (9th Cir. 1986) ................................................................16

*Kleppe v. Sierra Club*, 427 U.S. 390, 96 S. Ct. 2718, 49 L. Ed. 2d 576 (1976)...............................................................................................................30

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)........................................................................................................4

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 109 S. Ct. 1851, 104 L. Ed. 2d 377 (1990) ....................................................................................1, 34

*\* Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000) ....................................... 32, 33

*Mo. Public Serv. Comm'n v. FERC*, 234 F.3d 36 (D.C. Cir. 2000) ................................... 10

*NLRB v. Brown*, 380 U.S. 278 (1965) ............................................................. 43

*N. Slope Borough v. Andrus*, 486 F. Supp. 332 (D.D.C. 1980) ........................................ 26

*National Parks & Conservation Association v. Babbitt*, 241 F.3d 722 (9th Cir. 2001) ......................................................................... 3, 32, 41

*Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170 (D.D.C. 2004) ......................... 19, 37

*Natural Res. Def. Council v. Morton*, 388 F. Supp. 829 (D.D.C. 1974) ........................... 30

*Natural Res. Def. Council v. Houston*, 146 F.3d 1118 (9th Cir. 1998) ..................... 18, 25

*\* Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005) ......................................................................... 8, 38

*Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203 (D.D.C. 2005) ........................................ 20, 23

*Pac. Coast Fed'n of Fisherman's Ass'ns, Inc. v. NMFS*, 265 F.3d 1028 (9th Cir. 2001) ......................................................................... 21

*Pac. Rivers Council v. Thomas*, 936 F. Supp. 738 (D. Idaho 1996) ................................ 26

*Public Serv. Co. v. Andrus*, 825 F. Supp. 1483 (D. Idaho 1993) ...................................... 37

*Pueblo of Sandia v. Babbitt*, 231 F.3d 878 (D.C. Cir. 2000) ............................................. 10

*Recreational Fishing Alliance v. Evans*, 172 F. Supp. 2d 35 (D.D.C. 2001) ................... 21

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ................................ 33

*S. Utah Wilderness Alliance v. Norton*, 237 F. Supp. 2d 48 (D.D.C. 2002) ..................... 35

*S. Utah Wilderness Alliance v. Smith*, 110 F.3d 724 (10th Cir. 1997) ............................. 27

*Save the Yaak Comm. v. Block*, 840 F.2d 714 (9th Cir. 1988) .......................................... 31

*Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir. 1989) .......................................................... 32

*\* Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983) ........................................ 31, 41

iv

*Sw. Williamson County Cmty. Ass'n v. Slater*, 243 F.3d 270 (6th Cir. 2001) ..................................................................................................8

*Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002) ................................................................................................20

*Tenakee Springs v. Block*, 778 F.2d 1402 (9th Cir. 1985) ..................30

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L. Ed. 2d 117 (1978) ..............................................................................................26

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985) ...........................18

*Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727 (D.C. Cir. 2000) ...................10, 18

*Western Res., Inc. v. FERC*, 9 F.3d 1568 (D.C. Cir. 1993) ...............10

## FEDERAL STATUTES

5 U.S.C. § 704 ......................................................................................4, 8

40 C.F.R. § 1502.14 ...............................................................................35

40 C.F.R. § 1502.20 ...............................................................................30

40 C.F.R. § 1502.5 .................................................................................33

40 C.F.R. § 1508.25(a)(2) ......................................................................41

40 C.F.R. § 1508.27 ...........................................................36, 37, 38, 39, 40

40 C.F.R. § 1508.28 ...............................................................................30

40 C.F.R. § 1508.7 .................................................................................41

40 C.F.R. § 1508.9 .................................................................................35

50 C.F.R. § 17.3 .....................................................................................12

50 C.F.R. § 216.33(d)(2) ..........................................................................9

50 C.F.R. § 402.02 .....................................................................18, 22, 23

50 C.F.R. § 402.14 .........................................................................19, 22

50 C.F.R. § 402.16 .................................................................................25

16 U.S.C. § 1362(26) ...........................................................................................12

16 U.S.C. § 1531, *et seq.*......................................................................1, 12, 18, 21, 26

16 U.S.C. 1374, *et seq.*..........................................................................................4

42 U.S.C. § 4321, *et seq.*...................................................................................1, 30

28 U.S.C. § 1331................................................................................................4

## MISCELLANEOUS

*Wildlife Service and National Marine Fisheries Service Final ESA Section*
    *7 Consultation Handbook* (1998)..................................................................19

## <u>INDEX OF EXHIBITS</u>

**Exhibit 1**          Declaration of Will Anderson

**Exhibit 2**          Declaration of Sharon Young

## I.    INTRODUCTION

Defendants attempt to portray this case as a difference of opinion about scientific matters.  It is not.  Put simply, this case is about Defendants' failure to follow prescribed procedures under several environmental protection statutes.  These statutes require that Defendants analyze the consequences of their actions before authorizing research activities that will adversely impact endangered and threatened Steller sea lions.  Specifically, this case presents the fundamental question of whether an agency's statutory duties to study and disclose adverse impacts *before* it makes decisions may simply be deferred until *after* the agency has implemented actions on the ground.

Defendants concede that an Environmental Impact Statement ("EIS") is needed to assess the likely impacts of their decision to authorize invasive research on federally endangered and threatened species, that the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*, requires the necessary environmental review to be completed before an agency takes action, and that Defendants did not prepare an EIS before issuing the challenged permits in this case.  But instead of suspending the challenged permits to fully evaluate in an EIS the impacts of the actions being undertaken pursuant to those permits, Defendants propose to perform an "after-the-fact" EIS evaluating the impacts of those research activities.  Further, Defendants ask the Court to endorse this inverted process as compatible with the letter and spirit of NEPA – a statute that was designed to ensure that an "agency will not act on incomplete information only to regret its decision after it is too late to correct."  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371, 109 S. Ct. 1851, 1858, 104 L. Ed. 2d 377, 391 (1990).

Likewise, there is no dispute that a valid Biological Opinion ("BiOp") prepared by the agency to discharge its duty under the Endangered Species Act ("ESA"), 16

U.S.C. § 1531, *et seq.*, was required to determine whether the permits at issue may jeopardize the continued existence of Steller sea lions. Defendants, however, candidly admit that their BiOp was inadequate. Indeed, Defendants even go so far as to describe their own BiOp analysis as "relying on old data," "lacking in clarity," and suffering from "internal inconsistency" that could "frustrate judicial review." Defs.' Mem. at 34-35, 37. But here again, rather than acknowledging the simple truth that these legal defects compel suspension of the permits, which rely on this admittedly flawed analysis, Defendants propose to prepare an "after-the-fact" BiOp to evaluate the impacts of the decision they already made to issue the permits.

Why would the government do this? The answer is simple and indisputable: The government was in a rush to approve the research permits, so it took shortcuts with important federal laws passed by Congress to protect the Steller sea lions from extinction and promote their recovery. Indeed, Defendants flatly admit in their memorandum that they cut corners on the review and comment process with the Marine Mammal Commission due to the "pressing need to issue the permits." Defs.' Mem. at 2, 39. These shortcuts are not permissible, however, and the government now finds itself having to explain its way out of a trick bag of its own making.

First, the government now contends that its prior admission that an EIS is needed in this case was not an admission after all; but simply a "recognition" that the impacts of its research permit approvals required evaluation in an EIS – a distinction that Plaintiffs fail to grasp. Defs.' Mem. at 21-22. Second, the government contends that its decision to prepare a new BiOp renders moot, or more specifically may render moot in the future, the

Plaintiffs' ESA claims on the apparent, if reckless, theory that so long as they issue a new BiOp, where's the harm?

Clever semantics aside, the government is simply asking this Court to ratify what amounts to a "shoot first, ask questions later" approach to managing protected species entrusted to its care. The law, however, requires that the government make more than an after-the-fact, "check the box" effort to understand the impacts of its actions. Indeed, the *post hoc* environmental review procedures Defendants ask this Court to ratify in this case will reduce the ESA and NEPA to entirely meaningless paperwork statutes – to be ignored by agencies until and unless they are challenged in court for their actions, and then only followed as an after-thought. *See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 733 (9th Cir. 2001) ("The Park Service proposes to increase the risk of harm to the environment and then perform its studies [later] . . . . This approach has the process exactly backwards.").

If the important Congressional purposes driving NEPA and the ESA are to be met in this case, Defendants must be ordered to complete the required environmental evaluations (EIS and BiOp) as a condition precedent to the issuance of the permits. As is clear from their briefing, the government does not know or understand the impacts of the actions it has authorized in this case, and its proposal to discover and analyze those effects after-the-fact provides little comfort – especially in a matter involving a species that is struggling to avoid extinction. The issued permits must therefore be vacated, and Defendants ordered to satisfy their statutory obligations before authorizing further research.

## II.    JURISDICTION AND STANDING

Plaintiffs challenge Defendants' actions under four federal laws: NEPA; the

Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1374, *et seq.*; the ESA; and the

Administrative Procedure Act ("APA"), 5 U.S.C. § 706, *et seq.*[1]  This Court has

jurisdiction over this case pursuant to 28 U.S.C. § 1331, which affords federal courts

jurisdiction to hear civil matters "arising under the Constitution, laws or treaties of the

United States . . . ."  28 U.S.C. § 1331.  Defendants argue that Plaintiffs do not have

standing to bring this action.  They are mistaken.

