SUE ELLEN WOOLDRIDGE
Assistant Attorney General
JEAN E. WILLIAMS, Chief
SETH M. BARSKY, Assistant Chief
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
KRISTEN BYRNES FLOOM, Trial Attorney (DC Bar No. 469615)
P.O. Box 7369
Washington, D.C.  20044-7369
Telephone: (202) 305-0210
Facsimile: (202) 305-0275
Kristen.Floom@usdoj.gov

GREGORY PAGE, Trial Attorney (DC Bar No. 398121)
U.S. Department of Justice
Environment and Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C.  20044-0663
Telephone: (202) 305-0446
Facsimile: (202) 305-0506
Gregory.Page@usdoj.gov

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, et al. | ) ) ) | |
| Plaintiffs, | ) ) | Civ. No. 05-1392 |
| vs. | ) ) | |
| CARLOS M. GUTIERREZ, <u>et al.</u>, | ) ) | |
| Defendants. | ) | |

**FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
<u>CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

PAGE

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' MMPA CLAIM  . . . . . 2

II.   NMFS IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' ESA
      CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    NMFS' Reconsideration Of The Analysis In The 2005 BiOp Is Appropriate  . . . 5

      B.    NMFS Did Not Violate ESA Section 7(d) By Allowing The Permitted Activities
            To Proceed During Its Reconsideration Of The 2005 BiOp . . . . . . . . . . . . . . . . . 6

      C.    Plaintiffs' ESA Claim is Moot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.  PLAINTIFFS' CHARACTERIZATION OF PBR AND RELIANCE THEREON AS A
      BASIS FOR THEIR NEPA, ESA, AND MMPA CLAIMS IS FLAWED . . . . . . . . . . . 9

      A.    NMFS Considered The Steller Sea Lion PBR In The Context Of Issuing The
            Permits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      B.    The PBR Level Set By NMFS Is Conservative . . . . . . . . . . . . . . . . . . . . . . . . . 11

      C.    NMFS Can Effectively Track Mortality And Enforce The Suspension
            Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV.   NMFS PREDICATED ITS 2005 EA AND FONSI ON REASONED,
      SENSIBLE ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      A. NMFS Did Not Admit the 2005 EA and FONSI Were Unlawful . . . . . . . . . . . . . . 15

      B. NMFS Properly Analyzed the Uncertain Effects of Expanding
         Sea Lion Research . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      C. NMFS Properly Analyzed the Impacts that Plaintiffs
         Allege are "Highly Controversial" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      D. NMFS' Range of Programmatic Alternatives Was Proper . . . . . . . . . . . . . . . . . . . 24

      E. NMFS Properly Considered Cumulative Impacts . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

i

## TABLE OF AUTHORITIES

CASES                                                                    PAGE

Am. Rivers v. NMFS, 126 F.3d 1118, 1124 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Baltimore Gas & Electric Co. v. NRDC, 462 U.S. 87, 105 (1983) . . . . . . . . . . . 1, 18, 20, 21, 25

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971) . . . . . . . . . . . . . . 22

City of Angoon v. Hodel, 803 F.2d 1016, 1021 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . 25

City of Carmel-by-the-Sea v. Dept. Of Transportation, 123 F.3d 1142, 1155 (9th Cir. 1997) . . 25

Conner v. Burford, 848 F.2d 1441, 1455 n. 34 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 7

Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 126 (D.D.C. 2001) . . . . . . . . . . . . . . . . 5

Dep't of Transportation v. Public Citizen, 541 U.S. 752, 763 (2004) . . . . . . . . . . . . . . . . . . . . . 19

Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089, 1096 (9th Cir. 2003) . . . . . . . . . . . . . . . 7

Friends of Endangered Species v. Jantzen, 760 F.2d 976, 987 (9th Cir. 1985) . . . . . . . . . . . . . 23

Friends of the Payette v. Horseshoe Bend Hydroelectric Co., 988 F.2d 989, 993
 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Friends of the River v. FERC, 720 F.2d 93, 105 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . 25

Greenpeace Action v. Franklin, 14 F.3d 1324, 1331-1333, 1335 (9th Cir. 1992) . . . . . . . . . 21, 23

Headwaters, Inc. v. Bureau of Land Management, 914 F.2d 1174, 1180 (9th Cir. 1990) . . . . . 25

Idaho Dept. of Fish and Game v. NMFS, 56 F.3d 1071, 1075 (9th Cir. 1995) . . . . . . . . . . . . . . 8

Kleppe v. Sierra Club, 427 U.S. 390, 394 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 25

Lane County Audubon Soc'y v. Jamison, 958 F.2d 290, 294 (9th Cir. 1992) . . . . . . . . . . . . . . . 7

Marsh v. Oregon Natural Res. Council, 490 U.S. 360 (1989) . . . . . . . . . . . . . . . . 4, 18, 20, 21, 22

Metropolitan Edison v. People Against Nuclear Energy, 460 U.S. 766, 774-775(1983) . . . . . . 18

ii

Nat'l Black Police Ass'n v. District of Columbia, 108 F.3d 346, 349 (D.C. Cir. 1997) . . . . . . . . 9

Nat'l Wilderness Institute v. U.S. Army Corps of Eng'rs, Civ. No. 01-0273, 2005 WL 691775, at
  *16 (D.D.C. Mar. 23, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

North Slope Borough v. Andrus, 642 F.2d 589, 602 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . 25

Ocean Advocates v. U.S. Army Corps of Engineers, 402 F.3d 846 (9th Cir. 2005) . . . . . . . . . . 3

Pacific Rivers Council v. Thomas, 936 F. Supp. 738, 745 (D. Idaho 1996) . . . . . . . . . . . . . . . . 7

Preserve Endangered Areas of Cobb v. U.S. Army Corps of Engineers, 87 F3d 1242, 1248-1249
  (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Pueblo of Sandia v. Babbitt, 231 F.3d 878, 881 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 5

Sierra Club v. Marita, 46 F.3d 606, 619 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Sierra Club v. Peterson, 228 F.3d 559, 563 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Sierra Club v. U.S. Dep't of Transportation, 753 F.2d 120, 127-129 (D.C. Cir. 1985) . . . . . . . 21

Southwestern Bell Tel. v. Fed. Communications Comm'n, 168 F.3d 1344, 1350
  (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Steamboaters v. FERC, 759 F.2d 1382, 1394 (9th Cir 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Tennessee Valley Authority v. Hill, 437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Tourus Records v. Drug Enforcement Admin., 259 F.3d. 731, 736 (D.C. Cir. 2001) . . . . . . . 1, 25

Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 553, 555 . . . . . . . 18, 20, 24, 25

## STATUTES

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
16 U.S.C. § 1362(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
16 U.S.C. §1362(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
16 U.S.C. § 1362(20) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
16 U.S.C. § 1362(20)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16
16 U.S.C. § 1375 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
16 USC § 1536(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

40 C.F.R. § 1501.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
40 C.F.R. § 1502.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
40 C.F.R. § 1508.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
50 C.F.R. § 402.09 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
50 C.F.R. § 402.16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**INTRODUCTION**

As NMFS established in its Combined Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Cross-Motion for Summary Judgment ("Def. Mem.") (Doc. No. 14), plaintiffs have failed to meet their heavy burden to prove that NMFS acted arbitrarily and capriciously in issuing the challenged permits and amendments, in violation of the National Environmental Policy Act ("NEPA"), Endangered Species Act ("ESA") or Marine Mammal Protection Act ("MMPA").

