**Civ. No. 05-1392**    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    **Exhibit 6**

**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
Silver Spring, MD 20910

MAR    3 2006

**Memorandum For:**    The Record

**From:**    James Lecky
Director, Office of Protected Resources

**Subject:**    Revised biological opinion on the Permits, Conservation and Education
Division's proposal to issue eight permits pursuant to section 10 (a)(1) of
the Endangered Species Act of 1973, as amended, for studies on Steller
sea lions

This document constitutes the National Marine Fisheries Service's (NOAA Fisheries') biological
opinion on the effects of three new permits and major amendments to five existing Marine
Mammal Permits. The new permits are: (1) The North Pacific Universities Marine Mammal
Research Consortium, University of British Columbia, Vancouver, B.C. (NPUMMRC: File No.
715-1784); (2) the National Marine Mammal Laboratory, Alaska Fisheries Science Center,
Seattle, WA (NMML: File No. 782-1768); and (3) the Alaska Department of Fish and Game,
Anchorage, AK (ADFG: File No. 358-1769). These new permits would be valid until May
2010. The major amendments are: (1) Alaska SeaLife Center, Seward, AK (ASLC: Permit No.
800-1668); (2) the Oregon Department of Fish and Wildlife, Corvallis, OR (ODFW: Permit No.
434-1669); (3) Dr. Randall Davis, Texas A&M University, Galveston, TX (Permit No. 800-
1664); (4) the Aleutians East Borough, Juneau, AK (AEB: Permit No. 1010-1641); and (5) the
National Marine Mammal Laboratory, Alaska Fisheries Science Center, Seattle, WA (NMML:
File No. 782-1703). These major amendments will extend the duration of the permits for three
years, through 2008.

These proposed permits and amendments would authorize permittees to "take" threatened and
endangered Steller sea lions (*Eumetopias jubatus*) during various research activities. These
activities would occur in coastal areas of the States of Alaska, Washington, Oregon, and
California. This biological opinion has been prepared in accordance with section 7 of the
Endangered Species Act (ESA) of 1973, as amended (16 U.S.C. 1531 *et seq.*). This biological
opinion is based on information provided in the application for the proposed permits, published
and unpublished scientific information on the biology and ecology of Steller sea lions, and other
sources of information.



 Printed on Recycled Paper

Civ. No. 05-1392    Fed. Defs.' Reply in Support of Cross-Mot. for Summ. Jdmt.    Exhibit 6

**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
Silver Spring, MD 20910

MAR    3 2006

**Memorandum For:**    Steve Leathery
Chief, Permits, Conservation, and Education Division

**From:**    Angela Somma
Chief, Endangered Species Division

**Subject:**    Issuance of Scientific Research Permit Nos. 715-1784, 782-1768,
358-1769, and Major Amendments to Permit Nos. 881-1668, 1010-1641,
434-1669, 800-1664, and 782-1702.

Attached is NOAA Fisheries' Biological Opinion, issued under the authority of section 7(a)(2) of
the Endangered Species Act, on the issuance of the subject research permits and permit
modifications, which would authorize various research activities on Steller sea lions. NOAA
Fisheries concludes that the issuance of the permits and permit modifications is not likely to
jeopardize the continued existence of endangered western Steller sea lions (*Eumetopias jubatus*),
threatened eastern Steller sea lions. NOAA Fisheries concludes the permits and permit
modifications are not likely to adversely affect designated critical habitat.

Reinitiation of this consultation is required if (1) the amount or extent of incidental take is
exceeded; (2) new information reveals effects of this action that may affect listed species or
critical habitat in a manner or to an extent not previously considered; (3) the identified action is
subsequently modified in a manner that causes and effect to the listed species that was not
considered in the biological opinion; or (4) a new species is listed or critical habitat designated
that may be affected by the identified action.

If you have question regarding this opinion, contact me at (301) 713-1401.

Attachment



 Printed on Recycled Paper

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 3 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

# National Marine Fisheries Service
# Endangered Species Act Section 7 Consultation
## Biological Opinion

**Agency:**           Permits, Conservation and Education Division of the Office of
                      Protected Resources, National Marine Fisheries Service

**Activities Considered:**  1.  Issuance of Permit No. 881-1668 to Alaska SeaLife Center
                            2.  Issuance of Permit No. 434-1669 to Oregon Department of
                                Fish and Wildlife
                            3.  Issuance of Permit No. 800-1664 to Randall Davis, Texas
                                A&M University
                            4.  Issuance of Permit No. 1010-1641 to Aleutians East
                                Borough
                            5.  Issuance of Permit Nos. 782-1702 and 782-1768 to NOAA
                                Fisheries Service's National Marine Mammal Laboratory
                            6.  Issuance of Permit No. 358-1769 to Alaska Department of
                                Fish and Game
                            7.  Issuance of Permit No. 715-1784 to the North Pacific
                                Universities Marine Mammal Research Consortium

**Consultation Conducted by:**  Endangered Species Division of the Office of Protected
                                Resources, National Marine Fisheries Service

**Approved by:**

**Date:**                       MAR   3 2006

Section 7(a)(2) of the Endangered Species Act, as amended (ESA; 16 U.S.C. 1531 *et seq.*)
requires each federal agency to ensure that any action they authorize, fund, or carry out is not
likely to jeopardize the continued existence of any endangered or threatened species or result in
the destruction or adverse modification of critical habitat of such species. When a federal
agency's actions "may affect" one or more listed species or critical habitat that has been
designated for them, that agency is required to consult with either the National Marine Fisheries
Service (NOAA Fisheries Service) or the U.S. Fish and Wildlife Service, depending upon the
protected species that may be affected. For the actions described in this document, the action
agency is NOAA Fisheries Service's Office of Protected Resources - Permits, Conservation and
Education Division. The consulting agency is NOAA Fisheries Service's Office of Protected
Resources - Endangered Species Division.

This document represents NOAA Fisheries Service's biological opinion (Opinion) based on our
review of the NOAA Fisheries Service's Office of Protected Resources - Permits, Conservation
and Education Division's draft Environmental Assessment, the recovery plan for Steller sea

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 4 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

lions, past and current research and population dynamics modeling efforts, monitoring reports from earlier research authorized by NOAA, and previous biological opinions.

This biological opinion has been prepared in accordance with section 7 of the ESA (16 U.S.C. 1536). This biological opinion is based on information provided in the applications for the proposed permits and permit amendments, published and unpublished scientific information on the biology and ecology of threatened and endangered Steller sea lions, and other sources of information.

This document constitutes NOAA-Fisheries Service's biological opinion on the effects of NOAA Fisheries Service's Permits, Conservation and Education Division (F/PR1) proposal to issue section 10(a)(1)(a) permits to Alaska SeaLife Center, the Oregon Department of Fish and Wildlife, Randall Davis (Texas A&M University, Aleutians East Borough, the National Marine Mammal Laboratory, Alaska Department of Fish and Game, and the North Pacific Universities Marine Mammal Research Consortium for research or related studies on endangered and threatened Steller sea lions (*Eumetopias jubatus*). A complete record of this consultation is on file with NMFS' Office of Protected Resources, Endangered Species Division, Silver Spring, Maryland.

## Description of the Proposed Action

NOAA Fisheries Service proposes to amend five permits and issue three new permits pursuant to the Endangered Species Act (ESA) and Marine Mammal Protection Act (MMPA) that authorize the "take" of threatened and endangered Steller sea lions for scientific purposes. The proposed activities involve purposeful harassment, harm, pursuit, shooting, wounding, trapping, capture, or collecting ("take") of threatened and endangered Steller sea lions for scientific purposes. The ESA provides exemptions for the take of threatened and endangered species for scientific purposes if it is not to their disadvantage, and supports their conservation and the conservation of the ecosystems upon which they depend (16 U.S.C. 1531). Table 1 lists the permittees, permit numbers, and expiration dates of the proposed permits considered in this Biological Opinion.

**Table 1. Permits for Studies on Threatened & Endangered Steller Sea Lions**

| Permit No. | Permit Holder | Expiration Date |
|---|---|---|
| 881-1668 | Alaska SeaLife Center | December 30, 2008 |
| 434-1669 | Oregon Dept. Fish & Wildlife | December 30, 2008 |
| 800-1664 | Randall Davis, Texas A&M University | December 30, 2008 |
| 1010-1641 | Aleutians East Borough | December 30, 2008 |
| 782-1702 | National Marine Mammal Laboratory | September 30, 2008 |
| 782-1768 | National Marine Mammal Laboratory | May 31, 2010 |
| 358-1769 | Alaska Dept. Fish & Game | May 31, 2010 |
| 715-1784 | North Pacific Universities Marine Mammal Research Consortium | May 31, 2010 |

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 5 of 95

**Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6**

Each proposed permit contains a variety of research activities that would result in the directed take of threatened and endangered Steller sea lions from the western and eastern populations. Appendix A describes, in detail, the various activities proposed by each permittee for studying Steller sea lions. A brief summary of each permit is provided in this section, and includes a discussion of similarities among all permits.

Each permit authorizes the "take" of animals on an annual basis with many activities limited by the number of times the same individual can be taken (*see* Appendix A, Table A-1). Permitted activities involve all age-classes of Steller sea lions with specific activities targeted at particular cohorts (i.e., pups, juveniles, and adults [collectively non-pups]). For the purposes of this Opinion, unless age is specifically noted in the permit pups are those animals less than 1 year old, juveniles are between 1 and 3 years old, and individuals older than 3 years are considered adults.

Where NOAA Fisheries' Permits Division (PR1) noted in the permit that the "season" is "year-round" then the total "number of animals taken per year" may be taken any time during the year according to the objectives and protocols described in the permit application and permit. Where "season" is marked with a number of months, the total "number of animals taken per year" would be used entirely during those months.

Some study activities are denoted as "range-wide" or will occur in areas where the eastern and western distinct population segments of Steller sea lions overlap. Since the actual number of animals affected from each population is unknown in this instance, we assumed that these activities would occur on the population with the most immediate risk of extinction (the endangered western population of Steller sea lions. See *Effects of the Proposed Action* for further discussion on this issue). Otherwise specific locations of permit activities were allocated between the two distinct population segments (DPS or populations) as follows: West of 144°, Alaska-wide, Gulf of Alaska & Aleutian Islands, Alaska Peninsula, selected rookeries, and range-wide activities were assumed to affect the endangered western population of Steller sea lions, whereas activities East of 144°, and in Washington, Oregon, California, and Southeast Alaska were assumed to affect animals in the threatened eastern population.

The proposed permits collectively authorize the take of 519,240 Steller sea lions during surveys, tracking, and capture (Appendix A, Table A-1). Of this number, we expect 310,923 belong to the endangered western population and 208,317 animals belong to the threatened eastern population. NOAA Fisheries is proposing to authorize the restraint of subset of these animals (3,327) for additional sampling. Appendix A, Table A-2 summarizes the nineteen procedures that may be conducted on restrained animals. In general, researchers will: collect blood; biopsy muscle, skin, and blubber; take swab samples; extract teeth; collect whiskers (vibrissae) hair and nails; attach tags and instruments (externally and surgically implant); hot brand; conduct bioelectric impedance analyses; inject stable isotopes and Evans blue dye; conduct enemas or stomach intubation; conduct portable metabolic measurements, conduct ultrasonic imaging, and sixteen individuals will be removed from the wild for temporary captivity.

Each permit is briefly summarized below. Additional details on the proposed activities are available in the permits, the permit applications, the Environmental Assessment, and the administrative record for this action.

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 6 of 95

**Civ. No. 05-1392      Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.            Exhibit 6**

1. *Alaska SeaLife Center (Permit No. 881-1668).* The Permits Division proposes to issue an amendment to a permit held by the Alaska SeaLife Center (ASLC) to extend the duration of the permit and modify some of the objectives, methods, and numbers of Steller sea lions taken. The proposed amendment authorizes the collection of sea lion carcasses, capture of animals and remote monitoring activities. The ASLC states that the overall purpose of their research, including the proposed amendments, is to collect information on the health status (*e.g.*, morphometrics, body composition, immunology, epidemiology, endocrinology, viral serology), physiology (*e.g.*, vitamin requirements, stress responses to capture, handling, and captivity), life history (*e.g.*, ontogenetic and annual cycles, population dynamics), foraging behavior, and habitat use of Steller sea lions. To accomplish their objectives, the ASLC proposes to capture, sample, and mark Steller sea lions in the wild and conduct experimental studies on a number of juvenile Steller sea lions removed from the wild and maintained temporarily at the ASLC.

   The proposed permit would authorize the incidental harassment of up to 15,000 sea lions of all ages throughout Alaska. Up to 440 pups (>5 days up to 1 year old), 270 juveniles (between 1 and 4 years), and 140 adult females could be captured each year under the permit. The permit authorizes the capture of 5 pups, greater than 5 days old and less than 2 months, during peak breeding season. Most pups in this age category could not be captured during peak breeding season. Pups older than 2 months, juveniles, and adult females could be captured during any season. Up to 16 juvenile Steller sea lions between the ages of 1 and 4 years of age may be removed from the wild for temporary captivity and further sampling. The permit authorizes the following procedures on captive juveniles (see Appendix A, Table A-3 for a description of age-classes affected, and number of animals authorized for each procedure): transport, physical restraint, application of anesthesia and sedatives, weighing and morphometric measurements, blood sampling, blubber and skin biopsying, injection of water and collection of blood salmples, injection of sodium bromide, bioelectric impedance analysis, ultrasounds, fecal collection, skin and mucosal swabs, x-rays, endoscopy, urinalysis, flipper tagging, hot branding, attachment of data logger (external), food assimilation studies, doubly-labeled water studies, controlled fasting, ACTH challenge, and the surgical implanting of dual "life history transmitters." The ASLC permit would authorize the accidental mortality of up to 10 sea lions of any age per year in Alaska resulting from research activities. This permit expires on December 30, 2008.

2. *Oregon Department of Fish and Wildlife (Permit No. 434-1669).* The Permits Division proposes to issue an amendment to the Oregon Department of Fish and Wildlife's (ODFW) permit that would extend the duration of the permit for three years, and add a study on the effects of hot-branding. In total, the Permits Division would authorize ODFW to the take of threatened Steller sea lion pups and juveniles in Washington, Oregon and California by harassment during ground counts, capture and restrain, and incidental harassment during capture activities. Up to 17,000 sea lions would be harassed during these activities. The proposed permit would authorize the capture and restraint of up to 230 animals from the threatened Eastern population. Of this total, the permit would authorize the capture of 200 animals between 1 week and 6 weeks of age, and 30 animals per year between the ages of 4 months and 3 years of age. The permit authorizes the

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 7 of 95

Civ. No. 05-1392      Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.      Exhibit 6

following procedures on captured animals: blood collection, tissue sampling (skin biopsies), fecal loops and mucousal swabs, tagging, attachment of scientific instruments, enemas, and hotbranding (see Appendix A, Table A-2 for a description of age-classes and numbers affected, and locations and seasons where procedures may be conducted). The proposed permit amendment does not change the total number of animals captured and handled. The purpose of the research is to continue monitoring the status of the Steller sea lion population in California, Oregon, and Washington. ODFW proposes to continue their population monitoring and assessment through ground counts and observations as well as by capture, sample, and mark of Steller sea lions. This permit would authorize the accidental mortality of up to 10 sea lions of any age per year in California, Oregon, and Washington resulting from research activities. Permit No. 434-1669-02 would expire December 30, 2008.

3. *Dr. Randall Davis (Permit No. 800-1664).* The Permits Division proposes to issue a permit to Dr. Davis to for the capture of Steller sea lions, and incidental disturbance during capture and sampling. The purpose of Dr. Davis' research is to study the hunting behavior and three-dimensional movements of Steller sea lions. The results would be used, in conjunction with data on satellite remote sensing of hydrographic features, and on the abundance, distribution, and composition of prey at spatial and temporal scales, to address questions about Steller sea lion prey preference, predator/prey relationships, and ecological attributes of foraging habitat. Up to 2,400 sea lions of all ages in the Gulf of Alaska and Aleutian Islands would be incidentally harassed during capture activities and up to 45 sea lions (30 between ages 6 months and 3 years [a mix of pups and juveniles], and 15 females older than 3 years of age) could be captured and restrained. The permit authorizes the following procedures on captured animals: blood collection, blubber biopsies, fecal loops and culture swabs, tooth extraction, collection of vibrissae, hair and nails, tagging, hot branding, attachment of scientific instruments, bioelectric impedance analyses, injection of stable isotopes, and ultrasonic imaging (see Appendix A, Table A-2 for a description of numbers and age-classes affected, and locations and seasons where procedures may be conducted). Dr. Davis is also authorized for the accidental mortality of 13 Steller sea lions per year (10 between ages 6 months and 3 years [a mix of pups and juveniles], and 3 females older than 3 years of age. This permit expires on December 30, 2008.

4. *Aleutians East Borough (Permit No. 1010-1641).* The permit for Aleutians East Borough (AEB) would authorize take of 106,600 endangered Steller sea lions in Alaska by harassment during aerial and vessel surveys of Steller sea lion rookeries and haulouts, and the incidental harassment of 1,600 animals during scat collection. The purpose of the research proposed by the AEB is to provide additional information on seasonal prey consumption by Steller sea lions through analysis of scat collected at rookeries and haulouts along the Alaska Peninsula and Eastern Aleutian Islands, and to improve the accuracy and precision of population indices through expanded aerial and vessel surveys in the western Gulf of Alaska. AEB is not authorized for any incidental mortality resulting from their activities. This permit expires on December 30, 2008.

5. *National Marine Mammal Laboratory (Permit No. 782-1768 & 782-1702).* The Permits Division is proposing to amend a permit (*782-1702*) and issue a new permit (*782-1768*)

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 8 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

to National Marine Mammal Laboratory (NMML). The permit amendment would allow
NMML to capture, sample, tag, and hot-brand Steller sea lions in Washington and
Oregon, in addition to conducting aerial surveys and ground counts of animals. The
purposes of the proposed capture of Steller sea lions in Washington and Oregon are: to
identify individual animals to determine predation rates on endangered salmonids; to
perform disease screening and genetic analyses; and to document movements and
migration rates of individuals. The proposed permit authorizes up to 203,000 animals to
be disturbed during aerial surveys, the disturbance of up to 43,100 during ground counts,
and the incidental disturbance of up to 20,000 animals during scat collection, capture and
other observational activities. Up to 1,280 Steller sea lions may be captured and
restrained under this permit. The permit authorizes the following procedures on captured
animals: blood collection, blubber biopsies, fecal loop and mucousal swabs, tagging, hot
branding, and attachment of instruments (see Appendix A, Table A-2 for a description of
numbers and age-classes affected, and locations and seasons where procedures may be
conducted). PR1 proposes to authorize NMML up to 10 incidental mortalities, not to
exceed 5 from the endangered western population of Steller sea lions. This permit
expires on September 30, 2008.

PR1 proposes to issue NMML a new permit (782-1768) to collect information on the life
history, foraging behavior, habitat use, physiology, population status and trends, survival
and reproductive rates, and condition of Steller sea lions in the North Pacific. To
accomplish this, NMML proposes to conduct aerial surveys and ground counts as well as
capture, sample, and mark Steller sea lions. The proposed permit authorizes, for these
purposes, the disturbance of 4,500 animals in Washington and Oregon during aerial
surveys, the incidental disturbance of up to 4,500 animals during capture activities, and
the capture 12 animals per year, with the incidental mortality of up to 1 individual. The
permit authorizes the following procedures on captured animals: blood collection;
muscle, skin, and blubber biopsies; fecal loops; tooth extraction; collection of vibrissae,
hair and nails; tagging; hot-branding; attachment of scientific instruments; bioelectric
impedance analyses; injection of stable isotopes; injection of Evans blue dye; enemas or
stomach intubation; and ultrasonic imaging (see Appendix A, Table A-2 for a description
of numbers and age-classes affected, and locations and seasons where procedures may be
conducted). The proposed permit expires on May 31, 2010.

6. *Alaska Department of Fish and Game (Permit No. 358-1769)*. The Permits Division
   proposes to authorize the continued research of the Alaska Department of Fish and Game
   (ADFG). The purpose of ADFG's studies is to investigate the various hypotheses for the
   decline of Steller sea lions in western Alaska, which includes conducting studies of life
   history traits, physiological investigations of animal condition and time of weaning, and
   studies of animal movement and dive activity. To accomplish this, ADF&G proposes to
   conduct aerial surveys and ground counts as well as capture, sample, and mark Steller sea
   lions. The proposed permit authorizes ADF&G to harass up to 15,000 animals during
   aerial surveys, 25,000 during ground counts, the incidental harassment of up to 15,000
   during these activities, and the capture and restraint of up to 1,030 for further study. The
   permit authorizes the following procedures on captured animals: blood collection;
   muscle, skin, and blubber biopsies; fecal loops; tooth extraction; collection of vibrissae,

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 9 of 95

**Civ. No. 05-1392       Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.           Exhibit 6**

hair and nails; tagging; hot-branding; attachment of instruments; bioelectric impedance analyses; injection of stable isotopes and Evans blue dye; enemas or stomach intubation; portable metabolic chamber measurements; and ultrasonic imaging (see Appendix A, Table A-2 for a description of numbers and age-classes affected, and locations and seasons where procedures may be conducted). The incidental mortality of up to 10 animals is allowed under this permit. Permit No. 358-1769-00 expires on May 31, 2010.

7. *North Pacific Universities Marine Mammal Research Consortium (Permit No. 715-1784).* The Permits Division proposes to authorize the North Pacific Universities Marine Mammal Research Consortium (NPUMMRC) a five-year permit to conduct aerial surveys, collect scat from rookeries and haul outs in Southeast Alaska, and track animals at sea The objectives of the study are to understand how diets vary temporally and spatially, and how this variation is related to population trends and abundance, nutritional stress, and commercial fishing activities. The proposed permit authorizes NPUMMRC to harass up to 40,000 animals during aerial surveys, track 30 animals at sea, and incidentally harass up to 3,000 during the collection of scat. NPUMMRC would track animals tagged under other permits. NPUMMRC's permit, No. 434-1669-02, would expire May 31, 2010. The Permits Division would authorize the accidental mortality of up to 5 sea lions of any age per year in Alaska resulting from research activities.

### *Permit Conditions*

The proposed permits and permit amendments list general and special conditions to be followed before, during, and after the research activities are conducted. These conditions are intended to: (a) minimize the adverse effects on studies on Steller sea lions; (b) ensure that NOAA-Fisheries Service receives information on the nature and impact of the different studies, and (c) ensure that permit holders are coordinating their activities with others doing similar work and/or in the same area or seasons to avoid unnecessary duplication of research and adverse effects on the marine mammals.

a. *Aerial surveys*: Survey planes should approach from a kilometer or more offshore and without banking, which is believed to reduce the incidence of hauled out animals entering the water prior to the survey photographs, because the animals would only be within hearing range of the plane for 1-2 minutes.

b. *Capture and restraint:* These procedures should be performed or directly supervised by qualified personnel and it is recommended that an experienced marine mammal veterinarian be present to carry out or provide direct on-site supervision of all activities involving use of anesthesia and sedatives. Researchers should carry out activities efficiently, such that the total time that researchers are occupying the rookery/haul out, and total number of times a site is disturbed, are minimized. Stays on rookeries longer than five hours are justified only when it prevents additional disturbance of the site on subsequent days. Permit holders should use personnel experienced in capture and sampling techniques to complete the activities as quickly as possible.

To avoid respiratory distress, ischemia (restricted blood flow), or nerve damage, it is important that animals be properly positioned, i.e. ventrally recumbent, during anesthesia (Dierauf 1990). Respiration and arterial bloodgas ($pCO_2$) should be monitored and

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 10 of 95

Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6

oxygen administered, as needed to avoid prolonged breath holding during gas anesthesia, which can result in cardiac hypoxia (lack of oxygen to the heart muscle). Qualified personnel (i.e., experienced veterinarians, biologists, or other highly trained personnel) should be prepared to control or assist ventilations when using Valium, isoflurane, or Tiletamine. An emergency kit with equipment and supplies for responding to complications or emergencies should be readily available. The animal's body temperature should be closely monitored and steps taken to avoid hypo- and hyperthermia (e.g. cooling with water or covering to keep warm, as necessary). Drug doses should be calculated on the basis of the researcher's best estimate of an animal's lean body mass and metabolic rate.

If an animal is showing signs of acute or protracted alarm reaction (*e.g.*, overexertion, constant muscle tensions, abnormal respiration or heart rate) that may lead to serious injury, capture myopathy, other disease conditions, or death, research-related procedures must immediately cease and the animals should be monitored or the symptoms treated as determined appropriate by the Principal Investigator, Co-Investigator, or attending veterinarian. Similarly, caution should be exercised when approaching all Steller sea lions, particularly mother/pup pairs, and efforts to approach and handle a particular animal or mother/pup pair should be immediately terminated if there is any evidence that the activity may be life-threatening.

To reduce the risk of unintentional injection of drugs by projectile syringe (darts) into blubber, intravenously, or into vital organs, the length of the needle used should be appropriate for the size of the animal and its blubber thickness. In addition, care should be taken in darting animals to avoid accidental drowning of animals that either flee into the water prior to induction or slump into pools of water at induction.

Researchers should ensure that animals that have been captured or are recovering from anesthesia have an opportunity to recover without undue risk of injury from other animals. Animals should be processed in groups small enough that all animals can be adequately monitored (*e.g.,* 2 physically restrained but not chemically immobilized animals per observer). Handling and restraint time should be minimized to the maximum extent practicable. For example, if multiple procedures are to be performed on the same animal, there should be enough qualified personnel available to conduct as many activities simultaneously as possible without resulting in undue stress on the animal. When pups are collected, they should be sufficiently separated from each other and monitored to ensure that they are not suffocating, being crushed, or aspirating milk.

There is no indication that fostering is common in Steller sea lions. It is reasonable to assume that if a lactating female dies as a result of research, her dependent pup will starve. Therefore, researchers should take reasonable steps to identify pups of lactating females before attempting to immobilize a lactating female. In the event a lactating female dies or is seriously injured as a result of the research activities, the orphaned pup, when it can be identified, should be humanely provided for (i.e. salvaged [placed in a

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 11 of 95

**Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6**

Stranding facility for rehabilitation and eventual release], or if salvage is not possible, euthanized).[1]

To the maximum extent practical without causing further disturbance of the rookery/haulout, researchers shall conduct post-handling monitoring of animals captured or sampled, for signs of acute stress or injury. To the maximum extent practical without causing further disturbance of animals, researchers shall also monitor rookeries/haul outs following any disturbance (e.g., capture activities) to determine if any animals have been injured or pups abandoned.

c.  *Sampling and surgical procedures (e.g., blood collection, biopsy, tooth pulling, fecal loops/culture swabs, enemas, stomach intubation, bioelectric impedance analyses, and surgical implants).* These procedures should be performed or directly supervised by qualified personnel and it is recommended that an experienced marine mammal veterinarian be present to carry out or provide direct on-site supervision of all activities involving use of anesthesia and sedatives.

To the maximum extent practical, the animal should be restrained on a smooth surface. An attending veterinarian or other qualified personnel should be present during these procedure to monitor the physiologic state of each animal (e.g., by monitoring respiratory rate and character, heart rate, body temperature, and behavioral response to handling and sampling procedures). Animals that are physically restrained but continue to struggle or show signs of stress should be released immediately to minimize the risk that continued stress would lead to capture myopathy.

The volume of blood taken from individual animals should not exceed 1 milliliter of blood per kilogram of body mass, either as a single blood draw or over the course of several days[2]. Qualified researchers should not need to exceed three attempts (needle insertions) per animal when collecting blood. When conducting isotopically labeled water trials, additional needle insertions may be allowed, but the use of a catheter is strongly encouraged to minimize impacts on the animal. If an animal cannot be adequately immobilized for blood sampling, particularly when drawing blood from the intervertebral sinus, efforts to collect blood should be discontinued to avoid the possibility of serious injury or mortality from stress.

Sterile, disposable needles, biopsy punches, etc., should be used to minimize the risk of infection and cross-contamination. Where disposable equipment is not available (i.e., enema and stomach tubes, flipper punch, dental elevators) liquid chemical sterilants should be used with adequate contact times (as indicated on the product label) to affect proper sterilization, and instruments should be rinsed with sterile water or saline before use on animals. Care should be taken to avoid contact of equipment disinfectants with an

---

[1] Pups humanely euthanized would count against the total number of animals authorized for incidental mortality under the permit. If the dependent pup of a lactating female could not be identified prior to sampling the female, and the female dies as a result of the research, the pup should be assumed dead and counted against the total number of animals authorized for incidental mortality under the permit. Similarly, if a pregnant female dies as a result of the research, the fetus should also be counted against the total number of animals authorized for incidental mortality.
[2] Based on veterinary established guidelines for safe removal of blood from research animals. (McGuill and Rowan 1989; Morton *et al.* 1993).

9

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 12 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

animal's skin, and disinfectant agents should be changed periodically to avoid growth of resistant strains of microorganisms.

