

H

Only the Westlaw citation is currently available.
United States District Court,N.D. California.
CENTER FOR BIOLOGICAL DIVERSITY, et al.,
Plaintiffs,
v.
BUREAU OF LAND MANAGEMENT, et al.,
Defendants,
American Sand Association, et al, Defendant-
Intervenors.
**No. C 03-02509 SI.**

March 14, 2006.

Brendan R. Cummings, Joshua Tree, CA, Deborah A. Sivas, Stanford Law School, Stanford, CA, for Plaintiffs.
Kevin William McArdle, U.S. Department of Justice, Lisa Lynne Russell, Wildlife & Marine Resources Section, Washington, DC, Paul Andrew Turcke, Moore Smith Buxton & Turcke, Boise, ID, David P. Hubbard, Esq., Lounsbery Ferguson Altona & Peak, LLP, Escondido, CA, for Defendants.

ORDER RE: CROSS MOTIONS FOR SUMMARY
JUDGMENT
SUSAN, ILLSTON, J.

INTRODUCTION

**\*1** Plaintiffs are several environmental organizations who filed an eight count Second Amended Complaint on June 3, 2005, against the Bureau of Land Management and the U.S. Fish and Wildlife Service, alleging violations of the Endangered Species Act, 16 U.S.C. § § 1531 et seq., the National Environmental Policy Act, 42 U.S.C. § § 4321 et seq., the Federal Land Policy and Management Act of 1976, 43 U.S.C. § § 1701-1785, and the Administrative Procedure Act, 5 U.S.C. § 706 et seq.

Plaintiffs generally allege that defendants have failed adequately to protect two species listed under the Endangered Species Act, the Peirson's milk-vetch and the desert tortoise. Plaintiffs allege that both species are particularly threatened by off-highway vehicle recreational use in the Imperial Sand Dunes Recreation Area, and that the proposed management plan for the Dunes does not contain adequate safeguards to ensure against jeopardizing the

continued existence of these species. Defendants are the Bureau of Land Management ("BLM"), which manages the Dunes, and the U.S. Fish and Wildlife Service ("Service"), which consults with the BLM and is required to evaluate BLM actions that affect the Peirson's milk-vetch and the desert tortoise. Defendant-intervenors are a number of organizations representing off-highway vehicle recreationists. FN1

> FN1. Defendant-intervenors address some but not all of the issues raised by the principal parties. This decision analyzes the principals' arguments and refers to the arguments of defendant-intervenors if there is a significantly different approach, or if a particular argument is made with greater clarity.

All parties have filed cross-motions for summary judgment which address claims four through eight of the Second Amended Complaint. FN2 The parties' motions concern (1) Service's final Biological Opinion on January 25, 2005, regarding management of the Dunes pursuant to the Dunes' 2003 Recreation Area Management Plan ("RAMP"); (2) the BLM's Environmental Impact Statement for the RAMP; (3) the BLM's issuance of the Record of Decision giving final approval to the RAMP on March 24, 2005; and (4) the Service's final rule designating critical habitat for the Peirson's milk-vetch on August 4, 2004. The Court now decides these motions.

> FN2. The First and Second Claims of the Second Amended Complaint, which challenge the validity of the FWS's June 17, 2002, desert tortoise Biological Opinion, were the subject of the Court's August 3, 2004 Order on the parties' motions for partial summary judgment as well as the Court's January 3, 2005 Order Granting in Part and Denying in Part the Motion to Alter Judgment. The Third Claim challenges the April 3, 2003 BO, which has been superseded by the 2005 BO and is therefore moot.

The Court recognizes the complexity of the issues presented in this case, and that defendants have been given the difficult task of addressing the interests and

needs of off-highway vehicle recreationists while at the same time protecting listed species as required by law. In deciding the pending summary judgment motions, the Court has been mindful that its review is "narrow" but "searching and careful," *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). As the United States Supreme Court has instructed, in enacting the Endangered Species Act, "Congress[ ] intend[ed] to provide comprehensive protection for endangered and threatened species." *Babbitt v. Sweet Home Chapter*, 515 U.S. 687, 699, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995); *see also Tennessee Valley Authority v. Hill*, 437 U.S. 153, 174, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) ("[E]xamination of the language, history and structure of the [Endangered Species Act] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities.").

**\*2** In summary, after careful consideration of the parties' papers and the arguments of counsel, as well as of the voluminous administrative record, the Court concludes that defendants have failed to comply with federal environmental statutes in a number of important respects. As explained more fully below, the Court concludes that the 2005 Biological Opinion is flawed because, *inter alia*, it would permit significant declines in the population of the already-threatened Peirson's milk-vetch before instituting any mitigating measures. The Court concludes that allowing such a significant reduction of reproduction, numbers or distribution of the milk-vetch runs afoul of the requirement under the Endangered Species Act to "insure" that the RAMP is "not likely to jeopardize the continued existence of any ... threatened species." 16 U.S.C. § 1536(a)(2). Relatedly, the Court concludes that the Biological Opinion is flawed because it fails to explain how continued and expanded habitat degradation of almost half of the designated critical habitat for the Peirson's milk-vetch does not result in "adverse modification" to milk-vetch critical habitat. The Court also concludes that the Incidental Take Statement for the desert tortoise contained in the Biological Opinion must be set aside because it does not contain a meaningful standard by which incidental take can be measured, and because it fails to include required "terms and conditions" regarding how to minimize the potential for incidental take of desert tortoises as a result of recreational use.

With regard to the designation of critical habitat for the Peirson's milk-vetch, the Court rejects plaintiffs' procedural challenges to the final rule. However, the Court concludes that the final rule is arbitrary and capricious because it suffers from a number of substantive deficiencies. The Court concludes that by finding that there were no additional regulatory benefits to be gained by designating critical habitat in areas that were ultimately excluded, the Service improperly ignored the recovery goal of critical habitat. In addition, in excluding significant areas from the final critical habitat designation, the Service relied on assumptions that had no factual support in the record, improperly considered economic impacts of critical habitat designation that are coextensive with restrictions resulting from the listing of the milk-vetch, and failed to evaluate the economic benefits associated with reduced visitation.

The Court also concludes that the Environment Impact Statement is legally inadequate. By eliminating the interim closures that have been in place since November 2000 from the reasonable range of alternatives, the BLM failed to "present complete and accurate information to decision makers and to the public to allow an informed comparison of the alternatives contained in the EIS." *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir.2005). Finally, the Court also concludes that the BLM did not take a "hard look" at the impact of the RAMP on endemic invertebrates.

BACKGROUND

1. Management of the Dunes

**\*3** The Algodones Dunes are located in Imperial County in southeastern California. The Dunes are the largest mass of sand dunes in California. *See* ROD AR Sec.1 at 4125. The Dunes and immediately adjacent areas are managed by the BLM as the Imperial Sand Dunes Recreation Area ("ISDRA"). The ISDRA is located within the California Desert Conservation Area ("CDCA") in Imperial County in southeastern California, approximately 25 miles west of the Colorado River and immediately north of the border between the United States and Mexico. *See* ROD AR Sec. 2 at 9596. [FN3] In establishing the CDCA, Congress declared that the California desert is a "total ecosystem that is extremely fragile, easily scarred, and slowly healed," and that it is a rich and unique environment with "historical, scenic, archaeological, environmental, biological, cultural, scientific, educational, recreational, and economic resources." 43 U.S.C. § 1781(a)(1)-(2). Congress also stated that "the use of all California desert

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                            Page 3
Slip Copy, 2006 WL 662735 (N.D.Cal.)
**(Cite as: Slip Copy)**

resources can and should be provided for in a multiple use and sustained yield management plan to conserve these resources for future generations, and to provide present and future use and enjoyment, particularly outdoor recreation uses, including the use, where appropriate, of off-road recreational vehicles." _Id._ at § 1781(a)(4).

> FN3. Consistent with the format of the citations to the administrative record used by the parties, cites to the FWS administrative record for the January 25, 2005 Biological Opinion are referred to as "BO AR [document no. and page no.]"; cites to the FWS administrative record for the August 4, 2004 critical habitat designation for the Peirson's milk-vetch are referred to as "CH AR [document no. and page no.]"; cites to the BLM administrative record for the March 25, 2005 Record of Decision are referred to as "ROD AR [section no. and page no.]"; and cites to the documents added to the administrative record pursuant to this Court's July 8, 2005, order approving the parties' stipulation are referred to as "ROD SAR [exhibit letter and page no.]."

The ISDRA comprises approximately 167,000 acres of land in California, covering an area more than 40 miles long and averaging 5 miles in width. Of the total acreage of the ISDRA, approximately 159,000 acres are managed by BLM, 7,000 acres are privately owned, and 900 acres are owned by the State of California. In addition, the one-mile wide area around the ISDRA boundary within the planning area for the RAMP includes approximately 48,300 acres of BLM managed land, approximately 1,800 acres of military managed land, and approximately 9,100 acres of privately owned land. _See_ BO AR Doc. # 482 at 8844-45. In 1994, Congress formally established 26,202 acres in the ISDRA as the North Algodones Dunes Wilderness Area through the enactment of the California Desert Protection Act ("CDPA") of 1994, Pub.L. 103-433. ROD AR Sec.2 at 9150-51. This wilderness area is permanently closed to OHV use.

There are several management plans applicable to the Dunes. The first management plan for the Dunes was completed in 1972. _See_ ROD AR Sec.1 at 4125-28. Only a portion of this plan was implemented, including the establishment of the Algodones Natural Area, a camping area, and the construction of a ranger station. _Id._ at 4128.

The California Desert Conservation Area Plan, completed in 1980, is a comprehensive general management plan for the California desert, and included a number of decisions specific to the ISDRA. _See id._ at 4128. The 1980 plan designated most areas of the ISDRA as open to unlimited off-highway vehicle ("OHV") use. _See id._ at 4131. According to the 2005 BO, the California Desert Plan "provides a general prescription for management," while the purpose of the ISDRA Recreation Area Management Plan ("RAMP") "is to provide more specific management guidelines that pertain to the ISDRA, as an amendment to the CDCA Plan." BO AR Doc. # 697 at 12356.

**\*4** In 1987, the BLM completed a RAMP for the Dunes. _See_ ROD AR Sec.1 at 4119-467. The 1987 RAMP called for a number of monitoring programs and surveys of sensitive species found at the Dunes, _id._ at 4347-51, as well as a program of infrastructure development. _See id._ at 4187-204. Little of the monitoring was actually carried out. _See_ BO AR Doc. # 96 at 3927. The 2003 RAMP, which is the subject of the 2005 BO, would replace the 1987 RAMP and would guide management of the Dunes for 10 to 15 years. _See_ BO AR Doc. # 697 at 12356.

_2. Center for Biological Diversity et al. v. Bureau of Land Management et al., C 00-927 WHA and Interim Closures_

In March of 2000, the Center for Biological Diversity, the Sierra Club, and Public Employees for Environmental Responsibility filed a complaint alleging that the BLM was in violation of Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2), because it had failed to enter into formal consultation with the Service on the effects of the adoption of the CDCA Plan, as amended by the 1987 RAMP, on threatened and endangered species. _Center for Biological Diversity et al. v. BLM,_ Case No. 00-0927 WHA-JCS (N.D.Cal.). Several groups of recreationists in the CDCA area were granted status as defendant-intervenors, and the parties ultimately entered into a settlement that established interim actions to be taken to provide temporary protection for endangered and threatened species pending completion of consultation between BLM and the Service on the CDCA Plan. _See_ ROD AR Sec.3 at 15997. [FN4] Pursuant to the stipulations, BLM temporarily closed five areas in the ISDRA, totaling approximately 49,000 acres, to OHV and other recreational use to protect the Peirson's milk-vetch, and temporarily closed to camping a 25,600 acre area

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to protect the desert tortoise. *See* BO AR Doc. # 128. These closures were to remain in place until BLM signed the decision document implementing the new RAMP for the ISDRA.[FN5]

> FN4. As discussed in greater detail *infra,* the interim closures were approved by the BLM on September 27, 2001, pursuant to its authority under 43 C.F.R. § 8341.1(a), and published in the Federal Register on October 22, 2001. *See* Temporary Closure of Approximately 49,300 Acres to Motorized Vehicle Use of Five Selected Areas in the Imperial Sand Dunes Recreation Management Area, Imperial County, CA, 66 Fed.Reg. 53,431 (Oct. 22, 2001).

> FN5. The decision document, the Record of Decision, was signed by BLM on March 24, 2005. Pursuant to this Court's March 23, 2005, Order for Managing Remaining Claims, the temporary closure of the area published by BLM in the Federal Register on October 22, 2001, 66 Fed.Reg. 53,431-02 ("the Temporary Closure of Approximately 49,300 Acres to Motorized Vehicle Use of Five Selected Areas in the Imperial Sand Dunes Recreation Management Area") remains in effect until the Court rules on the merits of plaintiffs' challenge to the Record of Decision and the Biological Opinion.

On March 29, 2002, BLM issued a draft RAMP and accompanying Draft Environmental Impact Statement for the Dunes. As required by Section 7 of the ESA, BLM consulted with the Service on the draft RAMP regarding impacts to the Peirson's milk-vetch and the desert tortoise, the only listed species that are known to occur, or to have the potential to occur, in the ISDRA. *See* ROD AR Sec.2 at 9489. The Service issued a Biological Opinion dated April 3, 2003, on the proposed RAMP. *See* BO AR Doc. # 466. On January 25, 2005, the Service issued a new BO for the proposed RAMP, which concluded that the CDCA Plan, as amended by the ISDRA RAMP and subsequent revisions agreed upon during the consultation process, is not likely to jeopardize the continued existence of Peirson's milk-vetch or desert tortoise over the 10- to 15-year length of the ISDRA RAMP, nor is it likely to destroy or adversely modify critical habitat for the Peirson's milk-vetch over the 10- to 15-year length of the ISDRA RAMP. BO AR Doc. # 697 at 12396.[FN6]

> FN6. Adverse modification to desert tortoise critical habitat was not addressed in the BO because there is no desert tortoise critical habitat in the action area. *See* BO AR Doc. # 697 at 12393.

**\*5** On March 24, 2005, BLM issued the Record of Decision approving, with minor modifications, the Proposed Imperial Sand Dunes Recreation Area Management Plan and Proposed Amendment to the CDCA Plan. *See* ROD AR Sec.2 at 8098.

### 3. Peirson's Milk-Vetch, the Desert Tortoise, and OHV Use in the ISDRA

The ISDRA provides unique habitat for several endemic and sensitive plant, insect and animal species, including the Peirson's milk-vetch and desert tortoise. The August 7, 1998 Final Rule determining threatened status for the Peirson's milk-vetch describes the plant as follows:

*Astragalus magdalene* var. *peirsonii* is a stout, short-lived perennial reaching 20 to 70 cm (8 to 27 in) high. The stems and leaves are covered with fine silky hairs and the leaves are 5 to 15 cm (2 to 6 in) long, with 3 to 13 small oblong leaflets. The flowers are dull purple, arranged in 10- to 17-flowered racemes and the resulting pods are 2 to 3.5 cm (.8 to 1.4 in) long, inflated, with a triangular beak.

Endangered and Threatened Wildlife and Plants; Determination of Endangered or Threatened Status for Five Desert Milk-vetch Taxa from California, 63 Fed.Reg. 53,596 (Oct. 6, 1998) (codified at 50 C.F.R. pt. 17) (BO AR Doc. # 96 at 3919). At the time of listing, the Service identified OHV use as the greatest threat to the Peirson's milk-vetch. *Id.* at 3920. The only location where the Peirson's milk-vetch is currently known to occur within the United States is the Imperial Sand Dunes, which supports between 75 and 80 percent of the world's known colonies of the species. *Id.* at 3919.

The desert tortoise (*Gopherus agassizii* ) is a large, herbivorous reptile, with adults measuring up to 15 inches in shell length and found in portions of the western United States and Mexico. The Mojave population of the desert tortoise was listed as a threatened species in 1990. *See* Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Mojave Population of the Desert Tortoise, 55 Fed.Reg. 12,178 (Apr. 2, 1990) (codified at 50 C.F.R. pt. 17). The Recovery Plan for

the desert tortoise, written in 1994, is the basis and key strategy for recovering and delisting the desert tortoise. *See* BO AR Doc. # 697 at 12370. The plan divides the range of the desert tortoise into six distinct population segments or recovery units, and recommends the establishment of 14 desert wildlife management areas ("DWMA") throughout the recovery units. *Id.* The ISDRA lies within the Eastern Colorado Recovery Unit, which is one of four recovery units for desert tortoise that occur in the California Desert Conservation Area ("CDCA"), and is 6 miles away from the closest DWMA, or desert tortoise conservation area. *Id.* at 12380. Desert tortoise densities in the ISDRA appear to be very low based upon the rarity of desert tortoise sign and desert tortoise sightings. *Id.* at 12380-81. Fall 2002 surveys conducted in the ISDRA, although not exhaustive, yielded few observations of desert tortoise sign and no observations of live desert tortoises. *Id.*

**\*6** The ISDRA is also a popular OHV recreation area, with over 1.4 million OHV visitors in 2002. *See* ROD AR Sec.2 at 9610. Visitor levels continue to increase at the ISDRA, and have outpaced previous estimations. *See* BO AR Doc. # 633 at 11112. (stating that the BLM estimated visitorship for 2002 to be 1,005,000, while according to BLM figures there were over 1.4 million visitors.) *See id.* The BLM has estimated that visitorship for 2012 will be between 1,418,000 to 2,071,000. *See id.*

### 4. Critical Habitat Rule for the Milk-Vetch

On August 5, 2003, the Service published a draft determination of critical habitat for the Peirson's milk-vetch within the Algodones Dunes. *See* Endangered and Threatened Wildlife and Plants; Proposed Designation of Critical Habitat for *Astragalus magdalenae var. peirsonii* (Peirson's milk-vetch), 68 Fed.Reg. 46143 (proposed Aug. 5, 2003) (codified at 50 C.F.R. pt. 17). The Service published a final critical habitat designation for Peirson's milk-vetch on August 4, 2004, which became effective on September 3, 2004. *See* Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for *Astragalus magdalenae var. peirsonii* (Peirson's milk-vetch), 69 Fed.Reg. 47330 (Aug. 4, 2004) (codified at 50 C.F.R. pt. 17) (CH AR Doc. # 430). The final rule eliminated approximately 31,000 acres, or almost 60%, from the acreage originally proposed as designated critical habitat. *See id.*

### LEGAL STANDARDS

### 1. Summary Judgment

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Electric,* 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Ting v. United States,* 927 F.2d 1504, 1509 (9th Cir.1991). The evidence presented by the parties must be admissible. *See* Fed.R.Civ.P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979).

