UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 05-1392 (ESH) |
| v. | ) ) ) | |
| CARLOS GUTIERREZ, *et al.*, | ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' PROPOSED SUR-REPLY TO DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

**Introduction**

Defendants contend for the first time in their Reply in Support of Cross-Motion for Summary Judgment (hereinafter "Reply Brief") that Plaintiffs' claims under the Endangered Species Act ("ESA") are now moot and must be dismissed based on a newly-filed, 95 page Biological Opinion issued by Defendant National Marine Fisheries Service ("NOAA Fisheries") on March 3, 2006 (hereinafter "2006 BiOp"), and attached as Exhibit 6 to their Reply Brief. Defendants attempt to supplant their 2005 BiOp, and presumably the Administrative Record in this case, with the 2006 BiOp and its own Administrative Record (although Defendants have not provided that record to Plaintiffs or the Court). Yet Defendants have made no attempt to explain either how the 2006 BiOp remedies their ESA violations in issuing the 2005 permits, or how they propose to evaluate the 2005 permits in light of the "new information" analyzed in the 2006 BiOp.

A party generally is given leave to file a sur-reply if new issues are raised in a reply that the party has not had the opportunity to address. *See, e.g., Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001) (holding that "[t]he standard for granting a leave to file a sur-reply is whether the party making the motion would be unable to contest matters presented to the court for the first time in the opposing party's reply."). That is certainly the case here.

Defendants contend that the 2006 BiOp has merit, is valid and remedies the ESA violations raised by Plaintiffs with respect to the 2005 BiOp. Yet Defendants argue in their Response to Plaintiffs' Motion for Leave to File a Sur-Reply that Plaintiffs may not address the merits of the 2006 BiOp, thereby suggesting that the mere existence of the 2006 BiOp, without more, requires the Court to prudentially moot Plaintiffs' ESA claims without regard to the merits of the 2006 BiOp. This contention defies logic. On one hand, Defendants rely on the *merits* of the 2006 BiOp to assert that they have retroactively satisfied their obligations under the ESA; on the other hand, Defendants argue that Plaintiffs are not entitled to contest the merits of the very same BiOp. Plainly, Defendants' misguided reliance entitles Plaintiffs to review, consider and respond to the 2006 BiOp in a sur-reply. *See Lewis*, 154 F. Supp. 2d at 61.

## Argument

**I.    The 2006 BiOp Confirms Defendants Violated The National Environmental Policy Act By Failing To Prepare An Environmental Impact Statement**

As discussed further below**,** the 2006 BiOp contains the startling admission that the research permits at issue in this case will collectively authorize the take of ***519,240 Steller sea lions***, of which ***310,923 takes*** will occur to the endangered western population and ***208,317 takes*** will occur to the threatened eastern population. Ex. 6 at 5. Thus, the permits "authorize the disturbance of ***virtually every member*** of the eastern and western population of Steller sea lions ***numerous*** times." *Id.* at 37 (emphasis added). The 2006 BiOp estimates that ***every member*** of

the endangered western population will suffer five (5) exposure events every year for the life of the permits, and *every member* of the threatened eastern population will suffer three (3) exposure events every year for the life of the permits. *Id.*

If these breathtaking numbers (i.e., a half-million takes of a listed species) do not constitute a "significant effect" under the National Environmental Policy Act ("NEPA"), it is unclear what conduct would meet that threshold, which is determined based on the short- and long-term effects of the proposed federal action on a given resource and the severity of those effects. *See* 40 C.F.R. § 1508.27 (regulatory definition of "significant" under NEPA). By any rational measure, the repeated taking of hundreds of thousands of protected Steller sea lions results in a "significant effect" requiring analysis in an environmental impact statement ("EIS") under NEPA. Indeed, there are many cases where courts have required an EIS for agency actions impacting animals on a far less dramatic level than the half-million takes presented here. *See, e.g., Anderson v. Evans*, 314 F.3d 1006, 1019 (9th Cir. 2002) (setting aside decision to forego preparation of an EIS for the taking of five gray whales); *Greenpeace v. Evans*, 688 F. Supp. 579 (W.D. Wash. 1987) (rejecting National Marine Fisheries Service's finding that decision to issue permit to take a few dozen killer whales was not "significant" within the meaning of the CEQ Regulations); *Fund for Animals v. Norton*, 281 F. Supp. 2d 209 (D.D.C. 2003) (rejecting Department of Interior's finding that decision to issue permit to take 525 mute swans was not "significant" within the meaning of the CEQ Regulations).