### A.    The Individual Plaintiffs

Plaintiffs Will Anderson and Sharon Young (collectively, "the Individual

Plaintiffs") are both members of Plaintiff The Humane Society of the United States

("HSUS") and have standing to bring the present action.  *See Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) (setting forth

the general standing requirements: (1) an injury in fact; (2) a causal connection between

the injury and the conduct complained of; and (3) a type of injury that is likely to be

redressed by a favorable decision); *see also Communities for a Great Nw., Ltd. v.*

*Clinton*, 112 F. Supp. 2d 29, 33 (D.D.C. 2000).  The Individual Plaintiffs assert an injury

in fact that is concrete, particularized and actual; their asserted injuries are directly

traceable to Defendants' actions; and their injuries will be redressed by a favorable

decision by this Court.

---

[1]    Defendants contend that the statement of facts referenced in LCvR 7(h) is not applicable to this matter as a matter of law because this case is governed by the APA and judicial review under the APA is limited to the agency's administrative record.  *See* Defs.' Consolidated Statement of Material Facts and Statement of Genuine Issues at 2 n.1.  Plaintiffs agree with Defendants' view of the law on that issue and accordingly have not filed an opposition or otherwise responded to Defendants' Consolidated Statement for that reason.

Plaintiff Anderson has been an observer of Steller sea lions for nearly 35 years. *See* Decl. of Will Anderson ¶ 3, a copy of which is attached as Exhibit 1.[2]  Plaintiff Anderson derives "great enjoyment and satisfaction from viewing Steller sea lions in their natural habitat" and has "developed a unique and personal interest in ensuring the protection and recovery of this species."  *Id.*  Plaintiff Anderson regularly seeks out opportunities to observe Steller sea lions in their natural habitat and intends to continue to do so, including trips to locations in Washington and Oregon in 2006.  *Id.*  Plaintiff Young also is actively involved in studying and observing marine mammals – including Steller sea lions – and engages in advocacy pertaining to Steller sea lion conservation issues.  *See* Decl. of Sharon Young ¶ 2, a copy of which is attached as Exhibit 2.  Plaintiff Young reviews and comments on marine mammal stock assessments and research programs and has attended meetings of the Alaska Scientific Review Group and the Pacific Scientific Review Group at which stock assessments for Steller sea lions were discussed.  *Id.* at ¶ 3.  Plaintiff Young has observed Steller sea lions in their natural habitat since 1985, and has observed them yearly while attending meetings in California, Washington, British Columbia and Alaska.  *Id.* at ¶¶ 4-5.  She intends to continue seeking out Steller sea lions in their natural habitat in the future, and derives "tremendous pleasure from observing them free from harm in their natural environment."  *Id.* at ¶¶ 5-6.

Defendants' actions are directly harming Plaintiff Anderson's and Plaintiff Young's interests in observing Steller sea lions by reducing the already depleted number of Steller sea lions available for observation, by destroying the recreational and aesthetic

---

[2]    As this Court noted in *Communities for a Great Northwest*, "[t]he trial court may allow plaintiffs the opportunity to supply by affidavits further particularized allegations of fact in support of standing . . . ."  112 F. Supp. 2d at 33.

enjoyment the Individual Plaintiffs derive from observing this species in the wild, and by impairing their aesthetic enjoyment in viewing Steller sea lions by creating a substantial risk that they will encounter an injured, suffering sea lion in distress as a result of the research procedures authorized by the permits at issue in this case.  Decl. of Sharon Young at ¶ 8; Decl. of Will Anderson at ¶ 4.  Defendants' actions also directly injure Plaintiff Young by interfering with her ability to continue her work with Steller sea lions by further reducing the stock of Steller sea lions in the natural environment and by subjecting them to procedures that cause injury and pain.  Decl. of Sharon Young at ¶¶ 7-8.  On these bases, the Individual Plaintiffs clearly assert injuries in fact, directly attributable to Defendants' approval of the research permits at issue in this case, and redressable by this Court's grant of the relief sought by Plaintiffs.  The Individual Plaintiffs thus have standing to challenge Defendants' actions and seek redress in this Court.

### B.        The Humane Society Of The United States

Plaintiff HSUS also has standing to challenge Defendants' violations.  "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*, 528 U.S. 167, 180-81, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000) (*citing Hunt v. Wash. State Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

The HSUS is a non-profit organization and is the largest animal protection group in the United States, with over nine (9) million members and constituents.  Am. Compl. ¶ 6.  The HSUS membership and constituency includes 178,647 individuals residing in the

State of Washington and 14,813 individuals residing in the State of Alaska. *Id.* The HSUS strives to protect, conserve, and enhance the nation's wildlife and wildlands while also promoting the humane treatment of all animals, including marine mammals such as Steller sea lions. Am. Compl. ¶¶ 6-7. In particular, the HSUS has participated in numerous comment periods regarding the proposed issuance of scientific research permits affecting Steller sea lions, as well as regularly submitting comments on proposed revisions of the Steller sea lion stock assessments and educating the public about the species. *Id.* at ¶ 7. Accordingly, the HSUS has standing because "the interests at stake are germane to the organization's purpose." *Friends of the Earth, Inc.*, 528 U.S. at 180-81.

Plaintiffs assert that Defendants have violated the ESA, the MMPA, NEPA and the APA by "creating a threat to the sea lion population in the area and hastening the extinction of the species." Am. Compl. ¶ 9. These claims do not require the participation of individual members of the HSUS, although the Individual Plaintiffs are both members of the HSUS. *Friends of the Earth, Inc.*, 528 U.S. at 180-81. Nor do the various forms of relief sought by Plaintiffs require individual participation. *Id.* Accordingly, the HSUS has standing to bring and litigate this action before this Court.

## C. Plaintiffs Challenge Final Agency Action

Defendants attempt to derail this case by making a half-hearted attempt to mischaracterize Plaintiffs' claims as a challenge to NMFS' entire permitting program, rather than to the specific permits already issued, and then arguing that there is no final agency action because the permitting program is ongoing. Defs.' Mem. at 18-19. This argument has no merit whatsoever.

Plaintiffs' claims center on Defendants' failure to satisfy clear statutory mandates requiring the completion of environmental review *before* approving the issuance in May and June 2005 of a discrete set of research permits and permit amendments that are the subject of this action.  Contrary to Defendants' assertions, Plaintiffs do not seek a "wholesale correction" of Defendants' MMPA permitting structure from this Court, but rather Defendants' fulfillment of statutorily required procedures *before* Steller sea lions face harmful research activities under permits that were approved by NMFS and lie at the heart of this lawsuit.

Courts regularly have held that issuing a finding of no significant impact constitutes final agency action under the APA, *see, e.g., Foundation on Economic Trends v. Lyng*, 943 F.2d 79, 89 (D.C. Cir. 1991); *Southwest Williamson County Community Association v. Slater*, 243 F.3d 270, 274 (6th Cir. 2001), and there can be no dispute that approval of the research permits constituted final agency action.[3]  Accordingly, this Court has jurisdiction to hear Plaintiffs' claims under the APA.  *See* 5 U.S.C. § 704 (court has jurisdiction to review "final agency action").

This is not a novel legal concept.  In *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005), the court considered an action challenging the U.S. Army Corps of Engineers' issuance and extension of a permit allowing the construction of an addition to an existing oil refinery dock.  The court held the permit issued by the Corps was a final agency action bestowing jurisdiction over the plaintiffs'

---

[3]    Defendants also concede that this Court has jurisdiction over Plaintiffs' NEPA and ESA claims.  Defendants fail to explain how a final agency action exists with respect to Plaintiffs' NEPA and ESA claims, but somehow disappears from the MMPA claim. The reason for this failure is simple: A final agency action allowing for judicial review exists for all of Plaintiffs' claims.

MMPA claim. *Id.* at 861-62. In the same vein, NMFS' issuance of multiple permits under the MMPA without the requisite environmental review clearly bestows this Court with jurisdiction to consider Plaintiffs' MMPA claims.[4]

### III.   Defendants Violated NEPA, The ESA, And The MMPA By Failing To Analyze The Significance Of A Potential Exceedance Of The PBR Level If All Mortality Authorized Under The Permits Actually Occurs

Defendants attempt to draw Plaintiffs and this Court into a "battle of the science experts" over the Potential Biological Removal level (or "PBR level") by arguing that they are entitled to deference on the meaning, application and significance of the PBR level relating to Steller sea lions, including whether or not they were required to examine impacts to the PBR level resulting from issuance of the research permits. Defs.' Mem. at 22-27. Defendants are wrong.

The government established the PBR level to measure the health and sustainability of a protected marine mammal species – in this case, Steller sea lions. By its very nature, the PBR level is a "significant effect" barometer. Defendants spend five pages discussing this issue and in the process clearly illustrate the box Defendants have built for themselves. Defendants conveniently ignored the PBR level issue when approving the permits, and now for the first time attempt to articulate a rationale, through

---

[4]      Defendants' assertion that the Plaintiffs' MMPA claims are baseless is also without merit. NMFS is required to submit all MMPA research permit applications to the Marine Mammal Commission ("MMC") for review and comment prior to NMFS approval. 50 C.F.R. § 216.33(d)(2). Although the MMC comments on the permits at issue were not due until June 6, 2005, Ex. 1 to the Barrett Decl. at 1, NMFS nevertheless purported to complete its review under NEPA and the ESA on or about May 24, 2005, and issued the first permit on or about May 27, 2005. AR-406; AR-404; AR-407; Answer ¶ 69. Likewise, Defendants' issuance of research permits without analyzing the significance of a potential exceedance of the PBR Level is arbitrary and capricious and violates the MMPA. *See infra* Section III.

their attorneys, as to why the PBR level is not something that Plaintiffs or this Court should be concerned with (i.e., it is too "sciency").