The thrust of plaintiffs' NEPA claim regarding that the 2005 environmental assessment ("EA") and Finding of No Significant Impact ("FONSI") are arbitrary and capricious is the following: the potential for up to ten accidental sea lion deaths – which may or may not occur during scientific research – is more harmful to the western Steller sea lion population than the status quo that began indisputably harming this species well before Congress and NMFS attempted to ameliorate the harm by mandating and regulating the challenged research. Notably, plaintiffs fail to show a study, paper, or writing that establishes or even states that this scientific research (1) is not necessary to ascertain the cause or causes of the western sea lion stock's decline or (2) would significantly affect this species by authorizing hypothetical sea lion mortality of up to ten accidental deaths before NMFS would suspend all of the challenged research. Lacking this evidence, plaintiffs rely on mere policy preferences and stark speculation, which wholly fail to meet their burden of showing NMFS acted arbitrarily and capriciously under NEPA by not (1) considering "the relevant factors" in its EA and FONSI and (2) articulating "a rational connection between the facts found and the choice made."[1]/

---

[1]/       Baltimore Gas & Electric Co. v. NRDC, 462 U.S. 87, 105 (1983) ("Baltimore Gas"); Tourus Records v. Drug Enforcement Admin., 259 F.3d. 731, 736 (D.C. Cir. 2001).

Further, plaintiffs' ESA claim challenging the 2005 BiOp must be dismissed as moot because that BiOp has been superseded, and plaintiffs' MMPA claim must be dismissed because NMFS fulfilled its statutory duty to set a protective PBR level, and considered PBR in analyzing the impacts of the permitted activities on the Steller sea lion.   Thus, the Court should grant summary judgment in favor of NMFS and dismiss plaintiffs' complaint in its entirety.

## I.    THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' MMPA CLAIM

Plaintiffs' opposition  fails to counter NMFS' showing that their MMPA claim amounts to a programmatic challenge, and thus fail to articulate how their Complaint challenges final agency action.  See Def. Mem. at 18-20.  Plaintiffs' reliance on "a discrete set of research permits and permit amendments" as the basis for their MMPA claim highlights this weakness in their claim.  See Plaintiffs' Combined Memorandum in Reply to Federal Defendants' Opposition to Plaintiffs' Motion for Summary Judgment and in Opposition to Defendants' Cross-Motion for Summary Judgment ("Pl. Opp.") (Doc. No. 18), at 8 (emphasis added).  Plaintiffs challenge the permits globally, seeking broad injunctive relief that would not only enjoin current permits, but also prevent NMFS from issuing future permits.  See Amended Complaint at 41.  Yet plaintiffs claim deny that they seek "wholesale correction" of the permitting scheme.

NMFS does not dispute that the FONSI is a final agency action for purposes of jurisdiction over plaintiffs' NEPA claims, or that the 2005 BiOp is a final agency action for purposes of jurisdiction over their ESA claims.  Nor does NMFS dispute that each individual permit constitutes a final agency action.  However, plaintiffs have elected to challenge the permits globally, and seek relief that would affect all existing and future permits, resulting in an impermissible programmatic challenge.

This case is distinguishable from <u>Ocean Advocates v. U.S. Army Corps of Engineers</u>, 402 F.3d 846 (9th Cir. 2005).  There, the plaintiff challenged the issuance by the U.S. Army Corps of Engineers ("Corps") of a permit for construction of a dock at a refinery facility, and subsequent extension of the permit.  <u>Id.</u> at 854-55.  The plaintiff sought injunctive relief only with respect to the challenged permit, asking the court to freeze vessel traffic at the level that existed prior to the permit extension pending completion of a new NEPA analysis.  <u>Id.</u> at 871.[2] By contrast, here plaintiffs ask the Court not only to vacate all Steller sea lion permits and permit amendments issued in 2005, but also to prevent NMFS from issuing unspecified future research permits.

Instead, this case is more like <u>Sierra Club v. Peterson</u>, 228 F.3d 559, 563 (5th Cir. 2000), where plaintiffs cited a number of allegedly improper timber sales, but did not limit their challenge to those individual sales.  Rather, plaintiffs "requested broad injunctive relief blocking further timber sales" and the use of timber management techniques.  <u>Id.</u>  Here, plaintiffs claim to limit their challenge to "permits that were approved by NMFS," Pl. Opp. at 8, but also seek sweeping relief that would affect future permits.  Because such future permits do not constitute "an identifiable action or event," plaintiffs' MMPA claim does not challenge a discrete "final agency action," and is not reviewable by this Court.  <u>See id.</u> at 566.

---

[2]      The Ninth Circuit remanded the injunctive relief issue to the district court, instructing that court to consider "whether [plaintiff] has made the requisite showing for injunctive relief, what harm [the permitee] may suffer under an injunction, and the impact of such an injunction on the public."  <u>Ocean Advocates</u>, 402 F.3d at 871-72.

## II.    NMFS IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' ESA CLAIM

NMFS does not "concede error" with respect to the 2005 BiOp, or fail to dispute plaintiffs' ESA claim.  NMFS argued in its opening memorandum that plaintiffs failed to meet their APA burden of proving that the 2005 BiOp was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Def. Mem. at 36; see also 5 U.S.C. § 706(2)(A); Marsh v. Oregon Natural Res. Council, 490 U.S. 360 (1989).  However, because NMFS had decided to revisit the 2005 BiOp, NMFS asked the Court to exercise its discretion to decline to consider plaintiffs' ESA claim because it was prudentially moot.  Def. Mem. at 37-38.

Plaintiffs' ESA claim is now constitutionally moot.  NMFS has revisited the 2005 BiOp in response to plaintiffs' concerns, issuing a revised BiOp reaching the same conclusion: the permitted activities covered by the BiOp are not likely to jeopardize the continued existence of Steller sea lions or adversely affect designated critical habitat.  See Revised biological opinion on the Permits, Conservation and Education Division's proposal to issue eight permits pursuant to section 10(a)(1) of the Endangered Species Act of 1973, as amended, for studies on Steller sea lions ("Revised BiOp") (attached hereto as Exhibit 6), at 2.  Because NMFS has completed the Revised BiOp, plaintiffs' ESA claim challenging the 2005 BiOp is moot and must be dismissed.

### A.    NMFS' Reconsideration Of The Analysis In The 2005 BiOp Is Appropriate

There is nothing preventing NMFS from revisiting a biological opinion, even if it has not been declared legally invalid.  Just as an agency may, pursuant to court order, undertake additional investigation absent circumstances that would require reinitiation of consultation, the agency may also undertake such additional investigation on its own initiative.