Only experienced, qualified personnel (veterinarians, biologists) who know how to properly pass a stomach tube to avoid introduction of liquid into the trachea.[3]should attempt this procedure. Because proper cold sterilization takes some time, researchers should bring an adequate number of stomach tubes to ensure all tubes are properly sterilized between animals, or that there is one tube per animal.

d. *Flipper tagging.* Care should be taken to avoid placing the tag so low as to have the animal walking on it or so high as to have it irritating the animal's flank area (Dierauf 1990).

e. *Hot-branding.* Pups that are very young or in poor physical condition (e.g. under 20kg) should not be branded. It is recommended that isoflurane gas be used during branding, both as a temporary anesthetic and to ensure that animals remain still for optimal brand quality.

f. *Attachment of scientific instruments:* When epoxy hardener is mixed with resin catalyst, heat is generated, and the mix can cause thermal burns. Therefore, care should be used in adjusting the proportions of epoxy hardener and resin catalyst to prevent a "hot" mix and the minimum practical amount of epoxy should be used to prevent burning the animal. The weight and dimensions of the instrument package relative to the animal's size and mass, and duration of attachment, are important considerations in choosing a tag. Tag size and placement should be selected that will not interfere significantly with an animal's ability to forage or conduct other vital functions.

g. *Behavioral/demographic observations and remote monitoring:* To minimize the potential for disturbance caused by the placement of observers on rookeries and haulouts or for set-up and maintenance of remote monitoring stations, researchers should, to the maximum extent practicable, either access the locations concurrent with other research activities, or from points or by means that would not disturb sea lions (e.g. approaching from the other side of the island, where no animals are hauled out).

h. *Temporary captivity:* The mitigation measures in Permit No. 881-1668-03 specific to minimizing adverse effects the transport, short-term captivity, sampling, and subsequent release of juvenile sea lions at the ASLC would remain in effect in the amendment under the Proposed Action. As with all NOAA Fisheries' permits for research on pinnipeds used in captive experiments, the Steller sea lions must be maintained only in Animal and Plant Health Inspection Service (APHIS), USDA certified research facilities and a copy of the APHIS license(s) must be provided to NOAA Fisheries. No research on captive animals may occur until the research protocols have been reviewed and approved by the ASLC's Institutional Animal Care and Use Committee (IACUC).

---

[3] The proper procedure is to first estimate the length of the stomach tube necessary by measuring the distance to the stomach along the outside of the animal's body. The tube should be smoothly inserted into the mouth, down the left side of the animal's throat, into the stomach. If the animal cannot vocalize, the tube has been inserted into the trachea. To further verify that the tube is in the stomach, a small amount of air should be blown down the tube while listening for gurgling either through the tube or via a stethoscope placed on the left abdominal wall (Dierauf 1990).

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 13 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

Any cages used to transport animals between facilities and/or to a release site must meet the standards set forth by the APHIS, "Primary enclosures used to transport marine mammals" (9 C.F.R. 3.113 attached). During transport, researchers must keep the animal(s) at a comfortable temperature, using fresh or salt water as needed to cool the animal. Every effort must be made to minimize transport time, and animals should be transported during the cooler part of the day (where applicable), and during minimal traffic (when by ground), to the maximum extent possible. An emergency kit must accompany the animals during transport in the event an animal is injured or otherwise needs medical treatment. All transports of animals must be done by qualified personnel experienced in pinniped handling and medical procedures.

All animals must be held in quarantine conditions during captivity. All animals undergoing research must be closely monitored to determine if research activities are having an adverse effect on the individual(s). A licensed marine mammal veterinarian must be available for emergencies, illnesses, and for health screening prior to release.

Sea lions undergoing fasting at the ASLC would be monitored daily and the permit would require that they be removed from the trial (i.e., returned to feeding) if there was any indication they were becoming ill. The permit would also be conditioned to require cessation of the experiment for any animal whose rate of mass loss was greater than 3% of their initial mass per day or whose total mass loss exceeds 15% of initial body mass. Finally, any sea lions subjected to the controlled fasting experiments would be allowed time to recover and readjust metabolism prior to being returned to the wild.

To minimize the potential adverse behavioral effects of captivity, sea lions must be isolated from unnecessary direct human contact (e.g., hand feeding) to the maximum extent practical prior to release, and exposed to live prey species and demonstrate that they will capture and eat live prey, without humans visually present if possible. All sea lions must be flipper tagged for identification purposes prior to release. All sea lions must be monitored for a minimum of two weeks following any intrusive research procedures (with the exception of attachment of flipper tags and external scientific instruments), or until the site where the intrusive procedure was performed has healed. To allow sea lions to recover from the stress of handling and minimize the potential adverse effects of any drugs used during the research and ensure adequate healing without excessive inflammation, all sea lions must be off drugs (excluding vitamins/dietary supplements in the food, sedation for attachment of tags immediately prior to transport, and sedation for transport itself) for at least two weeks prior to return to the wild. In addition, all sea lions must be examined and approved by a qualified veterinarian to insure that the animal is in good health, is likely to survive in the wild, and does not pose a threat to the wild marine mammal population(s).

The ASLC's protocol for disease screening prior to release and for behavioral de-conditioning of animals for release into the wild must be provided to NOAA Fisheries' Office of Protected Resources. The ASLC must have a plan to provide permanent holding in the event that any sea lions are deemed non-releasable, and subsequent disposition of the animal(s) must be decided in consultation with NOAA Fisheries' Office of Protected Resources. The amended permit would require the ASLC to cease all

11

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 14 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

research and not bring any additional sea lions into captivity if two sea lions are found unsuitable for return to the wild as result of the research or captivity. Any sea lions that are determined unsuitable for release as a result of the research or captivity would count against the mortalities allowed in the current permit. The ultimate disposition (euthanasia or permanent captivity under a scientific research and enhancement permit) of any non-releasable animals would be determined by the Office Director. Since they are listed under the ESA, permanent captivity for any non-releasable sea lions would have to be authorized under a permit for enhancement or scientific research. The terms and conditions of such permits, including whether the animals would be allowed to reproduce in captivity, would be determined by NOAA Fisheries pursuant to the MMPA, ESA and their implementing regulations, including consultation under Section 7 of the ESA.

To prevent any artificial mixing of genetic stocks and to maximize their chances for successful reintegration into the wild population, animals would only be released in Alaska and every effort would be made to release them: (1) in groups; and (2) at the original capture site(s), in the vicinity of con-specifics of the same population, or in an area where they would normally be found given the time of year. The ASLC must notify NOAA Fisheries' Regional Administrator and/or Regional Stranding Coordinator of the date and location of the release two weeks prior to releasing animals to the wild.

i.  *Incidental mortality:*  To ensure that the total number of observed mortalities under all permits does not exceed permitted levels, all permit holders would be required to notify NOAA Fisheries of research-related mortalities by phone as soon as possible after the incident, preferably within 24-72 hours. Within two weeks of the incident, unless other arrangements have been made, the permit holder must submit a written report that includes a complete description of the events surrounding the incident and identification of steps that will be taken to reduce the potential for additional accidents.

In the event that research-related mortality of sea lions reaches the number specified in a permit, research must be immediately suspended and the protocol must be reviewed, and, if necessary, revised to the satisfaction of NOAA Fisheries in consultation with the Marine Mammal Commission.

In addition, activities under all permits for takes of Steller sea lions would be suspended, pending review, if the total number of research-related mortalities of endangered Steller sea lions reaches 10 animals under any combination of permits. The Chief of the Permits, Conservation and Education Division may authorize recommencing of research following a review of information submitted by the research on cause(s) of the death. If the total number of research-related mortalities of endangered Steller sea lions reaches 20 animals under any combination of permits in a year, research under all permits would be halted pending review and modification of the permits, if necessary.

## Approach to the Assessment

Section 7(a)(2) of the ESA requires federal agencies to ensure that their actions are not likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of critical habitat that has been designated for those species. The implementing regulations for section 7(b)(2) of the ESA clarify that to *jeopardize the continued existence of*

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 15 of 95

**Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6**

listed species means the federal agency is engaging in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species (50 C.F.R. 402.02).

The regulations that defined destruction or adverse modification were vacated by the Court in *Sierra Club v. U.S. Fish and Wildlife Service and National Marine Fisheries* Service (Fifth Circuit Court of Appeals; CA No. 98-3788-K-2 E.D. LA). Until the Services promulgate a new regulatory definition, the Services apply the statutory definition of critical habitat:

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed…, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and (ii) specific areas outside the geographical area occupied by the species at the time it is listed…, upon a determination by the Secretary that such areas are essential for the conservation of the species (16 U.S.C. 1533(5)(A)).

By law, NOAA-Fisheries Service issues biological opinions to help federal agencies comply with the requirements of the section 7 of the ESA. This biological opinion is designed to help the Permits Division, ensure that issuance of their permit and the associated activities are not likely to jeopardize the continued existence of threatened or endangered species, nor destroy or adversely modify designated critical habitat.

### Method

NOAA-Fisheries Service approaches its section 7 analyses of research permits through a series of steps. The first step identifies those aspects of proposed actions that are likely to have direct and indirect physical, chemical, or biotic effects on listed species or on the physical, chemical, and biotic environment of an action area. As part of this step, we identify the spatial extent of these direct and indirect effects, including changes in that spatial extent over time. The result of this step defines the *action area* for the consultation. The second step of our analyses identifies the listed resources that are likely to co-occur with these effects in space and time and the nature of that co-occurrence (these represent our *exposure analyses*). In this step of our analyses, we try to identify the number, age (or life stage), and gender of the individuals that are likely to be exposed to an Action's effects and the populations or subpopulations those individuals represent. Once we identify which listed resources are likely to be exposed to an action's effects and the nature of that exposure, we examine the scientific and commercial data available to determine whether and how those listed resources are likely to respond given their exposure (these represent our *response analyses*).

The final steps of our analyses — establishing the risks those responses pose to listed resources — are different for listed species and designated critical habitat (these represent our *risk analyses*). Our jeopardy determinations must be based on an action's effects on the continued existence of threatened or endangered species as those "species" have been listed, which can include true biological species, subspecies, or distinct population segments of vertebrate species. Because the continued existence of species depends on the fate of the populations that comprise them, the continued existence of these "species" depends on the fate of the populations that comprise them. Similarly, the continued existence of populations are determined by the fate of

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 16 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

the individuals that comprise them; populations grow or decline as the individuals that comprise the population live, die, grow, mature, migrate, and reproduce (or fail to do so).

Our risk analyses reflect these relationships between listed species and the populations that comprise them, and the individuals that comprise those populations. Our risk analyses begin by identifying the probable risks actions pose to listed individuals that are likely to be exposed to an action's effects. Our analyses then integrate those individual risks to identify consequences to the populations those individuals represent. Our analyses conclude by determining the consequences of those population-level risks to the species those populations comprise.

We measure risks to listed individuals using changes in the individuals' "fitness" or the individual's growth, survival, annual reproductive success, and lifetime reproductive success. In particular, we examine the scientific and commercial data available to determine if an individual's probable lethal, sub-lethal, or behavioral responses to an action's effects (which we identify during our response analyses) are likely to have consequences for the individual's fitness.

When individual, listed plants or animals are likely to experience reductions in fitness in response to an action, those fitness reductions are likely to reduce the abundance, reproduction, or growth rates (or increase the variance in these measures) of the populations those individual's represent (see Stearns 1992). Reductions in at least one of these variables (or one of the variables we derive from them) is a *necessary* condition for reductions in a population's viability, which is itself a *necessary* condition for reductions in a species' viability. As a result, when listed plants or animals exposed to an action's effects are *not* expected to experience reductions in fitness, we would not expect the action to have adverse consequences on the viability of the populations those individuals represent or the species those populations comprise (for example, see: Anderson 2000; Mills and Beatty 1979; Brandon 1978; Stearns 1977, 1992). As a result, if we conclude that listed plants or animals are *not* likely to experience reductions in their fitness, we would conclude our assessment.

Although reductions in the fitness of individuals is a *necessary* condition for reductions in a population's viability, reducing the fitness of individuals in a population is not always *sufficient* to reduce the viability of the population(s) those individuals represent. Therefore, if we conclude that listed plants or animals are likely to experience reductions in their fitness, we determine whether those fitness reductions are likely to reduce the viability of the populations the individual's represent (measured using changes in the populations' abundance, reproduction, spatial structure and connectivity, growth rates, variance in these measures, or measures of extinction risk). In this step of our analyses, we use the population's base condition (established in the *Environmental Baseline* and *Status of Listed Resources* sections of this opinion) as our point of reference. If we conclude that reductions in individual fitness are not likely to reduce the viability of the populations those individuals represent, we would conclude our assessment.

Reducing the viability of a population is not always *sufficient* to reduce the viability of the species those populations comprise. Therefore, in the final step of our analyses, we determine if reductions in a population's viability are likely to reduce the viability of the species those populations comprise using changes in a species' reproduction, numbers distribution, estimates of extinction risk or probability of being conserved. In this step of our analyses, we use the species' status (established in the *Status of the Species* section of this opinion) as our point of

14

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 17 of 95

**Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6**

reference. Our final determinations are based on whether threatened or endangered species are likely to experience reductions in their viability and whether such reductions are likely to be appreciable.

To conduct these analyses, we rely on all of the evidence available to us. This evidence might consist of monitoring reports submitted by past and present permit holders; reports from NOAA-Fisheries Service's Science Centers; reports prepared by natural resource agencies in States, Tribes, and other countries; reports from foreign and domestic non-governmental organizations involved in marine conservation issues; the information provided by the Permits Division when it initiates formal consultation; and the general scientific literature. We supplement this evidence with reports and other documents — environmental assessments, environmental impact statements, and monitoring reports — prepared by other federal and state agencies like the Minerals Management Service, U.S. Coast Guard, and U.S. Navy whose operations extend into the marine environment.

During each consultation, we conduct electronic searches of the general scientific literature using *Biosis*, *Article First*, and *Aquatic Sciences and Fisheries Abstracts* search engines. We supplement these searches with electronic searches of doctoral dissertations and master's theses. These searches specifically try to identify data or other information that supports a particular conclusion (for example, a study that suggests whales will exhibit a particular response to a close approach) as well as data that does not support that conclusion. When data are equivocal, or in the face of substantial uncertainty, our decisions are designed to avoid the risks of incorrectly concluding that an action would not have an adverse effect on listed species when, in fact, such adverse effects are likely.

We rank the results of these searches based on the quality of their study design, sample sizes, level of scrutiny prior to and during publication, and study results. Carefully-designed field experiments (for example, experiments that control potentially confounding variables) are rated higher than field experiments that are not designed to control those variables. Carefully-designed field experiments are generally ranked higher than computer simulations. Studies that produce large sample sizes with small variances are generally ranked higher than studies with small sample sizes or large variances.

### Action Area

The action area for this biological opinion is the entire range of Steller sea lions in California, Washington, Oregon, and Alaska, including the eastern (threatened) and western (endangered) populations. This area encompasses all proposed research activities in state waters and the United States Exclusive Economic Zone off the coasts of California, Washington, Oregon, and Alaska. However, the majority of research activities would focus on animals located on rookeries, haulouts, and in waters surrounding these areas. The action area would also include the facilities at the ASLC in Alaska.

### Status of the Species and Environmental Baseline

NOAA Fisheries has determined that the action being considered in this biological opinion may affect the following species and critical habitat provided protection under the ESA:

Steller sea lion [western population]        *Eumetopias jubatus*        Endangered

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 18 of 95

Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6

Steller sea lion [eastern population]        *Eumetopias jubatus*        Threatened

By regulation, environmental baselines for biological opinions include the past and present impacts of all state, Federal or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process (50 C.F.R. 402.02). Because the action area for this consultation encompasses the known distribution of the threatened and endangered populations of Steller sea lions, we have combined our summaries of the Status of the Species with the Environmental Baseline. Our summary provides the information on the biology and ecology of Steller sea lions that is necessary to (a) understand the species' status and trend in terms of its risk of extinction, and (b) provide the background necessary to understand information presented in the *Effects of the Action*, and *Cumulative Effects* sections of this biological opinion.

### Listing status

Steller sea lions were listed as threatened under the ESA on November 26, 1990 (55 FR 49204). The listing followed a decline in the U.S. population of about 64% over the three decades prior to the listing. In 1997, the species was split into two separate populations based on demographic and genetic differences (Bickham *et al.* 1996; Loughlin 1997), the western population was reclassified to endangered while the eastern population remained threatened (62 FR 30772). The eastern (threatened) population includes animals east of Cape Suckling, Alaska (144°W), while animals in the western (endangered) population are at Cape Suckling and to the west (Loughlin 1997).

### Biological Characteristics of the Species

#### Species description and distribution

Steller sea lions are distributed along the rim of the North Pacific Ocean from the Channel Islands off Southern California to northern Hokkaido, Japan (Loughlin *et al.* 1984). Their centers of abundance and distribution are in Gulf of Alaska and the Aleutian Islands, respectively (NMFS 1992). In the Bering Sea, the northernmost major rookery is on Walrus Island in the Pribilof Island group. The northernmost major haul-out is on Hall Island off the northwestern tip of St. Matthew Island. Their distribution also extends northward from the western end of the Aleutian chain to sites along the eastern shore of the Kamchatka Peninsula.

The species does not exhibit group migratory patterns, but individuals disperse widely outside of the breeding season, and may mix with individuals from other areas. Adults and juveniles, however, appear to exhibit fidelity to land sites, termed rookeries or haulouts. Rookeries are used by adult sea lions for pupping, nursing, and mating during the reproductive season (generally from late May to early July). Haulouts are used by all age classes of both genders but are generally not where mating occurs, although occasionally pupping occurs at haul-out sites.

#### Life history information

Steller sea lions have a polygynous reproductive strategy in which a single male may mate with multiple females. As mating occurs on land (or in the surf or intertidal zones), males are able to

16

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 19 of 95

Civ. No. 05-1392      Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.            Exhibit 6

defend territories and thereby exert at least partial control over access to adult females and mating privileges. The pupping and mating season is relatively short and synchronous, probably due to the strong seasonality of the sea lions' environment and the need to balance aggregation for reproductive purposes with dispersion to exploit distant food resources. In May, adult males compete for rookery territories. In late May and early July, adult females arrive at the rookeries, where pregnant females give birth to a single pup. Mating occurs about one to two weeks later (Gentry 1970). The gestation period is probably about 50 to 51 weeks, but implantation of the blastocyst is delayed until late September or early October (Pitcher and Calkins 1981). Due to delayed implantation, the metabolic demands of a developing fetus are not imposed until well after fertilization. The sex ratio of pups at birth is assumed to be about 1:1 (e.g., York 1994) or biased toward slightly greater production of males (e.g., Pike and Maxwell 1958, NMFS 1992). The sex-ratio for non-pups, however, is biased towards females (Calkins and Pitcher 1982; Trites and Larkin 1992).

For females with a pup, the nursing period continues for months to several years. The transition to nutritional independence may, therefore, occur over a period of months as the pup begins to develop essential foraging skills, and depends less and less on the adult female. The length of the nursing period may also vary as a function of the condition of the adult female. The nature and timing of weaning is important because it determines the resources available to the pup during the more demanding winter season and, conversely, the demands placed on the mother during the same period. The maintenance of the mother-offspring bond may also limit their distribution or the area they use for foraging.

The reproductive cycle includes mating, gestation, parturition, and nursing or post-natal care. The adult female's ability to complete this cycle successfully depends largely on the prey available to her. While much of the effort to explain the Steller sea lion decline has focused on juvenile survival rates, considerable evidence suggests that the decline may also be due, in part, to decreased reproductive success by adult females.

### *Population status and trends*

Numbers of Steller sea lions declined dramatically throughout much of the species' range, beginning in the mid- to late 1970s (Braham *et al.* 1980; Merrick *et al.* 1987; NMFS 1992, 1995a). For two decades prior to the decline, the estimated total population was 250,000 to 300,000 animals (Kenyon and Rice 1961; Loughlin *et al.* 1984). By 1989, the population estimate declined by 50-60% to about 116,000 animals (NMFS 1992); by 1994, it had collapsed an additional 15%. The decline has been restricted to the western population of Steller sea lions which declined by about 5% per year during the 1990s.

### *Western Endangered Population*

Between late 1970s and the mid-1990s, counts of the western population of sea lions fell from 109,880 animals to 22,167 animals, a decline of 80% (NMFS 1995a). The 1996 count was 27% lower than the count in 1990. Fritz and Stinchcomb (2005) estimate that from 1991 to 2000, the number of adults and juvenile sea lions in the western population declined by about 38%. Surveys by Fritz and Stinchcomb (2005) indicate that the current number of non-pups in the western population is 29,037. NOAA Fisheries Service combined this number with the number of pups in 2001-2004 (9,476) to reach the current minimum population estimate of 38,513

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 20 of 95

Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6

(NMFS 2005). These data suggest that the declined in the western population has abated, with numbers of animals increasing at the core of the range and numbers still declining, but at a slower rate than observed in the early 1990s, along the edges (eastern and central Gulf of Alaska and western Aleutian Islands; Fritz and Stinchcomb 2005).

Figure 1 depicts the counts of adult and juvenile (non-pups) Steller sea lions at rookeries and haulout trend sites from late 1970s to 2004. Counts of non-pup Steller sea lions at trend sites indicate an increase in the population between 2000 and 2002 of about 6%, and a similar rate of increase between 2002 and 2004. These are the first region-wide increases for the western population since standardized surveys began in the 1970s. Nevertheless, the 2004 count is still 32.6% lower than the 1990 count for this population, and 69% lower than in the 1985 count at the at trend sites at Kenai-Kiska (Fritz and Stinchcomb 2005; NMFS 2005). The long-term average decline between 1991 and 2004 is 3.1% per year (NMML unpublished data *in* NMFS 2005).

**Figure 1. Counts of Steller sea lions (non-pups from the western population) observed at rookery and haul-out trend sites in the Gulf of Alaska & Aleutian Islands (late 1970s to 2004[1] [Fritz and Stinchcomb 2005; NMFS 2005]).**



[1] Correction factor applied to 2004 count for film format differences (Fritz and Stinchcomb 2005).

Recent regional trends in pup-counts appear to follow the pattern in non-pup counts, with relative stability in the western Gulf of Alaska since 1994, and increases in pup counts in the eastern Aleutian Islands and eastern Gulf of Alaska. However, pup-counts in the central Gulf of Alaska were the lowest on record in 2003-2004, and have declined steadily since 1998 (*see* table 9 *in* Finch and Stinchcomb 2005).

A number of population models have been developed for Steller sea lions (e.g., Pascual and Adkison 1994; York et al. 1996; Gerber and VanBlaricom 2001; Holmes and York 2003; Winship and Trites 2006). Several models and field studies indicate that juvenile survival was

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 21 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

disproportionately low during the declines in the 1980s (almost 50% below the 1976 levels) relative to fecundity and adult survivorship (York 1994; Merrick et al. 1995; Chumbley et al. 1997; Holmes and York 2003). Using a serious of nested models Holmes and York (2003) observed a demographic shift in nature of the declines during the 1990s with adult survivorship at its lowest (20% below 1976 levels) with juvenile survivorship and fecundity high. They noted that by the mid to late 1990s adult and juvenile survivorship was slightly depressed (within 5 to 10% of 1976 levels), but fecundity was low (Homes and York 2003). While low fecundity affects the continued decline, Holmes and York (2003) suggested that even a small depression in adult and juvenile survivorship at these levels may significantly contribute to population declines. It appears that during the peak of the decline in the 1980s about 15,000 to 20,000 animals a year died (NRC 2003). Mortality from known sources (i.e., fishing, subsistence harvest, predators) accounts for about 4,500 animals per year between 1985 and 1989 (NRC 2003). However, the contribution of some known sources of mortality may be severely underestimated (e.g., shooting). A number of other sources of mortality likely also contributed to the current size of the population but are not included in this estimate including: nutritional stress, changes in foraging success and prey availability. These are explored briefly in the section titled *Factors Affecting the Species*.

The significant uncertainty in underlying causes that lead to the current status of the Steller sea lion makes prediction of future population variability inherently difficult if not impossible to make with a high level of confidence. Long-term (e.g., 100 year) predictions fail because estimated parameters used in the model are incorrect such as we have failed to include some known or unknown variable acting on the population (or subpopulations), and environmental stochasticity cannot be accurately predicted and incorporated into the model (Hanski 2002). A combination of model approaches allow for comparing significant model parameters and model results. According to several population models the western DPS has a greater than 5-10% chance of going extinct within the next 100 years (York et al. 1996; Gerber and VanBlaricom 2003; Winship and Trites 2006), while many individual rookeries (breeding aggregations) however, have a much higher risk of extinction (e.g., western Aleutian island rookeries and Gulf of Alaska; Winship and Trites 2006).

### Eastern Threatened Population

The eastern DPS of Steller sea lions includes animals east of Cape Suckling, Alaska (144°W) south to California waters. Trend counts in Oregon were relatively stable in the 1980s, showing a gradual increase in numbers since 1976 (NMFS 2005). Numbers in California, however, have declined to less than 2,000 non-pups, from counts between 1927 and 1947 that were as high as 7,000 non-pups (NMFS 2005). The count from Central California in 2000, reached the second lowest count of 349 non-pups (in 1992 the count was as low as 276 non-pups). In Southeast Alaska, counts of non-pups at trend sites increased by 56% from 1979 to 2002 from 6,376 animals to 9,951 (Merrick *et al.* 1992; Sease *et al.* 2001; NMFS 2005). Counts of non-pups at British Columbia trend sites increased nearly 260% between 1982 and 2002 (NMFS 2005).

Figure 2 depicts the counts of adult and juvenile (non-pups) Steller sea lion at rookeries and haulout trend sites throughout the DPS. Counts from some trend sites were not available in all years. In some years, no counts were available in British Columbia and thus, available counts were not summed in these years for total DPS count. Consequently, only four total data points

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 22 of 95

**Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6**

are illustrated in the Figure 2. For more details on the counts, and use of earlier counts to complete yearly estimates see NMFS 2005.

NOAA Fisheries considers this population stable, and multiplies pup counts by a factor of 4.5 (based on Calkins and Pitcher 1982) to estimate the total population size (NMFS 2005). Pup count data from 2002 from across the range of the eastern population, multiplied by a factor of 4.5 results in a population estimate of 44,996 animals. In 2002, 4,877 pups were counted in Alaska, 3,281 pups were counted in British Columbia, 1,128 pups were counted in Oregon, and 713 counted in California. The current minimum population estimate is 43,728 animals. NMFS calculates this estimate by adding non-pup counts taken in 2002 in Southeast Alaska, to counts of animals in Washington, Oregon and California in 1996, counts of animals in Canada in 1998, and recent pup counts (2002 counts noted previously [NMFS 2005]).

**Figure 2. Counts of Steller sea lions (non-pups) observed at U.S. trend sites of the eastern threaten population (NMFS 2005).**



### Critical Habitat

Critical habitat has been designated for Steller sea lions in California, Oregon, and Alaska (50 CFR 226.202). Steller sea lion critical habitat includes all major rookeries in California, Oregon, and Alaska and major haulouts in Alaska. Steller sea lion critical habitat in Alaska includes a terrestrial zone that extends 0.9 km (3,000 feet) landward from the baseline or point of each major rookery and major haul-out. Critical habitat in Alaska also includes an air zone extending 0.9 km (3,000 feet), measured vertically from sea level, above the terrestrial zone of each major rookery and major haulout. In addition, for major rookeries and major haulouts east of 144° W. longitude, critical habitat includes an aquatic zone that extends 0.9 km (3,000 feet) seaward in State and Federally managed waters from the baseline or basepoint of each major rookery and major haulout. In Alaska's State and Federal managed waters that are west of 144° critical habitat includes an aquatic zone that extends 20 nm (37 km) seaward from the baseline or base point of each major rookery and major haul-out. In California and Oregon, critical habitat

20

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 23 of 95

Civ. No. 05-1392      Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.      Exhibit 6

includes an air zone extending 0.9 km (3,000 feet), measured vertically from sea level, above areas historically occupied by sea lions at each major rookery. In addition, critical habitat in California and Oregon includes an aquatic zone that extends 0.9 km (3,000 feet) seaward in State and federally managed waters from the baseline or basepoint of each major rookery. Steller sea lion critical habitat also includes three special aquatic foraging areas in Alaska, including the Shelikof Strait area, the Bogoslof area, and the Seguam Pass area. Some of the proposed research may occur in Steller sea lion critical habitat.

### Factors Affecting the Species

Of the two listed populations of Steller sea lions, the western population has the greatest risk of extinction. The endangered western population declined by about 90% from the early 1970s to the late 1990s. Recent counts indicate that the rate of decline in the western population has slowed, while the eastern population has increased. The current status of the western and eastern populations of Steller sea lions is a consequence of the natural events and human activities in the marine environment it occupies.

The following section summarizes the principal phenomena known to affect the likelihood that Steller sea lion populations will survive and recover either in the wild. Some human activities occurred in the past, ended, and no longer appear to affect either sea lion population; other activities have ended, but have had effects on the structure or composition of Steller sea lion populations that continue to hinder their ability to reverse their decline toward extinction. Still other human activities appeared to affect Steller sea lion populations after their decline and continue to affect them. These activities establish the environmental baseline that affects the survival and recovery of Steller sea lions, and is considered against the backdrop of natural factors (not-human induced) that also affect these populations.

### Predation

Killer whales and sharks prey on Steller sea lions, and given the reduced abundance of sea lions at multiple sites this successful predators may exacerbate the decline in local areas (e.g., Barrett-Lennard *et al.* 1995). Research suggests that the transient (migratory) killer whales may rely on marine mammal prey to a greater extent than *resident* and *offshore* killer whales (Barrett-Lennard *et al.* 1995; Matkin *et al.* 2002; Heise 2003; Krahn *et al.* 2004). According to observations in the Gulf of Alaska, Steller sea lions may be a preferred prey in this region where researches observed 79% of the killer whale attacks were on Steller sea lions. In other regions, less than 10% of the attacks observed were on Steller sea lions (*see* NPUMMRC 2006).

Although the number of chases or harassment events by a large predator like a killer whale or shark would outnumber the successful kills, evidence suggests losses due to predation may be significant. For instance, the stomach of a dead killer whale that washed ashore in Prince William Sound in the early 1990s contained 14 flipper tags from Steller sea lions. Using survey data and data on the stomach contents of 15 killer whales, Barrett-Lennard *et al.* (1992) ran Leslie matrix simulations under various assumptions of killer whale predation in relation to changes in Steller sea lion density. As a result, killer whale predation of Steller sea lions did not likely cause the severe decline in Steller sea lions in the 1980s but may exacerbate the decline in some areas. Barrett-Lennard *et al.* (1992) estimate that some 18% of Steller sea lion mortality may be attributed to killer whale predation. Sharks also likely prey on Steller sea lions. While

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 24 of 95

Civ. No. 05-1392      Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.          Exhibit 6

we know of no formal estimates of the numbers of Steller sea lion mortalities attributed to shark predation, Loughlin and York (2001) assume that it is a very low level and have used 2% as an estimate of shark induced mortalities. The rate of predation on Steller sea lions from both killer whales and sharks may increase in proximity of large fish processing vessels, where observers have noted killer whales and sea lions aggregating and feeding on discards from the vessels (Loughlin and York 2001).