### 2. Review of Administrative Action

**\*7** Judicial review of final agency actions is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq. See Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy,* 898 F.2d 1410, 1413 (9th Cir.1990). The court "shall" set aside any agency decision that the Court finds is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA precludes the trial court reviewing an agency action from considering any evidence outside of the administrative record available to the agency at the

time of the challenged decision. *See* 5 U.S.C. § 706(2)(E); *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743-44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985); *Havasupai Tribe v. Robertson,* 943 F.2d 32, 34 (9th Cir.1991).

The Court must determine whether the agency decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated on other grounds, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The Supreme Court has explained that an agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Although the arbitrary and capricious standard "is narrow and presumes the agency action is valid, ... it does not shield agency action from a 'thorough, probing, in-depth review." ' *Northern Spotted Owl v. Hodel,* 716 F.Supp. 479, 481-82 (W.D.Wash.1988) (citations omitted). The Court cannot, however, substitute its judgment for that of the agency or merely determine that it would have decided an issue differently. *See Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

DISCUSSION

1. The 2005 Biological Opinion

For any federal action that may affect a threatened or endangered species (or its habitat), Congress has required by statute that the agency contemplating the action (here the BLM) must consult pursuant to Section 7 of the ESA with the consulting agency (here the FWS) to "insure" that the federal action "is not likely to [1] jeopardize the continued existence of any endangered species or threatened species or [2] result in the destruction or adverse modification" of the designated critical habitat of such species. 16 U.S.C. § 1536(2). After the agencies engage in the consultation process, the consulting agency issues a biological opinion ("BO"). The BO is required to

address both the "no jeopardy" and "no adverse modification" prongs of Section 7. *See* 50 C.F.R. § 402.14(g)(4).

In this case, the Service issued a final BO on January 25, 2005, concluding that the RAMP posed "no jeopardy" to the continued existence of the milk-vetch, and also that the RAMP will not result in the "destruction or adverse modification" of the designated critical habitat of the milk-vetch. The BO also contains an Incidental Take Statement for the desert tortoise that permits "take" [FN7] of the tortoise within the ISDRA. In their motion for summary judgment, plaintiffs challenge each of these aspects of the BO as arbitrary and capricious. Defendants and defendant-intervenors have filed cross-motions for summary judgment defending these findings and conclusions in the BO as lawful and supported by the administrative record.

FN7. Section 9 of the ESA and its implementing regulations prohibit the "take" of a threatened or endangered species of animal. *See* 16 U.S.C. § 1538(a)(1); 50 C.F.R. § 17.31. "Take" is defined broadly under the ESA to include harming, harassing, trapping, capturing, wounding or killing a protected species either directly or by degrading its habitat sufficiently to impair essential behavior patterns. *See* 16 U.S.C. § 1532(19). The ESA provides an exception to its prohibitions on take: a federal agency may take listed species in accordance with an Incidental Take Statement issued with a BO. *See id.* at § 1536(b)(4).

A. Standard of Review of a Biological Opinion

**\*8** As the Ninth Circuit recently stated, the Court's review "is 'narrow' but 'searching and careful,' ... and we must ensure that the FWS's decisions are based on a consideration of relevant factors and we assess whether there has been a clear error of judgment." *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.,* 378 F.3d 1059, 1065 (9th Cir.2004) (internal citations omitted). The BO must articulate "a rational connection between the facts found and the choice made." *Pac. Coast Fed'n of Fishermen's Ass'n, v. Nat'l Marine Fisheries Serv.,* 265 F.3d 1028, 1034 (9th Cir.2001) (internal quotations omitted).

Additionally, the Service's BO "may be invalid if it

Slip Copy                                                                                                    Page 7
Slip Copy, 2006 WL 662735 (N.D.Cal.)
**(Cite as: Slip Copy)**

fails to use the best available scientific information as required by 16 U.S.C. § 1536(a)(2)." *Id.* To the extent that there is any uncertainty as to what constitutes the best available scientific information, Congress intended "to give the benefit of the doubt to the species." *Conner v. Burford,* 848 F.2d 1441, 1454 (9th Cir.1988) (quoting H.R. Conf. Rep. No. 96-697, 1st Sess. 12, reprinted in 1979 U.S.C.C.A.N. 2572, 2576). And while a reviewing court must show deference to the reasonable decisions of an agency, such deference is "warranted only when the agency utilizes, rather than ignores, the analysis of its experts." *Ctr. for Biological Diversity v. Lohn,* 296 F.Supp.2d 1223, 1239 (W.D.Wash.2003).

B. The "No Jeopardy" Conclusion as to Peirson's Milk-Vetch

(1) The RAMP

The proposed RAMP would (1) reopen 4 areas of the ISDRA which had been temporarily closed to OHV use in order to protect Peirson's milk-vetch populations (as a result of earlier litigation) and (2) replace these closures with a smaller "Adaptive Management Area" ("AMA") that initially would allow OHV use at a proposed level of 525 vehicles per day, subject to potential annual adjustments based on visitor data and biological data. *See* BO AR Doc. # 697 at 12359-60. The only area of the ISDRA that would be completely closed to OHV use is the North Algodones Wilderness Management Area, which comprises approximately 16% of Peirson's milk-vetch habitat. *Id.* at 12358; BO AR Doc. # 295 at 7781. Of the remaining milk-vetch habitat, 61% would be opened to unlimited OHV use in five management areas, and 23% would be opened to limited OHV use in the AMA. *See* BO AR Doc. # 295 at 7782-83. [FN8]

FN8. This order refers to both Peirson's milk-vetch habitat, and Peirson's milk-vetch "critical habitat." Critical habitat consists of those areas which are "essential for the conservation" of a listed species, and the Service is charged with designating critical habitat for all species "concurrently" with the listing of that species. 16 U.S.C. § 1532(5)(A); § 1533(a)(3) & (b)(6)(C). Here, 16% of Peirson's milk-vetch habitat is found in the North Algodones Wilderness Management Area, and 84% of the plant's

habitat is found in the non-wilderness management areas; of the designated *critical habitat,* 52% is located in the North Algodones Wilderness Management Area, and 48% is located in the non-wilderness management areas. *See* BO AR Doc. # 295 at 7781-83; BO AR Doc. # 697 at 12397.

The Adaptive Management Area (AMA) encompasses 23% of milk-vetch habitat. BO AR Doc. # 295 at 7782. Under the RAM, BLM intends to limit access to the AMA to 525 vehicles per day. BO AR Doc. # 697 at 12389. The BO acknowledges that "it would be possible, given the projected number of permits and the acreage of the AMA, for permitted vehicles to drive over the entire surface of the AMA within 6 peak holiday periods if each vehicle drove 21 miles per day.... However, BLM proposes to require an education program for AMA visitors. This program is expected to reduce the potential vehicle impacts to Peirson's milk-vetch occurrences." *Id.* [FN9] The RAMP would also prohibit camping in the AMA, and the BLM would conduct "more intensive monitoring" in the AMA than in other management areas. *Id.* at 12359, 12389.

FN9. The RAMP states that AMA visitors will be required to complete a "resource conservation program" in order to obtain a permit to use the AMA. BO AR Doc. # 483 at 9374. Visitors will be provided with printed environmental education material including information on sensitive plant and animal species, other sensitive resources, safety information, and general stipulations for use of the AMA. *Id.* In order to obtain a permit, an individual must sign a document stating that he/she has read and understands the materials and stipulations. *Id.*
In addition to the AMA-specific visitor education, the RAMP states that the BLM will "work cooperatively with the OHV community, the environmental community, and other local, state, and federal agencies to develop and implement interpretive and public relations programs about safety, rules & regulations, desert survival, and the natural, historical and recreational resources of the ISDRA." *Id.* at 9352. The RAMP also states that the BLM will develop interpretive brochures and maps, conduct local and regional outreach to the OHV community, use the Internet for national and international outreach, continue the Junior

Slip Copy                                                                 Page 8
Slip Copy, 2006 WL 662735 (N.D.Cal.)
**(Cite as: Slip Copy)**

Ranger program, and establish volunteer host programs at campgrounds. *Id.* at 9352-53.

**\*9** The BO describes the RAMP's monitoring and research plan as follows:

The monitoring plan includes: (1) a commitment to reinitiate ESA section 7 consultation under the Act with the Service, as appropriate, so that scientific information collected can be fully integrated into the section 7(a)(2) analysis of the action; (2) dune-wide monitoring of Peirson's milk-vetch; (3) dune-wide monitoring and calibration of OHV use patterns; (4) two experimental studies on the effects of OHVs on Peirson's milk-vetch; (5) examination for correlation between OHV-use patterns and Peirson's milk-vetch population levels; (6) modeling of Peirson's milk-vetch populations under various management scenarios; (7) an implementation schedule; and (8) viability study of the seed bank.

*Id.* at 12361. The monitoring plan also establishes an annual review process "to ensure a no jeopardy/no adverse modification standard will be maintained" throughout the ISDRA. *Id.* at 12362. Under the plan, the BLM will monitor population trends in each of the management areas where Peirson's milk-vetch exists and if the milk-vetch "distribution or abundance significantly declines" past a certain threshold within any of the management areas "proactive measures will occur to protect the plant and its associated critical habitat." BO AR Doc. # 697 at 12362. The agency has set an interim threshold at 50% of the baseline 2004 reproductive population level in a comparable rainfall year. *Id.* at 12362-3. [FN10]

> **FN10.** The RAMP contemplates that these thresholds will be adjusted based on the results of 4 years of intensive data collection designed to establish baseline population values for each of the management areas. BO AR Doc. # 697 at 12363.

If the interim threshold is crossed in any management area, the BO states that the proactive measures "may include, but are not limited to: 1) education of OHV users regarding avoiding the plant; 2) implementation of permitting or other methods to minimize use in sensitive areas; 3) self-policing by OHV users to keep users out of sensitive areas; 4) partial closure of sensitive areas; and 5) complete closure of areas." *Id.* If the BLM and the Service are unable to agree on the appropriate response, the BLM "will ensure the

protection of the species and associated critical habitat ... by closing the relevant portions of the management areas in question. These areas will remain closed until a reinitiated consultation is completed, and the requirements of 43 C.F.R. § 8341.2 are met." *Id.* at 12362. [FN11]

> **FN11.** This regulation provides that the BLM shall close areas to OHVs in the event of "adverse effects" to wildlife and that such areas shall remain closed until the adverse effects are resolved/prevented.

(2) The BO's Findings and "No Jeopardy" Conclusion

Throughout the 2005 BO, the Service noted both the adverse impact of OHVs on Peirson's milk-vetch, as well as the likely adverse impact of the proposed RAMP on the species. *See generally* BO AR Doc. # 697 at 12386-89; *see also id.* at 12386 ("Vehicles can crush individual plants and reduce the reproductive output of those that survive); *id.* at 12387 ("The primary OHV recreation season coincides with the winter and spring periods of seed germination, growth and flowering of Peirson's milk-vetch .... [a]s a result, the anticipated increased vehicle use in areas of Peirson's milk-vetch occurrence likely will reduce reproductive success because plants or branches are damaged or destroyed prior to seed-set."); *id.* at 12388 ("Absence of Peirson's milk-vetch has been observed in many high use areas ..., which to some extent is likely attributable to local extirpation of the plant due to use intensity."); *id.* ("During the 10- to 15-year implementation period of the proposed RAMP, Peirson's milk-vetch populations likely will decline in areas of heavy use."). [FN12]

> **FN12.** The Court notes that both the BO and the agency defendants' motion for summary judgment state that OHV use negatively impacts the milk-vetch. *See* Def's Motion for Summary Judgment at 18. In contrast, defendant-intervenors argue throughout their papers that OHVs have little effect on the population dynamics of the milk-vetch. For support, defendant-intervenors cite several studies, some of which were commissioned by defendant-intervenor American Sand Association. However, these studies were considered by the Service in its evaluation of the RAMP and in its preparation of the BO, *see, e.g.,* BO AR Doc. # 697 at 12377,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12386-88, and the Service still concluded that OHVs pose a considerable threat to the milk-vetch. *See also* Endangered and Threatened Wildlife and Plants; 12-Month Finding for a Petition to Delist *Astragalus magdalenae* var. *peirsonii* (Peirson's Milk-vetch), 69 Fed.Reg. 31523, 31527 (June 4, 2004) (reviewing scientific literature and stating "[i]mpacts of OHV use on [Peirson's milk-vetch] plants and habitat have been noted by most dune plant studies."). Because the Service concluded in the BO that OHVs do pose a threat to the milk-vetch, and cited various scientific studies in support of that conclusion, the Court accepts those findings. The Court's review focuses on whether, in light of those findings, the ultimate "no jeopardy" conclusion is lawful.

**\*10** The Service ultimately concluded, however, that despite the significant adverse impacts of OHV use on the milk-vetch, the RAMP would not jeopardize the continued existence of the species because of the public education program, restrictions on OHV use in the AMA, the monitoring and research plan and program, and the designation of interim population thresholds for each management area that will trigger immediate management changes should degradation exceed the specified threshold. *Id.* at 12386-90, 12396-97. The Service placed particular emphasis on the monitoring plan and interim population thresholds as being critical to ensuring the continued existence of the milk-vetch. *Id.* at 12396-97.

(3) Analysis of the "No Jeopardy" Conclusion

The Court's review of the "no jeopardy" conclusion is deferential. A final agency decision, such as a BO, may only be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). However, as the Ninth Circuit has recently stated, the Court "must ensure that the FWS's decisions are based on a consideration of relevant factors and we assess whether there has been a clear error of judgment." *Gifford Pinchot Task Force*, 378 F.3d at 1065.

After careful review of the BO and the underlying administrative record, the Court concludes that the "no jeopardy" finding must be set aside. The Court concludes that allowing significant declines in the population of an already-threatened species before instituting *any* mitigating measures [FN13] to address the decline violates the requirement under the ESA to

"insure" that the RAMP is "not likely to jeopardize the continued existence of any ... threatened species...." 16 U.S.C. § 1536(a)(2). The regulations define "jeopardize the continued existence of" as "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. [FN14]

> FN13. The Court emphasizes that although defendants sometimes refer to the other management measures contained in the RAMP (such as limiting OHVs in the AMA to 525 vehicles per day, or the education program) as "mitigating measures," the BO explicitly contemplates that significant population declines will occur outside the AMA during the implementation of the RAMP. The "mitigating measures" that are at the heart of the BO's "no jeopardy" conclusion are those that will be taken by BLM *after* these population declines have occurred.

> FN14. This definition was left untouched by the Ninth Circuit's decision in *Gifford Pinchot Task Force,* which held that the Service's definition of "destruction or adverse modification" offended the ESA because it did not consider recovery goal of ESA. *See* 378 F.3d at 1069.

Here, by its very terms, the RAMP permits the significant reduction of reproduction, numbers, or distribution of the milk-vetch, and indeed the BO specifically contemplates that such reduction is likely:

Because the proposed RAMP would allow for substantial increases in OHV use in specified areas over the 10- to 15-year life of the RAMP, continued implementation of the CDCA Plan, as amended by the proposed RAMP, *likely will adversely affect* Peirson's milk-vetch plant survival and reproduction principally by individual Peirson's milk-vetch plants being run over by passing vehicles in areas outside the North Algodones Dunes Wilderness Management Area and AMA.

BO AR Doc.# 697 at 12390-91 (emphasis added); *see also id.* at 12387 ("As a result, the anticipated increased vehicle use in areas of Peirson's milk-vetch occurrence *likely will reduce reproductive success*

because plants or branches are damaged or destroyed prior to seed-set.") (emphasis added); *id.* at 12388 ("During the 10- to 15-year implementation period of the proposed RAMP, Peirson's milk-vetch *populations will likely decrease in areas of heavy use.*") (emphasis added); *id.* ("We anticipate *population declines to the 50 percent management threshold are possible* within the management areas that appear to receive most of the heavy OHV use, including Gecko, Glamis, parts of Ogilby (the areas without designated critical habitat), and Buttercup Management Areas.") (emphasis added); *id.* at 12396 ("Under the proposed RAMP, *continued and expanded species degradation is likely* ....") (emphasis added). The fundamental flaw with the BO's "no jeopardy" conclusion is that the RAMP, by its very terms, permits a 50% decline in the population of reproductive plants before the BLM is even required to consult with the Service on taking mitigating measures to address the population decline.

**\*11** Defendants place great emphasis on the fact that the population threshold applies to reproductive plants, not to seedlings or the seed bank, and also that the thresholds apply separately to each management area. However, the fact that the population threshold does not apply to seedlings cuts both ways because, theoretically, more than 50% of the seedlings in a given year could die and no proactive measures would be triggered under the RAMP. In addition, as the BO notes, "[t]he relative contribution of first-year plants of Peirson's milk-vetch to the seed bank and survival of the taxon is not fully understood. The available data suggests that older age classes produce substantially more seeds than first year plants, and that therefore the older persisting plants are more important for reproductive success." *Id.* at 12364. With respect to the fact that the thresholds apply to each management area, defendants are correct that this fact theoretically helps to reduce the extent of an overall population decline. However, it is theoretically possible that a 50% population decline could occur in multiple, or all, of the management areas. The seed bank is discussed *infra* in footnote 14.

Defendants have not specifically addressed the question of whether allowing a significant decrease in the population of the milk-vetch before instituting any mitigating measures directed at the population decrease violates the regulatory definition of "jeopardize." Instead, defendants argue that the BO's "no jeopardy" conclusion is lawful because if a 50% population decline in a management area occurs, the

BLM is required to take mitigating measures, and those mitigating measures will insure the survival of the milk-vetch. Defendants have not provided any authority for the proposition that an agency may base a "no jeopardy" conclusion on mitigation measures that will not be implemented until after further, substantial degradation to a threatened species.