In short, the Government's new BiOp has forthrightly provided the Court with conclusive evidence that its action in issuing the research permits results in a significant effect on Steller sea lions, and that an EIS therefore was required to evaluate these impacts. Having asked the Court to consider this new, extra-record document as evidence of its compliance with the ESA, the

Government cannot claim that this document should not be considered as evidence of its non-compliance with NEPA. Accordingly, because Defendants violated NEPA by failing to prepare an EIS before issuing the research permits, the permits must be suspended until such an EIS is prepared to ensure the "reasoned decisionmaking" required by NEPA. *See Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983) ("If *any* 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared *before* the action is taken."); *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*. 109 F. Supp. 2d 30, 43-44 (D.D.C. 2000) (vacating the agency's actions in "granting permits . . . as arbitrary, capricious and not in accordance with the law" upon the court's finding that an EIS was required); *see also Metcalf v. Daley*, 214 F. 3d 1135, 1142 (9th Cir. 2000) ("The comprehensive 'hard look' mandated by Congress and required by [NEPA] must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made.").

## II.     The 2006 BiOp Does Not Moot Plaintiffs' ESA Claims

Defendants' 2006 BiOp does not moot Plaintiffs' ESA claims because it does not cure the deficiencies in the 2005 BiOp. To the contrary, it reaches a "no jeopardy" conclusion that is not supported – and, in fact, contradicted – by the information contained in the 2006 BiOp. The 2006 BiOp also cannot "cure" Defendants' failure to comply with their ESA Section 7 obligations *before* they made their decisions in May 2005 to issue the permits – a violation that lies at the very heart of this case. *See* Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment (hereinafter "Plaintiffs' Summary Judgment Memorandum") at 28-36. Section 7 requires NOAA Fisheries to determine whether its proposed action – issuance of scientific research permits – will jeopardize the survival and recovery of

4

Steller sea lions *before* it takes that action.  *See Natural Res. Def. Council v. Houston*, 146 F. 3d 1118, 1129 (9th Cir. 1998) (failure to comply with ESA Section 7 cannot be corrected by *post hoc* assessments); *Oceana v. Evans*, 384 F. Supp. 2d 203, 224-25 (D.D.C. 2005) (an agency's basis for its decision must come from the record and not "post-hoc rationalizations").  NOAA Fisheries failed to do this in the 2005 BiOp, which is fatal to the permitting decisions.  It again failed to make the proper determination in the 2006 BiOp, even setting aside the fact that the 2006 BiOp cannot serve as legal justification for the prior actions in 2005. Indeed, the agency did not even attempt to suspend the operation of the challenged permits while it reissued its *post hoc* BiOp.

      Moreover, the 2006 BiOp itself is plainly deficient, as it fails to support a "no jeopardy" finding for a number of reasons.  For example, the 2006 BiOp relies on purported "new data" that was in fact readily available to NOAA Fisheries *prior to* May 2005, when the "old" 2005 BiOp was issued.  By allowing NOAA Fisheries to simply write an "after the fact" BiOp, based on a "new" Administrative Record, to purportedly "cure" its failure to comply with ESA Section 7 prior to the time it issued the permits, the Court would be endorsing a pattern and practice by this agency that violates the ESA and shifts the burden of ensuring ESA compliance to plaintiffs like The Humane Society of the United States.  Such a precedent would be tantamount to allowing the Government to violate the law at its convenience and then "back fill" the record with papers that purport to justify its earlier action.

      The 2006 BiOp's "no jeopardy" conclusion is also without foundation. The 2006 BiOp admits that the proposed permits collectively authorize the take of ***519,240 Steller sea lions***, of which ***310,923 takes*** will occur to the endangered western population and ***208,317 takes*** will occur to the threatened eastern population.  Ex. 6 at 5.  "NOAA Fisheries is proposing to

5

authorize the disturbance of ***virtually every member*** of the eastern and western population of Steller sea lions ***numerous*** times." *Id.* at 37 (emphasis added).  The endangered western population current minimum population estimate is 38,513 animals.  *Id.* at 19.  The threatened eastern population current minimum population is 43,728 animals.  *Id.* at 22.  The 2006 BiOp estimates ***every member*** of the endangered western population will suffer five (5) exposure events every year for the life of the permits, and ***every member*** of the threatened eastern population will suffer three (3) exposure events every year for the life of the permits.  *Id.* at 37.