But it is a "time-honored rule that a reviewing court 'must judge the propriety of [agency] action solely by the grounds invoked by the agency,'" at the time the decision under review is made, *Western Resource, Inc. v. FERC*, 9 F.3d 1568, 1576 (D.C. Cir. 1993), and hence the "court does not 'give an agency the benefit of a *post hoc* rationale'" for a decision previously announced. *Mo. Public Serv. Comm'n v. FERC*, 234 F.3d 36, 41 (D.C. Cir. 2000). Accordingly, "[u]nder the APA, if the record does not support the agency's decision, then the court must remand to the agency for additional investigation or explanation." *Pueblo of Sandia v. Babbitt*, 231 F.3d 878, 881 (D.C. Cir. 2000).

In this case, the PBR level for Steller sea lions is a threshold that, if reached, should make the government extremely nervous about the survival of the Steller sea lion population. One does not need to be a scientist to grasp the significance of this fundamental concept, or that it is a central issue in any analysis of environmental impacts on Steller sea lions resulting from the research activities approved in the permits. The government's decision not to evaluate it cannot be granted any deference, because there is no analysis in the decision under review to defer to. *See Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 739 (D.C. Cir. 2000) ("Counsel's argument in defense of this position was inspired and thoughtful, albeit in vain. The problem here is that counsel's argument is nowhere to be found in the orders under review, so we cannot ascribe it to the [agency]. The argument therefore constitutes a *post hoc* rationalization, which carries no weight on review."). Rather, the only available course of action is to set the decision aside and remand for a new decision. *Pueblo of Sandia*, 231 F.3d at 881.

Even if the Court were to review the agency's decisions on the basis of reasons that were <u>not</u> articulated by the agency at the time of decision, Defendants' *post hoc* justifications do not even pass muster on their own merits.  Thus, at the risk of playing into Defendants' game of "battle of the experts," Plaintiffs will parse the government's lengthy discussion of the PBR level, and explain why the analysis in the government's brief not only fails to substitute for the analysis they should have done before issuing the permits, but also highlights the critical need for a remand in this case.

### A.   Defendants Failed To Analyze The Impact Of The Research Permits On The PBR Level

The Administrative Record is barren of any discussion of the PBR level.  Had the Defendants considered it, they would have found that the activities they proposed to approve under the research permits would potentially push the Steller sea lion species closer to the brink of extinction.  It does not take a scientist to appreciate the significance of that risk.  Now, Defendants are left to rationalize why the PBR level concept is of no consequence.  They do this, in part, by engaging in a discussion of how the PBR level is calculated and the exact number of currently allowed Steller sea lion deaths – and, in so doing, they still manage to mischaracterize the PBR level.

For instance, Defendants boast of using a "conservative" PBR number, supported by "extensive simulation modeling."  Defs.' Mem. at 40-41 n.12.  The MMPA, however, defines the net productivity rate as "the annual per capita rate of increase in a stock resulting from additions due to reproduction, less losses due to mortality."  16 U.S.C. § 1362(26).  Because the western stock of Steller sea lions is actually *declining* in number on a year-to-year basis, the net productivity is in reality a *negative* number.  Thus any human-caused mortality further contributes to the decline of the species.  At any rate,

these points merely underscore the bright-line utility of the government's own PBR level as a "significant effect" barometer under NEPA, the MMPA, and the ESA.

Indeed, in *Grand Canyon Trust v. FAA*, the D.C. Circuit held that when a species' environment is already vulnerable, even the slightest increase in adverse conditions "may represent the straw that breaks the back of the environmental camel." 290 F.3d 339, 343 (D.C. Cir. 2002) (citation omitted). In this instance, the fact that the Defendants' action threatens to push the Steller sea lions past the PBR level for this species appears, under this Court's precedents, to qualify by a wide margin as a potential "straw that breaks the back of the environmental camel." A properly scoped EIS would have identified and evaluated this impact.[5]

It is Defendants' assertion that 197 Steller sea lion deaths would result from native harvest and fishery activities each year. Defs.' Mem. at 25. The PBR level for the

---

[5]    Defendants also wish the Court to believe that most of the Steller sea lion killings under the permits will by "hypothetical," and therefore should be not tallied up for purposes of measuring this action against the PBR level for Steller sea lions. In particular, Defendants devote significant energy distinguishing between "hypothetical" and "intentional" killing, and its significance to the level of "take" allowed under the 2005 permits. Defs.' Mem. at 6-8, 23, 40.

There is no basis for Defendants' attempted differentiation of the types of killings in relation to "take." Under the ESA, "take" is broadly defined as "harass, harm, pursue, shoot, hunt, wound, kill, trap, capture, or collect or attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Additionally, harm is defined as "an act which actually kills or injures wildlife," while harass "means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. In summary, all killing causes harm to the species, whether through incidental or intentional death.

Based on the statutory and regulatory definitions of "take," Defendants' argument that mortality, and therefore "take," may not be assumed because killing is "hypothetical" is invalid. Defs.' Mem. at 40. Plaintiffs understand that the authorization of incidental take is not a guarantee that such take will occur at all, or at the levels authorized. *See Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 130 (D.D.C. 2001).

western stock of Steller sea lions is 208 deaths per year.  AR-S (Angliss, R.P., DeMaster, D.P., & Lopez, A.L., Alaska Marine Mammal Stock Assessment, 2001, U.S. Dept. of Commerce, NOAA Tech. Memo. NMFS-AFSC-124 ("2001 Stock Assessment")).

NMFS has left open the possibility of allowing an additional 20 mortalities per year as a result of incidental research-related mortality.  AR-407 at 65.  This means that Defendants' currently authorized mortality figure easily exceeds the PBR level.[6]

In short, the "fuzzy math" on PBR level that Defendants have inserted into their brief only serves to underscore the truly significant impact that their permits could have on this species, and the critical need for this issue to be fully studied in a properly prepared EIS *before* the agency authorizes invasive research.

**B.    There Is No Effective Mechanism By Which Defendants Can Track The Cumulative Amount Of Mortality And Thereby Enforce The "Suspension" Authority NMFS Tried To Impose Under The Permits**

Defendants attempt to avoid their own PBR trap by asserting that they have mitigated the significant impact of exceeding the PBR level by touting ineffectual and unenforceable "permit conditions" that purport to require researchers to cease killing Steller sea lions if they exceed the number of mortalities authorized in an individual permit, or if a total of 10 Steller sea lions are killed under all of the permits issued. *See* Defs.' Mem. at 8 (*citing* AR-406 at 50, 106).  Despite relying on the existence of this

---

[6]    Defendants arrived at their inaccurate currently authorized mortality figure by adding native harvest mortality to fisheries mortality, 171 and 26, respectively.  Defs.' Mem. at 25.  These underlying figures are far from conservative estimates, however.  The 2001 stock assessment states that fisheries deaths are in reality "a minimum estimate." AR-S (2001 Stock Assessment).  In addition, the native harvest mortality number is in fact a mean figure with wide confidence intervals leading to an upper bound of mortality of greater than 225 Steller sea lions in a single year.  AR-S (2001 Stock Assessment).  In fact, the BiOp states that there was a "mean annual subsistence take of 448 from the Western U.S. stock."  AR-407 at 35.  The number of currently authorized deaths could then easily far surpass the PBR level for the species.

"mitigation measure" no less than five times in their brief, Defendants have nothing meaningful to say about how this "condition" translates to mitigation, precisely because it is unenforced and unenforceable.

Here is Defendants' "mitigation" in a nutshell: Each permit contains a provision that states the researcher must cease research if the number of incidental mortalities caused by research under that permit exceeds the amount allowed in the permit. *See, e.g.*, AR-355 at 7. The issued permits also state that all research will be suspended if the total number of incidental mortalities for Steller sea lions reaches 10, but that research may recommence "upon review of the information submitted by permit holders on the cause(s) of deaths" and continue until 20 animals are killed. *See, e.g.*, AR-355 at 7-8; AR-406 at 50.

If each permittee reached the number of incidental mortalities allowed on each individual permit before stopping, the total incidental mortality under the permits and amendments issued pursuant to the 2005 EA and FONSI would be 60 Steller sea lions, with not more than 18 coming from the endangered western population. AR-406 at 106. This number is significant because total mortality from all anthropogenic sources can be used to determine whether the PBR threshold would be exceeded, as it would in this case. *See supra* FN 6. But NMFS has *no mechanism whatsoever* for actually terminating the research before significantly more than 10 Steller sea lions are killed, so it is disingenuous for Defendants to argue in their brief that the number of incidental mortalities allowed under the permits is not significant.

Due to the nature of the research, Steller sea lion mortality may not be observed, and even if observed, may not be reported in a timely fashion to allow NMFS to follow

through with the suspension of permits based on the number of mortalities occurring

under individual permits.  *See* AR-407 at 67 ("[A]nimals may die from infection caused

by intrusive research days to weeks after a procedure . . . .  In the absence of adequate

monitoring, these deaths would not be noticed."); s*ee also infra* discussion below.  For

example, under a permit issued to the Alaska Division of Fish and Game, four pups died

in 2001, three pups died in 2002, and seven pups died in June and July of 2003.  AR-324.

However, there are no written reports of the mortalities included in the Administrative

Record as should be the case if researchers were following the reporting procedures

included in the permits.  *See, e.g*., AR-355 at 7 (showing that permits specify that "any

death that could have been caused by the presence or actions of the researchers" must be

reported by phone preferably within 24-72 hours, and in a written report within two

weeks of the death).  It is difficult to understand how NMFS plans to suspend research

activities after 10, or 20, endangered Steller sea lions are reported as killed when it is not

clear when or how NMFS even becomes aware of these deaths.  What is clear, however,

is that the government has not considered this critical issue – as would have been the case

if a fully-scoped EIS had been prepared.

The Administrative Record also illustrates that researchers may not be inclined to

report incidental mortalities, thus ensuring their research efforts will not be suspended.