There is no question that the Court could remand the 2005 BiOp to NMFS absent

4

circumstances that would require reinitiation of formal consultation.  See 50 C.F.R. § 402.16

(setting forth circumstances requiring reinitiation, including, inter alia, modification of the action

in such a manner as to cause an effect to the listed species that was not considered in the BiOp).

In challenges to actions by federal agencies, if the agency action is not supported by the record,

the agency has not considered all relevant factors, or the reviewing court is unable to evaluate

the challenged action on the basis of the record, "the proper course, except in rare circumstances,

is to remand to the agency for additional investigation or explanation."  Fla. Power & Light Co.

v. Lorion, 470 U.S. 729, 744 (1985).  See also Pueblo of Sandia v. Babbitt, 231 F.3d 878, 881

(D.C. Cir. 2000).  For example, a court may remand to the agency to remedy specific

shortcomings in the analysis, such as reconsideration of the effects of the action when added to

the environmental baseline.  See Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 126

(D.D.C. 2001).

        In this case, NMFS has already voluntarily undertaken "additional investigation or

explanation," as would be required if the Court were to find that the 2005 BiOp was deficient.

The Revised BiOp is not a post hoc rationalization offered by NMFS or counsel to bolster the

analysis in the 2005 BiOp.  Here NMFS not only clarified the existing analysis in the 2005

BiOp, but also undertook additional investigation and revised the analysis.  NMFS has corrected

internal inconsistencies and clarified that the finding is based on the data submitted in the 2005

permit applications, as summarized in Tables A-1 through A-3 of the Revised BiOp.  See

Revised BiOp at 72-93.[3]/  NMFS has also considered recent information that had been omitted

_____

[3]/        These tables are identical to Tables 1 and 2 in the 2005 BiOp, see AR 407 at 3-20, with
one exception.  NMFS concluded that the category "Incidental disturbance during studies of
other marine mammal species," id. at 5, is inapplicable to the covered permits.  However,

from the analysis in the 2005 BiOp, including the number of Steller sea lions reported as

harassed or killed during research activities in 2003 and 2004.  <u>See</u> Revised BiOp at 31-32.

NMFS updated the "Effects of the Proposed Actions" section, relying on recent literature.  <u>See</u>,

<u>e.g.</u>, <u>id.</u> at 34-36 (relying in part on studies from 2005 to determine effects of aerial and vessel

surveys).  In a revised "Integration and Synthesis of Effects" section, NMFS concluded that,

although the permitted activities would reduce the numbers of Steller sea lions, "there would not

be any appreciable reduction in the likelihood of the survival and recovery of either the western

or eastern DPS of Steller sea lion."  <u>Id.</u> at 58.  Finally, NMFS reconsidered cumulative effects

and revised that section of the BiOp, setting forth in detail the effects of future actions.  <u>See</u> <u>id.</u> at

52-54.  The scope of NMFS' reconsideration was appropriate and, as described <u>infra</u> at Section

II.C., the Revised BiOp renders moot plaintiffs' challenge to the 2005 BiOp.

> **B.  NMFS Did Not Violate ESA Section 7(d) By Allowing The Permitted Activities To Proceed During Its Reconsideration Of The 2005 BiOp**

There is no legal basis for plaintiffs' claim that allowing the research permits to continue

in force is a "<u>per se</u> violation" of ESA Section 7(d).  While consultation is ongoing, Section 7(d)

prohibits action agencies from making any "irreversible or irretrievable" commitment of

resources "which has the effect of foreclosing the formulation or implementation of any

reasonable and prudent alternative measures" to the agency action.  <u>See</u> 16 USC § 1536(d).  The

section 7(d) prohibition becomes applicable after the initiation of consultation and continues

until consultation is concluded.  <u>Id.</u>; 50 C.F.R. § 402.09.

Congress enacted section 7(d) in response to the Supreme Court's decision in <u>Tennessee</u>

---

harassment of Steller sea lions during research on other marine mammals is discussed generally
in the Revised BiOp at pages 31-32.

Valley Authority v. Hill, 437 U.S. 153 (1978).  See Pacific Rivers Council v. Thomas, 936 F.

Supp. 738, 745 (D. Idaho 1996).  The purpose of section 7(d) is to ensure that agencies do not

undertake irrevocable activities during the consultation process.  Conner v. Burford, 848 F.2d

1441, 1455 n. 34 (9th Cir. 1988); Lane County Audubon Soc'y v. Jamison, 958 F.2d 290, 294

(9th Cir. 1992).  Section 7(d) has not been interpreted to mean "that no agency can ever proceed

with proposed action until consultation is complete."  Pacific Rivers Council, 936 F. Supp. at

746.  Rather, Section 7(d) requires the action agency to avoid making "significant investments

into a project that cannot be recovered, or would be wasted, if it were determined that the project

jeopardized the continued existence of an endangered species," and taking actions that would

"preclude the formulation and implementation of alternative measures that could be taken" with

respect to the agency action.  Nat'l Wilderness Institute v. U.S. Army Corps of Eng'rs, Civ. No.

01-0273, 2005 WL 691775, at *16 (D.D.C. Mar. 23, 2005).  In this case, NMFS did not take any

actions in the interim period that would preclude alternative measures that could be taken, such

as modifying the permits and/or amendments in the event the Revised BiOp concluded that the

permitted activities would jeopardize the species.  Thus, allowing the permitted activities to

proceed pending issuance of the Revised BiOp did not violate ESA Section 7(d).

    **C.**    **Plaintiffs' ESA Claim is Moot**

    Plaintiffs' ESA claim, based on the 2005 BiOp, is clearly moot in light of the Revised

BiOp, which supersedes the 2005 BiOp.  See Am. Rivers v. NMFS, 126 F.3d 1118, 1124 (9th

Cir. 1997) ("the biological opinion in the present case has been superseded by the [new]

Biological Opinion . . . . [t]herefore, any challenge to the [prior] Biological Opinion is moot);

Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089, 1096 (9th Cir. 2003) ("when one [BiOp]

supersedes another, a challenge to the superseded [BiOp] is moot").  Because the superseded

2005 BiOp has no continuing adverse impact and there is no effective relief that this Court may

grant, plaintiffs' request for judicial review of the 2005 BiOp is moot.  See Southwestern Bell

Tel. v. Fed. Communications Comm'n, 168 F.3d 1344, 1350 (D.C. Cir. 1999).