Mortality due to predation may naturally affect a disproportionate number of juveniles and pups. According to a survey conducted by Heise *et al.* (2003) more mariners observed killer whale activity during July when pups leave the rookeries. While these observations may be a function of observer activity, research on other pinniped species suggests pups are more frequently killed by killer whales than other age-classes (*see* Lopex and Lopez 1985, Hoelzel 1991, and Baird 1994 *as cited in* Heise *et al.* 2003). Certain killer whale populations or subpopulations may have adapted to the timing of just such an event. Matkin et al. (2002) suggested that the average (best estimate) weight of Steller sea lion taken by a killer whale is about 160 kg (an animal of this size is likely a juvenile).

### Disease

Disease and parasitism are also potential causes of population decline, and evidence is available indicating exposure of animals to diseases and that animals carry parasites. However, we have insufficient evidence at this time to suggest what role, if any, disease or parasitism may impede survival and recovery of Steller sea lion populations. Disease and parasitism are common in all pinniped populations and have been responsible for major die-offs in other species, but such events are usually relatively short-lived and provide more evidence of morbidity or mortality. Burek et al. (2000, 2005) evaluated samples from the period of steepest decline in Steller sea lions populations (1970s to 1990s) and found no evidence of significant exposure of sea lions to several morbilliviruses, but did find exposure to several other viruses, such as phocid herpesviruses, caliciviruses and others. While some of these viruses may contribute to low birth rates and reduce an individual's immunity, the extent to which they have affected Steller sea lion populations is unclear. As such, disease and parasitism remain a concern that requires additional monitoring.

### Natural environmental change

Studies of atmospheric and oceanic circulation and physical properties indicate that the Gulf of Alaska and Gulf of Alaska ecosystems shift between at least two types of climatic regimes (Trenberth 1990; Ebbesmeyer *et al.* 1991; Brodeur and Ware 1992; Beamish 1993; Francis and Hare 1994; Miller *et al.* 1994; Trenberth and Hurrell 1994, 1995; Ingraham *et al.* 1998). While these regimes differ in many ways, they can be simply categorized as "warm" and "cold" depending on atmospheric and oceanic temperatures. One factor inducing the shift between regimes is changes in the position of the Aleutian Low Pressure system, which leads to changes in atmospheric temperature, storm tracks, ice cover, and wind direction (Wyllie-Echeverria and Wooster 1998). Indices, such as the Southern Oscillation Index, Pacific Decadal Oscillation, the North Pacific Index and the Aleutian Low Pressure Index, and several lesser-known indices, reflect shifts between regimes. Certain, major shifts are apparent in all indices (e.g., the 1977 regime shift), but not all regime shifts are apparent in all indices. Historical studies suggest that

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 25 of 95

Civ. No. 05-1392      Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.      Exhibit 6

over the last 500 years, the system has oscillated between the two distinct regimes every 10-30 years (Ingraham *et al.* 1998; Benson and Trites 2002).

A well-documented shift from a cold to a warm regime in 1976-77 was associated with dramatic changes in the structure and composition of the invertebrate and fish communities as well as the distribution of individual species in the North Pacific ocean and Bering Sea (Brodeur and Ware 1992; Beamish 1993; Francis and Hare 1994; Miller *et al.* 1994; Hollowed and Wooster 1992, 1995; Wyllie-Echeverria and Wooster 1998). For instance, many groundfish stocks, particularly pollock, Atka mackerel, cod and various flatfish species increased in abundance as a result of strong year-classes spawned in the mid to late 1970s. Many of the long-lived flatfish species (e.g., arrowtooth flounder, Pacific halibut, yellowfin sole, and rock sole) remained in high abundance since then, while other shorter lived groundfish species (pollock, Atka mackerel, and Pacific cod) have oscillated in abundance. Based on these patterns, researchers have associated "warm" years (and other related environmental conditions, such as southwest winds in April [Wyllie-Echeverria and Wooster 1998]), with the production of strong year-classes of gadids (Hollowed and Wooster 1992, 1995; Wespestad *et al.* 2000).

Increases in many broadly distributed benthic (e.g., arrowtooth flounder, Pacific halibut) and semi-demersal (e.g., pollock and Pacific cod) piscivorous groundfish species since the late 1970s has been associated with either (or both) a decline in abundance (at least in nearshore environments; Anderson et al. 1996) or a change in distribution of short-lived pelagic species such as capelin. Anderson and Piatt (1999) describe an almost complete disappearance of capelin from bays and the nearshore environment of the western and central Gulf of Alaska beginning in the late 1970s and early 1980s, and increases in cod and flatfish. During this time, the prevalence of capelin in the diets of many piscivorous birds and pinnipeds in the Gulf of Alaska also declined (e.g., Merrick *et al.* 1997). However, Yang *et al.* (2005) estimated that capelin consumption in 1990 in the Gulf of Alaska by the groundfish species was at least 222,000 t. This suggests that capelin did not disappear from the Gulf of Alaska (since so much was eaten by groundfish), but changed distribution in response to the cooler water conditions. Changes in water temperatures may have reduced the availability of capelin to Steller sea lions in the SE Bering Sea and Gulf of Alaska while increasing the availability of capelin to other piscivores.

Sea lions may have lived through many regime shifts in the few million years that they have existed. What may be different about this most recent shift is the coincident development of extensive fisheries targeting the same prey that sea lions depend on during warm regimes. Fisheries in the Bering Sea and Gulf of Alaska expanded enormously in the 1960s and 1970s. The existence of a strong environmental influence on sea lion trends does not rule out the possibility of significant fisheries-related effects. The cause of the sea lion decline need not be a single factor. To the contrary, strong environmental influences on Gulf of Alaska and Gulf of Alaska ecosystems could increase the sensitivity of sea lions to fisheries or changes in those ecosystems resulting from fisheries.

### *Impacts of human activity on Steller sea lions*

#### *Commercial harvest of Steller sea lions*

In 1959, the Bureau of Commercial Fisheries awarded a contract to a commercial fishing company to develop techniques for harvesting sea lions in Alaskan waters. The two-fold purpose

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 26 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

of the contract was to reduce the sea lion herds (because of alleged depredations on salmon and halibut fisheries) and to provide an economical source of protein for fur farms, fish hatcheries, and similar purposes (Thorsteinson and Lensink 1962). In 1959, 630 sea lion bulls were killed in an experimental harvest, but the harvest proved to be uneconomical. Another study was contracted by the Bureau of Indian Affairs of the Department of Interior to analyze the feasibility of a commercial sea lion harvest in Alaska (Little 1964). A total of 45,178 pups of both sexes were killed in the eastern Aleutian Islands and Gulf of Alaska between 1963 and 1972 (Merrick *et al*. 1987). Such harvests may have depressed recruitment in the short term and may have explained declines noted at some sites in the eastern Aleutian Islands or the Gulf of Alaska. These harvests do not appear to explain declines in other regions.

### Subsistence harvest of Steller sea lions

The MMPA authorizes the taking of any marine mammal by Alaska Natives for subsistence purposes or for the purpose of creating and selling authentic native articles of handicrafts and clothing, given that it is not done in a wasteful manner (MMPA, Section 101[b]). The ESA also contains provisions that allow for the continued subsistence use of listed species. Both the ESA and the MMPA contain provisions that allow regulation of the subsistence harvest of endangered, threatened, or depleted species, if necessary (NMFS 1995a).

The Alaska Department of Fish and Game has documented subsistence harvest of sea lions since 1992. Estimates by Wolfe and Mishler (1993, 1994, 1995, 1996) indicate a mean annual subsistence take of 448 animals from the western endangered population from 1992 to 1995. Aleut hunters in the Aleutian and Pribilof Islands harvest the majority (79%) of sea lions, and about 99% of the total statewide harvest comes from the western population (i.e., west of 144° longitude). According to survey data collected by ADFG, the estimated mean annual subsistence harvest from the western stock between 1996 and 2003 was 184 animals per year. The highest harvest level during this period occurred in 2003 (estimated mean 212 animals harvested statewide, confidence interval: 149 to 303). ADF&G estimates age and sex composition of harvested animals only. These estimates suggest that male and female adult sea lions comprise the largest portion of the harvest and are harvested at about the same rate (Wolfe *et al.* 2003).

### Contaminants

Several studies indicate that organochlorine pollutant residues in the tissues of California sea lions and harbor seals have been associated with reproductive failure (NMFS 1992). These pollutants have also been reported in association with impaired immune systems (Becker *et al*. 1997). A number of studies (Varanasi *et al*. 1992; Lee *et al*. 1996; Krahn 1997; Krahn et al. 2004) have also indicated relatively high concentrations of organochlorine compounds in Steller sea lions in Alaska, although these levels have not yet been associated with any changes in health or vital rates (see also, Barron *et al*. 2003).

Low-level mercury exposure is evident in pups and females, but the long-term effect mercury or even methylmercury has on Steller sea lions is unclear (Beckmen *et al*. 2002). Based on recent data on methylmercury in salmon, Beckmen et al. (2002) suggest that exposure at low levels is cause for concern because methylmercury is a powerful neurotoxicant that acts synergistically with polychlorinated biphenyls. Some Steller sea lions are likely directly exposed to oil, particularly during tanker breaches like the spill from the Exxon Valdez in 1989 and the spill

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 27 of 95

Civ. No. 05-1392     Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.          Exhibit 6

from a Malaysian freighter, Selangdong, in 2004. Exposure or fouling fur (pelage) is not as detrimental to a sea lion as an otter or bird because the blubber is the primary insulation. While, no significant adverse effects of the oil were confirmed following the Exxon spill (Calkins *et al.* 1994) ingestion and exposure of mucosal membranes may have chronic effects on an individual's health (see discussion, next section). At present, there is not enough information to determine what role, if any, exposure to contaminants plays in the health, survival and recovery of Steller sea lion populations.

*Oil and gas or mineral development*

Previous biological opinions written by NOAA Fisheries Service for both the Bering Sea and Aleutian Islands and the Gulf of Alaska analyzed oil and gas or mineral development under the heading of "human development" (NMFS 1993, 1995b). In each case it was noted that human development activities that result in aquatic habitat destruction or the release of contaminants and pathogens (e.g., mineral exploration and extraction, effluent discharges into the marine environment) could directly diminish the health and reproductive success of Steller sea lions or cause them to abandon feeding, breeding, or resting sites. Development and discharge proposals typically undergo ESA section 7 consultation during the federal permitting process.

On October 15, 1993, NOAA Fisheries Service completed a biological opinion on the leasing and exploration activities of the Minerals Management Service in the Cook Inlet/Shelikof Strait region (lease sale Number 149). The biological opinion concluded that such activities were not likely to jeopardize the continued existence of any listed or proposed species, nor were they likely to destroy or adversely modify critical habitats (NMFS 1993). In 1995, NOAA Fisheries Service conducted another section 7 consultation with the Minerals Management Service and concluded that the lease sale and exploration activities for the proposed oil and gas Lease Sale Number 158, Yakutat, were not likely to jeopardize the continued existence of any listed or proposed species, nor were the activities likely to destroy or adversely modify critical habitats (NMFS 1995b).

We expect oil spills will adversely affect Steller sea lions if they contact individual animals, haulouts, or rookeries when occupied, or large proportions of major prey populations. Potential effects could include: oil exposure, including surface contact and pelage fouling, inhalation of contaminant vapor, and ingestion of oil or oil-contaminated prey. Because the insulation of non-pup sea lions is provided by a thick fat layer rather than pelage whose insulative value could be destroyed by fouling, oil contact is not expected to cause death from hypothermia; however, sensitive tissues (e.g., eyes, nasal passages, mouth, lungs) are likely to be irritated or ulcerated by exposure to oil or hydrocarbon fumes. Oiled individuals probably will experience effects that may interfere with routine activities for a few hours to a few days; movement to clean water areas is expected to relieve most symptoms. Females returning from feeding trips may transfer oil to pups, which probably are more sensitive to oil contact.

The extent to which sea lions avoid areas that have been oiled is not known; individuals observed in Prince William Sound and the Gulf of Alaska after the Exxon Valdez oil spill did not appear to avoid oiled areas (Calkins and Becker 1990). Sea lions were sighted swimming in or near oil slicks, oil was seen near numerous haul-out sites, and oil fouled the rookeries at Seal Rocks and Sugarloaf Island (Calkins *et al.* 1994). All of the sea lions collected in Prince William Sound in October 1989 had high enough levels of metabolites of aromatic hydrocarbons in the bile to

25

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 28 of 95

**Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6**

confirm exposure and active metabolism at the tissue level. But as noted above, no evidence indicated damage caused to sea lions from toxic effects of the oil (Calkins *et al.* 1994).

Although Alaska is estimated to contain large petroleum resources on its outer continental shelf and in state waters, the only oil produced from Alaska's outer continental shelf to date has come from Cook Inlet south of Anchorage. In the foreseeable future, the kind of extensive oil and gas activities that characterize the outer continental shelf of the central Gulf of Mexico is not likely for the Gulf of Alaska. Little or no oil and gas exploration or production is occurring or likely to occur soon on the Russian outer continental shelf area of the Bering Sea. The National Research Council recently concluded, therefore, that oil and gas activities in the Bering Sea have not significantly affected the Bering Sea ecosystem (NRC 1996).

*Disturbance by activities unrelated to fishing*

Several studies investigating the potential effects of oil and gas exploration and development on the Steller sea lion have noted human disturbance as a potential factor. Calkins and Pitcher (1982) found that disturbance from aircraft and vessel traffic has extremely variable effects on hauled-out sea lions. Sea lion reaction to occasional disturbances ranges from no reaction at all to complete and immediate departure from the haul-out area. The type of reaction appears to depend on a variety of factors. When sea lions are frightened off rookeries during the breeding and pupping season, pups may be trampled or even abandoned in extreme cases. Sea lions have temporarily abandoned some areas after repeated disturbance (Thorsteinson and Lensink 1962), but in other situations they have continued using areas after repeated and severe harassment. Kenyon (1962) noted permanent abandonment of areas in the Pribilof Islands that were subjected to repeated disturbance. A major sea lion rookery at Cape Sarichef was abandoned after the construction of a light house at that site, but then has been used again as a haul-out after the light house was no longer inhabited by humans. The consequences of such disturbance to the overall population are difficult to measure. Disturbance may have contributed to or exacerbated the decline, although it is not likely to have been a major factor.

*Entanglement in marine debris*

Observations of Steller sea lions entangled in marine debris have been made throughout the Gulf of Alaska and in southeast Alaska (Calkins 1985), typically incidental to other sea lion studies. Two categories of debris, closed plastic packing bands and net material, accounted for the majority of entanglements. Loughlin *et al.* (1984) surveyed numerous rookeries and haul-out sites to evaluate the nature and magnitude of entanglement in debris on Steller sea lions in the Aleutian Islands. Of 30,117 animals counted (15,957 adults; 14,160 pups) only 11 adults showed evidence of entanglement with debris, specifically, net or twine, not packing bands or other materials. Entanglement rates of pups and juveniles appear to be even lower than those observed for adults (Loughlin and Nelson 1986). It is possible that pups were too young during the survey to have encountered debris in the water or that pups and juveniles were unable to swim to shore once entangled and died at sea. Trites and Larkin (1992) assumed that mortalities from entanglement in marine debris were not a major factor in the observed declines of Steller sea lions and estimated that perhaps fewer than 100 animals are killed each year. Current estimates of annual mortality related to entanglement in fishing gear are addressed in the next section of this Opinion.

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 29 of 95

**Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6**

*Incidental take of Steller sea lions in fisheries*

Steller sea lions have been caught incidentally in foreign commercial trawl fisheries in the Gulf of Alaska and Gulf of Alaska since those fisheries developed in the 1950s (Loughlin and Nelson 1986; Perez and Loughlin 1991). Alverson (1992) suggested that from 1960 to 1990, incidental take may have accounted for over 50,000 animals, or almost 40% of his estimated total mortality due to various fishery and subsistence activities. Perez and Loughlin (1991) reviewed fisheries and observer data and reported that from 1973 to 1988, sea lions comprised 87% (over 3,000) of the marine mammal incidental take reported by observers. They extrapolated the take rate to unobserved fishing activities and suggested that the incidental take during 1978 to 1988 was over 6,500 animals. Using the average observed incidental rates during 1973 to 1977 they also estimated that an additional 14,830 animals were incidentally taken in the trawl fisheries in Alaska during 1966 to 1977. Finally, they concluded that incidental take was a contributing cause of the population decline of Steller sea lions in Alaska, accounting for a decline of 16% in the Gulf of Alaska and 6% in the Gulf of Alaska. However, because the actual decline has exceeded 80% since 1960, fishery related mortality of Steller sea lions does not appear to be the only factor contributing to their decline.

### Western Endangered Distinct Population Segment

The current estimate of incidental mortality of Steller sea lions in the western population attributed to commercial fisheries is 31 animals per year (NMFS 2005). This estimate is derived from observer data and self-reported data from fishers, and includes estimates of mortality from entanglement from fishing gear. NMFS estimates the mean annual mortality from stranding from entanglement in fishing gear is 0.2. Estimates of both data sets are extrapolated to account for coverage and bias, with estimates from observer data providing the bulk of data (estimated mean annual mortality rate observed in the fisheries is 25.1 (CV = 0.58; NMFS 2005).

Satellite tracking studies suggest that Steller sea lions rarely go beyond the U.S. EEZ into international waters. Given that the high-seas gillnet fisheries have ended and other net fisheries in international waters are minimal, the probability that significant numbers of Steller sea lions are taken incidentally in commercial fisheries in international waters is low. NMFS has concluded that the number of Steller sea lions taken incidental to commercial fisheries in international waters is insignificant (NMFS 2005).

### Eastern Threatened Distinct Population Segment

The current estimate of incidental mortality of Steller sea lions in the eastern population attributed to commercial and tribal fisheries is 4 animals per year (NMFS 2005). This estimate is derived from observer data and self-reported data from fishers and includes estimates of mortality from entanglement from fishing gear (standing data).

*Intentional take of Steller sea lions in fisheries*

Historically, Steller sea lions and other pinnipeds were seen as nuisances to the fishing industry and management agencies because they damaged catch and fishing gear and were thought to compete for fish (Mathisen 1959). Sea lion numbers were reduced through bounty programs, controlled hunts, and indiscriminate shooting. Steller sea lions were also killed for bait in the crab fishery. Government sanctioned control measures and harvests stopped in 1972 with the introduction of the MMPA.

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 30 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

The total number of sea lions killed since the early part of this century is unknown. Alverson (1992) suggested that intentional take may have reached or exceeded 34,000 animals from 1960 to 1990. Fishermen were seen killing adult animals at rookeries, haul-out sites, and in the water near boats. The loss of that many animals would have an appreciable effect on the population dynamics of sea lions, but the effect would not account for the total decline of the western population. The effect was likely concentrated in areas closer to fishing communities and less important in more isolated areas (e.g., central and western Aleutian Islands).

Sea lion populations appear to be growing slowly in southeast Alaska, where considerable commercial fishing occurs. Expanded observer coverage in the domestic groundfish fishery after 1989 and increased public awareness of the potential economic and conservation impacts of continued sea lion declines have probably reduced the amount of shooting. Nevertheless, anecdotal reports of shootings continue and a small number of prosecutions have occurred or are occurring. Recently, British Columbia outlawed the shooting of Steller sea lions in and around the commercial farming operations. An estimated 45 animals were killed each year between 1999 and 2003 in an effort to control predation at fish farm operations in British Columbia. However, British Columbia has not authorized this activity since 2004 (*see* NMFS 2005).

*Competition with Commercial Fisheries*

Numerous fisheries are conducted in Federal and State waters off Alaska that may adversely affect Steller sea lions. In Federal waters off Alaska, NOAA Fisheries and the North Pacific Fishery Management Council prosecute groundfish fisheries (including fisheries for Atka mackerel, walleye pollock, and Pacific cod) that affect both Steller sea lion populations. The State of Alaska prosecutes fisheries for herring, crab, shrimp, groundfish, Pacific cod, and Pacific salmon throughout state waters. These fisheries may interact with Steller sea lions in a wide variety of ways, including operational conflicts (e.g., incidental kill, gear conflicts, sea lion removal of catch) and biological conflicts (e.g., competition for prey).

The potential biological effects of these fisheries on listed Steller sea lions, particularly the endangered western population, have been the subject of extensive debate since the mid-1990s. Some authors have argued that the fisheries may adversely affect Steller sea lions by (a) competing with sea lions for prey, particularly, walleye pollock, and (b) affecting the structure of the fish community in ways that reduce the availability of alternative prey (for example, Alaska Sea Grant 1993, NRC 1996). Other authors have argued that Steller sea lions may be harmed by diets that are dominated by walleye pollock (Rosen and Trites 2000). Still others suggest that the fisheries are not the primary cause of the Steller sea lion's decline and, instead, point to environmental changes (the regime shift that was discussed previously) and increased predation (primarily by killer whales) as the causative agents (for example, see Saulitis et al. 2000).

The debate over the effects of federal fisheries on listed Steller sea lions escalated between the late 1990s and 2001 in several legal challenges on the biological opinions NOAA Fisheries issued, pursuant to section 7 of the ESA, on the effects of the groundfish fisheries on Steller sea lions (NMFS 1998, 2000, 2001). Ultimately, in response to a biological opinion that found the groundfish fisheries jeopardized the continued existence of Steller sea lions, Congress allocated $2 million for the National Academy of sciences to review the issue of the fishery affect on the status of Steller sea lions (the full statement of the task is found on page 2 of NRC 2003). The committee commissioned with this task could not find conclusive evidence for either the

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 31 of 95

Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6

justification of or the overturning of the "reasonable and prudent measures" that NOAA Fisheries Service established under these fisheries (NRC 2003). While no global reduction of prey biomass from fisheries removal was detected during the period of steepest declines of Steller sea lions, localized depletion of some prey stocks may suggest at least a portion of the decline, in combination with several other factors discussed in this section.

In comparison with federal authorized fisheries, the size of the State of Alaska commercial groundfish fisheries are generally small and are expected to have less impacts on listed species with respect to competition for prey and long term ecosystem impacts. There is a reasonable expectation that the State will expand their management of groundfish fisheries within State waters given their recent proposals that have been reviewed by NOAA Fisheries Service (e.g., Aleutian Islands pollock and Pacific cod). The crab fishery is one of the biggest fisheries managed by the state, but is not likely to directly compete for prey with either Steller sea lions or other listed species.

The patterns of Steller sea lion decline are variable (e.g., York et al. 1996), and review of localized fishing effort with Steller sea lion trends indicates fishing effort is correlated with these trends (Dillingham et al. 2005). In particular, Dillingham et al. (2005) found walleye pollock density (and longline fishing effort) showed a consistent and statistically significant inverse relationship with the rate change in Steller sea lion trend sites. Although the rate of change observed by Dillingham et al. (2005) confirms that fishing adversely affected the population, the size of the effect detected cannot alone explain the severe decline in the early 1980s.

Nevertheless, the fisheries appear to have had some adverse effect on Steller sea lions in the past and we expect these impacts to continue. We have direct evidence that Alaska's herring fisheries, in particular, compete with Steller sea lions and other listed species. Steller sea lions appear to be attracted to the dense aggregations of herring that occur along some sections of the coast during the herring's short, spawning period. Because the timing of herring spawning varies, fishery managers have learned to depend on the presence of Steller sea lions to determine when herring spawning is imminent. Steller sea lions have been observed in the middle of these fishing areas and have been observed leaving the spawning grounds shortly after the herring finish spawning (fishery biologists survey the biomass of the spawning deposits by SCUBA, but wait until the sea lions leave the area for safety reasons).

In general, state and federal groundfish fisheries reduce the abundance or alter the distribution of several prey species that include walleye pollock and cod. The groundfish fisheries may cause dense schools of prey species to scatter which could affect the foraging behavior of marine mammals and seabirds that target aggregated prey. Repeatedly causing fish schools to scatter and reducing their density would also reduce the value of the foraging areas to Steller sea lions by increasing the amount of time and energy and sea lion would have to expend to feed on the same number of fish. The reductions of biomass at larger spatial scales would exacerbate the effects of small-scale depletions caused by fishing; because the spawning biomass in the entire ecosystem is about half of what it would be without fishing, there are fewer spawning-aged fish to replenish areas where fishing has occurred.

Based on available data, we would expect several groundfish fisheries, particularly the pollock and cod fisheries, to compete with foraging Steller sea lions, contribute to their nutritional stress, and appreciably reduce the value of the marine portions of critical habitat that has been

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 32 of 95

Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6

designated for Steller sea lions. The fisheries may reduce the abundance of prey within these marine foraging areas and would alter the distribution of groundfish prey in ways that would reduce the effectiveness of foraging sea lions. The reduction in the abundance of prey species and the alteration of their distribution could effectively keep the carrying capacity of critical habitat for Steller sea lions below the current population size.

*Sport and Subsistence/Tribal Fisheries.* Relative to commercial fisheries, we expect that sport and tribal/subsistence fisheries have an incremental effect on listed Steller sea lions. For perspective, Alaska's sport fishery harvests about 1% (4,000 mt) and subsistence fishery harvests 2% (8,000 mt) of the annual State of Alaska total fish harvests, while the commercial fisheries accounted for 97% (900,000 mt) of the annual harvest in 1998. The actual effect these fisheries have on Steller sea lions is likely incremental, particularly in comparison to commercial fisheries. Impacts are likely limited to minor removals of the potential foraging base, but in such small volumes that we expect only incremental adverse effects, if any. However, we expect any increases would continue in relatively low amounts in the future. The nature of these fisheries is slow removal rates and dispersed catch. Other effects from these activities may include general human disturbance as more fishers recreate in remote areas that are occupied by Steller sea lions. In general, sport and subsistence fisheries are expected to continue into the foreseeable future throughout the action area and may increase in the future as tourism and population increases.

### Research

Steller sea lions have been captured, handled, wounded, and killed for scientific research for almost 50 years (Thorsteinson and Lensink 1962; Calkins and Pitcher 1982; Calkins and Goodwin 1988; Calkins *et al.* 1994):

- In 1959, 630 sea lion bulls were killed in an experimental, commercial harvest. Life history information (age, size, reproductive condition, food habits) was collected.

- Between 1975 and 1978, researchers shot 250 sea lions in nearshore waters and on rookeries and hauling areas of the Gulf of Alaska. Stomachs were removed and examined for food content, reproductive organs were preserved for examination, blood samples were taken for disease and parasite studies, body measurements were recorded for growth studies, skulls were retained for age determination, tissue samples were preserved for elemental analysis and pelage samples were taken for molt studies.

- In 1985 and 1986, researchers killed 178 sea lions in the Gulf of Alaska and southeastern Alaska to compare food habits, reproductive parameters, growth and condition, and diseases, with the same parameters from animals which were collected in the 1970s. The study was designed to address the problem of declining numbers of sea lions in the North Pacific and particularly in the Gulf of Alaska.

- In 1989, following the Exxon Valdez oil spill, sixteen Steller sea lions were killed as part of the Natural Resources Damage Assessment study.

Since 1956, Steller sea lions have been counted by airplanes, boats, and on foot. By the late 1990s, research activities began to focus on the status and trend of Steller sea lions in the western portion of their range; once the western population of Steller sea lions was identified and reclassified as endangered, research activities began to focus on interactions between the sea lions and commercial fisheries in the Aleutian Islands, Bering Sea, and Gulf of Alaska. In 1995,

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 33 of 95

Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6

7,500 Steller sea lions were disturbed during research activities, but no mortalities were reported. Research activities conducted in 1996 followed a similar pattern, although one mortality was reported. In 1997, 31,150 Steller sea lions were approached by researchers, 14,550 were disturbed, 137 were captured, and 121 were tagged, but no mortalities were detected or reported. In 1998, 48,000 Steller sea lions were disturbed by these investigations, 384 pups were captured, tagged, and branded, but no mortalities were reported.

The controversy fueled by NOAA Fisheries' reasonable and prudent measure under the November 2000 biological opinion on the impacts of the fishery on Steller sea lions (discussed previously), led to a significant increase in resources "to produce the science and data to keep the fisheries open while protecting the sea lion population (Senate Report 106-404 see Ferrero and Fritz 2002)." Federal funding for Steller sea lion research activities in 2001 represented an increase of more than $38 million over the previous year. With this increase in funding came an influx of new requests for authorization to study endangered and threatened Steller sea lion populations, pursuant to section 10 of the ESA and the MMPA. Prior to the increase in federal funding NOAA Fisheries Service authorized two permits for research on Steller sea lions, and with the increase in funds available for research projects requests for research permits increased at four-fold.

According to the Permits Division, in 2000 investigators disturbed 2,976 animals. The Permits Division described these disturbances as *level B* harassment[1] and 63 animals were exposed to research activities that qualified as *level A* harassment under the MMPA. Numbers of animals disturbed by research activities rose in 2001, to 23,207 animals that experienced level B harassment, with a concomitant increase in animals experiencing disturbance characterized as level A harassment. In 2002, the number of Steller sea lions experiencing level A harassment was 426 while 28,898 animals experienced level B harassment. During this same reporting period researchers reported killing 4 animals in one year (2001) and 3 animals the next (in 2002).

The numbers of Steller sea lions harassed by research activities increased nearly two-fold between 2002 and 2004, with an increase of almost fifteen times the number harassed in 2004 compared to reported numbers in 2000. Table 2 summarizes the number of Steller sea lions reported as harassed or killed during research activities in 2003 and 2004. Relative to the number of activities being conducted research related mortality has generally been low. The highest number of reported mortalities occurred in 2003, when 7 animals died.

Steller sea lions are also harassed during research on other marine mammals. Presently, five permits issued by PR1 authorize the incidental disturbance of Steller sea lions during directed research on other marine mammals. In total the five permits authorize the incidental disturbance of 8,450 Steller sea lions in Alaska, Washington, Oregon, and California. These permits are for directed research on killer whales, other cetaceans, and for monitoring the status of harbor seals, California sea lions, and northern elephant seals in California, Washington and Oregon.