None of the parties have cited any case law that is directly on point, and indeed the Court has been unable to locate any. However, the Court notes that all of the cases cited by defendants in which courts have upheld "no jeopardy" findings are distinguishable because in those cases the mitigating measures were to be implemented at the same time as the federal action. None of the cases hold that a "no jeopardy" finding is lawful when the agency specifically states that an action will have a significant deleterious impact on a listed species, but no mitigating measures will be instituted until after those impacts have occurred; and the Court is aware of no such authority. *Cf. Pac. Coast Fed'n of Fishermen's Ass'n,* 265 F.3d at 1037-38 (holding "no jeopardy" findings in biological opinions flawed because agency failed to analyze short-term impacts on listed species despite acknowledging that short-term effects had potential to jeopardize listed fish populations).

For example, in *Selkirk Conservation Alliance v. Forsgren,* 336 F.3d 944 (9th Cir.2003), the biological opinion concluded that although a proposed project adversely affect grizzly bears, it would not jeopardize the bear due to mitigating measures limiting the use of roads, restricting commercial use in certain logging areas, adding grizzly bear habitat, and other restrictions. *Id.* at 952-53. Thus, unlike the instant case, the mitigating measures were to be implemented at the same time as the proposed project in order to reduce the acknowledged adverse impact on the bears.

**\*12** Defendants' reliance on *Swan View Coalition, Inc. v. Turner,* 824 F.Supp. 923 (D.Mont.1992), is similarly unavailing. In that case, the plaintiffs challenged a biological opinion approving a plan that established forest-wide standards and guidelines and did not authorize any site-specific development. *Id.* at 933. The biological opinion stated that if the plan and standards pertaining to grizzly bears were consistently adhered to, the plan would not adversely affect the grizzly bear. *Id.* at 934. Thus, unlike the instant case, in *Swan View* there was no finding of adverse impact on the listed species, and there were protective measures to be followed at the same time

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 11
Slip Copy, 2006 WL 662735 (N.D.Cal.)
**(Cite as: Slip Copy)**

as the implementation of the forest plan.

The third case defendants rely on, *California Native Plant Soc'y v. Norton,* 2004 WL 1118537 (S.D.Cal. Feb.10, 2004), is also distinguishable from the instant case. In that case, the Service issued a biological opinion concluding that a proposed development project would not jeopardize an endangered plant because, *inter alia,* of a proposed transplantation program, and because the majority of the species would be protected under a military management plan. *Id.* at *4. The plaintiffs argued that the Service could not rely on the military management plan to mitigate against jeopardy. The court rejected this argument, noting that the military's management plan was not voluntary but was part of a statutorily-mandated natural services management plan, that the military's plan was finalized and implemented prior to the completion of the BO, and that it set out "specific mitigation measures." *Id.* at *11. Thus, unlike the case here, the proposed project included specific mitigation measures both in the form of a transplantation program and an already-implemented military management plan with "specific mitigation measures."

Relatedly, the Court further concludes that deferring any mitigation measures until after significant degradation has occurred to a threatened species does not "address the threats to the species in a way that satisfies the jeopardy and adverse modification standards." *Ctr. for Biological Diversity v. Rumsfeld,* 198 F.Supp.2d at 1152, *citing Sierra Club v. Marsh,* 816 F.2d 1376 (9th Cir.1987). As discussed *supra,* throughout the BO the Service acknowledges the considerable deleterious impact that the RAMP is likely to have on Peirson's milk-vetch. However, the RAMP does not require that any mitigating measures be taken until after the reproductive milk-vetch population has declined past the 50% threshold. Even then, although the BO states that proactive measures "will" be taken, no specific measures are required, and they "may" include anything from additional public education efforts to self-policing by OHV users to closure of sensitive areas. *See* BO AR Doc.# 697 at 12362.

The Court recognizes that agencies should be afforded latitude and flexibility to determine the most appropriate course in responding to issues. At the same time, however, if the Service's primary justification for the "no jeopardy" conclusion is that mitigating measures "will" be taken when milk-vetch populations decline past the 50% threshold, the Service must determine that those mitigating

measures will address the threats to the species. *See Rumsfeld,* 198 F.Supp.2d at 1154. Here, the RAMP simply provides that proactive measures will be taken, but no specific mitigation measures are required unless the BLM and FWS are unable to agree, in which case BLM is required to "close the relevant portions of the management areas in question ... until a reinitiated consultation is completed and the requirements of 43 C.F.R. § 8341.2 are met." BO AR Doc. # 697 at 12362. The Court concludes that the deferred nature of any mitigating measures until after additional significant population declines, in combination with the fact that no particular mitigating measures are required unless the agencies cannot agree, does not sufficiently address the threats to the milk-vetch to insure against jeopardy. [FN15]

> FN15. The Court further notes that the BO justifies the 50% threshold by stating that "the ongoing presence of a seed bank" will allow the species to rebound in the event the threshold is crossed. *Id.* at 12389. Although the BO does not cite any factual basis in support of the assertion regarding "the ongoing presence of a seed bank," defendants state in their papers that "[t]he record supports FWS's *assumption* that a persistent seed bank will ensure recovery of the species even if there appear to be significant adverse effects on the adult population in a particular area." Defs' Motion for Summary Judgement at 20:21-22; Reply at 3:12-14 (emphasis added). Defendant-invervenors also emphasize the importance of the persistent seed bank: they argue that the 50% threshold should cause no alarm, since in drought years milk-vetch populations routinely fall in numbers but rely on their seed banks as "bet hedging." Def-intervenors' Reply Brief at 13:6-11. Defendants cite two documents in the administrative record in support of FWS's "assumption" regarding a persistent seed bank, BO AR Doc. # 218 and BO AR Doc. # 269. However, a review of these documents, as well as of the other documents in the administrative record, reveals that there does not appear to be any hard data or studies showing that there is a persistent seed bank that will ensure the recovery of the species *in the event of a significant population decline.* At most, there are "assumptions" that "it is virtually

certain" that there is a persistent seed bank. BO AR Doc. # 218 at 5900 and 5908a. Moreover, the "assumptions" about a persistent seed bank are undercut by the Service's own statement in its 2004 findings against de-listing the milk-vetch, that "[t]he available information on the rate of seed deposition to the seed bank and the longevity of seeds in the seed bank does not support claims of a healthy seed bank. Given the low numbers of Peirson's milk-vetch, other natural predators (seed predatory beetles and kangaroo rats) further threaten the species by depleting an already low seed bank reserve." BO AR Doc. # 633 at 1115.

The Court finds that for the Service to make a critical assumption that is at odds with its own recent statement is arbitrary and capricious. Moreover, to allow the Service to make a critical assumption when the scientific data is unclear or simply not available "would eviscerate Congress' intent to "give the benefit of the doubt to the species." ' _Conner v. Burford,_ 848 F.2d 1441, 1454 (9th Cir.1988) (quoting legislative history of Endangered Species Act).

**\*13** The Court concludes that not only is the "no jeopardy" conclusion contrary to law, but it lacks a connection between the facts found and the choice made. _See Pac. Coast Fed'n of Fishermen's Ass'ns,_ 265 F.3d at 1034. The Service's "Early Alert" found that reopening the temporarily-closed areas to OHV use, along with allowing 525 vehicles per day in the AMA, would jeopardize the milk-vetch. _See generally_ BO AR Doc. # 295. Although defendants are correct that this Court's review is limited to the 2005 BO, the Service's analysis and findings in the Early Alert are nevertheless relevant to determining whether the ultimate "no jeopardy" finding is rational and supported by the record. _See Rumsfeld,_ 198 F.Supp.2d at 1147. The Early Alert found, _inter alia,_ that of the dune-restricted plant taxa monitored by the BLM, the Peirson's milk-vetch "appears to be the most vulnerable species to destruction by OHVs." BO AR Doc. # 295 at 7781. The Early Alert noted that the proposed RAMP would allow OHV use within 84% of milk-vetch habitat, which is a higher level of OHV use than existed when the Service sought the listing of the species, and that "[c]ontinued damage to plants within 84 percent of milk-vetch habitat in the Algodones Dunes is likely to appreciably reduce the survival and recovery of this species by reducing its reproduction, numbers, and

distribution in the wild." _Id._ at 7781-82. The Early Alert also stated that the proposed level of 525 vehicles per day in the AMA "is based on the maximum number of users that have been previously detected using this area, not on an assessment of the conservation needs of the species." _Id._ at 7782.

The Early Alert stated that in order to avoid jeopardy to the milk-vetch, the RAMP needed to be modified to (1) incorporate a monitoring plan that would, _inter alia,_ define impact thresholds and populations levels that would result in management changes, and (2) prohibit OHV use on approximately 40% of the "psammophytic scrub community within the range of the Peirson's milk-vetch as research continues on the effects of OHVs on this plant." _Id._ at 7784. "Once sufficient information is available to determine levels of OHV use consistent with the long-term conservation needs of the milk-vetch, ... compatible levels of OHV use could be authorized throughout the non-wilderness portion of the Algodones Dunes/Imperial Sand Dunes Recreation Area, including within both open and closed areas." _Id._

Defendants emphasize the fact that after the Service issued the Early Alert, the BLM made numerous revisions to the RAMP, including a more developed monitoring plan and the 50% interim threshold, thus addressing the concerns raised by the Service in its Early Alert. However, as stated _supra,_ the Early Alert concluded that until more information was gathered regarding the specific impact of OHV use on milk-vetch populations, _both_ the monitoring plan with thresholds that would trigger management changes _and_ closures were necessary to avoid jeopardy. In contrast, the "no jeopardy" conclusion in the 2005 BO rests almost entirely on the monitoring plan with interim thresholds, despite the fact that the extent of information regarding the impacts of OHV use on milk-vetch populations remained essentially the same. In light of the deleterious impact of OHVs on milk-vetch plants, which the 2005 BO repeatedly recognizes, and the lack of information about the effect on milk-vetch populations of opening up 84% of milk-vetch habitat to substantial or unlimited OHV use, the 2005 BO failed to "give the benefit of the doubt to the species." _Conner,_ 848 F.2d at 1454.

### C. "No Adverse Modification" to Milk-Vetch Critical Habitat

**\*14** Under the ESA, the Service was also required to analyze whether the proposed RAMP will "result in the destruction or adverse modification" of the

Slip Copy                                                                                                                           Page 13
Slip Copy, 2006 WL 662735 (N.D.Cal.)
**(Cite as: Slip Copy)**

critical habitat of the Peirson's milk-vetch. 16 U.S.C. § 1536(a)(2). As the Ninth Circuit explained in *Gifford Pinchot Task Force,* critical habitat plays a central role under the ESA in protecting recovery and not just survival of protected species, and "it is logical and inevitable that a species requires more critical habitat for recovery than is necessary for the species survival ..." 378 F.3d at 1069. *Gifford Pinchot Task Force* struck down the regulatory definition of "destruction or adverse modification"[FN16] because it improperly required appreciable diminishment of the critical habitat necessary for *both* survival and recovery, and thus "reads the recovery goal out of the adverse modification inquiry." *Id.*

> FN16. The regulations defined "destruction or adverse modification" as "a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species...." 50 C.F.R. § 402.02.

The RAMP allows "low to moderate" OHV use on 48% of designated critical habitat (the remainder of the milk-vetch's critical habitat lies in Congressionally designated wilderness). *See* BO AR Doc. # 697 at 12397-98. [FN17] The BO states:

> FN17. The BLM predicts "low" OHV use in the Mammoth Wash management area of 808 vehicles per day, and "moderate" OHV use in the Ogilby management area of 2,770 vehicles per day.

Under the proposed RAMP, continued and expanded habitat degradation is likely; however a monitoring plan and an interim population threshold for each management area will be identified that will necessitate management measures, which will include closures if necessary, pursuant to 43 C.F.R. § 8341.2, should the monitoring data indicate that the conservation function of the primary constituent elements of any designated critical habitat is being impaired. During the initial 4 years of intensive data collection (which began in 2004), the 2004 data will be used as the baseline from which to determine change to the plant numbers. The plant's presence is naturally cyclic, largely in response to rainfall patterns. If there is a noticeable decline in species abundance, BLM has the management authority to temporarily suspend use in one or more of the management areas. Since changes in species

abundance are likely to occur if critical habitat is adversely affected, monitoring the population abundance would allow us to assess the ongoing status of the primary constituent elements of the critical habitat. In addition, since no vehicle threats are anticipated in 52 percent of the critical habitat (located in the Northern Algodones Dunes Wilderness), we do not anticipate activities in this area that could result in adverse modification of critical habitat.
*Id.* at 12397. Thus, the Service concluded that the RAMP would not "adversely modify" the critical habitat of the milk-vetch, despite its recognition that "continued and expanded habitat degradation is likely," because the monitoring program and future mitigating measures will minimize the "extent of the degradation." *Id.* at 12397-98.

The Court holds that the Service's "no adverse modification" conclusion is unsupported because the Service fails to explain how "continued and expanded habitat degradation" of almost half of the designated critical habitat does not result in "adverse modification" to milk-vetch critical habitat. As with the "no jeopardy" finding, the Service's "no adverse modification" finding hinges on the fact that "a monitoring plan and an interim population threshold for each management area will be identified that will necessitate management measures, which will include closures if necessary, pursuant to 43 C.F.R. § 8341.2, should monitoring data indicate that the conservation function of the primary constituent elements of any designated critical habitat is being impaired." *Id.* at 12397. However, just as with the flawed "no jeopardy" conclusion, the Court holds that deferring any mitigating measures until *after* the critical habitat degradation has occurred violates the Service's obligation to "insure" that an action will not "adversely modify" critical habitat. *See* 16 U.S.C. § 1536(a)(2). Moreover, the mitigating measures at issue would be directed at reversing significant population declines of an already-threatened species. The Court concludes that permitting such action impermissibly ignores the recovery goal of critical habitat, and as such, is not in accordance with the law and must be set aside. *See Gifford Pinchot Task Force,* 378 F.3d at 1069-70.

**\*15** Relatedly, the Court holds that the "no adverse modification" conclusion is flawed because the Service fails to provide any meaningful or rational explanation for this conclusion. The Service does not explain how allowing unlimited OHV use in 48% of designated critical habitat, when that use will result in "continued and expanded habitat degradation" as

well as injury and death to individual milk-vetch plants, is compatible with the recovery standard for actions affecting critical habitat as required by *Gifford Pinchot Task Force.* The Court finds that the failure to explain how allowing "continued and expanded habitat degradation" will not result in "destruction or adverse modification" of critical habitat is arbitrary and capricious. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,* 235 F.Supp.2d 1143, 1160 (W.D.Wash.2002) (where agency admitted dredging would have adverse impact on habitat, "failure to explain how dredging ... in critical habitat will not adversely modify that habitat" is arbitrary and capricious").

Defendants argue that the Service did not rely on the regulatory definition struck down by *Gifford Pinchot Task Force,* and they cite various references in the BO to that effect. However, although defendants are correct that BO makes reference to "conservation" and includes a disclaimer that its conclusions are not based on the now overturned regulation, the "no adverse modification" conclusion cannot be squared with the BO's recognition that the proposed RAMP will result in "continued and expanded" degradation of approximately half of designated critical habitat.

### D. The Incidental Take Statement for the Desert Tortoise

The final piece of the 2005 BO challenged by plaintiffs is the Incidental Take Statement ("ITS") for the desert tortoise, set forth at BO AR Doc. # 697 at 12398-401. Under Section 7 of the ESA, the Service is required to specify whether any "incidental taking" of protected species will occur as a result of the agency action. *See* 16 U.S.C. § 1536(b)(4). "Take" is defined to include harming, harassing, trapping, pursuing, collecting, shooting, capturing, wounding, or killing a protected species. *See id.* at § 1532(19). If the Service determines that an incidental taking will result, the Service must prepare an ITS which identifies areas where members of the protected species are at risk. Any taking which is subject to an ITS, and in compliance with the terms and conditions of the statement, is not a prohibited taking under the ESA. *See* 16 U.S.C. § 1536(o)(2). As relevant here, the ITS must specify (1) the amount or extent of such incidental taking on the species; (2) the reasonable and prudent measures necessary to minimize such impacts; and (3) the terms and conditions that must be complied with to implement the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i).

Plaintiffs raise two challenges to the desert tortoise ITS. First, plaintiffs contend that the ITS is invalid because it does not quantify nor provide an estimate of the amount or extent of take of desert tortoise. Second, plaintiffs contend that the ITS lacks "terms and conditions" implementing the reasonable and prudent measures necessary to minimize the impact of OHV use.

### (1) Amount or Extent of Take

**\*16** An ITS is required to contain measurable guidelines to determine whether incidental take is exceeded. *See* 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(4). While the Ninth Circuit has noted that "[i]deally, this 'trigger' should be a specific number," there will be "situations in which impact could not be contemplated in terms of a precise number." *See Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv.,* 273 F.3d 1229, 1249, 1250 (9th Cir.2001). In those cases, the burden is on the Service to establish that "no such numerical value could be practically obtained." *Id.* at 1250.

Under "Amount or Extent of Take," the desert tortoise ITS states:

The Service anticipates incidental take of desert tortoise in the ISDRA will be difficult to detect for the following reasons: 1) we cannot anticipate the precise numbers of desert tortoises that may be killed or injured because the number of desert tortoises within the ISDRA has not been estimated; 2) the ISDRA is large, desert tortoises are patchily distributed in this part of the species' range; and 3) we can not predict where and when the unmonitored recreational activities described herein will kill or injure tortoises. Incidental take may occur due to vehicle collision, collection associated with increasing levels of visitor use, changes in raven or other predator abundance associated with presence of people or trash, loss of cover from vehicle use, and approximately 50 acres of construction activities and road maintenance. However, the following level of take of this species will be quantified by the 65,382 acres of potential desert tortoise habitat within the ISDRA in microphyll woodland and creosote scrub to the east of the Algodones Dunes, and outside of the North Algodones Dunes Wilderness Management Area. We anticipate that there will be relatively few fatalities or injuries to desert tortoises.

BO AR Doc # 697 at 12399.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs contend that the Service acted arbitrarily and capriciously by failing to specify the amount or extent of authorized take with the required degree of exactness. Plaintiffs contend that the ITS violates the law because it does not provide any meaningful standard by which incidental take of desert tortoise can be measured.