Moreover, it is uncertain whether these repeated exposures will be spread evenly over the entire populations, or will be disproportionately concentrated on specific rookeries or age groups of Steller sea lions.  Indeed, the 2006 BiOp describes a multitude of adverse effects on Steller sea lions.  Thus, the 2006 BiOp concludes that "somewhere between 2,000 and 10,000 animals in the western population, and 7,000 animals from the eastern population, will respond each year to disturbance from aerial and vessel surveys by evacuating a site."  Ex. 6 at 38.  The 2006 BiOp describes the effects of such disturbance as follows:  "In the wild, when sea lions are frightened off rookeries during the breeding and pupping season, animals may be injured as they run over each other or slide or crash into cliff facings or underwater rocks in their haste to escape, and pups may be trampled or abandoned."  *Id.* at 36.  "The flight response in pinnipeds has been described as 'unrelenting and reckless' such that animals that are chased before capture (or which flee in response to the presence of researchers or low-flying aircraft) are placed in significant jeopardy, not only from the excessive metabolic heat generated from the flight itself, but also from a variety of potentially dangerous situations encountered in their escape attempts."  *Id.* at 36.

The new BiOp also concedes that the permits authorize the ground disturbance (for scat collection and ground counts) of *75,000 animals* from the endangered western population and *50,000 animals* from the threatened eastern population. Ex. 6 at 40. Effects from such activities include stampedes, evacuation and abandonment of the site, trampling of pups causing injury and death, abandonment of pups by their mothers causing death by starvation, and aggressive interactions resulting from re-establishment of territories. *Id.* at 39-40. The 2006 BiOp concludes that it lacks sufficient information to suggest how many animals would experience lethal and serious sublethal responses to these types of activities. *Id.* at 40.

The new BiOp further states that "[t]here has been insufficient resight effort of the more than 15,000 sea lions branded by ADF&G and NMML since 1975 to validate the merits of hot-branding versus the potential for adverse impacts to individual sea lions. Short-term observations of rookeries after branding, indicates that some delayed mortality is likely." Ex. 6 at 47. The 2006 BiOp describes the deaths of 42 pups after hot branding in 1993; 7 dead pups after hot branding in 2001; and 7 dead pups after hot branding in 2003. *Id.* at 48-49. However, the 2006 BiOp ignores this more recent information in its Cumulative Effects analysis when it concludes in the "Integration and Synthesis of Effects" section, based only on reports from 1995-1998, that "[t]he annual reports from more than a decade of study suggest that the adverse effects of research activities have not affected either Steller sea lion population or any particular rookeries or haulouts." *Id.* at 58.

Furthermore, on the previous page the 2006 BiOp states that disturbance from human activities results in a range of responses, from agitation to evacuation of suitable habitat, during which "individuals, particularly pups, may be injured or killed." Ex. 6 at 57. The 2006 BiOp goes on to admit that "the extent to which these types of incidences influence mortality rates in a

7

population or a breed aggregation is not clear" and concludes that "[i]n the face of this uncertainty, we cannot assume that mortality from these events or events like random shootings of sea lions is inconsequential.  Evidence suggests it has occurred in the past, and will continue into the future." *Id.*  The complete disregard of the information that is available calls into question the entire Cumulative Effects analysis and its conclusion that "population-level adverse effects" are not likely as a result of the permitted research activities.  *Id.* at 60.

The 2006 BiOp also concludes that the permit activities are expected to result in the accidental death of approximately 42 threatened and 24 endangered Steller sea lions (of which at least 16 would be juveniles) *each year over the next five years*, Ex. 6 at 60, and that "some other unknown portion of animals will die from disturbance through trampling or latent effects of stress, and their deaths will remain undetected." *Id.*   The 2006 BiOp then concludes:  "[T]here has been too little follow-up or long term monitoring to establish any long term effects of this research program." *Id.*  Based on the foregoing, one would reasonably conclude that adverse impacts are indeed likely, and need to be evaluated more fully before the proposed final action is taken.  But instead, ignoring its own data, the Government serves up the following *non sequiturs*: "Based on the limited information available on the short- and long-term effects of these research activities on Steller sea lions, we must conclude that population-level adverse effects are not likely," and "[g]iven the uncertainty around the latent impacts of research, we cannot assume that there is significant mortality from these impacts." *Id.*

Likewise, the 2006 BiOp states that if the total number of research-related mortalities of endangered Steller sea lions reaches 20 animals under any combination of permits in a year, research under all permits would be halted pending review and modification of permits if necessary, but does not include any nondiscretionary requirement to ensure that this suspension

8

requirement is enforceable. Ex. 6 at 14.[1]  There is no permit suspension requirement based on the number of research-related mortalities for the threatened eastern population of Steller sea lions.