Under Permit 782-1532-00, the National Marine Mammal Lab was permitted five (5)

incidental mortalities, after which research would be suspended pending further review.

AR-223 at 4, 6.  Despite this threat of suspension, activities under the permit resulted in

more than five deaths (5) that were not reported until after a U.S. Fish and Wildlife

Service refuge manager contacted NMFS to report the deaths of eight (8) Steller sea lion

pups. *See* AR-233, AR-236 (showing also that research under the permit was not halted and two additional pups were killed within a month); *see also* AR-243, AR-245. The permittee reported only one death in Oregon and two deaths in Alaska in its annual report. AR-259 at 26. NMFS' response was not only to allow the research to continue, but also to double, from five (5) deaths to ten (10) deaths, the number of mortalities authorized to this permittee. AR-250 at 3.

NMFS' assurances regarding suspension of research activities to mitigate the significant impact of this research on Steller sea lions reflects, at best, wishful thinking. These "mitigation measures" do not serve to "completely compensate for any possible adverse environmental impacts stemming from the original proposal [such that] the statutory threshold of significant environmental effects is not crossed and an EIS is not required." *See Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982). In fact, they provide no compensation whatsoever for the adverse impacts such mortalities will have on the Steller sea lion populations. As such, Defendants should not be able to rely on these purported "mitigation measures" to assure this Court that its actions will not have a significant impact on endangered Steller sea lions. *See Jones v. Gordon*, 792 F.2d 821, 823, 829 (9th Cir. 1986) (finding that conditions on permits for takes of killer whales, such as "no more than two animals could be removed from a distinct social group," do not mitigate uncertain environmental effects such that the agency could claim categorical exclusion from NEPA).

**IV.    Defendants Cannot Remedy Their ESA Violations By "After The Fact" Examination, In A New BiOp, Of Environmental Impacts Resulting From Issuance Of The Research Permits**

**A.    Defendants Have Admitted That The 2005 BiOp Is Deficient**

Defendants admit that their BiOp is deficient and acknowledge that the BiOp is riddled with "internal inconsistencies" and a "lack of clarity." *See* Defs.' Mem. at 37. Defendants therefore have decided to "revisit" their previous analyses and reissue a "revised" BiOp by March 1, 2006. *Id.* Specifically, Defendants plan to "remedy the inconsistencies and clarify its analysis of the effects of the action," and "reconsider the cumulative effects of the action." *Id.* All of this is a complicated way of saying that Defendants are conceding error, and do not dispute Plaintiffs' ESA claim in this case.

Ordinarily, that would be the end of the matter and Defendants would seek a voluntary remand, or agree to suspend the challenged action pending compliance with the ESA. But, remarkably, in this case Defendants ask the Court to simply overlook this serious error and instead propose to keep the challenged decisions in effect and allow the challenged actions to continue unabated, all while the agency prepares an after-the-fact BiOp.

But the fundamental question Defendants have failed to answer is "why bother?" If the permits have been issued, and will stay in effect, what purpose does looking at the cumulative impacts of their prior actions serve? Indeed, Defendants treat their belated proffered direct, indirect and cumulative effects analyses as though they exist in a vacuum, entirely disconnected from NMFS' no-jeopardy finding in the 2005 BiOp.

It is beyond dispute that Defendants were required as a matter of law to complete a valid BiOp as a condition precedent to issuing the permits. As discussed below, this *post hoc* ESA review process cannot stand – it completely ignores the fact that the

procedural requirements of the ESA serve its "explicit substantive goal[s]."  *Natural Res. Def. Council v. Houston,* 146 F.3d 1118, 1125 (9th Cir. 1998) (*citing Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985)).  ESA Section 7(a)(2) requires that NMFS "insure[s] that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species."  16 U.S.C. § 1536(a)(2).  *Post hoc* compliance with this mandate not only turns the statutory scheme on its head, but also renders meaningless the results of any *post hoc* analysis the agency may undertake because the very actions being analyzed already will have been taken, and the resulting jeopardy to the species already may have occurred.  Such a result cannot be reconciled with the ESA.  *See Natural Res. Def. Council,* 146 F.3d at 1129 ("The failure to respect the process mandated by law cannot be corrected with *post hoc* assessments of a done deal.") (emphasis added).

    **B.    Defendants Admit That They Did Not Conduct A Cumulative Effects Analysis In The 2005 BiOp**

    Although Defendants have agreed to "reconsider" their purported cumulative effects analysis in the 2005 BiOp, thereby explicitly acknowledging that NMFS' initial attempt at this analysis was inadequate, Defs.' Mem. at 37, Defendants nonetheless wish to engage in a debate over whether NMFS fulfilled the directive to evaluate "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of Federal action subject to consultation."  50 C.F.R. § 402.02.  Defendants' brief, however, is not the place to first consider these issues, which as a matter of law should have been analyzed prior to issuance of the permits.  *See Vincent Indus. Plastics*, 209 F.3d at 739 (*post hoc* rationalizations carry no weight on judicial review).  Because there is no evidence in the Administrative Record to

support *any* investigation by Defendants into future State or private activities, the BiOp is

inadequate because it does not include a cumulative effects analysis.

> 1.    **The Administrative Record Does Not Support A Finding That Defendants Undertook Any Efforts To Determine Whether There Were Any Relevant Future State Or Private Activities**

Defendants acted arbitrarily and capriciously in failing to even attempt to prepare

a cumulative effects analysis in the 2005 BiOp, because NMFS "has failed to articulate a

satisfactory explanation for its conclusions." *See Defenders of Wildlife,* 130 F. Supp. 2d

at 131. Defendants' sole explanation for the absence of any cumulative effects analysis is

that NMFS was "aware" of no future State or private activities, and is not required to

speculate about any. Defs.' Mem. at 35. Yet, Defendants are subject to the regulatory

command to "evaluate" cumulative effects. 50 C.F.R. § 402.14. This is an affirmative

obligation and, as described in the Consultation Handbook, requires "more effort." *See*

Ex. 9 of Barrett Decl. at 4-31 (*U.S. Fish and Wildlife Service and National Marine*

*Fisheries Service Final ESA Section 7 Consultation Handbook* (1998) ("Consultation

Handbook")). Courts have made clear that agencies "cannot ignore available biological

information or fail to develop projections," *Greenpeace v. NMFS*, 80 F. Supp. 2d 1139,

1149 (W.D. Wash. 2000) (*quoting Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir.

1988)), nor "disregard reasonably foreseeable projects," *National Wildlife Federation v.*

*Norton*, 332 F. Supp. 2d 170, 179 (D.D.C. 2004). Further, a cumulative effects analysis

which merely lists State and private activities does not suffice. *Greenpeace*, 80 F. Supp.

2d at 1149. NMFS' explanation that it simply "has no information" on cumulative

effects fails to comport with what is required for an acceptable cumulative effects

analysis.

19

Suggestions for gathering the data necessary to conduct a cumulative effects analysis include engaging in "observations and inquiries during field reconnaissance in the action area; discussion with State game and fish agencies and other Federal, State, tribal and local agencies, and conservation organizations; and newspapers and other sources of information." Ex. 9 of Barrett Decl. at 4-31. Had Defendants undertaken *any* affirmative action to determine whether future State or private actions in the action area existed, the Administrative Record would reflect these efforts. As it stands, the Administrative Record is wholly devoid of evidence of any such "evaluation" of cumulative effects. Because the Court is directed to "look to the justification provided by the agency in the record," *see Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 225 (D.D.C. 2005) (*citing El Rio Santa Cruz Neighborhood Health Ctr, Inc. v. U.S. Dep't of Heath & Human Servs.*, 396 F.3d 1265 (D.C. Cir. 2005)), and because the record reflects no effort on the part of the action agency to conduct a cumulative effects analysis, the BiOp is deficient.

Defendants also make a half-hearted attempt to argue that "[e]ven if the plaintiffs are correct that NMFS failed to undertake a sufficient investigation of cumulative effects," any such "error would be harmless." Defs.' Mem. at 36. However, "in the context of agency review, the role of harmless error is constrained," and may only be invoked "when a mistake of an administrative body is one that clearly had no bearing on the procedure used or the substance of the decision reached." *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059, 1071 (9th Cir. 2004) (*citing Buschmann v. Schweiker*, 676 F.2d 352, 358 (9th Cir. 1982)); *see also Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002) (holding that protecting

an agency from judicial review by the harmless error doctrine when it has failed to follow

a procedural requirement would "eviscerate" the purpose of the procedural requirement).

Because NMFS has not conducted any cumulative effects analysis, it cannot in good faith

maintain that any such analysis would still result in a no-jeopardy determination.

Certainly the ESA's purpose of insuring that agency actions are "not likely to jeopardize

the continued existence" of listed species would be frustrated by allowing Defendants to

play the "harmless error" card as a defense to failing to conduct an analysis and reaching

a conclusion based on a lack of such analysis. *See* 16 U.S.C. § 1536(a)(2).

### 2.    Plaintiffs Are Not Required To Search Out The Cumulative Effects That Should Have Been Analyzed By Defendants

Faced with a BiOp that clearly does not discharge Defendants' obligations under

the ESA, counsel for Defendants attempts to shift the burden to Plaintiffs. However, the

concept of agency deference, the cornerstone of Defendants' brief, is premised on the

notion that the agency is the scientific expert. *See Recreational Fishing Alliance v.