     Plaintiffs cannot escape this consequence by relying on the "capable of repetition, yet

evading review" exception to the mootness doctrine.  First, the challenged action is not too short

in duration to be fully litigated.  By its terms, the Revised BiOp does not expire on any particular

date.  Thus, plaintiffs will have an opportunity to litigate at a later date any claims that may arise

from the analysis in the Revised BiOp.  See Am. Rivers, 126 F.3d at 1123.  Plaintiffs' reliance

on the fact that the 2005 BiOp was in effect for less than one year is unavailing.  See Pl. Opp. at

28, n.10; See also Idaho Dept. of Fish and Game v. NMFS, 56 F.3d 1071, 1075 (9th Cir. 1995)

("capable of repetition, yet evading review" exception not applicable where challenged BiOp

was in effect for less than one year, but plaintiffs would have ample opportunity to obtain review

of superseding BiOp).  If plaintiffs are dissatisfied with the substance of the revised BiOp, they

have a recourse: assuming that they satisfy the jurisdictional prerequisites, they may pursue an

ESA claim based on the Revised BiOp.

     Second, there is no reasonable expectation that the plaintiffs would be subjected to the

same action again.  Because the 2005 BiOp has been superseded, and NMFS will rely on the

Revised BiOp in the future, there is no reasonable expectation of repetition.  See id.  The

allegedly deficient 2005 BiOp has been replaced and, as explained supra, NMFS has clarified

and revised the specific analyses that plaintiffs challenged.  NMFS has (a) updated and revised

the "Effects of the Action" and "Integration and Synthesis of Effects" sections, see Pl. Mem. at

8

29-33; and (b) reconsidered cumulative effects and revised that section of the BiOp, <u>see</u> Pl.

Mem. at 33-36.  Plaintiffs correctly identify the flaw with their argument: they are "critiquing

NMFS for doing precisely what plaintiffs have asked the Court to order NMFS to do . . . ."  Pl.

Opp. at 27, n.9.  There is no ongoing controversy with respect to the superseded 2005 BiOp, and

deciding plaintiffs' ESA claim would require the Court to render a prohibited advisory opinion.

<u>See</u> <u>Nat'l Black Police Ass'n v. District of Columbia</u>, 108 F.3d 346, 349 (D.C. Cir. 1997).

### III.    PLAINTIFFS' CHARACTERIZATION OF PBR AND RELIANCE THEREON AS A BASIS FOR THEIR NEPA, ESA, AND MMPA CLAIMS IS FLAWED

As an initial matter, plaintiffs' argument that NMFS violated NEPA, the ESA, and

the MMPA by failing to analyze the significance of exceeding the potential biological removal

("PBR") level must fail as a legal matter.  PBR is a regulatory tool applicable in the context of

the MMPA, and it does not have any independent meaning or applicability under the ESA.

Further the record shows that NMFS properly considered PBR in connection with its NEPA

analysis.  <u>See</u> <u>infra</u> at Section IV.B.  Finally, although PBR is relevant to NMFS' analysis under

the MMPA, as explained below, NMFS fulfilled its statutory duty to set a protective PBR level,

and considered PBR in analyzing the impacts of the permitted activities on the Steller sea lion.

Plaintiffs' argument also fails as a factual matter because: (1) the PBR levels for the

western and eastern stocks of Steller sea lions are protective of the species; and (2) NMFS did

consider PBR in the context of its decision to approve the permitted research.  Throughout their

opening and reply briefs, plaintiffs consistently blur the line between the endangered western

stock and the threatened eastern stock of Steller sea lions.  Each stock is listed as a distinct

population segment ("DPS") under the ESA.  <u>See</u> AR 406 at 7.  They are also separate

population stocks under the MMPA.  <u>See</u> 16 U.S.C. §1362(11).  Thus, each stock is managed

separately.  This distinction is particularly important with respect to the issue of PBR, because, as explained below, there are two distinct PBR levels for the stocks.  Each PBR level was determined in accordance with the MMPA, and is appropriately protective of the species.

### A.    NMFS Considered The Steller Sea Lion PBR In The Context Of Issuing The Permits

NMFS did not, as plaintiffs allege, "ignore[ ] the PBR level issue when approving the permits."  Pl. Opp. at 9.  As NMFS explained in its opening memorandum, the agency specifically addressed PBR in its 2003 supplemental EA, determining that research-related mortality of up to 20 sea lions per year would have a negligible effect on the recovery of the western Steller sea lion stock.  See Def. Mem. at 23; AR 390.  A review of the 2002 EA reflects that the mitigation measure for accidental mortality, pursuant to which research will be suspended if the total number of mortalities in the western stock reaches ten animals, see AR 406 at 50, was derived based on the PBR of the western stock.  See AR 385 (excerpt attached hereto as Exhibit 7), at 33-34 ("If accidental mortality in the western stock reached 10 sea lions (about 5% of the stock's PBR) then researchers would be required to consult with one another to identify research practices that would prevent accidental mortality in the western stock to exceed 20 sea lions (10% of the stock's PBR).").  In addition, the 2005 EA incorporates by reference the 2000 and 2001 annual stock assessment reports for Steller sea lions, which discuss the methodology used to determine PBR and set forth the PBR levels for the western and eastern stocks.[4/]  Thus, the record reflects that NMFS expressly considered the PBR levels for the

_____

[4/]    See Index to Administrative Record, Section S; See also Steller Sea Lion 2000 and 2001 Stock Assessments, available at http://www.nmfs.noaa.gov/prot_res/PR2/Stock_Assessment_ Program/individual_sars.html#pinniped.

species in the context of approving the permits.

### B.    The PBR Level Set By NMFS Is Conservative

In accordance with the MMPA, NMFS has set the PBR levels and managed anthropogenic removals for the western and eastern stocks at conservative levels, such that the current level of removals expected to occur on an annual basis – including removals associated with research – will not significantly increase the expected recovery time for either stock, or cause either stock to decline in abundance.  As explained in NMFS' opening memorandum, the MMPA defines PBR as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population."  16 U.S.C. § 1362(20).  However, as noted below, NMFS has implemented the PBR management scheme in such a way that the PBR for a population listed as endangered is much more conservative than the statutory definition.  NMFS uses the following formula to calculate PBR for marine mammals:  PBR = $N_{min} * \frac{1}{2} R_{max} * F_r$, where $N_{min}$ is the minimum population estimate, $R_{max}$ is the "maximum theoretical or estimated net productivity rate of the stock at a small population size," and $F_r$ is the recovery factor.  See id.[5]

The PBR level for the endangered western stock is calculated using a default value for the recovery factor ($F_r$) of 0.1 (i.e., 10%), which is the lowest possible recovery factor pursuant to the statutory formula.  See Def. Mem. at 42, n. 12; 16 U.S.C. § 1362(20)(C).  This allows only 10% of the maximum allowable removal level to be authorized for taking incidental to human

---

[5]    The product of $N_{min}$ and $\frac{1}{2} R_{max}$ is the maximum allowable removal level of a population, meaning that, in theory, if annual removals are equal to or less than this amount, the population will not decline below its "optimum sustainable population" size.  See  16 U.S.C. § 1362(9) (defining "optimum sustainable population").