---

[1] The 1994 Amendments to the MMPA define harassment as "Any act of pursuit, torment, or annoyance which (i) has the potential to injure a marine mammal or marine mammal stock in the wild (Level A harassment); or (ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing a disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering (Level B harassment)."

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 34 of 95

**Civ. No. 05-1392**      **Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.**      **Exhibit 6**

Research activities authorized under these permits are directed at other species, but may occur in the vicinity of, and result in harassment of Steller sea lions (see Appendix C, Activity table in the EA for this action). For the most part, these activities likely cause displays of agitation in Steller sea lions and in some cases may cause Steller sea lions to temporarily move away from researchers. No long-term population level responses are expected from these activities.

**Table 2. Numbers of Steller sea lions reported as harassed or killed during research related field investigations in 2003 and 2004** (Numbers denoted according to Distinct Population Segment and age-class harassed where available[1]).

| Type of disturbance | Pups/juveniles | | Adults | | Any Age | |
|---|---|---|---|---|---|---|
| **Western DPS** | **2003** | **2004** | **2003** | **2004** | **2003** | **2004** |
| Ground Disturbance | 4600 | 3632 | 10000 | 7157 | 16598 | 17298 |
| Aerial Disturbance | | | | | 1500 | 14579 |
| Vessel Disturbance | | | | | | 105 |
| Capture | 899 | 537 | 74 | | 5 | |
| Mortalities | | | | | | 2 |
| **Eastern DPS** | **2003** | **2004** | **2003** | **2004** | **2003** | **2004** |
| Ground Disturbance | | 925 | 3228 | | | 925 |
| Aerial Disturbance | | | | | | 147 |
| Vessel Disturbance | | | | | | |
| Capture | 437 | 469 | | | | |
| Mortalities | | | | | 7 | 2 |

[1]Investigations conducted in areas of overlap between the western and the eastern populations were allocated to the western population.

## Effects of the Proposed Actions

As discussed previously, this biological opinion assesses the effects of NOAA Fisheries Service's issuances of permits (under the MMPA and ESA) that would allow various investigators to harass, harm, pursue, capture, kill, trap, or capture Steller sea lions for research purposes. We summarized the eight permits (five amendments and three new permits) in the *Description of the Proposed Action*. In this section, we describe the range of responses we expect Steller sea lions to exhibit when researchers conduct various procedures authorized by NOAA Fisheries Service's Permits Division. This section includes summaries of the results of various studies that have examined the direct and indirect effects of the sampling procedures on Steller sea lions and other vertebrates. We rely on these summaries of the literature to determine how these species are likely to respond upon exposure to a particular sampling procedure (these represent our *response analyses*). Based on this body of information, we then assess the risks the different procedures pose sea lions, using the conceptual model described in the Approach to the Assessment.

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 35 of 95

Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.              Exhibit 6

The specific activities NOAA Fisheries Service is proposing to authorize are:

- Aerial & Vessel surveys
- Ground counts
- Incidental disturbance during scat collection, capture/sampling, instrumental retrieval or observation
- Collection of carcasses
- Receipt of tissue samples from subsistence harvested animals
- Tracking at sea
- Incidental mortality
- Remote marking
- Capture, recapture, and restraint
- Blood collection
- Tissue biopsies (muscle, skin, and blubber)
- Fecal loops/culture swabs
- Tooth extraction

- Collection of vibrissae, hair, nails
- Tagging (flipper or other temporary mark)
- Hot branding
- Attachment of scientific instruments
- Insertion of stomach temperature transmitters
- Bioelectric impedance analyses
- Injection of stable isotopes, Evans blue dye
- Enema or stomach intubation
- Portable metabolic chamber measurements
- Ultrasonic imaging
- And removal from wild for up to 3 months for various investigations (see appendix A for details)

The narratives that follow examine each activity authorized under the proposed permits, where necessary provide additional details of the procedure, and summarize the available data on the responses of individuals that have been exposed to the procedures. Four general categories describe an animal's potential response to disturbance: no response, behavioral responses, sublethal responses, and lethal responses. For the most part, in field studies no response means the observer could not detect a response or the response was not apparent because they could not distinguish between an animal's normal range of responses and its response to the stimulus. Whenever possible, we distinguish the behavioral reactions and responses to stimuli such as reflect responses and alert responses that reflect awareness or avoidance of the stimulus, from sublethal responses that encompass the full range of observable symptoms of acute or chronic stress in individual animals that disable but do not kill the individual animal. Signs of anxiety and stress that manifest changes in respiration, decreased foraging activity, reduced body condition, growth rates, and fecundity are all sublethal responses. However, there is considerable overlap in categories and an initial behavioral response to a particular stressor may in a matter of minutes, hours, or days manifest sublethal responses that elicit physiological or neurological changes in an individual's condition. In turn, certain sublethal responses can culminate in an individual's death (e.g., exertional myopathy; St. Aubin and Dierauf 2001).

Not all stress is negative, however. Stress responses are common natural occurrences, some innate stress responses can include fasting in prey-poor or environmentally stochastic environments, signal need to flee from predators and so on. These responses are important for maximizing fitness under adverse circumstances; however, there are trade-offs with such responses. In this opinion, we examine the range of stress responses induced by permitted research activities, and the trade-offs that result for the individuals and the populations they comprise.

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 36 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6

### *Effects of Aerial and Vessel Surveys*

According to the "risk-disturbance hypothesis", an animal's responses to a disturbance like airplane or watercraft noise would vary according to the perceived risk posed by the stimulus (Frid and Dill 2002). That is, an animal's response would increase in severity with perceived risk posed by the stimulus (Frid and Dill 2002). Relative to the other research activities, we expect that the disturbance from aircraft and vessel traffic will generally result in a low risk perception by hauled –out sea lions. We expect this is particularly true provided researchers: observe standard protocols for flying over rookeries and haul out sites at slow air speeds (100-150 knots), approach without banking, maintain altitudes greater than 150 m, and limit the time the craft is within the hearing range of the animals in the aggregation; and no vessel would be within close proximity to a rookery or haulout for this activity for more than 2-3 days at a time.

Even so, the antecedent condition of an animal and a suite of environmental circumstances may influence the response of an individual and aggregation of animals. The disturbance effects may range from no response to initiating the flight response in an aggregation (i.e., a stampede). Studies have shown disturbance from aircraft and vessel traffic has highly variable effects on Steller sea lions that are hauled out (Calkins and Pitcher 1982). Response may range from no reaction at all to the immediate and complete evacuation of haulout (Calkins and Pitcher 1982). The flight response in pinnipeds has been described as "unrelenting and reckless" such that animals that are chased before capture (or which flee in response to the presence of researchers or low-flying aircraft) are placed in significant jeopardy, not only from the excessive metabolic heat generated from the flight itself, but also from a variety of potentially dangerous situations encountered in their escape attempts (Sweeney 1990). In two separate instances, captive sea lions jumping from elevations of 4-5 feet landed on their chest areas, rupturing the brachiocephalic vein located in the left shoulder area (Sweeney 1990). The hemorrhage resulting from this injury was fatal for one animal and severely debilitating in the other. Jaw fractures, which could impede feeding, are also a common result of the flight response. In the wild, when    . sea lions are frightened off rookeries during the breeding and pupping season, animals may be injured as they run over each other or slide or crash into cliff facings or underwater rocks in their haste to escape, and pups may be trampled or abandoned.

Frid and Dill (2002) argue that an animal's response to human-caused disturbance is analogous to their response to a predator, such that they will make optimal fleeing decisions that balance the benefit of avoiding capture against the cost of abandoning the resource patch. In review of studies across taxa, Frid and Dill (2002) found that, in general, the probability of fleeing increases when the disturbance approaches more directly and when the cost of fleeing is lower than the perceived cost of staying. Results varied among studies as to whether speed and the size of the disturbance (i.e., size of the perceived predator) influenced flight responses (Frid and Dill 2002). In some instances, sea lions have temporarily abandoned haulouts after repeated disturbance (Thorsteinson and Lensink 1962; Kucey 2005), but in other situations they have continued using areas after repeated and severe harassment. Kenyon (1962) noted permanent abandonment of areas in the Pribilof Islands that were subjected to repeated disturbance. A major sea lion rookery at Cape Sarichef was abandoned after the construction of a light house at that site, but the sea lions used the site as a haulout after the light house was no longer inhabited by humans.

34

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 37 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

Whether or how much wild animals habituate to repeated disturbance is an area of considerable debate. Some argue that habituation, at best, occurs only partially in most animals because the fitness cost of underestimating the risk (not responding to a perceived threat) potentially outweighs the cost of responding to a stimulus through flight (see Frid and Dill 2002 for a review). Consequently, Frid and Dill (2002) expect that animals would be inclined to maximize fitness by overestimating perceived risks, not underestimating them.

All extraneous variables being equal, we would expect that the relative risk perceived by sea lions would be greater when personnel are on the ground as opposed to conducting air or vessel surveys. Recent studies by a graduate student at the University of British Columbia, confirm this assumption. Kucey (2005) recorded disturbance events from aircraft, birds, sea lions, humans, boats, and researchers collecting scat across 8 sites used by Steller sea lions in the summer and 6 sites used in the winter/spring season. Kucey (2005) observed more than 1,000 disturbance events of which slightly more than 40% caused animals to leave the site. She found that scat collection disturbances caused all animals to enter the water when researchers went ashore, whereas she recorded about 5% of the animals leaving the haulout sites in response to aircraft disturbance (n=20). Boat disturbance, however, evoked greater responses that aerial disturbances with more than 15% of the animals leaving the haulout in response to watercraft (n=36). Kucey (2005) observed that the nature of the vessel approach (i.e., speed, noise, fumes, combined with other variables like weather) influenced the magnitude of the response.

In submitting reports required under the permits, researchers generally report observing only a small percentage (less than 1%) of sea lions responding to the approaching survey planes. For example, during aerial surveys of the eastern population conducted in 2004, researchers reported counting 17,000 Steller sea lions from the plane of which only 147 responded to the activity. Unfortunately, researchers did not report the magnitude or type of the response. Presumably, given the distance at which researchers are observing animal responses the most likely response witnessed is that of an animal leaving the haulout site and entering water. Other types of agitation may also occur in response to such disturbance events such as increased vocalizations, and agitated movements (Kucey 2005).

NOAA Fisheries is proposing to authorize the disturbance of virtually every member of the eastern and western population of Steller sea lions numerous times. Combined, the permits authorize the exposure of about 200,000 Steller sea lions from the western population and 150,000 Steller sea lions from the eastern population to aerial surveys. Since the estimated size of the western population is 38,513 animals (NMFS 2005), this amounts to slightly more than five exposure events per animal per year, assuming the equal allocation of exposure events among all members of the population. Similarly, we would expect about three exposure events each year for each member of the eastern population[2]. Using estimates of response from research reports (~1% response), about 2,000 animals would respond to aerial survey disturbances by fleeing into the water. If a full 5% of the animals entered the water in response to aerial surveys, then nearly 10,000 animals (about ¼ of the western population) would exhibit flight responses to these disturbances. If 1 to 5% of the animals in the eastern population

---

[2] We based our estimates on the number of takes allocated in even years. During odd years, numbers would be slightly lower because the number of authorized takes is lower (See Appendix A, Table A-1).

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 38 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

respond similarly to aerial surveys, then anywhere between roughly 1,500 and 7,000 animals would responding to aerial disturbances attributed to research by fleeing into the water. The permits would also allow the exposure of up to 1,600 animals from the western population to watercraft. Using Kucey's (2005) observation rate of about 15% of the Steller sea lions fleeing in response to vessels, we estimate about 240 animals would exhibit this more severe response.

In practice, however, we do not expect equal exposure among individuals in a population. Some individuals within a population and within aggregations may be exposed a significantly greater number of times (e.g., individuals that occupy regularly monitored trend sites) and other individuals may rarely, if ever, be exposed to survey activities. Unfortunately, we cannot evaluate the spatial distribution of effects to ascertain what aggregations will have the highest exposure rates.

Even so, from our analysis there is little evidence to suggest that aerial surveys conducted carefully and in a manner directed according to the permits, would initiate site wide evacuations or stampedes. The vast majority of individuals at a site will likely show no observable response to overhead flights, but for the individuals that do respond to the disturbance stimulus by fleeing there are likely some trade-offs involved in the altered behavior. Animals resting at haulouts that shift to a flight response would increase their metabolic demand. Over time and with repeated disturbance events, these individuals could exhibit changes in body condition, such that it eventually affects an individual's reproductive success (see Frid and Dill 2002). Where it occurs, such prolonged predation risk (i.e., intense and repeated exposure to disturbances) may indirectly alter population or aggregation sizes.

Some trend sites likely receive repeated exposure to survey disturbances, however, we know of no systematic evaluation of the localized effect of prolonged and repeated exposure to aerial or vessel surveys on Steller sea lions in Alaska or elsewhere. Nor do we know what proportion of the total population these sites represent, and consequently what proportion of the population is routinely exposed to disturbance from aerial or vessel surveys. Given the amount of uncertainty that surrounds our exposure assessment (in particular, the lack of information on the spatial distribution of effects), our best estimate is that somewhere between 2,000 and 10,000 animals in the western population, and 7,000 animals from the eastern population, will respond each year to disturbance from aerial and vessel surveys by evacuating a site.

### *Effects of Ground Counts and Scat Collection*

About 20,000 Steller sea lions in western population would be disturbed during ground-based counts (as discussed previously, it is not clear whether specific rookeries or haulouts would be disturbed more than others). According to the authorized takes, one fourth of disturbed animals are pups less than one year old, and three-fourths are non-pups (adults and juveniles). The permits authorize the disturbance of 30,000 Steller sea lions in the eastern population (12,000 pups and 20,000 non-pups). As discussed previously, we expect that the relative risk perceived by animals of disturbance on the ground is far greater that that of distant activities like aerial surveys and to a lesser extent vessel disturbance.

Kucey (2005) conducted observations on ten sites in British Columbia used by Steller sea lions, primarily for hauling out and one rookery. Kucey (2005) observed Steller sea lion use of the sites for about 1 to 2 weeks before researchers landed on the site for scat collection, and

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 39 of 95

Civ. No. 05-1392      Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.      Exhibit 6

continued to observe Steller sea lion sites for 1 to 2 weeks post disturbance. Kucey (2005) recorded observed more than 1,000 disturbance events at the sites, which included a number of predetermined disturbance events to collect scats, and the branding of pups at the rookery. Researchers were present on haulout sites during scat collect for about two hours, whereas during branding researchers occupied the rookery for about 6 hours. Kucey (2005) observed that scat collection disturbance resulted in all animals entering the water (fleeing the site) as researchers went ashore. Three of the sites that she monitored never recovered to predisturbance levels, and of those that did recover returned to predisturbance levels about 4 days after the disturbance. Her study, however, could not detect whether the sites were reoccupied by the same or new individuals (such that individuals were unaware of the previous disturbance event). Notably, one of the sites that did not return to predisturbance numbers was the rookery site where branding occurred.

As discussed previously, the individual exposed to such disturbance events faces a trade-off decision based upon their perception of the risk posed by the disturbance. At a minimum, an individual that chooses flight will increase their net energy demand in response. Conversely, where sites are temporarily evacuated by 100% of the sea lions, as was observed by Kucey (2005), some individuals will likely experience injury or death. For instance, Steller sea lions generally give birth between mid-May through mid-July, with the highest frequency of births occurring mid-June. The permits authorize ground counts to begin in June each year. Many of the pups on a rookery would be a few days to six weeks old, depending on the timing of the ground count and the births in the aggregation. Because the motor skills of pups at this age are not as well developed as in older pups, the newborn pups would likely be unable to move out of the way and may get trampled or knocked into the water as adults flee researchers. Young pups are not adept swimmers and are usually unable to climb the rocky cliffs common to many rookeries. Even pups who are successful at climbing back onshore may suffer subsequent hypothermia and respiratory complications as a result of aspirating water while being tossed about in intertidal waves.

If researchers have not identified which mothers are in attendance and which are at sea, there is no way to determine whether a pup has been abandoned as the result of the disturbance unless they remain to monitor the rookery for several days. Foraging trips of lactating females may last several days or more (Brandon 2000). Even if mother-pup pairs have been identified, if researchers do not monitor a rookery after the disturbance until all the adult females that entered the water return to their pups, it will not be possible to determine if pups have been abandoned as a result of the disturbance. Fostering is very rare in Steller sea lions, thus the majority of abandoned pups will starve to death. Further, if pups (or adults) were injured during a stampede, they may not die from their injuries immediately. Death may not occur for several days, or weeks, in the case of infections or hemorrhages resulting from injuries, or injuries that affect an animal's ability to forage.

Steller sea lions in Alaska demonstrate site fidelity with respect to rookeries. The arrivals of males and pre-parturant females are closely timed and predictable from one year to the next. Large males of reproductive age are usually the first to arrive, establishing territories by aggressive competition with other males. Presumably, the holders of the "best" territories gain access to more females, and are therefore more successful at mating. When adult animals are displaced from the rookery during breeding season at least some animals will likely have to re-

37

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 40 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.         Exhibit 6

establish their territories. As a result, each disturbance that displaces animals from their territories increases the likelihood of aggressive interactions and the possibility of injury. Adult male Steller sea lions have large canines and powerful jaws and are capable of inflicting serious puncture and laceration wounds on opponents. These wounds may become infected. In addition, other sea lions on the rookery, including pups, may be injured during these aggressive competitions among males. Along with the possibility of physical trauma, the heightened aggressive interactions can result in secondary disease manifestations (Sweeney 1990).

The incidence and probability of stampedes in response to ground disturbance by researchers is not known. We suspect that the relative risk is greater with these ground disturbances than surveys conducted at a distance (e.g., aerial surveys). The magnitude of the disturbance effects on the animals may be affected by the number of personnel who come ashore, the amount of time the rookery or haulout is occupied by researchers (which usually means the amount of time the animals remain in the water or the pups are separated from their mothers), the frequency of these disturbances (both between and within years) and the timing of the disturbance (with respect to breeding, pupping, etc.). In total the permits authorize the disturbance of 75,000 animals from the western endangered population, and nearly 50,000 from the threatened eastern population. For the western population, if we equally allocate exposure among members of the population then each individual would be subjected to ground counts and scat collection disturbances twice each year. For the eastern population, these activities would result in a little more than one event per individual each year. As discussed previously, we do not expect each member of either population would be disturbed equally from these events, however do not have spatial or temporal information on the activities that allow us to predict what proportion of the population is routinely affected by these disturbance. We do, however, expect that the actual number disturbed is likely lower, as researchers frequently combine activities (e.g., scat collection with ground counts), which would make these estimates meaningless. In the absence of better information, we suspect these estimates represent worst-case scenarios. Evidence suggests than in some cases, these disturbances lead to the entire evacuation of site by Steller sea lions (Kucey 2005). When all or a large portion of animals evacuate a site we expect the risk of serious injury and mortality would increase, as well as sublethal responses such as increased territorial aggressions and increased energy expenditure. Unfortunately, we lack sufficient information to suggestion how many animals would experience lethal and serious sublethal responses to these types of activities.

### *General Effects of Capture and Restraint*

Chase, capture, and handling is generally very stressful on a wild animal, and in some instances can lead to detrimental responses (Fowler 1978; St. Aubin and Dierauf 2001). Each restraint incident has some effect on the behavior, life, or activities of an animal. A variety of somatic, psychological, and behavioral stressors can be associated with capture and restraint of wild animals. These include strange sounds, sights, and odors, the effects of chemicals or drugs, apprehension (which may manifest in behavioral signs of anxiety, fright, or terror), and territorial or hierarchical upsets associated with displacement of animals by researchers who come onto rookeries and haulouts. Distressed animals can incur contusions, concussions, lacerations, nerve injuries, hematomas, and fractures in their attempts to avoid capture or escape restraint (Fowler 1978). The stress response can change an animal's reaction to many drugs, including those

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 41 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

commonly used for chemical restraint, which can lead to lethal consequences. The annual reports from the current and previous permits held by NMML and ADF&G indicate that some animals showing distress and/or adverse reactions to drugs or handling that were not immediately released, subsequently died. Continuous stimulation of the adrenal cortex, as from stress associated with chronic disturbance or repeated capture, can cause muscle weakness, weight loss, increased susceptibility to bacterial infections, and poor wound healing, and can lead to behavioral changes including increased aggressive and antisocial tendencies (Fowler 1986).

Capture myopathy is a possible consequence of the stress associated with chase, capture, and handling in numerous mammal species (Fowler 1978), and results from increased muscular exertion and overstimulation of the nervous system. General indications of the condition may be assessed by gross observation, blood chemistry, gross pathology, and histological examination. Capture myopathy is characterized by degeneration and necrosis of striated and cardiac muscles and develop relatively quickly, within a few hours, or may enter a subacute phase developing a 7 to 14 days after capture and handling. It has been observed in animals that exert themselves maximally and those that remain relatively quiet, and occurs with either physical or chemical restraint. Fear, anxiety, overexertion, repeated handling, and constant muscle tensions such as may occur in protracted alarm reaction are among the factors that predispose an animal to this disease. A variety of factors may function in concert or individually. The muscle necrosis is likely due to acidemia resulting from a build up of lactic acid following profound muscle exertion: once necrosis has occurred, the prognosis for recovery is not favorable. The number of times an animal is captured, the method(s) of restraint, as well as the age and general condition of the animal are all factors that will affect an animal's response to capture.

In total the permits authorize the capture, restraint and sampling of about 3,085[3] animals from the western population and 242 animals from the eastern population each year. In general, the permits authorize the capture and restraint of more very young pups than any other age class (61% of the animals authorized for capture from the endangered western population are between 5 days old and 2 months old [n=1900] and 82% of the animals authorized for capture from the threatened eastern population [n=200]). Juveniles represent the second most sampled age-class, with up to 980 individuals between the ages of 2 months and 3 years old sampled in the western population, and 42 of sampled from the eastern population each year.

The remainder of this analysis focuses on the specific procedures authorized by the permits for conducting on captured and restrained animals. Appendix A, Tables A-2 and A-3, lists these procedures by permit holder, the age-class authorized for sampling, and the number of times a procedure is authorized. No more than 3,085 animals from the western population and 242 animals from the eastern population may be sampled using these procedures (these numbers are the maximum number authorized for capture). In most cases, the permits authorize researchers to conduct procedures on a subset of animals, so that not all animals will receive all test procedures. However, the permits authorize researchers to conduct multiple tests on each restrained animal.

---

[3] Some permits allocate different levels of capture depending upon the year captured. Rather than average takes across years, this number represents the maximum number of animals authorized for capture in a year. In some years the actual number of authorized takes is lower (See Appendix A, Table A-1).

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 42 of 95

Civ. No. 05-1392      Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.      Exhibit 6

*Effects of Chemical Immobilization (General Anesthesia/Sedation)*

A fairly high mortality rate caused by anesthesia has been reported in otariids (Gage 1993). Delivery of anesthesia in pinnipeds can be complicated by their particular anatomical and physiological specializations to the marine environment and by the logistics of working with wild animals. Determining the proper dose is dependent on a fairly accurate assessment of the animal's weight and condition, as miscalculation of an animal's weight can lead to an overdose, which can have lethal consequences (Fowler 1986). The typical induction time for most chemical restraint agents is 10 to 20 minutes following intramuscular injection. As a result, darting can be dangerous because it can spook an animal into the water before the immobilization has taken affect, which can result in drowning. In February 1993, under Permit No. 771 (64), an adult female darted with Telazol died[4]. Within 5 minutes she had rolled over into the surf and appeared unable to swim. By the time the researchers reached the animal she was not breathing and was given Dopram (a respiratory stimulant). She resumed breathing and began moving her head side to side and moving her foreflippers slightly. When these movements on the part of the animal began to interfere with the researcher's efforts to collect samples and attach a transmitter, the animal's head was covered in an attempt to calm her. By the time attachment of the transmitter was nearly completed it was noted that the female had been still for about a minute. Upon removing the rain jacket it was discovered that her pupils were dilated and she had no blink reflex. Attempts at resuscitation were unsuccessful and it was believed that the animal's immersion in sea water after darting may have triggered the dive response (breath holding, decreased heart rate, and reduced peripheral blood flow) and/or she may have aspirated sea water. It was also suggested that covering the animal's head may have contributed to her death by making her condition difficult to monitor and/or by pushing her back into the dive reflex.

The safest injection site for projectile syringes (darts) are in the deep muscle areas of the hind limbs (Scott and Ayars 1980). However, the blubber layer on pinnipeds can make delivery of an injectable drug into the muscle, where needed for proper absorption and distribution, difficult. In addition, inadvertent injection of drugs into the blubber frequently results in aseptic necrosis, sometimes leading to large abscesses (Geraci and Sweeney 1986). Injections into the chest cavity or stomach region can result in puncture of the lungs or stomach, which may kill the animal. In February 1993, under Permit No. 771(64), issued to NMML, a pup that was accidentally darted with Telazol when it unexpectedly moved in front of the target adult animal died, apparently as a result of inadvertent intravenous injection of a drug intended for intramuscular administration in a larger animal[5]. According to the report, the dart struck on the left flank, about 5 inches forward of the hip and about 2 inches off the spine, which apparently, as indicated by necropsy, entered the kidney, effectively causing an intravenous injection. Necropsy also revealed slight trauma to the kidney. The pup had also regurgitated approximately a liter or more of milk following the darting and may have aspirated some, which could have contributed to the death.

---

[4] Memorandum for the Record from R.L. Merrick, dated 10 March 1993, RE: Steller sea lion mortalities during field work, February 1993. Permit No. 771(64).

[5] Memorandum for the Record from R.L. Merrick, dated 10 March 1993, RE: Steller sea lion mortalities during field work, February 1993. Permit No. 771(64)

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 43 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

Hyperthermia (over-heating) can occur in animals under anesthesia because the blubber layer can make heat dissipation a problem, even at ambient temperatures that are comfortable for the researchers: otariids over 25 kg tend to become hyperthermic during anesthesia (Gage 1993). Hypothermia can also occur in sedated animals, during anesthesia or post-recovery, as many drugs can affect thermoregulation. In hypothermia, the reduction in body temperature reduces tissue metabolism, while hyperthermia increases it. Both of these can have implications for the animal's reaction to any drugs administered, as well as any pathological conditions that may exist.

In one study about 10% of animals induced with Telazol (tiletamine-zolazepam) or gas were observed to become apneic (stop breathing) within five minutes of induction (Gage 1993). Tiletamine is a cyclohexamine, which is a dissociative anesthetic that induces catatonia. It also has an analgesic effect through its action on the spinal cord, but it does not block visceral pain. Both hyperthermia and hypothermia are possible consequences of immobilization with tiletamine, depending on ambient temperatures. Respiratory depression is also possible, as is hypersalivation, which can lead to choking or aspiration of fluid.

There is an excitatory phase seen with tiletamine characterized by occasional muscle spasms resembling seizures, due to spinal reflex firings, which can be minimized by using tiletamine in combination with diazepam. Zolazepam is a benzodiazepine, or antianxiety drug, that has a sedative effect and is a skeletal muscle relaxant. Zolazepam slightly depresses cardiovascular function. Both tiletamine and zolazepam are excreted in the kidneys and are contraindicated in animals with severe renal or hepatic disease.

The safety of these drugs is adversely affected in animals that are ill, stressed, or which have suffered from physical exertion (e.g. have been chased) prior to administration of the drug. There is no antidote (reversal agent) for tiletamine. Diazepam, which is a benzodiazepine similar to zolazepam, is metabolized slowly, with clinical effects typically disappearing within 60 to 90 minutes (Fowler 1986). There is a reversal agent for zolazepam, flumazenil. However, because zolazepam is used in combination with tiletamine to reduce the effects of the excitatory phase, reversing the effects of zolazepam in the absence of a reversal agent for tiletamine could result in convulsions and other side effects.

Inhalation anesthetics such as isoflurane gas are used to induce anesthesia in animals that can be manually restrained, and are commonly used to augment analgesia or increase the depth of anesthesia in animals previously immobilized by injectable agents. Prolonging immobilization by administering repeated doses of injectable agents is associated with a high risk of mortality, and an additional dose of Telazol should never be given (Gage 1993)[6]. Isoflurane, a halogenated ether with potent anesthetic action (Stedman's Medical Dictionary 2000), is an inhaled general anesthetic that induces reversible depression of the central nervous system, resulting in unconsciousness, analgesia, voluntary muscular relaxation, and suppression of reflex activity (Fowler 1986). Isoflurane is especially useful for short procedures in which rapid recovery and few aftereffects are desirable. The effects of inhalation anesthetics increase predictably with

---

[6] Note that several of the animals that died under previous permits issued to ADF&G were given repeat injections of medetomidine and/or ketamine, the injectable agents used to immobilize them. See annual reports for Permits No. 771 and 965.

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 44 of 95

**Civ. No. 05-1392      Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.            Exhibit 6**

increased dose, unlike injectable agents, which tend to be unpredictable and idiosyncratic among animals (Fowler 1986). In general, captive animals have been observed to fully recover from anesthesia with isoflurane after 8 hours (Gage 1993). Isoflurane gas appears to have the best recovery characteristics, and be safe and reliable, in otariids (Haulena and Heath 2001).

### Effects of morphological measurements

Morphometric measurements are and are used to monitor changes in the health of the sea lions and monk seals and complement other physiological measurements taken as part of other procedures. These procedures consist of simple measurements capture a animal's length, girth, and weight and are not likely to adversely affect the health or survival of an animal. Risks are largely incidental to capture and restraint, as described previously.

### Effects of blood collection (venipuncture)

The risks of blood collection are largely incidental to capture and restraint, as described above. However, multiple attempts to obtain a blood sample are not only stressful and cause some degree of pain, they can result in damage to the vein, clotting, and abscess. Removing a volume of blood too large relative to the animal's mass and ability to replace what was taken can result in fatigue, anemia, weakened immunity, and problems with clotting.

### Effects of skin and blubber biopsy

Biopsy samples can produce wounds that, as with any wound, has the potential for infection after any of these procedures, particularly given the unsanitary environment of the rookeries. An otherwise healthy animal should be able to heal and recover from a properly performed procedure, but animals with compromised immune systems may develop major complications. This procedure may cause more than momentary pain.