The Court agrees. The Service has not established that no numerical value of desert tortoise take could be practically obtained. The first reason provided by the Service-that the number of desert tortoises within the ISDRA has not been estimated-is circular and unavailing: essentially the Service states that it cannot estimate the number of desert tortoise take because they do not know how many desert tortoise are in the ISDRA. However, this is different from stating that it is not *possible* to estimate the number of desert tortoise in the ISDRA. *See Natural Res. Def. Council v. Evans,* 364 F.Supp.2d 1083, 1137 (N.D.Cal.2003). Although defendants cite language from the 2005 BO stating that desert tortoise densities in the ISDRA are "probably low," BO AR Doc. # 697 at 12380, defendants have not pointed to any evidence in the record that it was impractical to estimate desert tortoise take. Indeed, the Service has estimated the numbers of desert tortoise in other areas of the Dunes outside the ISDRA. *See, e.g.,* BO AR Doc. # 697 at 12380 ("Abundant desert tortoise (from 0 to 59 desert tortoises per square mile) occur in the vicinity of Mesquite Mine about 3 miles east of the ISDRA (Nicholson 1984), and an average desert tortoise density of 20 desert tortoises per square mile was reported for the proposed Mesquite Regional Landfill site directly to the east of the ISDRA.").

**\*17** Defendants' assertion that it is impractical to estimate the number of desert tortoise in the ISDRA is also undercut by the fact that the 2003 BO included a specific number of desert tortoise take in the ITS. *See* BO AR Doc. # 466 at 8744 ("In accordance with Opinion 1-8-01-F-16, BLM shall contact the Service if more than five desert tortoises are found dead or injured in any 12-month period as a result of any specific activity or circumstance to determine whether formal consultation should be re-initiated on that aspect of the CDCA Plan."). [FN18] While defendants are correct that the relevant inquiry is whether the ITS in the 2005 BO is lawful, the ITS in the 2003 BO is nevertheless relevant to analyze defendants' argument that it is impractical to estimate the amount of desert tortoise take. *See Ctr. for Biological Diversity v. Rumsfeld,* 198 F.Supp.2d at 1147. Aside from arguing that the 2003 ITS is irrelevant, defendants do not explain either in their

briefs or in the 2005 BO why the Service was able to provide a numerical estimate for desert tortoise take in 2003 but unable to do so in the 2005 BO.

> FN18. Plaintiffs do not concede that the estimate of desert tortoise take in the 2003 BO is adequate, and the Court makes no finding in this regard.

Furthermore, the Court concludes that even if the Service met its burden to show a precise numerical value was not feasible, the ITS is nevertheless deficient because it does not contain a meaningful surrogate for defining the amount or extent of incidental take. The only arguable surrogate for defining the amount or extent of incidental take in the ITS is found in the following:

However, the following level of take of this species will be quantified by the 65,382 acres of potential desert tortoise habitat within the ISDRA in microphyll woodland and creosote scrub to the east of the Algodones Dunes, and outside of the North Algodones Dunes Wilderness Management Area.

BO AR Doc # 697 at 12399. There is no explanation of what this sentence means in either the ITS or defendants' papers. When questioned by the Court, defendants for the first time at oral argument asserted that this sentence, combined with the sentence that follows it ("We anticipate that there will be relatively few fatalities or injuries to desert tortoises."), somehow provides a standard for measuring take. Despite repeated questioning by the Court on this point, defendants were not able to articulate precisely how these two sentences constituted a surrogate for defining the amount or extent of incidental take. Instead, citing "Terms and Conditions" ("T & C) 4.1 of the ITS, defendants argued that any time there is a report of a killed or injured desert tortoise, the BLM is required to make a report to FWS, and the agencies are required to review the circumstances surrounding the incident "to determine whether additional protective measures are required." *Id.* at 12401.

The Court concludes that the neither the surrogate language quoted above, nor the reporting and consulting requirement contained in T & C 4.1, satisfies the Service's obligations under the ESA to provide a meaningful standard for measuring take. The law permits "the use of ecological conditions as a surrogate for defining the amount or extent of incidental take ... so long as these conditions are linked to the take of the protected species." *Arizona Cattle Growers,* 273 F.3d at 1250. When using

ecological conditions as a surrogate, the Service "must establish a link between the activity and the taking of species before setting forth specific conditions." *Id.* (internal quotation and citation omitted).

**\*18** The Ninth Circuit's decision in *Arizona Cattle Growers* is instructive. In that case, the court invalidated an ITS that used changes in ecological conditions as a surrogate for a numerical estimate of take. *Id.* at 1250. The ITS in *Arizona Cattle Growers* stated that incidental take of the loach minnow would be exceeded if:

Ecological changes do not improve under the proposed livestock management. Improving conditions can be defined through improvements in watershed, soil condition, trend and condition of rangelands (e.g., vegetative litter, plant vigor, and native species diversity), riparian conditions (e.g., vegetative and geomorphologic: bank, terrace, and flood plain conditions), and stream channel conditions (e.g., channel profile, embeddedness, water temperature, and base flow) within the natural capabilities of the landscape in all pastures on the allotment within the Blue River watershed.

*Id.* at 1249. The court invalidated the ITS because it did not sufficiently discuss the causal connection between the "improving conditions" and the taking of the species at issue. *Id.* at 1250. The court also held that the ITS's statement that if "ecological changes do not improve," takings will occur, was too vague to provide any meaningful trigger:This vague analysis, however, cannot be what Congress contemplated when it anticipated that surrogate indices might be used in place of specific numbers. Moreover, whether there has been compliance with this vague directive is within the unfettered discretion of the Fish and Wildlife Service, leaving no method by which the applicant or the action agency can gauge their performance.

*Id.* The court held that the lack of an articulated, rational connection between the "improving conditions" and the taking of the species, as well as the vagueness of the trigger, rendered the Service's implementation of the ITS arbitrary and capricious. *Id.* at 1251.

The deficient ITS in *Arizona Cattle Growers* is much more precise and defined than the purported surrogate contained in the instant desert tortoise ITS. As noted above, there is no explanation of what the following sentence means: "However, the following level of take of this species will be quantified by the

65,382 acres of potential desert tortoise habitat within the ISDRA in microphyll woodland and creosote scrub to the east of the Algodones Dunes, and outside of the North Algodones Dunes Wilderness Management Area." BO AR Doc # 697 at 12399. There is no explanation of how the level of take will be quantified in relation to the 65,382 acres of potential desert tortoise habitat, nor is there an "articulated, rational connection" between the ecological condition-the potential desert tortoise habitat-and the take. *See Arizona Cattle Growers, 273 F.3d at 1251.* To the extent this sentence is meant to act as a surrogate for a numerical estimate of take, it is too vague and confusing to act as any meaningful standard upon which compliance with the ITS can be measured.

**\*19** Defendants' reliance on the monitoring and reporting requirements contained in T & C 4.1 is also unavailing. This monitoring and reporting requirement fulfills a different requirement under the ESA and FWS regulations to "monitor the impacts of incidental take" and "report" to FWS such impacts. *See 50 C.F.R. § 402.14(i)(3).* T & C 4.1 is not a substitute for providing a measurable "trigger" of incidental take, and indeed it does not have the same legal effect of a "trigger," which is to invalidate the safe harbor provision of an ITS and re-initiate consultation between the parties. *See Arizona Cattle Growers, 273 F.3d at 1250* (describing trigger process); *Pac. Coast Fed'n of Fishermen's Assn's v. U.S. Bureau of Reclamation,* 2003 U.S. Dist. LEXIS 13745 at \*55 (N.D.Cal. July 14, 2003) (striking down as arbitrary and capricious an ITS that was "devoid of any threshold that, when reached, would indicate that an unacceptable level of take has occurred and would trigger reinitiation of consultation."), *rev'd in part on other grounds,* 426 F.3d 1082 (9th Cir.2005).

Accordingly, the Court concludes that the failure to comply with the requirements of a valid ITS renders the Service's issuance of the ITS arbitrary and capricious.

### (2) Terms and Conditions to Minimize Impact of OHVs on Take

Plaintiffs also contend that the ITS is invalid because it fails to include any terms and conditions that implement the "Reasonable and Prudent Measure" ("RPM") dealing with the most significant source of take at the Dunes, namely OHV use. RPM 3 provides that, "BLM shall minimize the potential for incidental take of desert tortoises from recreational

use, facility construction, and maintenance activities." BO AR Doc # 697 at 12400. The Terms and Conditions implementing RPM 3, T & C # 3.1, states:

BLM shall conduct desert tortoise surveys along Wash Road immediately prior to grading, and training equipment operators to look for, recognize, and avoid desert tortoises. A biological monitor shall be present during grading and construction activities (e.g., pit toilets), unless they are conducted between November and March, the primary inactive period of the desert tortoise. If these studies repeatedly fail to find desert tortoises after several years of maintenance, this survey requirement may lapse, pending written approval from the Service.

*Id.* at 12401.

Plaintiffs contend that T & C 3.1 relates directly only to activities associated with facility construction and maintenance, and that it fails to include any discussion of methods to minimize the impact of recreational use, and in particular OHVs, on the desert tortoise. Plaintiffs contend that this failing renders the ITS arbitrary and capricious.

Defendants' response effectively concedes that there is no Term and Condition that specifically addresses minimizing the impact of OHV use. Defendants argue that plaintiffs' reading of the ITS is "overly narrow," and they cite language in the BO stating that anticipated impacts to desert tortoise from recreational use are minor, and may not even be measurable, given the apparent low densities of the species in the area. BO AR Doc. # 697 at 12394-95. Defendants also cite language from the same section concluding that "[t]he overall population of desert tortoise is not likely to be affected [by the proposed RAMP], although individual desert tortoise may be killed or injured." *Id.* at 12395. In citing this language, defendants appear to implicitly argue that the ITS does not need a Term and Condition directed at minimizing OHV use because the anticipated impact on desert tortoise is "minor." Defendants also argue that BLM's efforts at visitor education will lessen the impact of OHVs on the desert tortoise.

**\*20** The Court concludes that the Service's failure to include any Terms and Conditions implementing RPM 3 with respect to minimizing take from recreational use in general, and OHV use in particular, violates the plain language of the ESA, and is therefore arbitrary and capricious. The ESA provides that if an ITS contains reasonable and prudent measures, it "shall" also include terms and

conditions that the agency must comply with in order to implement the RPMs. *See* 16 U.S.C. § 1536(b)(4). In this case, although RPM 3 states that the "BLM *shall* minimize the potential for incidental take of desert tortoises *during recreational use* ....," none of the Terms and Conditions address recreational use. BO AR Doc. # 697 at 12400 (emphasis added).

Although defendants may be correct that there are few desert tortoises in the ISDRA, that fact does not absolve the Service of its responsibility to delineate terms and conditions to minimize the potential of incidental take of desert tortoises during recreational use. *See* 16 U.S.C. § 1536(b)(4). Moreover, the 2005 BO contains numerous statements indicating the likelihood for incidental take of desert tortoises as a result of recreational use. *See, e.g.,* BO AR Doc. # 697 at 12395 ("Riding and camping in [the Ogilby Management Area] could result in desert tortoise mortality, collecting, or habitat damage, as well as predator attraction. No additional actions are planned for Ogilby Management Area in the proposed RAMP."; "[The Buttercup Management Area] would continue to receive heavy OHV pressure under the RAMP and impacts to desert tortoise might occur. An absence of sightings since the late 1980s suggests desert tortoise are uncommon in the area. However, any desert tortoise that did enter this management area would have a high probability of mortality or collection because of high visitation and the presence of Interstate 8."; "The overall population of desert tortoise is not likely to be affected, although individual desert tortoises may be killed or injured. Increases in ISDRA visitation would result in further degradation of tortoise habitat and reduced survivorship of individuals.").

These statements in the 2005 BO recognize that although there may be few desert tortoises in the ISDRA, those tortoises that remain or enter into the ISDRA are at risk for injury and/or death due to hazards posed by recreational OHV use. The Court concludes that the Service's failure to include terms and conditions to minimize the potential for incidental take of desert tortoises during recreational use violates the plain language of the ESA, 16 U.S.C. § 1536(b)(4), and is therefore arbitrary and capricious.

## 2. The BLM's Reliance on the 2005 BO

Section 7 of the ESA imposes an affirmative duty on a federal agency to ensure that any action it carries out will not jeopardize the continued existence of any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

endangered or threatened species or result in the destruction or adverse modification of critical habitat. *See* 16 U.S.C. § 1536(a)(2). Plaintiffs claim that BLM violated this provision by relying on an invalid BO. The parties agree that plaintiffs' claim that BLM violated the ESA by relying on the Service's 2005 BO rises or falls with plaintiffs' challenge to the 2005 BO itself.

**\*21** The BLM may rely on the Service's determination that an action is not likely to cause jeopardy or adverse modification as long as that agency's reliance is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Pyramid Lake Paiute Tribe of Indians,* 898 F.2d at 1415 ("A federal agency cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species; its decision to rely on a FWS biological opinion must not have been arbitrary or capricious."). For all of the reasons stated above with respect to the deficiencies in the 2005 BO, the BLM's reliance on the legally inadequate 2005 BO was in error.

### 3. Designation of Critical Habitat Rule for the Milk-Vetch

A critical habitat designation provides a means to "recover" a listed species and remove it from the endangered species list. *See Gifford Pinchot Task Force,* 378 F.3d at 1069. As defined, critical habitat is:
(i) the specific areas within the geographical area occupied by the species ... which are ... (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and
(ii) specific areas outside the geographical area occupied by the species, ... upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A). The ESA defines "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id.* at § 1532(3).

The ESA requires the Service to designate critical habitat for all species concurrently with listing. *Id.* at § 1533(a)(3) & (b)(6)(C). Critical habitat designations are required to be "on the basis of the best scientific data available." *Id.* at § 1533(b)(2). In addition, in designating critical habitat, the Service shall "tak[e] into consideration the economic impact, the impact on national security, and any other relevant impact of specifying any particular area as critical habitat." *Id.* Section 4(b)(2) of the ESA allows the Service to exclude areas from critical habitat if it determines that the benefits of such exclusion exceed the benefits of designating the area as critical habitat, unless the exclusion will result in the extinction of the species concerned. *See id.* Pursuant to both the ESA and the APA, the Service is required to provide public notice and comment on a critical habitat designation. *See id.* at § 1533(b)(5)(A)(i)-(ii); § 1533(b)(8); 5 U.S.C. § 553(b)-(c).

On August 5, 2003, the Service published a proposed rule designating approximately 52,780 acres of critical habitat for the Peirson's milk-vetch. *See Endangered and Threatened Wildlife and Plants; Proposed Designation of Critical Habitat for Astragalus magdalenae var. peirsonii* (Peirson's milk-vetch), 68 Fed.Reg. 46143 (proposed Aug. 5, 2003) (codified at 50 C.F.R. pt. 17). [FN19] The Service subsequently retained an economic firm to perform a comprehensive analysis of the economic impact of the proposed designation. On April 6, 2004, the Service announced the availability of the draft economic analysis and solicited comments from the public. *See Endangered and Threatened Wildlife and Plants; Proposed Designation of Critical Habitat for Astragalus magdalenae var. peirsonii* (Peirson's milk-vetch), 69 Fed.Reg. 18016 (April 6, 2004) (codified at 50 C.F.R. pt. 17). The final economic analysis was completed in July 2004. *See* CH AR Doc. # 418.

> FN19. As described in the "Background" section of the final rule, the process for designating critical habitat for the milk-vetch was only begun as a result of court order in two related cases which successfully challenged the Service's prior decision not to designate critical habitat. *See* CH AR Doc. # 430 at 8672.

**\*22** On August 4, 2004, the Service published the final critical habitat designation. *See Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for Astragalus magdalenae var. peirsonii* (Peirson's milk-vetch), 69 Fed.Reg. 47330 (Aug. 4, 2004) (codified at 50 C.F.R. pt. 17); CH AR Doc. # 430. The final rule designated approximately 21,836 acres as critical habitat for the milk-vetch. [FN20]

Slip Copy                                                                                                      Page 19
Slip Copy, 2006 WL 662735 (N.D.Cal.)
**(Cite as: Slip Copy)**

Pursuant to ESA Section 4(b)(2), the Service excluded almost 30,500 acres from the final designation after concluding, based on the final economic analysis, that the benefits of exclusion outweighed the benefits of inclusion, and that exclusion would not result in the extinction of the species. *See* CH AR Doc. # 430 at 8685-87. [FN21]

> FN20. The majority of the acres finally designated as critical habitat are in the already protected North Algodones Dunes Wilderness. *See id.* at 8683,

> FN21. The areas excluded constitute a portion of "Unit 1B" and all of "Unit 1C." *See id.* at 8685.

Plaintiffs raise numerous challenges to the Service's final rule designating critical habitat for the Peirson's milk-vetch. Plaintiffs contend that the final rule is arbitrary and capricious because it relied on an improper legal standard and flawed economic analysis. Plaintiffs also raise procedural challenges, contending that the final rule, which excluded approximately 59% of the proposed acreage (over 30,000 acres), violated the notice and comment provisions of the APA because the final rule was drastically different from the proposed rule.

The Court reviews the Service's decision to exclude areas pursuant to Section 4(b)(2) "for abuse of discretion." *Bennett v. Spear,* 520 U.S. 154, 172, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). "There is an abuse of discretion when an agency's decision is based on an erroneous conclusion of law or when the record contains no evidence on which it could have rationally based that decision." *Mendenhall v. Nat'l Transp. Safety Bd.,* 92 F.3d 871, 874 (9th Cir.1996).

A. Substantive Challenges to Final Critical Habitat Rule

(1) Use of Allegedly Improper Legal Standard

Plaintiffs contend the Service's final critical habitat rule suffers from a number of substantive deficiencies. First, plaintiffs assert that the Service failed to consider the regulatory benefits of critical habitat designation and in doing so used the same legally flawed analysis of critical habitat rejected by the Ninth Circuit in *Gifford Pinchot Task Force.* Plaintiffs argue that the Service improperly conflated

the "jeopardy" and "adverse modification to critical habitat" provisions of the Section 7 consultation requirement, and in so doing entirely disregarded the separate and additional regulatory benefits of critical habitat, namely promoting recovery of a species.

In concluding that the regulatory benefits of inclusion were minimal, the final rule notes that all of the proposed critical habitat areas that were ultimately excluded are currently occupied by the milk-vetch. *See* CH AR Doc. # 430 at 8685. The final rule then states:
If these areas were designated as critical habitat, any actions BLM proposed to approve, fund or undertake which might adversely modify the critical habitat would require a consultation with us. If the action affected an area occupied by the plants, consultation would be required even without the critical habitat designation. As indicated above, these two units [of proposed critical habitat] are each occupied by the listed plant, so consultation on BLM's activities on the excluded lands will be required even without the critical habitat designation.