The new BiOp also fails to include any enforceable terms and conditions that would mitigate the population declines that would result from the permit activities. Ex. 6 at 62-63. Instead, there are monitoring and observation requirements; requirements for annual reports to be submitted by December 31 of every year; requirements for human euthanasia of pups that lose their mothers due to research activities; and requirements for researchers to coordinate their efforts (but not to reduce them or otherwise avoid duplication).  *Id.*  Plainly none of these mitigation terms and conditions addresses or mitigates population declines resulting from the permit activities.[2]

As explained in Plaintiffs' Summary Judgment Memorandum, the Court must ensure that NOAA Fisheries' decisions "are based on a consideration of relevant factors and . . . assess whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L. Ed. 2d 136 (1971); *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.,* 378 F.3d 1059, 1065 (9th Cir. 2004); *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 130 (D.D.C. 2001).  Allowing significant declines in the population without instituting *any* mitigation measures to address those declines is a violation of the ESA Section 7

---

[1]  The 2006 BiOp also states that activities under all the permits would be suspended pending review if the total number of research-related mortalities of endangered Steller sea lions reaches 10 animals under any combination of permits, but again does not include any nondiscretionary requirement to ensure that this suspension requirement is enforceable. Ex. 6 at 14.  The BiOp does not explain why there are two separate suspension requirements, triggered by two separate mortality thresholds, for the western population of Steller sea lions, and no such requirements for the eastern population.  *Id.*

[2]  This laundry list of deficiencies may be just the very tip of the iceberg, since the Administrative Record supporting this new BiOp has not been disclosed by the agency.

requirement that NOAA Fisheries "insure" that the research permit activities are "not likely to jeopardize the continued existence" of a listed species. 16 U.S.C. § 1536(a)(2); *see also Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, Case No. C 03-02509 SI, 2006 WL 662735, *15 (N.D. Cal. Mar. 13, 2006) (overturning jeopardy determination where significant population declines were authorized but mitigation measures would not be implemented until after declines already had occurred), a copy of which is attached as Exhibit 1.

Thus, even if the Court were inclined to entertain Defendants' last minute "swap" of the agency decision under review, the new BiOp should be set aside for all of the reasons set forth above. Where, as here, NOAA Fisheries admits there will be a significant, deleterious impact on Steller sea lions resulting from research permit activities, and that there is insufficient information to determine the effects of those research activities on Steller sea lion populations, the 2006 BiOp must "give the benefit of the doubt to the species." *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988). Instead, NOAA Fisheries has turned this ESA requirement on its head by assuming no adverse effects or significant mortality based on the information before it: "Based on the limited information available on the short- and long-term effects of these research activities on Steller sea lions, we must conclude that population-level adverse effects are not likely;" "Given the uncertainty around the latent impacts of research, we cannot assume that there is significant mortality from these impacts." Ex. 6 at 60. The 2006 BiOp's "no jeopardy" determination is simply unsupportable, and Defendants should not be allowed to use it in an eleventh hour, transparent attempt to avoid this Court's adjudication of Plaintiffs' ESA claims in this case.

Finally, the 2006 BiOp cannot cure the unauthorized take that has occurred under the research permits due to the insufficiency of the 2005 BiOp. Unlike the facts in *Defenders v.*

*Babbitt*, in this case research activities resulting in take of Steller sea lions have been ongoing since May 2005. Because the 2005 BiOp was insufficient, those takes were unauthorized, in violation of ESA Section 9, and the 2006 BiOp does not cure those violations. Accordingly, Plaintiffs' ESA claims are not moot for this reason as well, and the challenged permits should be held unlawful and set aside based on Defendants' violations of the ESA.

## Conclusion

For the foregoing reasons, as well as those set forth in Plaintiffs' Summary Judgment Memorandum, judgment should be entered against Defendants, and the challenged permits should be declared unlawful and set aside until such time as Defendants have fully complied with federal laws designed to ensure that environmental risks are disclosed and fully analyzed *before* federal agencies take action that may harm critically endangered and threatened wildlife.

DATED:    March 22, 2006                    Respectfully Submitted,

  /s/ James Barrett
LATHAM & WATKINS LLP
JAMES R. BARRETT (DC Bar No. 41674)
DAVID J. HAYES (DC Bar No. 252130)
SARA K. ORR (DC Bar No. 493765)
555 Eleventh Street, N.W.
Suite 1000
Washington, D.C. 20004-1304
(202) 637-2200

KIMBERLY M. MCCORMICK
8363 Sumanee Place N.E.
Bainbridge Island, WA 98110

Counsel for Plaintiffs The Humane Society of the United States, Will Anderson and Sharon Young

11