Evans*, 172 F. Supp. 2d 35, 40-41 (D.D.C. 2001) ("Because the agency is expected to

have expertise is its area, a certain degree of deference is due . . . ."). In this vein, it is

NMFS' role as the expert agency to conduct the proper cumulative effects analysis in the

first instance, or to offer a plausible explanation why no cumulative effects were

considered. As such, when Plaintiffs asserted that both the BiOp on its face and the

Administrative Record reveal that NMFS conducted no cumulative effects analysis

whatsoever, it became Defendants' burden to demonstrate that it conducted a proper

cumulative effects analysis. *See Pac. Coast Fed'n of Fisherman's Ass'ns, Inc. v. NMFS*,

265 F.3d 1028, 1036 (9th Cir. 2001) ("[Plaintiff] asserts that NMFS did not consider

cumulative effect. The NMFS had an opportunity to place in the record evidence

demonstrating that it considered cumulative effect.  We find nothing to show that it did.")
Defendants clearly have not shouldered their burden, and as such the BiOp is deficient,
no matter what rhetorical reversals Defendants attempt to foist on the Court.

> **C.   Defendants' BiOp Is Also Legally Deficient Because NMFS Did Not
> Adequately Consider Effects Of The Proposed Research, When
> Added To The Environmental Baseline**

NMFS was required to engage in a "detailed discussion of the effects of the
[proposed] action on the listed species." 50 C.F.R. § 402.14(h)(2).  Such effects include
"the direct and indirect effects of an action on the species or critical habitat, together with
the effects of other activities that are interrelated or interdependent with that action, *that
will be added to the environmental baseline.*"  50 C.F.R. § 402.02 (emphasis added).
Here too, Defendants claim that their effects analysis is adequate, on the one hand, but on
the other hand admit that it is "lacking in clarity." Defs.' Mem. at 32-34.

In defending NMFS' effects analysis – while at the same time conceding that they
need a new BiOp – Defendants point to various facets of the environmental baseline that
Defendants have considered, *i.e.*, commercial and subsistence harvest, oil and gas or
mineral development.  Defs.' Mem. at 32.  Defendants also point to text in the 2005 BiOp
discussing effects of the proposed action.  *Id*. at 32-33.  Yet, significantly, Defendants
never explain how NMFS considered the effects of the action when added to the
environmental baseline.  *See Oceana,* 384 F. Supp. 2d at 230 (an agency does not fulfill
its ESA obligations when it considers the effects of the action and the environmental
baseline in isolation); *Defenders of Wildlife v. Norton*, No. Civ. A. 99-927, 2003 U.S.
Dist. Lexis 26558, at *19 (D.D.C. Jan 7, 2003) (same); *Defenders of Wildlife v. Babbitt*,
130 F. Supp. 2d at 127-28 (same).  While Defendants do include a reference to the
"Integration and Synthesis of Effects" portion of the BiOp, AR-407 at 67-69, they fail

to point out any consideration of the effects of the proposed permits when added to the

outstanding environmental baseline.  Defs.' Mem. at 33.  The reason is simple – no such

aggregate consideration exists in the BiOp.

       Additionally, Defendants appear to bolster their use of outdated information in the

environmental baseline portion of the BiOp by arguing that "[w]hether to rely on old data

in assessing threats to a species is a complicated inquiry . . . ."  Defs.' Mem. at 34.

Defendants also state that "plaintiffs fail to point to specific data affecting the baseline

that NMFS failed to consider."  *Id*. at 33.  Defendants mislead the Court.  Plaintiffs'

opening brief specifically notes that certain research permittees have submitted annual

reports with data on takes as recent as 2004.  Pls.' Mem. at 29-30 n.8.  Despite the

availability of this recent data, Defendants have chosen to exclude references to any data

collected after 1998.  Plaintiffs disagree that in this instance the decision to use updated

data is a complicated one.  For a BiOp to be valid, actions previously authorized under a

Section 7 consultation must form part of the environmental baseline once in effect, and

the agency is required by the ESA to make its decision based on the "best scientific

evidence available."  *See* 50 C.F.R. § 402.02 (environmental baseline includes "the

anticipated impacts of all proposed Federal projects in the action area that have already

undergone formal or early Section 7 consultation); 50 C.F.R. § 402.14(g)(8) (Service

must use best scientific and commercial data available in formulating a BiOp); *Defenders

of Wildlife v. Babbitt,* 130 F. Supp. 2d at 127 ("It is therefore in the analysis of the

environmental baseline that other federal activities . . . must be taken into account . . . .");

*Greenpeace*, 80 F. Supp. 2d at 1150 (noting that "[a]lthough an agency need not rely on

conclusive scientific proof in a biological opinion, its conclusions must be based on the

best scientific and commercial data available").

    Were this not to occur, the concept of the environmental baseline would be

significantly compromised because the baseline would not include all currently available

information on species impacts and authorized take.  Without that information, agencies

are not able to accurately analyze the impacts of authorizing additional "take" of a

species because they do not know the extent of existing species impacts.  Because

NMFS' analysis started with an "outdated" environmental baseline that did not include

all existing impacts to this species, the agency's analysis lacked any viable means by

which to achieve a clear and accurate assessment of either the current status of the

species or the effect of future impacts on that species.

    **D.    There Is No Legal Basis Under ESA Section 7 For "Reexamining" A
            BiOp While Allowing The Activities Requiring Section 7 Consultation
            To Continue**

    As discussed above, Defendants concede that the BiOp is deficient in this case,

but propose that the Court allow NMFS to "revise," "revisit," and "reconsider" its 2005

BiOp, while making no provision for the suspension of the activities resulting in "take"

under the permits purportedly evaluated in the defective 2005 BiOp.  Defs.' Mem. at 37.

This request is simply baffling.

    Plaintiffs are unaware of any legal authority, and Defendants have cited none, that

supports NMFS' right to allow such take to continue based on an admittedly deficient

ESA process.[7]  There is no question that a principle objective of this litigation is to force

---

[7]    Defendants do not seem to be providing for reinitiation of formal consultation
pursuant to 50 C.F.R. § 402.16.  Reinitiation of formal consultation is required "(a) [i]f
the amount or extent of taking specified in the incidental take statement is exceeded; (b)
[i]f new information reveals effects of the action that may affect listed species or critical

NMFS to comply with the ESA and its corresponding regulations.  Compliance with the ESA, however, is not satisfied when the permits are issued, NMFS "realizes" the BiOp's deficiencies, and then sets out to essentially back-fill its errors while the impacts continue absent the required analysis.  Regardless of any revisions made to the 2005 BiOp by March 1, 2006, the existence of the permits is predicated on the no-jeopardy determination made in the 2005 BiOp.  Defendants' attitude that reexamination of the BiOp is a sufficient remedy highlights their lack of understanding that "[t]he [ESA] process . . . itself offers valuable protections against the *risk* of a substantive violation and ensures that environmental concerns will be properly factored into the decision-making process as intended by Congress."  *Natural Res. Def. Council*, 146 F.3d at 1129.  Because the direct, indirect and cumulative effects analyses go hand-in-hand with a jeopardy/no-jeopardy determination, Defendants' last minute effort to now satisfy the ESA with a lawful BiOp requires suspension of the 2005 permits and amendments until that process is completed.[8]

Allowing the research permits to continue in force is also a *per se* violation of Section 7(d)'s prohibition against making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the

---

habitat in a manner or to an extent not previously considered; (c) [i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or (d) if a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16.

[8]    Defendants' statement that the bulk of the research allowed under the permits will not take place until May 1, 2006, Defs.' Mem. at 37, is of no moment because it does not change the *post hoc* nature of any revisions made to the BiOp.  However, as a practical matter Plaintiffs wish to point out that there are research activities occurring under all but two of the permits issued or amended in 2005 on a "year-round" basis.  AR-406 at 103-117.

formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2)" of Section 7.  16 U.S.C. § 1536(d).  Section 7(d) was enacted "to prevent Federal agencies from 'steamrolling' activity in order to secure completion of the projects regardless of their impact on endangered species." *Pac. Rivers Council v. Thomas*, 936 F. Supp. 738, 745 (D. Idaho 1996) (*quoting N. Slope Borough v. Andrus*, 486 F. Supp. 332, 356 (D.D.C. 1980)), *aff'd in part, rev'd in part*, 642 F.2d 589 (D.C. Cir. 1980).  In this case, NMFS' proposal to "revisit" the 2005 BiOp – without suspending the permit decisions that are based on that BiOp – is precisely the kind of "steamrolling" that section 7 was designed to prevent.  *See Pac. Rivers Council*, 936 F. Supp. at 745 (applying Section 7(d)'s purpose of "ensur[ing] that the status quo will be maintained during the consultation process," to prohibit livestock grazing prior to the completion of consultation).

There is no question that Section 7(a)(2) and Section 7(d) "mak[e] abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194, 98 S. St. 2279, 57 L. Ed. 2d 117 (1978).  Because of this "institutionalized caution" mandate of the ESA, *see id.*, Defendants' after-the-fact compliance with the ESA cannot stand.  If NMFS is embarking on a good faith revision of the cumulative effects and effects determination of the BiOp, the agency would necessarily question its no-jeopardy determination and, in turn, suspend the permits until it completes that inquiry.  In the absence of permit suspension, any BiOp revision can only be an unlawful, *post hoc* rationalization.

### E.    Plaintiffs' ESA Claims Are Not Moot

Defendants' argument that Plaintiffs' ESA claims are nonjusticiable because NMFS has decided to "revisit" the 2005 BiOp is without merit and symptomatic of

Defendants' "kitchen sink" approach to briefing. Defs.' Mem. at 37-38; *see also Greenpeace*, 80 F.Supp. 2d at 1150-51 ("NMFS takes a shot-gun approach in its briefing, arguing virtually every doctrine of justiciability applies to prevent this Court from providing the relief plaintiffs seek.").