11

activities, and the remaining 90% is conserved as a buffer to allow the species to recover.  See

Def. Mem. at 42, n. 12.[6]/  The PBR levels for the western and eastern stocks of Steller sea lions

set forth in the 2001 stock assessments are 208 and 1,395, respectively.  See 2001 Stock

Assessment for Western Stock (attached hereto as Exhibit 9), at 3; Exh. 8 at 12.[7]/

        Plaintiffs dispute that the PBR level used by NMFS is conservative, alleging that any

human-caused mortality will further the species' decline.  Pl. Opp. at 11.  Plaintiffs misconstrue

the intent of PBR in arguing that the PBR level should be set at zero, such that no human-caused

mortality is permitted.  Due to the nature of the calculation set forth above, the PBR level

increases and decreases as the stock's population increases and decreases.  However, even if the

population is decreasing (a negative population trajectory), the PBR level is not automatically

equal to zero.  The PBR level takes into account that a stock's population fluctuates over time.

In light of the buffer built into the PBR calculation for an endangered species – with a recovery

factor ($F_r$) of 0.1 – even if the number of mortalities exceeds the present PBR level for the

western stock by a factor of five it would not necessarily cause the stock to decline.  Rather, it

would merely slow the recovery of the stock, but over time the stock would be expected to return

---

[6]/        For the threatened eastern stock, NMFS uses a value for the recovery factor of 0.75 (i.e., 75%), which allows 75% of the maximum allowable removal rate to be authorized for incidental take, conserving the other 25% to aid recovery.  See 2001 Stock Assessment for Eastern Stock (attached hereto as Exhibit 8), at 12.  This recovery factor takes into account the fact that "total population estimates for the eastern U.S. stock have remained stable or increased over the last twenty years . . . ."  Id.

[7]/        Plaintiffs' attempt to call into question NMFS' estimate of subsistence harvest in the western stock is irrelevant.  See Pl. Opp. at 13, n. 6.  As shown above, the PBR level incorporates a buffer of 90% of the maximum allowable removal level, thus even if subsistence mortality slightly exceeds NMFS' estimate of 171, there will be a minimal impact on the overall status of the western stock.

to a healthy level as defined under the MMPA.  NMFS has satisfied its MMPA obligations by

using the formula explained above to set a conservative PBR, and authorizing the permits based

on a determination that the expected take of one animal per year – or even the maximum 20

animals per year – from the western stock is unlikely to significantly alter the current trajectory

of the population, or increase recovery time.

     C.    **NMFS Can Effectively Track Mortality And Enforce The Suspension Authority**

 As NMFS explained in its opening memorandum, all research under the permits would

be suspended pending review by NMFS if the total number of research-related mortalities in the

western stock reaches ten animals (under <u>any</u> combination of permits), and, if research is

continued, would be halted completely should mortality reach 20 animals within a year in the

western stock.  <u>See</u> Def. Mem. at 8, 24-25.  Plaintiffs dismiss this significant mitigation measure

based on their unfounded belief that NMFS is not capable of enforcing these limitations.

Plaintiffs' suggestion that Steller sea lion mortality is not observed or reported is without

merit.  The reason that plaintiffs cannot locate each report of an individual mortality in the

administrative record is straightforward: only those reports that were before the agency

decisionmaker responsible for issuing the permits are properly part of the administrative record.

The record reflects that NMFS receives initial notice of individual incidents from permittees at

or near the time of the mortality, and permittees subsequently summarize those incidents in their

annual reports.  <u>See</u>, <u>e.g.</u>, AR 345 (attached hereto as Exhibit 10) at 4 (reporting accidental

mortality of three animals lost during branding operations, and referencing email report to

Tammy Adams of NOAA in July 2002).  It is the annual reports, not the correspondence

regarding individual incidents, which were reviewed by the decisionmaker and are thus part of

the administrative record.

In overseeing the research activities, NMFS requires its researchers to fulfill all permit obligations, including reporting requirements.[8]/  The administrative record reflects that researchers not only report mortalities, but also take affirmative steps to reduce such mortality even absent NMFS enforcement.  For example, after the Alaska Department of Fish and Game experienced six mortalities during the first day of a pup branding trip, it contacted NMFS that same day to report the takes and a NMFS staff member advised the permittee that it could continue the branding activities as long as there were fewer than ten mortalities.  AR 348 (attached hereto as Exhibit 11) (Letter from T. Gelatt to S. Leathery) at 1.  In response, the permittee immediately altered the branding method in a manner that required more effort on the part of researchers, but was safer for the pups.  Id.; see also id. (Trip Report) at 4.  This record evidence directly controverts the scenario that plaintiffs paint for the Court, depicting NMFS as wholly unaware of mortalities resulting from the permitted activities.

Plaintiffs also make much of an isolated incident where a U.S. Fish and Wildlife Service refuge manager contacted NMFS to report mortalities that the manager believed had occurred in connection with a permit issued to the National Marine Mammal Lab.  See Pl.. Reply at 15.  The record shows that there was a genuine dispute between the refuge manager and the permittee regarding whether the permitted activity contributed to the mortalities.  See AR 236 at 1; AR 243.  Plaintiffs omit from their reply brief the stated reason that the mortalities were not reported as accidental mortalities: the National Marine Mammal Laboratory determined that the

---

[8]/    Significantly, the MMPA authorizes penalties for permit violations, including civil penalties of up to $10,000 for any violation, and fines of up to $20,000 and/or imprisonment for up to one year for knowing violations.  16 U.S.C. § 1375.

mortalities "were not directly caused by the branding/handling activity."  AR 236 at 1.[9]/

The record reflects that permittees are reporting their research activities to NMFS, and that the Permits Division carefully reviews such annual reports and refers permit violations to the NMFS Office of Law Enforcement as appropriate.  See, e.g., AR 130 at 2 (attached hereto as Exhibit 12) (notifying permittee of referral to Office of Law Enforcement where annual report indicated that permitee undertook activities not authorized in permit).  NMFS is able to effectively monitor compliance with permit conditions, including accidental mortality restrictions, and enforce the suspension provisions to ensure that accidental mortality in the endangered western stock is limited to no more than 20 animals per year.

## IV.  NMFS PREDICATED ITS 2005 EA AND FONSI ON REASONED, SENSIBLE ANALYSIS

### A.  NMFS Did Not Admit the 2005 EA and FONSI Were Unlawful

Proffering a document not in the authenticated administrative record (styled plaintiffs' "Exh. 3" or the "Hogarth letter"), plaintiffs theorize that NMFS admitted approximately one month after preparing the 2005 EA and FONSI ("EA and FONSI") that these NEPA documents are unlawful.  On two independent grounds, plaintiffs are wrong.