### Effects of muscle biopsy

The small diameter of the wound, combined with the depth of the biopsy, would create a wound that would tend to close on the surface prior to deep tissue healing. This increases the chances of abscess formation, particularly if the biopsy needle or dart was not properly sterilized. Biopsy wounds, as with any wounds including those acquired during intra-species aggressive interactions, may become contaminated despite use of sterile equipment. Therefore, leaving the wound open to drain should an abscess form, rather than suturing closed, is preferable. As with skin and blubber biopsies, unhealthy animals or those with compromised immune systems may develop major complications from such an infection.

### Effects of ultrasound

This procedure, by itself, poses no risk of injury to an animal. This procedure, by itself, poses no risk of injury to an animal. However, there is the possibility for adverse affects from the need for capture and restraint, as described above.

### Effects of fecal loops and skin or mucousal swabs

The potential adverse affects relate primarily to the risks of capture and restraint, as described above. In addition, there is the slight potential to introduce or spread infection if the loops and swabs are not used properly. There is the potential for perforation, and subsequent infection, when fecal loops are inserted into the rectum. There is the possibility for damage to the cornea

of the eye if ocular swabbing is done incorrectly. When performed by a qualified, experienced person using commonly accepted standards of good practice, these risks are likely negligible.

*Effects of tooth extraction*

The potential adverse effects of tooth extractions relate to the risks of capture, anesthesia, and the possibility of infection following extraction. The procedure may result in more than momentary pain, which could temporarily interfere with the animal's ability to forage. However, there are no data on the long-term effects of this procedure.

*Effects of collecting vibrissae, hair, and nails*

Clipping whiskers, hair and nails is not likely to result in any pain. The effects on the animal of clipping a whisker, toenail or patch of hair are probably largely incidental to the effects of capture and restraint described above. However, the pulling of a whisker may cause more than momentary pain due to the highly sensitive nature of this sensory organ. The area of the snout where the vibrissae follicles are located is highly vascularized and ennervated to enable a sea lion to use its vibrissae in search of food even at very cold temperatures (Gee 1998). Even so, the adverse effects on the animal of pulling a whisker are probably largely incidental to the effects of capture and restraint described above.

*General effects of marking (e.g., flipper tags and branding)*

Marking devices can be divided into temporary, semi-permanent, and permanent. In general, the use of natural marks and individual appearance requires familiarity with the subject animals, which typically means many hours of personal observation. When the use of natural marks to identify individual animals is not suitable or practical for achieving study objectives, there are a variety of methods for marking animals available.

*Temporary marks*: Paints, bleaches, and dyes have been used successfully to temporarily mark Steller sea lions and other pinnipeds. The duration of the mark depends on, among other things, the type of paint or dye used, and the season applied, because all pinnipeds molt (shed their coats) annually. As a result, paints and dyes can be used to identify individuals for weeks to months. Paint marks can be applied remotely using a paint gun that fires pellets filled with pigment that burst on impact and leave a spot on the animal's fur. This method does not allow use of alphanumeric characters and is therefore not practical when other than the crudest of marks are needed. In addition, it may be very difficult to get the paint to adhere to the fur sea lions. If animals can be captured and restrained, bleaches and dyes can be used to make unique alphanumeric marks on their fur. This method likely involves more stress to the animal than remote marking, and may cause incidental disturbance of conspecifics. However, the marks can be made large enough to be easily read from a distance, making it unnecessary to recapture the animal for identification, or cause additional disturbance to conspecifics. A variation on painting or dying the animal's fur is to capture animals and glue (using epoxy) a colored tag to their fur. This tag would fall off when the animal molts, and could have unique alphanumeric information written on it that could be read if researchers could get close enough or recapture the animal. Attaching a scientific instrument that emits a unique signal to the fur is also a method of temporary marking that has been used in a variety of species, including Steller sea lions.

*Semi-permanent marks*: There are numerous plastic, aluminum, and plated-steel tags available in a variety of colors, sizes, and identifying symbols that can be affixed to animals to allow

43

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 46 of 95

Civ. No. 05-1392   Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.   Exhibit 6

identification of individuals. All of these techniques require capture and restraint of the animal. Plastic cattle ear tags have been used for many years to mark numerous pinniped species, including Steller sea lions. The tags are attached through the flippers. While these tags may remain attached for the life of the animal, they can and do pull out. In addition, they can become faded or otherwise difficult to read over time. These plastic tags cannot necessarily be read from as a great a distance as large paint or dye marks, thus recapture of animals may be required for positive identification of individuals. However, when the study objectives require identification of individuals for longer than a few months or a season, or when animals will need to be recaptured for other reasons, plastic tags are the alternative of choice for many researchers. Another method of identifying individual animals is to attach scientific instruments, such as VHF and satellite transmitters, that broadcast signals on unique frequencies and allow tracking of animals or remote monitoring of their movement and activities. In pinnipeds, these tags are glued to the fur, or affixed to plastic tags that are attached through the flippers. These are considered temporary (if glued to fur) or semi-permanent (if affixed to flipper tags) because they will fall off when the animal molts or be lost when the flipper tag pulls out. In addition, the life of the tag is limited by the battery capacity, which, in turn, is limited by the size of the tag.

As described above, flipper tags are best considered semi-permanent markers as they can and do pull out because sea lions use their foreflippers in both aquatic and terrestrial locomotion. In addition to the effects of capture and restraint as described above, it is likely that affixing these tags to the flippers of sea lions causes more than momentary pain. When the tag is affixed there is the potential for infection at the wound site, particularly because the environment on the rookery is not aseptic and because the activity of the animal may prolong or prevent healing by producing repetitive stress on the wound. There is also the potential for infection when a tag pulls out of the flipper, for whatever reason. In moving about on a rookery or haulout, or swimming, tags can be torn from the flipper by abrasion on the substrate or by hydrodynamic pressure (Fowler 1986). There is no information on long-term tag retention or average retention rates in the annual reports from NOAA Fisheries' permits holders who use these tags on Steller sea lions. There is also no quantitative information on the rate of infection caused by flipper tagging. Both applicants report that tag-related mortality does not add significantly to natural mortality. However, Merrick et al. (1996) report that flipper tags can become difficult to read as the colors and markings on them fade over time and that they are not readily visible from any distance, partially because the gregarious nature of sea lions causes them to group together and obscure the flippers.

*Permanent marks*: When study objectives require recognition of individual animals for more than a season or a few years, temporary or semi-permanent marks must be re-applied, or a permanent mark can be used. As discussed above, applying both temporary and semi-permanent marks usually requires capture and restraint of the animal, and leads to disturbance of a significant number of animals in the area. Given that each capture event is stressful, and has the potential to injure the animal, when the objective is only to have animals that can be individually recognized from a distance, it is more advantageous to apply a permanent mark from the start. Using permanent marks is also favored over re-applying temporary marks when the interval between capture events is longer than the duration of the temporary mark.

Hot brands have been used for many years to permanently mark domestic livestock and some species of wildlife, including Steller sea lions and other pinnipeds. Cryo-branding, or freeze

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 47 of 95

Civ. No. 05-1392      Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.          Exhibit 6

branding has also been used successfully to permanently mark numerous species, including white-tail dear, fish, horses, and harbor seals. Tattoos have also been used to permanently identify domestic animals (e.g., cattle, dogs, horses) and wildlife (e.g., rabbits, polar bears, deer). Cryo-branding or freeze branding is considered by some to be more acceptable for use in marking wildlife because, when done correctly, there is virtually no chance of infection (Scott and Ayars 1980). These other techniques may result in less pain for the animal being branded. For instance, no pain reactions were observed in cetaceans during the freeze-branding procedures (Needham 1993). Nevertheless, the practicality of hot-branding as a means of permanently marking pinnipeds in the wild has been demonstrated in several studies, and as such it remains the preferred method for permanently marking pinnipeds (McMahon et al. 2006).

There has been insufficient resight effort of the more than 15,000 sea lions branded by ADF&G and NMML since 1975 to validate the merits of hot-branding versus the potential for adverse impacts to individual sea lions. Short-term observations of rookeries after branding, indicates that some delayed mortality is likely. Of 1,000 pups branded in the late 1980s, 2 dead marked pups were found a week after branding (Merrick et al. 1996). On Marmot Island in 1987, 400 pups were marked (some branded and others tagged only) with only 50% observed alive several months later. The observed mortality of marked verses unmarked animals was only slightly higher (1.5% for marked animals and 1.4% for unmarked animals [Merrick et al. 1996]). More recent short-term observations of branded pups on Ugamak Island yielded the same mortality estimate of 1.5% for marked animals, which is lower than observed "natural" mortality rates for this age class (Fritz and Gelatt, pers. comm., 1 Mar 2006).

In addition to the possible adverse effects of disturbing a rookery, as described above, the branding activity itself has the potential for adverse effects. To achieve the desired scarring, the burns must be second-degree, although third-degree burns are possible if the branding is done improperly. As a result, hot branding produces an acute burn wound involving a varying thickness of the skin and underlying tissue. This procedure, when performed correctly, produces 2nd degree burns (i.e., burns that penetrate the entire outer layer of the skin and into the inner skin layer, characterized by formation of blisters, swelling, and fluids seeping from the burned area). The forge used NOAA scientists by is approximately 5 cm wide by 8 cm high (Merrick et al.1996). For a one-week old pup measuring 95 cm standard length and 65 cm axillary girth, the total area affected is less than 2% of the animal's skin surface.

The degree of trauma caused by a brand will depend on a variety of factors including the temperature of the branding iron, the pressure with which the brand is applied, the time for which the iron is applied, the position of the brand, the condition, immunological status and behavior of the animal during and after the branding event, and infection rates and types (Gales 2000). Because it is difficult to control for many of these variables in the field, a wide range of wound healing scenarios are expected. The procedure likely causes more than momentary pain, and there is the potential for infection of the burned area, especially because the environment on rookeries and haulouts is not aseptic.

Further, in order to facilitate branding a large number of pups, researchers gather them into large groups for processing. Moving pups into large groupings and leaving them this way can result in deaths by suffocation as smaller, younger or weaker animals may become buried under others. Some injuries to pups left in these centralized piles may occur when the adult females return to

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 48 of 95

Civ. No. 05-1392     Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.          Exhibit 6

the rookery. Female Steller sea lions are very discriminating about suckling their pup, and only
their pup. Females have been observed to grab and toss pups who have come too close and that
are not theirs. If the pup lands too close to another lactating female that is not its mother, it may
get tossed again. As noted above, very young pups are not well able to move away from hostile
females because their motor skills are not sufficiently developed. Females have also been
observed to fight over ownership of a pup following disturbance, by tugging it back and forth
between them. Pups sustain injuries during these episodes. On a rookery, females choose and
defend "territories" in which they give birth and nurse their young. Females with newborn and
very young pups defend their pups, and their space, aggressively. When females with young
pups leave on foraging trips the young pups do not usually move far from the spot where their
mother left them. As a result, when adults are driven from the rookery and pups are placed in
large groups in central locations for branding or other research activities, the potential for injury
to or abandonment of pups as females return ashore is greater than if they were left more widely
spaced or near their original spots.

In 1993, 399 Steller sea lion pups were branded on Forrester Island in Southeast Alaska. Four to
five days after branding six dead, branded pups were collected during pup counts. Necropsy
revealed blunt trauma as the probable cause of death for two of the pups, and starvation was the
likely cause of death for the other four. Although the pathologist stated that these deaths could
not be linked to branding, it is not apparent how this possibility could be ruled out. In a
subsequent report from the permit holder, it was stated that it was unclear whether branding
operations contributed to abandonment of pups, and their subsequent starvation. An additional
36 dead pups were recovered on this rookery 4-5 days after branding. Five of these pups were
from a growth study in which pups were marked to be recaptured regularly for weighing and
other measurements: at least four of these pups appeared to have starved, possibly as the result of
abandonment. Of the remaining 26 dead pups, one was stillborn, three were neonatal deaths of
unknown cause, 15-16 were emaciated and probably starved to death, four died of trauma, one
from pneumonia, and one drowned. The possibility that the deaths of the emaciated animals or
those that died from trauma, pneumonia or drowning were related to the branding and research
activities cannot be ruled out.

In 2001, during branding of Steller sea lion pups on rookeries in Oregon (under Permit No. 782-
1532), approximately 1/3 of the pups present were captured and branded. Several days later 7
pup carcasses were observed on the rookery: 6 of the dead pups were branded. It is not known
what percentage of these mortalities could be attributed to the research activities vs. natural
causes. Necropsy indicated that one of the dead branded pups probably died as the result of
trauma associated with a bite wound on the head.[7] An additional dead pup was recovered during
the branding operations whose death was believed to be due to suffocation as a result of being
trapped in a crevice beneath another pup: this is being counted against the total number of
accidental mortalities allowed under their permit.

Seven pups died during branding operations in 2003. Six of the pups died while researchers were
on the rookery. Researchers attributed the cause of death for five of the pups to asphyxiation and

---

[7] Memo from D.P. DeMaster to Ann Terbush, dated July 25, 2001 regarding Steller sea lion pup mortality during
and after handling activity at Rogue Reef, Oregon.

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 49 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

terminal aspiration. The sixth pup died of aspiration of milk and asphyxiation post anesthesia. The seventh pup died of fulminant pulmonary edema caused by asphyxiation of cesspool fluids. This seventh pups apparently died before people were even on the island, perhaps as a result of the disturbance caused by the approach of researchers to the rookery. Only one of the seven pups was actually handled prior to death. The other pups died as an indirect consequence of the presence and actions of researchers on the rookery.

In their report to NOAA Fisheries, the researchers explain that the deaths of these pups "can be attributed to the most common problem faced on a rookery, the tendency for pups to pile up on each other when frightened. When this happens around even small pools of water with zero visibility it is impossible to know if a pup is in the pool without draining it. When it occurs while pups are being herded, a pup can suffocate within seconds.[8] As a result of the deaths in 2003, the holders of the permit modified their protocols to minimize the potential for recurrence of these types of research-related mortalities. In 2004 a single pup was reported to have died from asphyxiation following anesthesia.

*General Effects of Attaching Scientific Instruments*

In addition to the effects of capture and restraint described above, the attachment of an instrument can have both short- and long-term adverse effects. Possible chronic, short-term effects can include a reduction in foraging activity or an increase in grooming at the expense of other behaviors (Kenward 1987). These types of effects are likely present after most tagging events and may be as much a delayed result of the capture and handling as of the tag's presence.

Reactions of pinnipeds fitted with "crittercams" ranged from apparent curiosity about the instrument, to attempts to dislodge it, and aggressive reactions (Marshall 1998). Short-term effects can lead to acute problems for animals of various species: the presence of a tag has exacerbated capture shock and led to death in hares; the disturbance of tagging has resulted in desertion by incubating birds; abandonment or rejection of young in birds and ungulates was seen following tagging; and tagging may be enough to stop a dispersing animal from securing a territory, or push an animal over the brink of starvation when food is short (Kenward 1987).

The hydrodynamic drag created by the instrument can exert an additional energetic demand on an animal which could, over time, result in reduced foraging success, increased metabolic load, and resultant stress to the animal.[9]

The attachment of instruments to the hair with epoxy should not cause any pain if done properly, but may result in discomfort if the placement of the instrument causes pulling of the hair or skin as the animal moves. In addition, if the ratio of resin and catalyst is not correctly measured, the resultant exothermic (heat-producing) reaction can burn the animal's skin. Both the resin and hardener (catalyst) can cause skin irritation (itching, rashes, hives) and prolonged or repeated skin contact may cause sensitivity (itching, swelling, rashes). The low vapor pressure of the resin by itself makes inhalation unlikely in normal use. There is the possibility that an

---

[8] 2003 Annual Report for Permit No. 358-1564, submitted by ADF&G and on-file with NMFS Permits, Conservation and Education Division, Silver Spring, MD.

[9] from batched BiOp for 545-1562, 753-1599, etc. re: crittercam tags

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 50 of 95

**Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6**

instrument could be knocked or torn off, pulling out the hair and/or some of the underlying skin, which would then be open to infection.

*General Effects of Administering Drugs and Other Substances*

As with the other activities, the potential adverse affects of administering drugs in general are related to the effects of capture and restraint, as described above. In addition, because the blubber in some areas is not well vascularized, inadvertent injection of drugs into the blubber frequently results in aseptic necrosis, sometime leading to large abscesses (Fowler 1986). As a result, subcutaneous administration of drugs is usually problematic in marine mammals. There is the possibility of accidentally injecting drugs subdurally (beneath the dura matter, a fibrous membrane covering the central nervous system) when attempting to inject into the extradural vein (Stoskopf 1990).

*Effects of deuterium oxide injection:* Deuterium oxide administration with pre-and post-blood sampling is used to determine the energetic condition of the animal and is performed concurrent with bio-electrical impedance analysis. For this procedure, researchers would prepare a sea lion's skin with cleaning swabs of isopropyl alcohol or dilute povidone iodine:saline. As soon as possible after an initial blood sample (2 ml) has been taken, researchers inject a deuterium dose (0.07g x kg body mass + 10%) slowly deep into the muscle of the hip(s). The procedure is normally conducted after an animal has been sedated, but it can be performed with animals trained to experience it. A second blood sample is taken at 2 hours post injection. The proposed permit would allow the Sea Life Center to administer deuterium oxide or oxygen-18 once per month, up to twelve times per year.

Deuterium oxide is a stable, relatively non-toxic and naturally occurring isotopes. Up to 20-25% of body water can be replaced by deuterium oxide in mice before toxic effects are observed. The use of deuterium oxide increases the amount of time an individual animal must be handled due to the need for multiple blood samples prior to and after administration. Steller sea lions at the SeaLife Center would undergo deuterium oxide procedures while under anesthesia, thus reducing stress from repeated blood sampling. Sea lions at the SeaLife Center have previously been administered $D_2O$ up to every four months while under anesthesia with no adverse reactions (SeaLife Center Annual Reports 2002 - 2004). *Effects of lidocaine:* A surface anesthetic effect, e.g. loss of feeling or sensation, can be achieved by subcutaneous injection. Lidocaine hurts for several seconds to a minute following injection into the skin. Lidocaine can produce serious side-effects if injected intravascularly, and if accidentally swallowed, can cause convulsions.[10] The use of lidocaine with epinephrine is contraindicated as it may cause tachycardia (rapid heart rate). As a surface anesthetic, lidocaine is relatively safe, as evidenced by its available in a variety of over-the-counter topical preparations for relieving pain and itching in humans.

*Effects of valium:* The effects are dose-related, and cumulative. It is metabolized by the liver and excreted by the kidneys. Possible side effects include bradycardia (slowed heart rate), respiratory depression, tremor, confusion, photo-phobia, blurred vision, nausea, vomiting, depressed gag reflex, lethargy, and ataxia (inability to coordinate muscle activity during

---

[10] Lidocaine: adverse reactions. http://www.infomed.org/100drugs/lidotoc.html

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 51 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

voluntary movement). It should be used with caution in animals experiencing shock.[11] Injectable valium is irritating to the vein and tissue, and may cause pain during administration. It has a rapid onset when given intravenously.

*Effects of Injecting Evans blue dye*: Evans blue is a diazo dye used for determination of blood volume on the basis of dilution of a standard solution of the dye in plasma following intravenous injection. The dye binds to albumin in the blood stream and remains bound long enough to circulate and distribute in the entire plasma volume of the blood stream. Evans blue was carcinogenic in one study in rats when administered intraperitoneally, the only species and route tested. It produced sarcomas of the reticuloendothelial system in the liver.[12] This dye is considered a teratogen at high doses, which can cause abnormal prenatal development. However, although there are no references to the safety of this dye in Steller sea lions, this dye is currently used safely for numerous human medicine applications.

*Effects of Betadine*: Following contact with skin, a burning sensation and itching can occur. Severe complications are rare following application on intact skin.

## Effects of Bioelectric Impedence Analyses

Bio-electrical impedance analysis (BIA) measures an animal's composition by measuring the conductivity across electrodes placed on the skin or inserted under the skin. The procedure involves inserting four needles (two behind the skull and two near the tail), attaching leads to a BIA unit, and measuring the rate of the current between them. The procedure can also be performed using dermal surface electrodes that are not intrusive; however, this method has not been validated, so both methods must be used (needles and surface electrodes).

If animals are anesthetized, there would be no pain associated with the insertion of the needles. The insertion of needles does pose a risk of infection: bacteria or other infectious agents that may be present on the animal's skin or hair can be introduced under the skin. When performed by a qualified, experienced person using commonly accepted standards of good practice, these risks are likely negligible. However, the 2000 annual report for Permit No. 881-1443 (Alaska Sea Life Center) reported development of a subcutaneous abscess on a captive adult female Steller sea lion, apparently resulting from tissue necrosis induced by the focal electrical current at the site of a bioimpedence electrode implant. The abscess was opened for drainage and began to heal slowly over the next 5-6 months. However, a scab and area of granulation tissue then formed at the site and was treated with topical antibiotics for several months, resulting in a small area of scar tissue, which will likely remain hairless.Effects of enemas

## Effects of stomach intubation and enemas

In addition to the effects of capture and restraint, as described above, there is the risk of introduction of liquid into the trachea, initiating aspiration pneumonia or death when performing stomach intubation. There is also a risk of cross-contamination if equipment is not properly disinfected between animals. When performed by a qualified, experienced person using commonly accepted standards of good practice, these risks are likely negligible.

---

[11] http://www.kcmetro.cc.mo.us/pennvalley/emt/diazep.htm

[12] Animal carcinogenicity data. http://193.51.164.11/htdocs/Monographs/Vol08/EvansBlue.html

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 52 of 95

**Civ. No. 05-1392      Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.          Exhibit 6**

Any time a foreign object is inserted into the rectum there is the possibility of perforation, which can lead to peritonitis that may result in death. When performed by a qualified, experienced person using commonly accepted standards of good practice, these risks are likely negligible. As animals must be restrained for this procedure, and are usually chemically restrained, the risks associated with capture and restraint are also associated with this procedure.

### Effects of surgical implant of instruments

In addition to the effects of capture and restraint, as described above, there is a risk of infection and mortality associated with making an incision into the peritoneum. The surgery itself will not result in pain as the animals will be anesthetized. However, a certain amount of post-operative pain and discomfort is likely due to trauma associated with incisions through the abdominal wall. Any pain or discomfort associated with the surgery or subsequent wound healing may adversely affect an animal's ability to forage or escape predation. However, for animals held in captivity during wound healing, both infections and post-operative pain can be treated with appropriate antibiotics and analgesics.

### Effect of removal and temporary (90-day) captivity of juveniles

The "transient" juvenile program at the ASLC, which began with the capture of 2 animals in 2003, was the first of this type of program authorized by NOAA Fisheries for threatened and endangered Steller sea lions. NOAA Fisheries considered the possible effects of this activity before authorizing the program. In general, NOAA Fisheries assumed that the animals removed from the wild and held in temporary, but prolonged captivity, would either suffer reduced fitness (either in the form of reduced body condition or behavioral deficiencies that would affect survival) or they would leave the ASLC in better body condition than their free-ranging cohorts because of access to more food during captivity.

The ASLC removed 12 juvenile sea lions from the wild into their facilities between August 2003 and December 2004 for the "transient juvenile" program. ASLC released and followed all of the animals via satellite tags for at least several weeks. While this demonstrates that ASLC can successfully capture, maintain, and sample sea lions for up to three months, it does not establish whether such activities have adverse or beneficial effects on the individual sea lions held captive. ASLC handled the sea lions and conducted various sampling protocols, including many of the procedures described previously, each with some risk of adverse effects.

Three stranded Steller sea lion pups retrieved from Año Nuevo Island, California, and housed in the Marine Mammal Center for about 10 months, for later release in the wild appeared to make remarkable recovery and transition back into the wild (Lander and Gulland 2003). Although a small sample size from which to draw inferences, time-depth records were attached to the dorsal fur of the three pups enabling researchers to track their movements up to 3 months, post release. The largest of the three pups exhibited grater diving capabilities relative to the other two pups, which led researchers to speculate that the excess weight gain during captivity may have provided this individual with supplemental energy and a slight advantage over wild counterparts. Even so, the sample size is too small to draw inferences about the recovery and reintegration of animals released by ASLC following 3 months of holding. Presumably, a rehabilitation program would significantly limit handling time to avoid acclimation of animals to the artificial

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 53 of 95

Civ. No. 05-1392      Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.          Exhibit 6

environment, where as the ASLC is a laboratory program that allows and promotes significant testing and handling.

The proposed permit authorizes the expansion of ASLC's transient juvenile program. ASLC would be authorized to take up to 16 juvenile Steller sea lions per year for temporary holding (up to 3 months). Since the permit does not allow ASLC to hold more than 4 animals at a time, then 4 separate capture events would be necessary to retrieve a total of 16 animals from the wild. We discussed the effects of capturing and restraining wild Steller sea lions previously. We expect that the stress associated with prolonged and repeated handling would be particularly great for the animals held in captivity, relative to wild animals that are left alone in their natural habitat after a few hours. The program allows for repeated sampling over the course of the animal's captivity. We discussed many of the same sampling procedures authorized for these animals previously (see above discussion and also Appendix A, Table A-3). Two additional procedures proposed for temporary captive animals are discussed below.

*Adrenocorticotropic hormone (ACTH) challenge.* ACTH administration is standard means of determining adrenal function in both humans and animals. Veterinarians and human physicians routinely use both stimulating protocols. These stimulations do not require hospitalization for humans or over-night holding in the case of veterinary patients. Blood sampling during these studies would be conducted while the animals are under gas anesthesia to the maximum extent possible and a catheter would be used to facilitate multiple blood samples. A veterinarian would closely monitor animals during anesthesia. Husbandry staff would closely monitor animals during dry holding time and would respond appropriately to any stress or discomfort the animals may have. The proposed permit would allow the ASLC to perform studies over a two hour period on up to 8 animals per year.

The ASLC has conducted the ACTH procedure previously on the three adult sea lions. According to the 2002 and 2003 Annual Reports, the animals had no negative reactions to the anesthesia-facilitated blood sampling, and females ate and behaved normally while confined in a cage for fecal sampling.

*Manipulate diet and induce fasting.* The study procedure consists of feeding different suites of prey that are generally rotated basis. Between each trial, ASLC staff will measure the animal's a condition (body measurements, deuterium oxide and BIA analysis, standard blood chemistry, and assessment of assimilation efficiency) to determine how the prey suite has affected them over the trial period. ASLC would conduct pulse feedings to determine how blood chemistry and fatty acid profiles in blubber change with changing diet. Diets may also be varied for these animals. ASLC has conducted similar diet experiments and the sea lions appeared to have adapted to new diets and prey items without negative effect (SeaLife Center Annual Reports 2000 – 2004).

### Effects of the Action on Critical Habitat

Some of the proposed research activities will occur within designated critical habitat for Steller sea lions, but the research is not expected to adversely affect any of the physical, chemical, or biotic features that form and maintain critical habitat. The proposed research would not affect population ecology, or population dynamics of pre species, predators, or competitors of Steller sea lions. At best incremental and transient disturbances are anticipated from disturbances

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 54 of 95

Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6

increased human presence. For the most part, we do not expect that changes in prey distribution would be measurable even for the short period of time researchers may be in designated critical habitat. As a result, the proposed permits are not likely to adversely affect critical habitat that has been designated for Steller sea lions and is not addressed further.

## Cumulative Effects

Cumulative effects include the effects of future state, local, or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultations pursuant to section 7 of the ESA. Past and present impacts of non-federal actions are part of the environmental baseline discussed previously. Some of the future state, local, and private actions discussed below were discussed previously as part of the environmental baseline because the effects of these actions have occurred in the past, and to the best of our knowledge will continue into the future. We do not restrict our environmental baseline analyses to impacts that occurred only in the past and present, particularly where certain activities and their impacts are expected to continue into the foreseeable future. Nevertheless, to offer greater clarity to the reader we reiterated the effects of these continuing actions below.

*Subsistence Harvest.* We considered subsistence harvest of Steller sea lions by Alaska natives previously under the *Environmental Baseline*, and we expect these activities to continue into the foreseeable future. ADF&G documents subsistence harvest, in part through surveying Alaskan natives. Estimates by Wolfe and Mishler (1996) indicate a mean annual subsistence harvest of animals from the western population between 1992 and 1995 of 448 animals. Harvest has decreased since this period, although harvest during 2003 was the highest on record in the past ten years (Wolfe et al. 2003). In the past, the great majority (99%) of the statewide subsistence take was from west of 144W long. (i.e., the range of the western population). The overall future impact of the subsistence harvest on the western population will be determined by the number of animals taken, their sex and age class, and the location where they are taken. Subsistence harvest of Steller sea lions is not authorized in any other parts of the action area.

*State Commercial Fisheries.* We considered the effect of State commercial fisheries on Steller sea lions from both the western and eastern DPS under the *Environmental Baseline* of this opinion. We expect these activities to continue into the foreseeable future. In comparison with federal authorized fisheries, the state fisheries are generally small, such that anticipated effects would generally be proportional to the harvest. However, we analyzed the effects of state and federally authorized commercial fisheries together as part of the *Environmental Baseline*. There is a reasonable expectation that the State of Alaska will expand their management of groundfish fisheries within state waters given their recent proposals that have been reviewed by NOAA Fisheries Service (e.g., Aleutian Islands pollock and Pacific cod). It is unclear at this time how or whether these changes in the management of Alaska groundfish fisheries will affect Steller sea lion populations. At present, we know of no changes in other state fisheries that would alter the level of impact these fisheries are collectively having on Steller sea lions. Therefore, at a minimum, we expect that current impacts from commercial fisheries will continue into the foreseeable future, such that several fisheries, particularly the pollock and cod fisheries will compete with foraging Steller sea lions, and contribute to their nutritional stress. The fisheries

52

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 55 of 95

**Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6**

may reduce the abundance of prey within marine foraging areas and would alter the distribution of groundfish prey in ways that would reduce the effectiveness of foraging sea lions.