**\*23** *Id.* at 8685-86. The rule concludes that a critical habitat designation for the milk-vetch in the areas at issue would "provide virtually no additional Federal regulatory benefits" because the BLM already must consult with the Service over any action affecting the species in all of these areas. *Id.* at 8686. Plaintiffs argue that by limiting its analysis of regulatory benefits to whether a Section 7 consultation would be triggered, the Service ignored the recovery benefits of designating critical habitat.

The Court agrees. As discussed *supra, Gifford Pinchot Task Force* struck down the regulatory definition of "destruction or adverse modification" because it set the bar too high by requiring an appreciable diminishment of the value of critical habitat for both survival and recovery. 378 F.3d at 1069. The Ninth Circuit reasoned,
The agency's controlling regulation on critical habitat thus offends the ESA because the ESA was enacted not merely to forestall the extinction of a species (i.e., promote a species survival), but to allow a species to recover to the point where it may be delisted.... The ESA also defines critical habitat as including "the specific areas ... occupied by the species ... which are ... essential to the *conservation* of the species" and the "specific areas outside the geographical area occupied by the species ... that are essential for the *conservation* of the species...." 16 U.S.C. § 1532(5)(A) (emphases added). By these definitions, it is clear that Congress intended that conservation and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 662735 (N.D.Cal.)
**(Cite as: Slip Copy)**

survival be two different (though complementary) goals of the ESA. *See* 16 U.S.C. § 1533(f)(1) ("The Secretary shall develop and implement plans ... for the *conservation* and *survival* of endangered species and threatened species.") (emphasis added). Clearly, then, the purpose of establishing "critical habitat" is for the government to carve out territory that is not only necessary for the species' survival but also essential for the species' recovery.

.... Congress said that "destruction or adverse modification" could occur when sufficient critical habitat is lost so as to threaten a species' recovery even if there remains sufficient critical habitat for the species' survival. The regulation, by contrast, finds that adverse modification to critical habitat can only occur when there is so much critical habitat lost that a species' very survival is threatened. The agency's interpretation would drastically narrow the scope of protection commanded by Congress under the ESA.

*Id.* at 1070.

Here, defendants argue that because the milk-vetch is present in all of the proposed critical habitat areas that were ultimately excluded, any federal action that "may affect" those areas also "may affect" the species, thus triggering the Section 7 consultation process-and the opportunity to minimize or avoid any adverse effects on the relevant areas-even without the critical habitat designation. Defendants' argument misses the point, however, because although they are correct that the critical habitat designation of the excluded areas would not increase the *number* of opportunities for Section 7 consultations, the *scope* and *nature* of these consultations would be affected, as would the extent of the protections afforded the excluded areas. *See New Mexico Cattle Growers Ass'n v. U.S. Fish and Wildlife Serv.,* 248 F.3d 1277, 1283-84 (10th Cir.2001) (rejecting FWS's argument that impacts of listing and designating critical habitat are co-extensive).

**\*24** An example is illustrative. The final rule excluded portions of Subunit B and all of Subunit C from the designated critical habitat. Because milk-vetch is found in the excluded areas, if a federal action is proposed in those areas that may affect the milk-vetch, the agency contemplating the action would be required to consult with the Service pursuant to Section 7 of the ESA. That consultation would require the agencies to insure that the action is not likely to jeopardize the continued existence of the milk-vetch. However, because the excluded areas were not designated as critical habitat, the agencies would not be required to insure that, with respect to

these areas, the proposed action will not result in the destruction or adverse modification of the designated critical habitat. Put differently, while defendants are correct that Section 7 consultations will be triggered with respect to actions affecting Subunits B and C, the focus of those consultations will be on the species' survival, not recovery. In contrast, if the areas in Subunits B and C had been designated as critical habitat, any future Section 7 consultation would be required to also determine whether the proposed action would destroy or adversely modify the critical habitat, an inquiry that is broader than the jeopardy analysis. *See Gifford Pinchot Task Force, 378 F.3d. at 1069-70.* [FN22]

> [FN22.] Moreover, the critical habitat designation determines the geographic scope of the critical habitat analyzed in future Section 7 consultations. For example, the 2005 BO assessed the impact of the RAMP on the approximately 22,836 acres designated as critical habitat, instead of the 52,780 acres originally proposed.

Defendants assert that "the Service reasonably determined in its Section 4(b)(2) analysis that the consultations triggered by the presence of the species will provide a full opportunity to avoid adverse effects upon the [excluded] units," including consideration of conservation needs, even without the critical habitat designation. Defs' Reply at 11. There are two problems with this argument. First and most importantly, the law does not require the Service to consider whether a proposed action will destroy or adversely modify habitat that is not designated as critical. *See* 16 U.S.C. § 1536(a)(2). Thus, as stated *supra,* if a Section 7 consultation was triggered, the agencies would only be required to determine, with respect to the excluded areas, whether the proposed action jeopardized the continued existence of the species. The agencies would not be required by law to consider the impact of the action on non-critical habitat.

Second, the explanation in the final rule of the negligible regulatory benefits associated with designating critical habitat in the two units is slightly different, and more general, than that advanced by defendants in the summary judgment briefing. The final rule simply states "these two units are each occupied by the listed plant, so consultation on BLM's activities on the excluded lands will be required even without the critical habitat designation." CH AR Doc. # 430 at 8685-86. The

final rule does not state, as defendants do in their briefs, that this is so because the Service will be considering whether proposed actions will destroy or adversely modify habitat in Subunits B and C that is not designated as critical.

**\*25** Defendants also argue that the Service fully considered the recovery goals of the ESA in designating critical habitat because the proposed and final rules state that the Service considered the "conservation needs" of the milk-vetch in its designation of critical habitat. However, references to "conservation" in the proposed and final rules cannot be squared with the reasoning in the final rule which essentially equates the "jeopardy" and "adverse modification" determinations to conclude that the regulatory benefits of critical habitat designation in the excluded areas was negligible. Similarly, although the final rule acknowledges a decision from the Fifth Circuit invalidating the Service's definition of "destruction or adverse modification" and states that "[i]n response to this decision we are reviewing the regulatory definition of 'adverse modification' in relation to the conservation of the species," this statement is undercut by the Service's conclusion that there are no additional regulatory benefits as a result of designating critical habitat.[FN23]

> **FN23.** The Service's final rule designating critical habitat was issued on August 4, 2004. The Ninth Circuit's decision in *Gifford Pinchot Task Force* was issued on August 6, 2004. The decision mentioned in the final rule, *Sierra Club v. U.S. Fish and Wildlife Service,* 245 F.3d 434 (5th Cir.2001), struck down the regulatory definition of "adverse modification" on similar grounds as those relied on by the Ninth Circuit in *Gifford Pinchot Task Force.*

Accordingly, the Court concludes that by finding that there were no additional regulatory benefits to be gained by designating critical habitat in the areas that were ultimately excluded, the Service improperly ignored the recovery goal of critical habitat. *See Gifford Pinchot Task Force,* 378 F.3d at 1069-70. Because the Service's conclusion that the benefits of exclusion outweighed the benefits of inclusion is based on an erroneous conclusion of law, it is arbitrary and capricious. *See Mendenhall,* 92 F.3d at 874.

(2) Reliance on Allegedly Flawed Economic

Analysis

Plaintiffs also argue that the final rule is substantively flawed because it relied on a deficient economic analysis which both overstated the economic costs associated with critical habitat designation and understated the economic benefits of such designation. Plaintiffs contend that the Service failed to rely on the best scientific and commercial data available and that it failed to perform the required economic balancing in accordance with Section 4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2).

The final economic analysis ("FEA") concluded that the economic costs associated with designating critical habitat were substantial and that they justified excluding almost 60% of the proposed critical habitat. *See generally* CH AR Doc. # 418. The FEA reached this conclusion by assuming that all areas designated as critical habitat would be closed to OHV use.[FN24] *See id.* at 8405 (¶ 8), 8411-12 (¶ 16). The FEA projected the economic impact of such closures based upon its estimate of the economic costs associated with the interim closures that resulted from the settlement in *Center for Biological Diversity et al. v. Bureau of Land Management et al.,* C 00-0927 WHA.

> **FN24.** The assumption that critical habitat designation will result in closure of the entire area to OHV use appears inconsistent with the Service's and the BLM's other actions and decisions in this matter, and with the positions argued by defendants in these various motions.

The FEA measured the economic impact in terms of "efficiency effects" and "distributional effects." "Efficiency effects" represent the "opportunity cost of resources used or benefits foregone by society as a result of the regulations" protecting milk-vetch habitat. *Id.* at 8426-27 (¶ 44). "Distributional effects" refer to the regional economic impact of the restrictions in terms of shifts in employment, tax revenue, and local and regional economic input. *Id.* at 8404 (¶ 5).

**\*26** The FEA estimated that the past efficiency effects totaled $24.59 million and consisted primarily of "consumer surplus value" lost as a result of the temporary closures initiated in March 2000. *Id.* at 8408-09 (¶ 11 & Ex. ES-1). Based on economic valuation studies, the FEA determined that the consumer surplus value of a single OHV trip in the

ISDRA was $132. *Id.* at 8471-74 (¶ ¶ 155-59). The FEA estimated that the closures reduced OHV visitation at the ISDRA by 15% per year between 2001 and 2004. *Id.* at 8467 (¶ 141), 8469-71 (¶ ¶ 149-150, 154). By multiplying the number of lost visits in this time period by the consumer surplus value per visit, the FEA estimated that the total consumer surplus value lost as a result of the temporary closure was $20.37 million. *Id.* at 8408-09, 8474 (¶ 159). [FN25]

FN25. The other efficiency effects are comprised of administrative costs and project modification costs associated with conservation efforts. *See id.* at 8408 (¶ 11).

The FEA also estimated that the regional impact ("distributional effects") of past milk-vetch related management actions ranged from $13 to $26 million, consisting primarily of reduced OHV-related expenditures in the two counties primarily affected by OHV use in the ISDRA. *Id.* at 8409 (¶ 12). To calculate this figure, the FEA again assumed that the temporary closures reduced OHV visitation by 15%. The FEA then determined that expenditures relating to OHV recreation in the ISDRA range from $250 to $500 per trip. *Id.* at 8476 (¶ 167). The FEA calculated the regional economic impact by multiplying the number of trips lost by the estimated expenditures per trip. *Id.* at 8479 (¶ 169). The FEA also concluded that the regional impact was associated with the loss of 269 to 527 jobs and $.86 to $1.72 million in lost tax revenue in the affected counties. *Id.* at 8409-10 (¶ 13).

(a) 15% Decline in OHV Visitation

Plaintiffs challenge the FEA's assumption that the interim closures resulted in a 15% decline per year in OHV visitation. Plaintiffs argue that this assumption is arbitrary and capricious because BLM's own data show that OHV use actually increased after the closures, there are no visitation numbers showing a decline as a result of the closures, and the BLM reported that it did not notice a decline in visitation following the closures. Instead, the FEA's assumption of a 15% decline in OHV visitation is based primarily on a report from an OHV representative that unidentified and unquantified numbers of OHV users were "discouraged" from visiting the ISDRA. Plaintiffs contend that this unfounded assumption about OHV use cannot legitimately be used for forecasting given the contradictory actual visitation

data available from the BLM.

The Court agrees. The FEA's assumption that the interim closures resulted in a 15% decline in OHV visitation is based primarily on a report by a board member of defendant-intervenor American Sand Association that OHV users were "discouraged" from visiting the ISDRA as a result of the closures. The 15% decline is also based, to a lesser extent, on the fact that visitation data showed a 24% decline during the 2001 season. The FEA states,

**\*27** This analysis assumes that past management actions to protect the PMV resulted in a 15 percent decline in total OHV trips taken, at the upper bound, from 2001 to 2004. The temporary closure of 49,310 acres of the ISDRA reduced the numbers of acres available to OHV users by 37 percent. While detailed visitation data are not available to describe the effects of the closure, BLM data report that visitation dropped from 247,929 in the 2000 season to 187,557 in the 2001 season, or by 24 percent. As noted in Section 3, prior to 2002 BLM did not collect visitation information by management area; as such, it is not possible to identify which management areas received fewer visitors as a result of the closure. In addition, this drop in visitation may reflect a variety of factors, outside the closure. BLM has noted that visitation to the dunes often is subject to fluctuation based on economic and weather conditions. BLM indicates that the temporary closures likely had a minimal impact on visitation.

While BLM did not observe a drop in visitation related to the closures, OHV groups and users within the OHV community indicate that ISDRA visitors, particularly those who previously visited the closure areas, were discouraged by the news of the closures. Thus, visitation levels were likely impacted up to as much as 15 percent in the years subsequent to the closures (ASA, November 19, 2003)....

*Id.* at 8469-70 (¶ ¶ 149-50) (internal citations and footnotes omitted). The source noted, defendant-intervenor ASA, is more fully cited in the References section of the FEA: "ASA. November 19, 2003. Personal communication with Jim Branham (Board of Directors member)." *Id.* at 8510.

At first blush the BLM's data showing a 24% decline during 2001 would seem to support the FEA's assumption that the closures resulted in a 15% decline in OHV visitation. However, there are a number of problems with relying on this data. First and most importantly, the BLM itself did not observe a drop in visitation related to the closures, and indicated that the temporary closures likely had a

minimal impact on visitation. *Id.* at 8469-70 (¶ ¶ 149-50). Second, the FEA repeatedly acknowledges that there is no accurate pre-2002 visitation data due to the BLM's methodology for counting visitation. The FEA describes the visitation data and methodology for counting visitors as follows:

ISDRA visitation has increased since 1995. Exhibit 3-6 tracks ISDRA visitation over the past eight years. The drastic change in visitation estimates between 2001 and 2002 is attributed to the change in BLM's counting methodology. Prior to 2002, BLM extrapolated visitation through employing on-the-ground and fly-over estimates of vehicles during peak weekends. In 2002, BLM installed underground vehicle counters at each major ISDRA entrance point. Accordingly, accurate visitation data by management area prior to the 2002 recreation season is not available. Another source of information on visitation is based on the ISDRA visitation fee. BLM has charged a visitation fee since prior to the listing of the [Peirson's milk-vetch]. While these revenue data are available on an annual basis for the ISDRA as a whole, these data do not reflect actual visitation because compliance with paying the fee has been an issue.

**\*28** *Id.* at 8453-54 (¶  108) (internal footnotes and citations omitted).[FN26] Thus, the only data supporting the FEA's assumption that the temporary closures resulted in a 15% decline is, according to the FEA, not accurate. Third, the FEA assumed that the closures led to a 15% decline in OHV visitation for each year between 2001 and 2004. *See id.* at 8471 (¶ 154). However, the visitation data does not support an assumption that the closures led to such a decline for each year: according to the FEA, the 2001 data is inaccurate; the 2002 data shows a sharp increase which is likely attributable to the new counting methodology; and the 2003 data shows a slight decrease from 2002 but an increase from 2001.[FN27]

> **FN26.** The FEA also states that due to a change in the BLM's counting methodology in 2002, "accurate visitation data by management area prior to the 2002 recreation season is not available," *id.* at 8454, and that "[w]hether visitation to the ISDRA to the ISDRA declined as a result of the closures is debated." *Id.* at 8467.

> **FN27.** Moreover, the FEA states that "[v]isitation rates to the ISDRA have climbed steadily over the years and are anticipated to continue to trend upward over

the next ten years," *id.* at 8452 (¶  104), and "[t]he ISDRA has experienced an average annual growth rate of 7.5 percent since 1985." *Id.* at 8487 n. 48.

Simply put, there is no data in the record linking the interim closures to any reduced OHV visitation levels at the Dunes. In apparent recognition of this fact, and the fact that the BLM itself stated it did not notice a drop in visitation due to the closures, the FEA primarily justifies its assumption that the closures led to a 15% per year decline in OHV visitation based on the communication from an ASA board member that OHV users were "discouraged" from visiting the Dunes after the closures were implemented. *Id.* at 8470 (¶ 150). The FEA does not provide any details regarding the communication, such as how many OHV users reported being "discouraged," or exactly what being "discouraged" means with respect to visitation of the Dunes. Indeed, there is nothing quantifiable whatsoever about the statement, "OHV groups and users within the OHV community indicate that ISDRA visitors, particularly those who previously visited the closure areas, were discouraged by the news of the closures," yet this statement forms the basis for the FEA's conclusion that "[t]hus, visitation levels were likely impacted up to as much as 15 percent in the years subsequent to the closures." *Id.*[FN28]

> **FN28.** The FEA also states that "the American Sand Association believes that the 2000 closure may have impacted visitation by as much as 15 percent in the year subsequent to the closure." *Id.* at 8490 (¶ 191). Although this statement contains the 15% figure, there is still no quantifiable information regarding the basis for this belief. Moreover, the Court notes that apparently ASA's belief that the closures led to a decline was limited to the year subsequent to the closure, yet the FEA assumed that the closures led to a 15% decline for each year.

In light of the complete absence of any information in the FEA regarding how many OHV users were actually deterred from visiting the Dunes as a result of the closures, the Court concludes that there is no factual basis in the record to support the FEA's assumption that the closures resulted in a 15% decline in OHV visitation for each year between 2001 and 2004. As discussed *supra,* this was a critical assumption underlying all of the FEA's

analysis and its conclusion that designating all of the proposed critical habitat would lead to adverse efficiency effects of up to $193.93 million, adverse impacts on the regional economy between $53.73 million and $121.16 million, and the possible loss of 1,179 and 2,525 jobs. *See* CH AR Doc. # 430 at 8687. The Court concludes that it was arbitrary and capricious for the Service to rely on a critical assumption that lacks support in the record to justify excluding significant portions of critical habitat. *See Natural Res. Def. Council v. U.S. Envtl. Prot. Agency,* 966 F.2d 1292, 1305 (9th Cir.1992). Moreover, in relying on an unsubstantiated assumption that was critical to its exclusion decision, the Service did not rely on the "best scientific and commercial data available" as required by the ESA. 16 U.S.C. § 1533(b)(2).