"NMFS bears the heavy burden of demonstrating mootness," a burden that Defendants do not meet. *Headwaters, Inc. v. Bureau of Land Mgmt.*, *Medford Dist.*, 893 F.2d 1012, 1015 (9th Cir. 1989). Even if NMFS revises the 2005 BiOp, "[t]he fact that an alleged violation has itself ceased is not sufficient to render a case moot. As long as effective relief may still be available to counteract the effects of the violation, the controversy remains live and present." *Greenpeace*, 80 F. Supp. 2d at 1151 (*quoting Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1245 (9th Cir. 1988)).

Whether or not Defendants successfully remedy the inadequacies of the 2005 BiOp, the permits issued under the defective 2005 BiOp remain in effect and thus continue to exist in violation of the ESA. *See* Defs.' Mem. at 37 (Defendants admit the BiOp has "internal inconsistencies" and "lack[s] clarity."). This Court therefore clearly retains the ability to render effective relief in this case – namely, a suspension of the permits at issue.[9] *Contra S. Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 728-29

_____

[9]     This Court may be concerned that Plaintiffs are critiquing NMFS for doing precisely what Plaintiffs have asked the Court to order NMFS to do; that is, to revise the BiOp to comply with the provisions of the ESA. However, by leaving the permits outstanding, Defendants turn what could be a credible attempt to comply with applicable environmental laws into a *post hoc* rationalization for an incoherent and incomplete decision that remains the outstanding rationale for the issuance of the 2005 permits. The ESA mandates compliance before final action. More bluntly, Congress did not envision a process whereby an agency could take action that impacts an endangered species and then study the effects after the proposed actions (and impacts) have occurred. That, however, is precisely what Defendants are asking this Court to endorse.

(10th Cir. 1997) (holding a claim moot because plaintiff had failed to demonstrate "how any injury still flows from the alleged violation.").

Moreover, it is well established that an action is not moot where it is "capable of repetition, yet evading review," because "(1) the challenged action [is] in its duration too short to be fully litigated and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *See Beethoven.com, LLC v. Librarian of Cong.*, 394 F.3d 939, 950 (D.C. Cir. 2005) (articulating standard in the D.C. Circuit for "capable of repetition, yet evading review" exception). Here, the operative effect of Defendants' evasive "revisiting" maneuver is to insulate the permits authorized under the no-jeopardy finding in the 2005 BiOp from judicial review. Thus, BiOp "revisiting" without permit suspension creates the potential for a cycle of short-lived BiOps,[10] requiring Plaintiffs to repeatedly reinitiate proceedings, but never fully litigate the actual inadequacies of either the BiOps or the illegal process used by Defendants to purportedly comply with the ESA in approving research permits.

Plaintiffs are not hypothesizing a "sky is falling" worst-case scenario here – there is no question that Defendants' "approve and then cure" tactics are well documented.[11] Because the Court can provide relief for Plaintiffs' ESA claims through suspension of the permits, and because the adequacy of the 2005 BiOp, the related permits, and the no-jeopardy determination on which those permits are based all evade judicial review if

---

[10]    In this case the 2005 BiOp will have been in effect for less than one year, if Defendants issue a BiOp on March 1, 2006 as they state they will.

[11]    *See, e.g., Haw. Longline Ass'n v. NMFS*, 281 F. Supp. 2d 1, 12 (D.D.C. 2003), in which the Court noted that "[t]here is some dispute over Defendants' intent in reinitiating consultations, particularly given the timing of NMFS' decision," and that the "net effect of the agency's behavior was that NMFS effectively insulated the substance of the 2001 BiOp from Court review." *Id*. at 20.

NMFS' litigation strategy prevails, the ESA claims are justiciable and not barred by the mootness doctrine.

V.    **Defendants Cannot Remedy Their NEPA Violations "After the Fact" By Conducting An EIS While Continuing To Allow Research Activities To Occur Under The Permits**

A.    **Defendants Have Admitted They Must Prepare An EIS To Fully Examine The Impacts Of The Steller Sea Lion Research Permits**

Defendants wish us all to pretend that when they admitted an EIS is warranted to evaluate the effects of their actions in issuing the permits, they did not really mean an EIS is warranted to evaluate the effects of those actions.

But they did admit it. And there can be no credible dispute that NMFS has admitted its intention to prepare an EIS to evaluate the impact of the research permits (and associated activities) on Steller sea lions. *See* Ex. 4 to the Barrett Decl.; Defs.' Mem. at 20-22. So, while NMFS newly characterizes its stated "concern[ ] over the scope of the research" as concern about its entire program for administering such permits, the plain fact is that the agency previously admitted sharing Plaintiffs' concerns with the research permits specifically addressed in its 2005 EA, and therefore that it planned to prepare an EIS. *See* Ex. 3 to the Barrett Decl.; AR-402; Defs.' Mem. at 20. And the fact remains that NMFS issued the 2005 research permits and amendments *after* preparing a legally inadequate EA and FONSI. Whether NMFS chooses to prepare a programmatic EIS to guide future policy and actions, it still must prepare an EIS for the action at issue in this case.

As explained in Plaintiffs' opening brief, this case is not about the environmental impact of NMFS' entire future permitting program of administering research grants and issuing research permits, nor is it about NMFS' general policy pertaining to grants and

research permits.  *Contra* Defs.' Mem. at 19.  Rather, the central issue here is whether the proposed action discussed in the 2005 EA requires preparation of an EIS prior to issuance of research permits that may significantly impact Steller sea lions.  It does.[12]

     If nothing else, NMFS' notice of its intent to prepare an EIS serves to underscore the significant impacts that it failed to adequately analyze in its 2005 EA for these permits, including (1) the types of research methods and protocols permitted, (2) the level of the research effort, (3) coordination of that research, (4) effects of the research, (5) researchers' qualifications, and (6) criteria for allowing modifications or amendments to existing permits, denying permit amendments and suspending or revoking permits.  *See* Ex. 4 to the Barrett Decl. at 76,781-76,782.  Allowing the research authorized under the 2005 permits and amendments to continue while NMFS determines how that research might significantly impact Steller sea lions violates the letter and spirit of NEPA as a matter of law.

---

[12]    When there are large-scale plans for the region and the entire permitting system needs to be evaluated in a programmatic EIS, NEPA requires a project-specific EIS as well.  *See Tenakee Springs v. Block*, 778 F.2d 1402, 1407 (9th Cir. 1985) (citing 40 C.F.R. § 1508.28, 1502.20); *Kleppe v. Sierra Club*, 427 U.S. 390, 409-14, 96 S.Ct. 2718, 2729-37, 49 L. Ed. 2d 576 (1976); *see also Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) ("[n]othing in [40 C.F.R. § 1508.28] tiering regulations suggests that the existence of a programmatic EIS for a forest plan obviates the need for any future project-specific EIS, without regard to the nature and magnitude of a project."); *Natural Res. Def. Council v. Morton*, 388 F. Supp. 829, 838 (D.D.C. 1974) ("[w]hile the programmatic EIS drafted by [the agency] provides general policy guidelines as to relevant environmental factors, it in no way insures that the decision-maker considers all of the specific and particular consequences of his actions, or the alternatives available to him").  Because this action may significantly impact Steller sea lions, NMFS was required to prepare an EIS before making any decisions about whether to issue the research permits.  42 U.S.C. § 4332(2)(C).

**B.    There Is No Legal Basis Under NEPA For Allowing Federal Action To Continue While "After The Fact" EIS Analysis Is Conducted**

When NMFS issued research permits allowing takes of Steller sea lions before preparing the EIS that NMFS itself admits is necessary, it violated NEPA's timing requirements.  *See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir. 2001) ("Where an EIS is required, allowing a potentially environmentally damaging project to proceed prior to its preparation runs contrary to the very purpose of the statutory requirement."); *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).  This Circuit has stated that "[i]f any 'significant' environmental impacts *might* result from the proposed agency action then an EIS must be prepared *before* the action is taken."  *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983) (emphasis added) (finding that "[NEPA] requires federal agencies to evaluate the environmental consequences of their actions *prior* to commitment to any actions which might affect the quality of the human environment"); *see also Metcalf*, 214 F.3d at 1142 (environmental review must take place early enough to contribute to the decisionmaking process and not to rationalize or justify decisions already made).

NEPA goes beyond simply requiring agencies to prepare an EIS for actions that may significantly impact the environment.  When an EIS is required, there is no legal basis for an agency to commit resources to the project prior to completion of its analysis on whether the agency should take the action in the first place – exactly the analysis that should take place in the EIS.  The Ninth Circuit has stated that "[p]roper timing is one of NEPA's central themes.  An assessment must be 'prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made'."  *Save the Yaak Comm. v. Block*,

840 F.2d 714, 718 (9th Cir. 1988) (*citing* 40 C.F.R. § 1502.5) ("The rationale behind this

rule is that inflexibility may occur if delay in preparing an EIS is allowed: 'After major

investment of both time and money, it is likely that more environmental harm will be

tolerated.'" (*citing Confederated Tribes and Bands of the Yakima Indian Nation v. FERC*,

746 F.2d 466, 471-72 (9th Cir. 1984) (*quoting Envtl. Def. Fund v. Andrus*, 596 F.2d 848,

853 (9th Cir. 1979)), *cert. denied*, 471 U.S. 1116, 105 S. Ct. 2358, 86 L. Ed. 2d 259

(1985)).

     NMFS has violated NEPA by issuing research permits that may significantly

impact endangered and threatened Steller sea lions prior to preparing an EIS to

adequately analyze those impacts. This violation cannot be remedied by preparation of

an after-the-fact EIS. To allow such a *post hoc* rationalization would convert the EIS

from a decisionmaking tool to "an exercise in form over substance." *See Metcalf*, 214

F.3d at 1142, 1146 (finding that the "'hard look' mandated by Congress and required by

[NEPA] must be timely, and it must be taken objectively and in good faith, not as an

exercise in form over substance, and not as a subterfuge designed to rationalize a decision

already made"); *see also Humane Soc'y of the U.S. v. Clark*, C.A. 99-0424, 1999 U.S.