First, NMFS demonstrated in its opening brief that the Hogarth letter is inadmissible under Supreme Court, D.C. Circuit, and other case law because (1) it was written after NMFS prepared the 2005 EA and FONSI and (2) plaintiffs have not met their burden under the APA of

---

[9]/        See also AR 246 at 1 (accidental mortality includes "any mortality resulting from the actions or presence of the researchers while conducting permit-authorized activities") (emphasis added).  Plaintiffs are correct that NMFS issued a permit amendment on November 12, 2002, permitting up to ten accidental mortalities; however, the amendment specified that mortalities were not to exceed five in the western stock.  See AR 250 at 7.

showing that this exhibit either transmits or documents a specific environmental factor that

NMFS failed to consider under federal law.  Def. Mem at 21, 21 n. 6; Federal Defendants'

Opposition to Plaintiffs' Motion to Supplement the Record (Doc. No. 21) at 1-8.  Notably,

plaintiffs do not distinguish or even disagree with these traditional APA cases.  Compare id. with

Pl. Opp. at 1, 29-30 and Plaintiffs' Motion to Supplement the Record.  Therefore, plaintiffs'

claim that NMFS "admitted" in the Hogarth letter that the 2005 EA and FONSI were unlawful

necessarily fails because this letter is inadmissible.

     Even if arguendo the Hogarth letter were admissible, NMFS did not admit anything of

substance in it except NMFS' decision to prepare a future EIS to analyze its entire program of

both administering congressional sea lion research grants and issuing related research permits.

Disagreeing, plaintiffs assert that NMFS' decision to analyze its research program in a future

EIS (because it shared plaintiffs' "concerns over the scope of the research on Steller sea lions")

is the same thing as admitting NMFS's analysis of its preceding 2002 and 2005 permits in the

EA and FONSI violated NEPA.  Pl. Opp. at 29-30; Pl. Exh. 3.

     This assertion is defective because plaintiffs premise it on the presumed existence of

legal and factual authority that does not exist: authority that NMFS' future EIS and its EA and

FONSI are mutually exclusive NEPA documents because NMFS cannot prepare (1) a lawful

future EIS unless its 2005 EA and FONSI, analyzing similar permits, are illegal or (2) a lawful

EA and FONSI in 2005 followed by a lawful EIS analyzing a broader category of future agency

actions.

     No applicable authority demonstrates that NMFS' future EIS and its previous EA and

FONSI are mutually exclusive NEPA documents.  Instead, where agencies decide to analyze a

broader category of future agency actions in a future EIS, that EIS is a discretionary NEPA duty, not a mandatory NEPA requirement, regardless of a valid EA's presence or absence. 40 C.F.R. §§ 1501.3(a) (where agency "has decided to prepare an environmental impact statement" in the future, another EA "is not necessary"); 1502.4(b) ("[e]nvironmental impact statements <u>may</u> be prepared [for] broad actions so that they are <u>relevant to policy</u> and are timed to coincide with meaningful points in agency <u>planning and decisionmaking</u>") (emphasis added).

Disagreeing with these regulations, plaintiffs assert that NMFS' future EIS and its EA and FONSI analyze the same universe of research permits and that, therefore, NMFS erred by (1) determining in the EA and FONSI that an EIS was not required and (2) then determining in the Hogarth letter that these 2005 permits could only be analyzed in an "after the fact" EIS. Pl. Opp. at 1, 29. However, plaintiffs' own exhibits establish that NMFS' future EIS and its previous EA and FONSI are not mutually exclusive because these documents analyze materially different universes of research monies and permitting decisions. Although the 2005 EA and FONSI are indisputably limited to 2005 research monies and corresponding permits, plaintiffs concede in their exhibit that NMFS broadened its future EIS by including (1) the "cumulative impacts of <u>continuing</u> to fund and permit [sea lion] research activities" and (2) the related effects of "administering grants and issuing permits associated with research" for its entire sea lion research program. Pl. Exh. 4 (emphasis added).

In sum, NMFS did not admit that the EA and FONSI violated NEPA because (1) the Hogarth letter is inadmissible and (2) NMFS' future EIS and its EA and FONSI are not mutually exclusive NEPA documents because they analyzed or will analyze categories of permits and research monies that are materially quite different.

17

**B. NMFS Properly Analyzed the Uncertain Effects of Expanding Sea Lion Research**

Plaintiffs' claim that NMFS did not properly analyze the uncertain scientific and other effects of the challenged research on western sea lion numbers is mistaken on two grounds. Pl. Opp. at 9-16, 37-41. First, plaintiffs erroneously presume that the EA and FONSI are arbitrary and capricious because uncertainty about the precise effect of more research on sea lion numbers is environmentally "significant" under NEPA by itself. Pl. Opp. at 39. However, the Supreme Court has reiterated that mere uncertainty or related environmental risk by themselves, absent a foreseeable chain of causation or context, "is not an effect on the physical environment [because a] risk is, by definition, unrealized in the physical world." <u>Metropolitan Edison v. People Against Nuclear Energy</u>, 460 U.S. 766, 774-775(1983); <u>see also</u> <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 349-350, 356 (1989) ("<u>Robertson</u>").

Therefore, the salient NEPA issue is not whether the effect of the challenged research on sea lion numbers is uncertain and therefore difficult to quantify, as plaintiffs urge, but whether NMFS considered this uncertainty rationally by (1) considering all applicable environmental factors "relevant" to it and (2) evaluating both uncertain effects and these environmental factors with "reasoned" analysis that, therefore, is "not 'arbitrary or capricious'."[10]/

---

[10]/     <u>Marsh</u>, 490 U.S. at 373, 376-378, 385; <u>Robertson</u>, 490 U.S. 332, 350-351; <u>Baltimore Gas</u>, 462 U.S. 87, 96, 105-106 (NEPA requires agencies to "consider and disclose" uncertainty, not resolve it); <u>Vermont Yankee Nuclear Power Corp. v. NRDC</u>, 435 U.S. 519, 553, 555 (1978) (because all "administrative consideration of evidence creates gaps between the time that the record is closed and the decision is made," the correct standard of judicial review judges agency action "by the information then available to it"); <u>Isaak Walton League v. Marsh</u>, 655 F.2d., 346, 369, 377 (D.C. Cir. 1981) (agency may properly evaluate uncertain environmental effects under NEPA on the basis of record before it at time of the decision, provided agency adequately "identifies areas of uncertainty") ("<u>Walton</u>").

18

Under these tenets, plaintiffs' claim that the EA and FONSI are defective because the challenged research would have an uncertain effect on western sea lion numbers fails for a fundamental reason: plaintiffs do not show a single aspect of this uncertain effect or effects that NMFS did not analyze rationally. Id. For example, plaintiffs state that, because uncertain and unidentified environmental impacts by definition "may" or may not cause significant environmental impacts, the EA and FONSI are defective because NEPA requires an EIS for all effects that "may" be significant. Pl. Opp. at 37-38. Plaintiffs are wrong. NEPA does not require an EIS for effects that might be significant, but for environmental impacts that "<u>would be</u> environmentally 'significant.'" <u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 394 (1976) (emphasis added); <u>see also</u> <u>Dep't of Transportation v. Public Citizen</u>, 541 U.S. 752, 763 (2004).