*Sport and Subsistence/Tribal Fisheries.* Relative to commercial fisheries, we expect that sport and tribal/subsistence fisheries have an incremental effect on listed Steller sea lions. For perspective, Alaska's sport fishery harvests about 1% (4,000 mt) and subsistence fishery harvests 2% (8,000 mt) of the annual State of Alaska total fish harvests, while the commercial fisheries accounted for 97% (900,000 mt) of the annual harvest in 1998. The actual effect these fisheries have on Steller sea lions is likely incremental, particularly in comparison to commercial fisheries. Impacts are likely limited to minor removals of the potential foraging base, but in such small volumes that we expect only incremental adverse effects, if any. However, we expect any increases would continue in relatively low amounts in the future. The nature of these fisheries is slow removal rates and dispersed catch. Other effects from these activities may include general human disturbance as more fishers recreate in remote areas that are occupied by Steller sea lions. In general, sport and subsistence fisheries are expected to continue into the foreseeable future throughout the action area and may increase in the future as tourism and population increases.

*Population Growth and Development.* In general, we expect that the populations of coastal states within the action area would increase in the foreseeable future. For each state, this suggest recreational activities, including sport fishing will experience growth as well. In Alaska, subsistence harvest would likely increase in relation to population increases. To bolster population declines, like in the Aleutians, the state of Alaska has begun to develop local fisheries. For example, the state would to see the development of a community in Adak, to help accomplish this the state has implemented a local Adak Pacific cod fishery where vessels fishing under the federal TAC would be excluded by size in order to allow the local small boat fleet to harvest the TAC in that area. This effectively takes management control away from the federal government, concentrates catch inside of state waters (out to 3 miles), and focuses the dependence of specific coastal communities on a resource which may not be available in the future. This system may put severe pressure on fishery managers in the future to enact regulations that provide for near-shore fisheries. At present, however, there are a significant number of hurdles to such modifications, such that we have not considered the impact of these modified fisheries because we do not believe they are "reasonably certain to occur" for purposes of this assessment.

In general, however, as the size of human communities increase, there is an accompanying increase in habitat alterations for housing, roads, commercial facilities, and other infrastructure. The impact of these activities on pristine landscapes and the biota they support increases as the size of the human population expands. As terrestrial plant communities and coastal areas are destroyed, modified, or fragmented for the construction of human communities, native plants and animals are displaced, and can become locally extinct.

As the human population expands (as is expected in particular around major cities), the risk of interactions between people and listed species increases. For instance, Steller sea lions typically haul out on offshore rocks and islands; however, in some areas they have adopted man made structures (e.g., jetties) as haul out habitat. The south jetty at the mouth of the Columbia River is such a location and is routinely used by several hundred Steller sea lions in addition to similar numbers of California sea lions.

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 56 of 95

Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6

Steller sea lions also occasionally forage in estuaries and the mouths of rivers along the west coast. Many of these estuary areas are also developed as marine terminals for shipping and boat moorage. The lower river reaches and estuaries are kept in navigable condition by maintenance dredging. Noise from dredge operations may cause temporary behavioral avoidance by Steller sea lions in the vicinity of the activity.

## Integration and Synthesis of Effects

Steller sea lions are protected pursuant to the ESA, as two distinct population segments. While their use of some areas may overlap, they are distinguished by whether they occur west or east of 144° W longitude. Animals east of 144° W are part of the eastern DPS, which is listed as threatened, and animals west of 144° W are part of the western DPS, which is listed as endangered. Fisheries, subsistence harvest, climate change, increased predation by killer whales and sharks, historic legal and now illegal shooting, and altered prey base (e.g., reduced biomass, changes in availability and nutritional value) are a few of the factors that may have led to current low levels of Steller sea lions from both populations, and some of the factors that continue to impact current populations. Much speculation has surrounded the animal and the causes of its precipitous decline in the 1970s and the reasons for their continued decline in the 1980s. When in 2000 NOAA Fisheries issued a finding that the commercial fisheries posed a threat to the recovery of Steller sea lions, the controversy seemed to reach a pinnacle. Congress responded with a sizeable increase in funding for Steller sea lion research activities so that NOAA and others could "produce the science and data to keep the fisheries open while protecting the sea lion population." With this increase in funding, NOAA received about a four-fold increase in requests for research permits for studies on Steller sea lions from both the western endangered DPS and the eastern threatened DPS. The first of these "new" research permits were issued in 2002, and this biological opinion analyses the effects of the second batch of research permits since the renewed interest in this species.

Of the two populations, the eastern population appears to be stable to slightly increasing, although it is still unclear why this population did not decline as much as the western population and why it appears to be recovering at a faster rate. The endangered western population of Steller sea lions, while it still has a higher risk of extinction in the foreseeable future, has shown modest increases in recent years. Both populations may now face threats that are different from the ones that caused their initial decline. From the 1950s through the 1980s, animals in both populations were killed intentionally and unintentionally by fishers, in commercial harvests, and in subsistence harvests which may have begun to destabilize the population. These harvests, however, appears to have disproportionately affected the western population. The harvest of over 45,000 pups from 1963 to 1972 probably changed the number of animals that recruited into the adult, breeding population in that region and contributed to local population trends in the 1960s through the early 1980s in the Gulf of Alaska and the eastern Aleutian Islands. Similarly, subsistence harvests prior to the 1990s were not measured but may have contributed to population decline in localized areas where such harvests were concentrated. The measurement of subsistence harvest began in 1992, and showed that natives were harvesting a modest number of animals from the western population. Current estimates indicate about 200 animals are harvested from the western population each year.

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 57 of 95

Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6

Predation may have shifted over the years, although this too is subject to considerable debate among scientists. One hypothesis, presented by Springer *et al.* (2003) is that killer whale predation of Steller sea lions increased in response to depleted whale populations post World War II, and this drove current pinniped declines. Others dispute this assertion. While their role in the initial decline is in dispute, the role of killer whales as a predator of at least some Steller sea lions is not. Roughly 20% of sea lion mortality is attributed to killer whales and other top predators like sharks (Loughlin and York 2001).

Commercial harvest of Steller sea lions is no longer permitted by law, but large harvests were likely a contributing factor in the decline of the population to its current levels. Today, no mortalities are attributed to commercial harvest. Some level of mortality occurs due to direct, illegal activities like shooting, but no population wide estimates are available.

Estimates suggest incidental mortality attributed to known stressors like fisheries has declined significantly in recent years. The total estimated incidental catch of Steller sea lions during 1966 to 1988 in foreign and joint-venture trawl fisheries operating off of Alaska was over 20,000 animals (Perez and Loughlin 1991). As fisheries have declined, the estimated level of incidental mortalities has also continued to decline. Additionally information from satellite tagged animals suggests that Steller sea lions rarely go beyond the U.S. EEZ into international waters (NMFS 2005). As a result the current estimate of incidental mortality of Steller sea lions in the western population attributed to commercial fisheries is 31 animals per year and insignificant numbers taken in commercial fisheries in international waters (NMFS 2005). The estimated mean annual mortality from stranding from entanglement in fishing gear is less than one animal each year (NMFS 2005). The current estimate of incidental mortality of Steller sea lions in the eastern population attributed to commercial and tribal fisheries is 4 animals per year (includes estimates of mortality from entanglement from fishing gear; NMFS 2005). We expect that this represents a minimum estimate of mortality that would continue into the future. These estimates do not factor in the indirect impacts that fishing has on Steller sea lion populations, not the least of which is the altered distribution of forage species.

Disturbance from other human activities likely results in a range of responses from individuals, from simple behavioral responses and low level transient displays of agitation to more extreme responses the evacuation of suitable habitat. When the latter occurs, individuals, particularly pups may be injured or killed. The extent to which these types of incidences influence mortality rates in a population or breeding aggregation is not clear. In the face of this uncertainty, we cannot assume that mortality from these events or events like random shootings of sea lions is inconsequential. Evidence suggests it has occurred in the past, and will continue into the future.

The status of the Steller sea lion populations remains well below historic levels. However, evidence suggests that the western population is increasing, and increases in the number of animals in the eastern population have been apparent for some time. The increase in the western population, while only recent, gives us modest hope that the population is on the road to recovery. Presently, however, it is far too soon to tell if this is in fact the case. The review of literature in the Environmental Baseline indicates that a number of factors continue to adversely affect Steller sea lions, such that recent upswings in the western population numbers represent little bright spots in an otherwise uncertain future. Certainly, the longer time series does not support the conclusion that this population is on an upward trend. In fact, a great deal of

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 58 of 95

**Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6**

uncertainty surrounds the future prospects of this population, and some of the breeding aggregations. There remains so much we don't know. For instance, mortality from known sources accounts for only about 1/5 losses witnessed between 1985 and 1989 (NRC 2003), such that a significant amount of past mortality remains unaccounted for.

As such, more research is necessary to describe linkages between changes in the environment and to better describe the dynamics of Steller sea lion populations. Distinguishing between anthropogenic and environmentally-driven stressors that influence the population's past is necessary in order to understand and predict the future of the populations, and to predict the effect of management strategies. Even so, the research activities themselves may lead to sometimes severe consequences for an individual, the breeding aggregation, and even the populations they compromise.

Studies of natural populations generally have unpredictable effects on the populations that are being studied. Research itself can pose a risk of killing or serious injuring wild animals while they are captured and restrained. Intrusive research, such as muscle and blubber biopsies, hot-branding, or use of stomach tubes to collect stomach contents, increase the risk of severe stress responses and infection for animals, and increase the risk of mortality. The annual reports from more than a decade of study suggest that the adverse effects of research activities have not affected either Steller sea lion population or any particular rookeries or haulouts, although individual animals have been adversely affected or killed. For example, in 1998, 48,000 Steller sea lions were disturbed by these investigations, 384 pups were captured, tagged, and branded, but no mortalities were reported. In 1997, 31,150 Steller sea lions were approached by these researchers, 14,550 were disturbed, 137 were captured, and 121 were tagged, but there were no known mortalities. The results of the studies conducted in 1996 followed a similar pattern, although there was 1 mortality (which equates to 0.002% of the animals approached or 0.007% of the animals disturbed). In 1995, 7,500 Steller sea lions were disturbed, but there were no mortalities.

The aerial surveys could effectively disturb every animal in both the eastern and western populations of Steller sea lions several times throughout the year, although best available information suggestions that generally only a small fraction of an aggregation responds to these stressors through flight. Of greater concern are the activities that cause entire aggregations to startle, flee, and even stampede. Unfortunately, research activities conducted on Steller sea lions for more than two decades have not collected or reported detailed information on the responses of the sea lions to the various procedures that would make it possible to assess the individual and collective effects of these research activities on the population ecology of Steller sea lions. Since animals may die from infection caused by intrusive research days to weeks after a procedure (for example, deaths from capture myopathy can occur 7 to 14 days or more following a capture event), we would need information from longer-term monitoring to properly assess the effects of these research activities on Steller sea lions.

Less than 4,000 animals each year would be subjected to more intensive handling and sampling. These animals may experience varying degrees of pain in response to specific kinds of stimuli including trauma, heat, and corrosive chemicals. Because there is survival value in appearing not to experience pain, be damaged, or incapacitated in any way, it is not appropriate to assume a procedure is not painful to the animal simply because it does not appear to react. In addition,

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 59 of 95

Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6

marine mammals do not typically exhibit symptoms of disease until very late in the disease process, possibly because to appear weak or sick would make them more susceptible to •  predation. Instead, a disease process is usually fairly advanced before overt symptoms are evident. This means that not only might researchers be unlikely to observe injuries or infections resulting from research that may affect an animal's survival if they do not conduct adequate post-activity monitoring, they may not be able to tell from a cursory exam that an animal selected for handling is already ill in a way that would predispose them to adverse reactions to research activities.

The total number of accidental mortalities per year that would be authorized under all permits is not likely, in the absence of other sources of mortality, to contribute significantly to the decline or failure to recover of threatened or endangered Steller sea lions, assuming they would be distributed among both populations, both sexes, and all age classes. However, the potential sub-lethal affects associated with disturbance are also of concern. These sub-lethal effects include research activities that: (1) disrupt one or more behavioral patterns that are essential to an individual animal's life history or to the animal's contribution to a population, or both; and (2) have the potential for injuries that may manifest themselves as an animal that fails to feed successfully, breed successfully (which can result from feeding failure), or complete its life history because of changes in its behavioral patterns. Injury to an individual animal could be injurious to a population because the individual's breeding success will have been reduced.

The most commonly observed response of pinnipeds to disturbance is avoidance, where the animals move away from the source of the disturbance. It has commonly been assumed that animals are not affected, or only minimally affected, if they do not move away when human activities are occurring in close proximity. However, a recent study suggests that an animal's behavioral response to disturbance is also a function of a variety of factors including the quality of the site currently occupied, the distance to and quality of other suitable sites, the relative risk of predation or density of competitors in different sites, and the investment that an individual has made in a site (e.g., in establishing territory or gaining dominance status). As a result, animals with no suitable habitat nearby may be forced to remain despite disturbance, and regardless of the consequences for their survival or reproductive success. Disturbance can result in stress that leads to a variety of neurochemical and hormonal changes with physiological consequences including suppression of the immune system and increased susceptibility to viral and bacterial diseases (Fair and Becker 2000). Disturbance can also result in increased agonistic behaviors that can result in injuries or death, and can lead to stress, which has been shown to decrease reproductive success or survival in a variety of mammals and invertebrates (Neuman 1999). It is not certain whether even short periods of physical exertion, as when disturbance results in increased vigilance, avoidance/escape, or agonistic behaviors, may have significant impacts on an individual's energy budget.

The research that has been conducted thus far has been assumed to have negligible short- and long-term effects on Steller sea lions populations, but that assumption has not been the subject of its own study. The best available information suggests that there is the potential for adverse physical and behavioral effects on individual Steller sea lions from the research activities that will result from the proposed permits. The proposed research activities are expected to result in the accidental death of approximately 42 threatened and 18 endangered Steller sea lions each year over the next five years. Based upon past reported mortalities, the permitted number of

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 60 of 95

Civ. No. 05-1392      Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.            Exhibit 6

mortalities seems considerably higher than would likely occur provided researchers maintain at least the same diligence in the field as they have in the past. Numbers of sea lions authorized for disturbance during ground surveys is similar to the numbers reported as disturbed in 2003 and 2004. In 2003 a total of 7 mortalities occurred during research activities, and 4 mortalities occurred in 2004 (2 from each population). Even though authorized numbers of mortalities seem high based on past reports, we are compelled to evaluate the effects of the federal action. This federal action authorizes up to 18 incidental mortalities from the western population and 42 from the eastern population. If we add the loss of 16 juveniles from the western population (assuming the animals held in prolonged, but temporary captivity die rather than integrate back into the wild population) then a conservative estimate is that no less than 24 animals from the western population will die as a result of the proposed research. Based on reported mortalities and the age-classes handled, we expect that the vast majority of animals that die will be juveniles. No less than 16 of the animals we assume will die are from the juvenile age-class. It is reasonable to believe, based on our analysis of the effects of the action, in particular disturbance events that involve researcher activity on rookeries and haulouts, some other unknown portion of animals will die from disturbance through trampling or latent effects of stress, and their deaths will remain undetected. Given the uncertainty around the latent impacts of research, we cannot assume that there is significant mortality from these impacts. At the same time, we cannot assume that latent effects of research would not reduce numbers of Steller sea lions at a site. To date, there as been too little follow-up or long term monitoring to establish any long term effects of this research program.

By killing about 24 Steller sea lions each year in the western population and 42 each in the eastern population, the proposed permits would reduce the numbers of Steller sea lions. Although the mortalities associated with the permits and research activities would reduce the numbers, and may even reduce the reproduction of endangered Steller sea lions and also threatened Steller sea lions, the "jeopardy" standard requires us to consider those effects on the species' survival and recovery in the wild. Specifically, we must determine whether the reductions in a species' reproduction, numbers or distribution would be expected to appreciably reduce a species; likelihood of surviving and recovering in the wild. Because natural or other stochastic or environmental factors would cause variations in the numbers of juvenile Steller sea lions reaching maturity each year, the small loss in juvenile animals associated with the proposed research would be masked by natural mortality. We expect this reduction in numbers is small enough such that there would not be any appreciable reduction in the likelihood of the survival and recovery of either the western or eastern DPS of Steller sea lion. Based on the limited information available on the short- and long-term effects of these research activities on Steller sea lions, we must conclude that population-level adverse effects are not likely. There has been no evidence that the research conducted over the past several years has resulted in population-level impacts that would have accelerated the rate of population decline.

### Conclusion

After reviewing the current status of the endangered western population of Steller sea lions, the threatened eastern population of Steller sea lions, the environmental baseline for the action area, the effects of the proposed research program, and the cumulative effects, it is NOAA Fisheries' biological opinion that the research program, as proposed, is not likely to jeopardize the

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 61 of 95

**Civ. No. 05-1392**      **Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.**      **Exhibit 6**

continued existence of the endangered western population of Steller sea lions or the threatened eastern population of Steller sea lions. Critical habitat for this species has been designated for listed Steller sea lions, however, the proposed action is not expected to affect that area and no destruction or adverse modification of that critical habitat is anticipated.

## Incidental Take Statement

Section 9 of the Act and Federal regulation pursuant to section 4(d) of the ESA prohibit the take of endangered and threatened species, respectively, without special exemption. Take is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct. Harm is further defined by NOAA Fisheries to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering. Harass is defined by FWS as intentional or negligent actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding, or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the Act provided that such taking is in compliance with the terms and conditions of this Incidental Take Statement.

NOAA Fisheries is not including an incidental take statement that exempts take incidental to the proposed permits from the section 9 prohibitions. The proposed section 10(a)(1)(A) permits exempt any purposeful or incidental take associated with the proposed research from the section 9 prohibitions; since that take will already be exempt, an additional exemption through an incidental take statement is unnecessary.

## Conservation Recommendations

Section 7 (a)(1) of the ESA directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations are discretionary agency activities designed to minimize or avoid adverse effects of proposed actions on listed species or critical habitat that has been designated for them, help implement recovery plans or recovery actions, or to develop information that would effect better management decisions in the future.

This biological opinion concluded that the proposed actions are not likely to jeopardize the continued existence of the threatened eastern population of Steller sea lions or the endangered western population of Steller sea lions.

1.    To minimize impacts of pup counts, NOAA Fisheries should condition the proposed permits so that researchers:

   a.    will not survey until the end of the pupping season (late June or later), after mother-pup bonds are well established;

   b.    will minimize the time that they are occupying the beach ($\leq$ 2 hours for counting, $\leq$ 5 hours if capturing 50 pups for measuring and weighing); and

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 62 of 95

**Civ. No. 05-1392     Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.          Exhibit 6**

   c.    will use biologists experienced in herding to slowly move the adults out of the way, and experienced counters to complete the surveys as quickly as possible.

2.    To minimize the potential negative impacts of pup handling activities, NOAA Fisheries should condition the proposed permits so that the researchers should:

   a.    process pups in small groups (10-20), allow animals to rest before handling, and animals showing signs of distress must be released; and

   b.    restrain pups by hand, without using either a restraint board or drugs and minimize handling time.

3.    To minimize the effects of research activities and on populations and aggregations, and to ensure research activities net a maximum amount of useable information for discerning impacts on Steller sea lions, NOAA Fisheries should condition permits so that researchers:

   a.    capture, handle, and conduct studies of basic biology and physiology on relatively "healthy" aggregations and/or populations, and

   b.    researchers are using comparable methods for like tests and activities, so that data can be compiled across the range of similar studies (meta-analysis)

In order to be exempt from the prohibitions of section 9 of the ESA, NOAA Fisheries must comply with the following terms and conditions, which implement the reasonable and prudent measures described above and outline required reporting/monitoring requirements. These terms and conditions are non-discretionary:

1.    NOAA Fisheries should condition the proposed permit so that survey aircraft should be flown at slow speeds (100-150 kts), at an altitude of 150-200 m, and close offshore (500 m).

2.    NOAA Fisheries should condition the proposed permits so that, when investigators are conducting behavioral and demographic observation and remote monitoring stations, they should monitor and observe sea lions from viewpoints that do not harass animals.

3.    In the event that a female dies or is seriously injured as a result of the activities, the orphaned pup(s) should be provided for humanely (i.e., salvaged [placed in a Stranding facility for eventual release], or if salvage is not possible, euthanized). Pups humanely euthanized should count against the total number of animals authorized for accidental mortalities.

4.    NOAA Fisheries should condition the proposed permits to require permit holders to exercise caution when approaching all pinnipeds, particularly mother/pup pairs, and to terminate efforts to approach and handle a particular animal or mother/pup pair if there is any evidence that the activity may be life threatening or interfering with the animals' vital functions.

5.    NOAA Fisheries should condition the proposed permits to require the permit holders to coordinate research authorized herein with other researchers conducting the same or similar studies on the same species and in the same locations

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 63 of 95

**Civ. No. 05-1392      Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.                    Exhibit 6**

6.    Annual Report - Each year that the permit is valid, NOAA Fisheries should require permittees to submit an annual report by December 31, describing the specific activities that have been conducted. At a minimum, the annual report should include:

    a.    *in tabular form*, the: species, activities, numbers of animals, age class/gender, numbers of times each activity was performed on each animal, and specific locations of takes.

    b.    *in narrative form*:

        i.    A reiteration of the objectives and how the results of the research pertain to or further these research goals.

        ii.    A description of the animals' reactions to the activities.

        iii.    An indication as to when or if any results have been published or otherwise disseminated during the year.

        iv.    A description of the activities planned for the forthcoming year, and steps that have been or will be taken to coordinate the research activities with that of other researchers.

7.    Final Report - Permittees should submit final reports within 120 days after completing their research. These reports should include:

    a.    A reiteration of the objectives and a summary of the results of the research and how they pertain to or further the research goals stated in the permit application;

    b.    An indication, to the extent possible, of where and when the research results will be published; and

    c.    A final table similar to the ones provided in the Annual Reports, summarizing *ALL* takes for the entire permit.

8.    All reports, and any papers or publications resulting from the research authorized by the proposed permit should be submitted to the Chief, Permits Division, Office of Protected Resources, NOAA Fisheries, 1315 East-West Hwy., Suite 13705, Silver Spring, MD 20910.

In order for NOAA Fisheries to be kept informed of actions minimizing or avoiding adverse effects or benefiting listed species or critical habitat that has been designated for them, NOAA Fisheries request notification of the implementation of any conservation recommendations.

## Reinitiation Notice

This concludes formal consultation on NOAA Fisheries' proposal to issue research permits to the National Marine Mammal Laboratory and others pursuant to the provisions of section 10 of the Endangered Species Act and Marine Mammal Protection Act. As provided in 50 CFR §402.16, reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion; (3) the agency action is subsequently modified in a manner that causes an effect to the

listed species or critical habitat not considered in this opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action. In instances where the amount or extent of incidental take is exceeded, section 7 consultation must be reinitiated immediately.

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 65 of 95

Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6

## Literature Cited

Alaska Sea Grant. 1993. Is it Food? Addressing Marine Mammal and Seabird Declines. Workshop Summary. Alaska Sea Grant Report 93. 29 pages.

Alverson, D.L. 1992. A review of commercial fisheries and the Steller sea lion (Eumetopias jubatus): The conflict area. Reviews in Aquatic Sciences 6: 203-256.

Anderson, P.J., J.E. Blackburn, and B.A. Johnson. 1996. Declines of forage species in the Gulf of Alaska, 1972-1995, as an indicator of regime shift. Pages 531-544 in Proceedings of the Forage Fishes in the Marine Ecosystems Symposium. Alaska Sea Grant College Program.

Anderson, P.J. and J. F. Piatt. 1999. Community reorganization in the Gulf of Alaska following ocean climate regime shift. Marine Ecology Progress Series 189: 117-123.

Anderson, J.J. 2000. A vitality-based model relating stressors and environmental properties to organism survival Ecological Monographs 70(3): 445-470.

Australian Antarctic Division. 2000. Marking elephant seals: Fact Sheet Available at http://www.aad.gov.au/default.asp?casid=1825

Barrett-Lennard L.G., K. Heise, E. Saulitis, G. Ellis, and C. Matkin. 1995. The impact of killer whale predation on Steller sea lion populations in British Columbia and Alaska. University of British Columbia, Fisheries Centre, 2204 Main Mall, Vancouver, B.C. V6T Iza. 71 p.

Barron, M.G., R. Heintz, M.M. Krahn. 2003. Contaminant exposure and effects in pinnipeds: implications for Steller sea lion declines in Alaska. The Science of the Total Environment 311(2003): 111-133.

Beamish R.J. 1993. Climate and exceptional fish production off the west coast of North America. Canadian Journal of Fisheries and Aquatic Sciences 50:2270-2291.

Beckmen, K.B., L.K. Duffy, X. Zhang, K.W. Pitcher. 2002. Mercury concentration in the fur of Steller sea lions and northern fur seals from Alaska. Marine Pollution Bulletin 44(2002): 1130-1135.

Benson, A.J., and A.W. Trites. 2002. Ecological effects of regime shifts in the Bering Sea. Fish and Fisheries 3:95-113.

Bickham, J.W., J.C. Patton, and T.R. Loughlin. 1996. High variability for control-region sequences in a marine mammal: implications for conservation and biogeography of Steller sea lions (Eumetopia jubatus). J. Mammal. 77:95-108.

Brandon, R.N. 1978 Adaptation and evolutionary theory. Studies in History and Philosophy of Science 9(3):181 - 206.

Brandon, E.A.A. 2000. Maternal investment in Steller sea lions in Alaska. Ph.D. dissertation, Texas A&M University, Galveston. 144 pages.

Braham, H. W., R. D. Everitt, and D. J. Rugh. 1980. Northern sea lion population decline in the eastern Aleutian Islands. Journal of Wildlife Management 44:25-33.

Brodeur, R.D., and D.M. Ware. 1992. Long-term variability in zooplankton biomass in the subarctic Pacific Ocean. Fisheries Oceanography 1: 32-38.

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 66 of 95

**Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6**

Burek, K.A., F.M.D. Gulland, G. Sheffield, K.B. Beckmen, E. Keyes, T.R. Spraker, A.W. Smith, D. E. Skilling, J.F. Evermann, J.L. Stott, J.T. Saliki, and A.W. Trites. 2000. Disease agents in Steller sea lions in Alaska: a review and analysis of serology data from 1975-2000. Fisheries Center Research Report 11(4). 26 pages. The Fisheries Centre, UBC, Vancouver, BC.

Burek, K.A., F.M.D. Gulland, G. Sheffield, K.B. Beckmen, E. Keyes, T.R. Spraker, A.W. Smith, D. E. Skilling, J.F. Evermann, J.L. Stott, J.T. Saliki, and A.W. Trites. 2005. Infectious diseases and the decline of Steller sea lions in Alaska (Eumetopias jubatus) in Alaska, USA: Insights from serologic data. Journal of Wildlife Diseases 41(3): 512-524.

Byrd, G.V., J.C. Williams, and R. Walder. 1992. Status and biology of the tufted puffin in the Aleutian Islands, Alaska after a ban on salmon driftnets. U. S. Fish and Wildlife Service, Alaska Maritime National Wildlife Refuge, Aleutian Islands Unit, PSC 486, Box 5251, FPO AP 96506-5251, Adak Alaska.

Calkins, D.G. and K.W. Pitcher. 1982. Population assessment, ecology and trophic relationships of Steller sea lions in the Gulf of Alaska. Pages 445-546 in Environmental assessment of the Alaskan continental shelf: final reports of principal investigators. U.S. Dept. Comm., NOAA.

Calkins, D.G. 1985. Steller sea lion entanglement in marine debris. Pages 308-314 in R.S. Shomura and H.O. Yoshida, editors. Proceedings of the workshop on the fate and impact of marine debris, 27-29 November 1984, Honolulu, Hawaii. U.S. Dept. Commer. NOAA Tech. Memo. NMFS SWFSC-54.

Calkins, D.G., and E. Goodwin. 1988. Investigations of the decline of Steller sea lions in the Gulf of Alaska. Unpublished report. Alaska Department of Fish and Game. 76 pages.

Calkins, D.G., E.F. Becker, T.R., Spraker, and T.R. Loughlin. 1994. Impacts on Steller sea lions. Pages 119-139 in T.R. Loughlin, editor. Marine mammals and the Exxon Valdez. Academic Press, San Diego, CA.

Calkins and Becker. 1990. Assessment of injury to sea lions in Prince Williams Sound and the Gulf of Alaska: marine mammal study No. 4: preliminary status report for April through November 1990. Draft. November 27, 1990.

Chumbley, K., J. Sease, M. Strick, and R. Towell. 1997. Field studies of Steller sea lions (Eumetopias jubatus) at Marmot Island, Alaska, 1979-1994. U.S. Dept. Commer. NOAA Tech. Memo. NMFS-AFSC-77.

Day, G.I., Schemnitz, S.D., and Taber, R.D. 1980. Capturing and marking wild animals. In S.D. Schemnitz, editor. Wildlife Management Techniques Manual. Fourth Edition. The Wildlife Society, Washington, D.C.

Dierauf, L.A. 1990. Pinniped husbandry. Pages 553- 590 In L.A. Dierauf, editor. Handbook of Marine Mammal Medicine: Health, Disease, and Rehabilitation. CRC Press, Inc. Boca Raton, FL

Dillingham, P.W. J.R. Skalski, and K.E. Ryding. 2005. Fine-scale geographic interactions between Steller sea lion (Eumetopias jubatus) trends and local fisheries. Canadian Journal of Fisheries and Aquatic Sciences 63:107-119.

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 67 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

Ebbesmeyer, C.C., D.R. Cayan, D.R. McLean, F.H. Nichols, D.H. Peterson, and K.T. Redmond. 1991. 1976 step in the Pacific climate: forty environmental changes between 1968-1975 and 1977-1984. Pages 115-126 in J.L. Betancout and V.L. Tharp, editors. Proc. Seventh Annual Pacific Climate (PACLIM) Workshop, April 1990. Edited by the California Department of Water Resources. Interagency Ecological Study Program Technical Report No. 26.