(b) Even distribution of OHV use within management areas

**\*29** Plaintiffs also contend that the FEA improperly inflated the costs associated with critical habitat designation by assuming an even distribution of OHV use within the various management areas even though the areas receiving the highest OHV use were already excluded from the proposed critical habitat designation. When the Service designated proposed critical habitat, it "avoided designating many of the concentrated use areas in the ISDRA, in particular intensive OHV activity areas, including many major staging sites, campgrounds, and disturbed areas along roadways." CH AR Doc. # 418 at 8412 (¶ 16). Plaintiffs argue that given the exclusion of the most heavily used areas from the proposed critical habitat, the FEA could not properly assume that "visitation within the ISDRA is evenly distributed within each management area" in order to measure the economic impacts of designating critical habitat. *Id.* at 8411 (¶ 16).

The Court disagrees and concludes that, given the limitations in the available data concerning OHV visitation within each management area, the FEA and the Service reasonably assumed that OHV use would be evenly distributed. The FEA's methodology in this regard is as follows. Using two BLM growth projections, the FEA first calculated the OHV visitation likely to occur in each management area where OHV use is permitted for the period of 2005 through 2024. *Id.* at 8487-88 (¶¶ 184-86). Because data indicating the extent of OHV use likely to occur in the critical habitat portion of each management area did not exist, the FEA assumed that OHV use

would be evenly distributed throughout the management area. *Id.* at 8411 (¶ 16). The FEA calculated the expected OHV use in the proposed critical habitat by multiplying the expected visitation in each management area by the percentage of critical habitat in each management area. *Id.* at 8411-12 (¶ 16). The FEA then used these numbers to arrive at the consumer surplus values and regional economic contributions for each area. *Id.* at 8412-13 (¶¶ 18, 20); 8471-74 (¶¶ 155-58); 8489 (¶ 187); 8492 (Fig.4-1); 8494-95 (¶¶ 194-95); 8499 (Fig.4-2).

The FEA recognized that assuming OHV use was evenly distributed throughout each management area could result in an overstatement or an understatement of the economic impact that could result if the proposed critical habitat area were closed to OHV use.

It is not possible, using existing data, to predict the percentage of OHV users who visit areas of the ISDRA that are proposed for critical habitat. The Service has excluded high-use, developed, staging, and camping areas that are unlikely to contribute to the conservation of the PMV for the proposed designation. However, the inner portions of the dunes may be more attractive to some users, although these areas are more remote and are therefore likely to experience less intensive visitation. Lacking detailed data on user patterns and to offset conflicting attitudes towards visitation distribution, the analysis models visitation based on BLM counts and assumes an equitable distribution of visitation within each management area. To the extent that areas proposed for designation are less or more popular with OHV users, this analysis could overstate or understate impacts by over-or underestimating the number of trips that could be affected by the designation.

**\*30** *Id.* at 8462-63 (¶ 127). The Court concludes that the FEA's approach, and the Service's reliance on this approach (separate and apart from the other deficiencies noted elsewhere in this decision), is consistent with the Service's obligation to use the best available data.

(c) Co-extensive costs

In their reply brief, plaintiffs contend for the first time that the Service improperly considered coextensive "administrative and project modification costs" attributable to the listing of the milk-vetch in its decision to exclude critical habitat. Relying on competing cases from outside the Ninth Circuit, the parties dispute whether the Service may make an

exclusion decision based upon consideration of economic impacts of the critical habitat designation that are coextensive with restrictions resulting from the milk-vetch's status as a listed species, or whether the Service is limited to consideration of incremental costs solely attributable to critical habitat designation. The final rule states that if all areas proposed for designation were closed to OHV use, the efficiency effects would include $0.57 million per year in administrative and project modification costs incurred by the BLM on "implementing ISDRA-wide milk-vetch conservation measures, including monitoring, and enforcement, and section 7 consultation with the Service." *See* CH AR Doc. # 430 at 8686-87.

Defendants contend that even assuming that 100% of the challenged costs identified by plaintiffs are coextensive with restrictions related to the milk-vetch's listed status, such costs did not form the basis of the Service's exclusion decision. However, defendants' argument is unavailing because the "administrative and project modification costs" are included in the "adverse efficiency effects" identified by the final rule *See id.* at 8686; *see also* CH AR Doc. # 418 at 8412 (¶ 18) ("If areas proposed for critical habitat designation within a management area were closed to OHV use, efficiency effects would be associated with administrative costs, project modification costs, and consumer surplus losses to OHV users."). The fact that the administrative and project modification costs constitute a relatively small proportion of the adverse efficiency effects does not mean that these costs did not form the basis, in part, of the Service's exclusion decision, and indeed, the plain language of the final rule states that the Service did consider these costs in making its decision.

Defendants also argue that the Service is permitted to consider coextensive costs when excluding critical habitat. Defendants cite the Tenth Circuit's decision in *New Mexico Cattle Growers Association,* which rejected the Service's "baseline" approach to analyzing the economic impacts associated with designating critical habitat. 248 F.3d at 1284-85. The court described that approach as follows: "the baseline approach moves any economic impact that can be attributed to listing below the baseline and, when making the [critical habitat designation], takes into account only those economic impacts rising above the baseline." *Id.* at 1280. In that case, the FWS designated critical habitat for the Southwestern Willow Flycatcher, and determined that the flycatcher critical habitat designation resulted in no

economic impact. *Id.* Various groups brought suit challenging this determination and contending that the Service should have considered all economic impacts associated with designating critical habitat, including those that are coextensive with listing.

*\*31* The Tenth Circuit noted,
The root of the problem lies in the FWS's long held policy position that [critical habitat designations] are unhelpful, duplicative, and unnecessary.... In turn, the policy position of the FWS finds its root in the regulations promulgated by the FWS in 1986 defining the meaning of both the "jeopardy standard" (applied in the context of listing) and the "adverse modification" standard" (applied in the context of designating critical habitat).

*Id.* at 1283. Although the *New Mexico Cattle Growers* court was not presented with the question of whether those regulatory definitions were valid, that court noted that "federal courts have begun to recognize that the results they produce are inconsistent with the intent and language of the ESA." *Id.* at n. 2 (citing *Sierra Club v. U.S. Fish and Wildlife Serv.,* 245 F.3d 434 (5th Cir.2001)). FN29 Because the ESA bars economic considerations when a listing determination is made, the *New Mexico Cattle Growers* court concluded that "the regulation's definition of the jeopardy standard as fully encompassing the adverse modification standard renders any purported economic analysis done utilizing the baseline method virtually meaningless." *Id.* at 1284-85. In order to give effect to the congressional directive that economic impacts be considered at the time of critical habitat designation, the court held that the Service must consider all impacts of a critical habitat designation, including coextensive impacts. *Id.* at 1285.

> FN29. *New Mexico Cattle Growers* was issued in 2001, prior to the Ninth Circuit's decision in *Gifford Pinchot Task Force.*

The Court is not persuaded by the reasoning of *New Mexico Cattle Growers,* and instead agrees with the reasoning and holding of *Cape Hatteras Access Preservation Alliance v. U.S. Dep't of the Interior,* 344 F.Supp.2d 108 (D.D.C.2004). That case also involved a challenge to the Service's baseline approach, and the court held that the baseline approach was both consistent with the language and purpose of the ESA and that it was a reasonable method for assessing the actual costs of a particular critical habitat designation. *Id.* at 130. FN30 "To find

the true cost of a designation, the world with the designation must be compared to the world without it.... The Service, however, must not allow the costs below the baseline to influence its decision to designate or not designate areas of critical habitat. That would be inconsistent with the ESA's prohibition on considering economic impacts during the species listing process." *Id.*

FN30. The ESA provides,
The Secretary shall designate critical habitat ... on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, *of specifying any particular area as critical habitat.* The Secretary may exclude any area from critical habitat if he determines that the benefits *of such exclusion* outweigh the benefits *of specifying such area* as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.
16 U.S.C. § 1533(b)(2) (emphasis added).

The *Cape Hatteras* decision is particularly instructive because it was made after a careful review of the decisions in *Sierra Club* and *Gifford Pinchot Task Force,* which both struck down the regulatory definition of "adverse modification," as well as the Tenth Circuit's decision in *New Mexico Cattle Growers. See id.* at 128-29. While the *Cape Hatteras* court agreed with the Fifth and Ninth Circuits that the regulatory definition of "adverse modification" caused the Service to undercut the importance of critical habitat, the court disagreed with the Tenth Circuit that the baseline approach violates the language of the statute. *Id.* at 129-30. The court stated, and this Court agrees, that "[a]pparently hamstrung by its inability to consider the validity of 50 C.F.R. § 402.02, the Tenth Circuit found another way to require the Service to provide a more rigorous economic analysis." *Id.*

**\*32** Accordingly, because the Court concludes that the Service acted contrary to law by considering coextensive administrative and project modification costs when it excluded areas from the critical habitat designation, the Service's critical habitat designation is arbitrary and capricious.

(d) Failure to quantify public costs savings

Plaintiffs contend that the Service overlooked the economic benefits of designating critical habitat because the FEA did not quantify public costs savings in expenditures related to providing on-site infrastructure, enforcement and emergency services. In its review of the "Benefits of Inclusion," the Service stated that only insignificant regulatory and educational benefits would result from designating 52,780 acres of critical habitat. *See* CH AR Doc. # 430 at 8685-86. Plaintiffs argue that because the Service's decision to exclude approximately 31,000 acres was based upon the assumption that designation would result in reduced OHV visitation, the Service was also required to evaluate the economic benefits associated with such reduced visitation.

The Court agrees. A fundamental assumption of the FEA, and of the Service's decision to exclude critical habitat from the final designation, is that designating critical habitat will result in costly closures of critical habitat areas to OHV use. To determine the losses associated with these theoretical closures, the FEA analyzed existing data and gathered new data regarding expenditures made by OHV users. *See* CH AR Doc. # 418 at 8476-78 (¶ 167) (describing, *inter alia,* information provided by OHV groups for economic analysis). By only analyzing the loss of revenue and jobs associated with closures, and failing to analyze the concomitant public costs savings, the FEA provided an unbalanced assessment of the "economic impact and any other relevant impact of specifying any particular areas as critical habitat." 16 U.S.C. § 1533(b)(2).

Defendants argue that the Service was not required to consider these impacts because, as the Service stated in the final critical habitat rule, "data are not available to estimate the extent of these cost savings; as such, these cost savings are not monetized in this analysis." CH AR Doc. # 430 at 8679. Although defendants are correct that the Service is not required to create data for the purposes of a critical habitat designation analysis, the Service is required to consider the data that it already has in its possession. As plaintiffs note, some of the potential public costs savings are already monetized in the FEA. For example, the cost of providing on-site infrastructure and services are anticipated to cost BLM $600,000 per year; BLM anticipates incurring annual costs of $3.12 million related to law enforcement, emergency, and additional holiday staffing; and the Imperial County Sheriff's Office was granted $750,000 for OHV law enforcement and emergency services at the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 27
Slip Copy, 2006 WL 662735 (N.D.Cal.)
**(Cite as: Slip Copy)**

Dunes. *See* CH AR Doc. # 418 at 8461 (¶¶ 122-24); *see also id.* at 8486 (Ex. 4-9). Thus, information already existed that could have been used to analyze the potential cost savings associated with closures to OHV users. <sup>FN31</sup>

> **FN31.** Moreover, while the Service is not required to conduct studies in order to gather data that does not exist, the Court finds it notable that in the preparation of the economic analysis, the researchers actively gathered information from the OHV community to determine the consumer surplus value, including information about "medical supplies and treatment." *Id.* at 8478 (Ex. 4-3).

**\*33** Defendants also argue, somewhat inconsistently, that a portion of these public costs are attributable to enforcing the closures and implementing a biological monitoring plan, and thus, defendants argue, not all of these costs would be considered as cost savings in the event of a closure. *See id.* at 8461 (¶ 123) ("Portions of these costs [related to law enforcement, emergency, and holiday staffing] have been identified by BLM as affiliated with PMV protective measures, including the 2001 closures and implementing a biological monitoring plan for the plant, and are estimated in Section 4 as project modification costs (Ex. 4-9)."); *see also id.* at 8486 (Ex. 4-9). However, the fact that the BLM has been able to identify which portion of the costs are attributable to protection of the milk-vetch and enforcing the closures suggests that, conversely, the BLM can identify which portion of the costs are not attributable to such protective measures.

Defendants also note that the BLM's comments on the draft economic analysis indicated that "[t]he closures have substantially increased the cost of managing the area. Cost for signing, materials, labor, and equipment have all increased." CH AR Doc. # 332 at 7505. However, this was not the reason given in the FEA or by the Service for not analyzing whether there were any public costs savings associated with the closures. Instead, the FEA and the Service both explicitly recognized that reduced OHV visitation due to closures could reduce public costs, but that because data indicating the extent of any potential reduction was unavailable, the FEA did not attempt to analyze those savings. *See* CHAR Doc. # 418 at 8461 (¶ 125); CH AR Doc. # 430 at 8679 (Comment 35). The Court cannot "supply a reasoned basis for the agency's decision that the agency itself

has not given." *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1182 (9th Cir.2000) (internal citation and quotation omitted).

(e) Failure to consider non-motorized uses/value of Dunes

Plaintiffs also contend that the Service did not consider the value of non-motorized, non-consumptive uses of the Dunes, including hiking, backpacking, camping, wildlife viewing, birdwatching and photography. The FEA states, "[t]he analysis does not account for other activities that might be taking place in the ISDRA closure areas to mitigate the consumer surplus impact." CH AR Doc. # 418 at 8420. Plaintiffs contend that this failure violates the ESA's requirement that the Service shall "tak[e] into consideration ... any other relevant impact of specifying any particular areas as critical habitat." 16 U.S.C. § 1533(b)(2).

The Court concludes that the Service did not abuse its discretion when it concluded that the value of non-OHV recreation was so small that it did not need to be calculated. The FEA states that "[w]hile the ISDRA provides opportunities for non-OHV recreation, such as hiking and horseback riding, historical use patterns indicate that the number of individuals participating in these activities is far less than those involved in OHV-based recreation." CH AR Doc. # 418 at 8405 (¶ 6); *see also id.* at 8443 (¶ 88) ("[G]iven the current disparity between the number of non-OHV trips and OHV trips, non-OHV recreation given closures to OHV use would likely draw several orders of magnitude less visitation"), 8453 (¶ 105) (noting that North Algodones Wilderness Area, which is closed to OHV use, receives approximately 6 groups of visitors per year). The FEA and the Service recognized that a decrease in OHV visitation could result in an increase in non-motorized recreation with associated economic benefits. *Id.* at 8420; CH AR Doc. # 430 at 8679 (Comment 38). However, because the record indicates that only a very small amount of non-OHV recreation has historically occurred in areas closed to OHV use, the Service did not abuse its discretion in concluding that any increase in non-OHV recreation that might result from a future closure would be insignificant. <sup>FN32</sup>

> **FN32.** Plaintiffs also contend that the Service improperly failed to assess other benefits associated with non- or reduced-

OHV use, including improved air quality, reduced noise, protection of flora and fauna, and increased soil retention on and around closed areas of the Dunes. The FEA recognized that "real social welfare benefits can result from the conservation and recovery of endangered and threatened species. Such benefits have also been ascribed to preservation of open space and biodiversity, both of which are associated with species conservation. Likewise, regional economies and communities can benefit from the preservation of healthy populations of endangered and threatened species, and the habitat on which these species depend." CH AR Doc. # 418 at 8431-32 (¶ 64). However, noting that it is often not "feasible to monetize, or even quantify, the benefits of environmental regulations," the FEA declined to do so, relying instead on expressing the benefits "in biological terms." *Id.* Whether an adequate description of the "biological terms" has been provided here is open to dispute, but plaintiffs cite no cases suggesting that such an issue is dispositive of the validity of the FEA.

### B. Procedural Challenges to Final Critical Habitat Rule

**\*34** The ESA and APA require the Service to provide the public with notice and to accept comment on any proposed listing or critical habitat designation. *See* 16 U.S.C. § 1536(b)(5)(A), 1533(b)(8); 5 U.S.C. § 553(b)-(c). Plaintiffs contend that the Service's final critical habitat rule violated these notice and comment requirements because the final rule eliminated over 30,000 acres (over 60%) of proposed critical habitat for economic reasons with no mention of such an intention in the proposed rule, and therefore the Service did not provide the requisite public notice of the intended exclusions. Relying on *Small Refiner Lead Phase-Down Task Force v. U.S. Environmental Protection Agency,* 705 F.2d 506, 547 (D.C.Cir.1983), plaintiffs argue that the notice given was inadequate because it "deviate[d] too sharply" from the proposed rule and therefore fails to serve the policies underlying the notice requirement: to ensure agency regulations are "tested by exposure to diverse public comment"; to provide "fairness to affected parties" by giving them notice and the opportunity to be heard; and to provide affected parties with sufficient opportunity to develop evidence in the record to support their objections to a rule, thereby

enhancing the quality of judicial review. *Id.*

Defendants argue that the law does not require that the final rule be identical to the proposed rule, but only that "that final rule which departs from a proposed rule must be a 'logical outgrowth' of the proposed rule." *Natural Res. Def. Council v. Envtl. Prot. Agency,* 279 F.3d 1180, 1186 (9th Cir.2002). "The essential inquiry focuses on whether interested parties reasonably could have anticipated the final rulemaking from the draft." *Id.* (internal quotation and citation omitted). Defendants note that the Service repeatedly stated in the proposed rule that it would consider excluding areas if it determined, based on the economic analysis, that the benefits of exclusion outweighed the benefits of inclusion. *See e.g.,* 68 Fed.Reg. at 46154, 46143, 46144, 46147, and 46148. Defendants also note that when the Service notified the public of the availability of the draft economic analysis ("DEA"), the Service again emphasized that it might "exclude an area from critical habitat if we determine that the benefits of excluding the area outweigh the benefits of including the area in critical habitat." 69 Fed.Reg. at 18018. Defendants argue that affected parties were fairly provided notice and the opportunity to be heard, and that in fact plaintiffs obtained a copy of the DEA and submitted extensive comments to the Service.