Dist. LEXIS 3686, at *16-17 (D.D.C. Mar. 17, 1999) (stating that "courts must require

agencies to prepare an EIS at the time the proposal for a major federal action occurs")

(*citing Kleppe*, 427 U.S. at 405-06)). Courts have found that "the risk implied by a

violation of NEPA is that real environmental harm will occur through inadequate

foresight and deliberation. The difficulty of stopping a bureaucratic steam roller, once

started . . . seems . . . a perfectly proper factor for a district court to take into account in

assessing that risk." *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989) (vacating

the district court's decision not to issue a preliminary injunction). Because of the risk of harm to Steller sea lions resulting from this blatant NEPA violation, this Court should suspend or invalidate the permits until the requisite environmental review is completed.

### C.    Defendants Violated NEPA By Failing To Prepare An EIS

#### 1.    Defendants' Purported NEPA Standard Of Review Flies In The Face Of Well-Established NEPA Case Law

There is no dispute that "NEPA governs the manner in which an agency reaches its decision," and as such, "[i]ts dominant purpose is to ensure that federal agencies consider the environmental consequences of their proposed actions *in advance of a final decision to proceed*." Defs.' Mem. at 9 (emphasis added) (*citing Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-50 (1989)). Defendants, however, seem to imply that judicial review should terminate upon the showing of mere preparation of NEPA documents. Defendants correctly state that the Supreme Court has held that courts should uphold NEPA documents if the agency conducted a "reasoned evaluation" of the environmental factors therein. Defs.' Mem. at 10 (*citing Marsh*, 490 U.S. at 377, 385). In reviewing an agency's decision not to supplement an EIS, however, the *Marsh* Court noted that "courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance – or lack of significance – of the . . . information." *Marsh*, 490 U.S. at 378 (finding that "a contrary approach would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasoned evaluation 'of the relevant factors'"); *see also Friends of the Earth v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 36 (D.D.C. 2000) (finding that despite

*Marsh's* deferential standard of review, "a reviewing court must undertake a 'thorough, probing, in-depth review' of the agency's decision and then decide whether it was 'based on a consideration of the relevant factors.'") (*citing Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-416 (1971); *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995)) (stating that "deference does not mean obeisance. Deference will not 'shield [an agency] action from a thorough, probing, in-depth review.").

This Circuit has noted that "the critical judicial task is 'to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 151 (D.C. Cir. 1985) (*citing Balt. Gas & Elec. v. Natural Res. Def. Council*, 462 U.S. 87, 98 (1983)). In this Circuit, the Court applies a four-factor test for judicial review of a FONSI: "(1) whether the agency took a 'hard look' at the problem; (2) whether the agency identified the relevant areas of environmental concern; (3) . . . whether the agency made a convincing case that the impact was insignificant; and (4) if there was an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum." *See Cabinet Mountains Wilderness*, 685 F.2d at 678, 682 (*citing Md.-Nat'l Capital Park & Planning Comm'n v. U.S. Postal Serv.*, 487 F.2d 1029, 1040 (D.C. Cir. 1973)) (stating this Circuit's well-established four-factor test for judicial review of a FONSI). Because NMFS' EA does not properly address significant environmental concerns, it "can hardly be deemed adequate for a reasoned determination that an EIS is not appropriate." *See Found. on Econ. Trends v. Weinberger*, 610 F. Supp. 829, 841 (D.D.C. 1985) (*citing Heckler*, 756 F.2d at 154). For the reasons stated below, as well as in Plaintiffs' Memorandum of Points and Authorities

in Support of its Motion for Summary Judgment, NMFS failed to take the requisite "hard

look" and its EA and FONSI must be overturned as arbitrary and capricious.

### 2. NMFS Did Not Analyze A Reasonable Array Of Alternatives And Plaintiffs Are Not Precluded From Raising This Issue

To fulfill its statutory obligations under NEPA, NMFS is required to adequately

consider feasible alternatives, the "heart" of the NEPA process. 40 C.F.R. §§ 1502.14,

1508.9. NMFS failed to adequately analyze alternatives beyond the proposed action and

no action, mentioning three other alternatives but dismissing them prior to any type of

analysis of their feasibility. AR-406 at 30-33. NMFS inappropriately dismissed two of

the alternatives by referencing self-serving, unsupported assertions made by the

permittees. AR-406 at 32-33; *see S. Utah Wilderness Alliance v. Norton*, 237 F. Supp. 2d

48, 52-54 (D.D.C. 2002) (finding the agency could not simply dismiss alternatives

without independent analysis just because applicants claimed the alternatives would not

meet their objectives). The only other alternative that was briefly "considered but

eliminated from detailed study" was a temporary moratorium on all research directly

affecting Steller sea lions, AR-406 at 30-31, an alternative that NMFS has already stated

will likely not be considered in its EIS either. Ex. 4 to the Barrett Decl. at 76,782.

NMFS' dismissal of all but two alternatives – the proposed action and no action –

without adequate analysis of those dismissed, simply does not comport with Defendants'

claim that "NMFS analyzed alternatives in detail." Defs.' Mem. at 31.

Likewise, Defendants' assertion that Plaintiffs are barred from raising this claim

because it was not raised in administrative proceedings is without merit. Defs.' Mem. at

30. The HSUS did submit its concerns, as well as suggestions for alternatives to

consider, during the NEPA scoping process. *See* AR-401 at 7; AR-402 at 2-3. This is

not a case where Plaintiffs failed to identify alternatives that were not evaluated in the

EA, or failed to urge NMFS to consider alternatives during the scoping process.  *See*

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764-65, 124 S. Ct. 2204, 159 L. Ed. 2d 60

(2004) (finding that because respondents failed to identify alternatives not evaluated in

the EA and failed to urge the agency to consider alternatives, they "therefore forfeited

any objection to the EA on the ground that it failed adequately to discuss the potential

alternatives to the proposed action").  NMFS was properly alerted to alternatives to its

proposed action and simply limited its analysis to the proposed action and the "status

quo" (no action).

### 3.    Defendants Failed To Analyze Potential Significant Impacts In An EIS

When determining the significance of agency action, both the "context" and the

"intensity" of the proposed action are to be considered.  *See* 40 C.F.R. § 1508.27.  The

context of the action includes factors such as "society as a whole (human, national), the

affected region, the affected interests, and the locality."  40 C.F.R. § 1508.27(a).

Intensity is defined as the severity of the impact, 40 C.F.R. § 1508.27(b), and should

include the following factors pertinent to this case:  (1) impacts that may be both

beneficial and adverse; (2) the degree to which the effects on the quality of the human

environment are likely to be highly controversial; (3) the degree to which the possible

effects on the human environment are highly uncertain or involve unique or unknown

risks; (4) the degree to which the action may establish a precedent for future actions with

significant effects or represents a decision in principle about a future consideration; (5)

whether the action is related to other actions with individually significant but

cumulatively significant impacts; (6) the degree to which the action may adversely affect

an endangered or threatened species or its habitat that has been determined to be critical

under the ESA; and (7) whether the action threatens a violation of federal, state, or local

law or requirements imposed for the protection of the environment.  *Id.*

Because of the impact of mortalities relative to the PBR level, the "highly

controversial" and "highly uncertain" impacts, and the cumulatively significant impacts,

the proposed action is significant and requires an EIS.  Despite Defendants' contention

that "'highly controversial' and 'highly uncertain' environmental effects constitute[] two

factors, among many, that are relevant to whether a given agency action would or would

not . . . require an EIS," Defs.' Mem. at 27, the presence of only *one* significance factor

could lead this Court to require NMFS to consider the significant impacts of its action in

an EIS, particularly where the action involves uncertain or controversial effects of a

species listed as endangered under the ESA.  *See Fund for Animals v. Norton*, 281 F.

Supp. 2d 209, 231, 235 (D.D.C. 2003) ("the existence of one or more [40 C.F.R. §

1508.27(b)] significance factors can justify setting aside a FONSI and remanding either

for further consideration of those factors or preparation of an EIS"); *see also Pub. Serv.

Co. v. Andrus*, 825 F. Supp. 1483, 1495 (D. Idaho 1993) (finding if any one of these

factors is present, it "should result in an agency decision to prepare an EIS"); *Nat'l

Wildlife Fed'n v. Norton*, 332 F. Supp. 2d at 181 (*citing Friends of the Earth*, 109 F.

Supp. 2d at 43).

a.    **NMFS Did Not Analyze The Impact Of The Proposed
        Research Activities Against The Total PBR level**

As discussed *supra* at 11-13, NMFS failed to analyze the impact of the proposed

research activities on the PBR level for Steller sea lions.  Because exceeding the PBR

level is in itself a significant impact, Defendants violated NEPA by failing to prepare an

EIS before issuing the permits.  It is a basic principle that "an EIS *must* be prepared if substantial questions are raised as to whether a project . . . *may* cause significant degradation of some human environmental factor."  *See, e.g., Ocean Advocates*, 402 F.3d at 864 (emphasis in original).