Plaintiffs also contend that the EA's and FONSI's analysis of uncertain effects is arbitrary and capricious because NMFS determined "there are no studies dedicated to documenting and assessing the effects of research on Steller sea lion stock or population." Pl. Opp. at 39. Although NMFS certainly admits this is true, it is true because of a fact fatal to plaintiffs' uncertainty claim: it is scientifically impossible now for either NMFS or anyone else to quantify the precise effect of the challenged scientific research on sea lion numbers because this research itself is needed to ascertain the cause or causes of the western sea lion's declining population that, to date, are <u>indisputably and scientifically unknown</u>. <u>See</u> Def. Mem. at 3-8.

Thus, lacking a recognized study establishing a certain causal relationship between any known environmental factor and the western sea lion stock's declining population trend, NMFS properly analyzed all known studies of accidental sea lion mortality during scientific research. NMFS noted that, within a group of 7,500 sea lions disturbed during similar research in 1995,

"no mortalities were reported." NMFS also determined that, within a larger group of 31,150 and 48,000 sea lions it studied in 1997 and 1998 respectively, "no mortalities were detected or reported," even though these animals were approached, disturbed, captured, tagged, or branded. AR 407 at 43. Finally, NMFS determined that of the 331,174 western and eastern sea lions that were monitored by air, counted on foot, or otherwise touched by scientists under the 2002 permits, (1) no western stock mortalities were reported in 2002 and (2) no more than 10 mortalities were reported in 2003 and 2004. Exh. 3 (AR 390) at 12; AR 406 at 42. Thus, by rationally analyzing these studies of accidental sea lion mortality in the EA, FONSI, and elsewhere in the administrative record, NMFS did precisely what NEPA requires it to do: sensibly analyze all relevant studies in that record. Marsh 490 U.S. at 373, 376-378, 385; Baltimore Gas, 462 U.S. at 96, 105-106; Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 553, 555; Walton, 655 F.2d., 346, 369, 377.

Plaintiffs also claim that NMFS improperly analyzed the challenged research's uncertain effect on sea lion numbers by erroneously considering PBR analysis. As shown above, supra at Section III.A., both plaintiffs' and NMFS's citations to the record demonstrate that NMFS properly considered PBR analysis in that record. Thus, plaintiffs do not dispute that their preferred PBR maximum for the western sea lion, gleaned from this record, is 208. Pl. Opp. at 13. Instead, they complain NMFS erred in demonstrating, on the basis of the most recent studies in the record, that the challenged research would not exceed plaintiffs' urged PBR maximum. Def. Mem. at 24-25.

Notably, plaintiffs do not show how or why NMFS supposedly erred. Instead, they confine their attempted arithmetic or statistical rebuttal to a footnote and argue on the basis of a

1995 estimate that the "mean annual" subsistence or aboriginal take of western sea lions in or after 2005 could be as high as 448.  See Pl. Opp. at 13 n. 6.  However, the record reflects that NMFS did not consider plaintiffs' 1995 figures to be as reliable as more recent studies in predicting either existing or future aboriginal harvests because

> the mean annual subsistence takes of Steller sea lions have declined to approximately one-third between 1996-1998, and have been estimated [in 1999] at 171 animals per year. [The same 1999 study indicates] that subsistence harvest levels have declined sharply between 1992 and 1998, due largely to a decline in the number of hunters harvesting sea lions.

Def. Exh. 4 (AR 384) at 40; compare id. with Pl. Mem. at 13 n. 6 (relying on 1995 figures only). Therefore, on the basis of the most recent studies of both aboriginal and other takes, NMFS properly demonstrated that the western sea lions' combined annual mortality will not exceed plaintiffs' urged PBR maximum of 208.  Compare Def. Mem. at 24-25 (estimating a total annual removal of 207 western sea lions) with Def. Exh. 4 (AR 384) at 40 (1999 study of subsistence takes); AR 406 at 51 (1999 study of subsistence harvest); and AR 407 at 39 (1996 study of incidental takes during commercial fishing).

For all of these reasons, plaintiffs have not shown a single environmental factor relevant to the challenged research's uncertain effect on sea lion numbers that NMFS did not rationally analyze in the EA and FONSI.  Therefore, Supreme Court and other case law require this Court to defer to NMFS' specialized expertise in analyzing uncertain scientific and other environmental effects within its specialized jurisdiction.[11]/

Plaintiffs' claim that the EA and FONSI are inadequate because NMFS did not properly

---

[11]/       Marsh, 490 U.S. at 378; Baltimore Gas, 462 U.S. at 93,  96, 103, 105-106; Greenpeace Action v. Franklin, 14 F.3d 1324, 1331-1333, 1335 (9th Cir. 1992);  Sierra Club v. U.S. Dep't of Transportation, 753 F.2d 120, 127-129 (D.C. Cir. 1985).

21

analyze uncertain environmental effects also fails on a second ground: plaintiffs have not

rebutted the effectiveness of the protective mitigation measures which NMFS imposed to

compensate for uncertainty.  First, as mentioned above, NMFS determined that it would suspend

<u>all</u> research under the 2002 and 2005 permits, pending additional scientific review, "if the total

number of research-related mortalities of endangered [western] sea lions reaches <u>10 animals</u>

<u>under any combination of permits</u>." AR 406 at 50, 106 (emphasis added).  Rather than pointing

to evidence that this mitigation measure would be ineffective, plaintiffs speculate that "NMFS

has left open the possibility" that, despite a future suspension, it would (1) needlessly revoke it

and (2) thereby harm the western sea lion stock by allowing accidental mortality to reach a

maximum number of 20.  Pl. Opp. at 13; AR 406 at 50, 106; AR 407 at 65.

        Plaintiffs' criticism of mitigation measures fails.  In the event that NMFS' removal of this

suspension would either harm or significantly affect western sea lion numbers, NEPA requires

NMFS to prepare new or supplemental NEPA document before revoking it.  Therefore,

plaintiffs' speculation is defective because it presupposes NMFS would contravene NEPA in the

future by both revoking a needed suspension and thereby harming the western sea lion before

preparing new NEPA documents.<u>12</u>/

        NMFS adopted two additional mitigation measures designed to minimize the possibility

that western sea lion mortality would ever reach the level of ten accidental deaths that would

suspend all research permits.  NMFS (1) requires the attendance of a "veterinarian" or trained

---

<u>12</u>/        <u>See</u> <u>Marsh</u>, 490 U.S. 360, 374, 385 (where intervening environmental effect or factor
implicates "significant" effect on the physical environment <u>after</u> a NEPA document's publication
date, agencies must prepare a new or supplemental NEPA document); 40 C.F.R. § 1502.9; <u>see</u>
<u>also</u> <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 415 (1971) (agencies
entitled to presumption of integrity and regularity).

"biologists" during intrusive physiological study and (2) has adopted aerial flight restrictions ensuring that sea lions would only hear plane noise for "1-2 minutes." AR 406 at 45-50. These three mitigation measures are fatal to plaintiffs' claim that NMFS improperly analyzed the challenged research's uncertain effects. The law is plain that agencies may respond constructively to uncertain environmental effects by adopting such measures, even where they do not eliminate all adverse impacts or the possibility thereof.[13]/

In sum, plaintiffs' claim that NMFS erred in the EA and FONSI because it did not properly consider the challenged research's uncertain effect on sea lion numbers fails for two independent reasons: plaintiffs do not (1) show a single aspect of this uncertainty that NMFS did not rationally analyze and (2) controvert the effectiveness of the different mitigation measures by which NMFS responded properly and conservatively to these uncertain effects.