Fair, P.A. and Becker, P.R. 2000. Review of stress in marine mammals. Journal of Aquatic Ecosystem Stress and Recovery 7: 335-354.

Ferrero, R.C., and L.W. Fritz. 2002. Steller sea lion research and coordination: a brief history and summary of recent progress. U.S. Dept. of Commer. NOAA Tech. Memo. NMFS-AFSC-129. 34 pages.

Fowler, M.E. 1978. Zoo and Wild Animal Medicine, 2nd Edition. W.B. Saunders Company, Philadelphia.

Fowler, M.E. 1986. Zoo and Wild Animal Medicine. W.B. Saunders Company, Philadelphia.

Francis, R.C., and S.R. Hare. 1994. Decadal-scale regime shifts in the large marine ecosystems of the Northeast Pcific: a case for historical science. Fisheries Oceanography 3: 279-291.

Frid, A. and L.M. Dill. 2002. Human-caused disturbance stimuli as a form of predation risk. Conservation Ecology 6(1):1-11.

Fritz, L. W., and C. Stinchcomb. 2005. Aerial, ship, and land-based surveys of Steller sea lions (Eumetopias jubatus) in the western stock in Alaska, June and July 2003 and 2004. NOAA Technical Memorandum NMFS-AFSC-153, Alaska Fisheries Science Center, Seattle, Washington.

Gales, N. 2000. A field review of the Macquarie Island elephant seal hot branding program: December 2000. A report prepared for the Antarctic Animal Ethics Committee.

Gage, L.J. 1993. Marine Mammals. In M.E. Fowler, D.V.M., editor in chief. Zoo and Wild Animal Medicine: Current Therapy, 3rd edition W.B. Saunders Co., Philadelphia.

Gee, H. 1998. The warmth of whiskers. Nature News Service. Available at: http://www.nature.com/nsu/981112/981112-6.html

Gentry, R.L. 1970. Social behavior of the Steller sea lion. Ph.D. Dissertation, University of California, Santa Cruz; Santa Cruz, CA.

Geraci, J., and J. Sweeney. 1986. Clinical techniques. In Zoo and Wild Animal Medicine, 2nd Edition. M.E. Fowler, editor. W.B. Saunders Co, Philadelphia.

Gerber, L.R., and G.R. VanBlaricom. 2001. Implications of three viability models for the conservation status of the western population of Steller sea lions (Eumetopias jubatus). Biological Conservation 102(2001): 261-269.

Hanski, I. 2002. Metapopulations in highly fragmented landscapes. Pages 86-108 in S.R. Beissinger and D.R. McCullough, editors. Population viability analysis. Chicago Press, Chicago.

Haulena, M., and Heath, R.B. 2001. Marine mammal anesthesia. In L.A. Dierauf and F.M.D. Gulland (editors) CRC Handbook of Marine Mammal Medicine, Second Edition. CRC Press, Inc. Boca Raton, FL

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 68 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

Härkönen T., and K.C. Harding 2001. Spatial structure of harbour seal populations and the implications thereof. Canadian Journal of Zoology 79: 2115-2127.

Heise, K. L.G. Barrett-Lennard, E. Saulitis, C. Matkin, and D. Bain. 2003. Examining the evidence for killer whale predation on Steller sea lions in British Columbia and Alaska. Aquatic Mammals 29(3): 325-334.

Hollowed, A.B., and W.S. Wooster. 1992. Variability of winter ocean conditions and strong year classes of Northeast Pacific groundfish. . ICES Marine Science Symposia 195:433-444.

Hollowed, A.B., and W.S. Wooster. 1995. Decadal-scale variation in the eastern Subarctic Pacific:2. Response of northeast Pacific fish stocks. Pages 373-385 in In R.J. Beamish, editor. Climate changes in northern fish populations. Canadian Special Publication Fisheries and Aquatic Science 121:15-24.

Holmes, E.E., and A.E. York. 2003. Using age structure to detect impacts on threatened populations: a case study with Steller sea lions. Conservation Biology 17(6): 1794-1806.

Howe, A.L., R.J. Walker, C. Olnes, K. Sundet, and A.E. Bingham. 2001. Revised Edition: Harvest, catch and participation in Alaska sport fisheries during 1997. Alaska Department of Fish and Game, Fishery Data Series No. 98-25 (revised). Anchorage.

Ingraham, W. J. Jr., C.C. Ebbesmeyer, and R.A. Hinrichsen. 1998. Imminent Climate and Circulation Shift in Northeast Pacific Ocean Could Have Major Impact on Marine Resources. EOS, Trans. Am. Geophys. U.

Johnson, S.R. J.J. Burns, C.I. Malme, and R.A. Davis. 1989. Synthesis of information on the effects of noise and disturbance on major haulout concentration of the Bearing Sea pinnipeds. Document submitted to Mineral Management Service, U.S. Dept. of Inter. Contract No. 14-12-0001-30361. LGL Alaska Research Associates, 505 N. Lights Blvd, Suite 210, Anchorage, AK 99503.

Kenyon, K.W., and D.W. Rice. 1961. Abundance and distribution of the Steller sea lion. Journal of Mammalogy 42:223-234.

Kenyon, K.W. 1962. History of the Steller sea lion at the Pribilof Islands, Alaska. Journal of Mammalogy 43(1):68-75.

Kenward, R. 1987. Wildlife Radio Tagging: Equipment, Field Techniques, and Data Analysis. Academic Press, San Diego.

Kucey, L. 2005. Human disturbance and the hauling out behavior of Steller sea lions (Eumetopias jubatus). Thesis, UBC. 67 pages.

Krahn, M.M. 1997. Chlorinated hydrocarbon and DDT analyses of blubber from Steller sea lions from southeast Alaska. Chapter 5 in K.W. Pitcher, editor. Steller sea lion recovery investigation in Alaska 1995-1996. Alaska Department of Fish and Game.

Krahn, M.M., K.B. Beckmen, P.W. Pitcher, K.A. Burek. 2004. Population survey of organochlorine contaminants in blubber of four seal species: integrating biomonitoring and specimen banking. Chemosphere 34: 2109-2121.

Krahn, M.M., M.J. Ford, W.F. Perrin, P.R. Wade, R.P. Angliss, M.B. Hanson, B.L. Taylor, G.M. Ylitalo, M.E. Dahlheim, J.E. Stein, and R. S. Waples. 2004. 2004 Status review of Southern resident killer whales (Orcinus orca) under the Endangered Species Act.

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 69 of 95

Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6

NOAA Tech. Memo. NMFS-NWFSC-62. December 2004. Available at:
http://www.nwr.noaa.gov/

Lander, M.E., and F.M.D. Gulland. 2003. Rehabilitation and post-release monitoring of Steller
    sea lion pups raised in captivity. Wildlife Society Bulletin 31(4) 1047-1053.

Lee, J.S., S. Tanabe, H. Umino, R. Tatsukawa, T.R. Loughlin, D.C. Calkins. 1996. Persistent
    organochlorines in Steller sea lion (Eumetopias jubatus) from the bulk of Alaska and the
    Bering Sea, 1976-1981. Marine Pollution Bulletin 32:535-544.

Little, A.D., Inc. 1964. Feasibility of a Commercial Sea Lion Operation in Alaska. Report for
    U.S. Bureau of Indian Affairs. 145 p.

Loughlin T.R., D.J. Rugh, and C.H. Fiscus. 1984. Northern sea lion distribution and abundance:
    1956-1980. Journal of Wildlife Management 48:729-740.

Loughlin, T.R., and R. Nelson . 1986. Incidental mortality of northern sea lions in Shelikof
    Strait, Alaska. Marine Mammal Science 2:14-33.

Loughlin, T.R. 1997. Using the phylogeographic method to identify Steller sea lion stocks.
    Pages 159-171 in A.E. Dizon, S.J. Chivers, and W.F. Perrin, editors. Molecular genetics
    of marine mammals. Society of Marine Mammalogy, Special Publication No. 3.

Loughlin, T.R. and A.E. York. 2000. An accounting of the Sources of Steller sea lion,
    Eumetopias jubatus, mortality. Marine Fisheries Review 62(4):40-45.

Loughlin, T.R. and A.E. York. 2002. An accounting of the sources of Steller sea lion mortality.
    Pages 9-13 in D. DeMaster and S. Atkinson, editors. Steller Sea Lion Decline: Is it food
    II. University of Alaska Sea Grant, AK-SG-02-02, Fairbanks. 80 pages.

Marshall, G.J. 1998. Crittercam: an animal-borne imaging and data logging system. Marine
    Technology Science Journal. 32(1): 11-17.

Mathisen, O.A. 1959. Studies on Steller sea lions Eumetopias jubatus in Alaska. In
    Transactions of the North American Wildlife and Natural Resources Conference 24:346-
    356.

Matkin, C.O., L. Barrett Lennard, G. Ellis. 2002. Killer Whales and predation on Steller sea
    lions. Pages 61-66 in D. DeMaster and S. Atkinson, editors. Steller Sea Lion Decline: Is
    it food II. University of Alaska Sea Grant, AK-SG-02-02, Fairbanks. 80 pages.

McGuill, M.W., and A.N. Rowan. 1989. Biological effects of blood loss: implications for
    sampling volumes and techniques. ILAR News 315-20.

Merrick, R.L., T.R. Loughlin, and D.G. Calkins. 1987. Decline in abundance of the northern
    sea lion, Eumetopias jubatus, in 1956-86. Fishery Bulletin U.S. 85:351-365.

Merrick, R.L., D.G. Calkins, and D.C. McAllister. 1992. Aerial and ship-based surveys of
    Steller sea lions in Southeast Alaska, the Gulf of Alaska, and Aleutian Islands during
    June and July 1991. U.S. Dept. Commer. NOAA Tech. Memo. NMFS-AFSC-1, 37
    pages.

Merrick, R.L., R. Brown, D.G. Calkins, and T.R. Loughling. 1995. A comparison of Steller sea
    lion, Eumetopias jubatus, pup masses between rookeries with increasing and decreasing
    populations. Fishery Bulletin 85: 351-365.

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 70 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

Merrick, R. L., T. R. Loughlin, and D. G. Calkins. 1996. Hot-branding: a technique for long-term marking of pinnipeds. U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Marine Fisheries Service, NMFS-AFSC-68.

Merrick, R.L., M.K. Chumbley, and G.V. Byrd. 1997. Diet diversity of Steller sea lions (Eumetopias jubatus) and their population decline in Alaska: a potential relationship. Canadian Journal of Fisheries and Aquatic Sciences 54: 1342 - 1348.

Miller, A.J., D.R. Cayan, T.P. Barnett, N.E. Graham, and J.M. Oberhuber. 1994. The 1976-77 Climate Shift of the Pacific Ocean. Oceanography 7:21-26.

Mills, S.K., and J.H. Beatty. 1979. The propensity interpretation of fitness. Philosophy of Science 46:263-286.

Morton, D.B., D. Abbot, R. Barclay, B.S. Close, R. Ewbank, D. Gask, M. Heath, S. Mattic, T. Poole, J. Seamer, J. Southee, A. Thompson, B. Trussell, C. West, and M. Jennings. 1993. Removal of blood from laboratory animals and birds. First report of the Working Group on Refinement. Laboratory Animals 27: 1-22.

NMFS [National Marine Fisheries Service]. 1992. Recovery plan for the Steller sea lion (Eumetopias jubatus). Prepared by the Steller seal lion recovery team for the National Marine Fisheries Service, Silver Spring, MD, 92 p.

NMFS [National Marine Fisheries Service]. 1993. Endangered Species Act consultation on the proposed Outer Continental Shelf oil and gas lease sale no. 149, Cook Inlet/Shelikof Strait, Alaska. Silver Spring, MD. 15 October 1993.

NMFS [National Marine Fisheries Service]. 1995a. Status review of the United States Steller sea lion (Eumetopias jubatus). Prepared by the National Marine Mammal Laboratory, Alaska Fisheries Science Center, Seattle, WA. 61 p.

NMFS [National Marine Fisheries Service]. 1995b. Endangered Species Act Section 7 Consultation with Minerals Management Service on oil and gas leasing and exploration in the Gulf of Alaska/Yakutat Planning Area: Lease Sale 158. Office of Protected Resources, Alaska Region, NMFS. 16 November 1995.

NMFS [National Marine Fisheries Service]. 1998. Endangered Species Act Section 7 Consultation on an Atka mackerel fishery under the BSAI groundfish fishery FMP between 1999 and 2002; and authorization of a walleye pollock fishery under the BSAI FMP between 1999 and 2002; and under the GOA groundfish fishery. Office of Protected Resources, Alaska Region, NMFS, Juneau, AK. 3 December 1998, 224 pages.

NMFS [National Marine Fisheries Service]. 2000. Endangered Species Act Section 7 Consultation, Biological Opinion and incidental take statement on the authorization of the Bering Sea/Aleutian Islands and Gulf of Alaska groundfish fisheries based on the fishery management plans. Protected Resources Division, Alaska Region, NMFS, Juneau, Alaska. 30 November 2000. 352 pages.

NMFS [National Marine Fisheries Service]. 2001. Endangered Species Act Section 7 Consultation, Biological Opinion and incidental take statement on the authorization of the Bering Sea/Aleutian Islands and Gulf of Alaska groundfish fisheries based on the fishery management plans as modified by amendments 61 and 70. Protected Resources Division, Alaska Region, NMFS, Juneau, Alaska. 30 October 2001. 206 pages.

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 71 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

NMFS [National Marine Fisheries Service]. 2005. Draft Stock assessment report for Steller sea lions (Eumetopias jubatus): Western U.S. Stock.

NPUMMRC [North Pacific Universities Marine Mammal Research Consortium]. 2006. Killer whale research: Diet. Available at:
http://www.marinemammal.org/research/killerwhales/dietary.php

NRC [National Research Council]. 1996. The Bering Sea Ecosystem. National Academy Press, Washington D.C. 307 pages.

NRC [National Research Council]. 2003. Decline of the Steller sea lion in Alaskan waters. Untangling food webs and fishing nets. National Academy Press, Washington D.C. 204 pages.

Neuman, D.R. 1999. Agonistic behavior in harbor seals (*Phoca vitulina*) in relation to the availability of haul-out space. Marine Mammal Science 15(2): 507-525.

Pascual, M.A., and M.D. Adkison. 1994. The decline of the Steller sea lion in the Northeast Pacific: Demography, Harvest or Environment? Ecological Applications 4(2): 393-403.

Perez, M.A. and T.R. Loughlin. 1991. Incidental catch of marine mammals by foreign and joint venture trawl vessels in the U.S. EEZ of the North Pacific, 1973-1988. U.S. Dept. Commer. NOAA Tech. Memo. NMFS-104. 54 pages.

Pike, G.C., and B.E. Maxwell. 1958. The abundance and distribution of the northern sea lion (Eumetopias jubata) on the coast of British Columbia. Journal of the Fisheries Research Board of Canada 15:5-17.

Pitcher, K.W., and D.G. Calkins. 1981. Reproductive biology of Steller sea lions in the Gulf of Alaska. Journal of Mammalogy 62: 599 - 605.

Rosen, D.A.S., and A.W. Trites. 2000. Pollock and the decline of Steller sea lions: Testing the junk-food hypothesis. Canadian Journal of Zoology 78(7): 1243-1250.

Saulitis, E.L., C.O. Matkin, K. Heise, L. Barrett-Lennard, and G.M. Ellis. 2000. Foraging strategies of sympatric killer whale (Orcinus orca) population in Prince William Sound, Alaska. Marine Mammal Science 16:94-109.

Scott, T.G., and J.S. Ayars. 1980. Capturing and marking wild animals. In Wildlife Management Techniques Manual, 3rd edition. H.S. Mosby, editor. The Wildlife Society, Inc. Bethesda, MD

Sease, J.L., W.P. Taylor, T.R. Loughlin, and K.W. Pitcher. 2001. Aerial and land-based surveys of Steller sea lions (Eumetopias jubatus) in Alaska, June and July 1999 and 2000. U.S. Dept. Commer. NOAA Tech. Memo. NMFS-AFSC-122, 52 pages.

Springer, A.M., J.A. Estes, G.B. van Vliet, T.M. Williams, D.F. Doak, E.M. Danner, K.A. Forney, and B. Pfister. 2003. Sequential megafaunal collapse in the North Pacific Ocean: an ongoing legacy of industrial whaling? Proc. National Academy of Sciences 100: 12223-12228.

St. Aubin, D.J., and L.A. Dierauf. 2001. Stress and marine mammals. Pages 253-269 in In L.A. Dierauf, editor. Handbook of Marine Mammal Medicine: Health, Disease, and Rehabilitation. CRC Press, Inc. Boca Raton, FL

Stedman's Medical Dictionary, 27th edition. 2000. Lippincott, Williams, and Wilkins, Philadelphia.

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 72 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

Stearns, S.C. 1992. The evolution of life histories. New York: Oxford University Press. 249p.

Stearns, S.C. 1977. The Evolution of Life History Traits: A Critique of the Theory and a Review of the Data. Ann. Rev. Ecol. Syst. 8: 145-171.

Stoskopf, M.K. 1990. Marine Mammal Pharmacology. *In* Dierauf, L.A. (editor), CRC Handbook of Marine Mammal Medicine: Health, Disease, and Rehabilitation. CRC Press, Inc. Boca Raton, FL

Sweeney, J.C. 1990. Marine Mammal Behavioral Diagnostics. Pages 53-72 in In L.A. Dierauf, editor. Handbook of Marine Mammal Medicine: Health, Disease, and Rehabilitation. CRC Press, Inc. Boca Raton, FL

Thorsteinson, F.V. and C.J. Lensink. 1962. Biological observations of Steller sea lions taken during an experimental harvest. The Journal of Wildlife Management 26(4):353-359.

Trenberth, K. E. 1990. Recent observed interdecadal climate changes in the Northern Hemisphere. Bull. Amer. Meteor. Soc. 71, 988–993. [Ordered ILL?]

Trenberth, K. E., and J. W. Hurrell, 1994. Decadal atmosphere-ocean variations in the Pacific. Climate Dyn., 9, 303.

Trenberth, K.E., and J.W. Hurrel. 1995. Decadal coupled atmospheric ocean variation in the North Pacific Ocean. Pages 15-24 in R.J. Beamish, editor. Climate change and northern fish populations. Canadian Special Publication Fisheries and Aquatic Science 121.

Trites A.W., and P.A. Larkin. 1992. The status of Steller sea lion populations and the development of fisheries in the Gulf of Alaska and Aleutian Islands. Fisheries Centre, UBC Report. 134 p. Vancouver, BC.

Varanasi, U.J.E. Stein, W.L. Reichert, K.L. Tilbury, M.M. Krahn, and S. Chan. 1992. Chlorinated and aromatic hydrocarbons in bottom sediments, fish and marine mammals in U.S. coastal waters: laboratory and filed studies of metabolism and accumulation. In C.H. Walker, and D.R. Livingstone, editors. Persistent Pollutants in Marine Ecosystems.

Wepestad, V.G., L.W. Fritz, W.J. Ingrahm, and B.A. Megrey. 2000. On relationships between cannibalism, climate variability, physical transport, and recruitment success of Bering sea walleye Pollock (Theragra chalcogramma). ICES Journal of Marine Science 57:272-278.

Winship, A.J., and A.W. Trites. 2006. Risk of extirpation of Steller sea lions in the Gulf of Alaska and Aleutian Islands: A population viability analysis based on alternative hypotheses for why sea lions declined in western Alaska. Marine Mammal Science 22(1):124-155.

Wolfe, R.J., and C. Mishler. 1993. The subsistence harvest of harbor seal and sea lion by Alaska Natives in 1992. Technical Paper No. 229, pts. 1 and 2. Division of Subsistence, Alaska Department of Fish and Game, Division of Subsistence.

Wolfe, R.J., and C. Mishler. 1994. The subsistence harvest of harbor seal and sea lion by Alaska Natives in 1993. Technical Paper No. 233, pts. 1 and 2. Division of Subsistence, Alaska Department of Fish and Game, Division of Subsistence.

Wolfe, R.J., and C. Mishler. 1995. The subsistence harvest of harbor seal and sea lion by Alaska Natives in 1994. Technical Paper No. 236 pts. Division of Subsistence, Alaska Department of Fish and Game, Division of Subsistence.

Wolfe, R.J., and C. Mishler. 1996. The subsistence harvest of harbor seal and sea lion by Alaska Natives in 1995. Technical Paper No. 238. Division of Subsistence, Alaska Department of Fish and Game, Division of Subsistence.

Wolfe, R.J., J.A. Fall, R.T. Stanek. 2003. The subsistence harvest of harbor seals and sea lions by Alaska natives in 2003. Technical Paper No. 291. Alaska Department of Fish and Game, Division of Subsistence.

Wyllie-Echeverria, T., and W.S. Wooster. 1998. Year-to-year variations in Bering Sea ice cover and some consequences for fish distributions. Fisheries Oceanography 7:159-170.

Yang, M-S., K. Aydin, A. Greig, G. Lang, and P. Livingston. 2005. Historical review of Capelin (Mallotus villosus) consumption in the Gulf of Alaska and Eastern Bering Sea. U.S. Dept. Commer. NOAA Tech. Memo. NMFS-AFSC-155.

York, A.E. 1994. The population dynamics of northern sea lions, 1975-1985. Marine Mammal Science 10:38-51.

York, A.E., R.L., Merrick, and T.R. Loughlin. 1996. An analysis of the Steller sea lion metapopulation in Alaska. Pages 259-292 in D.R. McCullough, editor. Metapopulations and Wildlife Conservation. Island Press, Washington, DC.

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 74 of 95

Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6

## Appendix A: Permitted Takes of Steller Sea Lions

Each permit authorizes the "take" of animals on an annual basis with many activities limited by the number of times the same individual can be taken. Permitted activities involve all age-classes of Steller sea lions with specific activities targeted at particular cohorts (i.e., pups, juveniles, and adults [collectively non-pups]). Where NOAA Fisheries Permits Division (PR1) notes in the permit that the "season" is "year-round", then the total "number of animals taken per year" could be used by the permit holder any time during the year, according to the objectives and protocols described in their application and mitigation measures required by the permit. Where "season" is marked with a number of months, the total "number of animals taken per year" would be used entirely during those months.

Some study activities are denoted as "range-wide" or will occur in areas where the eastern and western distinct population segments of Steller sea lions overlaps. Since the actual number of animals affected from each population is unknown in this instance, we assumed that these activities would occur on the population with the most immediate risk of extinction (the endangered western population of Steller sea lions). Otherwise specific locations of permit activities were allocated between the two populations as follows: West of 144°, Alaska-wide, Gulf of Alaska & Aleutian Islands, Alaska Peninsula, selected rookeries, and range-wide activities were assumed to affect the endangered western population of Steller sea lions, whereas activities East of 144°, and in Washington, Oregon, California, and Southeast Alaska were assumed to affect animals in threatened eastern population.

In total the proposed permits collectively would authorize the take of 519,240 Steller sea lions during surveys, tracking, and capture. Table A-1 addresses these animals and activities. Of this number, we expect 310,923 belong to the endangered Western population and 208,317 animals belong to the threatened Eastern population. Researchers will conduct additional procedures on a subset of restrained and captive animals (Tables A-2 and A-3, respectively). Table A-2 summarizes the nineteen procedures that may be conducted on animals restrained in the field. Table A-3 summarizes the procedures that ASLC will conduct on 16 animals contained in temporary, longer-term captivity.

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 75 of 95

Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6

| Activity | Age-Class | No. Taken per Year | Takes/Animal per Year | Season | Location |
|---|---|---|---|---|---|
| **Aerial survey: breeding season** | | | | | |
| NMML | pups | 10k | U | June '05-'09 | West of 144°W |
| (782-1768) | non-pups | 29k | U | June '06 & '08 | |
| | non-pup | 15k | U | Jun-Jul '05, '07, '09 | East of 144°W |
| | pup | 6k | U | June '05-'09 | |
| | non-pup | 18k | U | June '06 & '08 | |
| | non-pup | 10k | U | Jun-Jul '05, '07, '09 | |
| NMML | all | 4500 | Up to 40 | Year round | WA and OR |
| (782-1702) | | | | | |
| NPUMMRC | pups | 5k | 2 | once in Jun & once in Jul | SEAK |
| | non-pups | 15k | 2 | once in Jun & once in Jul | SEAK |
| **Aerial survey: non-breeding season** | | | | | |
| NMML-1768 | all | 25k | U | Aug-May '05-'09 | West of 144°W |
| | all | 10k | U | Aug-May '05-'09 | East of 144°W |
| NPUMMRC | non-pup | 20k | Up to 10 | monthly Aug-May | SEAK |
| **Aerial survey: other** | | | | | |
| ADFG | non-pups | 15k | U | Mar-Apr '05-'10 | SEAK-Alsek & Akwe River |
| NMML-1768 | all | 25k | U | Mar, Jun, Sep, Dec '05-'09 | West of 144°W |
| | all | 55k | U | Jan-Dec '05-'09 | East of 144°W |

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

Table A-1 continued.  Threatened & Endangered Steller Sea Lions authorized for study under various research permits.

| Activity | Age-Class | No. Taken per Year | Takes/Animal per Year | Season | Location |
|---|---|---|---|---|---|
| AEB | all | 28k | 4 | Sep, Dec, Mar, Jun '05, '07 | GOA, East Aleutian Is, AK Peninsula |
|  |  | 77k | 4 | Sep, Dec, Mar, Jun '06 |  |
| **Vessel survey** | | | | | |
| AEB | all | 1600 | 4 | Sep, Dec, Mar, Jun | GOA, East Aleutian Is, AK Peninsula |
| **Ground counts (may include incidental scat collection)** | | | | | |
| ADFG | non-pups | 15k | U | Jun-Jul '05-'10 | SEAK |
|  | pups | 10k | U | Jun-Jul '05-'10 |  |
| NMML-1768 | pups | 4,100 | U | Jun-Jul '05, '07, '09 | West of 144°W |
|  | non-pups | 15k | U | Jun-Jul '05, '07, '09 |  |
|  | pups | 6k | U | Jun-Jul '06, '08 | West of 144°W |
|  | non-pups | 18k | U | Jun-Jul '06, 08 |  |
| ODFW | non-pups | 5k | U | June – July annually | CA/OR/WA |
|  | pups | 2k | U | June – July annually | CA/OR/WA |
| **Incidental disturbance during scat collection, capture/sampling, instrument retrieval, or observational activities** | | | | | |
| ADFG | all | 15k | U | year-round | Alaska-wide |
| NMML-1768 | all | 20k | U | year-round | Alaska-wide |
| NMML-1702 | all | 4500 | Up to 30 | Year-round | WA/OR |
| ODFW | all | 10k | U | year-round | CA/OR/WA |

Table A-1 continued.  Threatened & Endangered Steller Sea Lions authorized for study under various research permits.

| Activity | Age-Class | No. Taken per Year | Takes/Animal per Year | Season | Location |
|---|---|---|---|---|---|
| NPUMMRC | all | 3k | Up to 12 | monthly | SEAK |
| Davis | adults | 1200 | U | year-round | GOA & Aleutian Is. |
| | pups and juveniles | 1200 | U | year-round | GOA & Aleutian Is. |
| ASLC | all | 15k | U | year-round | Alaska-wide |
| AEB | all | 1600 | 4 | Sep, Dec, Mar, Jun | GOA, East Aleutian Is., AK Peninsula |
| **Collect carcasses/parts of carcasses of dead sea lions** | | | | | |
| ADFG | all | unlimited | 1 | year-round | Alaska-wide |
| ASLC | all | unlimited | 1 | year-round | Alaska-wide |
| **Receive tissue samples from subsistence harvested sea lions** | | | | | |
| ADFG | all | unlimited | 1 | year-round | Alaska-wide |
| **Behavioral and demographic observations on rookeries** | | | | | |
| NMML-1768 | all | 0 | 0 | year-round | Range-wide |
| ADFG | all | 0 | 0 | year-round | Alaska-wide |
| **Remote monitoring stations on rookeries and haulouts** | | | | | |
| NMML-1768 | all | 0 | 0 | year-round | Range-wide |
| ODFW | all | 0 | 0 | year-round | CA/OR/WA |
| **Imaging sea lion/prey interactions with multi-beam sonar** | | | | | |

75

Case 1:05-cv-01392-ESH     Document 22-2     Filed 03/10/2006     Page 78 of 95

Civ. No. 05-1392     Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.     Exhibit 6

Table A-1 continued.  Threatened & Endangered Steller Sea Lions authorized for study under various research permits.

| Activity | Age-Class | No. Taken per Year | Takes/Animal per Year | Season | Location |
|---|---|---|---|---|---|
| NMML-1768 | all | 0 | 0 | year-round | Range-wide |
| **Tracking animals at sea** | | | | | |
| NPUMMRC | 1-3 yrs | 30 | 1 | Sep-Dec | SEAK |
| **Incidental mortality** | | | | | |
| ADFG | all | 10 | 1 | year-round | Alaska-wide, NTE 5 from western population |
| NMML-1768 | all | 10 | 1 | year-round | Alaska-wide, NTE 5 from western population |
| NMML-1702 | all | 1 | 1 | year-round | WA/OR |
| ODFW | all | 10 | 1 | year-round | CA/OR/WA |
| NPUMMRC | all | 5 | 1 | year-round | SEAK |
| Davis | 6 mos to 3 years | 10 | 1 | year-round | GOA & Aleutian Is. |
| | females > 3 years | 3 | 1 | year-round | NTE 2 from western pop |
| ASLC | all | 10 | 1 | year-round | Alaska-wide, NTE 5 from western population |
| AEB | All | 1 | 1 | year-round | GOA, East Aleutian Is., AK Peninsula |

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 79 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

Table A-1 continued.  Threatened & Endangered Steller Sea Lions authorized for study under various research permits.