The Court concludes that the Service did not commit a procedural violation. As defendants note, the Service did provide notice that it might exclude an area from critical habitat depending on the results of the economic analysis. Moreover, plaintiffs and other interested parties provided comment on the draft economic analysis, which was the basis for the ultimate exclusions. The Court concludes that eliminating almost 60% of the proposed critical habitat from the final rule approaches, but does not exceed, the limit of what can be considered a "logical outgrowth" of the proposed rule.

### 4. Plaintiffs' Challenges Under the National Environmental Policy Act

**\*35** The National Environmental Policy Act ("NEPA") requires federal agencies to analyze the environmental impacts of a proposed action before proceeding with that action. *See* 42 U.S.C. § 4332(2)(C). Under NEPA and the regulations promulgated thereunder by the Council on Environmental Quality ("CEQ"), federal agencies must prepare and circulate to the public a comprehensive environmental impact statement

("EIS") so that the environmental impacts can be considered and disclosed to the public during the decision-making process. *See* 40 C.F.R. § § 1501.2, 1502.5. In the EIS, the agency must identify direct, indirect, and cumulative impacts of the proposed action, consider alternative actions (including the alternative of taking no action) and their impacts, and identify all irreversible and irretrievable commitments of resources associated with the action. *See* 42 U.S.C. § 4332(2); 40 C.F.R. § 1502.14(d).

Plaintiffs argue that the BLM violated NEPA in three respects. First, plaintiffs contend that the BLM should have identified the current management of the Dunes, including the interim closures, as the "no action" alternative. Second and relatedly, plaintiffs contend that even if BLM was not required to designate the interim closures as the "no action" alternative, BLM violated NEPA by excluding the interim closures as a "reasonable" alternative. Third, plaintiffs argue that BLM violated NEPA by failing to identify or analyze impacts to endemic invertebrates found at the Dunes.

A. Exclusion of Interim Closures From the "No Action" Alternative

NEPA requires that an EIS include "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). NEPA regulations provide that an EIS must include "the alternative of no action" as well as "all reasonable alternatives." 42 U.S.C. § 4332(C); 40 C.F.R. § 1502.14(a), (d). BLM considered and analyzed four alternatives in the EIS, which it identified as "Alternative 1: No Action"; "Alternative 2: Recreation and Natural/Cultural Resource Protection Alternative" (BLM's preferred alternative); "Alternative 3: Natural and Cultural Resource Protection Alternative"; and "Alternative 4: Motorized Recreation Opportunities Alternative." *See* ROD AR Sec.2 at 09168. None of the alternatives include the interim closures that are currently in place at the Dunes.

The EIS describes the No Action Alternative as follows:
Under Alternative 1, the ISDRA would continue to be managed according to the existing and approved management plan and policies (e.g., the 1987 RAMP). In addition, the No Action Alternative would include compliance with policies and management measures instituted since the 1987 RAMP was first implemented, including the designation of the North Algodones Dunes

Wilderness in 1994 and the release of Wilderness Study Area 362 from further suitability studies. Alternative 1 does not include any of the actions that were proposed in the 1987 RAMP and were not implemented prior to 2002 because management must also accommodate the findings of more recent resource inventories at the ISDRA, as well as updated regulations that could constrain full implementation (e.g., new facilities would not be allowed in the wilderness area). Under this alternative the ROS classifications and management areas that apply to the action alternatives will not be created.... Also, Alternative 1 does not include the interim OHV closure areas or the temporary camping closure because these are temporary measures and not part of the management policy for the ISDRA....
**\*36** This alternative continues the current management of the Planning Area, without considering the recent and proposed plan amendments for this area. The CDCA Plan would not be amended under this alternative, and no adaptive management program would be implemented. Multiple use classes and vehicle use classes would remain the same as in the 1987 RAMP.

ROD AR Sec. 2 at 9171.

Plaintiffs contend that the No Action Alternative is improperly identified because the "current management" of the ISDRA includes the interim closures. Plaintiffs argue that by excluding the current closures from the No Action Alternative, the EIS did not provide an accurate baseline from which the RAMP's effects on the environment could be evaluated. For support, plaintiffs cite guidance issued by the Council on Environmental Quality regarding determination of the "no action alternative":
The first situation might involve an action such as updating a land management plan where ongoing programs initiated under existing legislation and regulations will continue, even as new plans are developed. In these cases "no action" is "no change" from current management direction or level of management intensity. To construct an alternative that is based on no management at all would be a useless academic exercise. Therefore, the "no action" alternative may be thought of in terms of continuing with the present course of action until that action is changed.

Forty Most Frequently Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed.Reg. 18026, 18027 (Mar. 23, 1981) (codified at 40 C.F.R. pts. 1500 *et seq.*). Plaintiffs contend that because the interim closures

are part of the "present course of action," they should have been included in the No Action Alternative. Plaintiffs contend that the EIS is fundamentally flawed because, by excluding the interim closures from the No Action Alternative, the EIS was able to misleadingly conclude that Alternative 2 (the BLM's preferred alternative) will decrease environmental impacts to the Dunes. *See* ROD AR Sec. 2 at 9383 ("Potential impacts to habitat types including creosote bush scrub, psammophitic scrub, and microphyll woodland are expected to decrease overall under Alternative 2, relative to Alternative 1."); *id.* at 9384 ("Impacts to special status and plants are expected to decrease under Alternative 2."). Plaintiffs argue that because the EIS failed to properly identify the "No Action" alternative, it fails to present an accurate assessment of the environmental effects of the proposed action.

Defendants argue that the interim closures were properly excluded from the No Action Alternative because these closures did not proceed through a typical land use planning process but were instead developed as an agreement to resolve litigation in *Center for Biological Diversity et al. v. Bureau of Land Management et al.,* C 00-0927 WHA. Defendants also argue that because the closures were always only intended to be temporary, they are not part of the "current management direction" or "existing plan" for the Dunes. Thus, defendants contend, it was not arbitrary or capricious of the BLM to exclude the interim closures from the No Action Alternative.

**\*37** None of the cases cited by the parties are on point. The Ninth Circuit has noted that the " 'no action' status quo alternative ... is the standard by which the reader may compare the other alternatives' beneficial and adverse impacts related to the applicant doing nothing." *Kilroy v. Ruckelshaus,* 738 F.2d 1448, 1453 (9th Cir.1984) (internal citation and quotation omitted). Here, as plaintiffs contend, doing nothing would mean that the current management of the Dunes, including the interim closures, would continue. The Court is also sympathetic to plaintiffs' contention that by excluding the interim closures from the No Action Alternative, BLM was able to state, somewhat disingenuously, that its preferred alternative, Alternative 2, would lead to greater protections for plants and habitat; it is undisputed that if the BLM had included the interim closures in the No Action Alternative, Alternative 2 would lead to comparatively less protections for special status plants and habitat.

However, the Court concludes that because the interim closures were agreed to within a litigation context, it was not arbitrary or capricious of the BLM to exclude these closures from the No Action Alternative. None of the cases or regulations cited by the parties address a situation such as the instant one in which temporary measures have been instituted in a litigation context. Moreover, although it is true that "doing nothing" would result in the interim closures remaining in place, defendants are correct that it was contemplated that the interim closures would only remain in place until defendants completed environmental review of the RAMP (and any ensuing litigation over such review had concluded). Although the Court is concerned that excluding the interim closures from the No Action Alternative is not consistent with the purpose behind designating a no action alternative, the Court concludes that BLM's exclusion of the interim closures from the No Action Alternative was not arbitrary and capricious given the atypical history of the interim closures.

B. Elimination of the Interim Management
Alternative from the Range of Reasonable
Alternatives

The NEPA regulations require that an agency "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). Such rigorous exploration and objective evaluation of all reasonable alternatives is "the heart of an EIS." *Natural Res. Def. Council v. U.S. Forest Serv.,* 421 F.3d 797, 813 (9th Cir.2005). As the Ninth Circuit has held,

In order to be adequate, an environmental impact statement must consider not every possible alternative, but every reasonable alternative. The existence of a viable but unexamined alternative renders an environmental impact statement inadequate. The question for the district court, therefore, is whether the [omitted alternative] was reasonable.

**\*38** *Citizens for a Better Henderson v. Hodel,* 768 F.2d 1051, 1057 (9th Cir.1985) (internal citations omitted). Put differently, "[t]he touchstone for [the court's] inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *California v. Block,* 690 F.2d 753, 767 (9th Cir.1982).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 662735 (N.D.Cal.)
**(Cite as: Slip Copy)**

Here, BLM identified the interim closures as a possible alternative ("Interim Management Alternative"), but then eliminated this alternative on the ground that it did not meet the "purpose and need" for the BLM's action. *See* ROD AR Sec. 2 at 13321 (Draft EIS); ROD AR Sec. 2 at 9206-08. The Final EIS states that the Interim Management Alternative was rejected because that alternative would not: (1) "[p]rovide a process to allow the maximum recreational use of the ISDRA while maintaining the unique and diverse habitat of the dunes system"; (2) "[d]evelop a large continuous geographical area for habitat and species conservation"; (3) "[a]llow the closed geographical areas to be available for OHV and other recreational uses or for the recreational use of the area to be adjusted as needed to conserve the habitat and species"; and (d) "[u]tilize sound science when making decisions concerning species conservation and multiple use of the ISDRA." *See* ROD AR Sec.2 at 9207. The EIS also states that "these closures are not necessary for adequate protection of sensitive species." *Id.* at 9208.

"The stated goal of a project necessarily dictates the range of 'reasonable' alternatives and an agency cannot define its objectives in unreasonably narrow terms." *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.,* 123 F.3d 1142, 1155 (9th Cir.1997). The Court must determine whether the EIS's "purpose and need" was reasonable, and then whether the IMA was reasonable in light of the cited project goals. *See id.*

Plaintiffs contend that the EIS's stated purposes of providing "maximum recreational use of the ISDRA," and developing "a large continuous geographical area for habitat and species conservation" which "will be available for OHV use" are unreasonably narrow and tailored in such a way so that only the BLM's preferred alternative, Alternative 2, would be selected. The Final EIS states that the purposes of the project are, in relevant part, to:

Provide a process to allow the maximum recreational use of the ISDRA while maintaining the unique and diverse habitat of the dunes system. This process will allow adaptive use of at least one large geographical area with monitoring and evaluation of the habitat and the abundance of specific species. The monitoring and evaluation data will be used to make adjustments to the recreational use of the geographical area.

Develop a large continuous geographical area for habitat and species conservation. This area will include all of the habitat types that are present in the

dunes system. It is important that this area is continuous and that the habitat is not fragmented. Although this geographical area will be available for OHV and other recreational uses, the recreational use, habitat condition and species abundance will be monitored and the recreational use of the area will be adjusted as needed to conserve the habitat and species.

**\*39** ROD AR Sec. 2 at 9141.

The Court concludes that allowing "maximum recreational use of the ISDRA while maintaining the unique and diverse habitat of the dunes system" is a reasonable purpose. Plaintiffs contend that none of the statutes related to the Dunes authorize the BLM to "maximize" recreational use of the ISDRA; however, the EIS states that such recreational use is to be maximized *while* maintaining the unique and diverse habitat of the dunes. Given the stated limitation of protecting the habitat of the dunes, this purpose is not unreasonable. *See Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1067 (9th Cir.1998).

Similarly, the Court concludes that developing a large continuous geographical area for habitat and species conservation, while monitoring recreational use, habitat condition and species abundance within that area, is a reasonable purpose. *See id.* If this purpose were read so as to require OHV use on *all* geographical areas designated for habitat and species conservation, the Court would be inclined to conclude that this purpose is unreasonably narrow. However, because both Alternative 2 and Alternative 3 contain areas closed to OHV use, and both of these alternatives were included in the EIS, this purpose presumably does not mean that OHV use is allowed on all areas designated for habitat and species conservation.

Having concluded that the purposes challenged by plaintiffs are reasonable, the Court next evaluates whether the IMA was a reasonable alternative in light of these goals. *See City of Carmel-by-the-Sea,* 123 F.3d at 1155. The Court concludes that the IMA is a reasonable and viable alternative for managing the Dunes for multiple use and species protection as has been shown since the interim closures were put into place in 2000. Defendants again protest that the interim closures were only instituted as a result of litigation. However, while this unusual procedural context may be relevant to determining whether the interim closures should be included in the No Action Alternative, this history does not mean that the IMA

is not a reasonable alternative that the BLM (and the public) should have evaluated for the purpose of making prospective decisions.

This is particularly so in light of the fact that the BLM repeatedly justified the interim closures on the ground that they were both reasonable and necessary. The BLM's own decision record ("DR") for the closures, based on an environmental assessment ("EA"), found that the interim closures were both necessary for resource protection (pending the completion of the BO) and compatible with most normal OHV recreation. *See generally* ROD AR Sec. 3 at 15538-15551(DR) and 15573-15795(EA). The BLM found that the interim closures provided ample OHV recreation opportunities:

[A]pproximately 69,000 acres of the 118,000 acres of the Dunes which have been open to OHV use since 1972 remain available to OHV use as a result of these interim closures, including many of the traditional areas of concentrated use. The interim closures avoid major camping and staging areas within the ISDRA, provide "open" access corridors to popular OHV use areas, and minimize OHV closures in high-use or traditional riding areas.

**\*40** *Id.* at 15541. Indeed, when the interim closures were challenged by OHV groups, BLM defended the reasonableness of the closures, and the court found that they were justified. *See American Sand Ass'n v. U.S. Dep't of the Interior,* 268 F.Supp.2d 1250, 1253-55 (S.D.Cal.2003).

Defendants argue that the BLM did not need to include the IMA within the range of reasonable alternatives because Alternative 3, the Natural and Cultural Resources Protection Alternative, would close to OHV use approximately 41,000 acres within 3 units as compared to the approximately 49,000 acres within 5 units under the IMA. However, the fact that Alternative 3 is a reasonable alternative does not justify eliminating the IMA as a reasonable alternative. NEPA requires agencies to "[r]igorously explore and objectively evaluate *all* reasonable alternatives...." 40 C.F.R. § 1502.14(a) (emphasis added). Moreover, the IMA differs significantly from the other alternatives developed by BLM, including Alternative 3, in that it not only provided for greater closures over a more dispersed area, but it is the only alternative that would maintain any closure south of I-8. *See* ROD AR Sec.2 at 9207.

Defendants' reliance on *Hells Canyon Alliance v. U.S. Forest Service,* 227 F.3d 1170 (9th Cir.2000), is not persuasive. In *Hells Canyon,* the plaintiffs

claimed that the Forest Service violated NEPA by failing to include a reasonable range of alternatives in an EIS regarding a recreation management plan for portions of the Snake River. *Id.* at 1173. The EIS contained seven alternatives regulating, to differing degrees, motorized water craft on the river. *Id.* at 1173-74. Most of the alternatives restricted motorized use levels, two contemplated the elimination of motorized water craft from the "wild" part of the river, and the "preferred alternative" included both motorized use-level restrictions and a non-motorized window in part of the "wild" river for three-day periods every other week for two months for a total of 24 motor-free days. *Id.* The plaintiffs contended that the Forest Service erred by excluding from the range of reasonable alternatives an alternative that set motorized use at levels existing in the 1970s when the Act establishing the Hells Canyon National Recreation Area was passed. *Id.* at 1180.

The Ninth Circuit held that while the plaintiffs' claim presented a close question, it ultimately failed because "inclusion of the low levels for the 1970s would have been unrealistic in light of the statutorily mandated objectives" of striking the appropriate balance between recreational and ecological values. *Id.* at 1180-81. The court stated that the Forest Service's broad range of seven alternatives was sufficient to permit a reasoned choice. *Id.* at 1181. The court also held that one of the alternatives that was included was rejected because its use levels were unacceptably low, and that "[h]aving analyzed and rejected a higher use level (Alternative C), the Forest Service had no obligation to consider an alternative unlikely to be implemented and inconsistent with basic policy objectives for managing the area, which included a level of use acceptable to all river users." *Id.*

**\*41** In contrast to *Hells Canyon,* the IMA was a reasonable alternative because it has been the status quo since November 2000 when the closures were implemented. As discussed *supra* and documented in the record, the BLM repeatedly justified the closures in both regulatory and litigation contexts as being necessary for resource protection (pending the completion of the BO) and compatible with most normal OHV recreation. Unlike *Hells Canyon,* and indeed unlike all of the cases relied on by the parties, this case presents a fairly unusual situation where the alternative that is excluded from the range of reasonable alternatives is not simply a theoretical option, but is actually in operation and has been for years. "The existence of a viable but unexamined alternative renders an environmental impact

statement inadequate." *Citizens for a Better Henderson,* 768 F.2d at 1057.

Finally, the Court concludes that the complete elimination of the interim closures from any alternative considered in the EIS runs contrary to NEPA's requirement that agencies "present complete and accurate information to decision makers and to the public to allow an informed comparison of the alternatives considered in the EIS." *Natural Res. Def. Council v. U.S. Forest Serv.,* 421 F.3d at 813. "Where the information contained in the initial EIS was so incomplete or misleading that the decision maker and the public could not make an informed comparison of the alternatives, revision of the EIS may be necessary to provide a reasonable, good faith, and objective presentation of the subjects required by NEPA." *Animal Def. Council v. Hodel,* 840 F.2d 1432, 1439 (9th Cir.1988), *amended by* 867 F.2d 1244 (9th Cir.1989) (internal citation and quotations omitted). As noted *supra,* by not including interim closures in the No Action Alternative, BLM was able to conclude (and represent to the public) that Alternative 2, its preferred alternative, provided greater protection for special status species and their habitat. Such a statement belies the fact that in reality Alternative 2 provides for considerably less protection for special status species in comparison to the actual status quo. Such obfuscation is compounded by the fact that BLM eliminated the IMA from the range of reasonable alternatives, and thus neither BLM nor the public could make an informed, objective comparison of the alternatives.

### C. Effects of Action on Endemic Invertebrates

The EIS contains a chapter titled "Affected Environment." *See* ROD AR Sec.2 at 9211-9360. The stated purpose of the chapter is to define the "baseline affected environment" that is then analyzed in the "Environmental Consequences" chapter of the EIS. *Id.* at 9211. Within the "Affected Environment" chapter, the EIS identifies five endemic invertebrates that are known or likely to occur at the Dunes. *See id.* at 9239. [FN33] The EIS contains descriptive information on three of those invertebrates, and for each the EIS states, "[n]o information about the threats to this species is available." *Id.* at 9270-71. The "Environmental Consequences" chapter of the EIS does not discuss any of the five invertebrates except to state that "As a consequence [of allowing OHV use in the Dunes], some special-status wildlife species like ... endemic dune beetles occurring in these dunes would be killed or injured by OHV

activity." *Id.* at 9383. This sentence is the only statement regarding the environmental consequences of the RAMP on endemic invertebrates contained in the EIS's discussion of biological resources. *See id.* at 9380-90.