### b.    NMFS Did Not Properly Consider "Highly Controversial" And "Highly Uncertain" Impacts

The proposed action is significant because of "highly controversial" and "highly uncertain" impacts that NMFS did not properly analyze.  40 C.F.R. § 1508.27(b).  Courts have found that "[t]he effects of an action are 'highly controversial' when there is 'a substantial dispute [about] the size, nature or effect of the major Federal action rather than the existence of opposition to a use'."  *Friends of the Earth v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d at 39 (*citing Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)).  The *Friends of the Earth* court found that because of pleas from the public and from federal and state agencies, as well as concern expressed by the Army Corps' own leadership at the reaction to the proposed action, it was "clear that the [proposed action] is genuinely and extremely controversial."  *Id.* at 39-40 (disagreeing with defendant's claim that this was merely a case of the "loudest voices . . . forc[ing] the preparation of an EIS by instigating a controversy"); *see also Coal. on Sensible Transp., Inc. v. Dole*, 642 F.Supp. 573, 587 (D.D.C. 1986) (finding it significant that "no agency charged with environmental responsibility opposed . . . [the] project.") (internal quotations omitted), *aff'd*, 826 F.2d 60 (D.C. Cir. 1987) (*citing W. Houston Air Comm. v. Fed. Aviation Admin.*, 784 F.2d 702, 705 (5th Cir. 1986)).

Likewise, NMFS' issuance of research permits is "highly controversial" for the same reasons as the proposed action in *Friends of the Earth*:  (1) the Marine Mammal

Commission, an independent federal agency created to provide oversight of marine mammal conservation policies, submitted both preliminary and final comments urging NMFS to provide further explanation, reduce the scope of the projects, or prepare an EIS, *see* Ex. 1 to the Barrett Decl. at 5; Ex. 2 to the Barrett Decl. at 2; (2) the HSUS and Defenders of Wildlife submitted comments expressing concern about the inadequacy of the EA and urging NMFS to prepare and EIS for the proposed action, AR-406 at 16; and (3) NMFS itself expressed concern over the scope of the research, as well as an intent to prepare an EIS to evaluate the impact of the research permits. *See* Ex. 3 to the Barrett Decl.; Ex. 4 to the Barrett Decl.; Defs.' Mem. at 20.

Issuance of these research permits is also significant based on the "highly uncertain effects or unknown risks." 40 C.F.R. § 1508.27(b)(5). NMFS acknowledges in its EA that "[t]here have been no studies dedicated to documenting and assessing the effects of research on Steller sea lion stock or population. The cumulative effects of various research activities on Steller sea lions, including the possibility of cumulative effects that may not become evident for some time, are *uncertain*." AR-406 at 120 (emphasis added). While it may be true, as Defendants suggest, that agencies may attempt to ameliorate these uncertain effects with mitigation measures, Defs.' Mem. at 29, that is not the case here. *See supra* at 13-16.

It is also not the case that this Court owes NMFS' decision any higher level of deference because of "scientific uncertainty." Defs.' Mem. at 11, 30. As discussed *supra* at Section I, 9-11, this case is not about scientific differences of opinion, but rather about whether NMFS followed the *procedural* mandates required by statute. NMFS admits that "research activities conducted on Steller sea lions for more than two decades have

not collected or reported detailed information on the responses of the sea lions to the

various procedures that would make it possible to assess the individual and collective

effects of these research activities on the population ecology of Steller sea lions." AR-

407 at 67. That is precisely the type of information one would expect an agency to

collect as part of its "hard look" at the impact of its proposed actions. Courts have found

that "[p]reparation of an EIS is mandated where uncertainty may be resolved by further

collection of data . . . ." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d at 728,

732 (*citing Blackwood*, 161 F.3d at 1213-1214) (finding that an EIS was required

because, among other factors, the effects of a proposed action to increase the number of

cruise ships entering Glacier Bay were uncertain, in part because "little is known about

the effects of the disturbance [on Steller sea lions]"). NMFS also acknowledges further

uncertainty in that "animals may die from infection caused by intrusive research days to

weeks after a procedure . . . [and i]n the absence of adequate monitoring, these deaths

would not be noticed." *Id.*

    For these reasons, the issuance of multiple new permits and amendments to

existing permits for intrusive research on Steller sea lions has "highly uncertain effects"

warranting preparation of an EIS. *See Fund for Animals*, 281 F. Supp. 2d at 234 (finding

that the agency's actions were highly uncertain because it "failed to identify the precise

locations at which mute swans will be killed, the number of birds that will be killed at

particular individual sites, or the environmental impacts of those killings on local

communities").

    In sum, Defendants' recent Federal Register notice announcing their decision to

prepare an EIS to examine impacts associated with the contested research permits

provides the Court with ample evidence of Defendants' own uncertainty regarding these effects. Ex. 4 to the Barrett Decl. at 76,780.

### c. Defendants Failed To Conduct Any Cumulative Impacts Analysis

Rather than alleging that NMFS' EA adequately analyzes cumulative impacts, as is required under NEPA and its implementing regulations, Defendants incorrectly allege it is Plaintiffs' burden to bring cumulative impacts to NMFS' attention. Defs.' Mem. at 30; 40 C.F.R. §§ 1508.7, 1508.25(a)(2). In remanding the agency's EA for full consideration of cumulative effects, the court in *Grand Canyon Trust* noted that "NEPA requires [the agency] to 'fully assess[ ] the possible environmental consequences' of activities 'which have the potential for disturbing the environment.'" *Grand Canyon Trust*, 290 F.3d at 342, 347 (D.C. Cir. 2002) (*citing Sierra Club v. Peterson*, 717 F.2d at 1415). The burden to identify and analyze cumulative impacts of an agency's proposed action falls on the agency. *See Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1161 (9th Cir. 1997) (remanding the EIS for proper consideration of cumulative impacts). The *Carmel* court held that despite the agency's argument that absent plaintiffs' identification of a specific action not considered, the cumulative impacts discussion is adequate, it is the agency's burden under NEPA to identify and analyze cumulative impacts. *Id.* (*citing Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir. 1975)) ("Compliance with [NEPA] is a primary duty of every federal agency; fulfillment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs"); *see also Hammond v. Norton*, 370 F. Supp. 2d 226, 245 (D.D.C. 2005) ("The identification of cumulative effects is a task committed 'to the special competency' of the agency preparing an EIS.") (*citing Kleppe*, 427 U.S. at 413).

41

NMFS admits that the cumulative impacts of its action on the Steller sea lion populations are uncertain.  AR-406 at 120.  NMFS also states, in its discussion of cumulative impacts in the context of the two alternatives considered, that "[t]here have been no studies dedicated to documenting and assessing the effects of research on Steller sea lions or other marine mammals at a population level, nor on the synergistic or cumulative effects of various research activities and other human-related impacts on individual marine mammals or populations."  AR-406 at 41.  This is followed by a "*brief summary* of the past, present, and future human-related activities affecting the marine mammals, particularly Steller sea lions, within the action area."  *Id*. at 51-57 (emphasis added).  Defendants appear to believe that the absence of any knowledge regarding cumulative effects somehow excuses them from performing any such analysis to obtain this information.  Defendants' approach, of course, would turn NEPA on its head – the statute is designed to provoke careful thought and analysis regarding heretofore unknown effects of a given agency action.  Congress did not design it as a "box checking" exercise, whereby an agency can proceed to "go" when it concludes that the cumulative effects of its action are not already known.

In short, NMFS' burden under NEPA to analyze cumulative impacts of its proposed action requires something more than a regurgitation of conclusory remarks, summaries of future actions, and dismissive statements about the absence of studies on the effects of such action.  *See Friends of the Earth*, 109 F. Supp. 2d at 42 (finding insufficient agency's conclusory remarks that the impact of three permits for riverboat casinos would be "minimal" because, despite 9-10 pages of discussion in each of three EAs, there was no analysis of cumulative impacts); *Citizens Exposing Truth About*

*Casinos v. Norton*, Case No. A-03-CA-242, 2004 U.S. Dist. LEXIS 27498, at *27-28

(D.D.C. Feb. 24, 2004) (finding insufficient analysis in the EA when the agency makes

such conclusory and dismissive statements as "when evaluated together with future

projected increases in ambient noise in the vicinity, there will be some increase in noise,

but it will probably not be measurable").

## VI.    CONCLUSION

Defendants' entire brief can be reduced to two concepts – all agency decisions are

entitled to deference, and an agency can conduct its environmental review after, rather

than before, it makes and implements decisions that may harm the environment.  The first

concept ignores the well-established principle that "[courts] must not 'rubber-stamp . . .

administrative decisions that they deem inconsistent with a statutory mandate or that

frustrate the congressional policy underlying a statute.'"  *Ariz. Cattle Growers' Ass'n v.

U.S. Fish and Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001) (*quoting NLRB v.

Brown*, 380 U.S. 278, 291 (1965)).  The second concept not only ignores the plain

language of NEPA and the ESA, but also requires the Court to embrace the troubling

legal conclusion that a federal agency's gross violations of important environmental

review procedures should have no legal consequences, even when the underlying subject

matter is the "alarming decline" of the Steller sea lion.

Because such a result is impossible to reconcile with the letter or spirit of NEPA,

the MMPA, and the ESA, and would have far-reaching consequences in all future

circumstances where an agency fails to carry out its environmental review functions in

good faith, Plaintiffs respectfully request that Summary Judgment be entered in their

favor, and the challenged permits be set aside and remanded to NMFS for new

proceedings in accordance with Congress' procedural and substantive environmental

protection mandates under NEPA, the MMPA, and the ESA.


DATED:         February 17, 2006              Respectfully Submitted,

                                              /s/ James R. Barrett
                                              LATHAM & WATKINS LLP
                                              James R. Barrett(DC Bar No. 441674)
                                              David J. Hayes (DC Bar No. 252130)
                                              Sara K. Orr (DC Bar No. 493765)
                                              555 Eleventh Street, N.W.
                                              Suite 1000
                                              Washington, D.C. 20004-1304
                                              (202) 637-2200

                                              KIMBERLY MCCORMICK
                                              8363 Sumanee Place N.E.
                                              Bainbridge Island, WA  98110
                                              Counsel for Plaintiffs The Humane Society
                                              of the United States, Will Anderson and
                                              Sharon Young