### C. NMFS Properly Analyzed the Impacts that Plaintiffs Allege are "Highly Controversial"

Plaintiffs also posit that the EA and FONSI are defective because the 2005 permits would have "highly controversial" environmental effects. Pl. Opp. at 38-39. In its opening brief, NMFS demonstrated that this claim fails because plaintiffs cannot meet a two-part burden established by controlling case law. Under this traditional precedent, plaintiffs have not demonstrated that (1) the MMC criticism on which they predicate their claim implicates a

---

[13]/     See Preserve Endangered Areas of Cobb v. U.S. Army Corps of Engineers, 87 F3d 1242, 1248-1249 (11th Cir. 1996); Friends of the Payette v. Horseshoe Bend Hydroelectric Co., 988 F.2d 989, 993 (9th Cir. 1993); Greenpeace Action v. Franklin, 14 F.3d 1324, 1331-1333, 1335 (upholding EA, FONSI, and related mitigation measures analyzing the uncertain effect of commercial fishing on threatened sea lions); Friends of Endangered Species v. Jantzen, 760 F.2d 976, 987 (9th Cir. 1985); Steamboaters v. FERC, 759 F.2d 1382, 1394 (9th Cir 1985); Sierra Club, 753 F.2d at 126-129.

"substantial dispute" different from mere "opposition" or criticism per se and (2) NMFS's

response to this MMC criticism was "arbitrary or capricious" because it failed to take a "hard

look" at the unidentified environmental factors allegedly implicated by it.  Def. Mem. at 27-29.

In their opposition, plaintiffs merely repeat their opening brief, which apparently rests on

a decision to neither distinguish nor even mention this case law.  Compare id. with Pl. Opp. at

38-39.  Therefore, plaintiffs' claim that the unidentified environmental factors supposedly

implicated by the MMC criticism are "highly controversial" necessarily fails.

### D.  NMFS' Range of Programmatic Alternatives Was Proper

Plaintiffs claim that NMFS erred in analyzing alternatives fails for an elementary reason:

plaintiffs do not show or describe an alternative that NMFS should have considered under NEPA

but did not consider.  Pl. Opp. at 35-36.  Therefore, plaintiffs' alternatives claim fails because

NMFS analyzed a reasonable range of alternatives in detail.  Compare AR 406 at 20-33 and

40-50 with Vermont Yankee, 435 U.S. at 551.

The closest plaintiffs get to even disagreeing with NMFS's evaluation of a known

alternative is their allegation that it erred by both "briefly" considering and then rejecting the

alternative of a "temporary moratorium on all [scientific] research" without lengthier analysis.

Pl. Opp. at 35.  However, NMFS explained that it rejected this alternative because it contravened

the research mandated by Congress.  The alternative that plaintiffs desire

> was not considered further because it would not allow collection of information on
> population distribution and abundance trends...or vital rates.  This information is
> important in monitoring the status of the species and may be used in identifying
> conservation problems.

AR 406 at 31; see also Def. Mem. at 4-6 (discussing research mandated by Congress).  This

explanation was more than proper under NEPA.  Traditionally, NEPA allows agencies to both

24

develop and evaluate their range of alternatives according to the purposes of the same laws and regulations that required them to propose the agency action in the first place.[14]/

### E.  NMFS Properly Considered Cumulative Impacts

In the EA and FONSI, NMFS analyzed the cumulative impacts of the challenged research in detail.  AR 406 at 51-59.  Although plaintiffs contend this analysis is arbitrary and capricious, they do not adduce either evidence or analysis to show how or why this supposedly is so.  Thus, in its opening brief, NMFS invited plaintiffs to demonstrate that NMFS did not consider an environmental impact or impacts that would be "cumulatively significant," either alone or by themselves.  40 C.F.R. §§ 1508.7, 1508.25(a)(2) (emphasis added).  In their opposition, plaintiffs specifically decline to identify a significant or potentially significant cumulative impact that NMFS did not consider.  Instead, they complain that, by placing the burden of proof on plaintiffs, NMFS tries to "turn NEPA on its head."  Pl. Opp. at 42.  However, this burden is elementary under NEPA, not novel.[15]/  Therefore, plaintiffs' cumulative impact claims necessarily fail.

### CONCLUSION

For the foregoing reasons, plaintiffs' Complaint must be dismissed in its entirety.

---

[14]/    See Vermont Yankee, 435 U.S. at 551-553 (1978); City of Carmel-by-the-Sea v. Dept. Of Transportation, 123 F.3d 1142, 1155 (9th Cir. 1997); Headwaters, Inc. v. Bureau of Land Management, 914 F.2d 1174, 1180 (9th Cir. 1990); City of Angoon v. Hodel, 803 F.2d 1016, 1021 (9th Cir. 1986); Friends of the River v. FERC, 720 F.2d 93, 105 (D.C. Cir. 1983); North Slope Borough v. Andrus, 642 F.2d 589, 602 (D.C. Cir. 1980).

[15]/    See Baltimore Gas, 462 U.S. 87, 105; Kleppe, 427 U.S. at 412-414; Tourus Records v. Drug Enforcement Admin., 259 F.3d. 731, 736 (D.C. Cir. 2001); Sierra Club v. Marita, 46 F.3d 606, 619 (7th Cir. 1995).

Respectfully submitted this 10th day of March, 2006

                                                SUE ELLEN WOOLDRIDGE
                                                Assistant Attorney General
                                                JEAN E. WILLIAMS, Chief
                                                SETH M. BARSKY, Assistant Chief
                                                U.S. Department of Justice
                                                Environment and Natural Resources Division
                                                Wildlife and Marine Resources Section


                                                _____/s/_____

                                                KRISTEN BYRNES FLOOM, Trial Attorney (DC Bar No. 469615)
                                                P.O. Box 7369
                                                Washington, D.C.  20044-7369
                                                Telephone: (202) 305-0210
                                                Facsimile: (202) 305-0275
                                                Kristen.Floom@usdoj.gov


                                                GREGORY PAGE, Trial Attorney
                                                (DC Bar No. 398121)
                                                U.S. Department of Justice
                                                Environment and Natural Resources Division
                                                General Litigation Section
                                                P.O. Box 663
                                                Washington, D.C.  20044-0663
                                                Telephone: (202) 305-0446
                                                Facsimile: (202) 305-0506
                                                Gregory.Page@usdoj.gov

Of Counsel:
Mary O'Brien
NOAA Office of General Counsel
for Fisheries
1315 East-West Highway
SSMC3 - Room 15111
Silver Spring, MD  20910

                                                *Attorneys for Defendants*