| Activity | Age-Class | No. Taken per Year | Takes/Animal per Year | Season | Location |
|---|---|---|---|---|---|
| Remote marked (pelage dye, bleach, or paint) or remote tagged (with dart tags fired from $CO_2$ rifle or pistol) | | | | | |
| NMML-1702 | >1 year | 3 | 3 | Year-round | WA/OR |
| Capture/Recapture (various methods) and Restraint (various methods) with Standard Morphometric Measurements | | | | | |
| ADFG | >5 days to 2 mos | 700 | 1 | June-July | Alaska-wide |
| | >2 mo to 3 years | 300 | 4 | year-round | |
| | > 3 years | 30 | 2 | year-round | |
| NMML-1768 | > 5 days to 2 mo | 1100 | 1 | June-July | Alaska-wide |
| | > 2 mo to 3 yrs | 120 | 4 | year-round | |
| | > 3 yrs | 60 | 2 | year-round | |
| NMML-1702 | > 1 year | 12 | 2 | Year-round | WA/OR |
| Davis | 6 mos to 3 years | 30 | 4 | year-round | GOA & Aleutian Is. |
| | females > 3 years | 15 | 4 | year-round | GOA & Aleutian Is. |
| ODFW | 1 week to 6 weeks | 200 | 1 | Jun-Jul | CA/OR/WA |
| | 4 mos to 3 yrs | 30 | 1 | Year-round | CA/OR/WA |

Table A-1 continued. Threatened & Endangered Steller Sea Lions authorized for study under various research permits.

| Activity | Age-Class | No. Taken per Year | Takes/Animal per Year | Season | Location |
|---|---|---|---|---|---|
| ASLC | >5 days to 2 mos | 40 | 1 | Jun-Jul '05 | Selected rookeries |
| | | 20 | 5 | Breeding season '05 | Selected rookeries |
| | | 60 | 1 | Jun-Jul '06 & '07 | Selected rookeries |
| | | 40 | 5 | Breeding season '06 & '07 | Alaska-wide |
| | 2 mos to 1 yr | 220 | 1 | year-round '05, '06, '07 | Alaska-wide |
| | | 20 | 3 | year-round '05 | |
| | | 40 | 3 | year-round '05, '06, '07 | |
| | > 1 yr to 4 yrs | 210 | 1 | year-round '05. '06, '07 | Alaska-wide |
| | | 20 | 3 | year-round '05 | |
| | | 40 | 3 | year-round '06, '07 | |
| | Adult females | 20 | 1 | year-round '05 | Alaska-wide |
| | | 20 | 3 | year-round '05 | |
| | | 60 | 1 | year-round '06, '07 | |
| | | 40 | 3 | year-round '06, '07 | |

78

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 81 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

Table A-2. Research activities involving captured and restrained Steller Sea lions (Numbers of animals proposed for the following activities are a subset of animals authorized for capture – see Table A-1).

| Activity | Age-Class | No. Taken | Takes/Animal/Year | Season | Location |
|---|---|---|---|---|---|
| **Blood Collection** | | | | | |
| NMML-1768 | > 5 days to 2 mo | 450 | 1 | June-July | Alaska-wide |
| | > 2 mo to 3 yrs | 120 | 4 | year-round | |
| | > 3 yrs | 60 | 2 | year-round | . |
| NMML-1702 | > 1 year | 12 | 2 | year-round | WA/OR |
| ADFG | newborn to 2 mos | 700 | 2 | June-July | Alaska-wide |
| | 2 months to 3 yrs | 300 | 4 | year-round | |
| | > 3 years | 30 | 2 | year-round | |
| Davis | 6 mos to 3 years | 30 | 4 | year-round | GOA & Aleutian Is. |
| | females > 3 years | 15 | 4 | year-round | |
| ODFW | 1 week to 6 weeks | 50 | 1 | June - July | CA/OR/WA |
| | ≥4 mos to 3 yrs | 30 | 1 | year-round | |
| ASLC | >5 days to 2 mos | 40 | 1 | June – July '05 | Selected rookeries |
| | | 20 | 5 | Breeding season '05 | Selected rookeries |
| | | 40 | 1 | June – July '06, '07 | Alaska-wide |
| | | 40 | 5 | Breeding season '05 | Alaska-wide |
| | 2 mos to 1 yr | 220 | 1 | year-round | Alaska-wide |
| | | 20 | 3 | year-round '05 | |
| | | 40 | 3 | year-round '06, '07 | |
| | > 1 yr to 4 yrs | 134 | 1 | year-round '05, '06, '07 | Alaska-wide |

Table A-2 continued.  Research activities involving captured and restrained Steller Sea lions (Numbers of animals proposed for the following activities are a subset of animals authorized for capture – see Table A-1).

| Activity | Age-Class | No. Taken | Takes/Animal/Year | Season | Location |
|---|---|---|---|---|---|
| | | 20 | 3 | year-round '05 | |
| | | 40 | 3 | year-round '06, '07 | Alaska-wide |
| | Adult females | 20 | 1 | year-round '05, '06, '07 | |
| | | 20 | 3 | year-round '05 | |
| | | 40 | 3 | year-round '06, '07 | |
| **Muscle biopsy** | | | | | |
| ADFG | ≥ 4 mos to 3 years | 90 | 4 | year-round | Alaska-wide |
| | > 3 yrs | 30 | 4 | year-round | |
| NMML-1768 | > 2 mo to 3 yrs | 60 | 4 | year-round | Alaska-wide |
| | > 3 yrs | 30 | 2 | year-round | |
| **Tissue samples for genetic analysis (i.e., skin biopsy)** | | | | | |
| NMML-1768 | > 5 days to 2 mo | 450 | 1 | June-July annually | Alaska-wide |
| | > 2 mo to 3 yrs | 120 | 1 | year-round | |
| | > 3 yrs | 60 | 1 | year-round | |
| ADFG | > 5 days to 2 mos | 700 | 1 | June-July annually | Alaska-wide |
| | ≥2 mos to 3 yrs | 300 | 4 | year-round | |
| | > 3 years | 30 | 1 | year-round | |
| ODFW | 1 week to 6 weeks | 200 | 1 | June-July annually | CA/OR/WA |
| | ≥4 mos to 3 yrs | 30 | 1 | year-round | |

80

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 83 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

Table A-2 continued. Research activities involving captured and restrained Steller Sea lions (Numbers of animals proposed for the following activities are a subset of animals authorized for capture – see Table A-1).

| Activity | Age-Class | No. Taken | Takes/Animal/Year | Season | Location |
|---|---|---|---|---|---|
| **Blubber biopsy (may include skin)** | | | | | |
| ADFG | > 5 days to 2 mos | 20 | 1 | June-July annually | Alaska-wide |
| | ≥2 mos to 3 years | 300 | 4 | year-round | |
| | > 3 years | 30 | 1 | year-round | |
| NMML-1768 | > 2 mo to 3 yrs | 120 | 4 | year-round | Alaska-wide |
| | > 3 yrs | 60 | 2 | year-round | |
| NMML-1702 | > 1 year | 12 | 2 | Year-round | WA/OR |
| Davis | 6 mos to 3 years | 30 | 4 | year-round | GOA & Aleutian Is. |
| | females > 3 years | 15 | 4 | year-round | |
| ASLC | >5 days to 2 mos | 40 | 1 | Jun- Jul '05 | Selected rookeries |
| | | 20 | 3 | Breeding season '05 | Selected rookeries |
| | | 40 | 1 | June –July '06, '07 | Alaska-wide |
| | | 40 | 3 | Breeding season '06, '07 | Alaska-wide |
| | 2 mos to 1 yr | 220 | 1 | year-round '05, '06, '07 | Alaska-wide |
| | | 20 | 3 | year-round '06, '07 | |
| | | 40 | 3 | year-round '06, '07 | |
| | > 1 yr to 4 yrs | 134 | 1 | year-round '05, '06, '07 | Alaska-wide |
| | | 20 | 3 | year-round '05 | |
| | | 40 | 3 | year-round '06, '07 | |

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 84 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

Table A-2 continued. Research activities involving captured and restrained Steller Sea lions (Numbers of animals proposed for the following activities are a subset of animals authorized for capture – see Table A-1).

| Activity | Age-Class | No. Taken | Takes/Animal/Year | Season | Location |
|---|---|---|---|---|---|
| | Adult females | 20 | 1 | year-round '05 | Selected rookeries |
| | | 20 | 3 | year-round '05 | Selected rookeries |
| | | 20 | 1 | year-round '06, '07 | Alaska-wide |
| | | 40 | 3 | year-round '06, '07 | Alaska-wide |
| **Fecal loops/culture swabs, skin and mucousal swabs** | | | | | |
| ADFG | > 5 days to 2 mos | 350 | 2 | June-July annually | Alaska-wide |
| | >2 mos to 3 years | 300 | 4 | year-round | |
| | > 3 years | 10 | 2 | year-round | |
| NMML-1768 | > 5 days to 2 mo | 1100 | 1 | June-July annually | Alaska-wide |
| | > 2 mo to 3 yrs | 120 | 4 | year-round | |
| | > 3 yrs | 60 | 2 | year-round | |
| NMML-1702 | > 1 year | 12 | 2 | Year-round | WA/OR |
| Davis | 6 mos to 3 years | 30 | 4 | year-round | GOA & Aleutian Is. |
| | females > years | 15 | 4 | year-round | |
| ODFW | ≤ 1.5 months | 200 | 1 | June – July annually | CA/OR/WA |
| | ≥4 mos to 3 yrs | 30 | 1 | year-round | |
| ASLC | >5 days to 2 mos | 40 | 1 | June - July '05 | Selected rookeries |
| | | 20 | 3 | Breeding season '05 | Selected rookeries |
| | | 40 | 1 | June –July '06, '07 | Alaska-wide |

82

Table A-2 continued. Research activities involving captured and restrained Steller Sea lions (Numbers of animals proposed for the following activities are a subset of animals authorized for capture – see Table A-1).

| Activity | Age-Class | No. Taken | Takes/Animal/Year | Season | Location |
|---|---|---|---|---|---|
| | | 40 | 3 | Breeding season '06, '07 | Alaska-wide |
| | 2 mos to 1 yr | 220 | 1 | year-round '05, '06, '07 | Alaska-wide |
| | | 20 | 3 | year-round '06, '07 | |
| | | 40 | 3 | year-round '06, '07 | |
| | > 1 yr to 4 yrs | 134 | 1 | year-round '05, '06, '07 | Alaska-wide |
| | | 20 | 3 | year-round '05 | |
| | | 40 | 3 | year-round '06, '07 | |
| | Adult females | 20 | 1 | year-round '05 | Selected rookeries |
| | | 20 | 3 | year-round '05 | Selected rookeries |
| | | 20 | 1 | year-round '06, '07 | Alaska-wide |
| | | 40 | 3 | year-round '06, '07 | Alaska-wide |

**Tooth extraction (only 1 tooth is taken over the life of an animal)**

| Activity | Age-Class | No. Taken | Takes/Animal/Year | Season | Location |
|---|---|---|---|---|---|
| ADFG | 6 mos to 3 years | 300 | 1 | year-round | Alaska-wide |
| | > 3 years | 30 | 1 | year-round | |
| NMML-1768 | > 2 mo to 3 yrs | 120 | 1 | year-round | Alaska-wide |
| | > 3 yrs | 60 | 1 | year-round | |
| Davis | 6 mos to 3 years | 30 | 1 | year-round | GOA & Aleutian Is. |
| | females > years | 15 | 1 | year-round | |
| ASLC | 2 mos to 1 yr | 240 | 1 | year-round '05 | Alaska-wide |

Table A-2 continued.  Research activities involving captured and restrained Steller Sea lions (Numbers of animals proposed for the following activities are a subset of animals authorized for capture – see Table A-1).

| Activity | Age-Class | No. Taken | Takes/Animal/Year | Season | Location |
|---|---|---|---|---|---|
| | | 260 | 1 | year-round '06, '07 | |
| | > 1 yr to 4 yrs | 154 | 1 | year-round '05 | Alaska-wide |
| | | 174 | 1 | year-round '06, '07 | |
| | Adult females | 60 | 1 | year-round '05 | Alaska-wide |
| | | 100 | 1 | year-round '06, '07 | |
| **Collect vibrissae, hair and nails** | | | | | |
| ADFG | >5 days to 2 mos | 20 | 1 | June-July annually | Alaska-wide |
| | >2 mos to 3 yrs | 350 | 2 | year-round | |
| | > 3 years | 10 | 2 | year-round | |
| NMML-1768 | > 2 mo to 3 yrs | 120 | 4 | year-round | Alaska-wide |
| | > 3 yrs | 60 | 2 | year-round | Alaska-wide |
| NMML-1702 | >1 year | 12 | 2 | Year-round | WA/OR |
| Davis | 6 mos to 3 years | 30 | 4 | year-round | GOA & Aleutian Is. |
| | females > years | 15 | 4 | year-round | GOA & Aleutian Is. |
| **Flipper tag or other temporary mark (e.g., bleach, paint, dye, glued patch)** | | | | | |
| ADFG | >5 days to 2 mos | 700 | 1 | June-July annually | Alaska-wide |
| | >2 mos to 3 yrs | 300 | 1 | year-round | Alaska-wide |
| NMML-1768 | > 5 days to 2 mo | 700 | 1 | June-July annually | Alaska-wide |
| | > 2 mo to 3 yrs | 120 | 4 | year-round | |

84

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 87 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

Table A-2 continued.  Research activities involving captured and restrained Steller Sea lions (Numbers of animals proposed for the following activities are a subset of animals authorized for capture – see Table A-1).

| Activity | Age-Class | No. Taken | Takes/Animal/Year | Season | Location |
|---|---|---|---|---|---|
| | > 3 yrs | 60 | 2 | year-round | |
| NMML-1702 | >1 year | 12 | 2 | Year-round | WA/OR |
| Davis | 6 mos to 3 years | 30 | 1 | year-round | GOA & Aleutian Is. |
| | females > years | 15 | 1 | year-round | GOA & Aleutian Is. |
| ODFW | pups < 6 weeks | 200 | 1 | June – July annually | CA/OR/WA |
| ASLC | >5 dys to 2 mos | 60 | 1 | June – July '05 | Selected rookeries |
| | | 100 | 1 | June – July '06, '07 | Alaska-wide |
| | 2 mos to 1 yr | 240 | 1 | year-round '05 | Alaska-wide |
| | | 260 | 1 | year-round '06, '07 | |
| | > 1 yr to 4 yrs | 154 | 1 | year-round '05 | Alaska-wide |
| | | 174 | 1 | year-round '06, '07 | |
| | Adult females | 60 | 1 | year-round '05 | Alaska-wide |
| | | 100 | 1 | year-round '06, '07 | |
| Hot-brand (only one brand over life of animal) | | | | | |
| ADFG | >5 days to 2 mos | 600 | 1 | June-July annually | Alaska-wide |
| | >2 mos to 3 yrs | 300 | 1 | year-round | |
| | > 3 years | 30 | 1 | year-round | |
| NMML-1768 | > 5 days to 2 mo | 400 | 1 | June-July annually | Alaska-wide |
| | > 2 mo to 3 yrs | 120 | 1 | year-round | |

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 88 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

Table A-2 continued.  Research activities involving captured and restrained Steller Sea lions (Numbers of animals proposed for the following activities are a subset of animals authorized for capture – see Table A-1).

| Activity | Age-Class | No. Taken | Takes/Animal/Year | Season | Location |
|---|---|---|---|---|---|
| | > 3 yrs | 60 | | year-round | |
| NMML-1702 | > 1 year | 12 | 1 | Year-round | WA/OR |
| Davis | 6 mos to 3 years | 30 | 1 | year-round | GOA & Aleutian Is. |
| | females > 3 years | 15 | 1 | year-round | |
| ODFW | < 1.5 months | 200 | 1 | June – July annually | CA/OR/WA |
| | ≥4 mos to 3 yrs | 30 | 1 | year-round | |
| ASLC | > 5 dys to 2 mos | 60 | 1 | June – July '05 | Selected rookeries |
| | | 100 | 1 | June- July '06, '07 | Alaska-wide |
| | 2 mos to 1 yr | 240 | 1 | year-round '05 | Alaska-wide |
| | | 260 | 1 | year-round '06, '07 | |
| | > 1 yr to 4 yrs | 154 | 1 | year-round '05 | Alaska-wide |
| | | 174 | 1 | year-round '06, '07 | |
| | Adult females | 60 | 1 | year-round '05 | Alaska-wide |
| | | 100 | 1 | year-round '06, '07 | |
| Attachment of scientific instruments (e.g., VHF, SLTDR, UTPR, video system/data logger, sonic tag, drag/buoyancy blocks) | | | | | |
| ADFG | >5 days to 2 mos | 130 | 1 | June-July annually | Alaska-wide |
| | >2 mos to 3 yrs | 65 | 4 | year-round | |
| | > 3 yrs | 30 | 1 | year-round | |
| NMML-1768 | > 2 mo to 3 yrs | 120 | 4 | year-round | Range-wide |

86

Table A-2 continued.   Research activities involving captured and restrained Steller Sea lions (Numbers of animals proposed for the following activities are a subset of animals authorized for capture – see Table A-1).

| Activity | Age-Class | No. Taken | Takes/Animal/Year | Season | Location |
|---|---|---|---|---|---|
| | > 3 yrs | 60 | 2 | year-round | |
| NMML-1702 | > 1 year | 6 | 2 | Year-round | WA/OR |
| Davis | 6 mos to 3 years | 30 | 4 | year-round | GOA & Aleutian Is. |
| | females > 3 years | 15 | 4 | year-round | |
| ODFW | ≥4 mos to 3 yrs | 30 | 1 | year-round | CA/OR/WA |
| | 1 week to 2 months | 80 | 1 | June – July annually | |
| ASLC | 2 mos to 1 yr | 20 | 3 | year-round '05 | Alaska-wide |
| | | 40 | 3 | year-round '06, '07 | |
| | >1 yr to 4 yrs | 20 | 3 | year-round '05 | Alaska-wide |
| | | 40 | 3 | year-round '06, '07 | |
| | Adult female | 20 | 3 | year-round '05 | Alaska-wide |
| | | 40 | 3 | year-round '06, '07 | |
| **Insert stomach temperature transmitters** | | | | | |
| ASLC | >2 mos to 1 yr | 20 | 1 | Year-round '05 | Alaska-wide |
| | | 40 | 1 | Year-round '06 and '07 | |
| | >1 year to 4 yrs | 20 | 1 | Year-round '05 | Alaska-wide |
| | | 40 | 1 | Year-round '06 and '07 | |
| | Adult females | 40 | 1 | Year-round '05 | Alaska-wide |
| | | 80 | 1 | Year-round '06 and '07 | |

87

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 90 of 95

Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6

Table A-2 continued. Research activities involving captured and restrained Steller Sea lions (Numbers of animals proposed for the following activities are a subset of animals authorized for capture – see Table A-1).

| Activity | Age-Class | No. Taken | Takes/Animal/Year | Season | Location |
|---|---|---|---|---|---|
| **Bioelectric impedance analysis** | | | | | |
| NMML-1768 | > 2 mo to 3 yrs | 120 | 4 | year-round | Alaska-wide |
| | > 3 yrs | 60 | 2 | year-round | |
| ADFG | ≥2 mos to 3 yrs | 300 | 2 | year-round | Alaska-wide |
| | > 3 yrs | 30 | 2 | year-round | |
| Davis | 6 mos to 3 years | 30 | 4 | year-round | GOA & Aleutian Is. |
| | females > 3 years | 15 | 4 | year-round | |
| ASLC | > 5 days to 2 mos | 20 | 5 | Breeding season '05 | Selected rookeries |
| | | 40 | 5 | Breeding season '06, '07 | Alaska-wide |
| | 2 mos to 1 yr | 220 | 1 | year-round '05, '06, '07 | Alaska-wide |
| | | 20 | 3 | year-round '05 | |
| | | 40 | 3 | year-round '05 | |
| | > 1 year to 4 years | 134 | 1 | year-round '05, '06, '07 | Alaska-wide |
| | | 20 | 3 | year-round '05 | |
| | | 40 | 3 | year-round '06, '07 | |
| | Adult females | 20 | 1 | year-round '05, '06, '07 | Alaska-wide |
| | | 20 | 3 | year-round '05 | |
| | | 40 | 3 | year-round '06, '07 | |
| **Inject stable isotopes (e.g., H-3, O-18) and collect serial blood samples** | | | | | |

88

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 91 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

Table A-2 continued.  Research activities involving captured and restrained Steller Sea lions (Numbers of animals proposed for the following activities are a subset of animals authorized for capture – see Table A-1).

| Activity | Age-Class | No. Taken | Takes/Animal/Year | Season | Location |
|---|---|---|---|---|---|
| ADFG | >2 mos to 3 yrs | 300 | 4 | year-round | Alaska-wide |
| NMML-1768 | > 2 mo to 3 yrs | 120 | 4 | year-round | Alaska-wide . |
|  | > 3 yrs | 60 | 2 | year-round |  |
| ASLC | > 5 dys to 2 mos | 20 | 5 | Breeding season '05 | Selected rookeries |
|  |  | 40 | 5 | Breeding season '06, '07 | Alaska-wide |
|  | 2 mos to 1 yr | 220 | 1 | year-round '05, '06, '07 | Alaska-wide |
|  |  | 20 | 3 | year-round '05 |  |
|  |  | 40 | 3 | year-round '06, '07 |  |
|  | > 1 year to 4 years | 134 | 1 | year-round '05, '06, '07 | Alaska-wide |
|  |  | 20 | 3 | year-round '05 |  |
|  |  | 40 | 3 | year-round '06, '07 |  |
|  | Adult females | 20 | 1 | year-round '05, '06, '07 | Alaska-wide |
|  |  | 20 | 3 | year-round '05 |  |
|  |  | 40 | 3 | year-round '06, '07 |  |
| Davis | 6 mos to 3 years | 30 | 4 | year-round | GOA & Aleutian Is. |
|  | females > 3 years | 15 | 4 | year-round | GOA & Aleutian Is. |
| Inject Evans blue dye and collect serial blood samples |  |  |  |  |  |
| ADFG | > 2 mos to 3 yrs | 300 | 4 | year-round | Alaska-wide |
| NMML-1768 | > 2 mo to 3 yrs | 120 | 4 | year-round | Alaska-wide |

89

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 92 of 95

Civ. No. 05-1392    Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.    Exhibit 6

Table A-2 continued.   Research activities involving captured and restrained Steller Sea lions (Numbers of animals proposed for the following activities are a subset of animals authorized for capture – see Table A-1).

| Activity | Age-Class | No. Taken | Takes/Animal/Year | Season | Location |
|---|---|---|---|---|---|
| | > 3 yrs | 60 | 2 | year-round | Alaska-wide |
| **Enema or stomach intubation** | | | | | |
| ADFG | >5 days to 2 mos | 350 | 2 | June-July annually | Alaska-wide |
| | >2 mos to 3 yrs | 300 | 4 | year-round | |
| | > 3 yrs | 30 | 2 | year-round | |
| NMML-1768 | > 2 mo to 3 yrs | 120 | 4 | year-round | Alaska-wide |
| | > 3 yrs | 60 | 2 | year-round | Alaska-wide |
| ODFW | 4 months to 3 years | 30 | 1 | year-round | CA/OR/WA |
| ASLC | 2 mos to 1 yr | 20 | 3 | year-round '05 | Alaska-wide |
| | | 40 | 3 | year-round '06, '07 | |
| | >1 yr to 4 yrs | 20 | 3 | year-round '05 | Alaska-wide |
| | | 40 | 3 | year-round '06, '07 | |
| | Adult females | 20 | 3 | Year-round '05 | Alaska-wide |
| | | 40 | 3 | Year-round '06, '07 | Alaska-wide |
| **Portable metabolic chamber measurements** | | | | | |
| ADFG | 2 mos to 3 yrs | 200 | 4 | year-round | Alaska-wide |
| | > 3 yrs | 30 | 2 | year-round | Alaska-wide |
| **Ultrasonic imaging [note: (R) means animals will be sampled with remote device on rookery]** | | | | | |
| ADFG | 2 mos to 3 yrs | 300 | 2 | year-round | Alaska-wide |

Case 1:05-cv-01392-ESH    Document 22-2    Filed 03/10/2006    Page 93 of 95

Civ. No. 05-1392        Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.        Exhibit 6

Table A-2 continued. Research activities involving captured and restrained Steller Sea lions (Numbers of animals proposed for the following activities are a subset of animals authorized for capture – see Table A-1).

| Activity | Age-Class | No. Taken | Takes/Animal/Year | Season | Location |
|---|---|---|---|---|---|
|  | > 3 yrs | 30 | 2 | year-round | Alaska-wide |
| NMML-1768 | > 2 mo to 3 yrs | 120 | 4 | year-round | Alaska-wide |
|  | > 3 yrs | 60 | 2 | year-round | Alaska-wide |
| ASLC | > 5 days to 1 yr | 60 (R) | 4 | year-round '05 | Chiswell Is |
|  |  | 250 (R) | 4 | year-round '06, '07 | Alaska-wide |
|  | >1 yr to 4 yrs | 100 (R) | 4 | year-round '05 | Chiswell Is |
|  |  | 400 (R) | 4 | year-round '06, '07 | Alaska-wide |
|  |  | 134 | 1 | year-round '05, '06, '07 | Alaska-wide |
|  | Adult female | 60 (R) | 4 | year-round '05 | Chiswell Is |
|  |  | 240 (R) | 4 | year-round '06, '07 | Alaska-wide |
|  | Adult male | 20 (R) | 4 | year-round '05 | Chiswell Is |
|  |  | 80 (R) | 4 | year-round '06, '07 | Alaska-wide |
|  | 1 year to 4 yrs | 134 | 1 | year-round | Alaska-wide |
| Davis | 6 mos to 3 years | 30 | 4 | year-round | GOA & Aleutian Is. |
|  | females > 3 years | 15 | 4 | year-round | GOA & Aleutian Is. |
| Removal from wild with temporary captivity at ASLC and associated sampling (see Table A-3 for study activities) |
| ASLC | >1 yr to 4 yrs | 16 | 1 | Year round | Alaska-wide |

Case 1:05-cv-01392-ESH   Document 22-2   Filed 03/10/2006   Page 94 of 95

Civ. No. 05-1392      Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. Jdmt.      Exhibit 6

Table A-3. Research activities involving captured and restrained Steller Sea lions (Numbers of animals proposed for the following activities are a subset of animals authorized for capture – see Table A-1).

| Activity | No. taken per year | Takes per Animal | Frequency |
|---|---|---|---|
| 1. Transport and temporary maintenance at ASLC for up to 3 months followed by return to wild | 16[1] (≤ 4 at once) | 1 | Capture may occur at any time of year |
| 2. Physical Restraint | 16 | Up to 13 | Up to weekly as needed for "health assessments" and activities #20-23 |
| 3. Anesthesia | 16 | Up to 13 | Up to weekly as needed for "health assessments" and activities #20-23 |
| 4. Sedatives | 16 | Up to 13 | Up to weekly as needed for "health assessments" and activities #20-23 |
| 5. Body mass/morphometrics/3D-photogrammetry for "health assessment" | 16 | Up to 13 | At entrance, exit, and weekly in between |
| 6. Blood sampling for "health assessment" | 16 | Up to 13 | At entrance, exit, and weekly in between |
| 7. Blubber/skin biopsy for "health assessment" | 16 | 2 | At entrance and exit |
| 8. Inject labeled water & collect serial blood samples for "health assessment" | 16 | 4 | At entrance and exit, plus twice more according to research timetable of the group |
| 9. Inject Na Br and collect serial blood samples for "health assessment" | 16 | Up to 4 | At entrance and exit, plus twice more according to research timetable of the group |
| 10. Bioelectric impedance analysis for "health assessment" | 16 | Up to 13 | At entrance, exit, and weekly in between |
| 11. Diagnostic ultrasound for "health assessment" | 16 | Up to 13 | At entrance and exit, and weekly in between |
| 12. Fecal collection (fecal loop) for "health assessment" | 16 | Up to 13 | At entrance and exit, and weekly in between |
| 13. Skin & mucosal swabs for "health assessment" | 16 | Up to 13 | At entrance, exit, and weekly in between |
| 14. Diagnostic x-ray for "health | 16 | 2 | At entrance and exit |

Table A-3. Research activities involving captured and restrained Steller Sea lions (Numbers of animals proposed for the following activities are a subset of animals authorized for capture – see Table A-1).

| assessment" | | | |
|---|---|---|---|
| 15. Diagnostic endoscopy for "health assessment" | 16 | 2 | At entrance and exit |
| 16. Urinalysis (with catheter) for "health assessment" | 16 | 2 | At entrance and exit |
| 17. Flipper tag | 16 | 1 | Once – before exit |
| 18. Hot brand | 16 | 1 | Once – before exit |
| 19. Attach external data logger | 16 | 1 | Once – before exit |
| 20. Food assimilation and protein turnover studies with 48 hours dry holding, dosing with $Cr_2O_3$ and Co-EDTA and injection of [15][N]Glycine and associated blood sampling | Up to 10 over duration of permit | Up to 2 trials[2] | Up to 10 trials[2] over 3 years with no animal undergoing more than 2 trials |
| 21. Doubly-labeled water technique validation study with 4 days dry holding, injection of isotopes and serial blood samples | 4 out of 16 in #1 | 1 | Once over life of permit |
| 22. Controlled fasting (includes pre/post $D_2O$ and 3 pre-fast and 3 post-fast blubber biopsies) | 4 out of 16 in #1 | 1 | Up to 8 animals over duration of permit[3] |
| 23. ACTH challenge (includes serial blood samples over 2 hour period plus one more sample 24-hrs post dosing) | 4 out of 16 in #1 | 1 | Up to 8 animals over duration of permit[4] |
| 24. Surgically implant dual "Life History Transmitters" | 16 | 1 | Once – before exit |

1. Animals captured in field by ASLC under Permit No. 881-1668 (Table A-1).

2. For the "food assimilation and protein turnover studies" in Activity #20, a trial is one complete sequence of dosing (with $Cr_2O_3$ and Co-EDTA and injection of [15][N]Glycine) and associated 48 hour dry holding and blood sampling.

3. Note the ASLC has already completed this study with 4 animals in 2004 so they would not use more than 4 more over the duration of the permit.

4. Note the ASLC has already completed this study with 4 animals in 2004 so they would not use more than 6 more over the duration of the permit.