> FN33. The EIS lists the Andrews' dune scarab beetle, Brow-tassel weevil, Carlson's dune beetle, Cheeseweed owlfly, and the Hardy's dune beetle within a "List of Wildlife Species that are Known or Have the Potential to Occur in the ISDRA." *Id.* at 9239.

**\*42** Plaintiffs contend that the BLM violated NEPA because (1) the EIS completely ignores the existence of numerous endemic invertebrates found in the Dunes, despite information about these species in earlier land management plans and in the administrative record; (2) the EIS fails to adequately analyze the effect of the RAMP on the five endemic invertebrates that are identified in the EIS; and (3) BLM failed to gather existing information or do independent research regarding the unique endemic invertebrates of the Dunes.

The Court reviews the EIS to determine whether the BLM took a "hard look" at the environmental consequences of its action. *See Marble Mountain Audubon Soc'y v. Rice,* 914 F.2d 179, 182 (9th Cir.1990) (*citing Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)). "The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).

The Court concludes that the BLM failed to take such a "hard look" at the impact of the RAMP on endemic invertebrates for a number of related reasons. As an initial matter, to the extent defendants suggest that they were not required to examine the effects of the RAMP on endemic invertebrates aside from the five listed in the EIS, the Court rejects that contention. NEPA "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council,* 435 U.S. 519, 553, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1973).

The Court concludes that the EIS's treatment of

endemic invertebrates is deficient for a number of related reasons. First, because the "Affected Environment" chapter of the EIS sets the "baseline" for the environmental analysis that is the heart of the EIS, it is important that the baseline be accurate and complete. If numerous species are omitted from the environmental baseline, neither the Court nor the public can be assured that the BLM took a "hard look" at the environmental impacts on those species. *See Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1379-80 (9th Cir.1998).* Here, despite extensive information in the record and available to the BLM regarding scores of invertebrates that are known or believed to be endemic to the Dunes, the EIS only identifies five invertebrates. *See, e.g.,* BO AR Doc. # 46 at 1518-20 (1987 "Algodones Dunes Wildlife Habitat Management Plan" prepared by BLM and State of California, listing over 4 dozen endemic invertebrates); ROD SAR Doc. A (1974 study, "The Natural History of the Algodones Dunes, Imperial Valley, California," describing and listing various endemic invertebrates); *id.* at Doc. B (scientific studies regarding various endemic invertebrates); ROD AR Sec.1 at 5609-5758 and 7827-7870 (reports on beetles of the Dunes prepared for BLM in 1979). Inexplicably, the EIS does not mention the endemic white-faced digger bee (*Hapropoda* ssp.), which the Service has repeatedly noted is a pollinator of the Peirson's milk-vetch, and may be critical to the survival of that species. *See* BO AR Doc. # 697 at 12365 (2005 BO; noting that bee is "apparently the primary pollinator of the plant"); BO AR Doc. # 633 at 11109 (12-Month Finding for Petition to Delist Milk-Vetch; describing study which states that bee is "only effective pollinator" of plant); CH AR Doc. 430 # at 8680 (final critical habitat rule stating that Service modified the primary constituent elements of milk-vetch critical habitat to include plants that support bee).

**\*43** Not only is the record replete with evidence that numerous other endemic invertebrates are found at the Dunes, but defendants acknowledge that the BLM was aware of resource inventories describing such species. Indeed, defendants curiously defend the EIS by arguing that the BLM considered an extensive amount of CDCA and ISDRA resource inventories of invertebrates when it developed the RAMP.[FN34] Even if this true, however, the fact that the BLM considered information describing numerous endemic invertebrates aside from the five species listed in the EIS only underscores plaintiffs' argument that BLM ignored such information when preparing the EIS. Regardless of whether the BLM considered

inventories describing endemic invertebrates in its preparation of the RAMP, NEPA requires that the BLM prepare an EIS that considers every significant aspect of the environmental impact of the RAMP, and that the BLM, through the EIS, "inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec., 462 U.S. at 97.* Here, there is no indication from the EIS itself that the BLM considered the environmental impact of the RAMP on the numerous endemic invertebrates that are known or likely to occur in the Dunes.

> FN34. Defendants cite ROD AR Sec.1 at 4471, 5609, 5986, 6086, 7827, and 7890. These documents discuss and list numerous invertebrates in addition to the five listed in the EIS that are either known or likely to be endemic to the Dunes.

Defendants next argue that BLM sought out the Service's input in developing the list of species to be addressed in its environmental review, *see* ROD AR Sec.2 at 15492-93, and that the interagency species identified and analyzed in the EIS correspond to the special status invertebrate species identified in the California Department of Fish and Game's Natural Diversity Database and known to exist in Imperial County. *See* ROD AR Sec. 1 at 2231; ROD AR Sec.2 at 15490. However, the fact that the BLM consulted with the Service on the EIS does not, in and of itself, satisfy its obligation to consider every significant aspect of the environmental impact of the RAMP. As discussed *supra,* the record contains extensive information about endemic invertebrates that are known or likely to exist at the Dunes, and yet the EIS does not mention the majority of these species.

Defendants rely on *No GWEN Alliance of Lane County, Inc. v. Aldridge, 855 F.2d 1380 (9th Cir.1988),* to argue that the EIS did not need to address endemic invertebrates other than the five species identified. However, *No GWEN Alliance* does not support defendants' position. In that case, the Ninth Circuit rejected the plaintiffs' argument that an EIS was defective because it did not consider the wholly speculative possibility that the construction of radio towers to be used in sending messages to strategic forces would increase the possibility of nuclear war. *Id.* at 1385. The court held that while an EIS need not examine purely speculative impacts, an EIS was required not only "when an agency action *will in fact cause* significant effects on the human environment, but also when the action *may have*

significant effects on the human environment." *Id.* (emphasis in original). Here, it is logical to assume that opening up significant portions of the Dunes to unrestricted OHV use "may have significant effects" on endemic invertebrates at the Dunes. Indeed, the EIS acknowledges as much in its single statement regarding the deleterious impact of OHV use on dune beetles. *See* ROD AR Sec.2 at 9383. There is no reason to assume that OHV use will kill or injure dune beetles, but that other endemic invertebrates will not also be killed or injured.

**\*44** Defendants also argue that the BLM adequately addressed concerns regarding endemic invertebrates through the public comment process. Defendants cite the following excerpt from the EIS:
# 29 Public Concern: The Final EIS should include an analysis of each endemic species to the dunes.
Public Comment: *The plan fails to analyze many dunes-endemic species (# 218)* BLM Response: The BLM, through the FEIS, has proposed monitoring efforts for a variety of plant and animal species that are intended to give managers the necessary information (data) to make decisions on the amount of OHV use that is appropriate based on population sampling of listed and sensitive species. Data on all species endemic to the ISDRA is not available for analysis.

ROD AR Sec.2 at 9536-37 (emphasis in original).
FN35

FN35. The 2005 BO states that in addition to monitoring Peirson's milk-vetch, the monitoring plan "also includes monitoring of dune vegetation, desert tortoise populations, Colorado Desert fringe-toed lizard populations, flat-tailed horned lizard populations, avian populations, and microphyll woodlands." BO AR Doc. # 697 at 12361. Thus, even the monitoring that is proposed will not monitor endemic invertebrates.

This response does not fulfill the BLM's obligations under NEPA to "consider every significant aspect of the environmental impact of a proposed action." *Vermont Yankee Nuclear Power Corp.,* 435 U.S. at 553. As the Ninth Circuit has held, it is not appropriate to defer consideration of impacts until a future date because "NEPA requires consideration of the potential impact of an action *before* the action takes place." *Neighbors of Cuddy Mountain,* 137 F.3d at 1380 (internal quotation omitted) (emphasis

in original). Here, the BLM has deferred any consideration of the environmental impact of the RAMP on endemic invertebrates through a proposed monitoring program. This is completely contrary to the purpose of NEPA, which is to ensure that the agency engages in a thorough analysis of the environmental impact of a proposed action. *See id.*

Relatedly, to the extent that the BLM believed that information necessary to analyze the impacts of the RAMP on endemic invertebrates was incomplete or unavailable, it was required to "make clear that such information is lacking," and, if such information is considered "essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant," the BLM was required to include the information in the EIS. 40 C.F.R. § 1502.22(a). FN36 The EIS does not contain *any* statement that there is incomplete or unavailable information to explain the BLM's failure to even identify numerous other endemic invertebrates in the "List of Wildlife Species that are Known or Have the Potential to Occur in the Area" contained in the EIS. Indeed, given the extensive information contained in the record regarding the existence of numerous endemic invertebrates in the Dunes, including information prepared by the BLM itself, the Court is skeptical that the BLM could truthfully make such a statement. *See, e.g.,* ROD AR Sec. 1 at 4471, 5609, 5986, 6086, 7827, and 7890; BO AR Doc. # 46 at 1518-20; ROD SAR Ex. A and B.

FN36. The relevant CEQ regulation provides:
When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.
(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.
40 C.F.R. § 1502.22.

Even with regard to the five endemic invertebrates that are identified in the EIS, the EIS only contains descriptive information regarding three of these species, and does not discuss the environmental

impacts to any of these species except for a single sentence acknowledging that OHV use will kill and injure dune beetles. Similarly, although the EIS does contain some descriptive information for the three beetles identified in the EIS, the EIS states for each beetle that "no information about threats to this species is available." ROD AR Sec.2 at 9270-71. However, at least with regard to the Andrews' dune scarab beetle, this statement lacks credibility in light of the fact that the Service proposed this species for listing as threatened under the ESA in 1978. *See* 10 North American Beetles: Proposed Endangered Species or Threatened Species Status and Identification of Critical Habitat, 43 Fed.Reg. 35636-43 (Aug. 10, 1978). [FN37] In the proposed rule, the Service stated, "the continued disruption of dune troughs by off-road vehicles prevents the accumulation of dead organic matter upon which the immature stages of this beetle feed." *Id.* at 35637.

FN37. At the time the Andrews' dune scarab beetle was proposed for listing, the ESA required listing proposals to be finalized within two years or withdraw. In October 1980, the Service issued a notice to withdraw the proposal because final rulemaking had not been completed for eight of the ten beetles within the two year deadline. *See* Withdrawal of an Expired Proposal of Eight North American Beetles; Endangered and Threatened Wildlife and Plants, 45 Fed.Reg. 65137 (Oct. 1, 1980) (codified at 50 C.F.R. pt. 17). In December 2002, plaintiff Center for Biological Diversity petitioned the Service to list the Andrews' dune scarab beetle under the ESA. *See* ROD SAR Ex. B.

**\*45** Further, even if the BLM could accurately state that the information necessary to analyze the impact of the RAMP on endemic invertebrates was incomplete or unavailable, such information is "essential to a reasoned choice among alternatives," and thus according to its own regulations the BLM would need to demonstrate that the overall costs of obtaining such information are "exorbitant" in order to be excused from providing such information. 40 C.F.R. § 1502.22. Here, the BLM has not asserted that the costs of obtaining such information are high or made any showing in that regard. In sum, there is simply nothing in the EIS to demonstrate that the BLM even considered the existence of numerous species of endemic invertebrates, much less took a "hard look" at the environmental impact of the

RAMP on any of the species of endemic invertebrates.

Finally, defendants' reliance on *Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004), is inapposite. In *Norton,* the Supreme Court held that a BLM land use plan that stated that BLM "will" take certain actions did not create a binding commitment on the BLM that could be compelled under the Federal Land Policy Management Act ("FLPMA"). *See id.* at 69-70. However, at issue here is whether the BLM provided adequate review under NEPA. The Court's conclusion that the BLM failed to adequately identify or analyze the impacts of the RAMP on endemic invertebrates under NEPA does not involve any analysis whatsoever regarding the BLM's obligations under FLPMA.

### 5. Plaintiffs' Challenges Under the Federal Land Policy and Management Act

The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701-1785, declares that public lands must be managed for multiple uses in a manner that will protect the quality of the scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values. *See* 43 U.S.C. § 1701(a)(7) & (8). FLPMA contains several provisions related to BLM's planning and management of public lands such as the Dunes. FLPMA requires that the BLM prepare and maintain a current inventory of all public lands and their resources. *See* 43 U.S.C. § 1711(a). FlPMA also provides that the systematic inventory of public lands and their resources forms the basis of the land use planning process. *See* 43 U.S.C. § 1701(a)(2). FLPMA also requires that the BLM "shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). BLM has implemented this requirement in its regulations. Under 43 C.F.R. § 8341.2(a), BLM must close areas to OHVs where OHVs are causing or will cause negative impacts to threatened and endangered species or wildlife. An area already closed to OHVs pursuant to § 8341.2(a) can only be reopened to such vehicles if BLM "determines that the adverse effects have been eliminated and measures implemented to prevent recurrence." *Id.*

**\*46** Plaintiffs raise several challenges to BLM's Record of Decision ("ROD"), which gave final approval to the RAMP. [FN38] First, plaintiffs contend

that because the BLM failed to collect and maintain current inventory data on the resources of the ISDRA, the BLM's approval of the RAMP without the current inventory data was arbitrary and capricious. Second, plaintiffs contend that the BLM illegally reopened the temporarily closed areas of the ISDRA to OHV use without a finding in the ROD that the adverse effects caused by OHVs had been eliminated.

FN38. The ROD is found at ROD AR Sec.2 at 8098-8113.

A. Approving the RAMP Without Current Inventory

FLPMA states that "[t]he Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values," and this "[t]his inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values." 43 U.S.C. § 1711(a). The Act also states that "[t]he preparation and maintenance of such inventory or the identification of such areas shall not, of itself, change or prevent change of the management or use of public lands." Id. In developing or revising land use plans, the Act instructs the Secretary to "rely, to the extent it is available, on the inventory of the public lands, their resources, and other values." Id. at § 1712(c)(4).

Plaintiffs contend that the BLM relied on incomplete and insufficient inventory data regarding the resources of the Dunes, and therefore that the BLM's approval of the RAMP was arbitrary and capricious.[FN39] Both in their papers and at oral argument, the parties agreed that the Court's resolution of this issue is largely dependent on how the Court resolves plaintiffs' challenges under NEPA to the EIS because the invertebrates analyzed in the EIS are the invertebrates identified in the process of developing and approving the RAMP. See Defs' Motion for Summary Judgment at 48.

FN39. Although plaintiffs' motion for summary judgment suggested that they were challenging the BLM's alleged failure to maintain current inventories, plaintiffs have clarified that they do not independently challenge the BLM's failure to carry out the surveys, study plots and monitoring prescribed in previous management plans, but that these failures provide important context for evaluating the outdated nature of

the current inventories, as well as the BLM's awareness that these inventories are outdated.

Defendants are correct that FLPMA does not require that the BLM have current inventory data on every species potentially in the ISDRA prior to approving the RAMP. Defendants are also correct that directives in management plans, such as directives to monitor and study species, are not legally enforceable. See Southern Utah Wilderness Alliance, 542 U.S. at 69-70. However, the problem here is not that the BLM did not update the inventory data so that it was exhaustive and current; to the contrary, the problem lies with the fact that, despite extensive evidence in the record indicating the existence of numerous other species found at the ISDRA, discussed supra, the BLM nevertheless approved the RAMP which does not take these species into consideration. Defendants do not dispute that the BLM failed to maintain a current inventory of the Dunes, and indeed the administrative record demonstrates that the BLM failed to do so. See, e.g., BO AR Doc. # 96 at 3927. The Court concludes it was arbitrary and capricious to approve the RAMP with such obviously outdated and inadequate inventories.

B. Reopening the Temporarily Closed Areas to OHV Use

*47 43 C.F.R. § 8341.2(a) provides, in relevant part, [W]here the authorized officer determines that off-road vehicles are causing or will cause considerable adverse effects upon soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources, the authorized officer shall immediately close the areas affected to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence.... [T]hese lands shall not be opened to the type(s) of off-road vehicle to which it was closed unless the authorized officer determines that the adverse effects have been eliminated and measures implemented to prevent recurrence.

Plaintiffs contend that the BLM violated this regulation because the ROD does not contain a determination that the adverse effects from OHV use in the Dunes will be eliminated under the RAMP or that measures have been implemented to prevent

Slip Copy                                                                                     Page 38
Slip Copy, 2006 WL 662735 (N.D.Cal.)
**(Cite as: Slip Copy)**

recurrence of such adverse effects. If anything, plaintiffs argue, the ROD makes the opposite finding because the ROD incorporated the 2005 BO, which in turn notes that under the proposed RAMP, continued and expanded species degradation is likely. *See* BO AR Doc. # 697 at 12396.

Defendants argue that plaintiffs improperly equate the Service's statement in the BO that continued habitat degradation is likely with the FLPMA proscription against undue degradation of public lands because the standards have not been equated and, when taken in context, are quite different. Defendants also argue that the adverse effect that led to the closures-the lack of consultation with FWS on the Dunes plan-was eliminated prior to the signing of the ROD with the receipt of a BO from the Service, and therefore reopening of the temporarily-closed areas was consistent with 43 C.F.R. § 8341.2(a).

The Court need not address defendants' specific arguments in light of its conclusion that the BO's "no jeopardy" finding is flawed. Because the "no jeopardy" finding is unsupported, any determination under 43 C.F.R. § 8341.2(a) that the "adverse effects have been eliminated and measures implemented to prevent recurrence" based upon the 2005 BO must be set aside.

### 6. Form of relief

Within 14 days of the filing date of this order, the parties shall file simultaneous briefs regarding the form of relief, and within 21 days of the filing date of this order, the parties shall file response briefs. The Court shall inform the parties whether oral argument is necessary.

### CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS in part and DENIES in part plaintiffs' motion for summary judgment (Docket No. 157) and GRANTS in part and DENIES in part defendants' motion for summary judgment (Docket No. 160).

IT IS SO ORDERED.

N.D.Cal.,2006.
Center for Biological Diversity v. Bureau of Land Management
Slip Copy, 2006 WL 662735 (N.D.Cal.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.